**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**DICK ANTHONY HELLER,** *et al.*,

    **Plaintiffs,**

       **v.**

**DISTRICT OF COLUMBIA,** *et al.*,

    **Defendants.**

**Civil Action No. 08-1289 (JEB)**

---

## ORDER

For the reasons set forth in the accompanying Memorandum Opinion, the Court

ORDERS that:

1. Defendants' Motion for Summary Judgment is GRANTED;

2. Plaintiffs' Cross-Motion for Summary Judgment is DENIED;

3. Plaintiffs' challenges to the District of Columbia's firearm laws are DISMISSED

   WITH PREJUDICE, except for their challenge to the vision requirement for gun

   registration, which, having been decided on jurisdictional grounds, is DISMISSED

   WITHOUT PREJUDICE; and

4. Judgment is ENTERED in favor of Defendants.

IT IS SO ORDERED.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  May 15, 2014

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

DICK ANTHONY HELLER, *et al.*,

    Plaintiffs,

        v.

DISTRICT OF COLUMBIA, *et al.*,

    Defendants.

---

Civil Action No. 08-1289 (JEB)

<u>**MEMORANDUM OPINION**</u>

The District of Columbia knows gun violence. Notorious for a time as the "murder capital" of the United States, it recorded over 400 homicides annually in the early 1990s – more than one for every 1500 residents. While safety in the District has improved markedly in this millennium, residents will not soon forget the violence of the more recent past: the wounding of seven children outside the National Zoo on Easter Monday in 2000, the triple murder at Colonel Brooks' Tavern in 2003, the five killed in the South Capitol Street shootings in 2010, and the twelve shot to death inside the Washington Navy Yard only a few months ago. These number just a few of the lives lost to guns in our city's recent memory.

In an effort to stem this violence and promote public safety, the District of Columbia has, over the last several decades, passed some of the most restrictive gun laws in the nation. In fact, it was the District's handgun ban that the Supreme Court struck down in <u>District of Columbia v. Heller</u> (<u>Heller I</u>), 554 U.S. 570 (2008), where the Court concluded that the Second Amendment protected handgun possession for self-defense in the home. Seeking to accommodate that constitutional right while also protecting the community from gun violence, the District responded by enacting a law that banned assault weapons and large-capacity magazines but

1

merely imposed registration requirements for handguns and long guns.  Plaintiffs believe that

such a law still infringes their Second Amendment rights and have brought this action to

challenge it.

A prior district court initially upheld the constitutionality of the law, but on appeal, the

D.C. Circuit offered a mixed response.  Although it affirmed the bans on assault weapons and

large-capacity magazines, as well as the handgun-registration requirement, it remanded the case

to this Court to permit the parties to develop a more thorough factual record in relation to the

lion's share of the regulations.  Having done so, both sides now cross-move for summary

judgment, asking the Court to consider their constitutional arguments in light of the new

evidence adduced.

The Second Amendment requires the District to justify its firearm-registration

requirements by presenting substantial evidence that they will achieve important governmental

interests and that they are narrowly tailored to such ends.  The Court ultimately concludes that

the government has met that burden and that the regulations pass constitutional scrutiny.

The people of this city, acting through their elected representatives, have sought to

combat gun violence and promote public safety.  The Court finds that they have done so in a

constitutionally permissible manner.

I.      **Background**

In 2008, the Supreme Court struck down the District of Columbia's handgun law as

violating the Second Amendment right to keep and bear arms.  That landmark decision, Heller I,

announced that the Second Amendment protects "the right of law-abiding, responsible citizens to

use arms in defense of hearth and home."  Id. at 635.  The Court thus voided the District's total

ban on handgun possession as well as its requirement that D.C. residents store their lawfully

owned firearms disassembled or bound by a trigger lock.  See id. at 574-75.  Because a handgun is "the quintessential self-defense weapon" and because storing firearms disassembled or locked "makes it impossible for citizens to use them for the core lawful purpose of self-defense," the Court found that these two regulations contravened the Second Amendment.  Id. at 629-30, 635.

A few months after Heller I, the D.C. Council enacted the Firearms Registration Amendment Act of 2008, which amended what remained of the District's gun laws in order to create a new and constitutionally compliant scheme for regulating firearms.  See D.C. Law 17-372; 56 D.C. Reg. 3438 (May 1, 2009).  The Council adjusted this scheme again in 2012.  See D.C. Law 19-170; 59 D.C. Reg. 5691 (May 15, 2012).  When the Council considered both the 2008 FRA and the 2012 amendments, it held several days of public hearings during which it received oral and written testimony supporting and opposing the legislation.  See Def. Mot., Exh. A (Appendix) at 33-49 (Council of the District of Columbia Committee on Public Safety and the Judiciary, Report on Bill 17-1843, "Firearms Registration Amendment Act of 2008") ("2008 Report"); id. at 120-48 (Council of the District of Columbia Committee on the Judiciary, Report on Bill 19-614, "Firearms Amendment Act of 2012") ("2012 Report").

The FRA establishes a city-wide gun registry, which requires that all gun owners in the District individually register each of their firearms with the city government.  See D.C. Code § 7-2502.01.  It then ties a host of obligations, limitations, and prohibitions to that basic registration mandate.  See § 7-2502.02-.11.

More specifically, the regulatory regime adopted by the Council works as follows: To possess a firearm within the District, the owner must register that weapon with the city.  See § 7-2502.01(a).  This basic registration requirement applies equally to handguns and to long guns. See § 7-2501.01(9) (defining "firearm" without distinguishing between handguns and long

guns).  The firearm-registration system is run by the District's Metropolitan Police Department,

which processes registrants' applications and maintains a database of firearm registrations.  <u>See</u>

Def. Mot., Exh. B (Declaration of Lieutenant Jon Shelton), ¶¶ 3, 9, 13.  The District bars the

registration – and thus the possession – of certain kinds of firearms, including sawed-off

shotguns, machine guns, and assault weapons.  <u>See</u> § 7-2502.02(a).  The District also bars blind

people from registering – and thus possessing – any firearm at all.  <u>See</u> § 7-2502.03(a)(11).

Finally, the District does not allow gun owners to register more than one pistol per month,

although a new D.C. resident may grandfather in multiple pistols that he owned prior to moving

here.  <u>See</u> § 7-2502.03(e).  Given that this provision refers only to "pistols," the limitation

presumably does not apply to other types of firearms, such as rifles or shotguns.

　　　　To register a firearm, the owner must appear in person at MPD headquarters with the

weapon he seeks to register.  <u>See</u> § 7-2502.04(c).  He must be photographed and fingerprinted,

<u>see</u> § 7-2502.04(a) & (b), complete a background check, <u>see</u> § 7-2502.03(a), and provide, among

other things, his current place of employment and his residences going back five years.  <u>See</u> § 7-

2502.03(b).  The background check queries a number of sources, including the Federal Bureau of

Investigation, the Washington Area Law Enforcement System, the National Criminal

Information Center, and the D.C. Superior Court.  <u>See</u> Shelton Decl., ¶¶ 11-12.  According to

MPD policy, "personally identifiable information provided by applicants on firearms-registration

forms is exempt from disclosure to the public . . . as a clearly unwarranted invasion of personal

privacy."  <u>Id.</u>, ¶ 13.  The prospective registrant must also take and pass a test demonstrating

knowledge of the District's firearms regulations as well as complete a firearms-training and

safety course provided free of charge by the District.  <u>See</u> D.C. Code § 7-2502.03(a)(10) &

(13)(A).  After the registrant has passed the test and completed the course, he need not do so

again in order to register additional weapons.  See id.  Lastly, the registrant must pay a fee to

reimburse the District for its registration expenses.  See § 7-2502.05(b).

The owner of a registered firearm must keep the registration certificate with him

whenever he is in possession of the weapon and he must produce it upon the demand of a law

enforcement officer.  See § 7-2502.08(c).  If the firearm is lost, stolen, or destroyed, he must

immediately notify MPD; if he sells or transfers the weapon, he must notify District police

within two days; and if he changes his name or address, he must notify the police within 30 days.

See § 7-2502.08(a).  Registration certificates expire after three years, so gun owners must

continually renew the certificates for the firearms in their possession.  See § 7-2502.07a.

Penalties for violating the District's registration requirements may include fines, revocation of

registration certificates, prohibition from possessing firearms, and prison time.  See §§ 7-

2502.08(e) & 7-2507.06.

Skeptical of the lawfulness of this post-Heller I regulatory regime, Plaintiffs sued the

District.  They claimed, first, that the D.C. Council lacked the regulatory authority to enact this

scheme and, second, that the regulations once again violated the Second Amendment.  See

Second Am. Compl., ¶¶ 68-80.  Judge Ricardo Urbina granted summary judgment for the

District on both points.  See Heller v. District of Columbia, 698 F. Supp. 2d 179, 181 (D.D.C.

2010).

On appeal, the D.C. Circuit rejected Plaintiffs' first argument but did not completely

decide the second, remanding the case to this Court for further consideration.  See Heller v.

District of Columbia (Heller II), 670 F.3d 1244, 1264 (D.C. Cir. 2011).  On the question of the

Council's regulatory authority, the court found that the District of Columbia Home Rule Act,

D.C. Code § 1-201.01 et seq., empowered the Council to enact the challenged gun laws.  See

Heller II, 670 F.3d at 1251.  On the Second Amendment question, the court upheld the District's basic registration requirement as applied to handguns as well as its ban on assault weapons and large-capacity magazines.  See id. at 1253-58, 1260-64.  As to the remaining aspects of the regime, however – the basic registration requirement as applied to long guns and the other requirements as applied to all firearms – the panel majority found the record "inadequate," noting that the District had failed "to present any data or other evidence to substantiate its claim that these requirements can reasonably be expected to promote either of the important governmental interests it has invoked."  Id. at 1258-59.  The D.C. Circuit therefore vacated the judgment below and remanded the case for this Court, Judge Urbina having since retired, "to develop a more thorough factual record" and so that the District could present "some meaningful evidence" to justify these laws.  Id. at 1259-60 (quoting Turner Broadcasting System, Inc. v. F.C.C., 512 U.S. 622, 664-68 (1994)).

Following the Heller II decision, the parties engaged in discovery.  The District provided opinion testimony in support of its gun laws from four expert witnesses: Cathy L. Lanier, Mark D. Jones, Joseph J. Vince, Jr., and Daniel W. Webster.  See Def. Mot., Exhs. G, D, H, and I (Declarations of Cathy L. Lanier, Mark D. Jones, Joseph J. Vince, Jr., and Daniel W. Webster).  Plaintiffs presented one expert witness opposing the law: Gary Kleck.  See Pl. Mot., Exh. 7 (Declaration of Gary Kleck, Ph.D.).  As this Opinion cites extensively to the conclusions of these witnesses, their impressive credentials are worth recounting in some detail.

The District's first expert witness, Chief Lanier, has served since 2007 as the Chief of Police of D.C.'s Metropolitan Police Department.  See Lanier Decl., ¶ 4.  She has worked for MPD since 1990.  See id.  Lanier received her Bachelor's and Master's Degrees from Johns Hopkins University, and a Master's Degree in National Security Studies from the Naval

Postgraduate School in Monterey, California.  See id., ¶ 9.  She is also a graduate of the FBI

National Academy and the federal Drug Enforcement Administration's Drug Unit Commanders

Academy.  See id.  Prior to her service as Chief, Lanier worked as Commander of MPD's

Special Operations Division, as the first Commanding Officer of MPD's Office of Homeland

Security and Counter-Terrorism, and as a uniformed patrol officer, including time as

Commander of D.C.'s Fourth District.  See id., ¶¶ 6-8.  As Chief, Lanier has spearheaded a

number of efforts to prevent gun violence in the District, including the reinstitution of MPD's

Gun Recovery Unit and the creation of a "collaborative information-sharing process among local

criminal justice agencies, including police, prosecutors, Superior Court, . . . the Court Services

and Offender Supervision Agency . . . and the D.C. Pretrial Services Agency."  Id., ¶ 5.  Lanier

testified before the D.C. Council Committees considering the gun laws at issue here in both 2008

and 2012.  See id., ¶ 3.

The District's next witness, Mark Jones, is currently employed as a Senior Law

Enforcement Advisor at the University of Illinois's Crime Lab.  See Jones Decl., ¶ 3.  Before

joining the University, Jones spent twenty years as an ATF agent.  See id.  He received his

Bachelor's in Criminal Justice from the University of Illinois and his Master's in Management at

Johns Hopkins.  See id. at 15.  Jones's most recent assignment was as the Regional Firearms

Advisor to several Central American governments, which he helped develop policies to reduce

gun violence.  See id., ¶¶ 3-4.  Based in El Salvador, Jones "led a team of experts who conducted

detailed assessments of the regulatory and enforcement environments in six of the seven

countries of Central America, . . . [and then] formulate[d] a training plan to help the public

security agencies in each of those countries to better focus and use their resources to deter illegal

small-arms trafficking."  Id., ¶ 4.  Before that, Jones served in a variety of capacities at ATF,

including seven years in the District.  See id., ¶ 3.  Jones has participated in over 100 arrests involving firearms-related crimes and in investigations across the country and around the world.  See id.  Jones was trained as a firearms instructor by the U.S. Diplomatic Security Service and later received additional firearms training at the Federal Law Enforcement Training Center.  See id., ¶ 7.  He has since trained numerous law-enforcement personnel in the safe use, care, and storage of firearms.  See id.

