No. 14-7071

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————————————————

**DICK ANTHONY HELLER, ABSALOM JORDAN,
WILLIAM CARTER, WILLIAM SCOTT, and ASAR MUSTAFA**

*Appellants*

v.

**THE DISTRICT OF COLUMBIA and
VINCENT C. GRAY, Mayor, District of Columbia**,

*Appellees*

—————————————————

**BRIEF FOR APPELLANTS**

—————————————————

Appeal from the U.S. District Court
for the District of Columbia
District Ct. Civil No. 08-1289 (JEB)

Stephen P. Halbrook
3925 Chain Bridge Road, Suite 403
Fairfax, VA  22030
(703) 352-7276
protell@aol.com

Dan M. Peterson
Dan M. Peterson, PLLC
3925 Chain Bridge Road, Suite 403
Fairfax, VA  22030
(703) 352-7276
dan@danpetersonlaw.com

*Counsel for Appellants*

# CERTIFICATE OF COUNSEL AS TO PARTIES, RULINGS, AND RELATED CASES

## Parties and Amici

The plaintiffs in the district court were Dick Anthony Heller, Absalom F. Jordan, Jr., William Carter, Mark Snyder, William Scott, and Asar Mustafa. The defendants in the district court were the District of Columbia, Mayor Vincent C. Gray, and former Mayor Adrian M. Fenty. There were no amici in the district court. In this court, Appellants are Dick Anthony Heller, Absalom F. Jordan, Jr., William Carter, William Scott, and Asar Mustafa. Appellees are the District of Columbia and Mayor Vincent C. Gray. No other parties, and no intervenors or amici, have appeared in this court.

## Ruling Under Review

The ruling under review by this court is the Order and Memorandum Opinion by Hon. James E. Boasberg of May 15, 2014, granting defendants' motion for summary judgment, denying plaintiffs' cross-motion for summary judgment, and entering judgment in favor of defendants. The ruling is at Joint Appendix ("JA") 942. It has not been reported, but may be found at 2014 WL 1978073. As part of the review of the final judgment, appellants also contest the interlocutory Memorandum Opinion and Order by Judge Boasberg denying plaintiffs' Motions to Strike Expert Reports, and treating such motions as motions *in limine*. The

Order and Memorandum Opinion, entered July 8, 2013, may be found at JA 69, 70, and the Opinion is reported as *Heller v. District of Columbia*, 952 F. Supp.2d 133 (D. D.C. 2013).

## Related Cases

This case was previously appealed to this court as *Heller v. District of Columbia*, Case No. 10-7036.  Other than that, this case has not previously been before this court or any other court other than the court below.  Counsel are unaware of any related cases currently pending in this court or any other court.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF COUNSEL AS TO PARTIES,
RULINGS, AND RELATED CASES ...................................................................i

TABLE OF AUTHORITIES ........................................................................vi

GLOSSARY ...............................................................................................xvi

JURISDICTIONAL STATEMENT ..............................................................1

STATEMENT OF ISSUES ...........................................................................2

CONSTITUTION, STATUTES, AND REGULATIONS ............................2

STATEMENT OF THE CASE ......................................................................2

    A.  Prior Proceedings in the Courts ......................................................2

    B.  Registration, Expiration, and Re-Registration Provisions ............4

    C.  Application and Effect of the Registration System .......................6

    D.  Burdens on Registrants ...................................................................8

SUMMARY OF ARGUMENT .....................................................................11

ARGUMENT .................................................................................................15

Standard of Review .......................................................................................15

I.  THE DISTRICT HAS THE BURDEN TO SHOW A NARROWLY-
TAILORED, TIGHT FIT BETWEEN REGISTRATION AND
PROTECTION OF POLICE OFFICERS AND CRIME CONTROL ..........16

A. This Court Held that the District Failed to Meet Its Burden ....................... 16

B. The District Must Show that Its Restrictions
Will in Fact Alleviate the Alleged Harms
in a Direct and Material Way ........................................................................... 20

C. A "Double Deference" Rule Does Not Apply to
Restrictions on Second Amendment Rights ..................................................... 23

II. THE DISTRICT'S FIREARM REGISTRATION
REQUIREMENTS VIOLATE THE SECOND AMENDMENT ............................. 25

A. The District's Foremost Purported Reason for
Registration – To Allow Police to Determine if Firearms
are Present When Responding to a Call – Turns Out to Be False.................... 26

B. Registration of Long Guns is Not a Narrowly-Tailored
Means to Protect Police Officers and Control Crime....................................... 29

    1. No Nexus Exists Between Registration
    and the Governmental Objectives ........................................................... 29

    2. Long Gun Registration Laws Are Novel, Outlier
    Restrictions that Are Not Narrowly Tailored .......................................... 36

C. In-Person Appearance, Photographing, Fingerprinting, Bringing
the Firearm to the MPD, and Re-Registration are Not Narrowly
Tailored Means to Achieve the Governmental Ends........................................ 38

    1. The National Instant Criminal Background Check
    System (NICS): Screening of Firearm Purchasers
    Without Registration ............................................................................... 39

    2. In-Person Appearance, Fingerprinting,
    and Photographing.................................................................................. 42

    3. Bringing the Firearm to MPD ............................................................ 46

4. Expiration and Re-registration ............................................................47

5. Payment of Fees ...................................................................51

D. The Requirements to Take a Test and Complete a Class
Do Not Protect Police Officers or Control Crime ............................................51

E. The Prohibition on Registering More Than One Pistol
in Thirty Days Does Nothing to Prevent Illegal Trafficking............................54

III. THE TRIAL COURT ERRED IN ADMITTING AND
RELYING UPON PURPORTED EXPERT OPINION
THAT WAS NOT BASED ON FACTS OR DATA..................................................58

CONCLUSION ...........................................................................64

CERTIFICATE OF COMPLIANCE...........................................................66

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES*

**CASES** <span style="float:right">**Page**</span>

*Ayissi–Etoh v. Fannie Mae*, 712 F.3d 572
(D.C. Cir. 2013)........................................................................... 15

*Barnett v. PA Consulting Group, Inc.*,
715 F.3d 354 (D.C. Cir. 2013) .....................................................16

*Berger v. Iron Workers Reinforced Rodmen*,
170 F.3d 1111 (D.C. Cir. 1999) .................................................. 15

*Board of Trustees of State Univ. of N.Y. v. Fox*,
492 U.S. 469 (1989) ................................................................... 18

*Burkhart v. Washington Metropolitan Area
Transit Authority*, 112 F.3d 1207 (D.C. Cir. 1997) ..................... 62

*Cablevision Systems Corp. v. FCC*,
649 F.3d 695 (D.C. Cir. 2011) .................................................... 21

*City of Mobile, Ala. v. Bolden*, 446 U.S. 55 (1980)...................... 53

*Crawford v. Marion County Election Bd.*, 553 U.S. 181 (2008)................................. 53

*District Intown Properties Ltd. Partnership
 v. District of Columbia*, 198 F.3d 874 (D.C. Cir. 1999)............................................. 15

*\*District of Columbia v. Heller*,
554 U.S. 570 (2008) ..................................................... 3, 16, 23, 24, 25, 33
<span style="float:right">36, 37, 48, 53</span>

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).......................................59

*Authorities chiefly relied upon are marked with asterisks.

*Edwards v. District of Columbia,*
755 F.3d 996 (D.C. Cir. 2014) .................................................................... 22, 37, 54, 57

*Elk Grove Unified Sch. Dist. v. Newdow,*
542 U.S. 1 (2004) ................................................................................................ 38

*Estate of Gaither v. District of Columbia,*
831 F. Supp.2d 56 (D. D.C. 2011) ....................................................................... 59

*Gen. Elec. Co. v. Joiner,* 522 U.S. 136 (1997) ............................................................. 59

*Harper v. Virginia State Board of Elections,*
383 U.S. 663 (1966) ............................................................................................ 51

*Heller v. District of Columbia,* 670 F.3d 1244
(D.C. Cir. 2011)
("*Heller II*") ............................................................... 3, 11, 12, 17, 18, 19, 24, 25, 26
29, 31, 35, 36, 38, 52, 59, 63

*Heller v. District of Columbia,*
952 F. Supp.2d 133 (D.D.C. 2013) ....................................................................... ii

*Heller v. District of Columbia,* No. 08-1289,
2014 WL 1978073 (D.D.C. May 15, 2014) .......................................................... i

*Joy v. Bell Helicopter Textron, Inc.,*
999 F.2d 549 (D.C. Cir. 1993) ............................................................................. 59

*Kachalsky v. County of Westchester,*
701 F.3d 81 (2d Cir. 2012) .................................................................................. 24

*Kerr v. Hickenlooper,* 744 F.3d 1156 (10th Cir. 2014) ............................................... 36

*Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525 (2001) ................................................. 21

*McCullen v. Coakley,* 134 S.Ct. 2518 (2014) ....................................................... 37, 38

*McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010) ........................................ 16, 23

vii

*Miller v. Reed*, 176 F.3d 1202 (9th Cir. 1999).................................................................. 53

*Murdock v. Com. of Pennsylvania*, 319 U.S. 105 (1943) ............................................. 51

*Riley v. California*, 134 S.Ct. 2473 (2014) ..................................................................... 28

*Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995) ........................................................ 20

*Schrader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013) ...................................................... 24

*Staples v. United States*, 511 U.S. 600 (1994) .............................................................. 36

*Thomas v. Collins,* 323 U.S. 516 (1945) ......................................................................... 37

*Turner Broadcasting System, Inc. v. FCC,*
512 U.S. 622 (1994) ("*Turner I*") ...................................................................... 20, 21, 24

*Turner Broadcasting System, Inc. v. FCC,*
520 U.S. 180 (1997) ("*Turner II*") ................................................................... 21, 22, 23

*United States v. Alvarez*, 132 S.Ct. 2537 (2012) .......................................................... 22

*United States v. Day*, 524 F.3d 1361 (D.C. Cir. 2008) ................................................ 16

*United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004).............................. 59, 60, 62

*United States v. Spriggs*, 996 F.2d 320 (D.C. Cir.1993) .............................................. 62

## CONSTITUTIONS, STATUTES, AND ORDINANCES

## Federal

U.S. Const., Amend I ......................................................................................... 36

U.S. Const., Amend II..................................................2, 11, 13, 25, 36, 38, 51, 52, 56

U.S. Const., Amend IV ........................................................ 36

18 U.S.C. § 921(a)(2) ........................................................ 40

18 U.S.C. § 922(a)(3) ........................................................ 39

18 U.S.C. § 922(g) ........................................................ 39, 49

18 U.S.C. § 922(n) ........................................................ 39

18 U.S.C. § 922(t) ........................................................ 29, 39

18 U.S.C. § 922(t)(1)(C) ........................................................ 40

18 U.S.C. § 922(t)(2) ........................................................ 40, 41

18 U.S.C. § 924(a)(2) ........................................................ 49

18 U.S.C. § 1028(d)(1) ........................................................ 40

26 U.S.C. § 5841 ........................................................ 30, 48

26 U.S.C. § 5845(a)(1) ........................................................ 30

26 U.S.C. § 5845(a)(3) ........................................................ 30

28 U.S.C. § 1291 ........................................................ 1

28 U.S.C. § 1331 ........................................................ 1

28 U.S.C. § 1343(3) ........................................................ 1

28 U.S.C. § 2201 ........................................................ 1

28 U.S.C. §2202 ........................................................ 1

42 U.S.C. § 1983 ........................................................ 1

Brady Handgun Violence Prevention Act, § 103(b),
P.L. 103-159, 107 Stat. 1536 (1993) ................................................ 39

Brady Handgun Violence Prevention Act, § 103(i)(2),
P.L. 103-159, 107 Stat. 1536 (1993) ................................................ 39

NICS Improvement Amendments Act,
P.L. 110-180, 121 Stat. 2559 (2008) ................................................ 39

NICS Improvement Amendments Act, § 103(f) ................................. 40

Real ID Act, P.L. 109-13, 119 Stat. 302 (2005) .............................. 44

Science, State, Justice, Commerce, & Related
Agencies Appropriations Act, 2006, § 621,
Pub. L. 109–108, 119 Stat. 2342, 2341-42 (2005) .......................... 45

**State and foreign**

1994 Virginia Laws Ch. 624, repealed by
Acts 2012, cc. 37 and 257 ............................................................... 57

2008 Mich. Pub. Acts No. 195 (2008)
(repealing Mich. Comp. Laws § 28.429) ......................................... 47

Act of 1748, 6 Hening, Statutes at Large 109-10 ............................ 57

An Act to Amend the Criminal Code & the
Firearms Act, 1st Sess., 41st Parliament, 60-61 Elizabeth II,
2011-2012 (Statutes of Canada 2012, Ch. 6) ................................. 34

ATF, State Laws & Published Ordinances – Firearms,
https://www.atf.gov/publications/firearms/
state-laws/31st-edition/index.html ................................................... 53

Code of Iowa, tit. XVI, § 724.15 ..................................................... 33

Haw. Rev. Stat. § 134-3 ............................................................ 30, 47, 48

S.C. Code § 23-31-140(10) (repealed 2004)................................................................57

**District of Columbia**

D.C. Code § 7-2501.01 *et seq.*...........................................................................2

D.C. Code § 7-2501.01 ......................................................................................2

D.C. Code § 7-2502.01 ....................................................................................47

D.C. Code § 7-2502.01(a)....................................................................... 4, 16, 25

D.C. Code § 7-2502.02 ......................................................................................2

D.C. Code § 7-2502.03 ......................................................................................2

D.C. Code § 7-2502.03(a)................................................................................47

D.C. Code § 7-2502.03(a)(2) ..........................................................................48

D.C. Code § 7-2502.03(a)(10) ............................................................. 5, 17, 52

D.C. Code § 7-2502.03(a)(13) ................................................................. 5, 52

D.C. Code § 7-2502.03(a)(13)(A)...................................................................17

D.C. Code § 7-2502.03(b)............................................................................ 16

D.C. Code § 7-2502.03(b)(9) ...................................................................... 46

D.C. Code § 7-2502.03(d)............................................................................ 17

D.C. Code § 7-2502.03(e)..................................................................5, 17, 54

D.C. Code § 7-2502.04 ....................................................................................2

D.C. Code § 7-2502.04(a)........................................................................ 4, 17, 43

D.C. Code § 7-2502.04(b)......................................................................... 4, 17, 43

D.C. Code § 7-2502.04(c) .......................................................................... 4, 17, 46

D.C. Code § 7-2502.05 ................................................................................... 2

D.C. Code § 7 -2502.05(b).............................................................................. 5

D.C. Code § 7-2502.06 ................................................................................... 2

D.C. Code § 7-2502.07 ................................................................................... 2

D.C. Code § 7-2502.07a ................................................................................. 2

D.C. Code § 7-2502.07a(a)...................................................................... 5, 17, 47

D.C. Code § 7-2502.07a(c) ........................................................................ 5, 47