Joseph Vince heads the Criminal Justice Program at Mount St. Mary's University, where he teaches courses on criminal justice and law enforcement.  See Vince Decl., ¶ 4.  He is also the President of Crime Guns Solutions, LLC, a consulting firm that provides training and advice to law enforcement on how to reduce gun-related crime.  See id.  Vince received his Bachelor's in Criminal Justice from Youngstown State University and his Master's in Criminal Justice from the University of Detroit.  See id. at 13.  He spent nearly 30 years as an agent with ATF, where he served as Chief of the Bureau's Firearms Enforcement Division and as Chief of its Crime Gun Analysis Branch.  See id., ¶ 4.  Given his expertise in investigating gun-related crime, Jones was appointed as the U.S. representative to the United Nations Working Group on Small Arms Proliferation and also served as a member of the U.S. negotiating team that, under the direction of the Office of National Drug Policy, attempted to reach an agreement with Mexico to halt the cross-border trade in drugs and guns.  See id., ¶ 5.  Jones is a member of the Firearms Committee of the International Association of Chiefs of Police and the American Bar Association's National Task Force on Stand Your Ground Laws.  See id., ¶ 6.  He has testified as an expert on firearms-related crime in numerous cases and provided a statement to D.C.'s Committee on the Judiciary when it considered amendments to the District's gun laws in 2012.  See id., ¶¶ 3, 6-7.

The District's last witness, Daniel Webster, is the Director of the Johns Hopkins Center for Gun Policy.  See Webster Decl., ¶ 5.  He also serves as Deputy Director for Research at the Johns Hopkins Center for the Prevention of Youth Violence.  See id.  Webster received his Bachelor's Degree from the University of Northern Colorado, his Master's in Public Health from the University of Michigan, and his Doctorate in Health Policy and Management from Johns Hopkins.  See id. at 15.  At the Johns Hopkins School of Public Health, Webster is a tenured Professor of Health Policy and Management; he also has a joint appointment in the School of Education's Division of Public Safety Leadership.  See id., ¶ 7.  He teaches graduate courses on violence prevention as well as research and evaluation methods, and his research over the past 23 years has focused primarily on gun-related injuries and violence.  See id., ¶¶ 6-7.  Webster has published nearly 70 articles in peer-reviewed, scientific journals, the majority of which address gun-related violence and its prevention.  See id., ¶ 8.  He is the lead editor of the book Reducing Gun Violence in America: Informing Policy with Evidence and Analysis, to which he contributed two chapters as a lead author and three chapters as a co-author.  See id.  Webster provided a written statement and oral testimony to the D.C. Committee on the Judiciary when it considered amendments to the District's gun laws in 2012.  See id., ¶ 3.

Finally, Plaintiffs' expert witness, Gary Kleck, is a Professor of Criminology and Criminal Justice at Florida State University.  See Kleck Decl., ¶ 6.  Kleck received his Bachelor's, Master's, and Doctorate in Sociology all at the University of Illinois.  See id. at 56.  He has worked as a consultant to the National Research Council, the National Academy of Sciences Panel on the Understanding and Prevention of Violence, and Canada's Department of Justice.  See id., ¶ 10.  He has also served as a member of the U.S. Sentencing Commission's Drug-Violence Task Force and of the Institute of Medicine and National Research Council

Committee on Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-Related Violence.  See id.  Kleck has authored or co-authored four books on guns and violence, among them Point Blank: Guns and Violence in America, Targeting Guns, The Great American Gun Debate, and Armed.  See id., ¶ 7.  He has also published scholarly research in numerous professional journals, addressing subjects such as the relationship between crime rates and gun ownership, gun-control laws, and gun trafficking.  See id., ¶¶ 8-9.

As both sides have now cross-moved for summary judgment, the Court turns to the substance of their arguments.

## II.     Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the nonmovant[s] is to be believed, and all justifiable inferences are to be drawn in [their]

favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007). The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor. Laningham v. Navy, 813 F.2d 1236, 1242 (D.C.Cir.1987). If the nonmovant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Liberty Lobby, 477 U.S. at 249-50.

There is some dispute between the parties as to what Plaintiffs must show to prevail in their challenge to the District's gun registry, which alleges that the regulations in question are unconstitutional both facially and as applied. To prevail on their as-applied challenge, the parties agree, Plaintiffs must show that the law in question is unconstitutional as applied to them in particular. See Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982). To prevail on their facial challenge, however, the District says Plaintiffs must show the regulations unconstitutional "in all of [their] applications," Def. Mot. at 19 (citing Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 699-70 (1995)), while Plaintiffs deride that rule as "inconsistently-applied." Pl. Mot. at 10 (citing Chicago v Morales, 527 U.S. 41, 44 n.22 (1999)). The Supreme Court's more recent precedent, however, states clearly that "a plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in

all of its applications."  Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449

(2008) (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)).  Because, as explained

below, the Court finds that the challenged regulations are constitutional as applied to Plaintiffs,

their facial challenge must fail as well.

## III.    Analysis

To analyze Plaintiffs' Second Amendment challenge to the District's gun laws, the Court

begins by defining the appropriate constitutional inquiry.  This is no easy task, as the parties

dispute exactly what is required of the District in order for it to demonstrate the lawfulness of its

firearms regulations.  After setting forth the constitutional framework, the Court will then apply

this standard to each challenged provision of the D.C. scheme.

### A.    The Second Amendment Inquiry

#### 1.    *The Constitutional Framework*

In Heller II, the D.C. Circuit followed several of its sister circuits in adopting a two-step

approach to resolving Second Amendment cases.  See Heller II, 670 F.3d at 1252 (citing Ezell v.

City of Chicago, 651 F.3d 684, 701-04 (7th Cir. 2011); United States v. Chester, 628 F.3d 673,

680 (4th Cir. 2010); United States v. Reese, 627 F.3d 792, 800-01 (10th Cir. 2010); and United

States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010)).  It proceeds as follows:

In the first step of the inquiry, the Court asks whether the challenged law "impinges upon

a right protected by the Second Amendment."  Id.  A historically "longstanding" regulation is

"presumed not to burden conduct within the scope of the Second Amendment."  Id. at 1253

(citing Heller I, 554 U.S. at 626-27 & n.26 and McDonald v. City of Chicago, 130 S. Ct. 3020,

3047 (2010)).  That presumption is based on the notion that a gun regulation that has "long been

accepted by the public . . . is not likely to burden a constitutional right" and therefore that a court

may assume that "the activities [it] cover[s] . . . [are] not protected from regulation by the Second Amendment." Id.   "A plaintiff may rebut this presumption," however, "by showing the regulation does have more than a de minimis effect upon his [Second Amendment] right." Id.   If the court determines that a challenged law does not burden the right to bear arms – either because it is longstanding and the plaintiff has failed to rebut the presumption of Second Amendment compatibility or because it simply does not burden the right – then there is no constitutional violation.  The court may uphold the law without going further.

If, instead, the challenged law does burden the Second Amendment right, then in the second step of the analysis, the Court must determine "whether the provision passes muster under the appropriate level of constitutional scrutiny." Id. at 1252.  Because the Supreme Court has not yet stated what level of scrutiny should apply to laws that burden the right to bear arms, see Heller I, 554 U.S. at 628 & n.27; Heller II, 670 F.3d at 1256, the Heller II panel considered whether strict or intermediate scrutiny was appropriate for judicial review of the gun-registration laws at issue here.  See Heller II, 670 F.3d at 1256-58.  Comparing the Second Amendment to the First, the panel reasoned that "the level of scrutiny . . . [should] depend[] on the nature of the conduct being regulated and the degree to which the challenged law burdens that right." Id. at 1257 (internal quotation marks and citations omitted).  Because "registration requirements do not severely limit the possession of firearms" and "none of the District's registration requirements prevent[] an individual from possessing a firearm in his home or elsewhere," the D.C. Circuit determined that the more deferential, intermediate level of scrutiny was the better choice. Id. at 1257-58 (internal quotation marks and citation omitted).  This Court is bound to follow that lead.

2.   *The Meaning of "Intermediate Scrutiny"*

On all of this, the parties are in agreement.  Their disagreement centers on what "intermediate scrutiny" actually means.

The basic language used to describe the standard is familiar enough: To satisfy intermediate scrutiny, the District must show that the challenged regulation is "substantially related to an important governmental objective."  Id. at 1258 (quoting Clark v. Jeter, 486 U.S. 456, 461 (1988)).  In other words, "the District must establish a tight 'fit' between the registration requirements and an important or substantial governmental interest, a fit 'that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective."  Id. (quoting Board of Trustees of State University of New York v. Fox, 492 U.S. 469, 480 (1989)).  "The requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and the means chosen are not substantially broader than necessary to achieve that interest."  Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989).  "[T]he fit between the challenged regulation and the asserted objective [need only] be reasonable, not perfect."  Schrader v. Holder, 704 F.3d 980, 990 (D.C. Cir. 2013).

So far, so good.  The parties part ways, however, on what exactly the District must do to survive this inquiry – in other words, what it must show to establish that the challenged gun regulations are "substantially related" to its important interests.

According to the District, it need only provide "'some meaningful evidence' demonstrating that the challenged registration requirements 'can reasonably be expected to promote' an important government interest."  Def. Reply at 6 (quoting Heller II, 670 F.3d at 1259) (emphasis added).  The District further contends that the "meaningful evidence" it

provides "is <u>not</u> required to . . . [be] empirical data, but rather may . . . [comprise] any evidence that is 'reasonably believed to be relevant.'" <u>Id.</u> at 7 (quoting <u>Renton v. Playtime Theatres, Inc.</u>, 475 U.S. 41, 51-52 (1986)) (emphasis added).

Plaintiffs claim, by contrast, that the District must establish that the challenged regulations will "<u>actually</u> achieve the governmental interest to a significant degree." Pl. Reply at 6 (emphasis added); <u>see also</u> Pl. Mot. at 48. Plaintiffs, contend, furthermore, that the District must provide "empirical evidence" to substantiate its argument – "[t]he test is evidentiary and objective, and is not dependent on unsupported 'expectations.'" <u>Id.</u> at 7.

This may appear a subtle point. But because it will set the terms of the Court's merits analysis, it is worth considering in detail. There are essentially two issues in contention here. First, whether the District need only show that the D.C. Council "could <u>reasonably believe</u> that the laws" would serve its important interests or if it must establish that the laws "<u>will</u> have th[o]se effects." Def. Reply at 2; Pl. Reply at 6 (emphasis added). And second, whether the District may meet its burden by citing to sources other than empirical data or if it is limited exclusively to statistical evidence. Both parties have excised snippets of language from prior cases that seem to support their side over the other. At the end of the day, however, the District has the better of the argument on both issues.

a.   Predictions versus Proof

As to the first point, the Supreme Court has stated explicitly that the government satisfies intermediate scrutiny if its predictions about the effect of a challenged law are rational and based on substantial evidence – it need not establish with certitude that the law will actually achieve its desired end. When applying the intermediate-scrutiny standard, "[t]he question is not whether [the legislature], as an objective matter, was correct[;] . . . [r]ather, the question is whether the

legislative conclusion was reasonable and supported by substantial evidence in the record."
Turner II, 520 U.S. at 211; see also Turner I, 512 U.S. at 666 (to survive intermediate scrutiny,
government must show that "in formulating its judgments, [the legislature] has drawn reasonable
inferences based on substantial evidence").  The Court has emphasized that "[the legislature's]
predictive judgments are entitled to substantial deference" because "[s]ound policymaking often
requires legislators to forecast future events and to anticipate the likely impact of these events
based on deductions and inferences for which complete empirical support may be unavailable."
Turner I, 512 U.S. at 665 (emphasis added); see also Turner II, 520 U.S. at 212 ("Congress is
allowed to make a rational predication [sic] of the consequences of inaction and of the effects of
regulation in furthering governmental interests.") (internal quotation mark and citation omitted);
84 Video/Newsstand, Inc. v. Sartini, 455 Fed. Appx. 541, 551 (6th Cir. 2011) ("This court has
repeatedly held that [under intermediate scrutiny] governments are not required to demonstrate
empirically that [their] proposed regulations will or are likely to [have their intended effects;] . . .
the touchstone is whether the legislature 'reasonably believed [the evidence it relied on] to be
reasonable' and whether the evidence 'fairly support[s] the [legislature's] rationale' for the law.")
(internal quotation marks and citations omitted)).  The Court has stressed, furthermore, that when
the evidence regarding a law's probable effect is in conflict, the judiciary should defer to the
legislature.  See Turner II, 520 U.S. at 199, 207-08, 211; see also City of Los Angeles v.
Alameda Books, Inc., 535 U.S. 425, 437 (2002) (government "does not bear the burden of
providing evidence that rules out every theory . . . that is inconsistent with its own").