D.C. Code § 7-2502.07a(c)(2) ....................................................................... 50

D.C. Code § 7-2502.07a(a)-(c) ...................................................................... 17

D.C. Code § 7-2502.07a(d) ............................................................................ 17

D.C. Code § 7-2502.07a(e)(1) ....................................................................... 47

D.C. Code § 7-2502.07a(g) ........................................................................... 50

D.C. Code § 7-2502.08 ................................................................................... 2

D.C. Code § 7-2502.08(a) ............................................................................. 47

D.C. Code § 7-2505.01 ................................................................................ 2, 39

D.C. Code § 7 -2505.02 ................................................................................... 2

D.C. Code § 7-2505.02(c).............................................................................. 39

D.C. Code § 7-2507.06 .................................................................................2, 25

D.C. Code § 7-2507.06(a).................................................................................4

D.C. Code § 7-2507.06(b).................................................................................4

D.C. Code § 7-2508.01 *et seq.*.......................................................................43

D.C. Code § 7-2508.01(2)...............................................................................48

D.C. Code § 22-3571.01(b)(5) .........................................................................4

D.C. Code § 22-3571.01(b)(6) .........................................................................4

D.C. Code § 22-4014 .....................................................................................43

*Code of Laws for the District of Columbia* 290-91 (1819) ........................... 51

Firearms Registration Amendment Act of 2008...........................................3

Firearms Amendment Act of 2012 ........................................................3, 17

## RULES AND REGULATIONS

28 C.F.R. §25.2............................................................................................ 40

28 C.F.R. § 25.4........................................................................................... 40

28 C.F.R. § 25.6........................................................................................... 40

28 C.F.R. § 25.7........................................................................................... 41

Fed. R. Civ. P. 26(a)(2)(B) ...........................................................................58

Fed. R. Evid. 702 .....................................................................58, 59, 62, 63

Fed. R. Evid. 704(a) .................................................................................... 62

D.C. Mun. Regs. tit. 24, § 2313 .................................................................. 10

D.C. Mun. Regs. tit. 24, § 2326.2 ............................................................... 50

D.C. Mun. Regs. tit. 24, § 2331.1 ................................................................. 8

Metropolitan Police Dep't, Notice of Final Rulemaking,
60 D.C. Reg. 17215 (Dec. 27, 2013) ............................................................ 5

**OTHER AUTHORITIES**

Letitia W. Brown, *Free Negroes in the
District of Columbia, 1790-1846* (1972) ...................................................... 51

Council of the District of Columbia Committee
on Public Safety and the Judiciary, Report on Bill
17–1843, "Firearms Registration Amendment Act of 2008" ............. 12, 18, 26, 29, 30

Council of the District of Columbia Committee
on the Judiciary, Report on Bill 19–614,
"Firearms Amendment Act of 2012" ...................................................... 27, 49

Martin S. Geisel et al., *The effectiveness of state
and local regulations of handguns*,
4 Duke Univ. L.J. 647 (1969) .......................................................................... 7

Gary Kleck et al., *Does gun control reduce
violent crime?* (2013) (unpublished paper,
C. of Criminology and Crim. Just., Fla. State Univ.) ...................................... 7

Gary Kleck and E. Britt Patterson, *The impact
of gun control and gun ownership levels on
violence rates*, 9 J. Quantitative Criminology 249 (1993) .............................. 7

Caillin Langmann, *Canadian firearms legislation
and effects on homicide, 1974 to 2008*,
27 J. Interpersonal Violence 2303 (2012) ...................................................... 7

xiv

Joseph P. Magaddino and Marshall H. Medoff,
*An empirical analysis of federal and state firearm*
*control laws*, in Firearms and Violence: Issues of
*Public Policy* 225 (Don B. Kates, Jr. ed., 1984)............................................................. 7

Douglas R. Murray, *Handguns, gun control laws*
*and firearm violence*, 23 Soc. Probs. 81-92 (1975)......................................................... 7

Steven A. Sumner, *et al.*, *Firearm Death Rates*
*& Association with Level of Firearm Purchase*
*Background Check,* Am J. Prev. Med. (July 2008) ................................................. 41, 42

U.S. Census Bureau, 2004 Survey of Inmates
in State & Federal Correctional Facilities .................................................................. 44

U.S. General Accounting Office,"Firearms
Purchased from Federal Firearms Licensees Using
Bogus Identification," GAO-01-427 (Mar. 2001) ..................................................... 44

# GLOSSARY

| Term | Abbreviation |
|---|---|
| Interstate Identification Index | III |
| Joint Appendix | JA |
| Metropolitan Police Department | MPD |
| National Instant Criminal Background Check System | NICS |
| Sealed Appendix | SA |

# JURISDICTIONAL STATEMENT

Jurisdiction in the district court was founded on 28 U.S.C. § 1331 in that this action arises under the Constitution and laws of the United States, and under 28 U.S.C. § 1343(3) in that this action seeks to redress the deprivation, under color of the laws, statutes, ordinances, regulations, customs and usages of the District of Columbia, of rights, privileges or immunities secured by the United States Constitution. This action seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202, and 42 U.S.C. § 1983.

This Court has jurisdiction under 28 U.S.C. § 1291. The district court rendered final judgment in an Order granting summary judgment for defendants and denying summary judgment for plaintiffs on May 15, 2014. JA 941, 986. Plaintiffs filed a timely notice of appeal on May 19, 2014. JA 988. The appeal is from a final order by the United States district court that disposes of all claims with respect to the parties.

# STATEMENT OF ISSUES

1.  Whether the challenged firearm registration requirements in D.C. Code § 7-2501.01 *et seq*. violate the Second Amendment to the United States Constitution.[1]

2.  Whether the trial court improperly admitted and relied on purported expert opinion that was not based on facts or data, and did not result from reliable application of principles or methods to data.

# CONSTITUTION, STATUTES, AND REGULATIONS

The following are in the Addendum: U.S. Const., Amend. II; D.C. Code §§ 7-2501.01, 7-2502.01, 7-2502.02, 7-2502.03, 7-2502.04, 7-2502.05, 7-2502.06, 7-2502.07, 7-2502.07a, 7-2502.08, 7-2505.01, § 7-2505.02, and 7-2507.06.

# STATEMENT OF THE CASE

## A.  Prior Proceedings in the Courts

This is an action for declaratory and injunctive relief to protect the rights of plaintiffs, who are law-abiding residents of the District of Columbia, to keep and bear arms under the Second Amendment without burdensome registration

---

[1] Issues not briefed because they were decided by this Court in the previous appeal, but preserved below by the Third Amended Complaint and in this Court, include challenges to all of the basic registration requirements (JA 7, 19-22), and the prohibitions on "assault weapons" and "large capacity ammunition feeding devices" (JA 14-19, 22-23).

requirements. Defendants include the District of Columbia and Vincent C. Gray, Mayor of the District of Columbia.

Following *District of Columbia v. Heller*, 554 U.S. 570 (2008), which invalidated the District's handgun prohibition, the District enacted the Firearms Registration Amendment Act of 2008, which was revised in the Firearms Amendment Act of 2012. These enactments made registration requirements for all firearms more burdensome than they were before the Supreme Court's decision in *Heller*.

In the initial proceedings, which challenged provisions of the Firearms Amendment Act of 2008, the district court issued summary judgment in favor of defendants, and plaintiffs appealed. This Court affirmed in part and reversed in part. *Heller v. District of Columbia,* 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*"). This Court upheld the prohibition on certain firearms and magazines, but decided that nearly all of the registration provisions were not sufficiently supported by evidence, and remanded for further proceedings.

After remand, the District passed further amendments in the Firearms Amendment Act of 2012, which plaintiffs challenged in their Third Amended Complaint. JA 4. The parties then engaged in discovery, in the course of which

the district court denied plaintiffs' motion to strike three expert reports filed by defendants.  JA 69, 70.

Plaintiffs and defendants each filed motions for summary judgment.  By Order dated May 15, 2014, the district court rendered summary judgment for defendants and denied summary judgment for plaintiffs.  JA 942.

## B.  Registration, Expiration, and Re-Registration Provisions

D.C. Code § 7-2502.01(a) provides that "no person . . . shall possess or control any firearm, unless the person . . . holds a valid registration certificate for the firearm."[2] Violation is punishable by one year's imprisonment and a $2,500 fine, and by five years' imprisonment and a $12,500 fine for a second offense. §§ 7-2507.06(a);  22-3571.01(b)(5)  &  (6).    Under certain circumstances, an administrative disposition with a fine may be authorized in the discretion of the prosecution.  § 7-2507.06(b).

To register a firearm, an applicant must appear in person and be fingerprinted and photographed.  § 7-2502.04(a), (b).  The registrant "may be required to bring with him the firearm for which a registration certificate is sought . . . ."  § 7-2502.04(c).

---

[2] All citations are to the D.C. Code unless otherwise noted.

Registration requires one "to demonstrate satisfactorily, in accordance with a test prescribed by the Chief [of Police], a knowledge of the laws of the District of Columbia pertaining to firearms . . . ." § 7-2502.03(a)(10). The applicant must have "completed a firearms training and safety class" offered by the Chief, or have submitted evidence of training from the U.S. military, another state, or an instructor. § 7-2502.03(a)(13). The applicant must pay "a nonrefundable fee to be established by the Mayor . . . ." § 7-2502.05(b).

"The Chief shall register no more than one pistol per registrant during any 30-day period," with an exception for new residents. § 7-2502.03(e). "Registration certificates shall expire 3 years after the date of issuance unless renewed . . . for subsequent 3-year periods." § 7-2502.07a(a). To renew, the applicant must submit a statement attesting to possession of the firearm, address, and "continued compliance with all registration requirements . . . ." § 7-2502.07a(c). The registrant must also appear in person at the Metropolitan Police Department (MPD) headquarters, be fingerprinted again, and pay $48 in fees. Metropolitan Police Dep't, Notice of Final Rulemaking, 60 D.C. Reg. 17215 (Dec. 27, 2013).

## C. Application and Effect of the Registration System

According to Lt. Jon Shelton, the long-time head of the MPD firearm registration unit, the vast majority of applicants to register firearms are law-abiding people with no disqualifying factors. JA 312. During 2011 and most of 2012, no rifle or shotgun applications, and only two handgun applications, were denied, of the more than 2000 applications submitted. JA 557.

From 2007 through early 2013, the MPD recovered more than 12,000 unregistered firearms. JA 52, 570, 572. During a roughly similar time period, MPD recovered only 36 registered guns owned by private individuals and associated with crime scenes. JA 443, 572.[3] Of those investigations, fewer than half (17) led to charges against the registered owner. Sealed Appendix (SA) 3-5. Only two resulted in convictions of the registered owner of an actual crime of violence apparently involving a firearm (Nos. 11 and 28) and only seven others resulted in *any* kind of conviction or sentence of probation against the registered owner (Nos. 1, 3, 18, 19, 20, 27, 34). *Id.*

The District's witnesses cited no studies showing that firearm registration requirements prevent illegal possession of firearms or reduce use of firearms in

---

[3] During discovery, the District stated that 37 guns had been recovered, but supplied data for only 36.

crime.   JA 545-47; 625-29, 637, 648.   Empirical studies demonstrate that

registration laws have no measurable effect on rates of crime or violence.[4]  *See* JA

699-704, 708-09 (summarizing studies).  Gun registration has no detectable effect

on rates of total homicide, gun homicide, long gun homicide, total robbery, gun

robbery, total aggravated assault, gun aggravated assault, rape, total suicides, gun

suicides, or fatal gun accidents.  JA 702.

The District conceded: "It is not clear (to the District) how [firearms]

registration records could be used to 'prevent' a crime." JA 442. In addition, "Lt.

Shelton cannot recall any specific instance where registration records were used to

determine who committed a crime," except for possession offenses.  *Id*.

FBI data show that for 2009 through 2011, three murders were committed

with long guns in the District, less than 1% of the 383 total murders. JA 616-17,

---

[4] Martin S. Geisel et al., *The effectiveness of state and local regulations of handguns*, 4 Duke Univ. L.J. 647 (1969); Gary Kleck et al., *Does gun control reduce violent crime?* (2013) (unpublished paper, C. of Criminology and Crim. Just., Fla. State Univ.); Gary Kleck and E. Britt Patterson, *The impact of gun control and gun ownership levels on violence rates*,  9 J. Quantitative Criminology 249 (1993); Caillin Langmann, *Canadian firearms legislation and effects on homicide, 1974 to 2008*, 27 J. Interpersonal Violence 2303 (2012); Joseph P. Magaddino and Marshall H. Medoff, *An empirical analysis of federal and state firearm control laws*, in *Firearms and Violence: Issues of Public Policy* 225 (Don B. Kates, Jr. ed., 1984); Douglas R. Murray, *Handguns, gun control laws and firearm violence*, 23 Soc. Probs. 81-92 (1975).

751, 754, 757.  For the same period, 96 homicides were committed with knives, non-firearm weapons, and hands, fists and feet, which is 32 times as many as were committed with shotguns and rifles combined.  JA 751, 754, 757.

No registered rifles and only two registered shotguns were recovered from crime scenes in the District from July 17, 2008, to October 19, 2012.  JA 443, 518-19.  Chief Lanier could not provide any example where registration records were used to solve a crime (defined as a non-possessory offense) committed with a long gun.  JA 615.  She could not identify any "studies or data that indicated that registration of long guns specifically as opposed to handguns aids in crime control or promotes officer safety."  JA 618-19.

MPD officers responding to calls are not informed in advance if there is a registered firearm at the location, and neither patrol officers nor dispatchers have any way to check registration records directly.  JA 510-12, 555, 603-04.

### D.  Burdens on Registrants

MPD charges $35 to take and process an applicant's fingerprints, and $13 per firearm for the registration. JA 312; D.C. Mun. Regs. tit. 24, § 2331.1.  Expenses are incurred for travel to and from MPD using public transit or a private vehicle and for parking, and income is forgone by taking time off work.  The Firearms Registration Section is open only from 9:00 a.m. to 5:00 p.m., Monday

through Friday. *See* http://mpdc.dc.gov/node/177912. Plaintiff Carter had to take multiple days off work to register his firearms. JA 830.

Registrants must pay a transfer fee of $125 to Charles Sykes, JA 830, the only licensed firearms dealer in the District who deals with the public, JA 529-31, and also pay shipping and transfer fees to out-of-state dealers.

Registrants must expend time traveling to and from MPD headquarters, JA 821-22, 828, 837, 842-43; looking for parking, JA 836-37; walking several blocks from a parking spot to MPD, JA 828, 836-37; filling out the registration application, JA 821, 837; being escorted in and out of the building with a firearm, completing an instruction course, taking a test, being fingerprinted, having a background check, registering, and standing in line at the cashiers' office, JA 821, 828-29, 837; dealing with Mr. Sykes, before the transaction and to consummate it, JA 828; waiting to be picked up, JA 838; returning home, JA 821, 829, 838; and in some cases traveling to a dealer out of the District. JA 828.