    Notably, the D.C. Circuit has instructed that courts should be especially deferential to
legislative predictions when it comes to gun policy: "In the context of firearm regulation, the
legislature is far better equipped than the judiciary to make sensitive public policy judgments

(within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." Schrader, 704 F.3d at 990 (internal quotation marks and citation omitted).

Given that the Supreme Court urges judicial deference to legislative predictions as well as to legislative judgments regarding conflicting evidence, it is plain that Plaintiffs are mistaken about the burden of proof in this case. The District need not prove that the gun-registration laws will actually further its asserted interests in order to prevail. This is evident notwithstanding the fact that the Court has occasionally used language that, taken in isolation, might seem to support Plaintiffs. See, e.g., Rubin v. Coors Brewing Co., 514 U.S. 476, 487 (1995) (intermediate scrutiny "is not satisfied by mere speculation or conjecture; rather, a governmental body . . . must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree"); Turner I, 512 U.S. at 664 (to survive intermediate scrutiny, government must demonstrate "that the regulation will in fact alleviate [the asserted] harms in a direct and material way"). This interpretation is consistent with Heller II itself, where the D.C. Circuit upheld the District's ban on assault weapons because "the evidence demonstrates [that it] is likely to promote the Government's interest in crime control." Heller II, 670 F.3d at 1263 (emphasis added).

While the legislature is entitled to make predictions about the effect of its chosen policies, especially in the context of firearm regulation, those predictions must still have a sound basis:

> That Congress' predictive judgments are entitled to substantial deference does not mean . . . that they are insulated from meaningful judicial review altogether. On the contrary, we have stressed . . . that the deference afforded to legislative findings does not foreclose our independent judgment of the facts bearing on an issue of constitutional law. This obligation to exercise independent judgment . . . is not a license to reweigh the evidence *de novo*, or to replace Congress' factual predictions with our own. Rather, it is to

> assure that, in formulating its judgments, Congress has drawn
> reasonable inferences based on substantial evidence.

Turner I, 512 U.S. at 666 (internal quotation marks and citations omitted).

The D.C. Council may rely on predictions about the effect of the gun-registration laws, then, but its predictions must be reasonable ones drawn from "substantial evidence."  The Supreme Court has emphasized that "substantiality is to be measured in this context by a standard more deferential than we accord to judgments of an administrative agency," Turner II, 520 U.S. at 195, but it has also made clear that the "substantial evidence" requirement has teeth, rejecting legislative predictions that were not backed by sufficient evidence.  See, e.g., Turner I, 512 U.S. at 666-68.  The Heller II court followed suit here, remanding this case for further consideration because the District had "fail[ed] to present any data or other evidence to substantiate its claim that these [gun-registration] requirements can reasonably be expected to promote either of the important governmental interests it has invoked."  Heller II, 670 F.3d at 1259.  To satisfy intermediate scrutiny, therefore, the District need not meet Plaintiffs' demanding standard by proving definitively that the challenged gun regulations will actually further its important interests.  Instead, its predictions about the effect of the gun regulations are entitled to significant deference, and the District need only show that they reflect "reasonable inferences based on substantial evidence."  Id. at 1259 (quoting Turner II, 520 U.S. at 195) (internal quotation marks omitted).

b.  Data versus Other Evidence

On the second point in contention – whether the District must rely only on hard data or if it may supplement the record with other forms of evidence – the government once again prevails.  The Supreme Court has specifically addressed this matter:  "[W]e have permitted litigants to justify . . . restrictions [under intermediate scrutiny] by reference to studies and anecdotes

18

pertaining to different locales altogether, or even, in a case applying strict scrutiny, <u>to justify restrictions based solely on history, consensus, and simple common sense.</u>"  <u>Lorillard Tobacco Co. v. Reilly</u>, 533 U.S. 525, 555 (2001) (emphasis added) (internal quotation marks omitted); <u>see also</u> <u>Alameda Books</u>, 535 U.S. at 439-40 ("A municipality considering an innovative solution may not have data that could demonstrate the efficacy of its proposal because the solution would, by definition, not have been implemented previously."); <u>National Ass'n of Mfrs. v. Taylor</u>, 582 F.3d 1, 15 (D.C. Cir. 2009) ("[Plaintiff] maintains that the congressional findings . . . are insufficient to support [the government's asserted interest] and thus to satisfy strict scrutiny. Rather, there must be 'studies, statistics, or empirical evidence . . . .'  We disagree."); <u>National Cable & Telecommunications Ass'n v. FCC</u>, 555 F.3d 996, 1000 (D.C. Cir. 2009) ("The Supreme Court has found 'various unprovable assumptions' sufficient to support the constitutionality of state and federal laws.") (quoting <u>Paris Adult Theatre I v. Slaton</u>, 413 U.S. 49, 61 (1973)).

The proper standard, the Supreme Court has suggested, is that the government may rely on "whatever evidence . . . is reasonably believed to be relevant to the problem that [the government is] address[ing]."  <u>City of Renton v. Playtime Theatres, Inc.</u>, 475 U.S. 41, 51-52 (1986); <u>see also</u> <u>Alameda Books</u>, 535 U.S. at 438-39.  When the D.C. Circuit remanded this case for further factual development, it accordingly did not limit the District exclusively to statistics, but instructed only that "the District needs to present <u>some meaningful evidence, not mere assertions</u>, to justify its predictive judgments."  <u>Heller II</u>, 670 F.3d at 1259 (emphasis added); <u>see also id.</u> (the District "fails to present any data <u>or other evidence</u> to substantiate its claim") (emphasis added).  That is a much broader mandate than what Plaintiffs claim is required here.

Relatedly, Plaintiffs attempt to discredit three of the District's expert witnesses – Lanier, Jones, and Vince – whose opinions rely primarily on their personal experiences working in law enforcement.  Plaintiffs urge that "formal training in statistical analysis and research design is necessary to evaluate the effectiveness of gun control measures, as is a thorough knowledge of the methods and findings of prior research on this topic.  These witnesses have neither that training nor that knowledge."  Pl. Mot. at 21 n.16.  Plaintiffs therefore suggest that the Court "give little or no weight to the unsupported personal opinion testimony of these three witnesses." Id.

The Court will not disregard the District's expert testimony on that basis.  While a police officer's personal experience may not always carry the same heft as a criminologist's data, this is no reason for the Court to entirely disregard the former in favor of the latter.  Indeed, in some cases, the reverse might be true.  Just as Justice Holmes once observed that "a page of history is worth a volume of logic," New York Trust Co. v. Eisner, 256 U.S. 345, 349 (1921), so too, sometimes, a page of professional experience is worth a volume of statistics.  That is hardly to say that an anecdote or two from "life on the beat" would suffice, yet in this case, the experience of the District's witnesses far exceeds that measure.  The D.C. Circuit, moreover, routinely permits law-enforcement officers to testify as expert witnesses based on their professional experiences, without the kind of formal statistical training that Plaintiffs insist is indispensable to any legitimate policy judgment.  See, e.g., Burkhart v. Washington Metropolitan Area Transit Authority, 112 F.3d 1207, 1211-12 (D.C. Cir. 1997); United States v. Spriggs, 996 F.2d 320, 325 (D.C. Cir. 1993).  This is because Federal Rule of Evidence 702 allows a witness to qualify as an expert "by knowledge, skill, experience, training, or education," Fed. R. Evid. 702 (emphasis added), and "experience" includes "employment in the field as well as experience in performing

tests or studies." <u>Groobert v. President and Directors of Georgetown College</u>, 219 F. Supp. 2d 1, 7 (D.D.C. 2002) (emphasis added).

Statistical data can, of course, be powerful validation for a particular position, and depending on the context, it may well be a practical necessity in order for the government to show that it had "substantial evidence" to support its policy judgments.  As the Supreme Court has observed, "The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." <u>Nixon v. Shrink Mo. Gov't PAC</u>, 528 U.S. 377, 391 (2000).  There is no <i>per se</i> rule, however, requiring the government to confine its justifications to objective evidence or empirical studies.  So long as the District provides "meaningful evidence" that satisfies intermediate scrutiny, it will have met its burden under the law.

In sum, to survive intermediate scrutiny, the District must show that its predictions about the effect of its gun-registration laws reflect "reasonable inferences based on substantial evidence." <u>Turner I</u>, 512 U.S. at 666.  The standard for substantiality is doubly deferential in this case, where the Court is reviewing a legislative judgment on firearms policy.  <u>See</u> <u>Turner II</u>, 520 U.S. at 195 (substantiality requirement more deferential when reviewing legislative judgments); <u>Schrader</u>, 704 F.3d at 990 (courts should be especially deferential when reviewing legislative judgments on gun policy).  "Substantial evidence," furthermore, is not limited solely to empirical data, but may also include all "meaningful evidence," <u>Heller II</u>, 670 F.3d at 1244, including "anecdotes . . . history, consensus, and simple common sense." <u>Lorillard Tobacco</u>, 533 U.S. at 555 (internal quotation marks omitted).

B. <u>The District's "Substantial Interests"</u>

Having lined the field for this Second Amendment inquiry, the Court may now referee the merits of the case.  As the D.C. Circuit noted in <u>Heller II</u>, the challenged gun-registration requirements here are intended to further two "substantial government interests": "[P]rotect[ing] police officers" and "aid[ing] in crime control."  <u>Heller II</u>, 670 F.3d at 1258.  On remand, the District has slightly expanded the second interest to "promoting public safety."  <u>See</u> Def. Mot. at 22.  "Crime control" and "public safety" are not synonymous terms as they relate to guns, since the latter also incorporates suicides and firearm accidents.  Plaintiffs have not disputed that these are indeed important interests, at least in the abstract.  <u>See</u> Pl. Mot. at 7.  The Court must now assess, however, whether those interests are actually in play in this case, before it moves on to analyze whether each of the challenged provisions is "substantially related" to such interests.

The first interest, the District says, is the protection of police officers.  Gun registration allegedly provides law-enforcement officers with a centralized record system that "allows officers to determine in advance whether individuals involved in a call [for police assistance] may have firearms."  <u>Heller II</u>, 670 F.3d at 1258; <u>see also</u> 2012 Report at 6; 2008 Report at 3-4; Lanier Decl., ¶ 17; Jones Decl., ¶ 11.  Plaintiffs question this justification, however, noting that when D.C. police officers respond to a call, they do not routinely check registration records to determine if a firearm is present, <u>see</u> Pl. Mot., Exh. 3 (Plaintiffs' Excerpted Deposition of Cathy Lanier) at 36, and that, in fact, such record checks are cumbersome and relatively rare.  <u>See</u> <u>id.</u>, Exh. 1 (Plaintiffs' Excerpted Deposition of Lieutenant Jon Shelton) at 19; <u>id.</u>, Exh. 2 (Plaintiffs' First Set of Interrogatories), Resp. No. 6.  Still, these checks <u>do</u> occur, <u>see</u> Def. Reply, Exh. N (Defendant's Excerpted Deposition of Lieutenant Jon Shelton) at 3, and so the Court finds that this justification provides some, albeit limited, support for the District's registration policy.

22

Much more persuasive is the District's second, public-safety, justification for the gun registry.  The registration system ostensibly serves this interest by allowing the city government to screen out dangerous or irresponsible people who try to obtain a firearm, to ensure that gun owners are familiar with gun safety and D.C. firearm regulations, and to inhibit the illegal trafficking of firearms.  See 2012 Report at 6-8; Lanier Decl., ¶¶ 17-18; Jones Decl., ¶¶ 10-16. In other words, the basic registration requirement allows the District to keep track of who is responsible for which guns, while also acting as a "hook" onto which the District can attach additional public-safety regulations.  This interest is particularly compelling in the District of Columbia, a "densely populated urban area" that "shares the problem of gun violence with other dense, urban jurisdictions."  Heller II, 670 F.3d at 1263 (quoting Comm. On Pub. Safety, Report on Bill 17-593 (Nov. 25, 2008) at 4) (internal quotation marks omitted); see also Lanier Decl., ¶¶ 11-16; Vince Decl., ¶ 12.  The empirical data bear this out: D.C.'s age-adjusted rate of firearm deaths, intentional and unintentional, is 14.62 per 100,000, significantly higher than the national rate (10.07) and the rate in neighboring jurisdictions (9.26 in Maryland and 10.69 in Virginia). Def. Mot. at 22 (citing Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System ("WISQARS"), available at www.cdc.gov/ncipc/wisqars).  Approximately three-quarters of all homicides in the District involve firearms.  See 2012 Report at 3.  Plaintiffs do not appear to dispute that public safety is a substantial government interest that the registration requirements are at least intended to address, and, indeed, the Court finds that this is a powerful justification for the District's gun-registration regime.

C.  Are the Challenged Provisions "Substantially Related" to the District's Interests?

Given that police protection and, especially, the promotion of public safety are significant government interests in this case, the Court now turns to the question of whether the various provisions of the District's gun registry challenged here are "substantially related" to those interests.  As explained earlier, to prevail on these points, the District must show that its predictive judgments about the effect of each provision at issue reflect "reasonable inferences based on substantial evidence," Turner I, 512 U.S. at 666, and that the provisions are narrowly tailored to its important interests in this case.