Extra trips to MPD may be required due to bureaucratic barriers, such as requiring an original of a training certificate rather than a photocopy, JA 830, requiring that the stock be on the firearm when it is brought to MPD, JA 821, or lacking the ability to perform fingerprinting, JA 843. Two trips were required early

9

in the process post-*Heller*, JA 828, 837, 842-43, and two trips are still required when the gun itself must be brought to MPD. D.C. Mun. Regs. tit. 24, § 2313.

Plaintiff Jordan expended six to nine hours to register each of his firearms, and it would have been longer had he not been exempt from the training requirement due to prior military training, JA 838, and had he not already owned the firearms he stored outside of the District. *Id.*

It took Carter seven to eight hours to register each firearm, not counting delays between the various steps. JA 829. Heller's first registration took about five hours. JA 821. It took Plaintiff Scott two trips to MPD to register a firearm, and each visit took several hours. JA 842-43.

The requirement that the firearm be brought to MPD to be registered creates the risk of being attacked and having guns stolen, or being detained and arrested. JA 829, 836.

Jordan was wrongfully denied a registration and had to reapply. JA 847-48. Mustafa was wrongfully denied, had the denial overturned in an administrative appeal, and had to apply again, expending some 31 hours. JA 380-81.

Testimony by Emily Miller at the 2012 hearing showed in great detail the confusing and burdensome nature of the registration process. JA 874-900.

The burdens severely impact Plaintiffs who live in poverty. Jordan and Scott live in subsidized housing. Jordan's annual income was $16,880, Scott's was $13,368, and Mustafa's was $5,208. JA 366, 838-39, 843-44.

## SUMMARY OF ARGUMENT

This is a Second Amendment challenge to the District of Columbia's firearm registration requirements. This Court previously upheld the basic handgun registration requirements, but found that the District failed to justify any requirement of long gun registration or certain novel requirements applied to all firearms. *Heller II*, 670 F.3d 1244. On remand, the District had the burden to show a narrowly-tailored, tight fit between the requirements and the objectives of crime control and protection of police officers. The lower court erred in holding that it did so.

Under intermediate scrutiny, the government must demonstrate that its restrictions will in fact alleviate the harms in a direct and material way, and that the means chosen are not substantially broader than necessary. Judicial review is not subject to a rule that is "doubly deferential" to the legislature just because Second Amendment rights are at issue. This Court required the District to "present some meaningful evidence, not mere assertions, to justify its predictive judgments."

*Heller II*, 670 F.3d at 1259. Assertions by current or former law enforcement officers, not supported by studies or data, do not constitute such evidence.

The District is an outlier with the most extreme restrictions on Second Amendment rights nationwide. Neither the United States nor any state requires the registration of all firearms, with the single exception of Hawaii, which does not cancel registrations every three years and require re-registration.

The District claimed in its 2008 Committee Report that registration "allows officers to determine in advance whether individuals involved in a call may have firearms . . . ." But in discovery on remand, the District flatly admitted: "MPD officers that are responding to a call for service are not informed in advance if there is a registered firearm at the location."

This Court found that the District had not submitted "even a single reference to the need for registration of rifles or shotguns . . . ." *Heller II*, 670 F.3d at 1259. The District fares no better now. Long guns are virtually never used in crime, and registration requirements have no nexus to the few that are. That neither the United States nor 49 states require registration of long guns renders such a requirement anything but a narrowly tailored, tight fit with the goals of crime control and protection of police.

The District failed to provide support for the novel registration requirements that this Court found to impinge on Second Amendment rights.  Through the National Instant Criminal Background System (NICS), federal law provides the most advanced records of persons disqualified under the laws of the United States and the states (defined to include D.C.) that are checked when a person seeks to purchase a firearm from a federally-licensed firearm dealer.  In-person appearance and a government-issued identification are required for a firearm transfer.  The District's registration requirements are duplicative and unnecessary.

To register a firearm, the District requires a person to appear personally and to be photographed and fingerprinted.  It provided no evidence that this is necessary to prevent fraud, that online registration would not suffice, or that the more narrowly-tailored NICS is inadequate.  Persons who register firearms would be just as law-abiding if they were not so required, and criminals obtain guns on the street.

The District also provides that a person may be required to bring the firearm(s) to be registered to MPD.  The District offered no reason for this requirement, which creates the risk that the gun may be stolen en route or that the person may be arrested for gun possession.  The district court's suggestion that this is "necessary to verify the character of the registered weapon" was not supported

by any evidence. No incentive exists to misrepresent the gun's serial number or other information on the application form, as only accurate information on the registration certificate protects the registrant from arrest. Not a single state requires that all firearms, of whatever type, may be required to be brought to a police department in order to be legally possessed.

Registration certificates expire and must be renewed every three years, a provision not required by a single state nationwide. Registrants are required to make an in-person appearance at MPD and be fingerprinted and photographed yet again. Failure to renew results in cancellation of the registration. The District's witnesses cited no evidence showing that periodic registration renewal reduces crime or protects police officers.

Registrants must pay fees for the above unnecessary requirements. Government may not impose a charge for exercise of a constitutional right.

Applicants wishing to register any kind of firearm must pass a test on District firearms law and complete a training and safety class provided by the Chief of Police. No evidence was submitted showing that these requirements, which do not exist in any state, reduce crime or protect police officers.

The District prohibits a person from registering more than one handgun within thirty days. The Chief testified that it is unlikely that anyone would register

more than one handgun and then "traffic" them illegally. The district court said that this law makes it possible to prosecute persons with "unregistered firearms." But it is the registration requirement, not the one-gun-a-month restriction, which allows prosecutions for unregistered firearms. The district court also said that the law reduces the number of firearms in the District, an objective that was not asserted by the District and that has no legal justification.

In sum, the requirements at issue burden Second Amendment rights and fail to constitute narrowly tailored, tight-fitting means of reducing crime and protecting police officers.

## ARGUMENT

### Standard of Review

The Second Amendment issues here are questions of law, requiring *de novo* review. *Berger v. Iron Workers Reinforced Rodmen*, 170 F.3d 1111, 1125 (D.C. Cir. 1999). "We review *de novo* a district court's grant of summary judgment, viewing all evidence in the light most favorable to the non-moving party." *Ayissi–Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013). "In deciding whether there is a genuine issue of material fact, the court must assume the truth of all statements proffered by the non-movant . . . ." *District Intown Properties Ltd. Partnership v. District of Columbia*, 198 F.3d 874, 878 (D.C. Cir. 1999).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Group, Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (citation omitted).

In addition, the laws at issue restrict mere possession of a firearm in the home. "[T]he right to keep and bear arms is fundamental to *our* scheme of ordered liberty," *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010) (citation omitted), and the right is recognized "most notably for self-defense within the home." *Id.* at 3044. Rational basis or another low standard of review "could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech . . . or the right to keep and bear arms." *Heller,* 554 U.S. at 629.

A district court's decision to admit expert evidence is reviewed for abuse of discretion. *United States v. Day*, 524 F.3d 1361, 1366 (D.C. Cir. 2008).

## I. THE DISTRICT HAS THE BURDEN TO SHOW A NARROWLY-TAILORED, TIGHT FIT BETWEEN REGISTRATION AND PROTECTION OF POLICE OFFICERS AND CRIME CONTROL

### A. This Court Held that the District Failed to Meet Its Burden

This Court previously upheld basic registration requirements, D.C. Code § 7-2502.01(a), including the submission of certain information, § 7–2502.03(b), but

"only as applied to handguns. With respect to long guns they are novel, not historic." *Heller v. District of Columbia,* 670 F.3d 1244, 1254-55 (D.C. Cir. 2011). The requirements as applied to long guns, including basic registration, were remanded for further evidentiary proceedings. *Id*. at 1260.

This Court also found the following not to be longstanding as applied to handguns or long guns, and remanded them for further evidentiary proceedings: the one-pistol-per-30-days rule, § 7-2502.03(e); the requirements that applicants appear in person, § 7-2502.04(c), and re-register each firearm after three years, § 7-2502.07a(a)-(c); and the requirements that an applicant demonstrate knowledge about firearms, § 7-2502.03(a)(10), be fingerprinted and photographed, § 7-2502.04(a)-(b), and take a firearms training or safety course, § 7-2502.03(a)(13)(A). *Heller II*, 670 F.3d at 1255, 1260.[5]

All of these specific requirements, and all requirements as applied to long guns, "affect the Second Amendment right because they are not *de minimis*," "make it considerably more difficult for a person lawfully to acquire and keep a firearm," and thus "impinge upon that right . . . ." *Id*. at 1255-56.

---

[5] Also remanded were the following provisions that are now repealed: the ballistics-identification provision, § 7–2502.03(d), and a background check every six years, § 7–2502.07a(d). The training requirement was modified to eliminate the need for training at a firearms range. Firearms Amendment Act of 2012, § 2(d).

Under intermediate scrutiny, this Court directed that "the District must establish a tight 'fit' between the registration requirements and an important or substantial governmental interest, a fit 'that employs . . . a means narrowly tailored to achieve the desired objective.'"[6] *Id.* at 1258, quoting *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989).

In the prior appeal, the District advanced two interests for registration, *i.e.*, "to protect police officers and to aid in crime control." *Heller II*, 670 F.3d at 1258. Under the record, however, "the novel registration requirements – or any registration requirement as applied to long guns" failed intermediate scrutiny "because the District has not demonstrated a close fit between those requirements and its governmental interests." *Id.* at 1258. The 2008 Committee Report, and accompanying testimony and written statements, did not show the registration requirements to be narrowly tailored.[7] *Id.*

---

[6] Plaintiffs preserve their prior argument that a categorical approach and/or strict scrutiny apply.

[7] The 2008 Committee Report claimed that registration "permits officers to charge individuals with a crime if an individual is in possession of an unregistered firearm . . . ." *Heller II* at 1258 n*. This Court observed: "These rationales are circular, however, and do not on their own establish either an important interest of the Government or a substantial relationship between the registration of firearms and an important interest." *Id.*

References were made to what "studies show," but the Report "neither identifies the studies relied upon nor claims those studies showed the laws achieved their purpose . . . ." *Id*. at 1258-59 (regarding registration of more than one handgun in 30 days).  The District offered only "cursory rationales" and failed "to present any data or other evidence to substantiate its claim that these requirements can reasonably be expected to promote either of the important governmental interests it has invoked . . . ." *Id*. at 1259 (safety training and demonstrating knowledge of gun laws).

This Court stressed that on remand the District must present "meaningful evidence, not mere assertions, to justify its predictive judgments." *Id*.  First, it had not shown "a substantial relationship between any of the novel registration requirements and an important governmental interest." *Id*.  Second, the 2008 Committee Report did not include "even a single reference to the need for registration of rifles or shotguns." *Id*.  "Accordingly, those registration requirements will be deemed constitutional only if the District shows they serve its undoubtedly important governmental interests in preventing crimes and protecting police officers." *Id*. at 1267.

**B.  The District Must Show that Its Restrictions Will in Fact
Alleviate the Alleged Harms in a Direct and Material Way**

The district court formulated the District's burden as whether the D.C. Council "could reasonably believe that the laws" would serve its objectives, not whether the District "must establish that the laws 'will have th[o]se effects.'" JA 952.  Yet for the belief to be "reasonable" the law must be based on evidence that such laws will achieve at least some of their purposes.  Under intermediate scrutiny, the government must "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."  *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 664 (1994) ("*Turner I*").  The district court treated this postulate of *Turner I* as a slip of the pen: "The District need not prove that the gun-registration laws will actually further its asserted interests in order to prevail. This is evident notwithstanding the fact that the Court has occasionally used language that, taken in isolation, might seem to support Plaintiffs."  JA 953.

For that proposition, the district court also quoted *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995), but *Rubin* quoted the above statement from *Turner I* and added: "We cautioned that this requirement was critical . . . ."  *Id.  Turner I*'s holding that a restriction must "in fact alleviate" the harms in question has been

20

routinely applied ever since. *See, e.g.*, *Cablevision Systems Corp. v. FCC*, 649 F.3d 695, 711 (D.C. Cir. 2011).[8]

The deference accorded to legislative predictive judgments does not mean that they are "insulated from meaningful judicial review," nor do legislative findings "foreclose our independent judgment of the facts bearing on an issue of constitutional law." *Turner I* at 666 (citation omitted). "This obligation to exercise independent judgment . . . is to assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence." *Id.*

Based on the "paucity of evidence" that a problem existed, and lacking "any findings concerning the actual effects of" the restrictions, it could not be determined whether the law was narrowly tailored and whether there were "'constitutionally acceptable less restrictive means' of achieving the Government's asserted interests." *Id.* at 667-68.

These principles were repeated in *Turner II*. *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 195 (1997). The expanded record allowed the Court to address whether the "provisions were designed to address a real harm, and whether

---

[8] "This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction . . . must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (citation omitted).

those provisions will alleviate it in a material way." *Id.* Deference to the legislative judgments applied to this first step of the analysis. *Id.* at 195-96.

Deference is not proper in the second portion of the inquiry, which "concerns the fit between the asserted interests and the means chosen to advance them." *Id.* at 213. A restriction must promote "a substantial governmental interest that would be achieved less effectively absent the regulation," and must not "burden substantially more [activity] than is necessary to further" that interest. *Id.* at 213-14. In determining whether the means were narrowly tailored, *id.* at 215-16, the Court assessed whether "the means chosen are not substantially broader than necessary" and if there was any "adequate alternative" to the restriction. *Id.* at 218 (citation omitted). The District fails to meet these standards here.

"That the District's asserted interests are substantial in the abstract . . . does not end our inquiry. To satisfy narrow tailoring, the District must prove the challenged regulations directly advance its asserted interests." *Edwards v. District of Columbia*, 755 F.3d 996, 1003 (D.C. Cir. 2014), citing *United States v. Alvarez*, 132 S.Ct. 2537, 2549 (2012) ("There must be a direct causal link between the restriction imposed and the injury to be prevented."). Overly broad restrictions that target an entire class (here, persons seeking to exercise their Second Amendment rights) rather than criminal acts are not narrowly tailored. *See id.* at 1005, 1009.

### C. A "Double Deference" Rule Does Not Apply to Restrictions on Second Amendment Rights

The Supreme Court rejected a plea "to treat the right recognized in *Heller* as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees . . . ." *McDonald*, 130 S.Ct. at 3044. The district court here did just that with its "double deference" rule.

Regarding the District's burden to "show that its predictions about the effect of its gun-registration laws reflect 'reasonable inferences based on substantial evidence,'" the district court wrote: "The standard for substantiality is *doubly deferential* in this case, where the Court is reviewing a legislative judgment on firearms policy." JA 956 (emphasis added). In support of that novel rule, the court stated that the "substantiality requirement [is] more deferential when reviewing legislative judgments . . . ." *Id.*, citing *Turner II*, 520 U.S. at 195. "More deferential" than what? *Turner II* finished the sentence: "more deferential than we accord to judgments of an administrative agency." *Id.* That standard applies to all legislative judgments and suggests nothing unique about "firearms policy."