In Heller II, the D.C. Circuit upheld two aspects of the District's gun-registration scheme: the basic registration requirement as applied to handguns and the prohibition on assault weapons and high-capacity magazines.  See Heller II, 670 F.3d at 1264.  The basic registration requirement as applied to handguns was "longstanding," according to the court, and thus presumptively lawful.  Id. at 1254.  There was no basis in the record to rebut that presumption, and so the Court upheld the requirement without further analysis.  See id. at 1254-55.  The ban on assault weapons and high-capacity magazines, by contrast, was not longstanding and did impose a burden on the Second Amendment right.  See id. at 1260-64.  The Heller II court nonetheless upheld that law as satisfying intermediate scrutiny.  See id.

That leaves the remaining provisions of the District's gun-registration regime: the basic registration requirement as applied to long guns and the accompanying registration requirements as applied to all guns.  The Heller II court found that these rules were "novel, not historic," and so remanded the case for further factual development and consideration under the remaining steps in the Second Amendment inquiry.  Id. at 1255-1260.  It is to that analysis that this Court now turns.

1.   *Basic Registration for Long Guns*

The Court begins by examining the constitutionality of the District's basic registration requirement as applied to long guns.  It first must determine whether long-gun registration imposes a burden on the right to keep and bear arms.  If it does not, then the Court may uphold the requirement without going further, since it will fall outside the domain of the Second Amendment's protection.  If the registration requirement does burden the Second Amendment right, then the Court must subject it to intermediate scrutiny in order to determine whether it passes constitutional muster.

a.   Burden of Long-Gun Registration

While this perhaps represents Plaintiffs' most significant remaining challenge to the D.C. scheme, it is, ironically, practically foreclosed by <u>Heller II</u>, where the D.C. Circuit suggested strongly that long-gun registration does not burden the right to bear arms.  There, in upholding the basic handgun-registration requirement as longstanding and thus presumptively lawful, the panel majority also observed that the law hardly imposed much of a burden on gun ownership: "[B]asic registration requirements are self-evidently de minimis, for they are similar to other common registration or licensing schemes, such as those for voting or for driving a car, that cannot reasonably be considered onerous."  <u>Id.</u> at 1254-55.  The court then added:

> The requirement of basic registration as applied to long guns may also be de minimis.  For now, however, we assume this requirement, too, impinges upon the Second Amendment right because . . . the record is devoid of information concerning the application of registration requirements to long guns.  On remand and with the benefit of additional evidence, the district court will be better able to address this question in the first instance.

<u>Id.</u> at 1255 n.**.

25

On remand, Plaintiffs have offered no evidence to suggest that the basic registration requirement – the mere fact of having to register one's gun, in isolation from the means prescribed by the District for doing so – is any more burdensome as applied to long guns than it is as applied to handguns.  Indeed, if the basic registration requirement is "self-evidently de minimis" as applied to handguns, then the Court is at a loss to imagine how that same requirement could become anything more than *de minimis* as applied to long guns.  Id. at 1254-55.  The requirement appears to be identical for each kind of weapon, and in either case, it is "similar to other common registration or licensing schemes, such as those for voting or for driving a car, that cannot reasonably be considered onerous."  Id.  The language of the Heller II opinion, then, should compel this Court to find that the basic registration requirement as applied to long guns is *de minimis*, and to uphold it as constitutional on that basis alone.

Because the relevant language from Heller II is technically *dicta*, however, and because the District's justifications for the basic registration requirement are central to the legality of the rest of the firearm-registration regime, the Court will follow the Court of Appeals's lead by assuming that the requirement as applied to long guns burdens the Second Amendment right and then subjecting it to intermediate scrutiny.  The Court has already established that the District has important interests in protecting police and promoting public safety, see Part III.B, *supra*, so it next must determine whether long-gun registration is "substantially related" to those interests.

b.  Evidence Regarding Long-Gun Registration

The evidence suggesting that a basic registration requirement for long guns will promote public safety and protect police consists of expert testimony from Chief of Police Lanier, see Lanier Decl., ¶¶ 16-18, 21-22, 26-30, former ATF agent Jones, see Jones Decl., ¶¶ 10-16, former

ATF agent and Professor Vince, <u>see</u> Vince Decl., ¶¶ 10-11, 26, and Professor Webster.  <u>See</u> Webster Decl., ¶¶ 12-13, 19-26, 35; <u>see also</u> 2008 Report at 3-4; 2012 Report at 5-8.

(i)     Gun Registration Generally

Lanier, Jones, and Vince recount that, in their professional opinions, firearm registration protects police and reduces gun-related crime.  Lanier notes that mandatory gun registration helps keep guns away from felons and mentally ill individuals, who may pose a threat to the general public.  <u>See</u> Lanier Decl., ¶ 18; <u>see also</u> Vince Decl., ¶ 10 (emphasizing "the many benefits of strong firearm-registration requirements, perhaps the main one being to keep weapons out of the hands of criminals or others who pose a safety risk to themselves or the public").  She further observes that registration allows law enforcement to monitor whether a gun owner subsequently became ineligible to possess a firearm – for instance, if he was later convicted of a felony or a domestic-violence offfense, or if he was committed by a court for mental-health treatment – and to ensure that the registrant surrenders the gun in accordance with the law.  <u>See</u> Lanier Decl., ¶ 21.  Registration, according to Lanier, also makes it easier for law enforcement to combat gun trafficking by tracking lost or stolen weapons.  <u>See</u> <u>id.</u>, ¶ 28.

Jones follows suit, endorsing the system based on his own personal experience:

> Based on my experience, firearm registration provides necessary information for public safety agencies and first responders such as presence of documented firearms and ammunition in homes and businesses to which they answer calls for service, and the identity of citizens who legally possess firearms and ammunition at those homes and businesses.  In my opinion, registration requirements also provide a framework within which public safety agencies may formulate firearms safety, training, and education programs focused on the needs of their constituent legal firearms owners.  In my observation, a well-regulated firearms registration process also increases the likelihood that law enforcement may successfully trace guns they recover.

27

Jones Decl., ¶ 11.  Vince does the same: "Registration has proven to be effective in keeping weapons away from criminals.  For instance, since 1934, the National Firearms Act has required the registration of weapons like machine guns and sawed-off shotguns, and I learned at the ATF that NFA-registered weapons are very rarely used in crime."  Vince Decl., ¶ 11.  He adds that "[r]egistration also makes it easier to trace guns used in crime to their last known legal owner, and to investigate possible illegal transactions, providing law-enforcement officers with critical information to track firearms when investigating gun crimes and gun smuggling."  Id.

Webster provides empirical evidence to back up these perspectives.  He recounts a study he led finding that Missouri's repeal of a similar gun-registration scheme quickly led to a dramatic increase in illegal gun trafficking in that state.  See Webster Decl., ¶¶ 14-18.  Not only did trafficking increase, but also homicide – just one year after Missouri repealed its law, its firearm-homicide rate increased by approximately 30%.  Id., ¶¶ 19-20.  "This increase was out of synch with changes during that period in age-adjusted homicide rates nationally and in other states in the Midwest."  Id.  Webster also describes a study that compared the proportion of guns used in crimes "that were originally sold by a licensed retail gun seller inside the state versus outside the state" and found that the ratio "was significantly lower in the cities located in states with . . . licensing and handgun registration (33.7%) . . . than in states that had neither of those laws (84.2%)."  Id., ¶ 23.  States with firearm registration, in other words, saw comparatively fewer of their locally sold weapons used in crime.  Webster further notes that the states with "permit-to-purchase licensing requiring prospective purchasers to apply directly with a law enforcement agency" – "the same firearm sales regulations used by the District of Columbia" – "have some of the lowest age-adjusted firearm morality rates . . . in the nation."  Id., ¶¶ 22, 23.  "[T]he three states that exported the fewest crime guns per capita," moreover, "had handgun

registries and permit-to-purchase licensing." <u>Id.</u>, ¶ 25.  Relatedly, Webster recounts a study he led that "examined the association between state gun sales regulations and the diversion of guns to criminals" and found that "[d]iscretionary [permit-to-purchase] licensing was independently associated with lower levels of diversion of guns sold by in-state dealers." <u>Id.</u>, ¶ 24.

(ii)      Long-Gun Registration Specifically

There is also evidence to suggest that the basic registration requirement should be applied to long guns just as it is applied to handguns.  Approximately 20% of the illegal firearms recovered by the District in 2010 were long guns, <u>see</u> 2012 Report at 19, and Plaintiffs' own expert, Professor Kleck, concedes that long guns are "more lethal" than handguns and should be regulated in the same way.  Def. Mot., Exh. M (Defendant's Excerpted Deposition of Gary Kleck, Ph.D.) at 3.  Between 2006 and 2010, 4,000 homicides were committed with long guns nationwide.  2012 Report at 19.  Both Lanier and Jones affirm that "[a]ll firearms, be they rifles, shotguns[,] or handguns, pose a similar threat to public safety in the wrong hands and . . . should be regulated similarly."  Jones Decl., ¶ 13; <u>see also</u> Lanier Decl., ¶¶ 31-35; 2012 Report at 20 ("The justifications that exist for registration of firearms in general . . . apply equally with regard to long arms.").   The D.C. Council also observed that long guns are a significant concern in the nation's capital because their long-range accuracy "poses a special threat to government officials, diplomats, and motorcades."  2012 Report at 20; <u>see also</u> Lanier Decl., ¶ 32; Jones Decl., ¶ 15; 2008 Report at 3.  Finally, as the District notes, leaving long guns outside the registration scheme would create a gap in the city's oversight system that might encourage criminals to use those weapons instead of handguns in order to cover their tracks from law enforcement.  According to this evidence, then, the differences between long guns and handguns do not justify varied treatment with respect to the basic registration requirement.

29

Considered in total, this combination of professional opinion and empirical data suggesting that mandatory gun registration, including long guns, reduces gun crime and allows first responders to determine in advance the presence of registered firearms easily surpasses the "substantial evidence" threshold.  The D.C. Council could reasonably infer from this evidence that the basic registration requirement would serve its interests in promoting public safety and protecting police and that the requirement should apply to long guns as well as handguns.  Given the powerful evidence in favor of gun registration and the overwhelming consensus among the experts – even Plaintiffs' own – that long guns pose an equal danger to handguns and should be regulated in the same manner, basic registration of long guns is narrowly tailored to achieve the District's interests in this case.  The provision therefore survives intermediate scrutiny.

### c.   Plaintiffs' Counterarguments

Plaintiffs put forward a number of reasons to reject the basic registration requirement – comprising both general attacks on all firearm registration and more focused critiques of the requirement as applied to long guns in particular.  In the final analysis, however, none of their arguments is persuasive.

First, Plaintiffs suggest that firearm registration is not "narrowly tailored" to the government's interests in promoting public safety and protecting police because "criminals . . . circumvent the process[] by purchasing guns on the street and bypassing registration altogether.  Only the law-abiding register their guns."  Pl. Mot. at 29; see also Pl. Reply at 8.  According to Plaintiffs, it seems, municipalities should be limited to enacting only those firearms regulations that lawbreakers will obey – a curious argument that would render practically any gun laws unconstitutional.  This argument, moreover, misses several of the benefits to which the registry is tailored, such as helping the District to ensure that law-abiding gun owners are not subsequently

rendered ineligible to possess their weapons, see Lanier Decl., ¶ 18; Vince Decl., ¶ 10, and

allowing law enforcement to track recovered weapons and identify unregistered ones likely

intended for trafficking or other crimes.  See Lanier Decl., ¶ 28; Jones Decl., ¶ 11; Vince Decl., ¶

11.  Nor do Plaintiffs suggest a narrower approach to achieving the District's interests here.

Plaintiffs, in any event, overstate what narrow tailoring demands in these circumstances.

"Narrow tailoring" in the context of intermediate scrutiny requires only that "the fit between the

challenged regulation and the asserted objective [be] reasonable, not perfect."  Schrader, 704

F.3d at 990.  Although a few criminals may slip through the cracks of the registry, the significant

evidence linking gun registration to crime reduction demonstrates that the "fit" is certainly

reasonable in this case.  As the Supreme Court has explained, "[T]he requirement of narrow

tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that

would be achieved less effectively absent the regulation."  Turner I, 512 U.S. at 662 (internal

quotation marks and citation omitted) (emphasis added).  Not all gun owners will register their

weapons and the registry will not stop all gun violence, but there is more than enough evidence

to support the District's conclusion that its goals of promoting public safety and protecting police

would be "achieved less effectively" absent the basic registration requirement.  Id.  That is all

the law requires.

Next, Plaintiffs question the methodology of Webster's empirical studies on gun

registration.  They contend, first, that "preventing 'diversion' [of guns] to criminals" – one

subject on Webster's studies – "is not the same as causing an actual reduction in violent crime."

Pl. Mot. at 28-29.  That may well be true, but the relation of one to the other is not unreasonable,

and the District may pursue its substantial interests in police protection and public safety not

only by directly seeking to reduce violent crime, but also by striving to prevent the illegal gun

trafficking that exacerbates it.  Cf. 2012 Report at 8 ("The government's interest in preventing

the trafficking of guns – i.e., the acquisition of guns by criminals – cannot be overstated.").