The district court further stated that "courts should be especially deferential to legislative predictions when it comes to gun policy," JA 953, based on the following: "In the context of firearm regulation, the legislature is far better

equipped than the judiciary to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013). But that is a truism about legislation on all subjects, and is derived from *Turner I*'s statement of that general rule. *Id.*, citing *Kachalsky v. County of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012) (quoting *Turner I*, 512 U.S. at 665).

Moreover, *Schrader* concerned gun possession by convicted criminals, who are "individuals who cannot be said to be exercising the core of the Second Amendment right identified in *Heller*, i.e., 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" *Schrader*, 704 F.3d at 989, quoting *Heller*, 554 U.S. at 635. For law-abiding citizens, restrictions on that fundamental right are subject to a rigorous narrow-tailoring analysis, not "double deference."

By contrast, the district court found that "the District need not . . . prov[e] definitively that the challenged gun regulations will actually further its important interests." JA 954. While "definitive" proof may not be required, this case was remanded because "the District needs to present some meaningful evidence, not mere assertions, to justify its predictive judgments." *Heller II*, 670 F.3d at 1259.

## II. THE DISTRICT'S FIREARM REGISTRATION
## REQUIREMENTS VIOLATE THE SECOND AMENDMENT

The District requires that a person register to exercise Second Amendment rights, subject to severe criminal penalties. D.C. Code §§ 7-2502.01(a), § 7-2507.06. After the Supreme Court decided *Heller*, the District made it much more difficult to register any firearm, including long guns, imposing additional restrictions which had not previously been seen as necessary. "After *Heller*, . . . D.C. seemed not to heed the Supreme Court's message. Instead, D.C. appeared to push the envelope again, with . . . its broad gun registration requirement." *Heller II*, 670 F.3d at 1271 (Kavanaugh, J., dissenting). This Court held as much when it remanded this case.

The District has the most pervasive restrictions on Second Amendment rights nationwide. Neither the United States nor any state requires the registration of all firearms, with the single exception of Hawaii, which does not require re-registration. Yet these extreme restrictions do not work, for as the district court notes: "D.C.'s age-adjusted rate of firearm deaths, intentional and unintentional, is 14.62 per 100,000, significantly higher than the national rate (10.07) and the rate in neighboring jurisdictions (9.26 in Maryland and 10.69 in Virginia)." JA 958. As Chief Lanier testified, people who regularly engage in criminal activities do not

register their firearms.  JA 573.  According to Lt. Shelton, it is "almost always the case" that people who apply for registration are law-abiding.  JA 541.  Thus, the burdens of registration fall entirely on the law-abiding people who register. Defendants' own witnesses admitted that no studies show that firearm registration prevents illegal possession of firearms or reduce use of firearms in crime.  JA 545-47; 625-29, 637, 648.

### A.  The District's Foremost Purported Reason for Registration – To Allow Police to Determine if Firearms are Present When Responding to a Call – Turns Out to Be False

The foremost reason the District claimed in the 2008 Committee Report that registration "is critical" was because it "allows officers to determine in advance whether individuals involved in a call may have firearms . . . ."  JA 124.  This Court highlighted that justification. *Heller II*, 670 F.3d at 1258.  Judge Kavanaugh was skeptical:

> D.C.'s articulated basis for the registration requirement is that police officers, when approaching a house to execute a search or arrest warrant or take other investigative steps, will know whether the residents have guns. But that is at best a Swiss-cheese rationale because police officers obviously will assume the occupants might be armed regardless of what some central registration list might say. So this asserted rationale leaves far too many false negatives to satisfy strict or intermediate scrutiny with respect to burdens on a fundamental individual constitutional right.

*Id*. at 1294-95 (Kavanaugh, J., dissenting).

The Council hearing records included no testimony by MPD that the registration records are ever checked before police respond to calls. Instead, the drafters of the 2008 Committee Report lifted this claim almost word-for-word, without attribution, from the testimony of a lobbyist for the Legal Community Against Violence (LCAV). JA 139-40. After the remand, the drafters of the 2012 Committee Report repeated the claim, again quoting an LCAV lobbyist, and again not divulging that this is not MPD policy at all. JA 164.

But in discovery on remand, the District flatly admitted: "MPD officers that are responding to a call for service are not informed in advance if there is a registered firearm at the location." JA 555. Neither MPD dispatchers nor officers being dispatched have direct access to the firearms registry, which can only be accessed from within the Firearms Registration Section. JA 314, 442-43, 509-12, 603. Nor do MPD officers investigating someone routinely check whether such person has registered firearms. JA 604.

Lt. Shelton, who has been branch commander over the Firearms Registration Section for approximately 20 years (JA 498), reports fewer than a dozen instances in which police agencies contacted his office to check registration records for an address before executing a search warrant. J.A. 443, 515. Officers responding to

calls are trained to treat potentially violent situations as always having the potential for presence of weapons.  JA 514, 641-42.

The district court commented: "Still, these checks do occur, see . . . [JA 924], and so the Court finds that this justification provides some, albeit limited, support for the District's registration policy."  JA 957. But Lt. Shelton's recollection of fewer than a dozen instances did not even include a statement that the checks had any value. Shelton was unaware of any instances where registration records were used to solve a crime other than possessory offenses. JA 442.

The District's rationale resembles the argument that warrantless searches of cell phone data "might help ensure officer safety . . .  by alerting officers that confederates of the arrestee are headed to the scene," which the Supreme Court recently rejected as follows: "There is undoubtedly a strong government interest in warning officers about such possibilities, but neither the United States nor California offers evidence to suggest that their concerns are based on actual experience."  *Riley v. California*, 134 S.Ct. 2473, 2485 (2014).  Here, the evidence demonstrates that the purported justification is *contradicted by* actual experience.

## B.  Registration of Long Guns is Not a Narrowly-Tailored Means to Protect Police Officers and Control Crime

### *1. No Nexus Exists Between Registration and the Governmental Objectives*

This Court found that the 2008 Committee Report did not include "even a single reference to the need for registration of rifles or shotguns," the justification for which "might have been written in invisible ink."  *Heller II*, 670 F.3d at 1259. Given that "the record is devoid of information concerning the application of registration requirements to long guns," additional evidence was required on remand.  *Id.* at 1255 n.**.  The District has again failed to meet its burden.

The district court began by stating that "Lanier, Jones, and Vince recount that, in their professional opinions, firearm registration protects police and reduces gun-related crime."  JA 960. That conclusory opinion is one of the ultimate legal issues at stake, and is not evidence.

In this regard, the district court relied on Chief Lanier's belief that registration helps screen out ineligible persons, JA 960, but Congress and 49 states believe that the National Instant Criminal Background Check System (NICS), 18 U.S.C. § 922(t), and state point-of-sale laws or other pre-purchase screening suffice to do that.  Those are more narrowly tailored means for ensuring that persons

ineligible to purchase long guns are screened out. Only Hawaii requires registration of all long guns.[9]

The district court cited Jones' belief that registration alerts first responders to the "presence of documented firearms and ammunition in homes and businesses to which they answer calls for service," JA 961, but Jones himself testified that MPD does not "notify their officers without being asked if there are registered guns in the home." JA 642.

Vince's opinion that machine guns and sawed-off shotguns registered under the National Firearms Act (NFA) are rarely used in crime does not support the district court's conclusion. JA 961. Neither are ordinary long guns, *i.e.*, rifles with barrels at least 16" in length, and shotguns with barrels at least 18" in length, which are not required to be registered under the NFA. 26 U.S.C. § 5841, 5845(a)(1), (3). The district court did not challenge the evidence that long guns are rarely used in crime:

> [Plaintiffs] note that homicides in the District are rarely committed with long guns – just three out of a total of 383 area murders between 2009 and 2011. See . . . [JA 749-49]. They also highlight the fact that between July 2008 and October 2012, a paltry two registered shotguns

---

[9] As noted by the 2008 Committee Report, "Hawaii and the District are the only states [*sic*] that require all firearms to be registered." JA 124. *See* Haw. Rev. Stat. § 134-3.

and zero registered rifles were recovered from crime scenes in the District, see . . . [JA 443, 518-19], while during an only slightly longer time period, more than 12,000 unregistered firearms were recovered.

JA 965.

The District asserted that 17% of "illegal firearms" recovered in the District in 2010 were long guns. JA 177; *cf.* JA 962. But "illegal" only means unregistered, and this Court already rejected the "circular" rationale in that regard. *Heller II*, 670 F.3d at 1258 n.*. The district court relied on Dr. Kleck's statement that long guns are "more lethal" than, and should be regulated in the same way as, handguns. JA 962. But Kleck also explained that that firearms registration is ineffective, and specifically that long gun registration does not reduce homicide. JA 698, 702-03. He did not state that long guns should be registered. The district court's speculation that not requiring long gun registration would cause criminals to forego handguns and turn to long guns, JA 962, was not supported by evidence.

Without any hard data, and based on the unsupported opinions of the District's witnesses, the district court concluded that "this combination of professional opinion and empirical data suggesting that mandatory gun registration, including long guns, reduces gun crime and allows first responders to determine in advance the presence of registered firearms easily surpasses the 'substantial evidence' threshold." *Id.* Yet the empirical evidence was that registration does *not*

31

reduce crime, JA 545-47, 625-29, 637, 648, 698, 702-03, and that first responders do *not* check registration records.  JA 314, 442-43, 509-12, 555, 603-04.

Without consideration of less intrusive alternatives, the court added that "basic registration of long guns is narrowly tailored . . . ." JA 963.  The court ignored the NICS and the laws of 49 states in concluding that plaintiffs did not "suggest a narrower approach to achieving the District's interests here." *Id*.  With almost unanimous rejection of long gun registration nationwide, it is unclear why virtually only in the District crime control and protecting police "would be 'achieved less effectively' absent the basic registration requirement." JA 963.

It is a truism that only law-abiding citizens register guns (and they would be equally law-abiding if not so required) and that criminals do not.  *See also* JA 541, 573.  That does not imply that "municipalities should be limited to enacting only those firearms regulations that lawbreakers will obey." JA 963.  It does mean that otherwise lawful long gun possession should not be a crime, and that penalties should be limited to misuse of firearms, which will deter some would-be criminals and will put those who are undeterred behind bars.

The district court next upheld *long gun* registration on the basis of Dr. Webster's study claiming that Missouri had a brief increase in homicide after repealing certain *handgun* purchase requirements.  Yet as Dr. Kleck pointed out,

"neighboring Iowa's homicide rate also increased over the same time period even though that state did not change its gun laws, and that [Webster's] choice of control variables and control areas was arbitrary."[10]  JA 964.  The isolated, cherry-picked datum from Missouri was supposedly buttressed because the District's three other witnesses thought registration to be a good idea and because "deference of this sort is considered especially appropriate when it comes to the regulation of firearms." JA 965.  The Supreme Court certainly did not think that in *Heller*.

Plaintiffs requested the District to produce "all studies, data, and other evidence" showing that its specific registration requirements as applied to long guns reduced the use thereof in crime, protected police officers, or promoted any other governmental interest.  In each case, the District responded, "The District does not have any independent studies on this topic, i.e., any studies that are not otherwise publicly available."  JA 323-35, 468-470.   Plaintiffs sought similar evidence that "basic registration" of long guns promoted such interests.  JA 470-71. The District gave the same response.  *Id.*  Nor has it cited any publicly available studies, data, or evidence showing that long gun registration reduced crime or protected police officers.

---

[10] Throughout the time period in question, Iowa had a handgun "permit to purchase" law similar to Missouri's.  Code of Iowa, tit. XVI, § 724.15.

Chief Lanier could not identify any "studies or data that indicate that registration of long guns specifically as opposed to handguns aids in crime control or promotes officer safety." JA 618-19. The studies on which Dr. Webster relied pertain to handguns, or do not distinguish between handguns and long guns. JA 660.

No fit at all, much less a tight fit, exists between long gun registration and crime control. District officials conceded that incidents involving long guns did not involve District residents or firearms registered in the District. See JA 577-79 (shots fired at White House), JA 612-13 (murder by convicted felon at Holocaust museum). The registration system did nothing to prevent or solve these incidents. JA 577-79, 612-13.

In the District's history, handguns and explosive devices, and never rifles or shotguns, have been used by actual or would-be assassins. JA 929-32, 965-66. Assassins are not deterred by registration laws.

Canada, the only jurisdiction with long gun registration that has been studied, repealed it.[11] The district court noted:

> Canada established a long-gun registry in the mid-1990s but repealed
> it in 2012 because it found, as the Canadian Minister of Public Safety

---

[11] An Act to Amend the Criminal Code & the Firearms Act, 1st Sess., 41st Parliament, 60-61 Elizabeth II, 2011-2012 (Statutes of Canada 2012, Ch. 6).

put it, that "the long-gun registry does . . . nothing to prevent crime or protect front-line officers." . . . [JA 767]. Some empirical data backs up the Minister's insight: According to Kleck, "U.S.-based cross-sectional research [on] . . . [f]irearms registration laws show[s] no statistically significant violence-reducing effect on any type of violence," and the one "serious empirical assessment of the impact of Canada's requirement that long guns (rifles and shotguns) be registered . . . found no evidence that the law had any beneficial effects, either immediate or lagged." [JA 702-03].

JA 966.

The district court found that "the Canadian example at the very least offers an important counterpoint to the District's own conclusions on this matter. Kleck, moreover, has offered a U.S.-based argument suggesting that gun registries are not as effective as the District might hope." JA 967.

Despite there being *no* evidence of a successful long gun registry, and multiple studies showing that registration does not work, JA 698-703, the district court concluded: "When there is merely conflicting evidence in the record, the judiciary must defer to the legislature's choice." JA 967. Yet the evidence is not in conflict, and the District's justification for long gun registration might still "have been written in invisible ink." *Heller II*, 670 F.3d at 1259.

## 2. Long Gun Registration Laws Are Novel, Outlier
### Restrictions that Are Not Narrowly Tailored

The District has "passed some of the most restrictive gun laws in the nation." JA 942. While the district court held long gun registration to be narrowly tailored, JA 963, this Court noted: "With respect to long guns [registration laws] are novel, not historic." *Heller II*, 670 F.3d at 1254-55. Similar to what the Supreme Court found in *Heller*: "Few laws in the history of our Nation have come close to the severe restriction of the District's handgun ban." 554 U.S. at 629. "[C]ourts, including the *Heller* Court, were willing to consider the rarity of state enactments in determining whether they are constitutionally permissible." *Kerr v. Hickenlooper*, 744 F.3d 1156, 1178 (10th Cir. 2014).