Plaintiffs also highlight several technical flaws in Webster's work, as described by

Professor Kleck:

> Webster's analysis of Missouri's permit-to-purchase licensing law
> is based on a fundamental misunderstanding of ATF trace data.  He
> claims that the time from when a gun was first sold at retail to
> when it is recovered by police ("time-to-crime," or TTC) is
> "indicative of possible trafficking." . . . It is not.  First, trace data
> cannot tell us whether a gun has been trafficked or otherwise
> "diverted."  As a National Research Council panel concluded,
> "trace data cannot show whether a firearm has been illegally
> diverted from legitimate firearms commerce." . . .  Second, and
> more specifically, the trace-based "short TTC" measure has been
> empirically shown to not be correlated with another, more widely
> accepted indicator of gun trafficking, the prevalence of obliterated
> serial numbers. . . .  In fact, the share of traced guns with a short
> TTC is actually far more strongly correlated with gun theft rates . .
> . . D.C.'s registration laws do nothing to affect rates of gun theft . .
> . . Webster's analysis is therefore distorted by an outdated,
> discredited interpretation of the meaning of short TTC.

Kleck Decl., ¶¶ 27-28.  Plaintiffs further note that Kleck questions Webster's conclusions linking

Missouri's repeal of its permit-to-purchase law with an increase in homicides, claiming that his

study was skewed by a brief increase in homicides in the state in 2008, that it failed to consider

the fact that neighboring Iowa's homicide rate also increased over the same time period even

though that state did not change its gun laws, and that his choice of control variables and control

areas was arbitrary.  See id., ¶¶ 31-35.

Kleck's testimony scores some blows against Webster's research.  Yet his critique does

not entirely vitiate Webster's endorsement of the D.C. gun-registration scheme.  The testimony

cited by Plaintiffs, if accurate, undermines only the part of Webster's research related to

measuring gun trafficking and homicide rates; it does not affect the studies he cites examining

the relationship between gun registration and the use of guns in crime.  See Webster Decl., ¶¶

22-25.  Even without the criticized aspects of Webster's research, the expert testimony of Lanier,

Jones, and Vince, and Webster's studies involving the effect of gun registration on the use of

guns in crime exceed the "substantial evidence" threshold necessary to justify the District's

policy.

The District, moreover, has provided additional research defending Webster's analyses

and critiquing Kleck's, which data restore some credibility to Webster's findings regarding the

relationship between firearm registration, gun trafficking, and homicide.  See Def. Mot., Exh. A

(Appendix) at 279-93 (Anthony A. Braga, et al., Interpreting the Empirical Evidence on Illegal

Gun Market Dynamics, 89 J. Urban Health: Bull. of the New York Acad. of Med. 779 (2012));

Fact Sheet – National Tracing Center, ATF (Feb. 2013), available at http://goo.gl/LvZyi3 (last

visited May 15, 2014).  In the face of these "conflicting views" of Webster's work, the Court

need not "put [its] imprimatur" on his research, but merely must decide whether the District has

provided "substantial evidence for [the D.C. Council] making the judgment that it did."  Turner

II, 520 U.S. at 208; see also Gonzales v. Carhart, 550 U.S. 124, 163 (2007) (courts should give

legislatures "wide discretion to pass legislation in areas where there is . . . scientific uncertainty")

(collecting cases).  In the D.C. Circuit, furthermore, deference of this sort is considered

especially appropriate when it comes to the regulation of firearms.  See Schrader, 704 F.3d at

990.  Despite Kleck's critiques, then, the Court finds that Webster's analyses, the accompanying

defense of his methods, and the other expert testimony submitted by the District clears the

substantial-evidence threshold.

Plaintiffs next train their fire on the necessity of the basic registration requirement as

applied to long guns.  They note that homicides in the District are rarely committed with long

guns – just three out of a total of 383 area murders between 2009 and 2011.  See Pl. Mot., Exh. 8

(Murder Statistics by State, Types of Weapons).  They also highlight the fact that between July

2008 and October 2012, a paltry two registered shotguns and zero registered rifles were

recovered from crime scenes in the District, see Def. Mot., Exh. J (D.C. Attorney General Letter

of Dec. 5, 2012) at 2; Plaintiffs' Excerpted Deposition of Lieutenant Jon Shelton at 22-23, while

during an only slightly longer time period, more than 12,000 unregistered firearms were

recovered.  See Plaintiffs' Excerpted Deposition of Cathy Lanier at 2.  Plaintiffs add that most of

the studies Webster describes either focused solely on handguns or did not distinguish between

handguns and long guns.  See Kleck Decl., ¶ 13.  Finally, in a particularly macabre exhibit

attached to their pleading, Plaintiffs observe that very few assassination attempts in the District

were committed with long guns; rather, hand guns, bombs, and biological agents seem to be the

assassin's weapons of choice.  See Pl. Mot., Exh. 11 (Table of U.S. Political Assassinations and

Attempts).

        Although Plaintiffs have raised some important points, these are not enough to undermine

the constitutionality of long-gun registration.  The District notes, first of all, that there are

reasons to be skeptical of Plaintiffs' numbers, see Plaintiffs' Excerpted Deposition of Cathy

Lanier at 49-50 (questioning accuracy of Plaintiffs' homicide statistics), but that even if there

were not, the D.C. Council is "entitled to rely on the experiences of . . . other cities" in setting its

own policy, Renton, 475 U.S. at 51, and to take pre-emptive action to prevent potential harms

before they occur.  See Turner II, 520 U.S. at 212.  In other words, the District could

appropriately consider the nation's long-gun homicide rate – 4,000 between 2006 and 2010,

2012 Report at 19 – when setting its own local gun policy.  Plaintiffs' homicide statistics,

moreover, ignore the fact that long guns may pose a public-safety threat when used to perpetrate

other kinds of violent crime, such as armed robbery and assault with a dangerous weapon, <u>see</u> 2012 Report at 3, and that the District was entitled to consider those concerns as well.  While the studies cited by Webster do not always distinguish between handguns and long guns, it was not unreasonable for the District to extrapolate from them in determining its long-gun policy, especially given the opinion of multiple experts that long guns and handguns pose similar dangers and should be regulated similarly.  <u>See</u> Jones Decl., ¶ 13; Lanier Decl., ¶¶ 31-35; Defendant's Excerpted Deposition of Gary Kleck, Ph.D. at 3.  As for the debate over political assassins' preferred weaponry, the Court need not wade into that gruesome calculus – although it does note the recent long-gun shooting at the White House, <u>see</u> Ann E. Marimow, <u>Man Admits Firing 8 Rounds at White House</u>, Wash. Post, Sept. 19, 2013, at B3 – because the quotidian danger posed by long guns is sufficient on its own to justify the District's registration policy. The D.C. Council could reasonably conclude from the substantial evidence before it that long guns, as well as handguns, should be registered with the city government.

Finally, Plaintiffs point to contrary evidence suggesting that long-gun registration does not protect police or promote public safety.  Canada established a long-gun registry in the mid-1990s but repealed it in 2012 because it found, as the Canadian Minister of Public Safety put it, that "the long-gun registry does . . . nothing to prevent crime or protect front-line officers."  Pl. Mot., Exh. 12 (House of Commons Standing Committee on Public Safety and National Security, Tuesday, November 15, 2011, Transcript) at 1.  Some empirical data backs up the Minister's insight: According to Kleck, "U.S.-based cross-sectional research [on] . . . [f]irearms registration laws show[s] no statistically significant violence-reducing effect on any type of violence," and the one "serious empirical assessment of the impact of Canada's requirement that long guns

(rifles and shotguns) be registered . . . found no evidence that the law had any beneficial effects, either immediate or lagged."  Kleck Decl., ¶¶ 94-95.

Faced with this evidence, the District questions whether Canada's experience is relevant to its own, given that our northern neighbor comprises several sparsely populated, rural provinces while D.C. is a dense, entirely urban jurisdiction.  It cannot be denied, however, that the Canadian example at the very least offers an important counterpoint to the District's own conclusions on this matter.  Kleck, moreover, has offered a U.S.-based argument suggesting that gun registries are not as effective as the District might hope.  These counterpoints, nevertheless, are better presented to the D.C. Council than to the federal judiciary.  As noted earlier, a court applying intermediate scrutiny may invalidate a law only if the legislature lacked substantial evidence to support its ultimate conclusion on the matter – a circumstance not present here. When there is merely conflicting evidence in the record, the judiciary must defer to the legislature's choice.  See Turner II, 520 U.S. at 199, 207-08, 211; Alameda Books, 535 U.S. at 437-38; see also Woollard v. Gallagher, 712 F.3d 865, 881 (4th Cir. 2012) ("[I]t is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments.").  Here, the D.C. Council chose to go with the substantial evidence indicating that long-gun registration would promote public safety and protect police, rather than the data points suggesting otherwise. That is all the law requires.

In sum, the basic registration requirement as applied to long guns satisfies intermediate scrutiny and therefore does not violate the Second Amendment.

2.   *The Registration-Process Requirements: Appearing In Person, Bringing the Firearm, Photographing, and Fingerprinting*

The constitutionality of the basic registration requirement as applied to long guns now established, the Court moves on to examine the associated registration requirements that

36

Plaintiffs have challenged as applied to all firearms.  The Court begins with the requirements related to the registration process itself.  To register a weapon, the registrant must appear in person and in possession of the firearm to be registered, and he must submit to being photographed and fingerprinted.  See D.C. Code § 7-2502.04.  Plaintiffs claim that these four requirements are not substantially related to the District's interests in police protection and public safety.  Once again, the Court will begin by determining whether these requirements burden the Second Amendment right, will then subject them to intermediate scrutiny, and will wrap up by addressing Plaintiffs' counterarguments.

a.   Burden of the Registration Process

The District, highlighting Heller II's observation that the registration schemes for voting or driving a car "cannot reasonably be considered onerous," Heller II, 670 F.3d at 1255, notes that at least some of the provisions at issue here are also present in voter-registration or driver's-license schemes and that they thus impose only a *de minimis* burden on the Second Amendment right.  In opposition, Plaintiffs emphasize the time and financial burden of traveling to the MPD office during business hours and fulfilling the various registration requirements.  See Pl. Mot. at 25, 42-45; id., Exh. 16 (Declaration of Dick Anthony Heller), ¶¶ 5-10; id., Exh. 17 (Declaration of William Carter), ¶¶ 5-6, 8-10, 12, 14, 17; id., Exh. 19 (Declaration of Absalom Jordan), ¶¶ 4, 6, 8, 10; id., Exh. 20 (Declaration of William Scott), ¶¶ 5-7, 9.  Either way, the issue has already been resolved by Heller II, which stated that the requirements in question "affect the Second Amendment right because they are not de minimis."  Heller II, 670 F.3d at 1255.  The Court, therefore, must apply intermediate scrutiny to determine the constitutionality of these four regulations.

b.   Evidence Regarding the Registration Process

The requirements at issue allow the city government to verify the identity of each person who seeks to register a firearm, to run a background check on that person, and to tie that person's identity to the weapon's registration certificate.  The District has presented substantial evidence that all this is necessary to ensure that the underlying registration scheme is effective in tracking who is eligible to own a firearm and who owns which weapons.  That insight is backed not only by "simple common sense," Lorillard Tobacco, 533 U.S. at 555 (internal quotation marks omitted), but also by an impressive array of expert testimony.

To begin, all the District's experts are in consensus that requiring people to appear in person with the weapon to be registered and to submit to fingerprinting helps to avoid fraud and ensures the identity of each prospective registrant.  Ensuring the integrity and accuracy of the registry, of course, is necessary for gun registration to achieve the District's substantial interests in protecting police and promoting public safety.  Lanier affirms that in her "professional opinion, the District's requirement of an initial in-person registration and background check . . . is the best means to verify an applicant's eligibility."  Lanier Decl., ¶ 19.  She explains, "Identity theft is rampant, and gun dealers are not necessarily well trained in identifying false documents. The use of fingerprints provides MPD with a means of biometric identification, which ensures that the applicant is who he says he is."  Id., ¶ 20.  Jones echoes this assessment:

> Requiring an individual to present him or herself to register a firearm allows District authorities to make a more thorough evaluation of that person, including an on-the-spot evaluation of behavior that might indicate the applicant is not being truthful . . . . An additional advantage to in-person registration is the indisputable identification of the aspiring registrant as the actual owner of the firearm in question, thus limiting the ability of one person to impersonate another to defeat the legal registration program.  Simply stated, programs that do not require in-person registration and ID verification are potentially less effective at

preventing the diversion of firearms from legitimate to illegal purposes.

Jones Decl., ¶¶ 21-22.  Vince agrees: "One of the most effective ways to ensure that criminals do not circumvent the firearm-registration process is to require in-person appearance and ID verification as part of registration."  Vince Decl., ¶ 19.  Vince explains that in-person registration "provides an opportunity to verify the intentions and accuracy of information for [the] person obtaining a permit . . . .  Without such a system, the District might just as well have kiosks dispense registration permits."  Id., ¶¶ 20-21.