"[T]here is a long tradition of widespread lawful gun ownership by private individuals in this country." *Staples v. United States*, 511 U.S. 600, 610 (1994). "[O]wning a gun is usually licit and blameless conduct. Roughly 50 percent of American homes contain at least one firearm of some sort . . . ." *Id*. at 613-14. Indeed, owning a long gun without registration is licit and blameless conduct in 49 states.

Application of intermediate scrutiny to long gun registration should take seriously that "the Second Amendment, like the First and Fourth Amendments,

codified a *pre-existing* right." *Heller*, 554 U.S. at 625. "If the exercise of the rights of free speech and free assembly cannot be made a crime, we do not think this can be accomplished by the device of requiring previous registration as a condition for exercising them . . . ." *Thomas v. Collins,* 323 U.S. 516, 539-40 (1945).

*McCullen v. Coakley*, 134 S.Ct. 2518, 2537 (2014), applied intermediate scrutiny to hold a buffer zone for abortion clinics to "burden substantially more speech than necessary to achieve" the state's interests. The law was "truly exceptional" in that "no other State with a law" like that could be identified, which raised the concern that the state "has too readily forgone options that could serve its interests just as well, without substantially burdening the kind of speech" at issue. *Id.*[12]

As here, narrowly-tailored alternatives included "criminal statutes forbidding assault" and other acts of violence. *Id*. at 2538. The state never "seriously undertook to address the problem with less intrusive tools" or "considered different methods that other jurisdictions have found effective." *Id*. at 2539. Police testimony that the law would "make our job so much easier" was no

---

[12] *See Edwards*, 755 F.3d at 1004 (evidence that five other cities impose a restriction like the District's "is diminished to the vanishing point by the scores of other U.S. cities" with no such restrictions).

substitute for narrow tailoring. *Id*. at 2540. Similarly, the District deems it easier just to arrest every gun owner who does not have registration papers rather than to focus on criminals.

In sum, the District has failed to show that long gun registration protects police officers and controls crime, much less that it is a narrowly tailored means of doing so.

### C. In-Person Appearance, Photographing, Fingerprinting, Bringing the Firearm to the MPD, and Re-Registration are Not Narrowly Tailored Means to Achieve the Governmental Ends

The registration requirements "affect the Second Amendment right because they are not *de minimis*," "make it considerably more difficult for a person lawfully to acquire and keep a firearm," and thus "impinge upon that right . . . ." *Heller II*, 670 F.3d at 1255-56; *see also* JA 968.[13] Just as none of the registration requirements applicable to long guns pass intermediate scrutiny, the novel registration requirements as applied to all firearms, including handguns, fail intermediate scrutiny.

---

[13] A *de minimis* burden is not the same as a *de minimis* violation of a constitutional right. "There are no *de minimis* violations of the Constitution – no constitutional harms so slight that the courts are obliged to ignore them." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 36-37 (2004) (O'Connor, J., concurring).

## 1. The National Instant Criminal Background Check System (NICS): Screening of Firearm Purchasers Without Registration

Registration is not required in order to perform background checks. The National Instant Criminal Background Check System (NICS), 18 U.S.C. § 922(t), was passed as part of the Brady Handgun Violence Prevention Act, § 103(b), P.L. 103-159, 107 Stat. 1536 (1993).[14] NICS represents a national consensus and standard on the checking of identities and background records of persons who obtain firearms, while at the same time prohibiting "any system for the registration of firearms, firearm owners, or firearm transactions." *Id*. § 103(i)(2).

Persons who purchase firearms from federally-licensed dealers are screened by NICS or approved alternatives.[15] NICS authorizes transfer of a firearm only if it would not violate federal[16] or state law, which is defined to include laws of the

---

[14] *See also* NICS Improvement Amendments Act, P.L. 110-180, 121 Stat. 2559 (2008).

[15] District residents may lawfully obtain firearms only from federally-licensed dealers. *See* 18 U.S.C. § 922(a)(3) (prohibition on transfer from out-of-state), (b)(3) (receipt of long gun from another state must be from dealer); §§ 7-2505.01, 7-2505.02(c).

[16] Federal law prohibits receipt of firearms by convicted felons and domestic-violence misdemeanants, fugitives from justice, drug addicts, persons committed to mental institutions, illegal aliens, persons subject to domestic restraining orders, persons under indictment, and others. 18 U.S.C. § 922(g), (n).

District.  18 U.S.C. §§ 922(t)(2), 921(a)(2).  NICS accesses records maintained in the National Crime Information Center (NCIC), the FBI's nationwide computerized information system of criminal justice data; the Interstate Identification Index (III), which includes criminal history records; and the NICS Index, which includes records on persons disqualified from possessing firearms under federal law.  28 C.F.R. §§ 25.2, 25.4.

NICS requires an in-person appearance in which "the transferor has verified the identity of the transferee by examining a valid identification document … containing a photograph of the transferee" and that has an "authentication provision" such as a hologram, watermark, image, or other feature that is used to determine if the document is counterfeit, altered, or falsified.  18 U.S.C. §§ 922(t)(1)(C), 1028(d)(1). The FBI conducts NICS checks without charging a fee.[17]

NICS checks may be conducted by the FBI or by a state, using the same databases and additional ones if the state chooses.  28 C.F.R. § 25.2 (defining "POC" as state or local Point of Contact for checks), § 25.6 (checks conducted by FBI or POCs).  Dealers in the District contact NICS directly.[18]

---

[17] § 103(f), NICS Improvement Amendments Act.

[18] *See* NICS Participation Map, http://www.fbi.gov/about-us/cjis/nics/general-information/participation-map.

NICS conducts the check based on name, sex, race, date of birth, state of residence, identifiers such as the transferee's Social Security number, and physical description. 28 C.F.R. § 25.7. Chief Lanier was incorrect in believing that the NICS check "is merely based on a social security number." JA 970.

Every District resident acquiring a firearm is subject to a NICS check, and NICS authorizes transfer of a firearm only if it would not violate federal or state (including D.C.) law. 18 U.S.C. § 922(t)(2). In registering the firearm, such person is subject to yet another background check based in part on the FBI database, NCIC, and the Washington Area Law Enforcement System ("WALES"). JA 969. These two background checks largely overlap.

The district court rejected the NICS alternative even though "federal law prohibits firearm sales that violate D.C. law," on the basis that the District's background checks may be more comprehensive. JA 972. But the District is free to conduct its background checks directly as a Point of Contact (see above), and consult any relevant databases, when the firearm is transferred by the federally-licensed dealer.

Chief Lanier opined that local level background checks are more effective at reducing firearm related crime than just the federal background check. JA 392-93, citing Steven A. Sumner, *et al.*, *Firearm Death Rates & Association with Level of*

*Firearm Purchase Background Check,* Am J. Prev. Med. (July 2008).[19]  But local

background checks are not at issue, as they can be done without registration of the

purchaser or the firearm.  Even perpetual background checks in the future could be

performed without any record of the specific firearms a person purchased.  The

district court did not squarely address this, relying instead on "the District's

independent reasons for establishing a firearm registry."  JA 973.  Yet reasons

could also be given to justify an Orwellian Telescreen in every house to ensure that

gun owners commit no crimes.  The issue is whether the District's outlier law is

narrowly tailored, and the laws of the United States and virtually every state

demonstrate that it is not.

### 2. *In-Person Appearance, Fingerprinting, and Photographing*

As provided by federal law, in-person appearance and positive identification

at the premises of the federally-licensed firearm dealer, together with the NICS

check, adequately screens out ineligible persons.  When a person receives a firearm

from the District's one dealer, the District is free to check additional databases.

---

[19]  As Chief Lanier admitted, the Sumner study does not purport to demonstrate that local background checks reduce the total number of suicides or homicides.  JA 586.

To register a firearm, an applicant must appear in person and be fingerprinted and photographed. D.C. Code § 7-2502.04(a), (b).[20] Despite that being unnecessary under federal law and the laws of the states generally, the district court found that the requirements are narrowly tailored. JA 971. While the District could "permit residents to register their guns remotely," *id*., the court did not explore that option.

The District's witnesses opined that each such requirement "helps to avoid fraud and ensures the identity of each prospective registrant." JA 968. None of them offered evidence that the more narrowly-tailored NICS did not achieve those aims.

Lt. Shelton admitted that his unit has not had a problem with false IDs presented by private individuals. JA 499-50. Criminals circumvent the process by purchasing guns on the street. Only the law-abiding register their guns. JA 541.

While "MPD has not yet had a problem with individuals using fake identification cards to purchase or register firearms," the district court thought that the legislature need not wait for fraud to occur. JA 971. That disregards the

---

[20] The process is similar to that required of criminal "Gun Offenders," § 7-2508.01 *et seq*., and "Sex Offenders," § 22-4014.

narrowly-tailored alternative offered by the NICS as a balanced way to prevent fraud.

The District's expert, Dr. Daniel Webster, conceded that these requirements have not "reduced in some substantial measure the trafficking of illegal guns into the District . . . ." JA 805. But he suggested that it may be possible to use fake identification, and thus NICS checks are insufficient. JA 415-16, citing GAO, "Firearms Purchased from Federal Firearms Licensees Using Bogus Identification," GAO-01-427 (Mar. 2001) ("GAO Report"). The study involved an attempt by undercover agents to deceive a total of only five firearm dealers by using fake IDs. *Id*. at 5-12. It took place in 2000, before passage of the Real ID Act, P.L. 109-13, 119 Stat. 302 (2005), under which driver's licenses must have holograms and other high tech anti-forgery devices. JA 792-96. Nothing in this tiny, outdated GAO study overrides Congress' judgment that the NICS works.

Criminals virtually never acquire guns by using a fake ID. The U.S. Census Bureau's 2004 Survey of Inmates in State & Federal Correctional Facilities found that only 14 of 1,818 inmates reporting use of a gun in the crime for which they were imprisoned, purchased it using a false name and presumably false ID. JA 661-62. That handful (0.8%) of criminals would also have been able to acquire guns from other sources. JA 662.

Fingerprinting may ensure that a background check is performed on the correct person only if the applicant's fingerprints are already on file with the FBI. As the District's witnesses admitted, no studies show that in-person registration would prevent criminals from circumventing the registration process.  JA 633-34, 635, 636, 648.

Dr. Webster argued that "permit to purchase" laws that require in-person application prevent "diversion" to criminals, but his data is based on ATF traces of firearms that were likely stolen from their owners and not "diverted" to criminals. JA 669-671.  Congress declared the limitation of ATF trace data as follows:

> The firearms selected do not constitute a random sample and should not be considered representative of the larger universe of all firearms used by criminals, or any subset of that universe.  Firearms are normally traced to the first retail seller, and sources reported for firearms traced do not necessarily represent the sources or methods by which firearms in general are acquired for use in crime.

Science, State, Justice, Commerce, & Related Agencies Appropriations Act, 2006, § 621, Pub. L. 109–108, 119 Stat. 2342, 2341-42 (2005).

In short, NICS checks constitute the national consensus of a narrowly tailored approach to determine eligibility to acquire a firearm.  The District's additional burdens of another in-person appearance, fingerprinting, and photographing are not narrowly tailored to reduce crime and protect police officers.

### 3. Bringing the Firearm to MPD

Along with the in-person appearance, a person "may be required to bring with him the firearm for which a registration certificate is sought . . . ." D.C. Code § 7-2502.04(c). All plaintiffs except Scott were required to do so on at least one occasion. JA 821, 828-29, 836-37. The District offered no reason for this requirement, which creates the risk that the gun may be stolen en route or that the person may be arrested or even shot by a police officer seeing a "man with a gun" (or a gun case).

"[N]o expert specifically addresses the requirement that registrants bring the gun to be registered with them . . . ." JA 969. Without any support in the record, the district court speculated that like the in-person appearance, "physically bringing the gun is similarly necessary to verify the character of the registered weapon." *Id*. The registration application requires the make, model, serial number, and other identifying marks on the firearm. § 7-2502.03(b)(9). A registrant would provide that information correctly to ensure the accuracy of the registration certificate, which protects the person from arrest for an unregistered firearm.

No law of the United States or of any state requires that any and all firearms, of whatever type, must be brought to a police department in order to be legally possessed. Hawaii, the single state that requires registration of all firearms, does

not require it.  *See* Haw. Rev. Stat. § 134-3.  Michigan repealed a similar requirement for handguns, and that law aimed only to allow for "safety inspections" rather than crime control.  2008 Mich. Pub. Acts No. 195 (2008) (repealing Mich. Comp. Laws § 28.429).

In sum, requiring a person to bring the firearm to MPD does nothing to reduce crime or protect police officers.

### 4.  *Expiration and Re-registration*

"Registration certificates shall expire 3 years after the date of issuance unless renewed in accordance with this section for subsequent 3-year periods."  D.C. Code § 7-2502.07a(a).  To renew, the applicant must attest to possession of the firearm, his or her address, and "continued compliance with all registration requirements set forth in § 7-2502.03(a)."  § 7-2502.07a(c).  This duplicates information in the original registration and in any notice of changed information filed pursuant to § 7-2502.08(a).

If the re-registration is over 90 days late, the registration is cancelled.  § 7-2502.07a(e)(1).  Persons may fail to re-register because of age, illness, debility, extended travel, military service, mistake, or financial distress.  The consequences may be prosecution for possessing an unregistered firearm (§ 7-2502.01), being

listed in the Gun Offender Registry (§ 7-2508.01(2)), and being prohibited from possession of a firearm (§ 7-2502.03(a)(2)).  *See* JA 823.

It is unclear why this provision suddenly became compelling after the Supreme Court decided *Heller* in 2008, since the District had required registration for decades without re-registration.  The District's witnesses cited no studies showing that periodic registration renewal reduces crime or protects police officers. JA 422-23, 597, 653, 807-809.  Hawaii, the only state that requires the registration of all firearms, does not provide that registrations expire and must be renewed. Haw. Rev. Stat. § 134-3.  Not even the National Firearms Act, which mandates registration of machineguns, requires re-registration.  26 U.S.C. § 5841.

The District initially claimed re-registration to be necessary to determine "whether a registered gun owner has become ineligible to own a firearm . . . ." JA 125.  The district court agreed with that policy. JA 980-81.  But as District officials and experts conceded, background checks could be conducted at any time without causing the registrations to expire. JA 542-44, 593-96, 650-52.  The district court recognized that "to some extent … this is already the District's current practice . . . ."  JA 893.  Checks for protective order violations and domestic violence charges are conducted at least monthly. JA 502-05, discussing JA 818.

The chance that a person who passed background checks has become ineligible to own a firearm is too remote to justify the burden of perpetual re-registration. The tiny number who may become ineligible have strong incentives, including the threat of ten years' imprisonment, to get rid of any guns they possess. *See* 18 U.S.C. §§ 922(g), 924(a)(2).