Webster, too, backs the District's registration process.  He recounts a United States Government Accounting Office study that found that gun stores and pawn shops in states that do not requiring fingerprinting for firearms purchases were vulnerable to purchasers who used fake identification cards.  See Webster Decl., ¶ 10.  He adds that "the casual scrutiny given to firearm sales applications suggest[s] that the system could also be vulnerable to other deceptive practices . . . .  For example, prospective purchasers could more easily put inaccurate information on their application forms . . . in order to avoid a denial of the application."  Id., ¶ 11.  Although no expert specifically addresses the requirement that registrants bring the gun to be registered with them, it is a permissible, common-sense inference from this testimony that if in-person appearance is necessary to verify the identity of the registrant, then physically bringing the gun is similarly necessary to verify the character of the registered weapon.  See Def. Mot. at 25 n.21.

The District's experts are in further agreement that a local background check, conducted using the prospective registrant's name and fingerprints, helps to keep guns out of the hands of unauthorized persons.  As mentioned previously, MPD runs a background check on prospective registrants that queries several sources including the FBI database, the Washington Area Law Enforcement System, and the National Criminal Information Center.  Shelton Decl., ¶¶ 11-12.

This check is more comprehensive than the one already required of gun dealers under federal law.  See Def. Reply, Exh. O (Declaration of Sergeant Colin Hall), ¶¶ 5-9; see also 18 U.S.C. § 922(t).  Lanier endorses the District's broader approach to background checks, citing a 2008 study that "found that states that use local-level agencies – such as local police or sheriff's departments – to perform background checks for firearms have lower rates of homicide and suicide than states that simply rely on a federal background check."  Lanier Decl., ¶ 19 (citing Steven A. Sumner, et al., Firearm Death Rates and Association with Level of Firearm Purchase Background Check, 35 Am. J. Prev. Med. 1-6 (2008)).  She explains the importance of fingerprinting to this process:

> [T]he criminal background check performed by MPD, which is based on fingerprints, is more effective than that performed by a gun dealer, which is merely based on a social security number. . . . The use of fingerprints provides MPD with a means of biometric identification, which ensures that the applicant is who he says he is and that MPD is performing a background check on the correct person.

Id., ¶ 20.  Webster concurs, quoting the conclusion of the GAO study mentioned above: "[T]he instant background check" required by federal law "does not positively identify purchasers of firearms . . . [and it] cannot ensure that the prospective purchaser is not a felon."  Webster Decl., ¶ 10.

Finally, the requirement that a potential registrant be photographed allows D.C. law enforcement to quickly verify an individual's identity when presented with his firearm-registration certificate.  Much like a driver's license, each firearm-registration certificate includes the photograph of the registrant taken at the time of registration.  See 24 D.C. Mun. Regs. § 2314.4 (2013).  Lanier explains the importance of including a photograph in the registration certificate:

> [A] registration certificate with photo identification . . . is critical
> to protecting the safety of police officers and the public.  . . . A
> certificate with a photo helps to quickly and safely communicate a
> registrant's legal status to a law enforcement officer.  Without this,
> in many instances it would be far more difficult for officers to
> readily distinguish between a registered owner legally transporting
> a firearm, and someone transporting an illegal firearm.  This photo
> identification, in turn, helps to keep both the officer and the
> registrant safe.

Lanier Decl., ¶ 27; see also 2012 Report at 9.  In other words, the photograph allows law

enforcement to verify visually that the person in possession of a registration certificate is indeed

its rightful holder.

The evidence shows, in sum, that the requirements that potential firearm registrants

appear in person and in possession of the weapon to be registered and that they submit to

fingerprinting and photographing help to effectuate the District's firearm-registration scheme by

preventing fraud, enabling more comprehensive background checks, and allowing police to more

easily verify the true owner of a registration certificate.  This evidence is sufficiently substantial

to justify the D.C. Council's predictions that the regulations in question will further the District's

important interests in police protection and public safety.

The Court finds, moreover, that the requirements are narrowly tailored to achieve those

interests.  The fingerprinting and photographing requirements align directly with the District's

need to verify the identity of gun registrants and perform background checks.  Although it would

be conceivably possible for the District to permit residents to register their guns remotely, the

city is not required to use the least restrictive means to further its goals here, see Heller II, 670

F.3d at 1244, and in-person registration is obviously necessary for the District to ensure that the

fingerprints and photographs that it processes are accurate.   Asking registrants to bring their

firearms with them, moreover, is the only surefire way to ensure the character of the weapon to

be registered.  The registration-process requirements, therefore, are not "substantially broader than necessary" to achieve the District's interests.  <u>Ward</u>, 491 U.S. at 799.  They satisfy intermediate scrutiny.

c.  Plaintiffs' Counterarguments

Once again, Plaintiffs launch several broadsides against the District's proffered justifications.  But once again, they miss the mark.

First, Plaintiffs contend that because MPD has not yet had a problem with individuals using fake identification cards to purchase or register firearms, <u>see</u> Plaintiffs' Excerpted Deposition of Lieutenant Jon Shelton at 4; Pl. Mot., Exh. 13 (Plaintiff's Excerpted Deposition of Daniel Webster) at 6-7, there is no need to combat fraud in the registration process.  "A fundamental principle of legislation," however, is that the legislature "is under no obligation to wait until the entire harm occurs but may act to prevent it."  <u>Turner II</u>, 520 U.S. at 212; <u>see also</u> <u>Crawford v. Marion County Election Bd.</u>, 553 U.S. 181, 194 (2008) (Indiana permitted to enact voter-ID law to combat voter fraud even though "[t]he record contain[ed] no evidence of any such fraud actually occurring in Indiana at any time in its history"); <u>Barry v. City of New York</u>, 712 F.2d 1554, 1559-61 (2d Cir. 1983) (New York City permitted to enact a regulation requiring public officials to disclose personal financial information "despite its 'virtually corruption-free history'").  The fact that MPD has not detected identity fraud in firearm registration so far does not mean that the District is barred from taking preemptive action to thwart it.

Next, Plaintiffs reassert their argument that the regulations will fail to keep weapons out of the hands of wrongdoers because "criminals already circumvent the process[] by purchasing guns on the street and bypassing registration altogether.  Only the law-abiding register their guns."  Pl. Mot. at 29; <u>see also</u> Kleck Decl., ¶¶ 16-17, 26.  This argument fails here for the same

42

reason it did when directed, as discussed earlier in this Opinion, at the basic registration

requirement for long guns.  The premise itself makes little sense – since it would invalidate any

and all gun regulations – and it fails to recognize the other important benefits of the gun registry.

Intermediate scrutiny, moreover, requires only that the challenged regulation "promote[] a

substantial government interest <u>that would be achieved less effectively absent the regulation</u>."

<u>Turner I</u>, 512 U.S. at 662 (emphasis added) (internal quotation marks and citation omitted); <u>see</u>

<u>also</u> <u>Schrader</u>, 704 F.3d at 990 (narrowly tailored in intermediate-scrutiny context means that

"'the fit between the challenged regulation and the asserted objective [need only] be reasonable,

not perfect.'").  Although the various registration requirements at issue will not prevent <u>all</u>

criminals from obtaining firearms, it surely will prevent <u>some</u> from doing so.  That is enough.

Third, Plaintiffs claim that the gun-dealer background checks mandated by federal law

cover the same ground as the District's background checks and so render them redundant.

Plaintiffs attempt to support this argument by noting that federal law prohibits firearm sales in a

state if such sales would violate federal or that state's (including D.C.'s) law.  <u>See</u> 18 U.S.C. §§

921(a)(2) & 922(t)(2).  But, as brief reflection makes clear, the first premise does not follow

from the second.  Although federal law prohibits firearm sales that violate D.C. law, that does

not mean that the criminal-background checks mandated by federal law are as comprehensive as

those required under the District's registration scheme.  Indeed, the only expert testimony in the

record on this subject suggests the contrary.  <u>See</u> Hall Decl., ¶¶ 5-9.  Not all gun sales, moreover

– <i>e.g.,</i> private transfers or gun-show sales – require a federal background check at all.  Along the

same lines, Plaintiffs challenge the study cited by Lanier for the proposition that local-level

background checks reduce suicide and homicide rates.  But even if, as Plaintiffs claim, this study

is flawed, common sense alone is enough for the District to justify its desire to perform more

comprehensive background checks than those required by federal law – obviously, more substantial background investigations should be more effective at screening out ineligible registrants.

Finally, Plaintiffs note that "[e]ven if the District wishes to conduct its own background checks, that does not require the permanent registration of the gun buyer, nor does it require recordation of the firearm." Pl. Mot. at 27. This argument ignores the District's independent reasons for establishing a firearm registry, discussed earlier. See Part III.C.1.b, *supra*. Incorporating background checks into the registration regime enhances the effectiveness of the city's registry – the registry does not exist to enable background checks.

To recap, the Court finds that the regulations associated with the registration process itself – that registrants appear in person, carrying the weapon to be registered, submit to fingerprinting, and have their photograph taken – are substantially related to the District's interests in police protection and public safety and narrowly tailored to achieving those interests. The requirements therefore satisfy intermediate scrutiny.

### 3. *The Firearms-Safety, Training, and Knowledge Requirements*

Next up is the requirement that registrants complete a firearms-training and safety class and pass a test demonstrating knowledge of the District's firearms laws in order to register a weapon. See D.C. Code § 7-2502.03(a)(10) & (13). The training and safety class is provided free of charge by MPD, see § 7-2502.03(a)(13)(A), and may be taken online or at MPD itself. See Def. Mot., Exh. C (Defendants' Responses to Plaintiffs' First Request for Production of Documents), Resp. 2. It takes from 30 minutes to one hour to complete. See Jones Decl., ¶ 26; MPD Firearms Safety Training Course, available at https://dcfst.mpdonline.com/ (last visited May 15, 2014). Once a registrant has taken the class and passed the test, he need not do so again

44

in order to register additional weapons.  <u>See</u> D.C. Code § 7-2502.03(a)(10) & (13)(A).  By now, the analytic routine should be familiar: the Court starts by assessing the burden of the requirements, next applies intermediate scrutiny, and finally addresses Plaintiffs' counterarguments.

### a.   Burden of These Requirements

The District contends that these requirements are "minimally burdensome" and so should not be considered to impinge on Plaintiffs' Second Amendment rights.  Def. Mot. at 28-29.  The Court finds otherwise.  First, <u>Heller II</u> plainly held that the required test demonstrating knowledge of the District's firearms laws was <u>not</u> merely a <i>de minimis</i> burden on the Second Amendment right.  <u>See</u> <u>Heller II</u>, 670 F.3d at 1255.  Second, that court found that a five-hour training and safety class – which was subsequently replaced with the current one-hour class – also qualified as a burden on the right to bear arms.  <u>See</u> <u>id.</u>  While it is possible, in theory, that the new, shorter training and safety class does not pose the same Second Amendment burden as the lengthier one addressed in <u>Heller II</u>, it would be a stretch to side with the District on this point.  A mandatory hour-long class is at least as much of a burden as fingerprinting or photographing, both of which the D.C. Circuit found to constitute burdens on the Second Amendment right.  <u>See</u> <u>id.</u>  The Court therefore finds that both the test and the revised class burden Plaintiffs' Second Amendment rights and will accordingly subject both to intermediate scrutiny.

### b.   Evidence Regarding These Requirements

The District has presented substantial evidence that the test and class requirements will further its interests in protecting police and public safety by reducing the risk of firearm

accidents and ensuring accountability for gun owners.  Multiple expert witnesses testified to this

effect.  First, Lanier:

> Anyone who possesses and registers a firearm should be aware of
> the laws and requirements for responsible gun ownership, as well
> as key safety principles. . . .  Training with respect to safe handling
> and storage of a firearm is a requirement in most every law
> enforcement profession that requires the carrying of a firearm.
> Safe handling is one of the very first components of training, to
> reduce accidental discharges . . . .  Moreover, in order to make
> registrants more clearly accountable under the law, it is important
> to be able to demonstrate that they were taught and aware of the
> requirements.

Lanier Decl., ¶¶ 23-24.  Next, Jones:

> In my opinion, requiring potential firearms owners to take a safety
> course addressing the safe handling, use, and storage of their
> firearms is a fundamental requirement encouraging responsible
> gun ownership.  Understanding the risks inherent to firearms
> ownership is common sense and may assist in reducing
> unintentional discharges and injuries. . . .  I believe that instructing
> District registrants in the widely accepted methods of safe storage,
> particularly in homes with children, is vitally important to both
> limiting access to the firearms only to authorized users and
> reducing theft, accidents, and other unintended consequences of
> bringing a firearm into the home.

Jones Decl., ¶¶ 25, 27.  Finally, Vince:

> Requiring citizens who want to register their firearms to take a
> course to learn about the safe use, handling, and storage of those
> firearms is just common sense.  Every person who owns a gun
> should be required to take such a course.  Because every firearm
> has the potential to seriously injure or kill, those who want to use
> such weapons should be trained in how to do so safely, to reduce
> the risk of accidental discharges. . . .  Requiring gun owners to
> know how to safely handle and store their weapons clearly reduces
> the risk of potentially fatal accidents.  I do not know of one firearm
> expert or law enforcement trainer who has not strongly
> recommended attending and successfully passing a safety course
> prior to owning or using a firearm.

Vince Decl., ¶ 23.