While some registrants may have moved or died without MPD being notified, JA 981, no harm was suggested by having their firearms still registered. The 2012 Committee Report speculated that the requirement "likely causes the owner to look for his or her gun if it hasn't been used, and this assures that the gun has not been lost or stolen." JA 169. Webster compared the requirement to the federal authority to inspect licensed gun dealers, JA 981, but that is irrelevant to requiring individuals exercising a constitutional right to re-register.

While not disputing that the District's experts "cite no studies showing that periodic registration renewal . . . reduce[s] crime or protect[s] police officers," the district court responded that "the District need not provide empirical studies conclusively proving the effectiveness of the challenged provisions." JA 983. But the District offered *no* evidence of the tight fit required by this Court.

Further burdening registrants are the MPD regulations that implement re-registration. The statute requires that the re-registration statement "shall be on a

form provided by the Chief that can be submitted online via the Metropolitan Police Department website, by mail, or in person." § 7-2502.07a(c)(2). Contrary to the district court, JA 979-80, that procedure is not countermanded by the further provision that the Chief shall establish a rule to renew registration certificates for firearms registered before January 1, 2011. § 7-2502.07a(g). It was explained that "the re-registration process is simple – the Chief of Police will provide a form for renewal, and submission can occur either online via MPD's website, by mail, or in person." JA 169. Further, "fingerprinting is a mandatory, one-time requirement," and "additional fingerprinting" would not be required. JA 166.

Contrary to the above, the District requires that to re-register, besides paying $48 in fees, one must appear in person at MPD headquarters and submit fingerprints yet again. D.C. Mun. Regs. tit. 24, § 2326.2. The district court upheld these requirements, JA 979-84, even though "[r]equiring in-person renewal for pre-January 1, 2011, registrants might well be broader than necessary to achieve the District's goals . . . ." JA 982.

The District failed to show that expiration and re-registration have any nexus with reducing crime or protecting police officers. The district court's finding that the requirement is narrowly tailored, JA 982-84, flies in the face of the fact that not a single state nationwide has such a requirement.

50

*5. Payment of Fees*

The District prohibits exercise of the Second Amendment right at any time, place (including one's home), or manner without payment of fees. "A state may not impose a charge for the enjoyment of a right granted by the federal constitution." *Murdock v. Com. of Pennsylvania*, 319 U.S. 105, 113 (1943). "[W]ealth or fee paying has . . . no relation to voting qualifications . . . ." *Harper v. Virginia State Board of Elections*, 383 U.S. 663, 670 (1966) (poll tax).[21]

Persons who purchase firearms after checks by NICS, which charges no fee, are capable of quietly keeping their firearms in their homes without any expense to the public. The District may not condition exercise of a fundamental constitutional right on the creation of a burdensome registration regime and then justify imposing "administrative costs" to pay for it.

## D. The Requirements to Take a Test and Complete a Class Do Not Protect Police Officers or Control Crime

Registration of a firearm requires an applicant "to demonstrate satisfactorily, in accordance with a test prescribed by the Chief, a knowledge of the laws of the

---

[21] While invidious voting restrictions were historically based on race, so too were firearms restrictions. *Code of Laws for the District of Columbia* 290-91 (1819) ("No slave shall . . . keep nor carry away any gun"), 300 (same applied to any "negro or mulatto"). *See* Letitia W. Brown, *Free Negroes in the District of Columbia, 1790-1846*, at 140 (1972) (free blacks were "prohibited from voting . . . and from bearing arms.").

District of Columbia pertaining to firearms and, in particular, the requirements of this act, the responsibilities regarding storage, and the requirements for transport . . . ." § 7-2502.03(a)(10). Further, the Chief must determine that the applicant has "completed a firearms training and safety class" provided by the Chief, or has submitted evidence of training from the U.S. military, another state, or otherwise by an instructor. § 7-2502.03(a)(13).

The district court correctly noted that the test and class impose more than *de minimis* burdens on the Second Amendment right, JA 973, citing *Heller II*, 670 F.3d at 1255. But it found that the requirements protect the police and public safety "by reducing the risk of firearm accidents and ensuring accountability for gun owners." JA 974. The court held that "the District need not prove with empirical evidence that its firearm regulations will have their intended effect," JA 975, and relied on the assertions, without data or studies, of the District's witnesses.

Chief Lanier thought that gun owners should be aware of applicable laws and safety principles. JA 974. True enough – the same could be said for voting – but the issue is whether the District may impose its requirements on a person just to exercise the constitutional right to possess a firearm in the home. That is not analogous to requiring a test to get a license for the privilege of driving on public roads – no test and no license is required just to keep a car in one's garage, and

driving is not a fundamental right. *Miller v. Reed*, 176 F.3d 1202, 1206 (9th Cir. 1999).

The court found the requirements to be narrowly tailored, JA 975, even though neither the United States nor any state requires training or a written test for the mere possession of a firearm.[22] Some states require training or an exam for a permit to carry a concealed handgun, and a handful require that to purchase a handgun. But people exercise the right to "keep arms" for other reasons, *e.g.*, for home defense, hunting, collecting, or as an inheritance. *Heller*, 554 U.S. at 583 & n.7.

No evidence exists that the training or the test prescribed by the Chief protects police officers or controls crime.[23] Even if "crime" were read so broadly as to include accidents, the District's experts cite no studies showing that mandatory training or testing in gun safety reduce unintentional discharges. JA 423-24, 597-99, 602, 654-55, 812-13.

---

[22] *See* ATF, State Laws & Published Ordinances – Firearms, https://www.atf.gov/publications/firearms/state-laws/31st-edition/index.html.

[23] *See Crawford v. Marion County Election Bd.*, 553 U.S. 181, 189 (2008) ("even rational restrictions on the right to vote are invidious if they are unrelated to voter qualifications"); *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 83 (1980) (Stevens, J., concurring) (citing cases against "practices such as poll taxes or literacy tests that deny individuals access to the ballot").

The District's mandatory exam for tour guides was recently invalidated in part because "the record is 'utterly devoid' of evidence that the burdens of studying for and passing the 100-question exam 'do anything at all to advance a legitimate government objective.'" *Edwards*, 755 F.3d at 1002. "The District rehearses a plethora of harms it claims to forestall with the exam requirement," but "the record contains no evidence" of a real problem. *Id*. at *5. That is exactly the case here.

### E. The Prohibition on Registering More Than One Pistol in Thirty Days Does Nothing to Prevent Illegal Trafficking

"The Chief shall register no more than one pistol per registrant during any 30-day period," with an exception for new residents. § 7-2502.03(e). The District sought to justify this as a way to prevent "trafficking of firearms" from elsewhere. Left unanswered is why anyone would bring in a firearm from outside D.C., register it in D.C., and then "traffic" it in D.C. or elsewhere, instead of just "trafficking" it without registration.

The district court noted that this Court held the restriction to "substantially burden the Second Amendment right," JA 976, but upheld it under the "trafficking" theory. JA 976-77. That the studies cited by the District involved states without registration systems did not seem to matter. *Id*. But the court recognized the elephant in the kitchen: "as Lanier concedes in her deposition, it does not seem

likely that an aspiring gun trafficker would purchase multiple pistols in the District and then seek to register them before passing them along to his customers." JA 979, citing JA 936-38.

Chief Lanier agreed that it "is not a likely scenario" that, absent the restriction, "someone would purchase multiple guns . . . , register them all with [the [police], and then turn around and sell those guns illegally . . . ." JA 938. It was further unlikely that a person "willing to violate federal law by transferring [a] handgun illegally across state lines" is "likely to turn around and try to register that gun in the District." JA 940. Guns are trafficked primarily into the District, not out of the District. JA 803-04.

Yet the district court opined that this reality "is practically an argument for the restriction in question: Precisely because gun traffickers are unlikely to attempt to register their wares, the one-pistol-per-month limitation allows D.C. law enforcement to identify and prosecute would-be criminals who have unregistered pistols in their possession." JA 979. But it is the registration requirement, not the one-gun-a-month restriction, that allows police to arrest persons with unregistered firearms. The restriction burdens law-abiding citizens like Plaintiff Absalom Jordan, who was prevented from registering two pistols at the same time. JA 20, 848.

The district court asserted an alternative justification for the one-gun restriction that was never argued by the District: it "will reduce the overall number of firearms in circulation within city bounds . . . ." JA 977-78. It added that the Second Amendment "has not been read to protect the right to amass a personal armory," and that the District has the constitutional power "to constrain the rate at which its residents accumulate deadly weapons." JA 978.

The court found the restriction to be narrowly tailored because "District residents can still accumulate up to 12 new pistols each year. That is more than enough." *Id.* Aside from the fact that plaintiff Jordan simply wanted to register two pistols at the same time, the court did not articulate any legal or constitutional basis to prohibit law-abiding citizens from acquiring more than a certain number of firearms.

The very text of the Second Amendment refers to the right to keep and bear "arms" in the plural. A citizen may acquire more than one handgun for any number of lawful reasons, including use by family members, as a valuable collection, as an inheritance or to preserve for descendants, or for different hunting purposes. There is nothing suspect or insidious about wishing to register more than one handgun in a 30 day period.

The District's law is virtually unprecedented.  Virginia had a law limiting purchase of handguns to one per 30 days, but it had wide exemptions, and was repealed.  1994 Virginia Laws Ch. 624, repealed by Acts 2012, cc. 37 and 257.[24] Then again, Virginia at one time provided that "every free negro or mulatto, being a housekeeper, may be permitted to keep one gun" (slaves could keep none).  Act of 1748, 6 Hening, Statutes at Large 109-10.  The existence of a statute proves nothing about its constitutionality.

In short, not a single instance has been cited of a firearm brought into the District, registered, and then "trafficked."  "The District failed to present any evidence the problems it sought to thwart actually exist."  *Edwards*, 755 F.3d at 1009.  Should the District suggest that the problem is with persons who bring firearms into the District and transfer them to criminals, that would "serve only to underscore the substantial mismatch between its stated objectives and the means chosen to achieve those goals."  *Id*. at 1007.

---

[24] South Carolina had a similar law, again with exemptions, but repealed it. S.C. Code § 23-31-140(10) (repealed 2004).

### III. THE TRIAL COURT ERRED IN ADMITTING AND RELYING UPON PURPORTED EXPERT OPINION THAT WAS NOT BASED ON FACTS OR DATA

During discovery, defendants served four expert reports pursuant to Fed. R. Civ. P. 26(a)(2)(B). Plaintiffs moved to strike the expert reports of Vince, Jones, and Lanier. (Dkt. Nos. 60, 61, 62.) The district court treated those motions as motions *in limine* and denied them. JA 69-80. On summary judgment, the District submitted declarations by each of these witnesses nearly identical to their reports. JA 342-356, 386-412. The court relied on these declarations more heavily than any other documentation in the case. The opinions submitted in these reports and declarations do not qualify as expert opinion, should not have been relied on by the district court, and should be disregarded on this appeal.

Rule 26(a)(2)(B) requires that an expert report contain "a complete statement of all opinions the witness will express and the basis and reasons for them," as well as "the facts or data considered by the witness in forming them . . . ." Fed. R. Evid. 702 allows expert opinion testimony only if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

As the drafters of Rule 702 explained, "[t]he court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *United States v. Frazier*, 387 F.3d 1244, 1265 (11th Cir. 2004) (en banc), citing Fed.R.Evid. 702 advisory committee's note (2000 amends.). The court is not required to "admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), quoted in *Estate of Gaither v. District of Columbia*, 831 F. Supp.2d 56, 66 (D. D.C. 2011) (precluding purported expert from testifying as to her opinion).

Instead of requiring adherence to Rule 702, the district court allowed these three witnesses to make the same kinds of unproven assertions as the committee report previously held by this Court to be unsubstantiated. *Heller II* at 1258-59. While testimony may be admissible even if "the factual bases for an expert's opinion are weak," *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 567 (D.C. Cir. 1993), these declarations fail to reach even that low threshold, as they present no data at all. The very few facts presented are anecdotal and often unidentified and unverifiable. Rather than reflecting "knowledge," the witnesses' reports and declarations reflect only the type of "subjective belief or unsupported speculation" held inadmissible in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590

59

(1993). *See also Frazier*, 387 F.3d at 1265 (approving exclusion of "unclear, imprecise and ill-defined" opinion).

Yet the district court relied on these "opinions" heavily for virtually all of the issues in this case. It credited the "professional opinions" of Vince, Jones, and Lanier that "firearm registration protects police and reduces gun-related crime." JA 960. None of these witnesses supply any facts or evidence that registration does so. The opinion cites Lanier Decl. ¶ 18 (JA 392) and Vince Decl. ¶ 10 (JA 402), each of which opines that registration keeps weapons out of the hands of criminals and mentally ill individuals. JA 960. Par. 10 of the Vince Declaration cites no facts in support of this opinion. Par. 18 of the Lanier Declaration makes reference to high profile shootings committed by people with mental illness, but does not state how registration (as opposed to background checks) would have affected these shootings, or whether the mental illness of these people was even known.

The district court also relies on Jones and Lanier for the contention that long guns and handguns pose a similar threat to public safety and should be regulated similarly. JA 962. But Jones Decl. ¶ 13, cited by the court, contains no facts or data to substantiate this assertion, and the paragraphs following ¶ 13 relate to a shooting in New York, carried out with a weapon that it is illegal to possess,

registered or unregistered, in the District.  *See* JA 347-48.  Paragraphs 31-35 of the Lanier Decl., cited by the court, again contain no data regarding the alleged need for or effect of registering long guns.   JA 396-97.   Instead, those paragraphs recount three unrelated shootings over the past five years, all of which involved unregistered long guns, and thus demonstrate the irrelevancy of registering long guns.

Regarding the in-person registration requirement, the district court relies, JA 968-69, on Jones ¶¶ 21 and 22 (JA 350-51), Lanier ¶¶ 19 and 20 (JA 392-93), and Vince ¶ 19 (JA 405).  All of the paragraphs cited are entirely fact-free, save an unverifiable anecdote by Vince,[25] and consist of sweeping, unsupported statements such as "[i]t is also my opinion that the District's requirement that a registrant appear in-person is entirely logical and in the public interest."   Jones Decl. ¶ 21 (JA 350).

The district court considered the opinions of these witnesses allowable as evidence because their "opinions rely primarily on their personal experiences working in law enforcement."   JA 955.   But experience alone is not "a sufficient

---

[25] Vince refers to "a case I'm familiar with" involving an unidentified individual in Pennsylvania who allegedly purchased a gun in Florida and allegedly used it against some unidentified person in Pennsylvania.  JA 405.  This is the only reference to a fact in Vince's entire declaration.

foundation rendering reliable any conceivable opinion the expert may express," and Rule 702's "reliability criterion remains a discrete, independent, and important requirement for admissibility." *Frazier*, 387 F.3d at 1261. While these witnesses may qualify as experts on other topics, their experiences -- such as supervising a police department or making numerous arrests -- are not qualifications to address the restrictions here.