In sum, these three expert opinions comprise substantial evidence that the District's mandatory course on firearms safety and test on firearms regulation will help to prevent firearm accidents and ensure accountability under the law.  It is also common sense to believe that mandatory training in firearm safety and testing in firearm regulations will encourage compliance and reduce accidents – accidental gun deaths, of course, are not even counted in homicide figures.

The Court finds, moreover, that these requirements are narrowly tailored to the District's interests here.  The D.C. Council obviously attempted to lighten the burden of the safety course, reducing it from five hours to only one, and requirements such as these are not unfamiliar.  It is standard practice, for example, to require motorists to demonstrate their knowledge of roadway laws and safety in order to obtain a driver's license.  Asking gun owners to take a short class and pass a minor test – once – in order to wield deadly weapons fits the District's interests in public safety and police protection.  The firearms-safety, training, and knowledge requirements therefore satisfy intermediate scrutiny.

### c.  Plaintiffs' Counterargument

Plaintiffs' only counterargument is to insist that "[n]o evidence exists that training or the test protects police officers or controls crime. . . . [T]he District's experts cite no studies showing that mandatory training or testing in gun safety reduce unintentional discharges."  Pl. Mot. at 36-37.  As already established in this Opinion, however, the District need not prove with empirical evidence that its firearm regulations will have their intended effect, see Part III.2.b, *supra* – it "may rely on any evidence that is 'reasonably believed to be relevant,'" Alameda Books, 535 U.S. at 438 (quoting Renton, 475 U.S. at 51-52), including "anecdotes . . . history, consensus, and simple common sense."  Lorillard Tobacco, 533 U.S. at 555 (internal quotation marks

omitted).  The expert testimony here – as well as the commonsense notion that training gun

owners in firearms safety and regulation will likely reduce accidents and increase accountability

– is enough for the provisions at issue to survive intermediate scrutiny.

### 4.  *The One-Pistol-Per-Month Limit*

The next provision Plaintiffs have challenged limits District residents to registering one

pistol every 30 days.  See D.C. Code § 7-2502.03(e).  The rule includes an exception for new

District residents, who may register multiple pistols in a single month "if those pistols were

lawfully owned in another jurisdiction for a period of 6 months prior to the date of the

application."  Id.  The Court proceeds as it did before: burden, intermediate scrutiny, Plaintiffs'

counterarguments.

### a.  Burden of This Limit

Defendants argue that the one-pistol-per-month limit does not substantially burden the

Second Amendment right, but since the Heller II court has already found otherwise, see 670 F.3d

at 1255, the Court must accept that finding and subject the restriction to intermediate scrutiny.

### b.  Evidence Regarding This Limit

As it did for the three previously discussed challenges, the District has again put forward

substantial evidence linking the one-pistol-per-month limit to a reduction in illegal gun

trafficking.  The D.C. Council's Committee on the Judiciary relied on a number of empirical

studies linking multiple gun purchases to gun trafficking, including:

- A study showing that "handguns involved in bulk purchases were 33% more likely to be used in crime than handguns purchased individually," 2012 Report at 15 (citing Mona Wright *et al*., Factors Affecting a Recently Purchased Handgun's Risk for Use in Crime Under Circumstances that Suggest Gun Trafficking, 87 J. URBAN HEALTH: BULL. OF THE NEW YORK ACAD. OF MED. 352, 356 (2010));
- A study showing that in Maryland "multiple-gun sales were up to 64% likely to be used in crime," id. (citing Christopher S. Koper, Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking and Criminal

Gun Use, Report to the National Institute of Justice 6, 83 (2007), available at https://www.ncjrs.gov/pdffiles1/nij/grants/221074.pdf (last visited May 15, 2014));

- A study showing that Virginia's one-pistol-per-month limit "reduced by 66% the odds that a crime gun was purchased in Virginia rather than elsewhere in the Southeast." Id. (citing Douglas Weil & Rebecca Knox, Effects Limiting Handgun Purchases on Interstate Transfer of Firearms, 275 J. AM. MED. ASS'N 1759, 1760 (1996)).

On remand, the District has further supplemented this already-impressive array of evidence with the testimony of several of its expert witnesses, who all support the one-pistol-per-month limit as a way to combat gun trafficking. Jones reflects: "In my experience, laws that limit the quantity of firearms that can be purchased or registered during a given time period make it more difficult for firearms traffickers to acquire and resell guns from that municipality or state." Jones Decl., ¶ 18. If gun registrations are capped, Jones explains, "[i]llegal gun sellers must then travel farther to obtain their goods, limiting their ability to employ local straw purchasers and generally reducing or removing the illegal seller's capacity to profit from his or her gun sales." Id. Jones says that his experience as an ATF agent in the District confirmed these observations. See id., ¶¶ 19-20. Vince, too, backs the limitation on multiple handgun sales: "In my opinion, one of the most effective methods of disrupting illegal interstate trafficking of firearms are state and local laws that limit the quantity of firearms that can be purchased or registered during a given time period." Vince Decl., ¶ 17. He endorses the District's version of the limitation: "I believe that the District's current law, which limits an individual to registering no more than one pistol during a 30-day period, is an effective means of limiting the illegal trafficking of guns into (or out of) the District." Id., ¶ 18; see also Lanier Decl., ¶ 30 ("In my opinion, the District's prohibition on registering more than one newly acquired handgun per month provides important benefits in terms of deterring and controlling the trafficking of firearms into or out of the District."). The limit, in short, prevents gun trafficking by limiting the flow of new handguns into the community.

The Court notes, furthermore, that Jones's testimony suggests an additional justification for the restriction unrelated to gun trafficking: It is a way to limit misuse of firearms by limiting access to multiple firearms.  <u>See</u> Jones Decl., ¶ 17.  In backing the limitation on this basis, Jones explains that his experience and his research have convinced him that "the single greatest risk factor for being murdered with a firearm, committing suicide with a firearm, or being injured by unintentional discharge of a firearm, is the easy availability of a firearm."  <u>Id.</u>  Limiting District residents to one pistol each month, in other words, will reduce the overall number of firearms in circulation within city bounds and thereby decrease the risk that District residents will be killed or injured, or will kill themselves, with a firearm.  That decrease is obviously related to the District's substantial interest in promoting public safety.  Although the Second Amendment "protects a personal right to keep and bear arms," including handguns, "for lawful purposes, most notably for self-defense within the home," <u>McDonald</u>, 130 S. Ct. at 3044, the Amendment has not been read to protect the right to amass a personal armory with a single stop at the gun shop.  While the District must respect the right of each resident to possess <u>a</u> handgun in his home for self-defense, it is also well within its constitutional powers to constrain the rate at which its residents accumulate deadly weapons.  All in all, this combination of empirical research and expert testimony constitutes substantial evidence supporting the D.C. Council's judgment that a one-pistol-per-month registration limit will reduce illegal gun trafficking and promote public safety.

The limit, moreover, is narrowly tailored to those interests.  The District has applied the rule only to pistols, rather than to all guns, and it permits new residents who own several pistols to grandfather all of them in at once.  The District might have adopted a less restrictive limit on multiple-gun purchases – one pistol per week, for example – but intermediate scrutiny does not

require it to use the least restrictive means possible, see Heller II, 670 F.3d at 1258, and even under the current limitation, District residents can still accumulate up to 12 new pistols each year.  That is more than enough.  The limitation is therefore not substantially broader than necessary to achieve the District's interests in this case and it survives intermediate scrutiny.

### c.   Plaintiffs' Counterarguments

Plaintiffs stand at the ready with two arguments against the District's evidence on this point – one empirical and the other more abstract.  Neither is convincing.

First, Plaintiffs question the reliability of the studies cited by the District, noting that there is no evidence that the District's own one-pistol-per-month limit has had any beneficial effects since it was enacted in 2009 and that several of the studies to which the District cites addressed either individual states without firearm registries or multiple states without regard to whether they had firearm registries or not.  Yet this objection does little to discredit the D.C. Council's judgment on the matter.  Although the research cited by the District may not be perfect, it is clearly sufficient to support a reasonable inference that limitations on multiple gun registrations, such as the one at issue here, will help to reduce illegal gun trafficking.

Second, Plaintiffs question the theory behind the limitation, since, as Lanier concedes in her deposition, it does not seem likely that an aspiring gun trafficker would purchase multiple pistols in the District and then seek to register them before passing them along to his customers. See Pl. Reply, Exh. 24 (Plaintiffs' Excerpted Deposition of Cathy Lanier, Part II) at 5-7.  Yet this critique, ironically, is practically an argument for the restriction in question: Precisely because gun traffickers are unlikely to attempt to register their wares, the one-pistol-per-month limitation allows D.C. law enforcement to identify and prosecute would-be criminals who have unregistered pistols in their possession.  Plaintiffs, moreover, once again overstate the degree of

"fit" required in this case.  As explained earlier, intermediate scrutiny demands only that the challenged regulation fit its objectives reasonably, not perfectly.  <u>See</u> <u>Schrader</u>, 704 F.3d at 990.

The provision must "promote[] a substantial government interest <u>that would be achieved less effectively absent the regulation</u>."  <u>Turner I</u>, 512 U.S. at 662 (emphasis added) (internal quotation marks and citation omitted).  By making it harder to purchase multiple handguns in a short period of time, the limitation likely deters at least some potential traffickers in the District who would have continued to ply their trade in the absence of the regulation.  This is all the law requires for the limitation to survive intermediate scrutiny.

### 5.   *The Renewal Requirement*

Plaintiffs next challenge the provision mandating that firearm-registration certificates automatically expire three years after the date they are issued, unless the registrant renews them. <u>See</u> D.C. Code § 7-2502.07a(a).  Registrants are eligible to renew their certificates so long as they continue to meet the District's initial registration requirements, <u>see</u> § 7-2502.03(a), and follow any procedures the MPD Chief establishes by rule.  <u>See</u> § 7-2502.07a(b).

At least some of the renewal process apparently depends on when the registration certificate was issued.  For firearms registered <u>before</u> January 1, 2011, the Chief of MPD is assigned the task of "establish[ing], by rule, a method for conducting the renewal of registration certificates."  § 7-2502.07a(g).  The Chief recently did just that, requiring that such registrants appear in person at the MPD's Firearm Registration Section, be fingerprinted, and submit an attestation confirming that they continue to possess the firearms in question, updating their current residential addresses, and affirming that they are still compliant with the District's various registration requirements.  <u>See</u> 24 D.C. Mun. Regs. § 2326.2.  Registrants must submit their renewals in accordance with a schedule that stretches over the course of the next two years,

with each gun owner assigned a particular three-month renewal period based on his date of birth.
See § 2326.3.

For firearms registered <u>after</u> January 1, 2011, the renewal process is specified in part by
statute.  Renewal notices are to be mailed to each registrant by MPD at least 90 days prior to the
expiration of his registration certificate.  See D.C. Code § 7-2502.07a(e)(1).  Registrants must
submit their renewals at least 60 days prior to the expiration of the registration certificate at
issue.  See § 7-2502.07(e)(2).  For each renewal, the registrant must submit a statement attesting
to his continued possession of the registered firearm, his address, and his continued compliance
with the various registration requirements.  See § 7-2502.07a(c)(1).  That statement must be
submitted on a form provided by the Chief of MPD "that can be submitted online via the
Metropolitan Police website, by mail, or in person."  § 7-2502.07a(c)(2).  It appears that the
Chief may establish additional rules to govern renewal for post-January 1, 2011, registrations,
see § 7-2502.07a(b), but none has yet been issued.

Presumably, the difference in treatment between pre- and post-January 1, 2011,
registrants will only persist for this first round of registration renewals.  In other words, the Court
assumes, based on the language of the statute, that after the pre-January 1, 2011, registrants have
renewed their registrations in accordance with the procedures specified by MPD, they will in the
future be subject to the same expiration and renewal rules as post-January 1, 2011, registrants.
To continue to treat pre- and post- January 1, 2011, registrants differently, after all, would make
no sense based on the record before the Court, and the Court sees no reason to attribute any such
purpose to the D.C. Council or to MPD.

Plaintiffs challenge both the fact that registration certificates expire – and thus must be
renewed – and the renewal procedures themselves.  To determine the constitutionality of the

renewal requirement, then, the Court must answer two separate questions.  First, is the "basic"

fact of registration expiration and renewal permissible, in isolation from whatever renewal

process has been specified by law?  And second, are the specific renewal procedures selected by

the District themselves consistent with the Second Amendment?  As the <u>Heller II</u> court has

already held that requiring registration renewal every three years imposes more than a *de minimis*

burden on Plaintiffs' Second Amendment rights, <u>see</u> <u>Heller II</u>, 670 F.3d at 1255, the Court will

address these issues under intermediate scrutiny.

a.   Evidence Regarding Certificate Expiration and Renewal

(i)      Basic Fact of Expiration and Renewal

On the first question, the Court finds that the District has presented substantial evidence

that the basic fact of registration expiration and renewal furthers the government's substantial

interests in this case by ensuring that the registry remains accurate and encouraging gun owners

to account for their firearms.  Several expert witnesses testify that requiring District gun owners

to renew their registrations every three years will improve public safety by making sure that, in

the time since they first registered, they have not fallen into a category of persons prohibited

from owning a firearm – for example, if they had been convicted of a disqualifying crime.  <u>See</u>

Jones Decl., ¶ 23-24; Vince Decl., ¶ 22; Webster Decl., ¶ 30; 2012 Report at 10-11.  Relatedly,

the D.C. Council's Committee on the Judiciary observed that registration expiration and renewal

would help "keep[] the registration records up to date."  2012 Report at 10.  While the previous

version of the registry law had not mandated renewal and instead simply "require[d] registrants

to notify MPD of any change in registration status," in the meantime "[t]housands of registrants

ha[d] moved, died, disposed of their guns (perhaps lost them) and ha[d] not notified MPD.