Such law enforcement persons have expertise on "police procedures, practices, and training," but "[e]xpert testimony that consists of legal conclusions cannot properly assist the trier of fact . . ., and thus it is not 'otherwise admissible.'" *Burkhart v. Washington Metropolitan Area Transit Authority*, 112 F.3d 1207, 1211-12 (D.C. Cir. 1997) (referring to Fed. R. Evid. 704(a)). While a police officer could testify about his observations based on "extensive experience in dealing with heavy drug users," *United States v. Spriggs*, 996 F.2d 320, 325 (D.C. Cir. 1993), such officer could not testify on the effectiveness of the drug laws and whether they were narrowly tailored.

Facts and data necessary to evaluate whether any of the challenged ordinances is likely to achieve its purpose are non-existent. Vince cited no studies, relying instead on a single unverifiable anecdote, and nebulous statements such as "studies show," one of the principal defects that this court previously pointed out

in the District's evidence. *Heller II* at 1258-59. Jones and Lanier each cited an academic study or two, but the vast majority of their testimony was mere unsupported opinion.

The three reports did not employ "reliable principles and methods" in reaching their conclusions, as required by Rule 702. They did not identify or apply any methodology at all.

That is not because evidence and studies do not exist regarding the effects of specific firearms laws on crime. As the Declaration of Dr. Gary Kleck (JA 656) shows, criminological research studies regarding the effects of firearms laws are abundant. None of these three witnesses have ever performed such studies, and they are not qualified to testify regarding studies done by others. Formal training in statistical analysis and research design is necessary to evaluate the effectiveness of gun control measures, as is a thorough knowledge of the methods and findings of prior research on this topic. JA 691-92. These three witnesses are retired (Vince, Jones) or serving (Lanier) law enforcement officers, and while no doubt competent to enforce the law, do not have the education or background to perform or evaluate the design or validity of criminological studies regarding the empirical effectiveness of firearms laws. JA 692-99.

The district court noted that the validity of the witnesses' opinions could be addressed on cross-examination, or raised on summary judgment. JA 74, 78-79. But there was no opportunity to cross-examine these witnesses at trial, because the district court allowed their declarations to be admitted, credited them, and granted summary judgment to defendants.[26]

The reports of these purported experts should have been stricken. On this appeal, no weight should be given by this court to their improper opinion evidence, and without that opinion evidence the analysis of the district court collapses.

## CONCLUSION

This Court should hold that the subject registration requirements violate the Second Amendment, reverse the judgment of the district court, and remand the case with an order to enter summary judgment in favor of Plaintiffs-Appellants, or alternatively to order that the case be tried.

---

[26] Plaintiffs argued on summary judgment that the declarations of these three experts should be given little or no weight, but the district court expressly decided to rely on those declarations. JA 955-57.

Date: September 2, 2014

Respectfully Submitted,

Dick Anthony Heller
Absalom F. Jordan, Jr.
William Carter
William Scott
Asar Mustafa

By counsel

/s/ Stephen P. Halbrook
Stephen P. Halbrook
D.C. Bar No. 379799
Suite 403
3925 Chain Bridge Road
Fairfax, VA 22030
(703) 352-7276
(703) 359-0938 (fax)
protell@aol.com

/s/ Dan M. Peterson
Dan M. Peterson
D.C. Bar No. 418360
Dan M. Peterson, PLLC
3925 Chain Bridge Road, Suite 403
Fairfax, VA  22030
(703) 352-7276
(703) 359-0938 (fax)
dan@danpetersonlaw.com

Counsel for Plaintiffs-Appellants

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,957 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

 /s/ Stephen P. Halbrook
STEPHEN P. HALBROOK

Counsel for Appellants

Date: September 2, 2014

# UNITED STATES CONSTITUTION

*Second Amendment*

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

## DISTRICT OF COLUMBIA CODE

### § 7-2501.01. Definitions.

As used in this unit the term:

. . .
(4) "Chief" means the Chief of Police of the Metropolitan Police Department of the District of Columbia or his designated agent.
. . .
(6) "Dealer's license" means a license to buy or sell, repair, trade, or otherwise deal in firearms, destructive devices, or ammunition as provided for in subchapter IV of this unit.
. . .
(8) "District" means District of Columbia.
. . .
(9) "Firearm" means any weapon, regardless of operability, which will, or is designed or redesigned, made or remade, readily converted, restored, or repaired, or is intended to, expel a projectile or projectiles by the action of an explosive; the frame or receiver of any such device; or any firearm muffler or silencer; provided, that such term shall not include:
(A) Antique firearms; or
(B) Destructive devices;
(C) Any device used exclusively for line throwing, signaling, or safety, and required or recommended by the Coast Guard or Interstate Commerce Commission; or
(D) Any device used exclusively for firing explosive rivets, stud cartridges, or similar industrial ammunition and incapable for use as a weapon.

(9A) "Firearms instructor" means an individual who is certified by the Chief to be qualified to teach firearms training and safety courses.

. . .

(12) "Pistol" means any firearm originally designed to be fired by use of a single hand or with a barrel less than 12 inches in length.

(12A) "Place of business" means a business that is located in an immovable structure at a fixed location and that is operated and owned entirely, or in substantial part, by the firearm registrant.

(13) "Registration certificate" means a certificate validly issued pursuant to this unit evincing the registration of a firearm pursuant to this unit.
. . .
(14) "Rifle" means a grooved bore firearm using a fixed metallic cartridge with a single projectile and designed or redesigned, made or remade, and intended to be fired from the shoulder.

(15) "Sawed-off shotgun" means a shotgun having a barrel of less than 18 inches in length; or a firearm made from a shotgun if such firearm as modified has an overall length of less than 26 inches or any barrel of less than 18 inches in length.

(16) "Shotgun" means a smooth bore firearm using a fixed shotgun shell with either a number of ball shot or a single projectile, and designed or redesigned, made or remade, and intended to be fired from the shoulder.

(17) "Short barreled rifle" means a rifle having any barrel less than 16 inches in length, or a firearm made from a rifle if such firearm as modified has an overall length of less than 26 inches or any barrel of less than 16 inches.

(18) "Weapons offense" means any violation in any jurisdiction of any law which involves the sale, purchase, transfer in any manner, receipt, acquisition, possession, having under control, use, repair, manufacture, carrying, or transportation of any firearm, ammunition, or destructive device.

## § 7-2502.01. Registration requirements.

(a) Except as otherwise provided in this unit, no person or organization in the District of Columbia ("District") shall receive, possess, control, transfer, offer for sale, sell, give, or deliver any destructive device, and no person or organization in the District shall possess or control any firearm, unless the person or organization

holds a valid registration certificate for the firearm. A registration certificate may be issued:

(1) To an organization if:

(A) The organization employs at least 1 commissioned special police officer or employee licensed to carry a firearm whom the organization arms during the employee's duty hours; and

(B) The registration is issued in the name of the organization and in the name of the president or chief executive officer of the organization;

(2) In the discretion of the Chief of Police, to a police officer who has retired from the Metropolitan Police Department;

(3) In the discretion of the Chief of Police, to the Fire Marshal and any member of the Fire and Arson Investigation Unit of the Fire Prevention Bureau of the Fire Department of the District of Columbia, who is designated in writing by the Fire Chief, for the purpose of enforcing the arson and fire safety laws of the District of Columbia;

(4) To a firearms instructor, or to an organization that employs a firearms instructor, for the purpose of conducting firearms training; or
(5) To a person who complies with, and meets the requirements of, this unit.

(b) Subsection (a) of this section shall not apply to:

(1) Any law enforcement officer or agent of the District or the United States, or any law enforcement officer or agent of the government of any state or subdivision thereof, or any member of the armed forces of the United States, the National Guard or organized reserves, when such officer, agent, or member is authorized to possess such a firearm or device while on duty in the performance of official authorized functions;

(2) Any person holding a dealer's license; provided, that the firearm or destructive device is:

(A) Acquired by such person in the normal conduct of business;

(B) Kept at the place described in the dealer's license; and

(C) Not kept for such person's private use or protection, or for the protection of his business;

(3) With respect to firearms, any nonresident of the District participating in any lawful recreational firearm-related activity in the District, or on his way to or from such activity in another jurisdiction; provided, that such person, whenever in possession of a firearm, shall upon demand of any member of the Metropolitan Police Department, or other bona fide law enforcement officer, exhibit proof that he is on his way to or from such activity, and that his possession or control of such firearm is lawful in the jurisdiction in which he resides; provided further, that such weapon shall be transported in accordance with § 22-4504.02;.

(4) Any person who temporarily possesses a firearm registered to another person while in the home of the registrant; provided, that the person is not otherwise prohibited from possessing firearms and the person reasonably believes that possession of the firearm is necessary to prevent imminent death or great bodily harm to himself or herself; or

(5) Any person who temporarily possesses a firearm while participating in a firearms training and safety class conducted by a firearms instructor.

(c) For the purposes of subsection (b)(3) of this section, the term "recreational firearm-related activity" includes a firearms training and safety class.

## § 7-2502.02. Registration of certain firearms prohibited.

(a) A registration certificate shall not be issued for a:

(1) Sawed-off shotgun;

(2) Machine gun;

(3) Short-barreled rifle;

(4) Pistol not validly registered to the current registrant in the District prior to September 24, 1976, except that the prohibition on registering a pistol shall not apply to:

(A) Any organization that employs at least one commissioned special police officer or other employee licensed to carry a firearm and that arms the employee with a firearm during the employee's duty hours;

(B) A police officer who has retired from the Metropolitan Police Department;

(C) Any person who seeks to register a pistol for use in self-defense within that person's home; or

(D) A firearms instructor, or an organization that employs a firearms instructor, for the purpose of conducting firearms training.

(5) An unsafe firearm prohibited under § 7-2505.04;

(6) An assault weapon; or

(7) A .50 BMG rifle.

(b) Repealed.

## § 7-2502.03. Qualifications for registration; information required for registration.

(a) No registration certificate shall be issued to any person (and in the case of a person between the ages of 18 and 21, to the person and his signatory parent or guardian) or organization unless the Chief determines that such person (or the president or chief executive in the case of an organization):

(1) Is 21 years of age or older; provided, that the Chief may issue to an applicant between the ages of 18 and 21 years old, and who is otherwise qualified, a registration certificate if the application is accompanied by a notarized statement of the applicant's parent or guardian:

(A) That the applicant has the permission of his parent or guardian to own and use the firearm to be registered; and

(B) The parent or guardian assumes civil liability for all damages resulting from the actions of such applicant in the use of the firearm to be registered; provided further, that such registration certificate shall expire on such person's 21st birthday;

(2) Has not been convicted of a weapons offense (but not an infraction or misdemeanor violation under § 7-2502.08, § 7-2507.02, § 7-2507.06, or § 7-2508.07) or a felony in this or any other jurisdiction (including a crime punishable by imprisonment for a term exceeding one year);

(3) Is not under indictment for a crime of violence or a weapons offense;

(4) Has not been convicted within 5 years prior to the application of any:

(A) Violation in any jurisdiction of any law restricting the use, possession, or sale of any narcotic or dangerous drug;

(B) A violation of § 22-404, regarding assaults and threats, or § 22-407, regarding threats to do bodily harm, or a violation of any similar provision of the law of another jurisdiction;

(C) Two or more violations of § 50-2201.05(b), or, in this or any other jurisdiction, any law restricting driving under the influence of alcohol or drugs;

(D) Intrafamily offense punishable as a misdemeanor, including any similar provision in the law of another jurisdiction; or

(E) Misdemeanor violation pursuant to § 7-2507.02 or § 7-2507.06;

(5) Within the 5-year period immediately preceding the application, has not been acquitted of any criminal charge by reason of insanity or has not been adjudicated a chronic alcoholic by any court; provided, that this paragraph shall not apply if such person shall present to the Chief, with the application, a medical certification indicating that the applicant has recovered from such insanity or alcoholic condition and is capable of safe and responsible possession of a firearm;

(6) Within the 5 years immediately preceding the application, has not been voluntarily or involuntarily committed to any mental hospital or institution; provided, that this paragraph shall not apply, if such person shall present to the Chief, with the application, a medical certification that the applicant has recovered from whatever malady prompted such commitment;

(6A) Within the 5 years immediately preceding the application, has not had a history of violent behavior.

(7) Does not appear to suffer from a physical defect which would tend to indicate that the applicant would not be able to possess and use a firearm safely and responsibly;

(8) Has not been adjudicated negligent in a firearm mishap causing death or serious injury to another human being;

(9) Is not otherwise ineligible to possess a firearm under § 22-4503;

(10) Has not failed to demonstrate satisfactorily, in accordance with a test prescribed by the Chief, a knowledge of the laws of the District of Columbia pertaining to firearms and, in particular, the requirements of this unit, the responsibilities regarding storage, and the requirements for transport; provided, that once this determination is made with respect to a given applicant for a particular firearm, it need not be made again for the same applicant with respect to a subsequent application for a firearm or for the renewal of a registration certificate pursuant to § 7-2502.07a;

(11) Is not blind, as defined in § 7-1009(1);

(12)(A) Has not been the respondent in an intrafamily proceeding in which a civil protection order was issued against the applicant pursuant to § 16-1005; provided, that an applicant who has been the subject of such an order shall be eligible for registration if the applicant has submitted to the Chief a certified court record establishing that the order has expired or has been rescinded for a period of 5 years or more; or

(B) Has not been the respondent in a proceeding in which a foreign protection order, as that term is defined in § 16-1041, was issued against the applicant; provided, that an applicant who has been the subject of such an order shall be eligible for registration if the applicant has submitted to the Chief a certified court record establishing that the order has expired or has been rescinded for a period of 5 years;

(13)(A) Has completed a firearms training and safety class provided free of charge by the Chief; or

(B) Has submitted evidence of any of the following:

(i) That the applicant has received firearms training in the United States military;

(ii) A license from another state for which firearms training is required, where the training, as determined by the Chief, is equal to or greater than that provided under subparagraph (A) of this paragraph; or

(iii) That the applicant has otherwise completed a firearms training or safety course conducted by a firearms instructor that, as determined by the Chief, is equal to or greater than that conducted under subparagraph (A) of this paragraph; and

(14) Has not been prohibited from possessing or registering a firearm pursuant to § 7-2502.08.

(b) Every person applying for a registration certificate shall provide on a form prescribed by the Chief:

(1) The full name or any other name by which the applicant is known;

(2) The present address and each home address where the applicant has resided during the 5-year period immediately preceding the application;

(3) The present business or occupation of the applicant and the address and phone number of the employer;

(4) The date and place of birth of the applicant;

(5) The sex of the applicant;

(6) Whether (and if so, the reasons) the District, the United States or the government of any state or subdivision of any state has denied or revoked the applicant's license, registration certificate, or permit pertaining to any firearm;

(7) A description of the applicant's role in any mishap involving a firearm, including the date, place, time, circumstances, and the names of the persons injured or killed;

(8) Repealed.