[Accordingly,] MPD has told the Committee that many registrants cannot be located."  <u>Id.</u>

Renewal, according to the evidence, will not only improve the accuracy of the District's registry, but it will also help keep track of residents' firearms.  The Committee noted that requiring gun owners to renew their registrations "likely causes the owner to look for his or her gun if it hasn't been used, and this assures that the gun has not been lost or stolen."  Id. at 11. Renewals also require registrants to "affirm[] continued possession of the firearm, which could prohibit an individual from later asserting that he or she did not know that the firearm was lost or stolen."  Id.  Indeed, Webster compares this system "to the widely-accepted Federal requirement that licensed gun dealers be audited periodically to make sure that they can account for their firearms."  Webster Decl., ¶ 30.  All in all, this evidence suffices to justify the District's judgment that the renewal requirement will help maintain an accurate gun registry and prompt residents to account for the weapons in their possession – both important benefits for ensuring public safety and protecting District police.

Expiration and renewal, moreover, are narrowly tailored to the District's interests in this case.  Asking gun owners to renew their registrations – just like motorists must renew their driver's licenses – is hardly an oppressive burden, and the Court can imagine no easier way for the city to both maintain the accuracy of its gun registry and ensure that gun owners regularly account for their weapons other than by requiring registrants to periodically update and affirm their information.  At the same time, this policy helps the District to perform continuous background checks on gun owners in the city.  Indeed, it is telling that Plaintiffs themselves suggest no more narrowly tailored alternative that could achieve all three goals at once. Although there may be cleaner ways for the District to pursue each of these benefits separately, the fit here need only be reasonable, not perfect.  See Schrader, 704 F.3d at 990.  The basic fact of registration expiration and renewal satisfies that requirement.

(ii)     Renewal Procedures

On the second question, the Court similarly finds that there is substantial evidence

supporting the actual renewal process that has been specified by the District and by MPD.

MPD's announced process for pre-January 1, 2011, registrants, who must renew their certificates

in person and submit to fingerprinting, finds support in the evidence justifying in-person

registration and fingerprinting.  See Part III.C.2.b, *supra*.  Just as the District may require in-

person appearance and fingerprinting at the time of registration in order to combat fraud and

perform background checks, it is a reasonable inference that those means are also appropriate at

the time of renewal for the same reasons.  The renewal process specified by statute for post-

January 1, 2011, registrants appears even less burdensome, since it provides that such renewals

may be submitted not only in person, but also online or via mail.  See D.C. Code § 7-

2502.07a(c)(2).  If MPD ultimately enacts more onerous policies for those renewals, Plaintiffs

may file another Second Amendment challenge.  As the record stands, however, the Court finds

that the renewal procedures that have been put in place so far are justified by the evidence.

The specified renewal procedures, moreover, are sufficiently narrowly tailored to survive

intermediate scrutiny.  Requiring in-person renewal for pre-January 1, 2011, registrants might

well be broader than necessary to achieve the District's goals, since the D.C. Council has

provided that post-January 1, 2011, registrants will also be able to renew their registrations

online or by mail.  See § 7-2502.07(c)(2).  Given that this requirement is apparently only a one-

time deal, however, and that it will only apply to a fraction of District gun owners, the Court

finds that it is "not substantially broader than necessary" to achieve the city's interests in this

case.  Ward, 491 U.S. at 799 (emphasis added); see also Heller II, 670 F.3d at 1258 (intermediate

scrutiny does not require government to use "the least restrictive means") (internal quotation

marks omitted).  The outcome might be different if the District were to require in-person

renewals for all gun owners in perpetuity, but on these facts, the government has not colored too

far outside the lines.  As for the post-January 1, 2011, registrants, the online and mail renewal

options are minimally burdensome and fit well to the District's interests in receiving updated

registry information and ensuring that gun owners account for their weapons.  They therefore

satisfy intermediate scrutiny.

### b.   Plaintiffs' Counterarguments

Plaintiffs raise several objections to the District's arguments on this point.  None of their

three points, however, alters the outcome.

First, Plaintiffs complain that the District's experts "cite no studies showing that periodic

registration renewal . . . reduce[s] crime or protect[s] police officers."  Pl. Mot. at 34.  But

Plaintiffs lost on this point far earlier – as the Court has already explained, the District need not

provide empirical studies conclusively proving the effectiveness of the challenged provisions.  It

need only put forward evidence "reasonably believed to be relevant to the problem" at hand,

Renton, 475 U.S. at 51-52, in order to show that "in formulating its judgments, [the D.C.

Council] has drawn reasonable inferences based on substantial evidence."  Turner I, 512 U.S. at

666.  The District has met that burden here.

Next, Plaintiffs claim that it is unnecessary to require gun owners to renew their

registrations in order to ensure that they have not committed a disqualifying criminal offense

subsequent to their initial background checks – the District could simply conduct those checks

remotely.  See Plaintiffs' Excerpted Deposition of Cathy Lanier at 27-28.  Indeed, to some

extent, it appears that this is already the District's current practice.  See Plaintiffs' Excerpted

Deposition of Lieutenant Jon Shelton at 8-11.  While the District could conduct background

checks remotely, however, Plaintiffs forget that this is not the sole purpose of the renewal requirement.  As already noted, the renewal process also serves to maintain the accuracy of the information in the District's gun registry and to ensure that gun owners periodically account for their weapons.  Even without the need to perform a background check, then, the renewal requirement is narrowly tailored to the District's important interests.

Finally, Plaintiffs charge that the renewal requirement imposes an especially severe and unjustifiable burden on individuals who own several firearms, since they may need to appear multiple times at MPD to renew their registrations and pay multiple renewal fees.  The process for renewing pre-January 1, 2011, registrations, however, appears to allow gun owners to renew multiple weapons in a single trip, see Firearms Registration Renewal Application, Metropolitan Police Department, available at http://goo.gl/LUKYqT (last visited May 15, 2014) (permitting renewal of three different firearm-registration certificates via a single form); Firearms Registration Renewal Application – Additional Registered Firearms, Metropolitan Police Department, available at http://goo.gl/DP0jdL (last visited May 15, 2014) (permitting renewal of twelve additional firearm registration-certificates via a single form), and the renewal fees are assessed on a per-registrant basis, not per firearm.  See Firearms Registration Renewal: Complete Renewal Procedures, Metropolitan Police Department, available at http://mpdc.dc.gov/node/750552 (last visited May 15, 2014) ("Regardless of the number of firearms you have registered, you will pay a total of $48, which includes a registration fee of $13 and a fingerprinting/FBI background check fee of $35.").  There is thus no special burden on multiple-gun owners who are renewing pre-January 1, 2011, certificates.  The process for renewing post-January 1, 2011, has not yet been announced in full, but as the record stands, there

is no reason to believe that it will impose a more onerous burden on multiple-gun owners than the system just described.

In any event, as alluded to earlier, see Part III.C.4, *supra*, the Second Amendment has so far been read to protect only "a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." McDonald, 130 S. Ct. at 3044.  While one or two firearms may be necessary for such purposes, a large collection of weapons is not.  The Constitution, in short, guarantees the right "to keep and bear arms," not the right "to keep and bear an armory."  As an individual seeks to acquire more guns, he moves farther and farther away from the right to bear arms and closer toward the constitutionally unprotected goal of assembling a personal arsenal.  Any special burden the renewal requirement places on owners of multiple firearms, then, is outside the Second Amendment's ken.

Because the record evidence demonstrates that the expiration of firearm-registration certificates and the accompanying renewal requirement are substantially related to the District's interests in protecting police and promoting public safety as well as narrowly tailored to those interests, the provisions survive intermediate scrutiny.

6. *The Administrative and Enforcement Provisions*

Plaintiffs also challenge several provisions related to the administration and enforcement of the District's gun-registry scheme.  These include the requirement that gun owners keep their registration certificates with them when they are in possession of their registered firearms and be able to exhibit the certificate upon the demand of law enforcement, see D.C. Code § 7-2502.08(c); the requirement that gun owners notify MPD in writing if their registered weapons are ever lost, stolen, or destroyed, if they sell or transfer their weapons, or if they change their name or address, see § 7-2502.08(a); the fees associated with the registration process, see § 7-

2502.05(b); Shelton Decl., ¶ 8; and the penalties for violations of the registration scheme.  See §

7-2507.06.

Although both parties devote several pages of their pleadings to this matter, the

constitutionality of these provisions has already been established by the D.C. Circuit.  In Heller

II, the panel majority noted that "plaintiffs . . . challenge several administrative and enforcement

provisions incidental to the underlying regime," including the ones just listed, but that these

provisions were "lawful insofar as the underlying regime is lawful and hence enforceable."

Heller II, 670 F.3d at 1249 n.*.  That holding by the Court of Appeals is binding on this Court,

and Plaintiffs have provided no reason to question it.  Because the Court has found the

underlying registration regime lawful, these provisions are also bulletproof.

> D.  Plaintiffs' Standing to Challenge Vision Requirement

The final provision of the D.C. gun registry at issue in this case is the requirement that a

registrant "not [be] blind."  D.C. Code § 7-2502.03(a)(11).  Because none of the Plaintiffs is

blind, however, they lack standing to challenge this rule.  The Court, consequently, need not

address Plaintiffs' argument about why even the blind should be allowed to own firearms.

To sue in federal court, a plaintiff must have "standing."  Standing requires that a

plaintiff "allege[] such a personal stake in the outcome of the controversy as to warrant the

invocation of federal-court jurisdiction."  Summers v. Earth Island Inst., 555 U.S. 488, 493

(2009) (internal quotation marks omitted).  Standing comprises three elements: (1) that the

plaintiff suffered a concrete and particularized injury that is actual or imminent, not conjectural

or hypothetical; (2) that there is a causal relationship between the plaintiff's injury and the

defendant's conduct; and (3) that it is likely that a victory in court will redress the plaintiff's

injury.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  "[A] plaintiff must

demonstrate" all three elements of standing "for each claim he seeks to press." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006).

It is undisputed that none of the Plaintiffs in this case is "blind" as defined by D.C. law. See Def. Mot., Ex. E (Plaintiffs' Responses to Defendants' First Requests for Admissions), Resp. 3.  They have thus suffered no "concrete and particularized" injury as a result of the District's prohibition on blind gun registrants.  Lujan, 504 U.S. at 560; see also Pennell v. City of San Jose, 485 U.S. 1, 8 (1988) ("A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement.").  As a result, they lack standing to challenge the vision requirement.

Fighting every possible skirmish, Plaintiffs contend that "because of age and other factors," they "may well face blindness, and need to plan accordingly for the uncertainties that condition may entail."  Pl. Mot. at 49.  That may well be true, but it is both too "speculative" to support their claim, Whitmore v. Arkansas, 495 U.S. 149, 157 (1990), and the kind of "'generalized grievance' shared in substantially equal measure by all or a large class of citizens" that "normally does not warrant exercise of [federal court] jurisdiction."  Warth v. Seldin, 422 U.S. 490, 499 (1975).

In a last-ditch effort to save this piece of their case, Plaintiffs grasp hold of a single phrase from the Heller II decision, where the court observed:

> [S]ome of the plaintiffs' arguments – in particular with respect to the provisions requiring registrants to demonstrate knowledge about firearms, meet a vision standard, and take a training course – are so cursory we might, in other circumstances, consider them forfeit.  As we will in any event be remanding other registration requirements to the district court, however, we see no reason to foreclose these particular plaintiffs from fleshing out their arguments as well as supplementing the record, if they can.

Heller II, 670 F.3d at 1256 n.* (emphasis added) (citations omitted).  Plaintiffs contend that the court's stray reference to "these particular plaintiffs" affirms their standing to challenge the vision requirement.  But they read too much into too little.  Even if the Court were to accept that the D.C. Circuit intended these three words to bear so much weight, it is clear from context that the Court of Appeals was referring to the question of whether it should dismiss the vision-requirement claim as forfeit or remand it so that Plaintiffs could develop it further.  The court passed no judgment on the question of whether Plaintiffs had standing to press their vision claim – it simply allowed that "these particular plaintiffs" could try to explain that claim on remand.

In now considering the question, the Court finds no standing to exist.

## IV.     Conclusion

For the foregoing reasons, the Court will issue a contemporaneous Order that will grant in full the District's Motion to Dismiss and deny Plaintiffs'.  The Court will dismiss with prejudice all of Plaintiffs' challenges to the District's firearm laws, except for their challenge to the vision requirement for gun registration, which, having been decided on jurisdictional grounds, will be dismissed without prejudice.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  May 15, 2014