(9) The caliber, make, model, manufacturer's identification number, serial number, and any other identifying marks on the firearm;

(10) The name and address of the person or organization from whom the firearm was obtained, and in the case of a dealer, his dealer's license number;

(11) Where the firearm will generally be kept;

(12) Whether the applicant has applied for other registration certificates issued and outstanding;

(13) Such other information as the Chief determines is necessary to carry out the provisions of this unit.

(c) Every organization applying for a registration certificate shall:

(1) With respect to the president or chief executive of such organization, comply with the requirements of subsection (b) of this section; and

(2) Provide such other information as the Chief determines is necessary to carry out the provisions of this unit.

(d) Repealed.

(e) The Chief shall register no more than one pistol per registrant during any 30-day period; provided, that the Chief may permit a person first becoming a District resident to register more than one pistol if those pistols were lawfully owned in another jurisdiction for a period of 6 months prior to the date of the application.

## § 7-2502.04. Fingerprints and photographs of applicants; application in person required.

(a) The Chief shall require any person applying for a registration certificate to be fingerprinted in order to conduct an efficient and adequate investigation into the matters described in § 7-2502.03 and to effectuate the purposes of this unit. The Chief shall maintain a record of the fingerprints of sufficient quality to enable periodic investigation to ensure compliance with § 7-2502.03.

(b) The Chief shall take a digitalized, full-face photograph of each applicant, other than an organization, to be included as part of a person's firearms registration application. The photo shall be taken simultaneously with the filing of the application.

(c) Every applicant (or in the case of an organization, the president or chief executive, or a person authorized in writing by him), shall appear in person at a time and place prescribed by the Chief, and may be required to bring with him the firearm for which a registration certificate is sought, which shall be transported in accordance with § 22-4504.02.

## § 7-2502.05. Application signed under oath; fees.

(a) Each applicant (the president or chief executive in the case of an organization) shall sign an oath or affirmation attesting to the truth of all the information required by §§ 7-2502.03 or § 7-2502.07a.

(b) Each application required by this subchapter shall be accompanied by a nonrefundable fee to be established by the Mayor; provided, that such fee shall, in the judgment of the Mayor, reimburse the District for the cost of services provided under this subchapter.

(c) Any declaration, certificate, verification, or statement made for purposes of firearm registration under this subchapter shall be made under penalty of perjury pursuant to § 22-2402. Except as required in § 7-2502.03(a)(1), no document shall be required to be notarized.

## § 7-2502.06. Time for filing registration applications.

(a) An application for a registration certificate shall be filed (and a registration certificate issued) prior to taking possession of a firearm from a licensed dealer or from any person or organization holding a registration certificate therefor. In all other cases, an application for registration shall be filed immediately after a firearm is brought into the District. It shall be deemed compliance with the preceding sentence if such person personally communicates with the Metropolitan Police Department (as determined by the Chief to be sufficient) and provides such information as may be demanded; provided, that such person files an application for a registration certificate within 48 hours after such communication.

(b) Repealed.

## § 7-2502.07. Issuance of registration certificate; time period; corrections.

(a) Upon receipt of a properly executed application for registration certificate, the Chief, upon determining through inquiry, investigation, or otherwise, that the applicant is entitled and qualified under the provisions of this unit, thereto, shall issue a registration certificate. Each registration certificate shall be in duplicate and bear a unique registration certificate number and such other information as the Chief determines is necessary to identify the applicant and the firearm registered. The duplicate of the registration certificate shall be delivered to the applicant and the Chief shall retain the original.

(b) The Chief shall approve or deny an application for a registration certificate within a 60-day period beginning on the date the Chief receives the application, unless good cause is shown, including nonreceipt of information from sources outside the District government; provided, that in the case of an application to register a firearm validly registered under prior regulations, the Chief shall have 365 days after the receipt of such application to approve or deny such application. The Chief may hold in abeyance an application where there is a revocation proceeding pending against such person or organization.

(c) Upon receipt of a registration certificate, each applicant shall examine same to ensure that the information thereon is correct. If the registration certificate is incorrect in any respect, the person or organization named thereon shall return it to the Chief with a signed statement showing the nature of the error. The Chief shall correct the error, if it occurred through administrative error. In the event the error resulted from information contained in the application, the applicant shall be required to file an amended application setting forth the correct information, and a statement explaining the error in the original application. Each amended application shall be accompanied by a fee equal to that required for the original application.

(d) In the event the Chief learns of an error in a registration certificate other than as provided in subsection (c) of this section, he may require the holder to return the registration certificate for correction. If the error resulted from information contained in the application, the person or organization named therein shall be required to file an amended application as provided in subsection (c) of this section.

(e) Each registration certificate issued by the Chief shall be accompanied by a statement setting forth the registrant's duties under this unit.

(f) In the discretion of the Chief of Police, a registration certificate may be issued to a retired police officer who is a resident of the District of Columbia for a pistol and ammunition which conforms to the Metropolitan Police Department General Orders and policies.

(g) When the retired police officer ceases to be a resident of the District of Columbia the registration certificate expires.

(h) Nothing in this unit shall create an entitlement to a registration certificate for a retired police officer. If the Chief of Police denies a retired police officer's registration certificate application, the Chief of Police shall state the reasons for the denial in writing.

(i) The District of Columbia shall not incur any liability by reason of the issuance or denial of a certificate, nor for any use made of the registered firearm.

## § 7-2502.07a. Expiration and renewal of registration certificate.

(a) Registration certificates shall expire 3 years after the date of issuance unless renewed in accordance with this section for subsequent 3-year periods.

(b) A registrant shall be eligible for renewal of registration of a firearm if the registrant continues to meet all of the initial registration requirements set forth in § 7-2502.03(a) and follows any procedures the Chief may establish by rule.

(c)(1) For each renewal, a registrant shall submit a statement to the Metropolitan Police Department attesting to:

(A) Possession of the registered firearm;

(B) The registrant's address; and

(C) The registrant's continued compliance with all registration requirements set forth in § 7-2502.03(a).

(2) The statement submitted pursuant to paragraph (1) of this subsection shall be on a form provided by the Chief that can be submitted online via the Metropolitan Police Department website, by mail, or in person.

(d) Repealed.

(e)(1) The Metropolitan Police Department shall mail a renewal notice to each registrant at least 90 days prior to the expiration of the registration certificate.

(2) A renewal application shall be received by the Metropolitan Police Department at least 60 days prior to the expiration of the current registration certificate to ensure timely renewal.

(3) It is the duty of the registrant to timely renew a registration before its expiration date and a failure of the Metropolitan Police Department to mail or the registrant to receive the notice required under paragraph (1) of this subsection shall not prevent a registration from expiring as of that date.

(f) Repealed.

(g) The Chief shall establish, by rule, a method for conducting the renewal of registration certificates for all firearms registered before January 1, 2011. This method shall be established before January 1, 2014.

(h) Notwithstanding subsection (a) of this section, no registration certificate shall expire and no renewal of a registration certificate shall be required earlier than provided in the rule established pursuant to subsection (g) of this section.


## § 7-2502.08. Duties of registrants; penalties.

(a) Each person or organization holding a registration certificate (for purposes of this section, "registrant") shall:

(1) Notify the Chief in writing of the loss, theft, or destruction of the registration certificate or of a registered firearm (including the circumstances, if known) immediately upon discovery of such loss, theft, or destruction;

(2) Notify the Chief in writing within 30 days of a change in the registrant's name or address as it appears on the registration certificate;

(3) Notify the Chief in writing of the sale, transfer, or other disposition of the firearm within 2 business days of such sale, transfer, or other disposition. The notification shall include:

(A) The identification of the registrant, the firearm, and the serial number of the registration certificate;

(B) The name, address, and date of birth of the person to whom the firearm has been sold or transferred; and

(C) Whether the firearm was sold or how it was otherwise transferred or disposed of.

(b) Each registrant shall return to the Chief the registration certificate for any firearm which is lost, stolen, destroyed, sold, or otherwise transferred or disposed of, at the time the registrant notifies the Chief of such loss, theft, destruction, sale, transfer, or other disposition.

(c) Each registrant shall have in the registrant's possession, whenever in possession of a firearm, the registration certificate, or exact photocopy thereof, for such firearm, and exhibit the same upon the demand of a member of the Metropolitan Police Department, or other law enforcement officer.

(d) The duties set forth in subsections (a) through (c) of this section are in addition to any other requirements imposed by this unit or other applicable law.

(e)(1) A registrant shall be subject to a civil fine of $100 for the first violation or omission of the duties and requirements imposed by this section.

(2) A registrant shall be subject to a civil fine of $500 for the second violation or omission of the duties and requirements imposed by this section, a registrant's registration certificates shall be revoked, and the registrant shall be prohibited from possessing or registering any firearm for a period of 5 years.

(3) A registrant shall be subject to a civil fine of $1,000 for the third violation or omission of the duties and requirements imposed by this section, a registrant's registration certificates shall be revoked, and the registrant shall be prohibited from possessing or registering any firearm.

(4) For the purposes of this subsection, "a violation or omission" that applies to multiple firearms shall constitute a single violation or omission if the violation or omission pertaining to each firearm arose from the same occurrence.
(5) The penalties prescribed in § 7-2507.06 shall not apply to a violation or omission of the duties and requirements imposed by this section.

## § 7-2505.01. Sales and transfers prohibited.

No person or organization shall sell, transfer or otherwise dispose of any firearm, destructive device or ammunition in the District except as provided in § 7-2502.10(c), § 7-2505.02, or § 7-2507.05.

## § 7-2505.02. Permissible sales and transfers.

(a) Any person or organization eligible to register a firearm may sell or otherwise transfer ammunition or any firearm, except those which are unregisterable under § 7-2502.02, to a licensed dealer.
. . .
(c) Any licensed dealer may sell or otherwise transfer a firearm except those which are unregisterable under § 7-2502.02, to any person or organization possessing a registration certificate for such firearm; provided, that if the Chief denies a registration certificate, he shall so advise the licensee who shall thereupon: (1) withhold delivery until such time as a registration certificate is issued, or, at the option of the purchaser; (2) declare the contract null and void, in which case consideration paid to the licensee shall be returned to the purchaser; provided further, that this subsection shall not apply to persons covered by subsection (b) of this section.
. . .


## § 7-2507.06. Penalties.

(a) Except as provided in §§ 7-2502.05, 7-2502.08, 7-2507.02, and 7-2508.07, any person convicted of a violation of any provision of this unit shall be fined not more than the amount set forth in section 101 of the Criminal Fine Proportionality Amendment Act of 2012, passed on 2nd reading on November 1, 2012 (Enrolled version of Bill 19-214) [§ 22-3571.01] or imprisoned for not more than 1 year, or both; except that:

(1) A person who knowingly or intentionally sells, transfers, or distributes a firearm, destructive device, or ammunition to a person under 18 years of age shall be fined not more than the amount set forth in section 101 of the Criminal Fine Proportionality Amendment Act of 2012, passed on 2nd reading on November 1,

2012 (Enrolled version of Bill 19-214) [§ 22-3571.01] or imprisoned for not more than 10 years, or both.

(2)(A) Except as provided in subparagraph (B) of this paragraph, any person who is convicted a second time for possessing an unregistered firearm shall be fined not more than the amount set forth in section 101 of the Criminal Fine Proportionality Amendment Act of 2012, passed on 2nd reading on November 1, 2012 (Enrolled version of Bill 19-214) [§ 22-3571.01] or imprisoned not more than 5 years, or both.

(B) A person who in the person's dwelling place, place of business, or on other land possessed by the person, possesses a pistol, or firearm that could otherwise be registered, shall be fined not more than the amount set forth in section 101 of the Criminal Fine Proportionality Amendment Act of 2012, passed on 2nd reading on November 1, 2012 (Enrolled version of Bill 19-214) [§ 22-3571.01] or imprisoned not more than 1 year, or both.

(3)(A) A person convicted of possessing more than one restricted pistol bullet in violation of § 7-2506.01(a)(3) may be sentenced to imprisonment for a term not to exceed 10 years and shall be sentenced to imprisonment for a mandatory-minimum term of not less than 1 year and shall not be released from prison or granted probation or suspension of sentence prior to serving the mandatory-minimum sentence, and, in addition, may be fined not more than the amount set forth in section 101 of the Criminal Fine Proportionality Amendment Act of 2012, passed on 2nd reading on November 1, 2012 (Enrolled version of Bill 19-214) [§ 22-3571.01].

(B) A person convicted of possessing a single restricted pistol bullet in violation of § 7-2506.01(a)(3) shall be fined not more than the amount set forth in section 101 of the Criminal Fine Proportionality Amendment Act of 2012, passed on 2nd reading on November 1, 2012 (Enrolled version of Bill 19-214) [§ 22-3571.01] or imprisoned for not more than 1 year, or both.

(b)(1) For the following violations of this unit, the prosecution may, in the operation of its discretion, offer an administrative disposition whereby a person may immediately resolve his or her case upon payment of a fine, in an amount set by the Board of Judges of the Superior Court of the District of Columbia; provided, that the person is not concurrently charged with another criminal offense arising from the same event, other than an offense pursuant to § 7-2502.01 or § 7-2506.01:

(A) Possession of an unregistered firearm pursuant to § 7-2502.01;

(B) Unlawful possession of ammunition (but not possession of more than one restricted pistol bullet) pursuant to § 7-2506.01; and

(C) Possession of a single restricted pistol bullet pursuant to § 7-2507.06(a)(3)(B); provided, that the person did not also possess a firearm at the time of arrest.

(2) In determining whether to offer an administrative disposition pursuant to this subsection, the prosecution, in the operation of its discretion, may consider, among other factors, whether at the time of his or her arrest, the person was a resident of the District of Columbia and whether the person had knowledge of § 7-2502.01, § 7-2506.01, or § 7-2507.06(a)(3)(B).

(3) An administrative disposition pursuant to this subsection is not a conviction of a crime and shall not be equated to a criminal conviction. The fact that a person resolved a charge through an administrative disposition pursuant to this subsection may not be relied upon by any court of the District of Columbia or any agency of the District of Columbia in any subsequent criminal, civil, or administrative proceeding or administrative action to impose any sanction, penalty, enhanced sentence, or civil disability.

(4) At the time of the prosecution's offer of an administrative disposition, the person may elect to proceed with the criminal case in lieu of an administrative disposition.

(5) The Mayor, pursuant to subchapter I of Chapter 5 of Title 2, may issue rules to implement the provisions of this subsection. The rules may provide procedures and criteria to be used in determining when the prosecution, in the operation of its discretion, may offer the option of an administrative disposition pursuant to this subsection.

**CERTIFICATE OF SERVICE**

I hereby certify that on September 2, 2014, an electronic PDF of the foregoing Brief of Appellants and the Appendix in this case were uploaded to the Court's CM/ECF system, which will automatically generate and send by electronic mail a Notice of Docket Activity to all registered attorneys participating in the case. Such notice constitutes service on those registered attorneys.

/s/ Stephen P. Halbrook
STEPHEN P. HALBROOK