No. 14-7071

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**DICK ANTHONY HELLER, ABSALOM JORDAN,
WILLIAM CARTER, WILLIAM SCOTT, and ASAR MUSTAFA**

*Appellants*

v.

**THE DISTRICT OF COLUMBIA and
VINCENT C. GRAY, Mayor, District of Columbia**,

*Appellees*
_____

**JOINT APPENDIX (VOLUME 2 OF 2)
(Public Appendix—Sealed Material in Separate Supplement)**
_____

Appeal from the U.S. District Court
for the District of Columbia
District Ct. Civil No. 08-1289 (JEB)

Todd S. Kim
Loren L. AliKhan
Holly M. Johnson
Office of the Solicitor General
Office of the Attorney General
441 4th Street, N.W., Suite 600 South
Washington, D.C. 20001
Tel: (202) 727-6287

Stephen P. Halbrook
3925 Chain Bridge Road, Suite 403
Fairfax, VA 22030
Tel: (703) 352-7276

Dan M. Peterson
Dan M. Peterson PLLC
3925 Chain Bridge Road, Suite 403
Fairfax, VA 22030
Tel: (703) 352-7276

*Counsel for Appellees*

*Counsel for Appellants*

# TABLE OF CONTENTS

## VOLUME 1 OF 2

Relevant Docket Entries from the U.S. District Court ..............................................1

Third Amended Complaint (Dkt. No. 43).................................................................4

Answer to Third Amended Complaint (Dkt. No. 44)..............................................25

Expert Report of Mark D. Jones (Dkt. No. 60-1) ..................................................37

Expert Report of Cathy L. Lanier (Dkt. No. 61-1) ................................................52

Expert Report of Joseph J. Vince, Jr. (Dkt. No. 62-1)...........................................59

Order denying Plaintiffs' Motions to Strike Expert
Testimony of Lanier, Jones, and Vince (Dkt. No. 67)............................................ 69

Memorandum Opinion regarding Order denying Plaintiffs'
Motions to Strike Expert Testimony (Dkt. No. 68) (reported
as *Heller v. District of Columbia*, 952 F. Supp.2d 133
(D.D.C. 2013)) .......................................................................................................70

Defendants' Motion for Summary Judgment and
Statement of Material Facts (Dkt. No. 73)..............................................................81

D.C. Council legislative materials (excerpts) including 2008 Committee
Report, 2012 Committee Report, and articles, studies,
and testimony submitted in connection with Committee
hearings (Def. Ex. A) (Dkt. No. 73-2) ...................................................................89

Declaration of Lt. Jon Shelton (Def. Ex. B) (Dkt. No. 73-3) ...............................310

Defendants' Responses to Plaintiffs' First Request for
Production of Documents (Def. Ex. C) (Dkt. No. 73-4)........................................315

Declaration of Mark D. Jones (Def. Ex. D) (Dkt. No. 73-5) .................................342

Plaintiffs' Responses to Defendants' First Request for
Admissions (Def. Ex. E) (Dkt. No. 73-6) ................................................357

Plaintiffs' Answers to Defendants' Interrogatories
(Def. Ex. F) (Dkt. No. 73-7) ..................................................................363

Declaration of Cathy L. Lanier (Def. Ex. G)
(Dkt. No. 73-8)......................................................................................386

Declaration of Joseph J. Vince, Jr. (Def. Ex. H)
(Dkt. No. 73-9)......................................................................................398

Declaration of Daniel W. Webster, with attached
Exhibit 1 (Def. Ex. I) (Dkt. No. 73-10) ...............................................413

Letter from Irvin B. Nathan to Stephen P. Halbrook,
12/5/2012 (Def. Ex. J) (Dkt. No. 73-11)...............................................441

Excerpts from Deposition of Dick Heller (Def. Ex. K)
(Dkt. No. 73-12)....................................................................................445

Registration expiration notice (Def. Ex. L) (Dkt. No. 73-13) ..............451

Excerpts from Deposition of Gary Kleck, Ph.D.
(Def. Ex. M) (Dkt. No. 73-14) .............................................................453

Plaintiffs' Motion for Summary Judgment and Opposition
To Defendants' Motion for Summary Judgment (Dkt. No. 75) ...........456

Plaintiffs' Statement of Material Facts (Dkt. No. 75-3) .......................459

Plaintiffs' Response to Defendants' Statement of
Material Facts (Dkt. No. 75-4)...............................................................482

Excerpts from Deposition of Lt. Jon Shelton (Pl. Ex. 1)
(Dkt. No. 75-6) ..........................................................................497

Defendants' Responses to Plaintiffs' First Set of
Interrogatories (Pl. Ex. 2) (Dkt. No. 75-7)............................548

Excerpts from Deposition of Cathy Lanier
(Pl. Ex. 3) (Dkt. No. 75-8) .....................................................569

Sealed Exhibit (cover sheet only) (Pl. Ex. 4) (Dkt. No. 75-9)..............................621

Excerpts from Deposition of Joseph J. Vince
(Pl. Ex. 5) (Dkt. No. 75-10) ...................................................622

Excerpts from Deposition of Mark Jones
(Pl. Ex. 6) (Dkt. No. 75-11) ...................................................638

Declaration of Gary Kleck, Ph.D., with attached exhibits
K-1 through K-5 (Pl. Ex. 7) (Dkt. No. 75-12) .......................656

FBI Uniform Crime Reports Table 20 (2009-2011)
(Pl. Ex. 8) (Dkt. No. 75-13) ...................................................749

Email correspondence between Jon Shelton and
Colin Hall, 4/10/2009 (Pl. Ex. 9) (Dkt. No. 75-14) ..............760

Email correspondence between Colin Hall and
Jon Shelton, 4/21/2009 (Pl. Ex. 10) (Dkt. No. 75-15) ..........762

Transcript of Hearing before Canada House of
Commons Standing Committee on Public Safety and
National Security, 11/15/2011 (Pl. Ex. 12) (Dkt. No. 75-17)................764

Excerpts from Deposition of Daniel Webster, Sc.D.
(Pl. Ex. 13) (Dkt. No. 75-18) .................................................791

Email correspondence between Morgan Kane, Cathy
Lanier, and others, 5/19/2010 (Pl. Ex. 14) (Dkt. No. 75-19)................................814

Email correspondence between Colin Hall and
Nicholas Breul, 5/19/2010 (Pl. Ex. 15) (Dkt. No. 75-20).......................................817

Declaration of Dick Anthony Heller (Pl. Ex. 16)
(Dkt. No. 75-21)........................................................................................................819

Declaration of William Carter (Pl. Ex. 17)
(Dkt. No. 75-22)........................................................................................................826

District of Columbia Firearms Registration
Written Examination (Pl. Ex. 18) (Dkt. No. 75-23) .............................................832

Declaration of Absalom Jordan (Pl. Ex. 19)
(Dkt. No. 75-24)........................................................................................................835

Declaration of William Scott (Pl. Ex. 20)
(Dkt. No. 75-25)........................................................................................................841

Declaration of Absalom Jordan from original district
court proceedings, 7/31/2009 (Pl. Ex. 21) (Dkt. No. 75-26) ................................846

D.C. Council legislative materials (excerpts) submitted
 in connection with hearing on Firearms Amendment Act
of 2012, including testimony by David Kopel, Emily Miller,
and Charles Cunningham (Pl. Ex. 22) (Dkt. No. 75-27) ......................................856

Letter from Irvin B. Nathan to Stephen P. Halbrook,
12/19/2012 (Pl. Ex. 23) (Dkt. No. 75-28)..............................................................907

Defendants' Response to Plaintiffs' Statement of
Material Facts (Dkt. No. 80-1).................................................................................910

Excerpts from Deposition of Lt. Jon Shelton
(Def. Ex. N) (Dkt. No. 80-3)....................................................................................922

Declaration of Sgt. Colin Hall (Def. Ex. O) (Dkt. No. 80-4) ...............................925

U.S. Political Assassinations and Attempts
(Pl. Ex. 11 corrected) (Dkt. No. 81-1) ...................................................................929

Excerpts from Deposition of Cathy Lanier
(Pl. Ex. 24) (Dkt. No. 81-2) ...................................................................................933

Order Granting Defendant's Motion for Summary Judgment
And Denying Plaintiffs' Cross-Motion for Summary Judgment
(Dkt. No. 82) ...........................................................................................................941

Memorandum Opinion to Order on Defendants' Motion
For Summary Judgment and Plaintiffs' Motion for
Summary Judgment (Westlaw version) (Dkt. No. 83) .........................................942

Notice of Appeal (Dkt. No. 84) .............................................................................988

Exhibit 1

Capital Reporting Company
Shelton, Lieutenant Jon  07-29-2013

9

1          In addition, the officers under Diaz have to

2    testify to the authenticity of those.  So those

3    officers also testify in court as to the authenticity

4    of the documents that they've traced and run the

5    firearms.

6        Q    When you say "authenticity of documents,"

7    what documents are you referring to?

8        A    We do two documents for the -- for a case,

9    depending on the charges.  Carrying a pistol would be

10   one charge that a document is for.  And an

11   unregistered firearm is the, I believe, the PD-32.

12   And the PD-36 is for carrying the pistol --

13       Q    Okay.

14       A    -- or rifle or shotgun illegally.

15       Q    All right.  And as a branch commander, how

16   long have you been in that position?

17       A    Well, I was the sergeant there since 1994.

18   And when I got promoted to lieutenant.  I maintained

19   that.  The then chief at the time wanted my expertise

20   in that to remain there, so I've been the lieutenant

21   in charge of that for 12 years.  So 20 years,

22   basically.

32

1  person --

2      A    It's also the law.

3      Q    Right.  Sure.  Certainly.  But --

4      A    Your indulgence, for a quick second?

5      Q    Sure.

6      A    Thank you.  Go ahead.

7      Q    To the best of your knowledge and in your

8  experience --

9      A    Sure.

10     Q    -- has the District had a problem with

11  people presenting false or forged identification

12  documents in an attempt to register a firearm?

13     A    I'm trying to see how I want to word this to

14  you so that it's as direct to your question as I

15  possibly can without deviating.

16     Q    Sure.  Okay.

17     A    Okay?  I would say that in my office, at the

18  security officers management branch, which licenses

19  people to carry firearms, that we do have problems

20  with people falsifying information on a regular basis

21  that is captured by the live scan machine.  People

22  that are coming into the firearms registration section

33

1   do not have a lot of documents that they need to

2   present.  So my answer to that would be, probably no.

3        Q     "Probably no" on the firearms registration

4   section side of things; is that right?

5        A     That's correct.

6        Q     Okay.  Do you recall any instance at all

7   where someone came into the firearms registration

8   section -- and now I'm referring to a private

9   individual --

10       A     Correct.

11       Q     -- and tried to use a false or a forged

12   identification document to register a gun?

13       A     I do not recall.

14       Q     Okay.  As part of the -- well, first of all,

15   when a person comes in -- and unless I tell you

16   otherwise, when I'm referring to this whole process,

17   I'm only concerned with the firearms registration

18   section and the registration by private individuals

19   and not security officers.  I may ask you a question

20   or two about security officers, but I'll try to make

21   that clear.

22       A     I understand.

42

1      Q      Okay.  And when you say that's done in a

2  different way, is that done by the District in a

3  different way?  At the time of a background check, do

4  you check mental health records?

5      A      Yes, we do.

6      Q      Okay.  And what type of mental health

7  records do you check when you do a background check?

8      A      What type?

9      Q      What database?

10     A      Oh, we get them -- we get them submitted

11  from D.C. Superior Court to us.

12     Q      Okay.

13     A      And then we -- we maintain them in a

14  relatively simple Excel spreadsheet.

15     Q      Okay.

16     A      And submit that to the FBI.

17     Q      You submit that to the FBI.  So if you're

18  doing -- at the -- I'm focusing on the point where the

19  District is doing a background check on an individual

20  for purposes of registering a firearm.

21             Do you check the spreadsheet?  Or do you

22  check the spreadsheet information that has somehow

57

1      Q      Okay.

2             MR. PETERSON:  Then let's mark one more.

3             THE WITNESS:  I'd like to point out that

4    they change the names of these databases on a regular

5    basis, so...

6    BY MR. PETERSON:

7      Q      Okay.  Has the name Courtview changed?  Do

8    you know?

9      A      I believe it's a relatively new database.

10     Q      Okay.

11            MR. PETERSON:  And then we'll have another

12   one we'll mark as Exhibit S4.

13            (S Exhibit Number 4 was marked for

14            identification.)

15   BY MR. PETERSON:

16     Q      And this one appears to be an e-mail from

17   Sergeant Hall to yourself --

18     A      Correct.

19     Q      -- dated November 30th, 2011.  And at the

20   top it states that, "In order to conduct checks for

21   CPOs" -- and CPO -- by the way, I'm stopping for the

22   court reporter -- I think is civil protective order;

JA 502

Capital Reporting Company
Shelton, Lieutenant Jon  07-29-2013

58

1  is that right?

2      A    Correct.

3      Q    -- "we check the CPO list about ever two

4  weeks provided by the Superior Court domestic violence

5  section.  If we find any matches in our gun database,

6  we began to work on retrieving the firearms from the

7  registrant."

8      A    Correct.

9      Q    Okay.  So is that still being done, as far

10 as you know?

11     A    That was the way I was under the impression

12 that it was done.  I did not know that Courtview

13 provided that.

14     Q    Okay.  All right.

15     A    This was my -- this is what -- this is what

16 my understanding was how we were getting them.

17     Q    All right.

18     A    And I was comfortable with this.

19     Q    Okay.

20     A    I -- you know.

21     Q    I guess my point is that certain databases

22 can be checked frequently to update it to determine if

59

1   a person is still eligible to possess a registered

2   firearm in the District; is that right?

3        A     Well, as far -- yes.

4        Q     Okay.

5        A     Are we done with this one (indicating)?

6        Q     Yes.  And here's sort of an earlier version.

7   That was late 2011.  I'll just get this on the record.

8   This will be S5.

9             (S Exhibit Number 5 was marked for

10            identification.)

11  BY MR. PETERSON:

12       Q     And this is a little bit older e-mail from

13  Morgan Kane to Chief Lanier.  It looks like it was

14  just forwarded, maybe.  But certainly it contains an

15  e-mail discussing various things from people below,

16  but the sentence I'm interested in is after the

17  heading from Nicholas Breul -- I guess B-R-E-U-L --

18  right up near the top there.

19       A     That's the appropriate pronunciation.

20       Q     Okay.  And he states to Chief Lanier, "That

21  there have been no arrests of any of the registered

22  firearms owners for any gun-related crimes or

60

1   violations.  Further, the gun registry unit monthly

2   checks the registered owners for any CPO/TPO

3   violations or domestic violence-related charges."

4           So I guess what we're doing here is just

5   taking this back a little bit further in time.  They

6   were apparently checking back in 2010 as well as in

7   late 2011 in terms of CPO violations; is that right?

8       A    Correct.

9       Q    Okay.

10          MR. PETERSON:  Okay.  I'm going to mark this

11  as Exhibit S6.

12          (S Exhibit Number 6 was marked for

13          identification.)

14  BY MR. PETERSON:

15      Q    And, again, I guess this is kind of a

16  confirmation of the same subject, might be bringing

17  coals to Newcastle as they say, but this one also

18  indicates that Sergeant Hall and his staff are,

19  "constantly checking for CPOs issued to our gun

20  registrants," correct?

21          MR. SAINDON:  Objection.  Foundation.

22          You can answer it.

61

1            THE WITNESS:  Yeah.  This was not -- when

2    he's referring to lieutenant here, he's not referring

3    to me.

4    BY MR. PETERSON:

5        Q    No.  No.  No.

6        A    Okay.  He's referring to Lieutenant Breul.

7        Q    Right.  Right.

8        A    Okay.  So, yes.  As I stated earlier, we get

9    the -- the CPOs.  I did not know that they were in

10   Courtview.  I am not familiar with Courtview like I am

11   the other databases.  But, of course, a CPO would

12   prohibit you from having firearms, so it was my

13   impression that we were getting them.  And we were and

14   are getting them directly from the courts --

15       Q    Okay.

16       A    -- submitted similarly in the fashion that

17   we were getting the mental health records.

18       Q    Okay.  And I'm not sure if we've covered

19   this, but what about mental health commitments?  Is

20   there a database or a set of records that can be

21   queried by MPD frequently to determine mental health

22   commitments?

62

1      A     Yes.

2      Q     Okay.  And was that the spreadsheet that you

3  were referring to?

4      A     Correct.

5      Q     Okay.

6      A     It's very prehistoric.  I mean, there's

7  no -- it's not a high-tech database.

8      Q     Okay.

9      A     We take the names and we enter them in.  And

10 that's one of the first things that we check.

11     Q     Do you know if those are checked on a

12 regular ongoing basis after the initial registration?

13     A     I believe -- I don't know the answer to

14 that.

15     Q     Okay.

16     A     We've checked every time somebody comes in

17 to register a gun.  That's one of the first checks

18 that we do.

19     Q     Okay.  But there wouldn't be anything that

20 would prevent you from looking at that updated

21 spreadsheet to determine if a person was still

22 eligible?

63

```
 1     A     Absolutely not.  No, sir.

 2     Q     Okay.

 3           MR. PETERSON:  Okay.  I see Andy looking at

 4  his watch.

 5           MR. SAINDON:  I like to check after an hour

 6  to see how my witness is feeling and if he wants to

 7  take a break.

 8           MR. PETERSON:  We can take a five-minute

 9  break, if you would like to.

10           MR. SAINDON:  It's up to you.

11           THE WITNESS:  That would be nice.

12           MR. PETERSON:  Okay.  Let's take a break.

13           MR. SAINDON:  Thanks.

14           (Brief recess.)

15           MR. PETERSON:  Let's mark the next exhibit

16  as S7.

17           (S Exhibit Number 7 was marked for

18           identification.)

19  BY MR. PETERSON:

20     Q     And, Lieutenant Shelton, I'll represent to

21  you that these are the responses by the District to

22  the plaintiff's first set of interrogatories.  And did
```

64

1   you help prepare some of those responses?

2        A    Yes, I did.

3        Q    Okay.  I'll ask you mostly about the ones

4   you worked on.

5        A    Okay.

6        Q    Interrogatory number 6 -- this would be on

7   page 7 of that document -- asked about whether police

8   officers are informed or can determine in advance

9   whether a person at a location or dwelling or building

10  may have firearms when they are called there for

11  police business.  And in the response, it states that,

12  "MPD officers that are responding to a call for

13  service are not informed in advance if there is a

14  registered firearm at the location.  Although

15  specialized units will sometimes contact the firearms

16  registration section to determine whether any firearms

17  are registered at an address or to a person prior to

18  executing a search or arrest warrant, these checks are

19  not captured by MPD."

20            Is that a correct statement?

21       A    That's completely correct.

22       Q    Okay.  And the registration information

66

1   And I inquired if I could get it there.  And I still

2   don't have an answer to that.  So it is held within

3   one unit only.

4        Q    Okay.  In fact, I think we have a statement

5   from your lawyers to that effect.  And I just want to

6   confirm that this is correct.

7             MR. PETERSON:  So this will be Exhibit S8.

8             (S Exhibit Number 8 was marked for

9             identification.)

10  BY MR. PETERSON:

11       Q    And at the bottom of the first page, the

12  carryover paragraph, the attorneys state that the

13  database "can only be accessed by authorized personnel

14  from terminals within the firearms registration

15  section; i.e., the database is not accessible through

16  the MPD's intranet or the Internet."

17            So is that correct?

18       A    Yes, sir.

19       Q    Okay.  And just to kind of follow up,

20  there's not a computer in police department squad cars

21  or vehicles that could access this information; is

22  that right?

67

```
1      A      Absolutely not.

2      Q      Okay.  And I need to --

3      A      Well, now if a gun is recovered on the

4  street, they can -- in a crime --

5      Q      Uh-huh.

6      A      -- it can be run by a serial number --

7      Q      Uh-huh.

8      A      -- but not -- you cannot access anything

9  that's related to the personal information by running

10  it through that terminal.

11      Q      Okay.

12      A      Okay.  Just to clarify that.

13      Q      So it's only -- it's kind of the reverse.

14  You can't --

15      A      That's correct.

16      Q      Okay.

17      A      Yes, sir.

18      Q      So when dispatch directs a vehicle or

19  officers to a location, do they tell them over the

20  phone or anything or over a radio whether or not there

21  are firearms at that location?

22      A      Dispatchers don't have the ability to do it
```

68

1    as well.

2        Q    Okay.

3        A    In fact, I --

4             MR. PETERSON:  All right.  I guess this will

5    be Exhibit S9.

6             (S Exhibit Number 9 was marked for

7             identification.)

8    BY MR. PETERSON:

9        Q    This one, I'm going to have to kind of

10   connect it up with another document here in just a

11   second.  But this is apparently an e-mail to you and

12   then a response from you to Sergeant Hall relating to

13   a list of 11 states that have registration like ours

14   for Hibbard's project.  And it -- then it's a little

15   obscure as to what it is that's being checked, but

16   apparently he is trying to check some type of

17   information relating to those 11 states, correct?

18       A    It would appear.

19       Q    Yes.  Okay.  And now I think maybe we can

20   clarify that with another document, which is going to

21   be Exhibit S10.

22            (S Exhibit Number 10 was marked for

69

1            identification.)

2    BY MR. PETERSON:

3        Q    And this is dated, oh, about 11 days after

4    the previous e-mail.  Again, an e-mail from Sergeant

5    Hall to yourself regarding Hibbard's project.  And it

6    states that, "Hibbard checked all the states you

7    requested him to, and none dispatched firearms

8    registration information to officers in the field when

9    responding to calls."

10            Do you remember this series of e-mails on

11   Mr. Hibbard's project?

12       A    Vaguely.

13       Q    Okay.  But apparently his research indicates

14   that the other jurisdictions are like the District in

15   which firearms registration information is not

16   dispatched to officers when responding to the call; is

17   that correct?

18       A    That's correct.  I was opposed to that ever

19   happening.

20       Q    Okay.  You were opposed to it, you say?

21       A    Yes.

22       Q    Why is that?

71

1   grips and not, you know, out where it could be -- be

2   possibly abused.

3        Q    Okay.  Is it correct that police officers

4   are trained to treat situations where there might be a

5   crime in progress or domestic dispute or some other

6   situation possibly involving violence as always having

7   a potential to have a dangerous weapon present?

8             MR. SAINDON:  Objection.  Relevance.

9             THE WITNESS:  I would say of course.

10  BY MR. PETERSON:

11       Q    Right.  Okay.

12       A    Yes.

13       Q    Thank you.  I think we already marked

14  Exhibit S8.  This is the December 5th letter from the

15  District's attorneys to counsel for the plaintiff.  If

16  you could get that in front of you, please.

17            And on page 2 of that document -- and it's

18  the one, two, three, fourth paragraph down -- and it's

19  the one that begins, "Regarding your complaint as to

20  the District's response to interrogatory number 21."

21            Do you see that paragraph?

22       A    Yes, I do.

72

1      Q     Then there's a statement that says that,

2   "According to Lieutenant Shelton, there have been less

3   than a dozen instances since he's been at SOMB where

4   certain police agencies, like MPD-Narcotics or the

5   U.S. Park Police, have contacted the firearms

6   registration section prior to executing a search

7   warrant in an effort to determine if there were any

8   registered firearms associated with a particular

9   address."

10          Is that a true statement, first of all?

11     A     Yes.

12     Q     Okay.  And how long have you been at SOMB?

13  I'm not sure of that.

14     A     Twelve years.

15     Q     Twelve years.  Okay.  And it states that

16  there's been less than a dozen.  Can you recall some

17  specific instances for us when this has taken place?

18     A     Yeah.  Yes, I can.

19     Q     Okay.  Why don't you give us a couple of

20  those.

21     A     Examples?

22     Q     Yeah.

76

1    the registration records and finds that the gun is

2    registered to John Jones at such and such an address.

3    And then they go to the address, and there's

4    Mr. Jones, and it turns out that he has powder residue

5    on his hands and is identified by other witnesses.

6             But that scenario just doesn't occur much at

7    all, does it?

8        A    The scenario that you just laid out to me,

9    no.

10       Q    No.  Okay.  All right.  Usually there's

11   witnesses or other ways of finding the individual

12   other than a firearm left at the scene, correct?

13       A    I would say that's a safe assumption, yes.

14       Q    Okay.  And in the few instances where

15   firearms are left at the scene -- I'm just asking you

16   based on your experience -- is it true as a general

17   matter that usually those are unregistered firearms as

18   opposed to registered firearms?

19       A    Yes, sir.

20       Q    Okay.  I'd like to show you now the answer

21   to interrogatory 13, which is on, again, Exhibit S7.

22            And did you help prepare the answer to this

78

1     Q    Okay.  And just to -- and I'm not going to

2  ask you to check my math here.  I've added them

3  together, and just eyeballing it here, I came up with

4  the number 6,046 for handguns for all of those years

5  put together, 473 for rifles, 612 for shotguns.  I'm

6  not asking you to check my math.  If I've done it

7  wrong, the attorneys will check me.  But adding those

8  three together, I came up with something over 7,000

9  firearms.

10          Does that look about right, just eyeballing

11  the thing?

12     A    It does.

13     Q    Okay.  Now, these are guns that are

14  recovered from crime scenes, it says.

15          But does that necessarily mean that the gun

16  was actually used to commit a crime if it's recovered

17  from a crime scene?

18     A    No.

19     Q    Okay.  The gun could be present for some

20  other reason other than the fact that it was actually

21  used in the commission of a crime; is that right?

22     A    Absolutely.

85

1    day with that firearm without deviation.

2        Q    Okay.

3        A    I have a detective unit that investigates

4    all of these.  And they're almost always stolen from

5    the individual at their home and eventually used in

6    the commission of crimes.

7        Q    All right.  Okay.

8        A    Is that adequate?

9        Q    Yes, that explains it.  I was just

10   wondering.  It seemed like a fairly significant

11   number, and I was just wondering.

12       A    Well, there's many, many, many people that

13   are armed that are carrying that are working in the

14   security industry here in the District of Columbia.

15       Q    All right.  So you don't -- I mean, looking

16   at this chart again over the period 2008 through

17   2012 -- and I'm on Exhibit S8 -- a striking fact is

18   the lack of rifles and shotguns that are recovered

19   from crime scenes.

20            It looks like during that four or five-year

21   period, there were no rifles and only two shotguns

22   recovered, correct?

86

1      A      Correct.

2      Q      They're not used in crime or associated with

3  crime scenes very much in the District; is that right?

4              MR. SAINDON:  Objection.  Foundation.

5              THE WITNESS:  Well, are we going to stick

6  with just the private, or do we want to talk about

7  both of these?  I mean, I'm not sure what you're

8  asking about.

9  BY MR. PETERSON:

10     Q      Okay.  Well, if you put them both together,

11  security companies even more --

12     A      Well, that's because they don't use them.

13     Q      They don't use them, correct.

14     A      Right.  There are some that have them, but

15  for the most part, they're not used.

16     Q      Okay.  But for private individuals, there

17  are fairly large numbers of rifles and shotguns

18  registered in the District, correct?

19     A      Yes, sir.

20     Q      Okay.  But over this roughly five-year

21  period, only two shotguns -- two registered shotguns

22  and zero registered rifles were associated in any way

97

1    correct?

2         A     You're going to have to rephrase your

3    question.

4         Q     Okay.  Fingerprints are used to positively

5    identify, you testified, that the person is indeed the

6    person that he's representing himself to be on the

7    application, correct?

8         A     That's correct.

9         Q     Okay.  Does information regarding residence

10   positively identify that person beyond what

11   fingerprints would identify them?

12        A     No.

13        Q     Okay.  Does the information regarding prior

14   residence lead to any additional databases being

15   searched during the registration process beyond the

16   ones we've mentioned, WALES and NCIC and NICS and so

17   forth?

18        A     I'm not aware of any.

19        Q     Okay.  So the five-year list of residences

20   doesn't really provide any additional information

21   regarding eligibility to possess a firearm, does it?

22        A     No, sir.  None at all.

Capital Reporting Company
Shelton, Lieutenant Jon  07-29-2013

98

1        Q    Okay.  Can you identify any instances in

2   which having that information about a prior list of

3   residences over five years either prevented a crime or

4   led to the identification of an individual who

5   committed a crime?

6        A    One more time, sir.

7        Q    Okay.  Can you identify any instances in

8   which having the information about a person's

9   residences during the prior five years either

10   prevented a crime from occurring or led to the

11   identification of an individual who committed a crime?

12       A    No, sir, I cannot recall.

13       Q    Okay.  In your opinion, could the District

14   have an effective registration system if this question

15   about residences during the prior five years was not

16   included on the application?

17       A    Yes.

18            MR. SAINDON:  Objection.  Calls for opinion.

19            But you can answer.

20            THE WITNESS:  I'm sorry.

21   BY MR. PETERSON:

22       Q    Your answer was yes?

99

1      A      Yes, sir, I do.

2      Q      Okay.  And, similarly, code section

3  7-2502.03(b)(3) requires the applicant to furnish

4  information regarding the registrant's present

5  business or occupation and the address and phone

6  number of the employer, correct?

7      A      I'm sorry, sir.  One more time.  I was

8  looking at the interrogatory.

9      Q      Okay.  I've mentioned the code section

10  already, but --

11     A      Right.

12     Q      -- it requires an applicant to furnish

13  information regarding the registrant's present

14  business or occupation and the address and phone

15  number of the employer, true?

16     A      Yes.

17     Q      Okay.  Let's turn to Exhibit S7, and that

18  will be interrogatory number 17 which is on page 12.

19  And this interrogatory asks the District to identify

20  the purposes for which MPD needs that information

21  regarding present business or occupation and address

22  or phone number of the employer.  And you can take a

Capital Reporting Company
Shelton, Lieutenant Jon  07-29-2013

105

1   done, I mean, you would know that that's for a

2   security company then, correct?

3        A     Correct.

4        Q     Okay.  Why do you need to know the employer

5   of a private individual?

6        A     I have no clue.

7        Q     Fair enough.  And then turning to the next

8   sentence, it says that -- and again, I'm on

9   interrogatory number 17, the answer on page 12.  It

10  states that, "The information regarding employer is

11  also used to determine if the purchaser is a member of

12  MPD and registering an off-duty service weapon."

13       A     Correct.

14       Q     Okay.  Well, first of all, why is that

15  important to know?

16       A     Metropolitan police officers are only

17  permitted to carry certain types of off-duty

18  weapons --

19       Q     Okay.

20       A     -- that we have to qualify on and be trained

21  on.

22       Q     Okay.  Could you just have a box again,

108

1   information is used to possibly try and locate him and

2   let him know that the firearm has been recovered or

3   lost and recovered, or --

4        Q    Okay.

5        A    -- involved in a crime or whatever the case

6   may be.

7        Q    And I'm not questioning your good faith on

8   privacy issues.

9        A    Sure.  Right.  No.

10       Q    But I did ask you if there's a written

11   policy or procedure and protocol saying it's not to be

12   discussed with the employer.

13       A    We don't discuss it with anybody.

14       Q    Okay.  Anything in writing that says that,

15   though?

16       A    Not that I'm aware of.

17       Q    Okay.  And then next section that we have

18   here has to do with section 7.2502.03(b)(6) which

19   requires a statement on the application regarding

20   whether the United States, a state, or subdivision has

21   ever revoked or denied an applicant's license,

22   registration, or permit for a firearm.

109

1              And in answer to interrogatory number 18,

2    which is on page 13 of Exhibit S7, it said that,

3    "Although it is difficult to verify this information

4    if the applicant provides a false statement, MPD

5    attempts to verify it.  And any information may be

6    used as part of the background investigation."

7              Does MPD attempt to verify that for every

8    application?

9        A    I don't ever recall seeing an application

10   where the person said -- answered yes to that.

11       Q    Okay.

12       A    How's that?

13       Q    All right.

14       A    Will that work?

15       Q    So in that case, there -- if they didn't

16   answer yes, there would be no need to attempt a

17   verification, right?

18       A    Correct.

19       Q    Okay.

20       A    You wouldn't even know where to begin.

21       Q    Okay.  Well, I guess that -- maybe that was

22   my next question.

110

1           How would you even attempt to verify it?

2      A    (Gesturing.)

3           MR. SAINDON:  You have to answer verbally.

4           THE WITNESS:  I'm sorry.  I thought we were

5   just, you know -- I'm sorry.  For a minute there, I

6   thought it was just me and you in there.

7           All right.  Do the question one more time.

8   BY MR. PETERSON:

9      Q    The question is, how would you ever even

10  attempt to verify that information?

11     A    You would not be able to.

12     Q    Okay.  And so since you don't recall any

13  instances where it's been attempted, I take it that

14  you don't recall any instance where the applicant had

15  lied that you know of.

16     A    Not that I know of.

17     Q    Right.  Okay.  Similarly -- and now we're on

18  interrogatory number 19, which is on that same page of

19  S7 -- down at the bottom of page 13, section

20  7.2502.03(b)(7) requires the applicant to disclose his

21  role in any mishap involving a firearm, including the

22  date, place, time, circumstances and names of the

112

1     Q     Okay.  But you do recall some instances in

2  which it has been reported?

3     A     Yes.  And then -- and then reported it and

4  scratched out and said it didn't happen.

5     Q     Oh, okay.  So do you recall any final

6  applications that were not scratched out that reported

7  mishaps?

8     A     One more time.

9     Q     You said that they were scratched out and

10  then --

11     A     I remember one very -- one right now that

12  I'm dealing with.

13     Q     Okay.  All right.  It was scratched out and

14  the person changed his mind and said there was no

15  mishap, right?

16     A     That's correct.

17     Q     Okay.  So do you recall any in which people

18  reported mishaps and they did not scratch it out or

19  continued to report the mishap and that was the final

20  version on the application.  Do you recall any of

21  those?

22     A     I believe so.

113

```
 1      Q    Okay.

 2      A    Just one, maybe two --

 3      Q    Okay.

 4      A    -- that I recall.

 5      Q    Do you recall if the application was denied

 6 on that basis?

 7      A    No.  I don't recall if it was, but I do

 8 not -- I do not believe it was.

 9      Q    Okay.  All right.  If it resulted in a

10 criminal charge, that might be a basis for turning it

11 down, correct?

12      A    Yes, sir.

13      Q    Okay.  Or criminal conviction, I should say.

14      A    Correct.

15      Q    Now, section 2502.03(b)(10) requires a name

16 and address of a person or organization from whom the

17 firearm was obtained; in the case of a dealer, his

18 dealer's license number.  And this is addressed in

19 interrogatory number 20 on page 14 of Exhibit S7.

20           And the basic purpose there, if you'll bear

21 with me, on page 15 is that the MPD does verify the

22 dealer and license number, and the information is used
```

JA 528

Capital Reporting Company
Shelton, Lieutenant Jon  07-29-2013

114

1    to determine if the transaction was a legal

2    transaction, correct?

3        A    Yes, sir.

4        Q    Okay.  Now, for a transaction inside the

5    District, only between two District residents, is it

6    legal for one individual to sell a firearm to another

7    privately without going through a dealer?

8        A    No, sir.

9        Q    Okay.  There's really only one dealer

10   commercially operating within the District, right?

11       A    Two.

12       Q    Two.  Okay.

13       A    One does not.  Well, no.  I retract that.

14   Operating within the District of Columbia.

15       Q    Yes.

16       A    He operates within the District of Columbia,

17   but he's not a commercial -- he does not deal

18   commercially with -- with District residents.

19       Q    Okay.

20       A    He's a federal firearms dealer that --

21       Q    Who is that?

22       A    He's a -- his name is Harry Fook, I believe.

Capital Reporting Company
Shelton, Lieutenant Jon  07-29-2013

115

```
 1      Q     F --

 2      A     F-O-O-K.

 3      Q     F-O-O-K.

 4      A     He may -- he could be retired right now.  I

 5  haven't checked lately.  He's an older man that deals

 6  strictly with overseas sales with ATF.

 7      Q     Oh, okay.  Okay.  Overseas sales.

 8      A     Yes, sir.

 9      Q     Okay.  But --

10      A     But he does hold a license with me --

11      Q     Okay.

12      A     -- to do -- to sell firearms.

13      Q     Okay.  Does he have an FFL also?

14      A     Yep.  You have -- that's a pretty much have

15  to.

16      Q     You have to have one?

17      A     Yes, sir.  That comes first.

18      Q     Okay.  But as far as commercially operating

19  within the District --

20      A     He will not -- he will not sell to

21  residents, businesses or security companies.

22      Q     Okay.  There's only one dealer who does
```

116

1   that, right?

2        A    That's correct.

3        Q    And that's Mr. Charles Sykes?

4        A    Correct.

5        Q    Okay.  And where are his business premises

6   located?

7        A    300 Indiana Avenue on the first floor.

8        Q    Okay.  So if a transaction is within the

9   District between District residents, you already know

10  that the firearm is going to go through Mr. Sykes,

11  correct?

12       A    That's correct.

13       Q    Okay.

14       A    That's correct.

15       Q    So really for those types of transactions,

16  you could have it listed on the form, I suppose.  But

17  you already know it's going to be Mr. Sykes and what

18  his dealer number is, right?

19       A    That's correct.

20       Q    Okay.  Now, for transactions originating

21  outside the District where a firearm is coming into

22  the District, it's illegal under federal law to

Capital Reporting Company
Shelton, Lieutenant Jon  07-29-2013

117

1    transfer a handgun across state lines into the

2    District without going through an FFL, right?

3         A     No, not always.

4         Q     Okay.

5         A     Okay.

6         Q     What instance are you thinking of where it

7    would not be illegal?

8         A     If you already owned the gun in another

9    jurisdiction --

10        Q     Correct.

11        A     -- and you moved into the District of

12   Columbia --

13        Q     Yes.

14        A     -- you would not have to go through a

15   federal firearms dealer.

16        Q     Correct.  Okay.  But if someone were to be

17   purchasing a gun for the first time --

18        A     A new purchase.

19        Q     -- a new purchase.

20        A     Right.

21        Q     And it was a handgun.

22        A     Correct.

118

```
 1      Q     And they were acquiring it outside the

 2  District --

 3      A     Yes.

 4      Q     -- to be brought into the District and

 5  possessed there, it would have to go through an FFL in

 6  the District, right?

 7      A     That's correct.

 8      Q     Okay.  And, again, that's Mr. Sykes only,

 9  correct?

10      A     That's correct.

11      Q     All right.  And so if it came in through

12  Mr. Sykes, you know that he's the dealer and what his

13  license number is and so forth for those types of

14  transactions, true?

15      A     That's correct.

16      Q     Okay.  In fact, if an FFL outside the

17  District attempted to transfer a newly purchased

18  handgun into the District to a District resident

19  without going through a District FFL, he could lose

20  his license, right?

21      A     He would lose his license from F -- well,

22  from ATF.
```

Capital Reporting Company
Shelton, Lieutenant Jon  07-29-2013

119

1       Q     Right.

2       A     Right.

3       Q     He could also be prosecuted for a felony,

4   correct?

5       A     Yes, sir.

6       Q     Okay.  So it's pretty unlikely that an FFL

7   outside the District is going to transfer a handgun

8   into the District without going through Mr. Sykes if

9   he values his freedom and his license.

10      A     That's correct.

11      Q     Okay.  Now, for long guns, they could be

12  transferred by an FFL outside the District to a

13  District resident without going through a dealer such

14  as Mr. Sykes; is that right?

15      A     That's correct.

16      Q     Okay.  So in that instance, why do you need

17  the dealer's name and license number?

18      A     Well, we -- the firearm does not need to be

19  brought to us.  Okay.

20      Q     Uh-huh.

21      A     So if you're buying a new firearm from

22  Atlantic Guns in Silver Spring, you come to us and get

120

1      the application.

2          Q      Uh-huh.

3          A      The application is just one part of the

4      process.

5          Q      Right.

6          A      You take the application back to Atlantic

7      Guns.  They put their information -- and they are

8      attesting to the fact that the specifications on that

9      gun are what they are:  The length of the barrel, the

10     action, the serial number.  They are attesting to

11     that.  We don't have to see that firearm.

12             Once they bring that application back from

13     Atlantic Arms, Atlantic Arms signs off on that.  It is

14     now their ATF license that is on the line if that

15     information is inaccurate when the application comes

16     back to us.

17         Q      Okay.

18         A      We then review that, approve it when the

19     fingerprints come back.  Then he can take that gun

20     back to Atlantic Firearms and take it directly home.

21         Q      Uh-huh.  Okay.  And under those

22     circumstances, you don't require the individual to

JA 535

121

1    bring the gun down to --

2         A    No, sir.

3         Q    -- MPD?

4         A    No.

5         Q    Okay.  You don't check for folding stocks?

6         A    We check the firearm when the firearm is

7    brought to us.  We will research it to make sure that

8    the firearm is legal in the District of Columbia.

9         Q    Okay.  When it's brought to you, what do you

10   mean by that?

11        A    If he -- well, I meant the application is

12   brought to us.

13        Q    Okay.  All right.

14        A    If he alters the firearm thereafter, then

15   he's committing a crime.  If he takes off the full

16   stock and puts pistol grips on it or something along

17   the line -- you said folding -- then he has committed

18   a crime.

19             But when the gun is bought and approved

20   through firearms registration, the newly purchased

21   firearm, we're basing it on the fact that a licensed

22   ATF dealer where he bought it from is attesting to the

122

1   facts that go on that application.

2        Q    Okay.  So you want that information about

3   the out-of-state dealer for purposes of an attestation

4   as to the legality of the firearm; is that it?

5        A    Correct.

6        Q    Okay.

7        A    Since we don't have to see it.

8        Q    Okay.  So that, I suppose, helps comply with

9   District registration laws, right?

10       A    Correct.

11       Q    Does it in any way, apart from the

12  registration laws of the District, help prevent or

13  solve crime?  And, again, I'm talking about not

14  regulatory stuff, but violent crime and that type of

15  thing.

16       A    No, sir.

17       Q    Okay.

18       A    Not that I would construe.

19       Q    Sure.

20       A    I'd like to apologize, but I had a cup of

21  coffee before I came here.

22       Q    Sure.

129

```
 1      Q     Sure.

 2            (Discussion off the record.)

 3  BY MR. PETERSON:

 4      Q     Okay.  Turning again to Exhibit S7, which is

 5  the interrogatories, interrogatory 21 on page 15 asks

 6  for all instances from 2008 to the present in which

 7  the information described in the interrogatories

 8  number 16 through 20 has been obtained from the

 9  firearms registration information basically and has

10  been used to reduce the use of firearms in crime,

11  protect police officers or promote any other important

12  governmental interest.

13            And just to recap, I think we've been

14  through all of these.  Sixteen related to the

15  five-year residence, 17 related to the employer

16  information, 18 related to denials or revocation of

17  prior licenses, 19 related to mishaps?

18      A     Right.

19      Q     And 20 related to the name or address of the

20  dealer or person.

21      A     Uh-huh.

22      Q     And so we asked the District to identify all
```

130

1    instances in which that specific information has been

2    used to reduce the use of firearms in crime other than

3    registration offenses or protect police officers.

4           Can you think of any instance in which that

5    specific information has actually been used to reduce

6    crime other than registration or to protect police

7    officers?  That specific information I'm only talking

8    about now.

9       A    Can we go through each individual one one

10   more time?

11      Q    Yes.  You can look at them.  It's there in

12   front of you.

13      A    Oh, I'm sorry.

14      Q    It's okay.  Sixteen is the five-year

15   residence period.

16      A    Right.  No.

17      Q    Seventeen is the present business or

18   occupation and address and phone number of the

19   employer.

20      A    No.

21      Q    Eighteen is denials or revocations of

22   previous licenses or permits.

131

1    A    No.

2    Q    Nineteen is mishaps.

3    A    No.

4    Q    And 20 is the person from whom the firearm

5    was obtained and the dealer's name and license?

6    A    No.

7    Q    Okay.  All right.  And turning to

8    interrogatory number 22, which is again on page 15

9    there -- and we have a number of objections, but the

10   question was to identify all instances from 2008 to

11   the present where the information about where a

12   registered firearm will generally be kept as required

13   by D.C. law has been -- where that information has

14   simply been used by MPD.

15          Do you know of instances where that has been

16   used for any purpose?

17   A    Well, regarding security companies, we want

18   to know where they're storing their firearms.

19   Q    Okay.

20   A    Okay.

21   Q    All right.

22   A    Where they're keeping them at.

137

1  with these particular denials.

2      Q    Oh, right.  You don't know the basis for

3  these --

4      A    For these denials.

5      Q    -- for these denials?

6      A    Correct.

7      Q    Right.  But I guess what I'm saying is the

8  number of denials is very small, whereas the number of

9  applications for handguns, that's running close to

10  1,000 a year.  So most of those 922 applications

11  submitted in 2012, for instance, were not submitted by

12  people with disqualifying information that would be

13  revealed by background check?

14      A    That's -- that's accurate.

15      Q    Okay.  So in short, they're basically

16  law-abiding people who were submitting these

17  applications?

18      A    I find that to be almost always the case.

19      Q    Okay.  But you don't know what the basis was

20  for denying the two handgun applications in 2011 and

21  2012?

22      A    No, sir, I don't.

148

1     Q     Right.  Right.

2     A     Sure.  Eyewitness account, perhaps a shell

3   casing.

4     Q     Right.

5     A     But that may be, you know, in a different

6   report.

7     Q     Okay.  That would typically go into a police

8   report?

9     A     Of course.

10    Q     Okay.  You've mentioned the reregistration

11   process a few times.

12    A     Uh-huh.

13    Q     And you've also -- we've discussed several

14   databases that can be queried, whether it's NCIC,

15   Courtview, WALES, NICS, those types of things.

16    A     Right.

17    Q     Are there any databases that can't be

18   queried unless there's a formal reregistration process

19   going on?

20    A     I don't understand your question.  I'm

21   sorry.

22    Q     Okay.  Of the types of databases we've

149

1   discussed, Courtview --

2        A    Right.

3        Q    -- there was evidence I think that it's

4   queried every couple of weeks in terms of CPOs and

5   that type of thing, and all these other databases.  If

6   the District wanted to -- I'm not saying it's their

7   current policy, but if they wanted to, is there

8   anything that prevents them from querying those

9   databases outside of a formal reregistration process?

10       A    I do not know the answer to that.

11       Q    Well, let me make it more concrete through

12  an example.

13       A    Okay.

14       Q    If you wanted -- if the appropriate

15  personnel within the District, authorized personnel --

16       A    Right.

17       Q    -- wanted to say, today we're going to check

18  100 registered firearms owners, we're going to run

19  them through all these databases, see if they're still

20  qualified to possess a firearm, is there anything that

21  would stop the District from doing that, that would

22  prevent them from doing that?

Capital Reporting Company
Shelton, Lieutenant Jon  07-29-2013

150

1      A      No, I do not believe so.

2      Q      Okay.

3      A      In fact -- no.

4      Q      No.  Okay.  All the things that you

5  typically check in connection with a registration you

6  could recheck at a later date if you wanted to?  I

7  mean, if it was appropriate to do that?

8      A      I think that was the goal of the

9  reregistration process.

10     Q      Okay.  All right.  What's the status of the

11 implementation of the three-year renewal?

12     A      It has to be in effect by January 1st of

13 2014.

14     Q      Okay.

15     A      Well, I'm sorry.  It must be implemented.

16     Q      Okay.

17     A      Did I say something different than that?

18            MR. SAINDON:  In effect, I think.

19            THE WITNESS:  All right.

20 BY MR. PETERSON:

21     Q      In effect?  Implemented?

22     A      Implemented, right.

202

1     Q     -- to finish up on.

2     A     Are we done with 33?

3     Q     Yes.  Have you or anybody that you supervise

4   as a branch commander ever done any studies of any

5   kind to actually try to determine whether the

6   District's registration laws actually reduce crime or

7   protect police officers?

8     A     I have -- I have not.

9     Q     Okay.

10    A     Whether anybody that I supervise did it on

11  their own -- on their own in their own time for their

12  own curiousness of knowledge, I do not know.

13    Q     Okay.

14    A     I have not, nor have I discussed that, to

15  the best of my recollection, with Sergeant Hall.

16    Q     Okay.

17    A     Who is -- we work very close together, as

18  you can see.

19    Q     Sure.  Sure.  To the best of your knowledge,

20  have either you or Sergeant Hall been asked to perform

21  any such studies?

22    A     We have done some research on other

203

1  registration issues with other jurisdictions, but not

2  to the question that you asked me, if firearms

3  registration protects -- however you worded it.

4      Q    Protects police officers or reduces crime.

5      A    Correct.

6      Q    You have not looked into that?

7      A    No.

8      Q    Okay.  In the other jurisdictions, what was

9  it that you were looking at?

10     A    At their processes for the -- for what

11 states had registrations, how they -- you know, what

12 were some of the requirements.  For example, Hawaii,

13 you know, you have to have a hunting license or --

14 they're very close to our registration, things of that

15 nature.

16     Q    Okay.  So are those studies still in

17 existence someplace in your files?

18     A    Well, it wasn't anything that he put in

19 writing, so to speak.  We just did some research to

20 see what other states did, you know, when we were

21 making our amendments, going through our amendments.

22     Q    Okay.  It wasn't written up, per se?

## Capital Reporting Company
### Shelton, Lieutenant Jon  07-29-2013

204

1     A     No.

2     Q     Okay.

3     A     It was probably discussed in multiple

4   meetings during these amendment acts.

5     Q     Okay.

6     A     Who's got what, who does what.

7     Q     Okay.  Are you aware of any studies at all

8   by anyone that look at the effectiveness of the D.C.

9   registration laws in terms of protecting officer

10  safety or reducing crime?

11    A     No, sir, I'm not.

12    Q     Okay.

13          MR. PETERSON:  Let's go off the record just

14  one second.

15          (Discussion off the record.)

16          MR. PETERSON:  Back on the record.  As far

17  as I'm concerned, we're done, unless counsel has

18  questions.

19          MR. SAINDON:  No, I don't have any.  Thank

20  you.  We would like to review and sign, please.

21          (Whereupon, at 5:25 p.m., the deposition of

22          LIEUTENANT JON SHELTON was concluded.)

Exhibit 2

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

)
DICK ANTHONY HELLER, et al.,       )
                        )
     Plaintiffs,           )
                        )
     v.                )     No. 1:08-cv-01289
                        )
DISTRICT OF COLUMBIA,  et al.,     )
                        )
     Defendants.      )
_____ )

DEFENDANTS THE DISTRICT OF COLUMBIA AND MAYOR VINCENT C. GRAY'S
RESPONSES TO
PLAINTIFFS' FIRST SET OF INTERROGATORIES

Pursuant to Fed. R. Civ. P. 33(b) and 34(b), defendants the District of Columbia and Mayor

Vincent C. Gray (collectively the "District"), by and through counsel, hereby respond to Plaintiffs' First

Set of Interrogatories.

(1)     The information supplied in these responses is not based solely on the knowledge of the

executing party, but includes knowledge of the party, its agents, representatives, and attorneys, unless

privileged.

(2)     The word usage and sentence structure may be that of the attorney assisting in the

preparation of these responses and does not necessarily purport to be the precise language of the executing

party.

(3)     For any additional responsive information that may be available through deposition

testimonies, the District incorporates such information for purposes of giving the parties notice that such

information exists, but does not adopt such testimony as accurate and complete.

GENERAL OBJECTIONS

The District's General Objections set forth herein, are to be considered continuing objections and/or assertions of privilege and responses to each and every specific discovery request that follows. That some of these General Objections are not restated in response to particular requests does not waive the assertion and application of the General Objections. The District's objections and responses given herein shall not prejudice any objection and/or assertion of privilege they may later assert in any context. Moreover, the District responds to the instant discovery subject to the accompanying objections, without waiving and expressly preserving all objections.

1.      The District objects to the instructions propounded by Plaintiffs to the extent that they seek or purport to impose obligations in excess of those required by the Federal Rules of Civil Procedure and/or the Local Rules of the United States District Court for the District of Columbia. Included in the instructions objected to are Plaintiffs' definitions, which purport to assign to words and phrases meanings other than those generally understood or used in common parlance.

2.      The District objects to this discovery to the extent that it inquires into matters privileged from disclosure pursuant to the attorney-client privilege, executive privilege, deliberative-process privilege, legislative privilege, informant's privilege, law enforcement privilege, prosecutorial privilege, spousal privilege, Privacy Act, District of Columbia Municipal Regulations, D.C. Office of Human Resources rules and/or regulations, the work-product doctrine, and/or any other applicable privilege or similar protection. Inadvertent production of any information or documents so privileged does not constitute a waiver of such privilege or any other grounds for objecting to the discovery request.

3.      The District objects to Plaintiffs' discovery requests to the extent that they seek information relating to events, policies or procedures that occurred or were in use at times other than

–2–

those relevant to the allegations in the Complaint. The District objects to this discovery to the extent that it seeks disclosure of confidential material or information in the absence of a protective order.

4.      In responding to these requests, the District does not waive, but retains and preserves any and all objections to the materiality, and/or relevance of the information provided.

5.      In responding to this discovery, the District does not concede or admit any premise, proposition, or characterizations contained in any request or any pleading in this or any other matter.

6.      In seeking the disclosure Plaintiffs seek hereby, Plaintiffs are understood to waive any and all privileges, protections or claims regarding or relating to the subject of the disclosure.

7.      The District objects to this discovery insofar as it is overbroad, unduly burdensome or vexatious on grounds, including, but not limited to, seeking materials without limitation as to time period or over a period of time so lengthy as to seek information immaterial, irrelevant to, or otherwise inadmissible in this litigation.

8.      The District understands that Plaintiffs' requests are not intended to seek communications or documents that are protected by the attorney-client privilege or protected by the work product doctrine and object to Plaintiffs' requests insofar as they could be read to seek such protected information.

9.      The District objects to these requests to the extent they are vague, ambiguous, irrelevant, and/or overly broad.

10.      The District objects to the Requests for Production of Documents that seek "[a]ll studies, data, and other evidence" as overly broad and premature. The term "[a]ll studies, data, and other evidence" encompasses literally all documents—from anywhere—involving the referenced topics, hence is public-record information equally available to the plaintiffs.

11.     To the extent Requests for Production of Documents Nos. 50 through 54 seek documents in the possession of the Council not part of the official legislative record, if such documents exist, they would likely be protected by one or more legislative privileges.

12.     The responses to these requests are accurate to the best of the District's knowledge as of this date. The District's investigation, however, is continuing, and the District may obtain additional information relevant to the subject matter of this action through discovery and further review of documents. The District will produce additional responsive information, if necessary, and reserves the right to rely on subsequently discovered information. The District will not provide copies of documents that are a matter of public record or already in plaintiffs' (or their attorneys') possession, which includes the public legislative record of any legislation challenged or referenced in the Complaint.

13.     The District reserves the right to object to the use of its responses to these requests in any proceedings other than the above-captioned case.

14.     The District objects to these requests to the extent that they seek information or documents not reasonably calculated to lead to the discovery of admissible evidence.

15.     Each and every response herein is made subject to the foregoing General Objections, regardless of whether a General Objection or specific objection is stated in the response. The explicit reference to a General Objection or the making of a specific objection in response to a particular discovery response is not intended to constitute a waiver of General Objections that are not specifically referred to in that response.

## OBJECTIONS AND RESPONSES TO INTERROGATORIES

<u>Inter. No. 1</u>: State by year the number of crimes committed with rifles in the District of Columbia from 2005 to the current date, excluding the crime of possession of an unregistered firearm.

Your answer should include the specific crime committed, the status of any criminal charges brought against the person committing the crime, whether the person was a resident of the District, whether the firearm was registered in the District, and the type (*e.g.*, single shot, semi-automatic, pump, bolt action, lever action) and caliber of rifle.

Response: The Department does not have this information available in the manner requested. Beginning September 17th, the Department launched I/LEADS, a new data system in which all crimes and arrests are captured in one system. However, since the data merge, conversion, and cleaning are still on-going, the crime and arrest data cannot be reported in the requested manner. Moreover, the data system capturing details about forensic evidence about guns used in crimes is still a stand-alone system. In addition, the Department does not maintain information in its data systems about the status of arrests. This is maintained by the relevant prosecutors and courts; the MPD receives some disposition about the status of arrests from the prosecutors, but MPD is not the source and cannot confirm its accuracy.

Below is the number of homicides, robberies, and assaults with a dangerous weapon, as classified by MPD under D.C. Official Code, which were committed with a firearm from 2005 through 2011. MPD is not reporting crime statistics during the system and data transition, but will provide 2012 data as it becomes available. Please note that these numbers do not reflect Part I crime totals as reported to the FBI's Uniform Crime Reporting program. The statistics for this report are based on initial police incident reports, and are subject to change due to ongoing investigations and new reports. The data for 2007–2011 was pulled directly from appropriate Year-End Morning Crime Reports as they were generated at the end of those years. The data was variously IMS and RMS; each report is as of the end of the calendar year report in the given year. The source of the data for 2005–2006 is I/LEADS, as run on October 19, 2012.

| Calendar Year | Homicide | Robbery | Assault with a Dangerous Weapon |
|:---:|:---:|:---:|:---:|
| **2005** | 155 | 1,444 | 806 |
| **2006** | 135 | 1,342 | 831 |
| **2007** | 141 | 1,675 | 866 |
| **2008** | 140 | 1,475 | 747 |
| **2009** | 108 | 1,638 | 683 |
| **2010** | 99 | 1,308 | 610 |
| **2011** | 77 | 1,161 | 520 |
| **Total** | 855 | 10,043 | 5,063 |

<u>Inter. No. 2</u>: State by year the number of crimes committed with shotguns in the District of Columbia from 2005 to the current date, excluding the crime of possession of an unregistered firearm. Your answer should include the specific crime committed, the status of any criminal charges brought against the person committing the crime, whether the person was a resident of the District, whether the firearm was registered in the District, and the type (*e.g.*, single shot, double barrel, semi-automatic, pump) and gauge of shotgun.

<u>Response</u>:  Please see the response to Interrogatory 1.


<u>Inter. No. 3</u>: State by year the number of crimes committed with handguns in the District of Columbia from 2005 to the current date, excluding the crime of possession of an unregistered firearm. Your answer should include the specific crime committed, the status of any criminal charges brought against the person committing the crime, whether the person was a resident of the District, whether the firearm was registered in the District, and the type of handgun (*e.g.*, semi-automatic, revolver).

<u>Response</u>:  Please see the response to Interrogatory 1.


<u>Inter. No. 4</u>: State the procedure used to conduct a background check of an applicant for registration of a firearm.  Your answer should include, but not be limited to, the databases searched.

<u>Response</u>:  Each applicant must submit to an FBI fingerprint background investigation which is

conducted using the Live Scan system. In addition, each applicant's name is run through National Crime Information Computer (NCIC) and Washington Area Law Enforcement System (WALES).

Inter. No. 5: State the procedures which have been established to conduct the re-registration of firearms after three years, as required by D.C. Code § 7–2502.07a(a)-(c), and the date those procedures were implemented.  Your answer should identify any information systems that the MPD uses or intends to utilize.

Response: These procedures have not yet been established. Per the *Firearms Amendment Act of 2012,* this re-registration system and procedures are to be established before January 1, 2014.

Inter. No. 6: State the procedures by which police officers who are called to a scene (see instructions above) determine in advance whether a person at the location, dwelling, building, or place of business may have firearms, and identify any standard operating procedures implementing these procedures.

Response: MPD officers that are responding to a call for service are not informed in advance if there is a registered firearm at the location. Although specialized units will sometimes contact the Firearms Registration Section to determine whether any firearms are registered at an address or to a person prior to executing a search or arrest warrant, these checks are not captured by MPD.

Inter. No. 7: State whether the Metropolitan Police Department maintains a list of the names and addresses of persons convicted of murder, robbery, arson, or any other felony, and the procedures, if any, by which officers determine in advance whether individuals involved in a call to a scene have such convictions, and identify any standard operating procedures implementing these procedures.

Response: The Metropolitan Police Department does not maintain such a list.

–7–

JA 555

<u>Inter. No. 8</u>: Identify any standard operating procedures for conducting periodic checks of criminal history/mental health records of persons with registered firearms to determine if they have become prohibited from possessing firearms, and state the number of instances from 2005 to the current date in which any such check revealed that a registrant was no longer legally eligible to possess firearms.

<u>Response</u>: MPD plans to begin these periodic checks when the re-registration is launched. Per the response to Interrogatory No. 5, the specific procedures will be established prior to implementation before January 1, 2014.

<u>Inter. No. 9</u>: Identify each instance from 2005 to the current date in which District of Columbia firearm registration records have been used to facilitate the return of lost or stolen firearms to their rightful owners.  Your answer should include the type of firearm (handgun, rifle, shotgun) for each instance.

<u>Response</u>: MPD does not maintain a record of each instance that a lost or stolen firearm is returned to the owner. However, the registration records have been used to facilitate the return of lost or stolen firearms.

<u>Inter. No. 10</u>: Identify each instance from 2005 to the current date in which District of Columbia firearm registration records have been used to prevent a crime or to determine who committed a crime, excluding the crimes of possession of an unregistered firearm and possession of ammunition for which there is no registered firearm.  For each instance, your answer should include the crime, the type of firearm (handgun, rifle, shotgun), and how the registration records were used to prevent a crime or to determine who committed a crime.

–8–

Response: Each time that MPD recovers a firearm associated with a crime, information is forwarded to the Gun Registration Unit to determine whether it is a legally registered firearm and who may have owned it. However, MPD does not capture the number of times this check is conducted

Inter. No. 11: For the years 2008 through the present, state separately for each year and by type of firearm (handgun, rifle, shotgun) how many applications to register were received, how many were actually registered, how many were rejected, and how many had other dispositions.

Response:

|  |  | *2008 | 2009 | 2010 | 2011 | **2012 | Total |
|---|---|---|---|---|---|---|---|
| Applications Submitted | Rifles | 72 | 56 | 59 | 79 | 104 | 370 |
|  | Shotguns | 142 | 128 | 134 | 141 | 125 | 670 |
|  | Handguns | 748 | 675 | 597 | 922 | 922 | 3864 |
| Firearms Registered | Rifles | 70 | 54 | 59 | 76 | 104 | 363 |
|  | Shotguns | 140 | 125 | 132 | 140 | 124 | 661 |
|  | Handguns | 723 | 650 | 577 | 900 | 885 | 3735 |
| Applications Denied | Rifles | 7 | 13 | 0 | 0 | 0 | 20 |
|  | Shotguns | 0 | 0 | 0 | 0 | 0 | 0 |
|  | Handguns | 11 | 55 | 6 | 1 | 1 | 74 |
| Applications w/other disp. | Rifles | 2 | 2 | 0 | 3 | 0 | 7 |
|  | Shotguns | 1 | 3 | 2 | 1 | 1 | 8 |
|  | Handguns | 25 | 25 | 20 | 22 | 37 | 129 |
| Pending | Rifles | 0 | 0 | 0 | 0 | 3 | 3 |
|  | Shotguns | 0 | 0 | 0 | 0 | 5 | 5 |
|  | Handguns | 0 | 0 | 0 | 0 | 10 | 10 |

* 2008: beginning 7/17/2008, with the enactment of the *Firearms Control Emergency Amendment Act of 2008.*
** 2012: Through 10/19/2012.

Inter. No. 12: State the total number of rifles, shotguns, and handguns that are currently registered with the District of Columbia, regardless of the date of registration, and how registration information is maintained (*e.g.*, paper copies, searchable computerized database). If registration information is included in a searchable database, identify the name of the database, who has access to the database, and the means for accessing it.

–9–

Response:  The number of all firearms registered in the District is below. These figures include all firearms, including those registered to security companies and off-duty law enforcement, as well as private individuals. It is not yet possible to separate this data for older registrations. Registration information is maintained in the Gun Registration database as well as filed paper copies. Staff assigned to the Gun Registration Unit has access to this database and the paper copy files.

| Rifles | 11,689 |
|---|---|
| Shotguns | 15,884 |
| Handguns | 55,997 |

Inter. No. 13: State the number of handguns, of rifles, and of shotguns which were found at a crime scene or were otherwise seized by the police, other than for possession of an unregistered firearm, in 2008, in 2009, in 2010, in 2011, and in 2012, and of those firearms, how many were registered.

Response: The table below reflects data on handguns, rifles and shotguns received within the Firearms Examination Section listed as being recovered from crime scenes for the years 2008 through September 30, 2012. This table does not include firearms listed with the charge of Found or Unregistered Firearm. The assessment of each charge is based on what MPD initially enters, and is not necessarily what the prosecutors eventually charge.

| | 2008 | 2009 | 2010 | 2011 | 2012* |
|---|---|---|---|---|---|
| Handguns | 1585 | 1390 | 1147 | 1092 | 832 |
| Rifles | 116 | 138 | 96 | 66 | 57 |
| Shotguns | 163 | 163 | 111 | 98 | 77 |

* This year reflects only January to September 30, 2012

Inter. No. 14: State whether the information provided by applicants for registration on the application may lawfully be disclosed to the public.  If so, state the statutory, regulatory, or administrative authority that either forbids or permits such disclosure.

Response: Only general information about firearm registrations that is not personally identifiable is provided to the public. D.C. Official Code Section 2-534 (a)(2) provides the authority to withhold releasing under the Freedom of Information Act any document that constitutes a clearly unwarranted invasion of personal privacy of anyone mentioned in the document.

Inter. No. 15: Identify all instances from 2005 to the current date in the District in which a person who was blind (as defined in D.C. Code § 7-1009(1)) misused a firearm or discharged a firearm in a dangerous or unsafe manner.

Response: The Department does not have this information. There are no checkboxes in our data systems to indicate whether a firearm was fired or whether the individual firing the firearm was blind. For example, a crime may be classified as an assault with a gun, but that does not necessarily mean a firearm was fired.

Inter. No. 16: Identify the purposes for which the MPD needs information concerning a registrant's residence during the 5-year period immediately preceding the application, as required by D.C. Code § 7-2502.03(b)(2), and state whether such information is verified by the MPD.

Response: The District objects to Inter. No. 16 as it calls for a legal conclusion and information that is not reasonably calculated to lead to the discovery of admissible evidence, and to the extent it seeks deliberative-process privileged information, attorney work product, attorney-client privileged information, and otherwise seeks to impose obligations on the District beyond

–11–

JA 559

the requirements of Fed. R. Civ. P. 26. Subject to and without waiving its general and specific objections and based on the District's investigation to date in connection with the allegations in the complaint, the District responds as follows: This requirement dates back to the *Firearms Control Regulations Act of 1975* and the reason(s) for such requirement, if available, may be found in that legislation's legislative history. This information is not verified by MPD.

Inter. No .17: Identify the purposes for which the MPD needs information concerning a registrant's present business or occupation, and the address and phone number of the employer, as required by D.C. Code § 7-2502.03(b)(3), and state whether such information is verified by the MPD.

Response: The District objects to Inter. No. 17 as it calls for a legal conclusion and information that is not reasonably calculated to lead to the discovery of admissible evidence, and to the extent it seeks deliberative-process privileged information, attorney work product, attorney-client privileged information, and otherwise seeks to impose obligations on the District beyond the requirements of Fed. R. Civ. P. 26. Subject to and without waiving its general and specific objections and based on the District's investigation to date in connection with the allegations in the complaint, the District responds as follows: This requirement dates back to the *Firearms Control Regulations Act of 1975* and the reason(s) for such requirement, if available, may be found in that legislation's legislative history. This information is not verified by MPD. However, this information is used to determine whether it is a private purchase by an individual or if the firearm will be used as inventory for private security companies operating within the District of Columbia. It is also used to determine if the purchaser is a member of MPD and registering an off-duty service weapon. In addition, the alternative contact information is sometimes used to contact the applicant, but the issue is not discussed with the employer.

−12−

JA 560

Inter. No. 18: Identify the purposes for which the MPD needs information concerning whether the District, the United States or the government of any state or subdivision of any state has denied or revoked an applicant's license, registration certificate, or permit pertaining to any firearm, as required by D.C. Code § 7-2502.03(b)(6), and state whether such information is verified by the MPD.

Response: The District objects to Inter. No. 18 as it calls for a legal conclusion and information that is not reasonably calculated to lead to the discovery of admissible evidence, and to the extent it seeks deliberative-process privileged information, attorney work product, attorney-client privileged information, and otherwise seeks to impose obligations on the District beyond the requirements of Fed. R. Civ. P. 26. Subject to and without waiving its general and specific objections and based on the District's investigation to date in connection with the allegations in the complaint, the District responds as follows: This requirement dates back to the *Firearms Control Regulations Act of 1975* and the reason(s) for such requirement, if available, may be found in that legislation's legislative history. Although it is difficult to verify this information if the applicant provides a false statement, MPD attempts to verify it, and any information may be used as part of the background investigation.


Inter. No. 19: Identify the purposes for which the MPD needs a description of an applicant's role in any mishap involving a firearm, including the date, place, time, circumstances, and the names of the persons injured or killed, as required by D.C. Code § 7-2502.03(b)(7), and state whether such information is verified by the MPD.

Response: The District objects to Inter. No. 19 as it calls for a legal conclusion and information that is not reasonably calculated to lead to the discovery of admissible evidence, and

−13−

to the extent it seeks deliberative-process privileged information, attorney work product, attorney-client privileged information, and otherwise seeks to impose obligations on the District beyond the requirements of Fed. R. Civ. P. 26. Subject to and without waiving its general and specific objections and based on the District's investigation to date in connection with the allegations in the complaint, the District responds as follows: This requirement dates back to the *Firearms Control Regulations Act of 1975* and the reason(s) for such requirement, if available, may be found in that legislation's legislative history. Although MPD attempts to verify the information, it is difficult to verify if an applicant makes a false statement unless criminal charges were filed as a result of the mishap. If an applicant provides information of a firearm mishap, a pattern of negligence with firearms is a potential threat to public safety and reason for denial of a registration, and therefore may be investigated.

Inter. No. 20: Identify the purposes for which the MPD needs the name and address of the person or organization from whom the firearm was obtained, and in the case of a dealer, his dealer's license number, as required by D.C. Code § 7-2502.03(b)(10), and state whether such information is verified by the MPD.

Response: The District objects to Inter. No. 20 as it calls for a legal conclusion and information that is not reasonably calculated to lead to the discovery of admissible evidence, and to the extent it seeks deliberative-process privileged information, attorney work product, attorney-client privileged information, and otherwise seeks to impose obligations on the District beyond the requirements of Fed. R. Civ. P. 26. Subject to and without waiving its general and specific objections and based on the District's investigation to date in connection with the allegations in the complaint, the District responds as follows: This requirement dates back to the *Firearms Control Regulations Act of 1975* and the reason(s) for such requirement, if available, may be

found in that legislation's legislative history. MPD does verify the dealer and license number. This information is used to determine if the transfer was a legal transaction.

<u>Inter. No. 21</u>: Identify all instances from 2008 to the present in which the information described in Interrogatories Nos. 16 through 20 has been obtained and used from a particular firearms registration application, or from a database or compilation of such registration information, to reduce the use of firearms in crime (other than registration offenses), protect police officers, or promote any other important governmental interest.

<u>Response</u>: The District objects to Inter. No. 21 as it calls for a legal conclusion and information that is not reasonably calculated to lead to the discovery of admissible evidence, and to the extent it seeks deliberative-process privileged information, attorney work product, attorney-client privileged information, and otherwise seeks to impose obligations on the District beyond the requirements of Fed. R. Civ. P. 26. Subject to and without waiving its general and specific objections and based on the District's investigation to date in connection with the allegations in the complaint, the District responds as follows: Although the information described in Interrogatories No. 16–20 is captured on the firearms-registration application, the Metropolitan Police Department does not capture each instance in which that information may be used "to reduce the use of firearms in crime (other than registration offenses), protect police officers, or promote any other governmental interest." As an example, however, as noted in the response to Interrogatory No. 19, if an applicant reports a mishap, then the Metropolitan Police Department would investigate the mishap to determine eligibility for firearms registration.

<u>Inter. No. 22</u>: Identify all instances from 2008 to the present in which the MPD has used information concerning where a registered firearm will generally be kept, as required by D.C.

Code § 7-2502.03(b)(11).   Your answer should include, but not be limited to, the purpose of the use of the information, how it was used, and who used it.

Response: The District objects to Inter. No. 22 as it calls for a legal conclusion and information that is not reasonably calculated to lead to the discovery of admissible evidence, and to the extent it seeks deliberative-process privileged information, attorney work product, attorney-client privileged information, and otherwise seeks to impose obligations on the District beyond the requirements of Fed. R. Civ. P. 26. Subject to and without waiving its general and specific objections and based on the District's investigation to date in connection with the allegations in the complaint, the District responds as follows: Although the information referenced in Interrogatory No. 22 is captured on the firearms-registration application, the Metropolitan Police Department does not capture each instance in which that information may be used "to reduce the use of firearms in crime (other than registration offenses), protect police officers, or promote any other governmental interest." For example, while a firearm may be kept at home for self-defense or be kept at a security company location for security operations, there have been applications submitted where the location that the firearm would be kept would have been unlawful.

Inter. No. 23: Identify each expert witness you intend to call as a witness at trial or you intend to have prepare an affidavit or declaration in support of a motion for summary judgment, state the subject matter of his or her testimony, and briefly describe the substance of that testimony.

Response: The District asserts that it has not yet retained any testifying experts regarding this matter. In the event a testifying expert is retained, the District will notify plaintiff and the Court in accordance with Fed. R. Civ. P. 26(b)(4).

Inter. No. 24: Identify each fact witness you intend to call as a witness at trial or you intend to have prepare an affidavit or declaration in support of a motion for summary judgment, state the subject matter of his or her testimony, and briefly describe the substance of that testimony.

Response: The District objects to this interrogatory as premature. The District will supplement this response as required by Fed. R. Civ. P. 26(a)(3)(A).

Inter. No. 25: Identify each person who assisted in preparing (including submitting information for inclusion in answers) the answers to these interrogatories, and the particular interrogatories which each such person assisted in preparing.

Response: Undersigned counsel and Kelly O'Meara, responses to Interrogatories No. 5 and 15; Anne Grant, responses to Interrogatories No. 1 through 3; Jon Shelton, responses to Interrogatories No. 4, 6 through 14, and 16 through 22; and Raymond Wickline, responses to Interrogatories No. 1 through 3.

I declare under penalty of perjury that the foregoing interrogatory responses [#5, 15] are true and correct, based upon my personal knowledge, discussions with current and former employees, and my review of relevant documents.

DATE: _____        _____
                                      KELLY O'MEARA
                                      Executive Director
                                      Office of Strategic Change
                                      Metropolitan Police Department

I declare under penalty of perjury that the foregoing interrogatory responses [#1–3] are true and correct, based upon my personal knowledge, discussions with current and former employees, and my review of relevant documents.


DATE: _____          _____
                                     ANNE GRANT
                                     Director of Records Management System
                                     Metropolitan Police Department


I declare under penalty of perjury that the foregoing interrogatory responses [#4, 6–12, 14, 16–22] are true and correct, based upon my personal knowledge, discussions with current and former employees, and my review of relevant documents.


DATE: _____          _____
                                     LIEUTENANT JON SHELTON
                                     Manager
                                     Security Officers Management Branch
                                     Gun Control Section
                                     Metropolitan Police Department


I declare under penalty of perjury that the foregoing interrogatory responses [#1–3] are true and correct, based upon my personal knowledge, discussions with current and former employees, and my review of relevant documents.


DATE: _____          _____
                                     RAYMOND WICKLINE
                                     Director of Tactical Crime Analysis
                                     Metropolitan Police Department

I declare under penalty of perjury that the foregoing interrogatory response [#13] is true and correct, based upon my personal knowledge, discussions with current and former employees, and my review of relevant documents.

DATE: _____                    _____
                                                 LYNDON R. WATKINS, SR.
                                                 Supervisor
                                                 Firearms Examination Section
                                                 Department of Forensic Sciences

Objections as noted.

DATE: November 2, 2012            Respectfully submitted,

                                  IRVIN B. NATHAN
                                  Attorney General for the District of Columbia

                                  ELLEN A. EFROS
                                  Deputy Attorney General
                                  Public Interest Division

                                  _____/s/ Grace Graham_____
                                  GRACE GRAHAM, D.C. Bar No. 472878
                                  Chief, Equity Section
                                  441 Fourth Street, NW, 6th Floor South
                                  Washington, DC 20001
                                  Telephone: (202) 442-9784
                                  Facsimile: (202) 741-8892
                                  E-mail: grace.graham@dc.gov

                                  _____/s/ Andrew J. Saindon_____
                                  ANDREW J. SAINDON, D.C. Bar No. 456987
                                  Assistant Attorney General
                                  Equity Section I
                                  441 Fourth Street, N.W., 6th Floor South
                                  Washington, D.C. 20001
                                  Telephone: (202) 724-6643
                                  Facsimile: (202) 730-1470
                                  E-mail: andy.saindon@dc.gov

_____/s/ Chad A. Naso_____
CHAD A. NASO [1001694]
Assistant Attorney General
Office of the Attorney General, DC
441 Fourth Street, NW
Sixth Floor South
Washington, DC 20001
(202) 724-7854 (o)
(202) 741-8951 (f)
chad.naso@dc.gov

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Defendants' Responses to Plaintiffs' First Set of Interrogatories was sent by e-mail, by prior written agreement, this 2nd day of November, 2012, to:

Stephen P. Halbrook, Esq.
Richard E. Gardiner, Esq.
Suite 403
3925 Chain Bridge Road
Fairfax, VA 22030
regardiner@cox.net
protell@aol.com

_____/s/ Andrew J. Saindon_____
ANDREW J. SAINDON, D.C. Bar No. 456987

–20–
JA 568

Exhibit 3

Capital Reporting Company
Lanier, Cathy  06-12-2013

9

1    generally.  You stated in your expert report that MPD

2    has, quote, successfully recovered more than 12,000

3    illegal firearms since 2007.  And I'm on page 3, I

4    believe.  First page.  I'm sorry.  Yes, the first

5    page.  When you say "illegal firearms," what does that

6    mean?

7        A    Firearms that are not properly registered or

8    registered illegally in the District of Columbia.

9        Q    Okay.  About how many registered firearms

10   were recovered by the District during that time

11   period, if you know?

12       A    I can't answer that question.

13       Q    We've got an exhibit that maybe can help.

14           (Lanier Deposition Exhibit Number 2 was

15   marked for identification.)

16   BY MR. PETERSON:

17       Q    Directing your attention to what has been

18   marked as Exhibit L-2.  I will represent to you so you

19   don't have to look at the whole thing that this is a

20   letter to counsel for the plaintiffs in this case,

21   dated December 5, 2012 from counsel for the District.

22           And turning your attention to page 2, there

10

1  is a chart there and, as you can see, that chart

2  extends from 2008 up through most of 2012, and

3  purports to list the registered firearms that are

4  associated with crime scenes.  And we have, for

5  private individuals, 35 handguns and two shotguns over

6  that period; is that correct?

7      A    I'm familiar with this number.  This is

8  registered firearms that are used in crimes, yes.

9      Q    Associated with --

10     A    Yes, about five a year, on average.

11     Q    Are all of them actually employed to commit a

12  crime or might they just be associated with a crime

13  scene in some other way?

14     A    The statistic reflects those that are used in

15  crimes.

16     Q    Okay.

17     A    The number would be different for those that

18  are recovered but not used in crimes.

19     Q    Okay.  Well, let's clear this up.  It's an

20  ambiguity apparently.  The paragraph right before the

21  chart there states that this is the numbers of

22  registered firearms associated with crime scenes.  And

11

1  then the table is used in crimes.  So that is a little

2  bit different, isn't it?

3      A    It is a little bit different.

4      Q    Okay.  But do you know, as a matter of fact,

5  whether these are actually used or just associated?

6      A    I would want to verify that before I confirm

7  that.  My belief is they are used in the crimes, but I

8  would want to verify that just to make sure because it

9  is a little...

10     Q    Very good.  And so about 37 registered guns

11 were recovered and the time frame is not exactly the

12 same, maybe a year different, between what was in your

13 report and what is here, but we have got about 37

14 registered guns recovered and about 12,000

15 unregistered guns during roughly the same time period;

16 is that right?

17     A    That is correct.

18     Q    Okay.  By the way, are suicides without

19 anything more considered to be a crime scene?

20     A    Initially they would be considered a crime

21 scene until a thorough investigation of the death is

22 complete, yes.

Capital Reporting Company
Lanier, Cathy  06-12-2013

12

```
1      Q     Okay.  Now, in the District, do most people

2   who, if I can say so, regularly engage in criminal

3   activities register their guns?

4            MR. SAINDON:  Objection.  Vague.

5            THE WITNESS:  Can you ask the question again?

6   BY MR. PETERSON:

7      Q     Yeah.  Do most people who regularly engage in

8   criminal activities in the District register their

9   guns?

10     A     No.

11     Q     Drug dealers, people who engage in shootings

12  outside nightclubs, that sort of thing, gang members?

13     A     No.

14     Q     Would be it correct to call the proportion of

15  folks like that who commit those crimes and also

16  register their guns a very tiny percentage probably?

17     A     That would be correct.

18     Q     Okay.  On page 1 of your expert report you

19  mention your efforts in leading antiterrorism efforts

20  in the District, and I would like to ask you some

21  questions about that.  But let me first just kind of

22  clarify for the record what I mean by terrorism.  And
```

13

1   you're more of an expert than I am, but what I'm

2   referring to is a situation that is planned and

3   carried out by several individuals, or even a single

4   individual if he's got an organized group behind him,

5   that is -- where terror is used as an instrument of

6   policy or revenge on behalf of a state, a group of

7   foreign ties or any type of ideological, political or

8   religious reason.

9           In other words, I'm trying to distinguish

10  that from the lone wolf who just goes out and starts

11  shooting things up for no reason.

12      A    Domestic terrorism or homegrown violent

13  extremism maybe.

14      Q    I will accept that.

15      A    Still fall within the definition of terrorism

16  technically, but yes.

17      Q    Okay.  In your experience, do people who are

18  plotting terrorist attacks register their guns?

19      A    The majority, no.

20      Q    Okay.  Can you recall any instance during the

21  time you have been chief of police in which a

22  terrorist plot was either committed in the District or

Capital Reporting Company
Lanier, Cathy  06-12-2013

14

1    a plot was broken up and the terrorist used or tried

2    to use firearms that were registered in the District?

3        A    I can't recall any off the top of my head.

4        Q    Okay.  Can you recall any such instance since

5    you have been with MPD?

6        A    No.

7        Q    To the best of your knowledge, have the D.C.

8    gun registration records ever been used to foil a

9    terrorist attack?

10       A    No.

11       Q    Okay.  And have those registration records,

12   to the best of your knowledge, ever been used to solve

13   an incident of terrorism after it occurred?

14       A    Not that I'm aware of.

15       Q    Okay.  You mentioned in your report the

16   bombing of the Murrah Federal Building in Oklahoma

17   City and the 1993 shootings outside of the CIA

18   headquarters in Langley.  Neither of those obviously

19   was within the District, correct?

20       A    Correct.

21       Q    Was the bombing of the Murrah Federal

22   Building carried out by the use of firearms?

15

1    A    No.

2    Q    That was a truck bomb, right?

3    A    Correct.

4    Q    So that bombing was indeed caused or

5  prevented or otherwise affected by other firearm

6  registration laws?

7    A    Correct.

8    Q    The CIA shootings in Langley that you

9  mentioned, was that shooting carried out with a

10  registered firearm?

11    A    No.

12    Q    Okay.  So that crime wasn't solved by using

13  registration data, correct?

14    A    Correct.

15    Q    But it was solved, right?

16    A    It was.

17    Q    Okay.  Now, people who abide by the

18  registration laws and go ahead and register their guns

19  are at least, to that extent, law-abiding, correct?

20    A    For the most part, yes.

21    Q    You testified previously that people who

22  commit crimes with firearms hardly ever have or use

Capital Reporting Company
Lanier, Cathy  06-12-2013

23

1   records to NICS?

2       A    I can't answer that question.

3       Q    Okay.  You also mentioned in your report

4   three incidents going back to 1994, in which shots

5   were fired at or near the White House.  And you

6   mentioned particularly a man from 20 -- who, in 2011,

7   was firing shots at the White House.  Was he from the

8   District?

9       A    No.

10      Q    Okay.  Did he use a gun registered in the

11  District?

12      A    No.

13      Q    In fact, didn't he use an AK-47 style of

14  rifle which it is not legal to possess in the

15  District?

16      A    Correct.

17      Q    Did the registration laws in any way

18  facilitate his capture?

19      A    No.

20      Q    You mentioned a 2001 shooting.  Are you

21  referring to the incident in which a man from Ohio, I

22  believe, was waving around a handgun and apparently

Capital Reporting Company
Lanier, Cathy  06-12-2013

24

1   discharged a shot near the White House?

2       A    Where are you referring to in my statement?

3       Q    Let me find it here.  Page 3, the second

4   paragraph from the bottom, the last sentence.

5       A    Yes.

6       Q    Okay.  At that time, for most people it

7   wasn't legal to possess a handgun in the District,

8   right?

9       A    That is correct.

10      Q    Do you recall whether that handgun was

11  registered in the District?

12      A    It was not.

13      Q    So registration records for the District

14  didn't serve any purpose in solving that crime; is

15  that right?

16      A    That is correct.

17      Q    Regarding the 1994 shooting at the White

18  House, if memory serves, that was carried out by a man

19  from Colorado; is that right?

20      A    I believe so.

21      Q    And he used an SKS rifle; is that right?

22      A    That is correct.

Capital Reporting Company
Lanier, Cathy  06-12-2013

25

1    Q    Was that rifle registered in the District?

2    A    No.

3    Q    He wasn't a District resident, was he?  He

4  was from Colorado -- I think we already established

5  that.  So were District registration records used to

6  solve that crime?

7    A    No.

8    Q    And you also mentioned -- this is on page 4

9  towards the bottom -- John Hinckley in his attempt to

10  assassinate President Reagan.  At that time, was Mr.

11  Hinckley a D.C. resident?

12    A    No.

13    Q    And he used a handgun in that attempt,

14  correct?

15    A    Correct.

16    Q    Was it legal for him to possess a handgun at

17  that time, in 1981, in the District?

18    A    In the District, no.

19    Q    So that handgun wasn't registered it goes

20  without saying?

21    A    Correct.

22    Q    Did D.C. registration laws have anything to

Capital Reporting Company
Lanier, Cathy  06-12-2013

26

```
 1  do with solving that case?

 2      A    No.

 3      Q    Hinckley was subdued at the scene, wasn't he?

 4      A    That is correct.

 5      Q    Now, is it likely that people who shoot at

 6  the White House or try to assassinate the President

 7  will register their weapons first?

 8           MR. SAINDON:  Objection.  Vague.

 9           THE WITNESS:  I would be speculating.

10  BY MR. PETERSON:

11      Q    Okay.  What would be your guess?

12      A    Experience is most people who are going to

13  crimes don't legally register a firearm, but...

14      Q    Okay.  In turning back to a theme that you

15  mentioned earlier, you state that the criminal

16  background check performed by MPD, which is based on

17  fingerprints, is more effective than that performed by

18  a gun dealer which is merely based on a social

19  security number?

20      A    Correct.

21      Q    And also name, right?

22      A    That is correct.
```

29

1   marked for identification.)

2   BY MR. PETERSON:

3       Q     I would ask you to take a second to take a

4   look at it.

5       A     Okay.

6       Q     And do you confirm or would you like to

7   revisit your prior statement that this website

8   actually contains the text for the study?

9       A     The summary of the study, yes.

10      Q     The summary of the study, okay.  Did you at

11   any point obtain the full text of the study and read

12   it?

13      A     I did see the full study.

14      Q     Okay.

15            (Lanier Deposition Exhibit Number 4 was

16   marked for identification.)

17   BY MR. PETERSON:

18      Q     So I will direct your attention then to what

19   has been marked as Exhibit L-4, but before we talk

20   about that, let me ask you just a couple of other

21   questions.

22            Understanding that various people can have a

30

1   hand in reviving or reviewing things, did you

2   personally write most of Exhibit 1 or did somebody

3   prepare it?

4       A    No, it was prepared by someone else.

5       Q    Who prepared it for you?

6       A    Someone on the legal team.

7       Q    Okay.  They take responsibility for its

8   contents, right?

9       A    Yes.

10      Q    Turning your attention to Exhibit L-4, it

11  says here on the first page -- and I'm under methods

12  up towards the top of the first page -- that negative

13  binomial regression models were used to perform this

14  analysis.  Can you explain to us what a negative

15  binomial regression model is and how it works?

16          MR. SAINDON:  Objection.  Foundation.

17          THE WITNESS:  No.

18  BY MR. PETERSON:

19      Q    And it also references various measures --

20  the IRR, the CI and that sort of thing -- under

21  results on the same page.  Do you know what those

22  measure and how they are calculated?

Capital Reporting Company
Lanier, Cathy  06-12-2013

31

1          MR. SAINDON:  Objection.  Relevance.

2          THE WITNESS:  No.

3    BY MR. PETERSON:

4      Q     Okay.  And on page 2 -- it's also on page 1.

5    I guess maybe page 1 is the easier one to look at.

6    Under methods it talks about how they control for age,

7    race, unemployment, crime, income, inequality,

8    poverty, alcohol consumption, urbanization and divorce

9    rate.

10          Are those the proper factors to control for

11   in a study of this kind?

12     A     My experience, those are relevant facts to

13   control for, yes.

14     Q     Those are?

15     A     Yes.

16     Q     The justification offered by the authors is

17   those are commonly identified in the literature as

18   being associated with the state's homicide or suicide

19   rate.  That statement is on page 2.  Do you agree with

20   that statement?

21     A     Where on page 2 am I looking?

22     Q     Page 2.  And you say that they were -- hold

Capital Reporting Company
Lanier, Cathy  06-12-2013

32

1    on a second.  I'm down the second column --

2        A    Outcome variables?

3        Q    Yes.

4        A    Yes, I do agree.

5        Q    Oh, no.  Sorry.  It's under statistical

6    analyses is where it is.  And again, it states that

7    multivariate analyses controlled for potentially

8    confounding factors commonly identified in the

9    literature as associated with the state's homicide or

10   suicide rate, and then it lists those factors.

11       A    That is correct.

12       Q    You agree with that?

13       A    Yes.

14       Q    Do you know whether these nine variables are,

15   in fact, associated with higher firearm homicide rates

16   or firearm suicide rates?

17       A    Again, from my experience, this appears

18   consistent with what my experience has been in the

19   past 23 years, that they are factors.

20       Q    Okay.  Do the authors ever state that there

21   were no other variables that should have been

22   controlled for?

33

1          MR. SAINDON:  Objection.  Foundation.

2          THE WITNESS:  No.

3    BY MR. PETERSON:

4      Q    Are there other factors that should have been

5    controlled for, in your opinion?

6      A    Not that I'm aware of.

7      Q    Okay.  And they refer to these as potentially

8    confounding factors.  Can you tell us what a

9    confounding variable or what a confounding factor is?

10     A    No.

11     Q    If some other variable besides background

12   checks caused the difference in firearms homicide

13   rates or suicide rates, and the authors have not

14   identified that other factor, then the study wouldn't

15   tell us much, would it?

16         MR. SAINDON:  Objection.  Speculation.

17         THE WITNESS:  I don't think I agree with that

18   statement, no.

19   BY MR. PETERSON:

20     Q    Okay.  Maybe I will rephrase it.

21     A    The study only says it's one factor.

22     Q    Pardon me?

34

1    A    The study only states it as one factor.  The

2  background check is one factor.

3    Q    Okay.

4    A    Not that all factors have been considered.

5    Q    Right.  But if there was some other factor

6  that actually caused the difference and it just

7  happened to be associated with local background

8  checks, then it might be that other factor that is

9  causing the different outcome and not the background

10  checks; is that right?

11    A    Potentially, yes.

12    Q    Okay.  Now, they study the impact of local

13  background checks on firearm suicide and firearm

14  homicide; is that right?

15    A    Correct.

16    Q    Okay.  Is there any evidence in the study

17  that local background checks reduce the total number

18  of suicides or the total number of homicides?

19    A    No.

20    Q    Okay.  And assuming that if local checks

21  denied guns for suicidal or homicidal applicants,

22  could they substitute other means besides firearms?

35

1          MR. SAINDON:  Objection.  Speculation.

2          THE WITNESS:  Can you ask the question,

3    please?

4    BY MR. PETERSON:

5      Q    I guess it's -- what I'm trying to drive at

6    is there is more than one way to kill yourself, right?

7      A    Yes.

8      Q    You don't have to do it with a firearm?

9      A    That is correct.

10     Q    If a background check denied somebody who was

11   suicidal or homicidal a firearm, they might be able to

12   kill themselves or someone else by some other means?

13     A    That is correct.

14     Q    Is there anything in the authors' methods in

15   this study that establish that homicide or suicide

16   declined after local background checks were first

17   implemented?

18     A    No.

19     Q    In fact, on page 5 the authors more or less

20   admit that this is a deficiency in this study, don't

21   they, where they say -- I'm on the first column,

22   second full paragraph -- it would have been ideal to

36

1    conduct a longitudinal analysis in which the states

2    that experience changes in the level of their

3    background check were compared to themselves, pre- and

4    post-change.

5           So they indicate that perhaps a longitudinal

6    study would have been better, right?

7    A     They do point that out in the study, yes.

8    Q     Okay.  And without doing a longitudinal

9    analysis over time, they can't really show any

10   decrease over time; is that right?

11          MR. SAINDON:  Objection.  Foundation.

12          THE WITNESS:  That is correct.

13   BY MR. PETERSON:

14   Q     Basically, they used a cross-sectional design

15   in this study, kind of a snapshot in time of the time

16   period of 2002 through 2004; is that right?

17   A     That is the time period used, yes.

18   Q     Okay.  Is there any way to know, based on

19   this study, whether the lower rates of firearm

20   homicide and suicide observed in these states with

21   local background checks already existed before the

22   background checks were first implemented?

JA 588

37

1    A    There is not.

2    Q    Okay.  Do we even know, based on this study,

3  when the local background checks were first

4  implemented?

5    A    No, not based on the study.

6    Q    Okay.  Did they control for other gun control

7  laws?

8    A    No.

9    Q    Okay.  And it could be, couldn't it, that if

10  a state has a local background check, that it might

11  also have, quote, tougher gun control laws overall

12  which could possibly result in the lower rates we see

13  here?

14         MR. SAINDON:  Objection.  Speculation.

15         THE WITNESS:  Potentially.

16  BY MR. PETERSON:

17    Q    Okay.  If you wanted to determine the effects

18  of just the local background checks, would it be

19  proper to statistically control for other major

20  categories of gun law?

21         MR. SAINDON:  Objection.  Foundation.

22         THE WITNESS:  I would say yes.

Capital Reporting Company
Lanier, Cathy  06-12-2013

38

1    BY MR. PETERSON:

2        Q    Okay.  Did the authors control for gun

3    ownership rights?

4        A    No.

5        Q    Isn't it possible, other things being equal,

6    that one might find higher firearms homicide or

7    suicide rates where 6 out of 10 households owned a gun

8    as opposed to 1 out 10 households owns a gun?

9        A    That is correct.

10       Q    That includes high-risk individuals or

11   groups?

12       A    That is correct.

13       Q    And I'm not saying that is true, by the way.

14   I'm just saying it's a variable that one ought to look

15   at possibly.

16       A    Correct.

17       Q    Okay.  It might also be a political fact that

18   states with high rates of gun ownership make it

19   politically harder to get stricter gun control?

20            MR. SAINDON:  Objection.  Relevance.

21            THE WITNESS:  I can't comment on that.

22   BY MR. PETERSON:

39

1     Q     Pardon?

2     A     I don't know that I can comment on that.  I

3  don't have an answer to that question.

4     Q     All right.  Fair enough.  Is the supposed

5  homicide-reducing effect of local background checks

6  purported to be found in this study statistically

7  significant, according to the measures they report?

8     A     I'm sorry.  Can you re-ask that question?

9     Q     Yeah.  Is the supposed homicide-reducing

10  effect of local background checks, which this study

11  purports to report, is it even statistically

12  significant, according to their measures?

13     A     I would say, yes, there is 19 and 20 percent

14  (sic) on homicide I believe so yes.

15     Q     I'm talking about the -- excuse me here just

16  a second.

17           The confidence measure under results on

18  page 1, the CI is .61 and 1.01.  And you're not a

19  statistician, I know, but --

20     A     Correct.

21     Q     But generally speaking, if it covers -- if it

22  goes over 1, it's not statistically significant.

40

1     A     Okay.

2           MR. SAINDON:  Is that a question, Counsel?

3           MR. PETERSON:  Well, I think she agreed with

4     the statement.

5     BY MR. PETERSON:

6     Q     Was the District of Columbia included in this

7     study?

8     A     No.

9     Q     Okay.  And we will get to the other studies

10    that are mentioned in your report in a little bit.

11    But you state in your report near the outset that your

12    opinions are based on your review of numerous studies

13    and books.  Are these studies and books that you

14    mentioned in addition to works that are cited in your

15    report or are you talking about the works that are

16    cited in your report?

17    A     Both.

18    Q     Okay.  So some would be in addition to what

19    you cite here, then.  What are the books that you

20    reviewed in connection with your opinions offered in

21    Exhibit 1?

22    A     There was a couple of other references in

Capital Reporting Company
Lanier, Cathy  06-12-2013

43

1   requirement actually advance that interest?

2       A      Potentially, yes.

3       Q      Okay.  When you say "potentially," when did

4   the District first start implementing a three-year

5   renewal requirement?

6       A      Procedures have not yet been implemented.

7   They will be implemented in January 2014.

8       Q      Okay.  So there is no real evidence as to

9   whether or not this works; is that right?

10      A      Well, having periodic background checks after

11  the first background check would reveal if there was

12  any additional felony arrests, domestic violence and

13  things of that nature.  So I would say it would be

14  effective.

15      Q      Okay.  But I'm speaking here right now of

16  just the renewal form itself, the every three years

17  where you have to send that in.  The District can do

18  background checks without a renewal form coming in;

19  isn't that right?

20      A      Yes, but one wouldn't have -- depends if the

21  person still has possession of the firearm,

22  essentially.

Capital Reporting Company
Lanier, Cathy  06-12-2013

44

1    Q    Right.  But I mean, if you wanted to know

2   whether John Doe remained eligible, you don't have to

3   wait for his three-year renewal to come in; is that

4   right?

5    A    Correct.

6    Q    And on the three-year renewal form the person

7   has to attest that he or she is still eligible; is

8   that correct?

9    A    Correct.

10    Q    That is for every firearm separately, right?

11    A    Correct.

12    Q    And does the three-year time period run from

13   the time of original registration of that firearm?  Is

14   that right?

15    A    We haven't finalized the procedures, but yes.

16    Q    Okay.  So if it were done that way, if a

17   person owned multiple firearms, there could be many

18   dates on which he or she had to complete a renewal

19   form; is that correct?

20    A    We haven't finalized procedures yet for

21   multiple firearms.  I can't answer that question.

22    Q    Okay.  But is the intent to do it by firearm?

45

1    A    I can't answer that question at this point.

2    Q    Okay.  But the law currently states that

3    there could be criminal penalties imposed if the

4    individual failed to renew every three years, right?

5    A    Civil and criminal, yes.

6    Q    And I think we -- I want to pick up this

7    thread again that MPD can run a background check on

8    any person at any time.  Is that a NICS check or what

9    type of a check is it?

10   A    It would be the same as the original

11   background check.

12   Q    Okay.  The -- you do an FBI background check,

13   right?

14   A    Correct.

15   Q    Is that what is known as an NCIC check?

16   A    That is correct.

17   Q    So they can do that at any time on any

18   person, right?

19   A    Correct.

20   Q    And that -- the NCIC check would reveal

21   felony convictions and other criminal convictions; is

22   that right?

46

1      A      That is correct.

2      Q      What about mental health?  Is that included

3  in any of those checks?

4      A      Mental health checks are done, yes.

5      Q      Locally or through NICS?

6      A      Maybe both, but I'm not sure.  I would have

7  to ask the person who runs it.

8      Q      Okay.  Who would we ask about that?

9      A      The oversight of the program is Lieutenant

10 Sheldon.

11             MR. PETERSON:  Okay.  And let's have another

12 exhibit marked here.

13             (Lanier Deposition Exhibit Number 5 was

14 marked for identification.)

15 BY MR. PETERSON:

16     Q      And I will just refer you to the fact that

17 this is a document, as you can see by the legend in

18 the lower right-hand corner, that was produced to us

19 by the District in discovery in this case.  And that

20 is a memo from Morgan Kane to you dated May 19, 2010,

21 correct?

22     A      Correct.

56

1    Q    -- in some detail.  Is that what you base

2  your opinion on primarily?

3    A    That, and the elimination of the ability

4  for -- or the addition of the use of biometrics to

5  verify identity.

6    Q    Okay.

7    A    My experiences of identity theft is pretty

8  prevalent, so...

9    Q    Okay.  And did you apply any methodologies to

10  data to arrive at your conclusions?

11    A    No.

12    Q    Do any of your opinions really state that

13  crime will be reduced by these laws or that officer

14  safety will be improved?

15    A    Do any of my opinions state that?

16    Q    Yeah, under the verifying eligibility

17  section.

18    A    No.

19    Q    Okay.  Turning to the next section of your

20  report that starts on page 5 that is entitled,

21  Ensuring the common body of knowledge.  And again, to

22  just identify the relevant code sections that we would

Capital Reporting Company
Lanier, Cathy  06-12-2013

57

1  be talking about here, would that be the ones dealing

2  with completing an online course and a test regarding

3  firearms, safety and knowledge of the District's

4  firearms laws?

5      A    Yes.

6      Q    Okay.  Anything else that this section would

7  relate to?  Any other code sections?

8      A    No.

9      Q    Okay.  And you state on page 5 that even if a

10  firearm was only kept in the home, the government has

11  an interest in reducing accidental discharges,

12  ensuring that guns are safely stored and ensuring that

13  owners are aware of the laws governing firearms.

14         Do you know if any of these interests were

15  cited as important governmental interest by the D.C.

16  Circuit for purposes of this case?

17         MR. SAINDON:  Objection.  Relevance.

18         THE WITNESS:  I'm not aware.

19  BY MR. PETERSON:

20      Q    Okay.  Do you have any evidence or data that

21  shows that this course and this test actually reduces

22  accidental discharges?

Capital Reporting Company
Lanier, Cathy  06-12-2013

58

1    A    I have no studies to support that, no.

2    Q    Okay.  Do you have any actual evidence that

3 having this test and course actually results in safe

4 storage practices by the people who complete it?

5    A    There have been no studies on that that I'm

6 aware of.

7    Q    Okay.  Does the District impose tests of

8 knowledge of the laws before other constitutional

9 rights can be exercised?

10        MR. SAINDON:  Objection.  Witness is not a

11 lawyer.

12        MR. PETERSON:  Okay.  I'm asking -- but if

13 she knows.

14 BY MR. PETERSON:

15   Q    Does the District require people to take a

16 course regarding liable and slander before they are

17 permitted to exercise free speech rights?

18   A    No.

19   Q    Or of course, warning people that bona fide

20 (sic) before they have the right to vote?

21   A    No.

22   Q    Turning to our next exhibit.

59

1          (Lanier Deposition Exhibit Number 8 was

2     marked for identification.)

3     BY MR. PETERSON:

4        Q     Turning your attention to what has been

5     marked as Exhibit L-8.  I will represent to you,

6     again, this is a document that was produced to us by

7     the District during discovery in this case.  Is this

8     the firearms registration written examination that is

9     currently used?

10       A     It is.

11       Q     Okay.  I have a question about that, because

12    I keep seeing references to a 20-question test and the

13    District provided to us two copies of this document,

14    and both of them only had 15 questions.

15          MR. PETERSON:  Does anybody know whether this

16    is the complete test or just a partial test?

17          THE WITNESS:  This is the one that is

18    currently online.

19          MR. SAINDON:  The Chief has already thrown

20    Lieutenant Sheldon under the bus and said he will

21    probably know additional information.

22    BY MR. PETERSON:

Capital Reporting Company
Lanier, Cathy  06-12-2013

60

1     Q     Assuming this is the official test, how many

2  questions on the test relate to safe storage?  Take

3  your time and go through and take a look at it.

4     A     Two.

5     Q     Two, okay.  Which ones are those?

6     A     Number 7, number 13.

7     Q     Okay.  7 doesn't really address storage, does

8  it?  But it does talk about firearm safety.

9     A     Safe handling.

10    Q     Safe handling, okay.  And the rest may have a

11 safety component.  In a certain sense, they really

12 address District laws, don't they?

13    A     Correct.

14    Q     Okay.  You mentioned in your report that

15 currently California, Connecticut, Hawaii,

16 Massachusetts and Michigan all have laws requiring

17 some sort of training or safety certification as part

18 of the registration progress.

19         So you mentioned five states that have a

20 requirement, but the fact that some states have a

21 particular law regarding registration doesn't

22 necessarily mean that the law works, does it?

62

1  demonstrate knowledge of the District's laws

2  pertaining to firearms.  In particular, the safe and

3  responsible use, handling and storage of the same is,

4  in my opinion, a reasonable and effective means of

5  reducing gun-related accidents.

6         Does the District keep statistics on

7  gun-related accidents?

8     A    We do not.

9     Q    Do you have any studies or actual evidence

10  that completion of the course reduces gun-related

11  accidents?

12    A    No.

13    Q    It's just a rationale that it might do so?

14    A    It is a requirement for law enforcement in

15  most every law enforcement profession that requires

16  the carrying of a handgun.  Safe handling is one of

17  the very first components of training, to reduce

18  accidental discharges by police who handle firearms

19  every day.

20         It is the first component of every training

21  block we do for new recruits and every year for

22  in-service requirement training to reinforce the safe

66

1    identification.  It's a requirement to have that with

2    you.

3        Q    Having a registration with you, photo ID?

4        A    Uh-huh.

5        Q    Would notification of lost, stolen firearms

6    be covered by this as well?

7        A    Yes.

8        Q    And you state on page 5 that the District

9    firearms registration requirements also serve to

10   provide law enforcement officers with critical

11   information needed to protect their safety and the

12   safety of the public.

13            I was a little surprised that you didn't

14   mention the use of registration information when

15   officers are called to investigate a crime scene or

16   dispatch the handling of domestic disturbance or

17   things of that nature.  Are the police crews equipped

18   with computers that can access the firearms registry

19   database?

20       A    They are not.

21       Q    Okay.  Can it be accessed remotely outside of

22   the MPD buildings at all?

67

1     A     By phone call they can make contact with

2   firearms registration and determine if a firearm is

3   registered or not.

4     Q     Okay.  They can call an individual who can

5   look it up?

6     A     Correct.

7     Q     Okay.  If officers are dispatched out on a

8   call to a crime scene or to make an arrest or whatever

9   the case might be and the address that they are going

10  to is known, is the registration database routinely

11  queried to determine if there were registered firearms

12  at that location?

13    A     No.

14    Q     Same with individuals.  If they know the name

15  of the individual, do they typically query the

16  database or routinely query the database to find out

17  if that individual is a registered firearms owner?

18    A     Not routinely, no.

19    Q     If a query happened to be made in a

20  particular instance and it showed that there was no

21  registered firearm at the particular address, would

22  the officers be justified in letting down their guard,

Capital Reporting Company
Lanier, Cathy  06-12-2013

75

1  BY MR. PETERSON:

2     Q    Okay.  And you state that an individual with

3  a legally registered firearm may pose less of a danger

4  to an officer than one with an illegal gun.  Do you

5  recall any instances in which an individual with a

6  registered firearm either shot or shot at a District

7  police officer?

8     A    No, I'm not aware of any.

9     Q    Okay.  And you do mention the year 2011, in

10  which, tragically, 71 officers were killed around the

11  country in the line of duty with firearms.  Were any

12  MPD officers among those 71?

13     A    No.

14     Q    Glad to hear it, by the way.

15     A    Me too.

16     Q    But MPD officers are attacked from time to

17  time by people with firearms, I assume; is that right?

18     A    Yes, we are.

19     Q    It's just the illegal non-registered firearms

20  that are used in those attacks, if I understood your

21  prior statement correctly?

22     A    That is correct.

Capital Reporting Company
Lanier, Cathy  06-12-2013

78

1  public safety issue; is that right?

2      A     Public safety benefit is that firearm is no

3  longer on the street and potentially in the wrong

4  hands, in the hands of the criminal, the person who

5  committed a crime to take your firearm.

6      Q     Right.  But assuming it's already been

7  recovered by MPD, the fact that it gets back to the

8  owner helps the owner --

9      A     Correct.

10     Q     -- it doesn't save the public under those

11 circumstances?

12     A     No, recovering it from the person that took

13 it would be the public safety.

14     Q     Okay.  Now, anybody whose property is lost or

15 stolen can report that to MPD, correct?

16     A     Correct.

17     Q     And for them to make a report of stolen

18 property generally, or lost property even, they don't

19 need to be compelled by the law to do that, do they?

20     A     Correct.

21     Q     I'm sure you get a lot of voluntary reports

22 of burglaries or break-ins at residences where

Capital Reporting Company
Lanier, Cathy  06-12-2013

79

1   property is stolen?

2      A    We do.

3      Q    Okay.  And just as with a registered firearm,

4   MPD will return the stolen property to the owner if

5   you happen to recover it, right?

6      A    Correct.

7      Q    When you receive a report that a firearm has

8   been lost or stolen and it happens to be registered,

9   does that registration information itself give MPD any

10  information that is helpful in solving the theft or

11  identifying the perpetrator of the theft?

12     A    No.

13     Q    And if there was no registration, the firearm

14  owner whose gun was stolen could report that and give

15  the police the serial number of the gun; is that

16  right?

17     A    Correct.

18     Q    Or at least the make, model and caliber,

19  physical description of the firearm?

20     A    Correct.

21     Q    And you state in your report that a lost

22  or -- a report of a lost or stolen gun, quote, at the

Capital Reporting Company
Lanier, Cathy  06-12-2013

80

1   very least, can help protect the registrant from being

2   associated with a crime later committed with that

3   firearm.

4           But that can be done in the case of a

5   voluntary report rather than a mandatory report also,

6   right?

7       A    I'm sorry.  What is your question?

8       Q    If a person wanted to be protected from being

9   associated with a crime later committed with a

10  firearm, he could report that theft of the firearm

11  voluntarily as opposed to having a law that required

12  him to do that?

13      A    Yes.

14      Q    So for this segment of your report, again,

15  providing law enforcement with critical information, I

16  just want to ask you what we have here in the way of

17  data that you relied on.

18      A    Only what is cited in the report and my

19  experience in law enforcement.

20      Q    I mean, the data -- we have 71 officers

21  fatally shot, and I don't see any other numerical data

22  in here.  Is there any?

87

1   firearms."  Is that the only study that you cite

2   there?

3       A    Okay.

4       Q    And that is on page 6.  Now, that study

5   focused on Virginia's one handgun a month law; is that

6   right?

7       A    Correct.

8       Q    We will mark this and get it distributed.

9           (Lanier Deposition Exhibit Number 9 was

10  marked for identification.)

11  BY MR. PETERSON:

12      Q    And have you at some point reviewed this

13  study?

14      A    I have.

15      Q    And it presents some analysis relating to

16  guns recovered and traced that were ultimately traced

17  to dealers in Virginia and several other southeastern

18  states, correct?

19      A    Correct.

20      Q    But Virginia doesn't have a system of

21  firearms registration, does it?

22      A    No.

88

1    Q    So going back to your statement on page 6

2  where it says that laws restricting the registration

3  or purchase of multiple firearms over a given period

4  are effective.

5         This study relates only to purchases, not to

6  registration, right?

7    A    Correct.

8    Q    Did the Weil study contain any measures of

9  illegal interstate trafficking in firearms?

10   A    Measures in what way?

11   Q    Volume, number of guns --

12   A    No.

13   Q    -- and moving through interstate channels.

14        And in fact, it just showed where guns have

15  come from and it didn't show whether they were

16  illegally transferred across state lines or legally

17  transferred, right; just shows the state of origin?

18   A    Correct, showed state of origin.

19   Q    So in that sense, it can't really prove that

20  Virginia's law was, quote, effective at disturbing

21  illegal interstate trafficking of firearms, can it?

22   A    I'm not sure I understand your question

89

1  again.

2      Q     Well, it's merely talking about the state of

3  origin rather than whether the guns were illegally

4  being transferred interstate?

5      A     Correct.

6      Q     Okay.  So we're not necessarily talking about

7  disrupting illegal interstate trafficking of firearms

8  with this study, correct?

9      A     Correct.

10     Q     Instead, that study was based on ATF trace

11  data, if I recall correctly; is that correct?

12     A     Correct.

13     Q     ATF trace data is only based on instances

14  where law enforcement, whether state or federal or

15  whatever, requested a trace, right?

16     A     That is correct.

17     Q     It also only includes successful traces,

18  right?

19     A     That is correct.

20     Q     So it's not representative of how firearms

21  generally might be moving across state lines?

22     A     It's the best measure.

Capital Reporting Company
Lanier, Cathy  06-12-2013

96

1      A      The footnotes of the report.

2      Q      Your base it on the footnote, the Weil study?

3      A      Yes.

4      Q      And did you apply any methodologies to these

5  data to arrive at your conclusions?

6      A      No.

7      Q      And do any of your opinions in this segment

8  show that crime will be reduced by these laws or that

9  officer safety will be improved?

10     A      There is no data in here for that, no.

11     Q      Okay.  In turning back to this subject of the

12  registry and whether officers might query that

13  registry before going out on a call for some reason,

14  you said they don't routinely do it, but they might do

15  it in some instances.  In what instances would that

16  database be queried, if you know?

17     A      I would defer to Lieutenant Sheldon for

18  answering that question.

19     Q      Okay.  Turning to the subject of handguns and

20  long guns which begins on page 6 of your report, we

21  already talked about several instances where someone

22  fired a long gun in the District in connection with

97

1    the earlier part of your report.

2           Here you state that -- and it's at the end of

3    the first paragraph -- that also in 2009 a man used a

4    .22 caliber rifle in a fatal shooting at the Holocaust

5    Museum.  And that is the James von Brunn case, right?

6    A    Correct.

7    Q    Was he a District resident?

8    A    No.

9    Q    Was his gun registered in the District?

10   A    No.

11   Q    Did the District's registration law help to

12   solve this crime?

13   A    No.

14   Q    In fact, Mr. von Brunn was a convicted felon,

15   wasn't he?

16   A    He was.

17   Q    And, thus, he was ineligible to possess

18   firearms under federal law, correct?

19   A    That is correct.

20   Q    On page 7 of your report you state that,

21   although they are less commonly used in the commission

22   of crimes in the District than handguns, they are

Capital Reporting Company
Lanier, Cathy  06-12-2013

98

1  used -- meaning long guns are used -- and in this

2  urban environment, their longer range can make them

3  even more dangerous than a handgun.  There are few, if

4  any, areas of the city that have the open space for

5  which long guns are typically used in more rural

6  areas, such as for hunting or recreational target

7  shooting.

8          Now, certainly, in the context of

9  registration laws, a registered long gun is no less

10 powerful or accurate than the same gun that is

11 unregistered, correct?

12     A     That is correct.

13     Q     Okay.  Is the rationale here that

14 registration will reduce the number of long guns in

15 the District and thereby prevent firing of long guns

16 for criminal purposes?

17     A     Registration of long guns has been required

18 since 1975, I believe.

19     Q     Correct.  But my point is, you stress here

20 how powerful they are and long distance and that sort

21 of thing.  What is the rationale for -- specifically

22 for registering long guns?

99

1    A    The registration has been in place since

2  1975.  I didn't write the regulation.  It is just

3  simply stating that the long guns are more lethal when

4  used in public.

5    Q    Is the rationale that registration will help

6  solve crimes after one is committed with a long gun?

7    A    Again, registration would be a deterrent to

8  those -- we would hope would be a deterrent to those

9  who want to use the firearms for illegal purposes.

10    Q    Okay.  But most of the examples you cite here

11  are people who were not deterred; is that correct?

12    A    That is correct.

13    Q    Can you give me an example where registration

14  and records were used to solve a crime, and by a crime

15  I mean a non-possessory offense committed with a long

16  gun?

17    A    No.

18    Q    Does the District keep data on the numbers or

19  percentages of crimes committed with long guns as

20  opposed to handguns?

21    A    I don't believe so.

22    Q    Okay.  In discovery there was some mention of

Capital Reporting Company
Lanier, Cathy  06-12-2013

103

1    A    I believe so, yes.

2    Q    Okay.

3         (Lanier Deposition Exhibit Number 12 was

4   marked for identification.)

5   BY MR. PETERSON:

6    Q    And again, I will represent to you that this

7   is the FBI Uniform Crime Report table 20 for the year

8   2010.  And that has similar data regarding homicides

9   for the District, doesn't it?

10   A    Yes.

11   Q    And again, total murders in the District of

12  Columbia for 2010 are 131.  And how many of those

13  committed are with rifles or shotguns?

14   A    Zero for both.

15        (Lanier Deposition Exhibit Number 13 was

16  marked for identification.)

17  BY MR. PETERSON:

18   Q    And once again, I will represent to you that

19  this is Uniform Crime Report published by the FBI for

20  2011, table 20.  And turning, again, to the District

21  of Columbia information, we have total murders of 108.

22  Total firearms used to commit those, 77.  And how many

104

1  rifles and shotguns were used?

2      A    This is showing zero rifles, one shotgun.  I

3  would like to point out, one thing is that there is in

4  each of these a good quantity of unknown --

5      Q    Right.

6      A    -- firearms so...

7      Q    Okay.

8      A    So 39 in this case.

9      Q    Okay.  I wonder why it's so high.  Do you

10  have any idea?

11      A    I don't.  And as I'm looking at these

12  numbers, I'm questioning 2010, just based on my

13  recollection of homicides in 2010, that I know pretty

14  well so...

15      Q    But this information is provided to the FBI

16  by the District itself, right?

17      A    I'm not sure who provides this or where this

18  report comes from, but...

19      Q    I mean, normally, just out of curiosity

20  wouldn't you be able to tell for rifles and handguns,

21  for instance, just by any recovered bullets?

22      A    If there is evidence recovered.  Sometimes

105

1   there is not.

2       Q    Right.  But typically you would know whether

3   it's a handgun caliber or shotgun caliber?

4       A    If there is evidence left on the scene, if

5   there is evidence recovered, you can.  There is not

6   always evidence recovered.

7       Q    Right.  .22 you might not know.  That would

8   be the -- okay.  Let's go back to Exhibit 13 for just

9   a minute.

10          Under knifes and cutting instruments, we have

11  21 homicides committed with them.  And other weapons,

12  9.  And hands, fists, feet, et cetera, we even have

13  one.

14          So there is a fair number here that are

15  committed without using firearms at all; is that

16  right?

17      A    That is correct.

18      Q    Particularly knives it looks like is a fairly

19  popular one.  Okay.  And can you point me to any

20  studies or data that indicate that registration of

21  long guns specifically as opposed to handguns aids in

22  crime control or promotes officer safety?

106

1      A     No.

2      Q     And so for this segment of your report on

3  long guns, just turning back to your report, on what

4  data are you basing your expert opinion?

5      A     Only what is cited in my report and my

6  experience of 23 years in law enforcement.

7      Q     Okay.  And there is really no, like,

8  numerical data cited here, just several instances of

9  shootings with long guns; is that right?

10     A     Correct.

11     Q     And did you apply any methodologies to these

12  data to arrive at your conclusions?

13     A     No.

14     Q     And do any of your opinions -- and you can

15  check if you would like -- purport to show that crime

16  will be reduced by these laws or that officer safety

17  will be improved?

18     A     No.

19           MR. PETERSON:  Want to take a break now?

20           (Brief recess.)

21           THE WITNESS:  Can I verify?

22           MR. SAINDON:  She wants to amplify a previous

107

1    response.

2    BY MR. PETERSON:

3        Q       All right.

4        A       The 2010 numbers in the Exhibit 13 -- 12 --

5    Exhibit 12, 2010 -- yes.  I mean, when I looked at

6    this number and the number of homicides involving

7    rifles and shotguns listed here as zero, I know that

8    is an inaccurate number.  We had several people

9    murdered with a rifle that year in March, and I

10   can't -- I don't know why it wasn't captured under

11   rifles here, whether it's somehow captured in the high

12   number of unknown.  I can only say I know for a fact

13   there were several people murdered with a rifle in

14   that year.

15       Q       What incident was that?

16       A       South Capitol Street.

17       Q       Was this the one involving the AK-47 --

18       A       Yes.

19       Q       In your opinion, does MPD make policy

20   regarding firearms registration laws?

21               MR. SAINDON:  Objection.  She's not a lawyer.

22               MR. PETERSON:  I'm just asking her opinion.

Material Under Seal Deleted

# Exhibit 4
# (Under Seal)

Exhibit 5

24

1    run it ballistically and match it up to shootings that

2    occurred the night before.  Should they trace that gun?

3    Absolutely.  It was used in a a crime or suspected to

4    be used in a crime.

5         Q    Do you have any idea, of the guns which were

6    traced on which your trace data was based, where the

7    gun itself was used to commit the crime, where it was

8    pointed at another person or brandished, used as a

9    weapon?  Do you have the breakdown of what percentage

10   of those --

11        A    Well, it's funny because the law states if

12   you go in to rob a bank and you only put your hand in

13   your pocket and intimidate that you have a gun, that's

14   a crime.  So I don't know that it would say that.  They

15   would have to use the NCIC code that would say

16   burglary, armed robbery.

17             So pure burglary, if they catch you in the

18   house and you have a gun that you brought in there,

19   that's illegal to have it.  You are committing a crime

20   with a gun.

21        Q    But you don't have any breakdown?  Is there

22   any breakdown available of what those numbers are?

25

1   That is, how many would be for which NCIC code?

2       A    No.  You would have to go to each police

3   department and go into a specific report and say, "Did

4   this person actually point that gun deliberately at

5   the" --

6       Q    That's not my question.  Is there a

7   breakdown?  When the information is submitted by the

8   police or the request for a trace is submitted by the

9   police department, do they provide ATF what the NCIC

10  code is that they are requesting?

11      A    Yes.  They provide that code.

12      Q    Those data are available?

13      A    Yes, sir.

14      Q    The next question is does ATF go back to the

15  police department and verify that the correct NCIC code

16  has been provided?

17      A    I think ATF does the same thing that the FBI

18  does with the Uniform Crime Report.  The police

19  department provides that.  They accept it.

20          However, there are various safety -- I don't

21  know if safety is the right word, but ways that ATF

22  tries to make sure that they have the proper

54

1    unregistered.

2       A    That's what I am saying.  NFA registered

3    weapons are good.  The other ones are not.

4       Q    But the requirement of registration doesn't

5    prohibit people from illegally possessing unregistered

6    firearms?

7       A    No.  Not 100 percent.  No.

8       Q    You don't know what percent it is in fact?

9       A    No, I do not.

10      Q    Now, how does registration keep weapons out

11   of the hands of criminals?

12      A    Well, again, you have all these many firearms

13   that these people have and they are kept secure by

14   responsible people who know what the law is, who have

15   had an extensive background check done on them, and

16   they are more likely and do keep those secure from

17   going to criminals and criminals don't have easy access

18   to those firearms.

19      Q    What studies do you have that support that

20   statement?

21      A    I have the count.  If you have the amount of

22   NFA weapons that are registered to people and very few

57

1   the registration of their firearms there.

2        Q     Let me stop you there.  Decrease in what?

3        A     In violent crime.  Since early 1990s to the

4   current, you have seen a significant drop in firearms

5   related violent crime in the City of the New York.

6        Q     Do you have any studies that show it was the

7   registration law that did that?

8        A     I don't think in my personal opinion, there

9   is one thing that --

10       Q     I'm not asking for your personal opinion.  My

11   question to you, sir, is do you have any studies that

12   support what you just said?

13       A     All I'm trying to say is I don't think that

14   there are -- there are studies on this.  Off the top of

15   my head, I can't give them to you.  What I'm saying is

16   I think they all show that there is a myriad of things.

17              I think the enforcement by police.  We have

18   to give them credit for that as well, but I definitely

19   think when Mayor Bloomberg says and the commissioner

20   says that it's one of the safest cities, it is.

21       Q     But you don't know of any studies that

22   support what you are saying?

58

1     A     Yes.  I think there have been studies.  I

2  just can't give them to you off the top of my head.

3     Q     You don't know of any studies?

4     A     I didn't say that.  I just said I don't

5  recall them right now.

6     Q     Are there any cited in your report?

7     A     No, there is not.

8     Q     Now, you say at the bottom of the page that,

9  "Firearm registration allows officials to identify

10 persons who subsequently become disqualified from

11 ownership."  How does registration do that?

12    A     Well, I think what the District is proposing

13 is that you have to have this background done on you

14 and then after -- I have to look at my report.

15    Q     Very bottom of Page 3.

16    A     I'm looking at three years that you have to

17 renew.  Whatever it is.  You have so many years.

18          What this allows, during that time period if

19 you were stopped and found to have heroin on you, if

20 you were involved in criminal activity, then you lose

21 that right to have that firearm.  So this gives an

22 opportunity to make sure that the wrong people don't

Capital Reporting Company
Vince, Joseph J. 06-13-2013

62

1   can't report it stolen because they don't have the

2   serial number.  You can't put Smith & Wesson.  There is

3   a lot of Smith & Wessons.

4           So because it's registered, you can go into

5   the database and find it out.  It can be put in NCIC.

6   Then if it's recovered, it will go back to the citizen.

7   That's a big advantage that they have there.

8       Q    So that advantage is the government helps you

9   keep your records?

10      A    Yes.  And keep the firearms safe.  Have

11  experts take a look at them.

12      Q    Do you know whether D.C. has a similar

13  requirement, that the firearm is examined to determine

14  if it's safe?

15      A    I don't know that they have it.  The only

16  thing I know about I put in my report.

17      Q    Do you know of any studies showing that that

18  examination process in Michigan has in any way affected

19  crime rates in Michigan?

20      A    The examination process?  I don't know that

21  the examination process would, but I know that the

22  registration has certainly helped us.  If somebody was

63

1    picked up with a firearm and it was reported stolen and

2    they had it, then we could arrest them for having a

3    stolen weapon because the registration system would

4    have it.

5         Q    Do you know of any studies showing that that

6    system in Michigan has reduced crime in Michigan?

7         A    There has been some studies about that but I

8    couldn't tell you what they said.

9         Q    You haven't cited any such studies in your

10   report?

11        A    No, I did not.

12        Q    Now, turning to Page 5 of your report, at the

13   top you said that, "It makes particular sense for the

14   District to require the registration of long guns in

15   order to track their presence and keep them out of the

16   hands of criminals and terrorists."

17             How does the requirement that long guns be

18   registered keep them out of the hands of criminals and

19   terrorists?

20        A    Well, again, it would be the problem that

21   D.C. has is not with guns from D.C.  It comes from

22   other places.  So if someone were found with a gun that

67

1   enforcement a tool to investigate illegal activity that

2   they wouldn't have if we didn't have registration.

3       Q    Okay.  Let's move on to the next paragraph.

4   You say, "For example, studies have shown that state

5   and local laws that limit the purchase of firearms by

6   an individual to one gun in a 30-day period are highly

7   effective in disrupting illegal interstate trafficking

8   of firearms."  What studies are you talking about?

9       A    There has been quite a few studies.  In

10  particular, as I mentioned, State of Virginia, when the

11  State of Virginia went to one gun a month.  We also did

12  studies at ATF while I was there.

13           You have to do it over a period of time.

14  Obviously guns are purchased now, and activities occur

15  and they don't fall into law enforcement hands until

16  sometime later when you can investigate them, but over

17  a period of time we could judge the amount of guns

18  being traced that are coming from Virginia went down

19  dramatically after they passed the gun registration

20  law.

21      Q    What study are you talking about?

22      A    I think ATF in some of their materials.

68

1   Either "Follow the Gun" or "Commerce in 2000" has some

2   of that.  But there has been other academic studies in

3   this area for the Department of Justice and National

4   Institute of Justice

5        Q    You don't know what they are?

6        A    Off the top of my head, I don't.

7        Q    You don't cite them in this report anywhere?

8        A    I don't cite them, but they are online,

9   National Institute of Justice.

10       Q    You said a little further down, "In my

11   research of multiple sale restrictions, I saw dramatic

12   reductions in the trafficking of crime guns originating

13   in the state of Virginia and other more restrictive

14   states when they instituted one gun a month regarding

15   the purchase of handguns." What research is that you

16   are talking about?

17       A    ATF is provided by licensed dealers when they

18   sell more than one handgun to an individual in the five

19   business day period, they have to report that to ATF.

20   ATF computerizes that and we examine before the law was

21   passed and after the law was passed and saw a

22   tremendous decrease in that.

Capital Reporting Company
Vince, Joseph J. 06-13-2013

69

1    Q    Who examined?

2    A    ATF.

3    Q    Were you involved in that study?

4    A    Yes.  I was part of the Crime Analysis

5  Branch, and that was something I did.

6    Q    You said "dramatic reductions in the

7  trafficking of crime guns."  What does that mean?

8    A    Well, the other thing we saw is that the

9  amount of firearms from Virginia that were ending up in

10  crimes in other states fell during this same time

11  period that we looked at, that they decreased.

12    Q    Did you look at D.C. in particular?

13    A    No, sir.  It was just guns that came from the

14  state of Virginia.

15    Q    So there is nothing in that study about

16  multiple sale restrictions dealing with the effects on

17  D.C.?

18    A    Well, certainly D.C. would have been a part

19  of our review because they are so close to Virginia and

20  they would be a place where the guns would need to be

21  trafficked to.  I'm saying we just didn't hone in at

22  that time on D.C.  No.

75

1     Q     Does it show anything about the reduction of

2  violent crime?

3     A     I think it shows or he makes reference to the

4  fact that what are the things that they have found that

5  seem to reduce violent crime.

6     Q     Anything in those studies that you know of

7  about the effect of those laws on making police

8  officers safer?

9     A     I think in some of those, going by my memory

10  again, it talks about police officers being shot, but I

11  can't respond to that specifically.  I don't remember.

12     Q     Going to in person registration near the

13  bottom of Page 5, you said, "One of the effective ways

14  to ensure that criminals do not circumvent the firearm

15  registration process is to require in person appearance

16  and I.D. verification as a part of registration."

17           What do you mean by "criminals do not

18  circumvent the firearm registration process?"

19     A     Well, if you don't have this, then you might

20  as well just have, as I said, a kiosk because you don't

21  have anybody examining.  Even the firearms industry

22  itself says this is a good thing to do, and they do it

76

1   in their training vignettes and material that the send

2   to dealers called "Don't Lie for the Other Guy."

3          What they are saying is it's your

4   responsibility as a dealer to examine the person that

5   comes in, to look at him when he comes in and ask him

6   questions.  In that same regard, this is what the

7   government will be doing with registration.  Does the

8   driver's license you are submitting match up to you.

9   Are you one in the same person.  Without this kind of

10  hands-on or person to person, how would you know?

11       Q    You don't cite any data that would support

12  that conclusion in your report, correct?

13       A    No.

14       Q    Do you know of any data that supports that

15  conclusion?

16       A    That supports the conclusion that?

17       Q    Your conclusion that it's an effective way to

18  ensure that criminals do not circumvent the firearms

19  registration process.

20       A    Well, I will say this, that the State of

21  Florida used to hand out driver's licenses without

22  examining people.  You just come in.  They didn't

Capital Reporting Company
Vince, Joseph J. 06-13-2013

80

1   carry, correct?

2       A     I forget the department in Florida.  It's not

3   a law enforcement department.  It's another department

4   in Florida that issues these times of permits.  I'm not

5   familiar with it but they issued it through the mail.

6       Q     You don't know if that was a permit to carry?

7       A     In Florida, I think you can carry very easily

8   and purchase guns.  I don't think it's a registration

9   system.  I think it's a carry or conceal and carry.

10      Q     All right.  Do you know of any studies that

11  support the idea of an in person examination by a

12  government official?

13      A     No.  It's mostly my experience.  If there has

14  been any studies on it, I think Mr. Gary Winterman has

15  done some because what he has looked is people

16  acquiring guns from the State of California permit

17  system.

18      Q     What other experiences do you have with in

19  person examination by government officials?

20      A     A lot.  Like dealers.  Again, the dealer is

21  acting as an agent of the government when they sell

22  firearms.

Capital Reporting Company
Vince, Joseph J. 06-13-2013

82

1      Q      I'm going to ask my question one more time.

2    Do you know of any studies dealing with the benefit of

3    in person examination by a government official?

4      A      I don't know of any studies.  When I worked

5    on a case in New York, there were some where the city

6    said you have to come down in person because they had

7    to verify, and they had people that tried to circumvent

8    that.  I don't know any more than that specifically.

9      Q      Okay.  Now, on the top of Page 6, you talked

10   about, "Having a registrant appear in person in front

11   of the government employee provides an opportunity to

12   verify the intentions and accuracy of information for a

13   person obtaining for a permit."  What do you mean by

14   "verify the intentions?"

15     A      It's the same way that the firearm industry

16   tells dealers to verify the intentions of the person

17   there buying.  So, in other words, are you really

18   acquiring a firearm or registering it so that you can

19   hand it to somebody else.

20            How can we verify that?  Well, I've this 96-

21   pound individual and I've got 40-pound gun here. Well,

22   what are you going do with it, or whatever. The other

102

1      A     No.  Because just the individual I talked

2   about in Philadelphia had a permit to carry a gun in

3   the state of Florida and came back to Philadelphia and

4   committed a homicide.  So, no. That would not prohibit

5   somebody from doing something not only illegal, but

6   awful damn stupid.

7      Q     Do you have any numbers that show or any data

8   that show that the D.C. registration law does in fact

9   prevent people from coming into the District to commit

10  crimes?

11     A     Again, I don't have any data that says that

12  it prevents people.  I think people do think twice

13  before coming into D.C. knowing that the law is

14  stricter here.

15     Q     What do you base that conclusion on?

16     A     Well, there is a law that's advertised

17  compared to no law.  On the other hand, what I'm trying

18  to say is this.  That what we see is a tool that law

19  enforcement can use.  What you want to do is take the

20  tool away so we have nothing.

21     Q     Have you looked at the data of how many

22  people are charged in the District with possession of

Exhibit 6

37

1    states that don't.

2        Q    Have you participated in those studies?

3        A    I did not.  No.  I have read them.

4        Q    Are they mentioned in your report?

5        A    They are not.

6        Q    They are not.  So you are not relying on them

7    for purposes of your expert report?

8        A    No.  They are adjunct to my report and the

9    studies that I used as the foundation of my report.

10       Q    What do you mean?  When I asked you at the

11   very beginning whether all the bases and reasons for

12   your opinions were included in the report and you said

13   they were, are you now telling me that there is

14   something that isn't in your report that you are

15   relying on for your report?

16       A    No.  My report is based on -- the opinions

17   that I espoused in my report are based on the two

18   studies that I mentioned in my report and I have read -

19   - as it says in my report, I have read and continue to

20   read other studies.

21            However, in writing my report I relied on the

22   two studies, "Homicide, Suicide and Unintentional

47

1  Security Service?

2      A     That's correct.

3      Q     And you are aware that Virginia has no

4  firearm registration requirement?

5      A     Yes.

6      Q     Now, are you aware of any studies, specific

7  studies that show that registration by citizens -- I'm

8  not talking about law enforcement having a record with

9  their agency, but registration by a citizen in order to

10 be able to possess the firearm, reduces suicides?

11     A     No.  I'm not aware of a study like that.

12     Q     Or that such a registration system -- strike

13 that.  Okay.  Now, you also said in that same sentence,

14 we talked about suicide before that, you said "greatest

15 single risk factor for being murdered with a firearm."

16 What do you base that on?

17     A     Doctor Hemmeway's risks and benefits of a gun

18 in the home.

19     Q     Anything else?

20     A     No.

21     Q     And then lastly, being injured by

22 unintentional discharge of a firearm.  What do you base

68

1   police officer, whoever it happens to be, would be able

2   to provide that officer responding to the home with the

3   information.

4          Say it was a domestic dispute.  Officer Jones

5   responded to 123 Main Street for a domestic dispute.

6   There are registered guns in that house.

7          That would change my calculus on how I might

8   approach the home and how I might approach the

9   individuals who are making the call for service, and it

10  might impact my -- the way that I interacted with those

11  people until I knew with certainty that there was no

12  gun in anyone's hand or on their person while I was

13  dealing with them.

14  Q    Two questions.  First off, if you were told

15  there were no registered guns in that household, then

16  you would take the attitude that it was perfectly safe,

17  that there weren't any guns in there?

18  A    No.  You would continue to exercise caution

19  until you had the individuals that were calling, or

20  whatever the dispute was, separated sufficiently where

21  you felt like you had a margin of safety.  I don't know

22  any police officer that would go into that situation

69

1    cavalierly like that.

2            With that said, if you know that there are

3    guns in the home, it's going to raise your caution

4    level just that much higher.

5        Q    Can you give me any examples of any

6    jurisdictions that you know of that in fact do that,

7    notify a responding officer whether there are guns in

8    the home, registered guns in the home?

9        A    No.  I can't tell you what jurisdictions does

10   that right now.

11       Q    Do you know what the Metropolitan Police

12   Department does?

13       A    I don't believe they notify their officers

14   without being asked if there are registered guns in the

15   home.

16           MR. GARDINER:   Maybe this would be a good

17   time to take a break.

18           (Whereupon, a recess was taken and then the

19            deposition continued as follows:)

20           BY MR. GARDINER:

21           (resumed)

22       Q    We're back on the record.  Staying on Page 6

73

1          So we were able to go back to that person and

2     essentially return their gun to them, or find out if

3     they had had an insurance settlement and then destroyed

4     the gun afterwards.

5          Q    In those cases, you said you were thinking of

6     two cases.

7          A    Forgive me.  I misspoke.  I'm thinking of one

8     case where there was a burglar who we recovered many,

9     many guns from.  In one case, the gun was -- in one of

10    those thefts the gun was registered to an Omaha party

11    and we were able to talk to that party.

12         Q    Had the party reported the gun as stolen?

13         A    Yes.

14         Q    When a gun is reported as stolen, where does

15    that information go, if you know?

16         A    Typically into the National Crime Information

17    Center.  NCIC is the national database maintained by

18    the FBI that allows things like stolen guns, stolen

19    cars and things like that to be tracked.

20         Q    Did you check that database for that one gun

21    to see if it was reported as stolen?

22         A    Yes.

74

1     Q     So you didn't need the registration

2  necessarily to find the owner?

3     A     No.

4     Q     All right.  Let me move down a little farther

5  on the page here.  You said, "Additionally, information

6  maintained in municipal gun registration records may be

7  used to investigate possible illegal transactions,

8  providing law enforcement officers with critical

9  information to identify straw man purchasers when

10  investigating firearms crimes and gun smuggling."

11        You say "may be used to investigate possible

12  illegal transactions."  Tell me what you mean by that.

13     A     Essentially it's further information that is

14  available to law enforcement officers about who the

15  registered owner -- who the owner of that firearm is.

16        It has been my experience that when you look

17  at different bits of forms that people fill out, the

18  different forms that people fill out for different

19  agencies, sometimes there is conflicting information on

20  there.  Sometimes they put information on a Form 4473

21  that might be different than the information that they

22  list on their driver's license or on their firearms

Capital Reporting Company
Jones, Mark  06-13-2013

84

1  factor for accidental injury with firearms, for murder

2  of an intimate with a firearm or for suicide.

3          So limiting the number of firearms in the

4  home would reduce the risk of accidental discharge,

5  intimate partner violence or suicide.

6      Q    When you say "limit the number," you are

7  talking about that you are specifically referencing

8  registering one handgun every 30 days?

9      A    Yes.

10     Q    But that doesn't limit the number you can

11  have in the home because you could register 1 every 30

12  days, correct?

13     A    Yes.

14     Q    And in a year you could have 12 in the home?

15     A    That's correct.

16     Q    An in 2 years you could have 24 in the home?

17     A    Yes.

18     Q    So what limit are you talking about, then?

19     A    I'm not referring to an any specific number.

20  I'm saying in general, it's a good policy to follow to

21  not have a lot of guns in your house. More guns is more

22  risk of someone coming into your hone to steal your

85

1    guns.  That makes you an attractive target for

2    burglary, and particularly if they are not stored

3    properly.

4           More guns means more opportunity to have an

5    impulse to commit suicide.  If you are having that

6    impulse and there is a gun handy, you are more likely

7    to have a completed suicide with a firearm if there is

8    a gun easily accessible.  So limiting the number of

9    guns in the home, in my mind, limits the opportunity

10   for bad use of that gun.

11      Q    You're not aware of any provision of the D.C.

12           law which limits the number of firearms

13   present in the home, are you?

14      A    No.

15      Q    The only law that has any kind of limit in it

16   is the restriction of registering 1 every 30 days?

17      A    Yes.

18      Q    Now, are you aware of any studies that show

19   that limiting the number of firearms present in the

20   home reduces murders?

21      A    No.

22      Q    Are you aware of any studies that show that

92

1       Q      And do you know how many guns that were

2   traced in the District were guns that were actually

3   involved in the misuse of the gun in some way, whether

4   it committed a robbery or murder?

5       A      Guns traced by MPD when I worked there by

6   definition were crime guns whether they were illegally

7   possessed in the District or it was a misuse.  So

8   virtually every gun that I'm aware of that was traced

9   was some sort of misuse was underpinning that trace.

10      Q      Do you know what percentage of those were

11  guns that were not that were illegal because they

12  weren't registered?

13      A      I don't.

14      Q      Now, are you aware of any studies that show

15  the effect of the enactment of the Virginia law that

16  you referenced on crimes in D.C.?

17      A      No.

18      Q      I think you said already but just so I'm

19  clear, you're also not aware of any studies showing

20  that the repeal of the Virginia law has had any effect

21  on crimes with guns in D.C.?

22      A      I'm not aware of that.  No.

Capital Reporting Company
Jones, Mark  06-13-2013

100

1     Q     You said, "An additional advantage" -- strike

2  that.  Before I get to that, are you aware of any

3  studies that show that requiring in person registration

4  leads to crime reduction?

5     A     No.

6     Q     Are you aware of any studies that show that

7  in person registration benefits officer safety?

8     A     No.

9     Q     Are you aware of any studies about in person

10  registration at?

11     A     I'm not.  No.

12     Q     Do you know of any other jurisdictions that

13  require in person registration?

14     A     Chicago does.  I had to present myself to the

15  gun registration unit at police headquarters to

16  register my firearms.  That's a requirement for all gun

17  owners in Chicago.

18     Q     What did they do there?

19     A     I had to fill out a form.  They take

20  fingerprints.  They take a photograph.  They do a

21  background investigation.  You have to pay a fee. You

22  submit the registration.  Then you go home.  Then in a

Capital Reporting Company
Jones, Mark  06-13-2013

101

1    couple of weeks your approved registration shows up in

2    the mail.

3        Q    Going back, you had mentioned that one reason

4    that you -- or one evaluation that you could make of a

5    person is whether he or she was blind or not?

6        A    Yes.

7        Q    Are you aware of any studies that show that

8    blind people are more dangerous than nonblind people

9    with firearms?

10       A    No, I'm not.

11       Q    Have you ever encountered anybody who is

12   blind who possessed a firearm?

13       A    I have not personally encountered anyone who

14   is blind that had a firearm.  No.

15       Q    Now, you said an additional advantage to in

16   person registration is the indisputable identification

17   of the aspiring registrant as the actual owner of the

18   firearm.

19            I don't understand what that means, how that

20   can be the case.  How do you know that he's the actual

21   owner of the firearm by looking at him?

22       A    Well, he's presented you with a variety of

104

1      Q     Okay.  But you have no independent personal

2   knowledge of that?

3      A     No.  I have never conducted a registration

4   background investigation in Washington, D.C.

5      Q     You just listed WALES, NCIC.  Are you

6   familiar with what databases the District has access

7   for purposes of registering firearm other than those?

8      A     No.

9      Q     Do you know if there is any reason why the

10  District can't review those databases everyday, if it

11  felt like it, for every registered firearm owner?

12     A     No.

13     Q     Now, I want to move to the three-year renewal

14  of registration on Page 9.

15     A     Okay.

16     Q     You said it compels a systemic review of all

17  legally registered firearms and registrants, and you

18  just agreed with me that there is no reason why the

19  District couldn't currently check on all criminal

20  history records and whatever records it may have access

21  to everyday if they felt like it.

22            So what is the systemic review, then, that

105

1  you are talking about?

2      A      Essentially a review of this nature forces

3  the District to go in on a regular basis, not an ad hoc

4  basis, everyday because some police officer in the gun

5  registration unit decides he wants to do it or she

6  wants to do it, but basically forces them to review

7  what's on file, what's been legally registered, and

8  look it over to make sure that it's still sufficient,

9  that everything in it is the way that it was and

10  continues to be.

11     Q    Then couldn't the chief of police just simply

12  issue an order to those who work in the registration

13  unit to do a check every six months?

14     A    I suppose she could do that.  It doesn't seem

15  to make much sense to me to do it on a ad hoc basis. It

16  seems to me that a systemic, programmatic, organized

17  way of reviewing registration is in the interest of the

18  citizens and the police department, not arbitrary, ad

19  hoc "I think I'm going to review these things today."

20     Q    I didn't say that.  I said on a regular every

21  six months.  Couldn't the chief, as far as you know,

22  just do that?

106

1      A      Sure.  They have instead decided to do it

2   every three years.  Sure.  They could do it every six

3   months.

4      Q      What is the importance of every three years

5   versus --

6      A      I don't understand or I don't know exactly

7   what underpins the policy decisions of the District of

8   Columbia on this instance.  I haven't read anything

9   about the legislative history of the registration

10  scheme really, but it seems to me that three years is a

11  lesser burden on the registered owner of the gun than

12  every year or every six months.  Instead it is every

13  three years.

14          So they have to verify every three years that

15  everything is the same and that they still have those

16  guns and that they are still in the same place as

17  opposed to doing it more frequently.

18     Q      But your primary concern, as I understand it,

19  is that the District be compelled to do something to --

20  that the police department be compelled to do updated

21  checks?

22     A      Yes.  I think it's important that they do

114

1          I'm in the process of doing that right now.

2     They issue a letter saying, "This is what we show.

3     Verify this stuff for us.  Come in or do it by mail."

4     Basically there is a renewal process.

5          Q    And are you aware of any studies of Chicago

6     that show that that process has led to crime reduction?

7          A    No.

8          Q    Are you aware of any studies that show that

9     that process promotes officer safety, police officer

10    safety?

11         A    No.

12         Q    All right.  Page 10 of your report.  You said

13    you personally completed the District's mandatory

14    online firearm safety training course, which took

15    approximately one hour, and you believe it to be a

16    positive first step?

17         A    Yes.

18         Q    Why do you refer to it as a first step?

19    What's wrong with it?

20         A    There is nothing wrong with it.  It's a very

21    good basic primer on firearm safety.

22         Q    So you say "first step."  Do you mean that

116

1  firearms owners that don't take it seriously enough. We

2  have a cavalier attitude in the United States about

3  owning firearms.

4         It's a right under the Constitution to own a

5  firearm and there is a responsibility that attaches to

6  that right.  I think the District has gone a long way

7  towards trying to balance the right to possess a

8  firearm with the responsibility inherent by creating

9  this course, in creating a registration process, and

10  basically telling the citizens of the District, "If you

11  want to own a firearm you have to be a responsible gun

12  owner."  I think that online course is a good start

13  towards that.

14     Q     Can you give me any jurisdictions outside of

15  the District where there is a requirement for a similar

16  firearms safety course?

17     A     The short answer is not for registration.

18  It's mostly for concealed carriers.

19     Q     For registration there aren't any that you

20  know of?

21     A     No.

22     Q     So can you give me any studies that show that

Capital Reporting Company
Jones, Mark  06-13-2013

117

1  a requirement like this reduces unintentional

2  discharges of firearms?

3      A    I cannot give you a study.  I can cite 30

4  years of my experience that people who are highly

5  trained, that people who have hours and hours of

6  firearms safety training and tactical training have

7  accidental discharges, unintentionally wound themselves

8  or someone else.

9          In my opinion, allowing someone to own a

10 firearm without sort of a basic firearms safety

11 training is tantamount to saying go out and have an

12 accident.

13     Q    Do you know how many firearms there are in

14 the United States?

15     A    The last number I heard was something like

16 300 million.

17     Q    Do you know how many fatal accidents there

18 were last year?

19     A    I don't.  I know that between 2003 and 2007,

20 there were something like 643 people killed

21 accidentally by firearms.

22     Q    What time period was that?

Exhibit 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DICK ANTHONY HELLER, *et al*.,           )
                                         )
            Plaintiffs,                  )
                                         )
                v.                       )        No. 1:08-cv-01289 (JEB)
                                         )
THE DISTRICT OF COLUMBIA, *et al.*,      )
                                         )
            Defendants.                  )

## DECLARATION OF GARY KLECK, PH.D.

I, Gary Kleck, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1.      I am over eighteen years of age, am fully competent to make this Declaration, and make the statements herein based on my personal knowledge and information.

2.      I have been retained by the plaintiffs in this case to offer expert testimony on their behalf.  I am being compensated for my work at the rate of $350 per hour.

3.      On May 20, 2013, I submitted expert rebuttal reports relating to the reports of Cathy Lanier, Daniel Webster, Mark Jones, and Joseph Vince.  My deposition was taken by counsel for the District on July 2, 2013.

4.      If called to testify in this case, I would testify substantially as described below.

5.      Section 1 of this Declaration describes my academic and other qualifications. Section 2 contains a point-by-point rebuttal of the Declaration of Daniel Webster, followed by a note regarding the lack of training and qualifications on the part of Mr. Jones, Mr. Vince, and Chief Lanier to offer expert opinion on the research studies and factual matters at issue in this case.  Section 3 contains a rebuttal of the Declaration of Chief Lanier.  Sections 4 and 5 provide rebuttals to Messrs. Jones and Vince, respectively.  Section 6 summarizes why the studies relied

upon by the declarations of these four witnesses do not address the matters at issue in this case (protection of police officers and crime control), and notes that empirical assessments that have addressed the effect of registration laws on crime have unanimously indicated that registration laws have no measurable effect on rates of crime or violence.

**Section 1 – My Qualifications**

6.      I am a Professor of Criminology and Criminal Justice at Florida State University. I received my doctorate in Sociology from the University of Illinois in 1979, where I received the University of Illinois Foundation Fellowship in Sociology.  I am currently the David J. Bordua Professor of Criminology at Florida State University, where I have been on the faculty since 1978.  I have been doing research in the field of guns and violence since 1976, and have been called "the dominant social scientist in the field of guns and crime" (Vizzard, 2000, p. 183).

7.      I am the author or co-author of four books on guns and violence.  These books constitute the most comprehensive reviews of evidence concerning guns and violence in the scholarly literature, and they inform and serve as part of the basis of my opinions.  More specifically, I am the author of Point Blank: Guns and Violence in America, which won the 1993 Michael J. Hindelang Award of the American Society of Criminology, awarded to the book of the previous several years which "made the most outstanding contribution to criminology."  In addition, I have authored Targeting Guns (1997) and, with Don B. Kates, Jr., The Great American Gun Debate (1997) and Armed (2001).

8.      I have also published scholarly research in all of the leading professional journals in my field. Specifically, my articles have been published in the American Sociological Review, American Journal of Sociology, Social Forces, Social Problems, Criminology, Journal of Criminal Law and Criminology, Law & Society Review, Journal of Research in Crime and

Delinquency, Journal of Quantitative Criminology, Law & Contemporary Problems, Law and Human Behavior, Law & Policy Quarterly, Violence and Victims, Journal of the American Medical Association, and many other scholarly journals.

9.      In particular, I have authored or co-authored the most methodologically sophisticated analyses in the published scholarly literature on: (1) the impact of gun ownership levels on rates of homicide and other crimes (Kleck and Patterson 1993; Kovandzic, Schaffer, and Kleck 2012; Kovandzic, Schaffer, and Kleck 2013), (2) the impact of gun control laws on rates of homicide and other crime (Kleck and Patterson 1993), (3) the effect of defensive use of guns by victims on victim injury and property loss (Kleck and Sayles 1990; Kleck and DeLone 1993; Tark and Kleck 2004), (4) the frequency of defensive gun use (Kleck and Gertz 1995), (5) the frequency of gun carrying for protection (Kleck and Gertz 1998), (6) the impact of offender gun possession or use on the likelihood of attack, injury, or death in crime incidents (Kleck and McElrath 1991; Kleck and DeLone 1993), and (7) the extent of gun trafficking and its impact on crime rates (Kleck and Wang 2009).

10.      I have testified before Congress and state legislatures on gun control issues, and worked as a consultant to the National Research Council, National Academy of Sciences Panel on the Understanding and Prevention of Violence; as a member of the U.S. Sentencing Commission's Drugs-Violence Task Force; as a consultant to the Department of Justice of Canada; and, most recently, as a member of the Institute of Medicine and National Research Council Committee on Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-Related Violence. I am also a referee for over a dozen professional journals, and serve as a grants consultant to the National Science Foundation.

11.     Finally, I teach doctoral students how to do research and evaluate the quality of research evidence, and have taught graduate courses on research design and causal inference, statistical analysis of data, and survey research methodology.  My current curriculum vitae is attached as Exhibit K-1.

**Section 2 – Rebuttal of the Declaration of Daniel Webster**

12.     This section is a point-by-point rebuttal of the Declaration of Daniel W. Webster. Page references are to pages in that document unless otherwise noted.  Before making specific points, however, I note generally that most of Professor Webster's report is not even relevant to the issues that I understand to be at stake in this litigation.  I have reviewed the opinion of the United States Court of Appeals (*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)), and understand that the District of Columbia identified two interests that the registration requirements are said to support: to protect police officers and to aid in crime control.  Not one of the studies cited by Webster bears on the protection of police officers.  As to crime control, almost all of the studies cited by Webster concerns topics such as "diversion" of guns and firearms "trafficking," which Webster never empirically links with crime rates or crime control.

13.     Further, most of the studies on which Webster relies pertain to handguns, or do not distinguish between handguns and long guns.  Thus, they do not provide evidence, as the Court of Appeals required in the *Heller v. District of Columbia* decision, to support any conclusions about long guns specifically.  None of the studies he cites in support of his claims examined long guns separately.  Instead, every single study pertains either to only handguns or pertains to all types of guns combined.

14.     I do not comment on Webster's description of his qualifications (Points 1-8) or his description of the D.C. gun control legislation (Point 9).

15.     On p. 2 (Webster's Point 10) Professor Webster cites a study stating that licensed firearm dealers did not question the validity of fake IDs offered by undercover agents posing as prospective gun buyers.   Webster appears to infer from this study that firearm registration applications should be submitted in person, and that this will result in fewer guns in the hands of prohibited persons.   This inference does not logically follow from the evidence in the cited study because it assumes that some significant number of criminal purchase attempts are currently made using fake IDs, and that therefore blocking such attempts in future would prevent a significant number of criminals from getting guns in D. C.   This inference is wrong for two reasons.

16.     First, the best available evidence indicates that criminals *virtually never* acquire guns by using a fake ID.   The largest, most nationally representative sample of criminals ever asked about how they obtained guns was studied in the U.S. Census Bureau's 2004 Survey of Inmates in State and Federal Correctional Facilities (SISFCF).   Inmates were asked if they possessed a weapon during the crime for which they were sentenced to prison, and what type of weapon was possessed.   Of 1,818 (unweighted) inmates who reported possessing guns during this offense, only 10.4% had purchased the gun from a gun shop or pawnshop, would therefore have been subject to a background check, and thus would have had a reason to provide false ID. Of these, nearly all purchased the gun under their own name, presumably because they did not have a disqualifying conviction at the time.   Of all the 1,818 total criminals' gun acquisitions, only 14 (*0.8%*) were obtained by a purchase using a false name, and presumably false identification (author's analysis of ICPSR 2013, attached as Exhibit K-2.   Webster speculates (Point 11) that other criminals might have used false identification without using a false name, e.g. by using a misspelled version of their true name or an inaccurate birth date, but there is not a

shred of empirical evidence to support this notion.  As he often does, Webster appears to give as much weight to his own speculations as to hard evidence.  The actual evidence indicates that Webster is conjuring up an imaginary benefit of D.C.'s registration requirements – a dubious solution to a nearly nonexistent problem.

17.     Second, most criminals have multiple sources they can use to obtain guns (Sheley and Wright, p. 27; May and Jarjoura, pp. 37, 47).  Thus, it is likely that most, perhaps all, of the handful of criminals (0.8% of those who used guns) who acquired guns via the use of fake ID at a gun store would also have been able to acquire guns from other sources such as friends or family.  Indeed, there is no affirmative evidence, cited by Webster or otherwise, that there are *any* criminals who obtain guns using false ID and who could not get a gun from other sources if this mode of acquisition were not available to them.

18.     Webster's Point 12 likewise proffers a completely speculative benefit of D.C.'s registration system – that it "could" mitigate the "potential" negative consequences of negligent sales practices by gun dealers (p. 3).  His very phrasing is overtly speculative.  Without any factual support, Webster implies that there is a significant problem of "negligent sales practice by gun dealers" (p. 3), and notes that a small share of gun dealers sell most of the guns later linked to crimes, as if this fact supports his speculation.  What he does not share with readers is that a small share of gun dealers also sell most of *all* guns, whether crime-involved or not.  This is just the nature of the firearms business – a few high-volume dealers sell most of the guns.  The share of guns later traced in connection with crimes that were originally sold by these few dealers is virtually identical to their share of total gun sales – exactly what one would expect if all the dealers were operating in completely lawful and responsible ways.  He claims that the large share of crime guns claimed by these few dealers cannot be "*fully* explained" [emphasis

added] by "sales volume," but this is a very misleading phrasing.  In the Wintemute, Cook, and Wright (2005) study on which Webster relies, the authors did indeed report that 11.7% of California firearms retailers accounted for 85.5% of traced (purportedly crime-involved) handguns, but they also reported that these same high-volume dealers also accounted for *81.5%* of *all* handgun sales.  In short, the top-selling dealers accounted for only slightly more traced "crime" handguns than one would expect based solely on their share of the handguns sold, even if none of the dealers engaged in a single criminal act or negligent business practice. Dealers who sell more guns to lawfully eligible buyers can expect more guns being traced back to them simply because a larger number of the guns they legally sold to legally eligible buyers will later be stolen from those buyers, otherwise acquired by criminals, recovered by law enforcement personnel, and traced.  Furthermore, "traced" guns are not at all the same thing as guns used to commit crimes.  See paragraphs 21-24, below.  In sum, sales volume may not explain absolutely all of the large share of "crime guns" claimed by high-volume gun dealers, but the data in the cited study indicate that it does explain *almost* all of this share, and the difference is negligible.

19.     Leaving aside the overwhelming influence of sheer sales volume on dealer traced-gun counts, Webster is also wrong when he claims that local crime rates do not explain this large share (p. 3, Point 13).  Lawful and responsible licensed gun dealers who operate in areas with higher rates of gun theft will have larger number of crime guns traced back to them merely because more of their legally eligible customers will have their guns stolen, used in crimes, recovered by police, and traced back to the dealers – even if the dealers never did a single illegal or irresponsible thing.  The only type of crime responsible for large numbers of gun thefts is burglary, specifically residential burglary (U.S. Bureau of Justice Statistics 2012, p. 2).  Thus, in order for a study to rule out local crime rates as an explanation for some dealers having high

trace counts, it would have to control for local burglary rates.  The study relied upon by Webster (Wintemute, Cook and Wright 2005, cited in Webster's fn. 3) did not do this.  Instead, the authors introduced controls only for a conspicuously irrelevant kind of crime, robbery (Wintemute et al. 2005, Table 4, p. 360) - a crime that is rarely responsible for moving guns into criminal hands (U.S. Bureau of Justice Statistics  2012, p. 2).  Although county burglary data were available to the authors, they inexplicably chose not to use these data.  Thus, Webster was wrong in claiming that the Wintemute et al. research showed that high sales volume and local crime rates could not fully explain licensed firearms dealers' high gun trace counts, since the cited research never actually tested this possibility by controlling for the most relevant local crime rate.  In sum, high-volume gun dealers' large share of total sales accounts for nearly all of the large share of traced guns claimed by high-volume gun dealers, and what little is not explained by sales volume may be explained by higher local burglary rates.  Consequently, there is, as far as we know, no remaining unexplained share of traced gun counts to be attributed to any kind of dealer misconduct, and Webster does not factually demonstrate any such misconduct.

20.      Webster also claims (p. 3, Point 13) that his study of undercover stings of licensed guns dealers (cited in fn. 4) showed that "many" dealers were susceptible to facilitating illegal straw sales."  These stings actually only found a tiny handful of dealers *might*  have been willing to engage in straw sales (the evidence was highly ambiguous). As Kleck and Wang (2009) noted, Webster, Vernick, and Bulzacchelli (2006) thought that licensed dealers were involved in straw sales because the undercover stings had supposedly produced a decrease in trafficked crime guns.  The problem was that these authors overinterpreted gun trace data, labeling *all* guns with (a) a time to crime under one year, and (b) whose criminal possessor was not the original retail

purchaser as "new trafficked crime guns" (p. 779).   In fact, virtually all of these guns may simply have been stolen from their lawful buyers within a year of purchase.   Thus, they had no foundation for judging trends in trafficked guns or straw sales, and therefore had no way of telling if stings reduced gun trafficking or straw sales.   Webster appears to believe that this handful were but the tip of the iceberg, and were representative of a much larger number of corrupt dealers in the full population of dealers.   This inference, however, would be valid only if the set of dealers subject to these stings were a representative sample of licensed gun dealers.   They were not.   Police specifically targeted dealers they knew to be among the few dealers with high trace counts or that they had received complaints about.   The sample was completely biased.   Thus, even if only a fraction of one percent of all licensed dealers were willing to sell to straw purchasers, by including *only* those "high-risk" dealers in the universe of dealers examined, it would be possible—indeed, nearly inevitable--to find that a high percentage of a small group suspected of misconduct might be willing to engage in misconduct.   Consequently, the cited study can tell us nothing about whether "many" licensed dealers are "susceptible to facilitating straw sales."

21.    For most of his other conclusions, Webster relies heavily on data concerning traces of guns performed by the Bureau of Alcohol, Tobacco and Firearms (ATF).   Therefore, it is important to first explain some of the ways in which Webster misinterprets trace data.   Most crucial of all, he shows no awareness of the fact that the set of guns traced by ATF is not a complete or representative sample of crime guns, but rather a nonrandom subset of police-recovered guns that (a) are nonrandomly *selected* by police for tracing, and (b)  ATF is able to successfully trace (Wellford et al. 2005; Kleck and Wang 2009).   At this late date, there is no way an honest scholar could fail to understand this point, as ATF has repeatedly and explicitly

stated that trace data cannot be used to draw conclusions about crime guns in general.  The

misuse of trace data to support erroneous conclusions has become so widespread that the

following disclaimer now appears on ATF's trace data reports: "Firearms selected for tracing are

not chosen for purposes of determining which types, makes or models of firearms are used for

illicit purposes.  The firearms selected do not constitute a random sample and should not be

considered representative of the larger universe of all firearms used by criminals, or any subset

of the universe" (U.S. Bureau of Alcohol, Tobacco, and Firearms 2013).  Therefore, regardless

of how he analyzed trace data, Webster had no basis for drawing conclusions about "crime guns"

because traced gun samples can tell us nothing about crime guns in general, but instead reflect

*the kinds of guns police choose for ATF to trace and that ATF is able to trace* (Kleck and Wang

2009).

22.     Thus, if police believe, however wrongly, that criminals in their jurisdiction

obtain guns from interstate gun traffickers, they will be especially likely to request ATF traces on

guns that they believed came from out of state (e.g., guns seized from suspects with out-of-state

driver's licenses).  Likewise, if police believe, however wrongly, that new guns are especially

likely to have been handled by gun traffickers, they will be especially likely to ask ATF to trace

guns that appear to be new – even if the initial premise was completely false (Kleck and Wang

2009).

23.     To try to justify his claim that the Wintemute, Cook, and Wright (2005) study

(Par. 18, above) supports an inference that there is a significant problem of "negligent sales

practice by gun dealers," Webster misleadingly claims that "a relatively small portion of gun

dealers sell the majority of *guns recovered by police from criminals*" (p. 3, emphasis added).

The data to which he refers, however, actually pertain only to the subset of guns recovered by

police *that they chose to submit for tracing*.  Thus, Webster actually had no basis for drawing conclusions about even crime guns recovered by police, never mind all crime guns.

24.     Webster also misunderstands what kinds of guns are included in samples of traced guns, describing them as "crime guns."   While ATF does indeed claim that traced guns are "crime guns," this is based on a highly eccentric definition of crime guns – they include not just (a) guns used to commit crimes (e.g., in a threat or an attack), but also (b) guns that were the object of a crime, such as a gun theft, (c) guns whose mere possession constituted the crime, and (d) guns with no known connection at all to any specific crime and that were merely *suspected* to have been somehow linked with crime (BATF 1997).   This is not a minor quibble, since the vast majority of traced guns in fact are not known to have been used to commit any crime.   For example, among the 1,421 guns from the District of Columbia traced in 2011, only 141 (9.9%) were associated with homicide, robbery, aggravated assault, or simple assault.   Most commonly, these traced guns were associated only with unlawful possession of a gun (537, or 37.8%) or were merely recorded as being "under investigation" (482, or 33.9%) – presumably guns merely suspected to somehow be linked with crime (BATF 2013).   Thus, *most* traced guns are not crime guns in any meaningful sense, and analyses of samples of traced guns therefore cannot be used, as Webster does, to infer anything about crime guns, in the sense of guns used to commit crimes.

25.     Webster grossly mischaracterizes the 2000 *Following the Gun* report by the Bureau of Alcohol, Tobacco and Firearms (p. 3, Point 13 and fn. 2).   He claims that this report indicated "that straw purchasers and corrupt licensed dealers represent the most prominent channels for [moving?] guns into the illegal market."   This is a flagrant distortion, since this report did not present a single statistic bearing on the prominence of any channels for illegal guns.   Instead, it was concerned only with ATF *criminal investigations.*   Thus, its data concerned

only those gun sources and channels on which ATF chose to focus its investigative efforts, and did not contain a shred of evidence on which channels were "the most prominent" sources of illegal guns.  ATF itself made this point explicit in the report, stressing that the investigations described in the report "do not necessarily reflect typical criminal diversions of firearms" (Bureau of Alcohol, Tobacco, and Firearms 2000, p. 53).  Webster simply ignored this caveat and drew conclusions about guns going into the illegal market that had no logical connection with these data, which merely reflected where ATF chose to concentrate its limited investigative resources.  Indeed, it is perfectly consistent with the evidence in this report to assert precisely the opposite of what Webster believes – that virtually no crime guns are acquired through "corrupt licensed dealers."  The data reflect only where investigations were aimed, not where flows of illegal guns were heaviest.

26.      Far more direct and relevant evidence bearing on this point comes from the 2004 Census Bureau survey of prison inmates, the largest, most nationally representative sample of criminals ever asked about how they obtained their guns (U.S. Bureau of the Census 2013a). This study revealed that criminals almost *never* acquire guns via straw purchases from licensed gun dealers.  Among 1,818 felons armed with guns during the offense that got them sent to prison, only 32 (1.8%) of them had (a) acquired a gun by buying it from a gun store or pawnbroker and (b) used another person to buy the gun for them (author's analysis of ICPSR 2013, attached as Exhibit K-2.  And, again, most of these few criminals almost certainly had other sources of guns they could have exploited.  Thus, contrary to Webster, straw purchases from licensed gun dealers should more accurately be described as one of the *least* prominent sources of criminals' guns rather than one of the most prominent sources.  More generally, illegal or negligent actions of corrupt or negligent licensed dealers appear to have virtually

nothing to do with the flow of guns into criminals' hands (Kleck and Wang 2009). Instead, thefts (mostly connected with burglaries), and purchases from friends, family, and acquaintances are the major means by which criminals obtain guns (Wright and Rossi 1986, pp. 181-188). We can be sure that Webster knew about the authoritative and far more relevant Census Bureau survey (U.S. Bureau of the Census 2013a), since he cites it elsewhere in his declaration (p. 9, fn. 13). Thus, he drew a conclusion directly contradicted by the best evidence known to him.

27.      Webster's analysis of Missouri's permit-to-purchase licensing law is based on a fundamental misunderstanding of ATF trace data. He claims that the time from when a gun was first sold at retail to when it is recovered by police ("time-to-crime", or TTC) is "indicative of possible trafficking" (p. 4, Point 14). It is not. First, trace data cannot tell us whether a gun has been trafficked or otherwise "diverted." As a National Research Council panel concluded, "trace data cannot show whether a firearm has been illegally diverted from legitimate firearms commerce" (Wellford et al. 2005, p. 40). Second, and more specifically, the trace-based "short TTC" measure has been empirically shown to *not* be correlated with another, more widely accepted indicator of gun trafficking, the prevalence of obliterated serial numbers. In places where a large share of traced guns have obliterated serial numbers, one is actually slightly *less* likely to find that a large share of those guns also had a short TTC. Thus, short TTC is not an indicator of gun trafficking. In fact, the share of traced guns with a short TTC is actually far more strongly correlated with gun theft rates (Kleck and Wang 2009, p. 1283). While gun theft is a form of gun "diversion," it is one that is quite different from gun trafficking, and does not involve any kind of misconduct by licensed gun dealers. D.C.'s registration laws do nothing to affect rates of gun theft. Likewise, out-of-state origins for traced guns are more likely to be the result of gun owners changing their residence across state lines, followed by the theft of their

guns in their new home state, than the product of interstate gun trafficking (Kleck and Wang 2009).

28.     Webster's analysis is therefore distorted by an outdated, discredited interpretation of the meaning of short TTC.  It is not a valid indicator of gun trafficking or misconduct by corrupt licensed gun dealers, and the only kind of "illegal gun diversion" it relates to is gun theft – a type of "diversion" that licensed gun dealers have nothing to do with.  Therefore, Webster's analysis of the Missouri permit-to-purchase (PTP) law (Points 15-18, pp. 4-5) can tell us nothing about changes in gun trafficking or dealer misconduct before and after the law's repeal.

29.     A more plausible interpretation of his Table 1 data than Webster's interpretation is that gun thefts, especially thefts of relatively new locally sold guns, increased after the permit law was repealed.  If the repeal of an onerous gun control law (or other factors) led to a burst in lawful gun sales, one would also expect an increase in thefts of those new guns, and thus more locally sold guns with a short TTC being seized by police.   This is precisely what Webster's Table 1 data indicate.

30.     There is good reason to believe there was indeed a burst of lawful gun sales during this period, since Bureau of Justice Statistics data indicate that there was a 14% increase in background checks for firearms transfers from 2007 to 2008 and another 9% increase from 2008 to 2009 in the U.S. (U.S. Bureau of Justice Statistics 2013, p. 4, Table 1; no data specific to Missouri are available).   Gun sales were increasing sharply at precisely the time an increased share of Missouri's traced guns were showing short TTCs.  And Missouri's increase could have been even larger than this national trend.  If there were more new guns to be stolen, then more new guns were likely to be stolen – and show up in gun trace samples as short TTC guns.  Thus, the trends that Webster guessed were indicating increased gun trafficking and illegal dealer sales

were more likely just a result of an increase in gun sales that lead to increased gun theft – a form of gun "diversion" that does not involve licensed gun dealers.  In any case, Webster had no measure of "diversion of guns to criminals" and thus had no way of judging whether it increased after Missouri repealed its PTP law.

31.     Webster claims to have somehow divined from trends in firearms homicide data that Missouri's repeal of its PTP law caused the increase in the gun homicide rate that occurred after 2007 (pp. 5-6, Point 19).  This is pure guesswork.  Webster's case for an impact of the repeal on homicide relies almost entirely on a single datum – the short-lived elevation of the gun homicide rate in 2008.  Beyond this chronological coincidence, Webster has no foundation for linking the repeal of the PTP law to the increase in gun homicides.  He appears to believe that the fact the Missouri experienced an increase in firearm homicide at a time when the U.S. as a whole and Midwest states experienced decreases in firearm homicide can somehow tell us *why* the increase occurred.  It cannot.   Nor does it even significantly narrow down the possible explanations.  Literally any variable that changed in Missouri after 2008 might be at least partly responsible for the gun homicide increase.  It is totally arbitrary to attribute the change to repeal of the PTP law.   In his deposition (p. 117), Webster mentions that he expanded the analysis reported in his Declaration by controlling for a few other variables – burglary rates, unemployment rates, law enforcement officers, incarceration rates, and the presence of "Stand Your Ground" self-defense laws.  He offers no explanation why he controlled these and not others known to influence homicide rates.  Thus, the choice of control variables appears to have been essentially arbitrary.

32.     The dubious character of Webster's research design can be illustrating by applying it to a nearby state that did *not* change its gun laws, and examining how its firearms

homicide rates changed.  The firearms homicide rate (measured using the same vital statistics homicide data that Webster relied on) in Iowa, the state on Missouri's northern border, nearly doubled from 2007 to 2008, from 0.639 to 1.197 firearms homicides per 100,000 population (author's analysis of CDC dataset provided by Webster), an 87% year to year increase, at the same time Missouri's rate increased only by 35%.  Comparing the average rates for 1999-2007 to 2008, as Webster did, shows a 34% increase in Missouri, and a 25% increase in Iowa—barely a difference at all.  Exhibit K-3.  This was a much larger proportional increase in gun homicide than occurred in the U.S. as a whole or in the Midwest.  Applying Webster's logic, this 87% increase could be attributed to the repeal of a PTP law or some other gun control law – except for the fact that Iowa did not repeal any gun control laws.  *For the entire time period relevant to Webster's Missouri study, Iowa had a PTP law similar to Missouri's, and did not alter or repeal it.*  Iowa Code § 724.15 et seq.  The simple point is that large percentage year-to-year increases or decreases in state-level firearm homicide rates are nothing special, and certainly can occur without any changes in firearms law being responsible.

33.     Webster also offers no reason for why he compared trends in firearms homicide rates in Missouri with those trends in the U.S. as a whole or the Midwest as a whole, i.e. why he chose those as his control areas.  The choice of comparison areas appears to be arbitrary.  Why not study trends in *all* states? Scholars have concluded that a more methodologically sound procedure is to study *all* jurisdictions that have passed a given type of law, and compare their crime trends with those of *all* jurisdictions that had not passed such laws (e.g. Marvell and Moody 1995).  Missouri's trend in gun homicide looks bad when compared to trends in the entire Midwest, but why use the entire Midwest as a control area?  The Midwest encompasses states that are nowhere near Missouri, like Minnesota, Wisconsin, Michigan, Indiana, Ohio,

North Dakota, and South Dakota, while excluding states that actually *border* Missouri, such as Arkansas, Oklahoma, Tennessee, and Kentucky.  Choosing different comparison areas would clearly make a difference in results since, as previously noted, the increase in the firearms homicide in Iowa from 2007 to 2008 was much worse than the increase in Missouri when it repealed its PTP law.  Put another way, if Iowa had been used as the control area, Webster would have found that the jump in firearms homicide in Missouri between 2007, when it repealed its PTP law, and 2008 was actually less than the jump in Iowa, which did not repeal its PTP law.   If one applied Webster's logic to this comparison, one would have to conclude that repealing the PTP law saved lives, since Missouri experienced less of a firearm homicide increase than Iowa did. It would, however, be as misguided to draw this conclusion as the one Webster drew, since the research design is simply too crude to permit even the most tentative conclusions about the impact, if any, of repealing the Missouri PTP law.

34.     Webster's analysis of Missouri firearm homicides (p. 5, Point 19) also makes no distinction between handgun homicides and long gun (rifle and shotgun) homicides.  Since the PTP law applied only to handguns, any effect of its repeal should have been found among handgun homicides.  Thus, Webster's data do not allow him to know how much of an increase there was in handgun homicide after Missouri's PTP law was repealed.

35.     Webster not only has no empirical foundation for linking the increase in gun homicides with the repeal of the permit law, but he also withholds one crucial piece of information – the *total* homicide rate did not increase after the law was repealed.   (Contrary to the label on Table 2, its data do not refer to [total] homicide rates of Missouri metropolitan areas; the data actually pertain only to gun homicide rates – see the text accompanying the table, Point 21, p. 6).  While the gun homicide rate in Missouri did happen to increase after the PTP law was

repealed in 2007, the total homicide (gun homicides plus nongun homicides) rate was basically unchanged, fluctuating from 7.1 homicides per 100,000 population in 2005 to 6.9 in 2006, 6.4 in 2007, 7.9 in 2008, 7.1 in 2009, and 7.2 in 2010 (author's analysis of CDC Wonder database, available at http://wonder.cdc.gov/cmf-icd10.html)  Exhibit K-4.  Thus, the total homicide rate had quickly returned to its pre-repeal level (in 2006) of 6.9  by 2009.  If the repeal of the permit law actually had made it easier for homicide-prone persons to acquire guns in 2008, it should have continued to do so in 2009-2011, since the same gun control regime (and lack of PTP law) continued to prevail.  Even if one were willing to believe that the repeal of the PTP law was driving changes in *firearm* homicide, the data indicate no increase in the *total* homicide rate after the repeal.   In short, the data that Webster chose not to share with his readers support the conclusion that *repeal of Missouri's PTP law had no effect on the risk of its citizens being murdered*.  Since neither Webster nor anyone else argues that it is more socially harmful for people to be murdered by firearms than to be murdered by other means, there is no foundation in his research for believing that the repeal of the PTP law increased the crime of homicide, or that the presence of that law had, before its repeal, reduced homicides.

36.    Webster's (Point 20) very brief discussion of his unpublished analysis of state firearm homicide rates is far too sketchy to evaluate.   Without the underlying data and computations, it is impossible to comment on it, except to note (again) that there was no increase in overall homicide in Missouri, and there is no basis for assuming that repeal of PTP was the causative factor in any increase in firearms homicide.

37.    Webster uses his study of Missouri gun homicide trends (Webster et al. 2013) as "evidence that firearm purchaser licensing and firearm registration requiring applicants to appear before law enforcement and be fingerprinted reduces the diversion of guns to criminals (p. 4,

heading of section containing Points 14-26).  His assessment of the impact of repealing the Missouri law, however, can tell us nothing about the effects of any of these three requirements, since his methods only allowed him to, at best, evaluate the overall impact of the entire PTP law being repealed.  Thus, even if one believed that repeal of the law somehow caused an increase in gun homicide, it is perfectly possible that both the requirement for the applicant to appear in person and the fingerprinting requirement in Missouri law were useless but that some other element of the law had benefits that were eliminated when the law was repealed, such as any optional background inquiries that sheriffs could carry out at their discretion (Missouri 571.090, subsection 3).  And even if either of these two requirements did have any benefit, Webster's methods do not allow him to separately establish the benefits of any one of the requirements.  He can only, at best, test for the effects of all of the elements of the law as a package. Consequently, the 2013 Webster et al. study of the repeal of the Missouri law can tell us nothing about the merits of D.C.'s requirements that registrants appear in person or that they be fingerprinted.  And they certainly can tell us nothing about the impact of a requirement that the applicant be photographed, since the Missouri law had no such requirement.  Likewise, none of the other studies cited by Webster had any evidence bearing on the merits of these three requirements.  Thus, Webster's endorsement of these provisions is not actually based on any relevant research evidence, but instead appears to be based solely on optimistic speculations about benefits that *might* result from such requirements.

38.    Webster claims (p. 7, Point 22) that firearm death rates are lower in states with PTP licensing, but since his crude "analysis" does not control for any other variables that affect rates of violent death, there is no foundation for attributing the lower firearm mortality rates in these states to PTP licensing.  Webster's attribution of the lower gun death rates to these laws is

therefore little more than a guess.  More sophisticated research that *did* control for numerous other factors that affect crime, including all other major types of gun control laws, and that studied *all* large U.S. cities rather than just a cherry-picked few areas, found no impact of permit-to-purchase laws on rates of homicide, suicide, aggravated assault, robbery, or rape (Kleck and Patterson 1993, p. 274).  Thus, Webster, in contravention of customary scholarly standards, chooses to base his conclusions on some of the weakest available research evidence rather than the strongest.  (He does not rebut the findings of the Kleck and Patterson study, nor claim that his research was methodologically stronger; he simply ignores it).

39.     On pp. 7-8 (Points 23-26) Webster returns to his erroneous interpretation of gun trace data, attributing a mistaken significance to the share of traced guns that originated in a state different from the one which the gun was recovered by police.  He claims that if, in states with PTP laws and handgun registration, a higher percentage of a city's traced guns come from out-of-state, this must mean that PTP and registration laws were at least partly responsible, by effectively discouraging criminals from getting in-state guns.  This is a complete *non sequitur* – Webster does not provide any logical links that connect his observations about out-of-state guns with the effects of these kinds of gun control.  The analysis he cites to support his claim (Webster, Vernick, and Hepburn 2001) did nothing to rule out a far more likely alternative explanation of these patterns.  It is politically harder to get stricter gun laws passed in states where a large share of the electorate are gun owners, so the presence of gun laws effectively serves as an indirect indicator of low gun ownership in a given state.  In such states, where there are fewer in-state guns for criminals to steal, a larger share of traced guns will necessarily come from out-of-state – even if the state's gun control laws have no effect whatsoever on criminal gun acquisition.

40.    For example, if state X has a lower rate of gun ownership than the rest of the U.S., then migrants from other states will, on average, own guns at a higher rate than the residents of state X.  Since people bring their possessions with them when they change residences, this means that migrants to state X will bring their guns with them.  Then, when some of these migrants are later victims of residential burglaries and their guns are stolen, these guns, if later recovered by police and traced, will obviously show out-of-state origins, since the migrants purchased the guns in their home states.  Consequently, a large share of traced guns in state X will have out-of-state origins, but for mundane reasons having nothing to do with gun trafficking or the presence or absence of in-state gun laws intended to reduce gun trafficking.  The higher out-of-state share of traced guns merely reflects the higher rate of gun ownership among migrants to state X relative to persons native to the state.  Webster and his colleagues (2001) did nothing to rule out this mundane alternative explanation of the patterns they observed in their data, e.g. by using easily obtained data on interstate migration and state gun ownership rates to control for guns brought into each state via simple cross-state migration (U.S. Bureau of the Census 2013b).

41.    In a later study of gun "exports" based on trace data,  Webster and his colleagues tried to control for state gun ownership rates, but chose to rely on questionable surveys done by the Centers for Disease Control (Webster et al. 2013, pp. 115-116).  The survey data pertained to 2001 even though the trace data patterns the authors were trying to explain pertained to 2009 (p. 115).  More importantly, the CDC surveys have yielded highly implausible estimates of state gun prevalence.  For example, if one takes their results at face value, Texas, Arizona, Florida, and Virginia all have gun ownership rates substantially *below* the national average (Okoro et al. 2002) – results that are sharply at variance with both popular perceptions that gun ownership is higher in Southern states and with data using alternative indicators of gun prevalence.  For

example, the percent of suicides committed with guns (PSG) is widely accepted as a valid indicator of differences in gun prevalence across areas (Kleck 2004).  For the period 1999-2003, the national average PSG was 55.3%, and the PSGs for the aforementioned states were all well above this average: 59.7% in Texas, 61.4% in Arizona, 54.0% in Florida, and 60.5% in Virginia (author's analysis of CDC Wonder database at  http://wonder.cdc.gov/cmf-icd10.html).  (These rates are computed by dividing deaths reported in "Gun Suicides 1993-2003" by deaths in "Total Suicides 1999-2003" in Exhibit K-5.  Thus, the CDC estimates of gun prevalence appear to be substantially in error, which means that Webster's use of these data did not effectively control for true differences in gun prevalence.  Webster and his coauthors did not explain why they did not simply use PSG measures instead of the dubious CDC measures.

42.     The 2009 Webster study (cited p. 7, Point 24, fn. 10) adds nothing to our understanding of the impact of gun laws on gun trafficking because it merely repeated the errors of the 2001 study – Webster studied unrepresentative samples of traced guns, wrongly assumed that his findings applied to crime guns in general, and ignored the more banal alternative explanations of patterns in his trace data.  He and his colleagues claimed to have measures of "diversion of guns" but in fact measured nothing of the kind.  Instead, they arbitrarily interpreted any traced gun with a TTC of under a year, recovered from a possessor who was not the legal purchaser of record as a "trafficked gun."  The ratio of (a) traced guns that were supposedly "trafficked" over (b) traced guns with a TTC longer than three years was their measure of the "diversion of guns."  As previously noted, a short TTC is not a valid indicator of a gun having been trafficked, so the "diversion of guns" measure used in this study was meaningless, and the associations of gun laws with this measure cannot be legitimately interpreted as an association between the presence of gun laws and rates of gun trafficking.

43.      The 2013 study cited on pp. 7-8 (Point 25, fn. 11) is likewise flawed by a misunderstanding of the meaning of gun trace data and of how guns are moved across state lines. Webster appears to believe that the sole reason, or at least the main reason, that guns are first sold at retail in one state but end up being used to commit crimes in a different state is because gun traffickers, aided by weak gun sales laws in the origin state, purchase guns in the origin state, then sell them to criminals in the destination state.   A more plausible explanation, which Webster and his colleagues did not control for and did nothing to refute, is simply that many Americans change residence across state lines each year, and move their possessions, including guns, with them.   If they are burglarized or their guns are otherwise stolen in the destination state, these guns are then, by definition, in the hands of criminals, and many of them will later be used in crimes, recovered by police, and traced.   Millions of guns like these will show out-of-state origins, but obviously for reasons having nothing to do with gun trafficking or weak gun sales laws.

44.      Webster refers to states that "export" large numbers of guns to other states, with the word "export" hinting at some deliberate commercial enterprise being responsible for the movement.   Rather than gun smugglers moving these guns, the more mundane explanation described above, based on the well-documented high volume of cross-state migration of Americans, is simply that people move their guns with them when they move.   For example, from 2010 to 2011, an estimated 6,987,416 Americans changed their residence across state lines, presumably taking their possessions with them (U.S. Bureau of the Census. 2013b).   Since there is now roughly one gun per U.S. resident (Kleck 2013), this implies that roughly 7 million guns are moved across state lines each year purely as a byproduct of ordinary migration.   Over a human lifetime of 70 years, it is therefore likely that *most* of the U.S. gun stock is moved across

state lines (Kleck and Wang 2009).  When some of these guns are later stolen or otherwise acquired by criminals, used in crimes, recovered by police, and traced, they will show up as guns with an out-of-state origin.

45.     From this standpoint, states that "export" large numbers of guns are merely those with high gun ownership rates, such that a high fraction of their out-migrants own guns.  Given obvious political realities, it is politically harder to pass stricter gun control laws in states with more gun-owning voters, i.e. states with high gun ownership rates.  Thus, the same states that "export" large numbers of guns (because they have high gun ownership rates) are also likely, for the very same reason, to have weaker gun laws - even if the weakness of those laws had absolutely no impact on illegal gun sales or gun trafficking.  Webster's own data actually confirm this interpretation, since he found that the strongest predictor of a state's rate of "crime gun export" was its gun ownership rate (Webster et al. 2013, p. 116 - see Table 8.2, IRR column, row labeled "Household gun ownership").

46.     Unlike in Webster's previous studies, the authors of the 2013 study controlled for "out-of-state population migration," but this was merely a crude measure of *overall* outmigration (Webster et al. 2013, pp. 115, 116).  This control cannot rule out the migration explanation because it does not control for flows of migrants between specific pairs of states.  A given state may have a fairly low rate of overall outmigration, yet have a high flow of migrants into a few high-crime states, in which residents are more likely to have their guns stolen.  The result would be a high rate of what Webster would mislabel "crime gun export," largely attributable to perfectly ordinary migration, but not to a high rate of *overall* outmigration.  Since Webster et al. only controlled for overall outmigration, their methods cannot rule out the foregoing migration explanation of the association between gun laws and interstate movement of guns.

47.     The 2013 study was also flawed by how the authors coded states' gun laws. Rather than relying on careful reading of original statutes, compiled in authoritative sources like the Bureau of Alcohol, Tobacco and Firearms' State Laws and Published Ordinances, as other scholars have done (e.g., Kleck and Patterson 1993; Kleck, Kovandzic and Bellows 2013), Webster and his colleagues chose to rely on a report produced by a gun control advocacy organization, Mayors Against Illegal Guns (MAIG), the creation of New York City's billionaire mayor, Michael Bloomberg (Webster et al. 2013, p. 114).   (This is the same Michael Bloomberg who is the namesake of Professor Webster's employer, the Bloomberg School of Public Health at Johns Hopkins University, whose renaming followed Bloomberg's gift of $35 million dollars to the school (http://www.jhsph.edu/news/news-releases/2001/bloomberg-name.html ).

48.     Webster's misinterpretation of his own research findings, from both the 2013 study and the others on which he relies, is to a great extent a by-product of this fundamental misunderstanding of how most guns move across state lines, i.e. of how guns are legally purchased in one state but end up being used in crimes in another.   He misattributes the undramatic but massive cross-state movement of guns associated with ordinary migration of millions of America's citizens to the actions of undocumented interstate gun smugglers, misleadingly describing this movement as "exporting guns to criminals across state borders" and the "diversion of guns to criminals" (p. 11).

49.     Webster is also highly selective, in his Declaration, in his reporting of the findings of his 2013 study.  Five of the ten firearms sales laws he and his colleagues studied showed no significant association with rates of crime gun "export," including laws specifically aimed at curtailing gun trafficking, such as limits of one handgun purchase per month, "strong dealer regulations," penalties for dealers who fail to conduct background checks, and state penalties for

straw purchasing (Webster et al. 2013, p. 116, Table 8.2).  Worse still, states with strong dealer regulation and state penalties for straw purchases actually had *higher* rates of crime gun "export" than states without such laws, though the associations were not quite statistically significant at the .05 level (see incident rate ratios [IRRs] larger than 1 on p. 116).  In short, Webster's findings were, on the whole, not supportive of the proposition that state laws regulating gun sales reduce the rate of crime gun "export."

50.    Webster, however, chose to focus in his Declaration (Point 26, p. 8) on the findings regarding PTP laws.  In this light, Webster's narrow focus on the finding for "discretionary permit-to-purchase (PTP)" laws (p. 9) appears to be the product of an arbitrary *ex post facto* emphasis on one kind of gun law for which he had some superficially supportive evidence, rather than a representative portrayal of the full set of his findings that had a bearing on the District of Columbia's challenged gun control measures.

51.    Conversely, one of the gun laws that Webster cites as affecting crime gun "export" rates in fact has nothing to do with attempts to restrict interstate gun trafficking – "junk gun" bans.  Given no sound basis for believing that these kinds of laws were aimed at interstate gun trafficking, Webster's citation of his findings concerning "junk gun" bans seems to be little more than an effort to pad out the list of findings that are supposedly supportive of the elements of the D.C. gun regulations.

52.    Curiously enough, Webster and his colleagues did not report any findings regarding the impact of *handgun registration* laws on gun "exports."  Thus, their reported findings failed to address the kind of control that is at the very heart of the current legal case.  Webster claims (Point 25, p. 8) that "handgun registry laws were too highly correlated with permit-to-purchase licensing to include in the statistical model."  This is misleading since the

mere existence of high correlations among predictor variables (called "multicollinearity" by statisticians) does not preclude including both variables in a statistical model.  Further, dropping one of the correlated variables from the analysis, if the variable truly does affect the dependent variable (i.e., is a "relevant" variable), is an unacceptable way of responding to multicollinearity (Maddala 1992, p. 291).  If handgun registration actually affected gun "exports," it would have been wrong for the authors to do what they did, i.e. drop the handgun registration variable from the model, since omitting a relevant variable biases estimates of the effects of the other variables retained in the model with which the omitted variable is correlated, such as other gun control laws (Wooldridge 2009, pp. 89-94).  Worse still, this distortion is especially severe when the wrongly omitted variable is highly correlated with the predictor variables retained in the model, which is exactly the situation Webster et al. faced.  Thus, Webster's estimates of the effects of PTP laws were distorted by the decision to drop the handgun registration variable, to the extent that the former type of gun control is correlated with the latter type.  Since states whose populations are favorable to one type of gun control are likely to be favorable to other types, the presence of a given type of gun control is almost certain to be positively correlated with the presence of other types of gun control.

53.     Either handgun registration affects gun "export" or it does not.  If it does (i.e., it is a "relevant" variable), the authors made a serious error, omitting a relevant variable and biasing their estimates of the effects of the other gun control variables, including the PTP law.  This would mean that Webster's claims about the effect of the PTP law cannot be relied upon.  On the other hand, if handgun registration does *not* affect gun exports, then the authors should have reported this unsupportive finding, and Webster, in his Declaration, should have admitted that his 2013 study failed to support the handgun registration elements of D.C.'s new gun laws.  The one

option that was clearly illegitimate was to simply decline to report an unsupportive finding regarding the effect of handgun registration.

54.     As it happens, there are at least six published scholarly studies that empirically assessed the impact of firearms registration laws on crime rates, none of which Webster chose to cite.  Collectively these studies found that firearms registration laws had no measurable impact on rates of any kind of crime or violence (Geisel, Roll, and Wettick 1969, p. 676; Murray 1975, p. 88; Magaddino and Medoff 1984, pp. 235-238; Kleck and Patterson 1993, pp. 267-271, 274; Langmann 2012; Kleck, Kovandzic, and Bellows 2013).  These studies are discussed in detail in paragraphs 85-94 below.

55.     Further, Webster claimed (p. 8, Point 26) that his findings support the proposition that PTP licensing systems "requiring in-person applications to local law enforcement" would reduce "cross-state diversion of guns to criminals," but not a single one of the studies he cites in support actually distinguished jurisdictions with PTP laws requiring in-person applications from those that did not. The distinction he actually made in his 2013 study was between states with PTP laws requiring fingerprinting and those that did not (Webster et al. 2013, p. 116, Table 8.2). While fingerprinting would incidentally entail an in-person appearance, nothing in Webster's methods allowed him to distinguish the effects of the in-person appearance from the effects of fingerprinting, which might have effects of its own. Likewise, the Webster et al. (2001) study (cited in Point 25) and the Webster et al. (2009) study cited in his footnote 10 had no evidence bearing on the effects of requiring an in-person application on "cross-state diversion of guns to criminals." Thus, he had no direct empirical foundation whatsoever for his endorsement of a requirement for an in-person appearance of applicants.  Instead, this conclusion is little more than a guess, at best only very indirectly connected with his own research findings on PTP laws

in general, and at worst contrary to the findings of methodologically stronger research (Kleck and Patterson 1993).

56.     The 2013 Webster et al. study is in any case irrelevant to the challenged D.C. measures.  This study investigated only the impact of various gun control measures on rates of crime gun "export," but neither Webster nor any other authority known to me has claimed that there is a problem with D.C. being an exporter of crime handguns to other states.  Consequently, even if one accepted his dubious conclusions regarding measures that reduce gun "exports," they have nothing to do with the D.C. registration requirements or other elements of its gun control regime.  The far more relevant and important findings would have been estimates of the effects of gun control measures on *crime rates*, but Webster et al., for unexplained reasons, did not report any such findings.

57.     Notwithstanding this lack of relevance, Webster asserts that this study also showed that "having a law requiring private gun owners to promptly report theft or loss of firearms was associated with a 30 percent lower rate of exporting guns to criminals across state borders" (p. 9, Point 29).  He does not, however, offer any logical reason *why* such a measure should have any impact on interstate gun trafficking.  He does not, for example, cite any evidence that gun traffickers gain their supply of guns by either stealing them or buying them from others who have stolen them.  Further, Webster does not cite any evidence that these laws have ever been enforced, or that even a single violator has ever been punished for failing to report a theft or loss of a firearm.  Since anyone accused of such an offense could easily claim, without fear of being decisively contradicted, to have been unaware of the theft or loss of their gun, it is difficult to even imagine how the law could be enforced.

58.     Since it is so implausible that these laws affect gun trafficking, alternative explanations are more likely to account for Webster's findings.  As noted before, places with more restrictive gun laws usually also have lower gun ownership rates, so the presence of a law requiring the reporting of stolen or lost guns, like other gun control laws, serves as an indirect indicator of relatively low gun ownership.  A state with lower gun ownership rates will "export" few guns to other states simply because a smaller fraction of that state's out-migrants own guns, and thus few of them will have guns to be stolen once they have moved to their destination state. Since Webster never controls for specific state-to-state patterns of interstate migration, he has no basis for concluding that weak gun laws in the origin states had anything to do with the lower rates of gun "exports" prevailing in some states.  He therefore has no credible empirically based foundation for endorsing D.C.'s requirement that lost or stolen guns be reported.

59.     Point 28 contains no empirical evidence that pertains to the effectiveness of the types of gun controls implemented in the District of Columbia, so I do not comment on it.  In his Point 29 Webster cites his 2013 study in connection with the duty to report gun thefts, but that research did not have any findings bearing on either crime reduction or police officer safety, and thus is irrelevant to the current case

60.     Webster endorses the D.C. requirement to reregister guns every three years, but does not even attempt to support the endorsement with any evidence that such frequent reregistration reduces crime, including violent gun crime and gun trafficking (p. 9, Point 30). Indeed, he does not cite any evidence that firearms registration of *any* kind reduces crime.  This is not surprising, since prior research has unanimously found that gun registration has no detectable effect on rates of homicide, suicide, rape, robbery, aggravated assault, or gun accidents (see Section 6 for a detailed review of the evidence).   Nor does he explain why the

authorities could not detect persons who had acquired a disqualifying conviction since after they originally registered their guns simply by periodically checking (a) computer files of persons convicted of crimes against (b) computerized lists of gun registrants.   It is not necessary for gun owners to repeatedly re-register their guns to accomplish this goal.

61.   Webster argues that reregistration requirements would somehow deter illegal transfers, but does not cite any evidence that persons likely to make illegal transfers ever register their guns in the first place.  If only law-abiding persons obey registration requirements, how would such requirements deter illegal transfers by criminals?  Webster neither explains this nor cites any evidence that criminals, including those who make illegal firearm transfers, register their guns.

62.   D.C. police have also found that virtually no registered guns are used to commit crimes in D.C.   During a period of over four years, D.C. police recovered a grand total of 37 guns registered to private individuals used in crimes – only about nine per year (plaintiff's Exhibit J, p. 2, table titled "Registered Firearms Used to Commit Crimes").   Further, many of this handful of registered guns were not actually used to commit violent crimes.  I have reviewed a chart of 36 of the 37   registered firearms for which information was supplied that were recovered  in  the  District between  7/17/2008  and  10/19/2012,  which  I  understand  will  be submitted as an exhibit in this case.  This chart indicates that a considerable proportion of these registered guns were connected only to firearms regulatory offenses (unlawful possession of a firearm, unlawful possession of ammunition, carrying a pistol without a license), which derive from the District's restrictive firearms regulatory regime itself, where the conduct would be legal in most jurisdictions depending on circumstances, and which do not involve traditional crimes such as murder, rape, assault, or other crimes of violence.  In addition, although disposition

information is lacking for many of the entries, there is enough to show that quite a few of the charges were dismissed; that is, there may have been no crime at all.  Further, several of the firearms were recovered in situations where the firearm itself was not even pertinent to the charged offense (e.g., assault on a police officer with elbows; firearm was in a safe).

63.     Webster also endorses the D.C. requirement that registrants take a safety training course, but cites no evidence that existing safety courses have prevented harm (p. 10, Point 31). Instead, he can only cite *recommendations* of various organizations concerning gun storage practices and a methodologically primitive study finding a statistical association between storage practices and self-inflicted and unintentional gun injuries – which did not, however, address the effects of safety training (p. 10, Point 32; Grossman et al. 2005).

64.     Even this study's findings regarding the effect of storage practices on gun injuries were meaningless, as the authors of this study made no serious effort to control for confounding variables – factors affecting gun injuries that are also correlated with gun storage practices. Thus, there was no sound basis for concluding that "safe" storage practices caused lower injury risks.  The practice of keeping guns loaded and unlocked appears to be almost entirely confined to persons who have guns for self-protection, who are disproportionately found in high-crime, low income areas (Kleck 1997, Chapter 9).  The higher injury rates of persons who keep guns loaded and unlocked may therefore be due to the higher rates of risk-taking behavior found in such areas.  Likewise, if persons with more reckless personalities are more likely to keep guns loaded and unlocked, this personality syndrome will itself increase involvement in accidents, even if gun storage practices themselves had no effect of their own.  In any case, this study had no bearing on whether gun safety training reduces gun injury or even affects firearm storage

practices.  The same problems afflicted the Miller et al. (2005) study (cited p. 11, Point 33), which like the Grossman study, had no evidence bearing on the impact of gun safety training.

65.     As it happens, there is strong evidence that laws mandating "safe" storage of guns have no detectable effect on rates of unintentional firearms injury – the type of gun injury most likely to be influenced by such laws.  Child Access Protection (CAP) laws require that guns be stored securely if a young person (typically a person under age 16 or so) might otherwise access them.  The best available evidence indicates that these laws had no effect on gun accidents among youth.  The most extensive study of CAP law impact was done by Hepburn and her colleagues (2006), who studied all 17 states that had enacted CAP laws by the time of their study.  They found no significant impact on unintentional firearm deaths among persons under age 15 in any but two of the states.  One of the two states that experienced significant drops in these kinds of deaths was California, but the authors concluded that since the drops did not occur until five years after the enactment of the CAP law, "it is likely that other factors" besides the CAP law caused the drops (p. 427).  This left Florida as the only state of the first 17 to pass CAP laws that experienced significant drops in fatal gun accidents among young people that might be attributed to the CAP law.  Florida, however, was unique in that it was the first state to pass a CAP law, and its enactment was accompanied by massive publicity about the dangers of keeping guns stored in an unsafe manner.  In light of the absence of any impact in the other 16 CAP states, it is more likely that the Florida drop was due to this massive news media blitz, rather than the enactment or enforcement of the law itself.  Since there could only be one first-in-the-nation CAP law, this publicity-generated impact cannot be expected to accompany subsequent implementations of CAP laws.  Hence, Webster's optimistic assessment was not grounded in the best available evidence, but rather was drawn in contradiction to what that evidence indicated.

But again, it should be stressed that this research has no direct bearing on the issue of the impact one could reasonably expect from gun safety training programs, and thus is irrelevant to the D.C. gun law's requirement of gun safety training.

66.     Finally, Webster cites a 1992 study by Kellermann et al. to support his conclusion that keeping guns locked up prevents suicides (p. 11, Point 34). This study contained no evidence whatsoever that firearms safety training increased the likelihood of gun owners keeping their guns locked up, or that such training discouraged suicide. Nor did it, or any of the other studies cited by Webster, have any evidence on the effects of knowledge about firearms laws. Thus, the Kellermann suicide study has no bearing on the merits of the District of Columbia's requirement that gun owners complete a firearms safety training course or its requirement that gun owners be knowledgeable about its firearms laws.

67.     To summarize, Professor Webster's Declaration is composed almost entirely of references to research, both his own and that of others, that is simply irrelevant to the issues in dispute in this case. *None* of the evidence cited by Webster bears at all on the protection of police officers, while the few studies that purportedly relate to crime control mostly concern matters like the "diversion" of guns and firearms "trafficking." These phenomena could be, at best, only very indirectly related to crime rates or crime control, but Webster does not even document any indirect links. As it happens, the best available evidence, which Webster makes no attempt to rebut, indicates that levels of gun trafficking have no effect on crime rates (Kleck and Wang 2009). Thus, even Webster's evidence on "the diversion of guns to criminals" has no actual relevance to the question of whether D.C.'s gun control measures have any realistic potential for controlling crime in the city. Finally, and most tellingly, Webster is utterly silent on the question of what research has had to say about the impact of gun registration on rates of

crime and violence.  As established in Section 6 of this Declaration, this body of research has uniformly found no detectable impact of gun registration on crime and violence.

### Comments About Defense Witnesses Lanier, Jones, and Vince

68.     The following comments pertain to all three of the remaining defense "expert" witnesses.  None of them are experts on the effectiveness of gun control measures.  The qualifications that are genuinely relevant to evaluating these measures would include formal training in multivariate statistical analysis, including coursework in ordinary least squares regression, logistic regression, two-stage least-squares methods, fixed effects panel designs, and similar statistical techniques.  Likewise, one would need a thorough knowledge of the different kinds of research designs that would allow one to make stronger causal inferences as to the effects of gun laws, to establish causal order (does X cause Y, or does Y cause X?), and to rule out alternative explanations of statistical associations.  This knowledge would enable a genuine expert to both conduct effective research and to distinguish strong research from weak research among other scholars' work, so as to know which studies can be most strongly relied upon in drawing conclusions.  Further, one would need a thorough knowledge of the methods and findings of prior research on this topic, especially of the most methodologically sophisticated research done in the field, to draw conclusions about whether gun control measures have beneficial effects.  The bulk of the more technically sound work has been published in criminological and social science academic journals, so those qualified to assess the effectiveness of gun control and other crime control policies would be able to demonstrate their mastery of the stronger prior research by knowledgably discussing and citing these more advanced research reports.  Neither Cathy Lanier, Joseph Vince, nor Mark Jones show even the most superficial acquaintance with the relevant research in this field, or evince any knowledge of

the methods used in research in the field, or demonstrate any ability to distinguish good research from bad.

**Section 3 - Rebuttal of the Declaration of Cathy Lanier**

69.    Cathy Lanier has undoubted expertise in the administration of a big city police department.  This expertise, however, has no relevance to the factual issues involved in this case. She has never done any research on the effects of firearms restrictions on crime, gun trafficking, officer protection, suicide, or gun accidents, and shows no evidence of being familiar with the body of research done by others.  Her discussion of her qualifications (pp. 2-3) reveals no training in research methods or statistics that would enable her to distinguish methodologically sound research from unsound, unreliable research on these topics.  In general, she simply refers to her law enforcement experience as a foundation for her "professional opinion" that various elements of the new D.C. gun controls will help "secure the Nation's Capitol" (p. 7).

70.    By itself, experience in law enforcement cannot provide expertise on issues like the impact of gun purchase permits, requiring guns to be registered, requiring theft or loss of guns to be reported, or the other factual issues at stake in this case.  It is impossible to directly observe crime-reducing effects of gun control provisions (or any other crime-control policies or practices), either in the course of law enforcement experience or of any other kind of personal experience, for the simple reason that one cannot directly observe crimes or other acts of violence <u>not</u> occurring.  One cannot "observe" X number of crimes not occurring, or know, through personal experience, that these X crimes did not occur because of the presence of a particular policy or practice aimed at reducing crime.  Likewise, knowledge of instances of violence that did occur can tell us nothing, by themselves, about whether the same or similar acts would have occurred in the absence of particular gun control provisions.  These effects can only

be indirectly detected using scientific research methods, and Chief Lanier lacks the training and knowledge that would enable her to either conduct such research herself, or be able to judge the relative technical merits of research done by others.

71.     Lanier's opinions do not rely to any significant degree on research, since she only cites research at two or three points in her Declaration.  Her lack of relevant research expertise is evident regarding one of few times she does cite research evidence.  She cites a study by Douglas Weil, an employee of the Brady Campaign to Prevent Gun Violence, and a colleague to support the claim that "laws restricting the registration or purchase of multiple firearms in a given period are effective in disrupting illegal interstate trafficking of firearms" (p. 6).  Chief Lanier apparently did not realize that this study, contrary to the claims of its authors, did not actually have any measures of interstate trafficking of firearms, and thus could not shed any light on the impact of a one-gun-a-month law on such trafficking.

72.     Lanier describes a number of incidents of gun violence, but does not cite any evidence that any of the incidents would have been prevented had gun control measures like those adopted by D.C. been in place (pp. 4, 6).   She discusses the need to do something about violence, but presents no evidence that D.C.-style measures are among the policies that would reduce violence (pp. 4-5).   Her opinion that "the District's firearms-registration laws significantly aid MPD's effort to prevent crime" etc. (p. 5, Point 16) is a total *non sequitur*- it comes out of nowhere, with no logical connection to any of facts cited elsewhere in her declaration.

73.     Lanier also confuses objectives or goals with actual accomplishments.  She appears to believe that if firearm registration was *intended* to serve various objectives (listed on p. 6, Point 17), then this is basically the same as actually achieving those objectives.  The mere

fact that the designers of D.C.'s gun laws had good intentions is treated as if this is a social good in and of itself.

74.     Lanier states that "individuals who legally register their firearms are much less likely to use those firearms for criminal purposes" (p. 8).   It is clear from context that she believes that (a) registering a gun *causes* individuals to be less likely to use guns for criminal purposes, rather than (b) registration of one's gun is merely an outward indicator of one's law-abiding nature.   She does not cite any supporting evidence or explain how she can distinguish which of these two positions is correct.  She also does not cite any evidence that any significant number of persons willing to "use firearms for criminal purposes" are also willing to register their firearms.  Indeed, she admitted in her deposition that very few criminals in the District register their guns (Lanier 2013, p. 12).  This raises the question, How, then, would registration improve "the safety of police officers and the public"?

75.     Likewise, Lanier does not explain how her department could enforce the requirement that gun registrants report theft or loss of a gun (p. 9, Point 28), given that any violator could simply claim they were unaware of the loss.  More tellingly, she does not cite a single instance of anyone in D.C. being arrested and convicted of violating this requirement, consistent with the hypothesis that this requirement is not actually enforced.

76.     In general, Chief Lanier's Declaration is little more than an evidence-free series of personal opinions that the D.C. gun law is a good thing simply because she can imagine ways in which violence *might be* prevented by its elements.  This is not evidence, expert or otherwise. It is safe to say that one can imagine hypothetical benefits flowing from even the most ineffective or even counterproductive policies.  And merely labeling a guess as a "professional opinion" does not make it any more than opinion.

**Section 4 - Rebuttal of the Declaration of Mark D. Jones**

77.     Although Mark Jones is undoubtedly expert in the enforcement of federal gun control laws, none of the qualifications he lists on pp. 1-3 of his Expert Report qualify him to judge the merits of key elements of the District of Columbia's gun control law or, more specifically, to assess the degree to which they "serve the goals of enhancing public safety and reducing firearm-related crime" (p. 5).  He has never done any research on the effects of firearms restrictions – either those of D.C. or other places - on crime, gun trafficking, officer protection, suicide, or gun accidents, and shows no evidence of being familiar with the considerable body of research done by others.  He also has no training in research methods or statistics that would enable him to distinguish methodologically sound research from unsound research done by others on these topics.  In general, he simply mentions his "experience in law enforcement" (p. 5), and asks the reader to take on faith that this somehow enables him to judge the merits of D.C. gun controls.

78.     By itself, experience in law enforcement cannot provide expertise on issues like the impact of gun purchase permits, requiring guns to be registered, requiring theft or loss of guns to be reported, or the other factual issues at stake in this case.  One cannot directly observe effects of gun control provisions, in connection with law enforcement experience or any other kind of personal experience, since one cannot directly observe, in the course of professional experience, crimes or other acts of violence not occurring.  Likewise, knowledge of instances of violence that do occur can tell us nothing, by themselves, about whether the same or similar acts would have occurred in the absence of particular gun control provisions.  These effects can only be indirectly detected using scientific research methods, such as those used in the research by Kleck and Patterson (1993) or Kleck, Kovandzic, and Bellows (2013).  Mr. Jones lacks the

training and knowledge that would enable him to either conduct such research himself, or be able to judge the relative technical merits of research done by others (such as the research cited in his footnotes 4-6).  His ignorance of the relevant scholarly research is demonstrated by his claim (p. 10) that "academic studies have repeatedly shown that the risk of injury or death by gunshot is dramatically increased in homes with firearms present," as he does not cite which studies support this claim, and appears to be unaware of the doubt that has been cast on studies making this claim (Kleck 2001).  His opinion that safety training would mitigate the risk of injury or death by gunshot is sheer speculation, unsupported by either his own research or that of anyone else.

79.     The same applies to Jones' opinion that requiring gun owners to report the theft or loss of their guns to police will reduce firearms trafficking (p. 11).  He does not even offer any logical reason why traffickers would be impeded if all gun thefts were reported to police.  He offers no evidence that firearms traffickers obtain guns by theft, nor any evidence their activities would be impaired if some "erstwhile gun owners whose weapons have been recovered by the police" no longer could avail themselves of "the most common excuses (loss and theft)" for why their guns were later recovered by police.  Indeed, he does not even explain why gun owners would no longer have that excuse now that D.C. requires the reporting of the theft or loss of guns – any gun owner could still claim that he did not *know* his gun had been stolen or lost, and thus did not know there was anything to report.  Under any reasonably foreseeable circumstances, no prosecutor would be able to prove otherwise.  In this connection, Jones offers no evidence that this sort of legal obligation has ever been effectively enforced in jurisdictions that have previously implemented such a policy.

80.     In general, the arguments Mr. Jones offers are speculative, anecdotal (e.g., pp. 5-6 citation of two individual incidents of violent crime), and unscientific, and can reveal nothing

about the likely consequences of the District's restrictions on guns.  Consequently, the "expert opinions" proffered by Mr. Jones amount to nothing more than personal opinions, unsupported by scientific evidence, and relabeled as "professional opinions."

**Section 5 - Rebuttal of the Declaration of Joseph Vince**

81.     Re. p. 1, "Background and Qualifications," Mr. Vince has undoubted expertise in the enforcement of federal gun control laws, in connection with his employment with the federal Bureau of Alcohol, Tobacco, and Firearms.  This expertise, however, has no relevance to the factual issues involved in this case.  He has never done any research on the effects of firearms restrictions on crime, gun trafficking, officer protection, suicide, or gun accidents, and shows no evidence of being familiar with research done by others.  He also has no training in research methods or statistics that would enable him to distinguish methodologically sound research from unsound, unreliable research on these topics.  He cites not a single scholarly article in support of his views.  In general, he simply mentions his "experience in law enforcement" (p. 3), and asks the reader to take on faith that this somehow enables him to judge the effects of key elements of D.C. gun controls.

82.     By itself, experience in law enforcement cannot provide expertise on issues like the impact of gun purchase permits, requiring guns to be registered, requiring theft or loss of guns to be reported, or the other factual issues at stake in this case.  One cannot directly observe effects of gun control provisions, in connection with law enforcement experience or any other kind of personal experience, since one cannot directly observe crimes or other acts of violence not occurring.  Likewise, knowledge of instances of violence that do occur can tell us nothing, by themselves, about whether the same or similar acts would have occurred in the absence of particular gun control provisions.  These effects can only be indirectly detected using scientific

research methods like those previously cited, and Mr. Vince lacks the training and knowledge that would enable him to either conduct such research himself, or be able to judge the relative technical merits of research done by others.  The arguments and evidence Mr. Vince cites are anecdotal (e.g., pp. 3-4 citations of individual incidents of violent crime) and unscientific, and can reveal nothing about the likely consequences of the District's restrictions on guns.

83.     Consequently, the "expert opinions" proffered by Mr. Vince amount to nothing more than personal opinions, unsupported by scientific evidence.   A prime example is his assertion that the registration of machine guns "has proved highly effective in reducing the use of automatic weapons in crime" and that registration of long guns and hand-guns likewise offer the benefits of "enhanced public safety, violence prevention"  (p. 4).  Leaving aside the merits of this claim, Vince offers no scientific evidence in support, and appears unaware of the extensive evidence that registration of firearms does *not* enhance public safety or prevent violence (Geisel et al. 1969; Magaddino and Medoff  1984; Kleck and Patterson 1993, p. 274; Murray 1975; Langmann 2012).  Likewise, he can only vaguely allude to unnamed "studies" that supposedly showed that restricting purchases of guns to one a month "are highly effective in disrupting illegal interstate trafficking of firearms" (p. 5), and can only cite his "opinion" and unspecified "experience" that somehow indicates that requiring registrants to appear in person prevents "the diversion of firearms for illegal purposes" (p. 5).

84.     Most remarkably, Mr. Vince insists that he has "seen first-hand how failing to notify police agencies of the theft of a weapon has *resulted in* homicides that could have been prevented with proper notification" (p. 7, emphasis added).  He does not bother to cite even a single specific homicide that fits this description, and certainly does not explain how he could know that a given homicide would not have occurred in the absence of a gun owner reporting the

theft of his gun.   He does not even explain the logic that links notification of the theft to homicide avoidance.   Assuming that the identity of a gun thief is usually unknown, how would police knowledge that a gun had been stolen by an unknown person prevent that unknown person (or another person to whom the thief transferred the gun) from committing a homicide?

85.    Likewise, Mr. Vince does not explain why a registration system like that of Michigan or D.C. is necessary for citizens to be "able to properly report the correct description of their stolen firearms" (p. 7).   Any gun owner can easily record the make, model, serial number, and other salient attributes of each of his firearms, store the information in a safe place, and use the information to inform police only if and when the gun is stolen – without the information having been previously provided to police.   Mr. Vince does not explain how registration adds anything in this regard.

86.    In sum, Mr. Vince offers only personal opinions on the key elements of the new D.C. gun control measures – opinions that bear no logical connection with his law enforcement experience, and that do not derive from (and in some cases are in contradiction of) the best available research bearing on those control measures.

**Section 6 - Empirical Evidence on the Impact of Gun Registration on Crime and Violence Rates**

87.    The most conspicuous omission from the District's expert witnesses is that they are utterly silent regarding the extant evidence concerning the impact of gun registration on crime.   This is understandable, since *empirical assessments have unanimously indicated that registration laws have no measurable effect on rates of crime or violence* (Geisel, Roll, and Wettick 1969, p. 676; Murray 1975, p. 88; Magaddino and Medoff 1984, pp. 235-238; Kleck and Patterson 1993, pp. 267-271, 274; Langmann 2012; Kleck, Kovandzic, and Bellows 2013).

Table 1 summarizes all six empirical studies of the impact of gun registration laws on rates of violence that are known to me. Five of the six are studies of U.S. registration laws; the lone Canadian study (Langmann 2012) will be discussed separately.

88.    These studies examined a variety of registration laws, but all of the laws entailed governmental record keeping of the acquisition of firearms. The studies have examined the impact on rates of homicide, robbery, aggravated assault, suicide, fatal gun accidents, and (in just one study, (Kleck and Patterson 1993) rape. Some separately assessed the impacts on rates of violent incidents involving firearms, others examined "total" rates, i.e. gun violence and nongun violence considered together. Each of the studies' methods and findings are summarized below.

89.    Geisel and his colleagues (1969) performed multiple regression analyses of data describing the 50 U.S. states as of 1960, those states as of 1965, and a set of 94 cities of 100,000 population or larger as they were in 1960. They controlled for eight possible confounding variables, and coded the presence of as many as 17 different kinds of gun controls. They measured gun control strictness in two different ways: (1) using a global measure of overall strictness that combined all the separate gun law measures into a single "total index value", and (2) estimating regression equations in which dummy variables separately representing the presence/absence of each kind of gun control were included. The first method can tell us nothing about the effects of any one kind of gun control such as registration. The more useful second type of analysis yielded "no significant or even meaningful results" (p. 676), *i.e.* it found no significant negative associations between any gun control dummy variable, including the one representing laws requiring "government record-keeping by government agencies … of handgun sales," and any crime or violence rate.

90.     Murray (1975) performed a multiple regression analysis of data describing the 50 states as they existed in 1970, controlling for 16 possible confounding variables.  He coded for seven different types of gun control, including whether "handgun sales [are] reported to the police."  His dependent (outcome) variables were rates of firearm homicide, firearm suicide, firearm robbery and firearm aggravated assault.  He found no significant associations between any of the gun laws, including registration of handgun sales, and any of the rates of firearms violence.

91.     Magaddino and Medoff (1984) performed multiple regression analysis on cross-sectional data describing the 50 states as they were in 1960 and as they were in 1970, controlling for nine other possible confounding factors, in addition to the seven types of gun control laws included.  In 42 tests of possible effects of gun laws on violence rates (3 kinds of violence x 2 different years x 7 law types = 42 tests), they did not find a single significant negative association of a state gun law with rates of homicide, robbery, or aggravated assault, in either 1960 or 1970.  More specifically, they found no evidence of any effect of "government record keeping" on any of the three kinds of violent crime.  No further description of this kind of registration was provided.

92.     Kleck and Patterson (1993) used two-stage least-squares procedures to estimate the effects of 19 different types of gun control laws, both at state and city levels, and gun ownership rates on all major forms of crime and violence that involve firearms.  They found no significant effect of laws requiring that a government agency receive records of gun sales and/or possession on rates of total homicide, firearm homicide, total aggravated assault, firearm aggravated assault, total robbery, firearm robbery, rape, fatal gun accidents, total suicide, and firearm suicide.

93.     Kleck, Kovandzic and Bellows (2013) used two-stage least-squares methods to estimate models of violence using data on the largest sample heretofore analyzed to test effects of gun laws on violence - 1,078 U.S. cities with a population of 25,000 or larger.   They simultaneously tested for the effects of 19 different types of gun control laws, enacted at both city and state levels, on rates of total homicide, firearms homicide, total robbery, and total aggravated assault.   They found no evidence of beneficial effects of laws requiring that the transfer or sale of guns must be registered with a governmental agency.   The only possible effect detected was a counterproductive positive effect on robbery rates.   Exhibit K-6.

94.     The results of this body of U.S.-based cross-sectional research are extremely consistent regarding gun registration; indeed, they are unanimous.   Firearms registration laws show no statistically significant violence-reducing effect on any type of violence.   To be specific, gun registration does not appear to have any detectable effect on rates of total homicide, gun homicide, long gun homicide, total robbery, gun robbery, total aggravated assault, gun aggravated assault, rape, total suicides, gun suicides, or fatal gun accidents in the U.S.

95.     There has been only one serious empirical assessment of the impact of Canada's requirement that long guns (rifles and shotguns) be registered.   Langmann (2012) used a variety of time series methods to assess whether there were any favorable changes in the trends of total homicide, firearms homicide, long gun homicide, spousal homicide, or spousal long gun homicide, in the period from 1995, when the long gun registration requirement was enacted as part of the C-68 firearms law, to 2003 when the requirement that all long guns be registered finally went into effect.   Complicating matters further, there was an amnesty announced in 2006 for those who had not yet registered their long guns.   Langmann found no evidence that the law had any beneficial effects, either immediate or lagged, on any of the aforementioned outcome

variables.  Although firearm violence declined in the years following implementation of C-68, it was no greater than would have been expected due to the continuation of trends already underway prior to C-68.

96.     In sum, research indicates that gun registration does not appear to reduce any form of violence.  It is rare for evidence on the impact of crime-control policies to be this consistent, but it is fair to say that the District of Columbia had no basis, rooted in empirical research, to expect any improvement in public safety to be produced by implementing gun registration in the District.  While it is easy enough to imagine a variety of reasons why registration *might* hypothetically reduce crime and violence, there is no foundation based on past experience with actual gun registration systems to expect any measurable decline in crime or violence.

I declare under penalties of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on _December 6_, 2013

_Gary Kleck_
Gary Kleck

# References

Author's unpublished analysis of Inter-university Consortium for Political and Social Research (ICPSR). 2013. Study 4572 - 2004 Survey of Inmates in State and Federal Correctional Facilities. Machine-readable dataset. Ann Arbor, MI: ICPSR.

DeZee, Matthew R. 1983. "Gun control legislation: impact and ideology." *Law and Policy Quarterly* 5:367-379.

Geisel, Martin S., Richard Roll, and R. Stanton Wettick. 1969. "The effectiveness of state and local regulations of handguns." *Duke University Law Journal* 4:647-76.

Grossman, David C., Beth A. Mueller, Christine Riedy, M. Denise Dowd, Andres Villaveces, Janice Prodzinski, Jon Nakagawara, John Howard, Norman Thiersch, and Richard Harruff. 2005. :Gun storage practices and risk of youth suicide and unintentional firearm injuries." *Journal of the American Medical Association* 293(6):707-714.

Hepburn, L., Deborah Azrael, Matthew Miller, and David Hemenway. 2006. "The effect of child access prevention laws on unintentional child firearm fatalities, 1979-2000. *Journal of Trauma* 61:423-428.

Kleck, Gary. 1991. *Point Blank: Guns and Violence in America.* NY: Aldine de Gruyter.

Kleck, Gary. 1997. *Targeting Guns: Firearms and their Control.* NY: Aldine de Gruyter.

Kleck, Gary. 2004. "Measures of gun ownership levels for macro-level crime and violence research." *Journal of Research in Crime and Delinquency* 41(1):3-36.

Kleck, Gary. 2013 "An overview of gun control policy in the United States." Pp. 562-579 in *The Criminal Justice System*, 10th edition, Edited by George F. Cole and Marc G. Gertz. Wadsworth.

Kleck, Gary, and Marc Gertz. 1995. "Armed resistance to crime: the prevalence and nature of self-defense with a gun." *Journal of Criminal Law & Criminology* 86(1):150-187.

Kleck, Gary, and Marc Gertz. 1998. "Carrying guns for protection: results from the National Self-Defense Survey." *Journal of Research in Crime and Delinquency* 35(2):193-224. Kleck, Gary, Tomislav Kovandzic, and Jon Bellows. 2013. "Does Gun Control Reduce Violent Crime?" Unpublished paper. College of Criminology and Criminal Justice, Florida State University, Tallahassee, Florida.

Kleck, Gary, and Don B. Kates. 1997. *The Great American Gun Debate.* San Francisco: Pacific Research Institute.

Kleck, Gary, and Don B. Kates. 2001. *Armed.* Buffalo, NY: Prometheus Books.

Kleck, Gary, Tomislav Kovandzic, and Jon Bellows. 2013. "Does gun control reduce violent crime?" Unpublished paper, College of Criminology and Criminal Justice, Florida State University, Tallahassee, Florida.

Kleck, Gary, and E. Britt Patterson. 1993. "The impact of gun control and gun ownership levels on violence rates." *Journal of Quantitative Criminology* 9:249-288.

Kleck, Gary, and Shun-Yung Wang. 2009. "The myth of big-time gun trafficking and the overinterpretation of gun tracing data." *UCLA Law Review* 56(5):1233-1294.

Kovandzic, Tomislav, Mark E. Schaffer, and Gary Kleck. "Gun prevalence, homicide rates and causality: A GMM approach to endogeneity bias." Chapter 6, pp. 76-92 in *The Sage Handbook of Criminological Research Methods*, edited by David Gadd, Susanne Karstedt, and Steven F. Messner. Thousand Oaks, CA: Sage.

Kovandzic, Tomislav, Mark Schaffer, and Gary Kleck. 2013. "Estimating the causal effect of gun prevalence on homicide rates: A local average treatment effect approach." *Journal*

*of Quantitative Criminology* 28(4): 477-541.

Langmann, Caillin.  2012.  "Canadian firearms legislation and effects on homicide 1974 to 2008."  *Journal of Interpersonal Violence* 27(12):2303-2321.

Lanier, Cathy. 2013.  Deposition of Cathy Lanier, chief of the Washington, D.C. Metropolitan  Police Department, June 12, 2013.

Maddala, G. S. 1992. *Introduction to Econometrics, Second Edition.*  N.Y.: Macmillan.

Magaddino, Joseph P., and Marshall H. Medoff. 1984. "An empirical analysis of federal and state firearm control laws." Pp.225-258 in *Firearms and Violence: Issues of Public Policy*, edited by Don B. Kates, Jr. Cambridge, Mass.: Ballinger.

May, David C. and G. Roger Jarjoura, 2006.  *Illegal Guns In The Wrong Hands.*  Lanham, MD: University Press of America.

Murray, Douglas R. 1975. "Handguns, gun control laws and firearm  violence." *Social Problems* 23:81-92.

National Rifle Association.  2010.  *Compendium of State Laws Governing Firearms 2010.*  Fairfax, VA: NRA Institute for Legislative Action.

Sheley, Joseph and James D. Wright. 1996.  *In The Line of Fire*.  NY: Aldine de Gruyter.

Tark, Jongyeon, and Gary Kleck. 2004. "Resisting crime: the effects of victim action on the outcomes of crimes." *Criminology* 42(4):861-909.

Tark, Jongyeon, and Gary Kleck. 2014. "Resisting rape: the effects of victim self-protection on rape completion and injury." *Violence Against Women* 23(3): (forthcoming March 2014).

U.S. Bureau of Alcohol, Tobacco and Firearms (ATF). 2000.  *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers.*  Washington, D.C.: U.S. Government Printing Office.

U.S. Bureau of Alcohol, Tobacco and Firearms (ATF).  2013. *ATF: District of Columbia.*  http://www.atf.gov/files/statistics/download/trace-data/2011/2011-trace-data-district-of-columbia.pdf.

U.S. Bureau of the Census. 2013a.  2004 Survey of Inmates in State and Federal Correctional Facilities.  Inter-university Consortium for Political and Social Research    (ICPSR).  Study 4572 - Machine-readable dataset.  Ann Arbor, MI: ICPSR.

U.S. Bureau of the Census. 2013b.  "State-to-State Migration Flows Table 2011," available at Census Bureau website, http://www.census.gov/hhes/migration/data/acs/state-to-state.html.

U.S. Bureau of Justice Statistics. 2012.  *Firearms Stolen During Household Burglaries and Other Property Crimes, 2005–2010.*  NCJ 239436.  Washington, D.C.: U.S. Government Printing Office.

U.S. Bureau of Justice Statistics. 2013.  *Background Checks for Firearm Transfer, 2010 – Statistical Tables.*  Available online at http://www.bjs.gov/content/pub/pdf/bcft10st.pdf.

U.S. FBI.  2013. Uniform Crime Reports website at http://www.fbi.gov/stats-services/crimestats.

Webster, Daniel W., Jon S. Vernick, and Maria T. Belzacchelli.  2009.  "Effects of state-level firearm seller accountability policies on firearms trafficking."  *Journal of Urban Health* 86:523-537.

Webster, Daniel W., Jon S. Vernick, and Lisa M. Hepburn.  2001.  The relationship between licensing, registration, and other state gun sales laws and the source state of crime guns.  *Injury Prevention* 7:184-189.

Webster, Daniel W., Jon S. Vernick, Emma E. McGinty, and Ted Alcorn. 2013.  "Preventing the

diversion of guns to criminals through effective firearm sales laws." In *Reducing Gun Violence in America.*  Edited by Daniel W. Webster and Jon S. Vernick.  Baltimore: Johns Hopkins.

Wellford, Charles F., John V. Pepper, and Carol V. Petrie (eds.). 2005. *Firearms and Violence: A Critical Review.*  Washington, D.C.: The National Academies Press.

Wintemute, Garen J., Philip J. Cook, and Mona A. Wright.  2005.  "Risk factors among handgun retailers for frequent and disproportionate sales of guns used in violent and firearm-related crimes.  *Injury Prevention* 11:357-363.

Wooldridge, Jeffrey M. 2009.  *Introductory Econometrics: A Modern Approach.*  Mason, OH: South-Western Cengage Learning.

Wright, James, and Peter H. Rossi. 1986. *Armed and Considered Dangerous.*  N.Y.: Aldine.

**Table 1.  Studies of the Impact of Firearms Registration on Violence Rates**

| Study | Place | Study Period | Type of Registration Evaluated | Violence Rate | Findings |
|---|---|---|---|---|---|
| Geisel et al. (1969) | 50 U.S. states; 129 large cities | 1960, 1965 | "Record keeping by government agencies … of handgun sales" | Total Homicide | No |
| | | | | Firearms Homicide | No |
| | | | | Total Suicide | No |
| | | | | Firearms Suicide | No |
| | | | | Fatal gun accidents | No |
| | | | | Total Agg. Assault | No |
| | | | | Firearms Agg. Assault | No |
| | | | | Total Robbery | No |
| Murray (1975) | 50 U.S. states | 1970 | "Handgun sales reported to police" | Firearms Homicide | No |
| | | | | Firearms Agg. Aslt. | No |
| | | | | Firearms Robbery | No |
| | | | | Firearms Suicide | No |
| Magaddino and Medoff (1984) | 50 U.S. states | 1960 | "Government record keeping" | Total Homicide | No |
| | | | | Total Robbery | No |
| | | | | Total Agg. Assault | No |
| | | 1970 | | Total Homicide | No |
| | | | | Total Robbery | No |
| | | | | Total Agg. Assault | No |

**Table 1.  Studies of the Impact of Firearms Registration on Violence Rates (continued)**

| Study | Place | Study Period | Type of Registration Evaluated | Violence Rate | Findings |
|---|---|---|---|---|---|
| Kleck and Patterson (1993) | 170 large U.S. cities | 1980 | Governmental agency received report of gun sales, possession | Total Homicide | No |
| | | | | Firearm Homicide | No |
| | | | | Total Agg. Assault | No |
| | | | | Firearm Agg. Assault | No |
| | | | | Total robbery | No |
| | | | | Firearm Robbery | No |
| | | | | Rape | No |
| | | | | Fatal Gun Accidents | No |
| | | | | Total Suicide | No |
| | | | | Firearm Suicide | No |
| Langmann (2012) | Canada | 1978-2008 | Bill C-68 – long gun registration, plus other elements | Total Homicide | No |
| | | | | Firearm Homicide | No |
| | | | | Long Gun Homicide | No |
| | | | | Spousal Homicide by Firearm | No |
| | | | | Spousal Homicide By Long Gun | No |
| Kleck et al. (2013) | 1,078 U.S. cities | 1990 | State laws requiring transfer/sale of guns to be registered with government agencies | Total Homicide | No |
| | | | | Firearm Homicide | No |
| | | | | Total Robbery | No |
| | | | | Total Agg. Assault | No |

Kleck Declaration Exhibit K-1

CURRICULUM VITAE

GARY KLECK

(Updated February 15, 2013)

PERSONAL

Place of Birth:            Lombard, Illinois

Date of Birth:            March 2, 1951

Address:                 College of Criminology and Criminal Justice
                         306 Hecht House
                         The Florida State University
                         Tallahassee, Florida 32306-1127

Telephone Numbers:       Office:        (850) 644-7651
                         Office FAX:   (850) 644-9614
                         Home:         (850) 894-1628

e-mail Address:          gkleck@fsu.edu


CURRENT POSITION

   David J. Bordua Professor of Criminology, Florida State University

COURTESY APPOINTMENT

   Professor, College of Law, Florida State University

PROFESSIONAL MEMBERSHIPS

   American Society of Criminology

   Academy of Criminal Justice Sciences

EDUCATION

   A.B.        1973 - University of Illinois, with High Honors and with Distinction in
               Sociology

   A.M.        1975 - University of Illinois at Urbana, in Sociology

   Ph.D.       1979 - University of Illinois at Urbana, in Sociology

ACADEMIC HONORS

National Merit Scholar, 1969

Freshman James Scholar, University of Illinois, 1969

Graduated from University of Illinois with High Honors and with Distinction in Sociology, 1973

University of Illinois Foundation Fellowship in Sociology, 1975-76

1993 Winner of the Michael J. Hindelang Award of the American Society of Criminology, for the book that made "the most outstanding contribution to criminology"  (for Point Blank: Guns and Violence in America).

TEACHING POSITIONS

| Fall, 1991 to present | Professor, College of Criminology and Criminal Justice, Florida State University |
| Fall, 1984 to Spring, 1991 | Associate Professor, School of Criminology, Florida State University. |
| Fall, 1979 to Spring, 1984 | Assistant Professor, School of  Criminology, Florida State University. |
| Fall, 1978 to Spring, 1979 | Instructor, School of Criminology, Florida State University. |

COURSES TAUGHT

Criminology, Applied Statistics, Regression, Introduction to Research Methods, Law Enforcement, Research Methods in Criminology, Guns and Violence, Violence Theory Seminar, Crime Control, Assessing Evidence, Survey Research, Research Design and Causal Inference.

DISSERTATION

Homicide, Capital Punishment, and Gun Ownership:  An Aggregate Analysis of U.S. Homicide Trends from 1947 to 1976.  Department of Sociology, University of Illinois, Urbana.  1979.

PUBLICATIONS (sole author unless otherwise noted)

BOOKS

1991,   Point Blank: Guns and Violence in America.  Hawthorne, N.Y.: Aldine de
2005    Gruyter.  Winner of the 1993 Michael J. Hindelang award of the American
        Society of Criminology.  Republished in 2005 in paperback by Transaction
        Publishers.

                Reviewed in Contemporary Sociology, American Journal of Sociology,
                Social Forces, Journal of Criminal Law and Criminology, The
                Criminologist, The Public Interest, Criminal Law Forum, Social
                Science Review, Criminal Justice Abstracts, Crime, Criminal Justice and
                Law Enforcement, Newsletter of Public Policy Currents, Commonweal,
                Choice, and others.

1997    Targeting Guns: Firearms and their Control. Hawthorne, N.Y.: Aldine de Gruyter.

1997    The Great American Gun Debate: Essays on Firearms and Violence (with Don B.
        Kates, Jr.).  San Francisco: Pacific Research Institute for Public Policy.

2001    (with Don B. Kates) Armed: New Perspectives on Gun Control.  N.Y.:
        Prometheus Books.

        Selected to Choice: Current Reviews for Academic Libraries' 39th annual
        "Outstanding Academic Title List," awarded for "excellence in scholarship and
        presentation, the significance of their contribution to their field, and their value as
        an important treatment of their topic."  Awarded to less than one percent of
        books.

RESEARCH MONOGRAPH

1979    Bordua, David J., Alan J. Lizotte, and Gary Kleck. Patterns of Firearms
        Ownership, Use and Regulation in Illinois.  A Report to the Illinois Law Enforce-
        ment Commission, Springfield, Illinois.

ARTICLES IN PEER-REVIEWED JOURNALS

1979    "Capital punishment, gun ownership, and homicide."  American Journal of
        Sociology 84(4):882-910.

1981    "Racial discrimination in criminal sentencing: A critical evaluation of the
        evidence with additional evidence on the death penalty." American Sociological

4

Review 46(6):783-804.

1982    "On the use of self-report data to determine the class distribution of criminal
        behavior." American Sociological Review 47(3):427-33.

1983    (with David Bordua) "The factual foundation for certain key assumptions of gun
        control."  Law and Policy Quarterly 5(3):271-298.

1985     "Life support for ailing hypotheses:  modes of summarizing the evidence on
        racial discrimination in criminal sentencing."  Law and Human Behavior
        9(3):271-285.

1986     "Policy lessons from recent gun control research." Law and Contemporary
        Problems 49(1):35-62.

1986    "Evidence that 'Saturday Night Specials' not very important for crime."
Sociology
        and Social Research 70(4):303-307.

1987     "American's foreign wars and the legitimation of domestic violence."
        Sociological Inquiry 57(3):237-250.

1988    "Crime control through the private use of armed force."  Social Problems 35(1):1-
        21.

1988    "Miscounting suicides." Suicide and Life-Threatening Behavior 18(3):219-236.

1990    (with Susan Sayles) "Rape and resistance."  Social Problems 37(2):149-162.

1991    (with Karen McElrath) "The effects of weaponry on human violence."  Social
        Forces 69(3):669-92.

1993    (with Miriam DeLone) "Victim resistance and offender weapon effects in
        robbery." Journal of Quantitative Criminology 9(1):55-82.

1993    (with E. Britt Patterson)  "The impact of gun control and gun ownership levels on
         violence rates." Journal of Quantitative Criminology 9(3):249-287.

1993    "Bad data and the 'Evil Empire': interpreting poll data on gun control."  Violence
        and Victims 8(4):367-376.

1995    "Guns and violence: an interpretive review of the field."  Social Pathology
        1(1):12-47.

1995   "Using speculation to meet evidence."  <u>Journal of Quantitative Criminology</u>
       11(4):411-424.

1995   (with Marc Gertz) "Armed resistance to crime: the prevalence and nature of self-
       defense with a gun."   <u>Journal of Criminal Law & Criminology</u> 86(1):150-187.

1996   "Crime, culture conflict and sources of support for gun control: a multi-level
       application of the General Social Surveys." <u>American Behavioral Scientist</u>
       39(4):387-404.

1996   (with Chester Britt III and David J. Bordua) "A reassessment of the D.C. gun law:
       some cautionary notes on the use of interrupted time series designs for policy
       impact assessment." <u>Law & Society Review</u> 30(2):361-380.

1996   (with Chester Britt III and David J. Bordua) "Avoidance and misunderstanding."
       <u>Law & Society Review</u> 30(2):393-397.

1997    (with Marc Gertz) "The illegitimacy of one-sided speculation: getting the
        defensive gun use estimate down."  <u>Journal of Criminal Law and Criminology</u>
        87(4):1446-1461.

1997   (with Tomislav Kovandzic and Marc Gertz) "Defensive gun use: vengeful
       vigilante imagery vs. reality: results from the National Self-Defense Survey."
       <u>Journal of Criminal Justice</u> 26(3):251-258.

1998   (with Marc Gertz) "Carrying guns for protection: results from the National Self-
       Defense Survey." <u>Journal of Research in Crime and Delinquency</u> 35(2):193-224.

1998   "What are the risks and benefits of keeping a gun in the home?"  <u>Journal of the
       American Medical Association</u> 280(5):473-475.

1998   (with Charles Crawford and Ted Chiricos) "Race, racial threat, and sentencing of
       habitual offenders." <u>Criminology</u> 36(3):481-511.

1999   (with Michael Hogan) "A national case-control study of homicide offending and
       gun ownership." <u>Social Problems</u> 46(2):275-293.

1999   "BATF gun trace data and the role of organized gun trafficking in supplying guns
       to criminals."  <u>St. Louis University Public Law Review</u> 18(1):23-45.

2001   "Can owning a gun really triple the owner's chances of being murdered?"
       <u>Homicide Studies</u> 5:64-77.

2002   (with Theodore Chiricos) "Unemployment and property crime: a target-specific

assessment of  opportunity and motivation as mediating factors."
<u>Criminology</u> 40(3):649-680.

2004    "Measures of gun ownership levels for macro-level crime and violence research."
<u>Journal of Research in Crime and Delinquency</u> 41(1):3-36.

2004    (with Jongyeon Tark) "Resisting crime: the effects of victim action on the
outcomes of crimes." <u>Criminology</u> 42(4):861-909.

2005    (with Brion Sever, Spencer Li, and Marc Gertz) "The missing link in general
deterrence research." <u>Criminology</u> 43(3):623-660.

2006    (with Jongyeon Tark and Jon J. Bellows) "What methods are most frequently
used in research in criminology and criminal justice?" <u>Journal of Criminal Justice</u>
34(2):147-152.

2007    "Are police officers more likely to kill African-American suspects?"
<u>Psychological Reports</u> 100(1):31-34.

2007    (with Shun-Yung Wang and Jongyeon Tark) "Article productivity among the
faculty of criminology and criminal justice doctoral programs, 2000-2005."
<u>Journal of Criminal Justice Education</u> 18(3):385-405.

2008    (with Jongyeon Tark, Laura Bedard, and Dominique Roe-Sepowitz) "Crime
victimization and divorce." <u>International Review of Victimology</u> 15(1):1-17.

2009    "The worst possible case for gun control: mass shootings in schools."
<u>American Behavioral Scientist</u> 52(10):1447-1464.

2009    (with Shun-Yung Wang) "The myth of big-time gun trafficking." <u>UCLA Law
Review</u> 56(5):1233-1294.

2009    (with Tomislav Kovandzic)  "City-level characteristics and individual handgun
ownership: effects of collective security and homicide." <u>Journal of Contemporary
Criminal Justice</u> 25(1):45-66.

2009    (with Marc Gertz and Jason Bratton)  "Why do people support gun control?"
<u>Journal of Criminal Justice</u> 37(5):496-504.

2010    (with James C. Barnes)  "Article productivity among the faculty of criminology
and criminal justice doctoral programs, 2005-2009."  <u>Journal of Criminal Justice
Education</u> 22(1):43-66.

2011    (with Tomislav Kovandzic, Mark Saber, and Will Hauser).  "The effect of

perceived risk and victimization on plans to purchase a gun for self-protection." <u>Journal of Criminal Justice</u> 39(4):312-319.

2013    (with James C. Barnes)  "Deterrence and macro-level perceptions of punishment risks: is there a "collective wisdom?"  <u>Crime and Delinquency</u> 59(2): (forthcoming, April 2013).

2013    (with Tomislav Kovandzic and Mark Schaffer) "Estimating the causal effect of gun prevalence on homicide rates: A local average treatment effect approach." <u>Journal of Quantitative Criminology</u> 28(4): (forthcoming c. September 2013).

2013    "Gun control after Heller and McDonald: what cannot be done and what ought to be done." <u>Fordham Law Review</u> (forthcoming).

2013    (with Jongyeon Tark) "Resisting rape: the effects of victim self-protection on rape completion and injury." <u>Violence Against Women</u> (forthcoming).

2014    (with James C. Barnes)  "Do more police generate more crime deterrence?" <u>Crime and Delinquency</u> 59(4): (forthcoming c. January 2014).

2014    (with Will Hauser) "Guns and fear: A one-way street?"  <u>Crime and Delinquency</u>.


OTHER PUBLISHED ARTICLES

1992    "Assault weapons aren't the problem."  <u>New York Times</u> September 1, 1992, p. A15.  Invited Op-Ed page article.

1993    "The incidence of violence among young people." <u>The Public Perspective</u> 4:3-6. Invited article.

1994    "Guns and self-protection." <u>Journal of the Medical Association of Georgia</u> 83:42. Invited editorial.

1998    "Using speculation to meet evidence: reply to Alba and Messner." <u>Journal on Firearms and Public Policy</u> 9:13-49.

1998    "Has the gun deterrence hypothesis been discredited?" <u>Journal on Firearms and Public Policy</u> 10:65-75.

1999    "There are no lessons to be learned from Littleton." <u>Criminal Justice Ethics</u> 18(1):2, 61-63.  Invited commentary.

1999   "Risks and benefits of gun ownership - reply."  <u>Journal of the American Medical Association</u> 282(2):136-136.

1999   "The misfire that wounded Colt's."  <u>New York Times</u> October 23, 1999.  Invited Op-Ed page article.

1999   "Degrading scientific standards to get the defensive gun use estimate down."  <u>Journal on Firearms and Public Policy</u> 11:77-137.

2000   "Guns aren't ready to be smart."  <u>New York Times</u> March 11, 2000.  Invited Op-Ed page article.

2000   (with Chester Britt III and David J. Bordua) "The emperor has no clothes: Using interrupted time series designs to evaluate social policy impact."  <u>Journal on Firearms and Public Policy</u> 12:197-247.

2001   "School lesson: armed self-defense works."  <u>Wall Street Journal</u> March 27, 2001.  Invited opinion article.

2001    "Impossible policy evaluations and impossible conclusions: a comment on Koper and Roth."  <u>Journal of Quantitative Criminology</u> 17(1):75-80.

2001   "Absolutist politics in a moderate package: prohibitionist intentions of the gun control movement."  <u>Journal on Firearms and Public Policy</u> 13:1-43.

2002   "Research agenda on guns, violence, and gun control."  <u>Journal on Firearms and Public Policy</u> 14:51-72.

2006   "Off target."  <u>New York Sun</u> January 5, 2006.  Invited opinion article.

2009   "How not to study the effect of gun levels on violence rates."  <u>Journal on Firearms</u> and Public Policy 21:65-93.

2011   "Mass killings aren't the real gun problem --- how to tailor gun-control measures to common crimes, not aberrant catastrophes."  <u>Wall Street Journal</u> January 15, 2011.  Invited opinion article.

2011   "The myth of big-time gun trafficking."  <u>Wall Street Journal</u> May 21, 2011.  Invited opinion article.

## BOOK CHAPTERS

1984   (with David Bordua) "The assumptions of gun control."  Pp. 23-48 in

Don B. Kates, Jr. (ed.) <u>Firearms and Violence: Issues of Regulation</u>. Cambridge, Mass.: Ballinger.

(Also appeared in <u>Federal Regulation of Firearms</u>, report prepared by the Congressional Research Service, Library of Congress, for the Committee on the Judiciary, United States Senate, 1982).

1984    "The relationship between gun ownership levels and rates of violence in the U.S." Pp. 99-135 in Kates, above.

1984    "Handgun-only gun control: a policy disaster in the making."  Pp. 167-199 in Kates, above.

1996    "Racial discrimination in criminal sentencing."  Pp. 339-344 in <u>Crime and Society</u>, Volume III – Readings: Criminal Justice, edited by George Bridges, Robert D. Crutchfield, and Joseph G. Weis.  Thousand Oaks, Calif.: Pine Forge Press.

1996    "Gun buy-back programs: nothing succeeds like failure."  Pp. 29-53 in <u>Under Fire:</u> <u>Gun Buy-Backs, Exchanges and Amnesty Programs</u>, edited by Martha R. Plotkin. Washington, D.C.: Police Executive Research Forum.

2000    "Firearms and crime."  Pp. 230-234 in the <u>Encyclopedia of Criminology and Deviant Behavior</u>, edited by Clifton D. Bryant.  Philadelphia: Taylor & Francis, Inc.

2001    (with Leroy Gould and Marc Gertz) "Crime as social interaction."  Pp. 101-114 in <u>What is Crime?: Controversy over the Nature of Crime and What to Do About It</u>, edited by Stuart Henry and Mark M. Lanier.  Lanham, Md.: Rowman and Littlefield.

2003    "Constricted rationality and the limits of general deterrence."  Chapter 13 in <u>Punishment and Social Control: Enlarged Second Edition</u>, edited by Thomas G. Blomberg.  New York: Aldine de Gruyter.

2004    "The great American gun debate: what research has to say."  Pp. 470-487 in <u>The Criminal Justice System: Politics and Policies</u>, 9th edition, edited by George F. Cole, Marc Gertz, and Amy Bunger.  Belmont, CA: Wadsworth-Thomson.

2008    "Gun control." Article in <u>The Encyclopedia of Social Problems</u>, edited by Vincent N. Parrillo. Thousand Oaks, CA: Sage.

2009    "Guns and crime." Invited chapter.  Pp. 85-92 in <u>21st Century Criminology: A</u>

<u>Reference Handbook</u>, edited by J. Mitchell Miller. Thousand Oaks, CA: Sage.

2012    Kovandzic, Tomislav, Mark E. Schaffer, and Gary Kleck. "Gun prevalence, homicide rates and causality: A GMM approach to endogeneity bias."  Chapter 6, pp. 76-92 in <u>The Sage Handbook of Criminological Research Methods</u>, edited by David Gadd, Susanne Karstedt, and  Steven F. Messner.  Thousand Oaks, CA: Sage.

2012    "The Great American Gun Debate: What Research Has to Say."  Chapter in <u>The Criminal Justice System</u>, 10th edition, Edited by George F. Cole and Marc G. Gertz. Wadsworth.

2012    (with Kelly Roberts) "What survey modes are most effective in eliciting self-reports of criminal or delinquent behavior?"  Chapter in <u>Handbook of Survey Methodology</u>, edited by Lior Gideon.  NY: Springer.

2013    "Deterrence: actual vs. perceived risk of punishment.  Article in <u>Encyclopedia of Criminology and Criminal Justice</u>. Berlin: Springer Verlag.


BOOK REVIEWS

1978    Review of <u>Murder in Space City: A Cultural Analysis of Houston Homicide Patterns,</u> by Henry Lundsgaarde.  <u>Contemporary Sociology</u> 7:291-293.

1984    Review of <u>Under the Gun</u>, by James Wright et al. <u>Contemporary Sociology</u> 13:294-296.

1984    Review of <u>Social Control</u>, ed. by Jack Gibbs.  <u>Social Forces</u> 63: 579-581.

1988     Review of <u>Armed and Considered Dangerous</u>, by James Wright and Peter Rossi, <u>Social Forces</u> 66:1139-1140.

1988     Review of <u>The Citizen's Guide to Gun Control</u>, by Franklin Zimring and Gordon Hawkins, <u>Contemporary Sociology</u> 17:363-364.

1989    Review of <u>Sociological Justice</u>, by Donald Black, <u>Contemporary Sociology</u> 19:261-3.

1991    Review of <u>Equal Justice and the Death Penalty</u>, by David C. Baldus, George G. Woodworth, and Charles A. Pulaski, Jr.  <u>Contemporary Sociology</u> 20:598-9.

1999     Review of <u>Crime is Not the Problem</u>, by Franklin E. Zimring and Gordon Hawkins.  <u>American Journal of Sociology</u> 104(5):1543-1544.

2001    Review of <u>Gun Violence: the Real Costs</u>, by Philip J. Cook and Jens Ludwig. <u>Criminal Law Bulletin</u> 37(5):544-547.

2010    Review of  <u>Homicide and Gun Control: The Brady Handgun Violence Prevention Act and Homicide Rates</u>, by J. D. Monroe. <u>Criminal Justice Review</u> 35(1):118-120.


## LETTERS PUBLISHED IN SCHOLARLY JOURNALS

1987    "Accidental firearm fatalities."  <u>American Journal of Public Health</u> 77:513.

1992    "Suicide in the home in relation to gun ownership." <u>The New England Journal of Medicine</u> 327:1878.

1993    "Gun ownership and crime."  <u>Canadian Medical Association Journal</u> 149:1773-1774.

1999    "Risks and benefits of gun ownership."  <u>Journal of the American Medical Association</u> 282:136.

2000    (with Thomas Marvell) "Impact of the Brady Act on homicide and suicide rates."

        <u>Journal of the American Medical Association</u> 284:2718-2719.

2001    "Violence, drugs, guns (and Switzerland)."  <u>Scientific American</u> 284(2):12.

2002    "Doubts about undercounts of gun accident deaths." <u>Injury Prevention Online</u> (September 19, 2002). Published online at <u>http://ip.bmjjournals.com/cgi/eletters</u> /8/3/252.

2005    "Firearms, violence, and self-protection." <u>Science</u> 309:1674. September 9, 2005.

## UNPUBLISHED REPORT

1987    <u>Violence, Fear, and Guns at Florida State University: A Report to the President's Committee on Student Safety and Welfare</u>. Reports results of campus crime victimization survey and review of campus police statistics on gun violence (32 pages).

## RESEARCH FUNDING

1994    "The Impact of Drug Enforcement on Urban Drug Use Levels and Crime Rates."

$9,500 awarded by the U.S. Sentencing Commission.

1997    "Testing a Fundamental Assumption of Deterrence-Based Crime Control Policy."
        $80,590 awarded by the Charles E. Culpeper Foundation to study the link
        between actual and perceived punishment levels.

## PRESENTED PAPERS

1976    "Firearms, homicide, and the death penalty:  a simultaneous equations analysis."
        Presented at the annual meetings of the Illinois Sociological Association,
Chicago.

1979    "The assumptions of gun control."  Presented at the Annual Meetings of the
        American Sociological Association, New York City.

1980    "Handgun-only gun control:  A policy disaster in the making."  Presented at the
        Annual Meetings of the American Society of Criminology, Washington, D.C.

1981    "Life support for ailing hypotheses:  Modes of summarizing the evidence on
        racial
        discrimination."  Presented at the Annual Meetings of the American Society of
        Criminology, Toronto.

1984    "Policy lessons from recent gun control research."  Presented at the Duke
        University Law School Conference on Gun Control.

1985    "Policy lessons from recent gun control research." Presented at the Annual
        Meetings of the American Society of Criminology, San Diego.

1986    "Miscounting suicides."  Presented at the Annual Meetings of the American
        Sociological Association, Chicago.

1987    (with Theodore G. Chiricos, Michael Hays, and Laura Myers) "Unemployment
        and crime: a comparison of motivation and opportunity effects."  Annual
        meetings of the American Society of Criminology, Montreal.

1988    "Suicide, guns and gun control."  Presented at the Annual Meetings of the Popular
        Culture Association, New Orleans.

1988    (with Susan Sayles)  "Rape and resistance."  Presented at the Annual Meetings of
        the American Society of Criminology, Chicago, Ill.

1989    (with Karen McElrath)  "The impact of weaponry on human violence."
        Presented at the Annual Meetings of the American Sociological Association, San

Francisco.

1989    (with Britt Patterson)  "The impact of gun control and gun ownership levels on
        city violence rates."  Presented at the Annual Meetings of the American Society
        of Criminology, Reno.

1990    "Guns and violence: a summary of the field."  Presented at the Annual Meetings
        of the American Political Science Association, Washington, D.C.

1991    "Interrupted time series designs: time for a re-evaluation."  Presented at the
        Annual Meetings of the American Society of Criminology, New Orleans.

1993    (with Chester Britt III and David J. Bordua) "The emperor has no clothes: Using
        interrupted time series designs to evaluate social policy impact." Presented at the
        Annual Meetings of the American Society of Criminology, Phoenix.

1992    "Crime, culture conflict and support for gun laws: a multi-level application of the
        General Social Surveys."  Presented at the Annual Meetings of the
        American Society of Criminology, Phoenix.

1994    (with Marc Gertz) "Armed resistance to crime: the prevalence and nature of self-
        defense with a gun."   Presented at the Annual Meetings of the American Society
        of Criminology, Miami.

1995    (with Tom Jordan) "The impact of drug enforcement and penalty levels on urban
        drug use levels and crime rates."  Presented at the Annual Meetings of
        the American Society of Criminology, Boston.

1996    (with Michael Hogan) "A national case-control study of homicide offending and
        gun ownership." Presented at the Annual Meetings of the American Society of
        Criminology, Chicago.

1997    "Evaluating the Brady Act and increasing the utility of BATF tracing data."
        Presented at the annual meetings of the Homicide Research Working Group,
        Shepherdstown, West Virginia.

1997    "Crime, collective security, and gun ownership: a multi-level application of the
        General Social Surveys."  Presented at the Annual Meetings of the American
        Society of Criminology, San Diego.

1998    (with Brion Sever and Marc Gertz) "Testing a fundamental assumption of
        deterrence-based crime control policy."  Presented at the Annual Meetings of the
        American Society of Criminology, Washington, D.C.

1998    "Measuring macro-level gun ownership levels." Presented at the Annual Meetings of the American Society of Criminology, Washington, D.C.

1999    "Can owning a gun really triple the owner's chances of being murdered?" Presented at the Annual Meetings of the American Society of Criminology, Toronto.

2000    "Absolutist politics in a moderate package: prohibitionist intentions of the gun control movement."  Presented at the Annual Meetings of the American Society of Criminology, San Francisco.

2001    (with Tomislav V. Kovandzic) "The impact of gun laws and gun levels on crime rates."  Presented at the Annual Meetings of the American Society of Criminology, Atlanta.

2001    "Measures of gun ownership levels for macro-level violence research."  Presented at the Annual Meetings of the American Society of Criminology, Atlanta.

2001    "The effects of gun ownership levels and gun control laws on urban crime rates." Presented at the Annual Meetings of the American Society of Criminology, Chicago.

2003    (with Tomislav V. Kovandzic) "The effect of gun levels on violence rates depends on who has them." Presented at the Annual Meetings of the American Society of Criminology, Denver.

2003    (with KyuBeom Choi) "Filling in the gap in the causal link of deterrence." Presented at the Annual Meetings of the American Society of Criminology, Denver.

2004    (with Tomislav Kovandzic) "Do violent crime rates and police strength levels in the community influence whether individuals own guns?"  Presented at the Annual Meetings of the American Society of Criminology, Nashville.

2004    (with Jongyeon Tark) "Resisting crime: the effects of victim action on the outcomes of crime."  Presented at the Annual Meetings of the American Society of Criminology, Nashville.

2004    (with Jongyeon Tark) "The impact of self-protection on rape completion and injury."  Presented at the Annual Meetings of the American Society of Criminology, Nashville.

2004    (with Kyubeom Choi) "The perceptual gap phenomenon and deterrence as psychological coercion." Presented at the Annual Meetings of the American

Society of Criminology, Nashville.

2005    (with Jongyeon Tark) "Who resists crime?" Presented at the Annual Meetings of the American Society of Criminology, Toronto.

2005    (with Jongyeon Tark and Laura Bedard) "Crime and marriage."  Presented at the Annual Meetings of the American Society of Criminology, Toronto.

2006    (with Shun-Yang Kevin Wang)"Organized gun trafficking, 'crime guns,' and crime rates."  Presented at the Annual Meetings of the American Society of Criminology, Los Angeles.

2006    "Are police officers more likely to kill black suspects?"  Presented at the Annual Meetings of the American Society of Criminology, Los Angeles.

2007    (with Shun-Yang Kevin Wang) "The myth of big-time gun trafficking. "Presented at the Annual Meetings of the American Society of Criminology, Atlanta.

2007    (with Marc Gertz and Jason Bratton)  "Why do people support gun control?" Presented at the Annual Meetings of the American Society of Criminology, Atlanta.

2008    (with J.C. Barnes)  "Deterrence and macro-level perceptions of punishment risks: Is there a "collective wisdom?"  Presented at the Annual Meetings of the American Society of Criminology,  St. Louis.

2009    "The myth of big-time gun trafficking."  Presented at UCLA Law Review Symposium, "The Second Amendment and the Right to Bear Arms After DC v. Heller."  January 23, 2009, Los Angeles.

2009    (with Shun-Yung Wang) "Employment and crime and delinquency of working youth: A longitudinal study of youth employment."  Presented at the Annual Meetings of the American Society of Criminology, November 6, 2009, Philadelphia, PA.

2009    (with J. C. Barnes)  "Do more police generate more deterrence?"  Presented at the Annual Meetings of the American Society of Criminology, November 4, 2009, Philadelphia, PA.

2010    (with J. C. Barnes) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2005-2009."  Presented at the annual Meetings of the American Society of Criminology, November 18, 2010, San Francisco, CA.

2010   (with Will Hauser) "Fear of crime and gun ownership."  Presented at the annual
       Meetings of the American Society of Criminology, November 18, 2010, San
       Francisco, CA.

2010   "Errors in survey estimates of defensive gun use frequency: results from national
       Internet survey experiments."  Presented at the annual Meetings
       of the American Society of Criminology, November 19, 2010, San Francisco, CA.

2010   (with Mark Faber and Tomislav Kovandzic)  "Perceived risk, criminal
       victimization, and prospective gun ownership."  Presented at the annual Meetings
       of the American Society of Criminology, November 19, 2010, San Francisco, CA.

2011   (with Shun-young Wang) "The impact of job quality and career commitment on
       delinquency: conditional or universal?"  Presented at the annual Meetings
       of the American Society of Criminology, November 17, 2011.

2011   (with Moonki Hong) "The short-term deterrent effect of executions on homicides
       in the United States, 1984-1998."  Presented at the annual Meetings
       of the American Society of Criminology, November 16, 2011.

2011   (with Kelly Roberts)  "Which survey modes are most effective in getting people
       to admit illegal behaviors?"  Presented at the annual Meetings of the American
       Society of Criminology, November 17, 2011.

2011   (with Will Hauser)  "Pick on someone your own size: do health, fitness, and size
       influence victim selection?" Presented at the annual Meetings
       of the American Society of Criminology, November 18, 2011.

2011   (with Tomislav Kovandzic) "Is the macro-level crime/punishment association
       spurious?"  Presented at the annual Meetings of the American Society of
       Criminology, November 18, 2011.

2012   (with Dylan Jackson) "Adult unemployment and serious property crime: a
       national case-control study."  Presented at the annual Meetings of the American
       Society of Criminology, November 15, 2012.

## CHAIR

1983   Chair, session on Race and Crime.  Annual meetings of the American Society of
       Criminology, Denver.

1989   Co-chair (with Merry Morash), roundtable session on problems in analyzing the
       National Crime Surveys.  Annual meetings of the American Society of
       Criminology, Reno.

1993    Chair, session on Interrupted Time Series Designs. Annual meetings of the American Society of Criminology, New Orleans.

1993    Chair, session on Guns, Gun Control, and Violence. Annual meetings of the American Society of Criminology, Phoenix.

1994    Chair, session on International Drug Enforcement. Annual meetings of the American Society of Criminology, Boston.

1999    Chair, Author-Meets-Critics session, More Guns, Less Crime.  Annual meetings of the American Society of Criminology, Toronto.

2000    Chair, session on Defensive Weapon and Gun Use.  Annual Meetings of the American Society of Criminology, San Francisco.

2002    Chair, session on the Causes of Gun Crime. Annual meetings of the American Society of Criminology, Chicago.

2004    Chair, session on Protecting the Victim.  Annual meetings of the American Society of Criminology, Nashville.

DISCUSSANT

1981    Session on Gun Control Legislation, Annual Meetings of the American Society of Criminology, Washington, D.C.

1984    Session on Criminal Sentencing, Annual Meetings of the American Society of Criminology, Cincinnati.

1986    Session on Sentencing, Annual Meetings of the American Society of Criminology, Atlanta.

1988    Session on Gun Ownership and Self-protection, Annual Meetings of the Popular Culture Association, Montreal.

1991    Session on Gun Control, Annual Meetings of the American Statistical Association, Atlanta, Ga.

1995    Session on International Drug Enforcement, Annual Meetings of the American Society of Criminology, Boston.

2000    Session on Defensive Weapon and Gun Use, Annual Meetings of the American Society of Criminology, San Francisco.

2004    Author-Meets-Critic session on Guns, Violence, and Identity Among African-American and Latino Youth, by Deanna Wilkinson.  Annual meetings of the American Society of Criminology, Nashville.

2007    Session on Deterrence and Perceptions, University of Maryland 2007 Crime & Population Dynamics Summer Workshop, Aspen Wye River Center,
Queenstown.
        MD, June 4, 2007.

2009    Session on Guns and Crime, at the DeVoe Moore Center Symposium On The Economics of Crime, March 26-28, 2009.


PROFESSIONAL SERVICE

        Editorial consultant -
                American Sociological Review
                American Journal of Sociology
                Social Forces
                Social Problems
                Law and Society Review
                Journal of Research in Crime and Delinquency
                Social Science Research
                Criminology
                Journal of Quantitative Criminology
                Justice Quarterly
                Journal of Criminal Justice
                Violence and Victims
                Violence Against Women
                Journal of the American Medical Association
                New England Journal of Medicine
                American Journal of Public Health
                Journal of Homicide Studies

Grants consultant, National Science Foundation, Sociology Program.

Member, Gene LeCarte Student Paper Committee, American Society of Criminology, 1990.

Area Chair, Methods Area, American Society of Criminology, annual meetings in Miami, November, 1994.

Division Chair, Guns Division, American Society of  Criminology, annual meetings in

Washington, D.C., November, 1998.

Dissertation evaluator, University of Capetown, Union of South Africa, 1998.

Division Chair, Guns Division, American Society of Criminology, annual meetings in Washington, D.C., November, 1999.

Member of Academy of Criminal Justice Sciences selection committee for Editor of Justice Quarterly, 2007.

## UNIVERSITY SERVICE

Member, Master's Comprehensive Examination Committee, School of Criminology, 1979-1982.

Faculty Advisor, Lambda Alpha Epsilon (FSU chapter of American Criminal Justice Association), 1980-1988.

Faculty Senate Member, 1984-1992.

Carried out campus crime survey for President's Committee on Student Safety and Welfare, 1986.

Member, Strategic Planning and Budgeting Review Committee for Institute for Science and Public Affairs, and Departments of Physics and Economics, 1986.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology, Summer, 1986.

Member, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology, Summer, 1986 to present.

Chair, Committee on Graduate Assistantships, School of Criminology, Spring, 1987.

Chair, Ad Hoc Committee on Computers, School of Criminology,  Fall, 1987.

Member, Recruitment Committee, School of Criminology,  Spring, 1988; Spring, 1989; and 1989-90 academic year.

Member, Faculty Senate Committee on Computer-Related Curriculum, Spring, 1988 to Fall, 1989.

Chair, Ad Hoc Committee on Merit Salary Distribution, School of Criminology, Spring, 1988.

Chair, Ad Hoc Committee on Enrollment Strains, Spring, 1989.

Member, Graduate Handbook Committee, School of Criminology,  Spring, 1990.

Member, Internal Advisement Committee, School of Criminology Spring, 1990.

University Commencement Marshall, 1990 to 1993.

Member, School of Criminology and Criminal Justice Teaching Incentive Program award committee.

Chair, Faculty Recruitment Committee, School of Criminology and Criminal Justice, 1994-1995.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology and Criminal Justice, 1994-1995.

Member, University Computer and Information Resources  Committee, 1995-1998.

Member, University Fellowship Committee, 1995 to present.

Member, University Library Committee, 1996 to 1999.

Chair, Electronic Access Subcommittee, University Library Committee, 1998 to 1999.

Member, Ad Hoc Committee on Merit Salary Increase Allocation, School of Criminology and Criminal Justice, 1998-1999.

Member, Academic Committee, School of Criminology and Criminal Justice, 2000-present.

Member, Recruiting Committee, School of Criminology and Criminal Justice, 2000-2001.

Member, Promotion and Tenure Committee, School of Criminology and Criminal Justice, 2000-present.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology and Criminal Justice, 2000-2002.

Chair, Promotion and Tenure Committee, School of Criminology and Criminal Justice, 2001-2002.

Faculty Adviser, School of Criminology and Criminal Justice Graduate Student Association, 2001-present.

Member, ad hoc committee on survey research, School of Criminology and Criminal Justice, 2002.

Coordinator of Parts 2 and 4 of the School of Criminology and Criminal Justice Unit Review, 2002.

Chair, Academic Committee, School of Criminology and Criminal Justice, 2002-2003.

Director, Honors Programs, School of Criminology and Criminal Justice, 2002-present.

Member, University Promotion and Tenure Committee, Fall, 2003 to present.

Member of University Graduate Policy Committee, Fall 2003 to present.

Director of Graduate Studies, School (later College) of Criminology and Criminal Justice, April 2004 to May 2011.

Chair, Promotion and Tenure Committee, College of Criminology and Criminal Justice, 2005-2006


PUBLIC SERVICE

Television, radio, newspaper, magazine, and Internet interviews concerning gun control, racial bias in sentencing, crime statistics, and the death penalty.  Interviews and other kinds of news media contacts include Newsweek, Time, U.S. News and World Report, New York Times, Washington Post, Chicago Tribune, Los Angeles Times, USA Today, Boston Globe, Wall Street Journal, Kansas City Star, Philadelphia Inquirer, Philadelphia News, Atlanta Constitution, Atlanta Journal, Arizona Republican, San Antonio Express-News, Dallas Morning News, Miami Herald, Tampa Tribune, Jacksonville Times-Union, Womens' Day,   Harper's Bazaar, Playboy, CBS-TV (60 Minutes; Street Stories) ABC-TV (World News Tonight; Nightline), NBC-TV (Nightly News), Cable News Network, Canadian Broadcasting Company, National Public Radio, Huffington Post, PolitiFact.com, and many others.

Resource person, Subcommittee on Crime and Justice, (Florida House) Speaker's Advisory Committee on the Future,  February 6-7, 1986, Florida State Capitol.

Testimony before the U.S. Congress, House Select Committee on Children, Youth and Families, June 15, 1989.

Discussant, National Research Council/National Academy of Sciences Symposium on the Understanding and Control of Violent Behavior, April 1-4, 1990, Destin, Florida.

Colloquium on manipulation of statistics relevant to public policy, Statistics Department, Florida State University, October, 1992.

Speech to faculty, students, and alumni at Silver Anniversary of Northeastern University College of  Criminal Justice, May 15, 1993.

Speech to faculty and students at Department of Sociology, University of New Mexico, October, 1993.

Speech on the impact of gun control laws, annual meetings of the Justice Research and Statistics Association, October, 1993, Albuquerque, New Mexico.

Testimony before the Hawaii House Judiciary Committee, Honolulu, Hawaii, March 12, 1994.

Briefing of the National Executive Institute, FBI Academy,         Quantico, Virginia, March 18, 1994.

Delivered the annual Nettler Lecture at the University of Alberta, Edmonton, Canada, March 21, 1994.

Member, Drugs-Violence Task Force, U.S. Sentencing  Commission, 1994-1996.

Testimony before the Pennsylvania Senate Select Committee to Investigate the Use of Automatic and Semiautomatic Firearms, Pittsburgh, Pennsylvania, August 16, 1994.

Delivered lectures in the annual Provost's Lecture Series, Bloomsburg University, Bloomsburg, Pa., September 19, 1994.

Briefing of the National Executive Institute, FBI Academy,         Quantico, Virginia, June 29,
1995.

Speech to personnel in research branches of crime-related State of Florida agencies, Research and Statistics Conference, sponsored by the Office of the State Courts Administrator, October 19, 1995.

Speech to the Third Annual Legislative Workshop, sponsored by the James Madison Institute and the Foundation for Florida's Future, February 5, 1998.

Speech at the Florida Department of Law Enforcement on the state's criminal justice

research agenda, December, 1998.

Briefing on news media coverage of guns and violence issues, to the Criminal Justice Journalists organization, at the American Society of Criminology annual meetings in Washington, D.C., November 12, 1998.

Briefing on gun control strategies to the Rand Corporation conference on "Effective Strategies for Reducing Gun Violence,"  Santa Monica, Calif., January 21, 2000.

Speech on deterrence to the faculty of the Florida State University School of Law, February 10, 2000.

Invited address on links between guns and violence to the National Research Council Committee on Improving Research Information and Data on Firearms, November 15-16, 2001, Irvine, California.

Invited address on research on guns and self-defense to the National Research Council Committee on Improving Research Information and Data on Firearms, January 15-16, 2001, Washington, D.C.

Invited address on gun control, Northern Illinois University, April 19, 2002.

Invited address to the faculty of the School of Public Health, University of Alabama, Birmingham, 2004.

Invited address to the faculty of the School of Public Health, University of Pennsylvania, March 5, 2004.

Member of Justice Quarterly Editor Selection Committee, Academy of Criminal Justice Sciences, Spring 2007

Testified before the Gubernatorial Task Force for University Campus Safety, Tallahassee, Florida, May 3, 2007.

Gave public address, "Guns & Violence: Good Guys vs. Bad Guys," Western Carolina University, Cullowhee, North Carolina, March 5, 2012.

Invited panelist, Fordham Law School Symposium, "Gun Control and the Second Amendment,"   New York City, March 9, 2012.

Invited panelist, "Covering High-Profile Court Cases: Controversial Laws (Stand Your Ground – with a focus on the Trayvon Martin case),"  2012 Reporters' Workshop, sponsored by the Florida Bar Association.  Florida Supreme Court Building, Tallahassee, FL, September 25, 2012.

OTHER ITEMS
    Listed in:
        Marquis Who's Who, 2009
        Marquis Who's Who in the South and Southwest, 25th edition
        Who's Who of Emerging Leaders in America, 1st edition
        Contemporary Authors
        Directory of American Scholars, 10th edition, 2002
        Writer's Directory, 20th edition, 2004.

Participant in First National Workshop on the National Crime Survey, College Park, Maryland, July, 1987, co-sponsored by the Bureau of Justice Statistics and the American Statistical Association.

Participant in Second National Workshop on the National Crime Survey, Washington, D.C., July, 1988.

Participant, Seton Hall Law School Conference on Gun Control, March 3, 1989.

Debater in Intelligence Squared program, on the proposition "Guns Reduce Crime." Rockefeller University, New York City, October 28, 2008.  Podcast distributed through National Public Radio.  Further details are available at
 http://www.intelligencesquaredus.org/Event.aspx?Event=36.

Subject of cover story, "America Armed," in Florida State University Research in Review, Winter/Spring 2009.

Grants reviewer, Social Sciences and Humanities Research Council of Canada, 2010.

Kleck Declaration Exhibit
K-2

**Kleck – Analysis of Survey of 2004 Survey of Inmates in State and Federal Correctional Facilities**

```
[DataSet5] F:\SPSSWIN\SISFC2004-Pt1.sav
USE ALL.
COMPUTE filter_$=(v1073 = 01).
VARIABLE LABELS filter_$ 'v1073 = 01 (FILTER)'.
VALUE LABELS filter_$ 0 'Not Selected' 1 'Selected'.
FORMATS filter_$ (f1.0).
FILTER BY filter_$.
EXECUTE.
FREQUENCIES VARIABLES=v1100
  /ORDER=ANALYSIS.
FREQUENCIES VARIABLES=v1101
  /ORDER=ANALYSIS.
```

## Frequencies – How many criminals got gun from a gun shop, store, or pawn shop?

**Statistics**

S5Q17H_1: GUN(S) CAME FROM WHERE

| N | Valid | 1818 |
|---|---|---|
| | Missing | 262 |

**S5Q17H_1: GUN(S) CAME FROM WHERE**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | From a gun shop or store | 154 | 7.4 | 8.5 | 8.5 |
| | From a pawnshop | 63 | 3.0 | 3.5 | 11.9 |
| | At a flea market | 10 | .5 | .6 | 12.5 |
| | At a gun show | 19 | .9 | 1.0 | 13.5 |
| | From the victim(s) | 54 | 2.6 | 3.0 | 16.5 |
| | From a friend/family member | 736 | 35.4 | 40.5 | 57.0 |

| | | | | | |
|---|---|---|---|---|---|
| | From a fence/black market source | 133 | 6.4 | 7.3 | 64.3 |
| | Off the street/from a drug dealer | 468 | 22.5 | 25.7 | 90.0 |
| | In a burglary | 38 | 1.8 | 2.1 | 92.1 |
| | Other | 143 | 6.9 | 7.9 | 100.0 |
| | Total | 1818 | 87.4 | 100.0 | |
| Missing | Don't know | 134 | 6.4 | | |
| | Refused | 24 | 1.2 | | |
| | Blank | 104 | 5.0 | | |
| | Total | 262 | 12.6 | | |
| Total | | 2080 | 100.0 | | |

```
USE ALL.
COMPUTE filter_$=(v1073 = 01 & (v1101 = 1 | v1101 = 2)). [Selects for offenders who
 possessed guns, got them from gun shop or store]
VARIABLE LABELS filter_$ 'v1073 = 01 & (v1101 = 1 | v1101 = 2) (FILTER)'.
VALUE LABELS filter_$ 0 'Not Selected' 1 'Selected'.
FORMATS filter_$ (f1.0).
FILTER BY filter_$.
EXECUTE.
FREQUENCIES VARIABLES=v1103 v1102
  /ORDER=ANALYSIS.
```

## Frequencies

[DataSet5] F:\SPSSWIN\SISFC2004-Pt1.sav

## Frequency Table

**Among criminals who got gun from gun shop, store, or pawnshop, how many**

JA 737

**used false identity to buy gun?**

**S5Q17H2: GUN(S)) BOUGHT UNDER OWN NAME**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Yes | 140 | 64.5 | 90.3 | 90.3 |
| | No | 14 | 6.5 | 9.0 | 99.4 |
| | Don't know | 1 | .5 | .6 | 100.0 |
| | Total | 155 | 71.4 | 100.0 | |
| Missing | Blank | 62 | 28.6 | | |
| Total | | 217 | 100.0 | | |

JA 738

**If criminal got gun from gun shop, store, or pawnshop, did he buy gun directly for himself, or did someone buy it for him?**

S5Q17H1: GUN(S) BOUGHT/GIFT

|         |                          | Frequency | Percent | Valid Percent | Cumulative Percent |
|---------|--------------------------|-----------|---------|---------------|--------------------|
|         | Brought it directly      | 155       | 71.4    | 82.9          | 82.9               |
| Valid   | Someone brought it for me| 32        | 14.7    | 17.1          | 100.0              |
|         | Total                    | 187       | 86.2    | 100.0         |                    |
| Missing | Blank                    | 30        | 13.8    |               |                    |
| Total   |                          | 217       | 100.0   |               |                    |

Kleck Declaration Exhibit
K-3

**Missouri**

| Year | AA firearm homicides | | | | |
|------|------|------|------|------|------|
| 1999 | 4.40085 | | | | |
| 2000 | 4.91786 | | | | |
| 2001 | 4.92388 | | | | |
| 2002 | 4.51222 | | | | |
| 2003 | 3.88053 | | | | |
| 2004 | 4.46112 | | | | |
| 2005 | 5.13375 | | | | |
| 2006 | 5.11663 | sum 99-07 | avg rate 99-07 | | |
| 2007 | 4.59977 | 41.94661 | 4.660734444 | % increase 07 to 08 | % increase avg 99-07 to 08 |
| 2008 | 6.22816 | | | 35.40155269 | 33.63044117 |
| 2009 | 5.51107 | sum 08-10 | avg rate 08-10 | % increase 99-07 to 08-10 | |
| 2010 | 5.72499 | 17.46422 | 5.821406667 | 24.90320434 | |

**Iowa**

| Year | AA firearm homicides | | | | |
|------|------|------|------|------|------|
| 1999 | 0.97816 | | | | |
| 2000 | 0.879301 | | | | |
| 2001 | 0.822847 | | | | |
| 2002 | 1.0188 | | | | |
| 2003 | 0.845337 | | | | |
| 2004 | 1.02855 | | | | |
| 2005 | 0.81557 | | | | |
| 2006 | 1.33123 | sum 99-07 | avg rate 99-07 | | |
| 2007 | 0.639631 | 8.359426 | 0.928825111 | % increase 07 to 08 | % increase avg 99-07 to 08 |
| 2008 | 1.19742 | | | 87.20481027 | 28.9177032 |
| 2009 | 0.661624 | sum 08-10 | avg rate 08-10 | % increase 99-07 to 08-10 | |
| 2010 | 1.14582 | 3.004864 | 1.001621333 | 7.837451997 | |

Kleck Declaration Exhibit K-4

```
                              MOtotalhoms, 1999-2010
"Notes"  "Year"  "Year Code"    Deaths   Population        Crude Rate
         "1999"  "1999"         381      5561948           6.9
         "2000"  "2000"         393      5595211           7.0
         "2001"  "2001"         430      5641142           7.6
         "2002"  "2002"         362      5674825           6.4
         "2003"  "2003"         318      5709403           5.6
         "2004"  "2004"         363      5747741           6.3
         "2005"  "2005"         410      5790300           7.1
         "2006"  "2006"         405      5842704           6.9
         "2007"  "2007"         379      5887612           6.4
         "2008"  "2008"         470      5923916           7.9
         "2009"  "2009"         421      5961088           7.1
         "2010"  "2010"         432      5988927           7.2
"Total "                        4764     69324817          6.9
"---"
"Dataset: Compressed Mortality, 1999-2010"
"Query Parameters: "
"ICD-10 Codes: X85-Y09 (Assault)"
"Race: All"
"States: Missouri (29)"
"Year: All, 1999 to 2010"
"Query Date: Dec 4, 2013 12:39:10 PM"
"---"
"Suggested Citation: Centers for Disease Control and Prevention, National Center for
Health Statistics. Compressed Mortality File"
"1999-2010 on CDC WONDER Online Database, released January 2013. Data are compiled
from Compressed Mortality File 1999-2010"
"Series 20 No. 2P, 2013. Accessed at http://wonder.cdc.gov/cmf-icd10.html on Dec 4,
2013 12:39:10 PM"
"---"
Caveats:
"1. The population figures used in the calculation of death rates for the age group
'under 1 year' are the estimates of the"
"resident population that is under one year of age. More information:
http://wonder.cdc.gov/wonder/help/cmf.html#Age Group."
"2. About sub-national population figures: population figures for 1999 are from the
1990-1999 series of bridged-race intercensal"
"estimates of the July 1 resident population; population figures for 2000 and 2010
are bridged-race April 1 census counts; and"
"population figures for 2001-2009 are from the revised 2000-2009 series of
bridged-race intercensal estimates of the July 1"
"resident population."
```

Kleck Declaration Exhibit K-5

GunSuicides1999-2003

```
Firearms Suicides, 1999-2003
"Notes" "State" "State Code"       Deaths  Population      Crude Rate
       "Alabama"        "01"       2029    22328455        9.1
       "Alaska"         "02"       387     3176176         12.2
       "Arizona"        "04"       2478    26334551        9.4
       "Arkansas"       "05"       1267    13447574        9.4
       "California"     "06"       7464    171975312       4.3
       "Colorado"       "08"       1792    21972104        8.2
       "Connecticut"    "09"       513     17167886        3.0
       "Delaware"       "10"       217     3978461         5.5
       "D.C."           "11"       64      2858436         2.2
       "Florida"        "12"       5966    81792220        7.3
       "Georgia"        "13"       3112    41740505        7.5
       "Hawaii"         "15"       136     6138552         2.2
       "Idaho"          "16"       642     6593341         9.7
       "Illinois"       "17"       2287    62348320        3.7
       "Indiana"        "18"       2056    30605819        6.7
       "Iowa"           "19"       809     14652188        5.5
       "Kansas"         "20"       907     13505457        6.7
       "Kentucky"       "21"       1802    20334999        8.9
       "Louisiana"      "22"       1732    22425971        7.7
       "Maine"          "23"       425     6429896         6.6
       "Maryland"       "24"       1178    26862344        4.4
       "Massachusetts"  "25"       551     31903847        1.7
       "Michigan"       "26"       2716    49883542        5.4
       "Minnesota"      "27"       1175    24848263        4.7
       "Mississippi"    "28"       1204    14253053        8.4
       "Missouri"       "29"       2121    28182529        7.5
       "Montana"        "30"       571     4537960         12.6
       "Nebraska"       "31"       526     8602798         6.1
       "Nevada"         "32"       1211    10454015        11.6
       "New Hampshire"  "33"       351     6262246         5.6
       "New Jersey"     "34"       875     42420658        2.1
       "New Mexico"     "35"       965     9191701         10.5
       "New York"       "36"       2165    95255759        2.3
       "North Carolina" "37"       3069    40957498        7.5
       "North Dakota"   "38"       209     3202506         6.5
       "Ohio"           "39"       3128    56918675        5.5
       "Oklahoma"       "40"       1543    17348873        8.9
       "Oregon"         "41"       1513    17344077        8.7
       "Pennsylvania"   "42"       3593    61549518        5.8
       "Rhode Island"   "44"       129     5283200         2.4
       "South Carolina" "45"       1527    20309781        7.5
       "South Dakota"   "46"       260     3786977         6.9
       "Tennessee"      "47"       2492    28722508        8.7
       "Texas"          "48"       6535    106450918       6.1
       "Utah"           "49"       864     11405318        7.6
       "Vermont"        "50"       227     3059033         7.4
       "Virginia"       "51"       2397    35930901        6.7
       "Washington"     "53"       2104    29878871        7.0
       "West Virginia"  "54"       916     9039333         10.1
       "Wisconsin"      "55"       1538    27027541        5.7
       "Wyoming"        "56"       331     2483689         13.3
"Total "                          84069   1423164155      5.9
"---"
"Dataset: Compressed Mortality, 1999-2010"
"Query Parameters: "
"
"ICD-10 Codes: X72 (Intentional self-harm by handgun discharge), X73 (Intentional
self-harm by rifle, shotgun and larger firearm"
"discharge), X74 (Intentional self-harm by other and unspecified firearm discharge)"
"Year: 1999, 2000, 2001, 2002, 2003"
"Query Date: Dec 4, 2013 3:04:31 PM"
```

GunSuicides1999-2003
"Suggested Citation: Centers for Disease Control and Prevention, National Center for
Health Statistics. Compressed Mortality File"
"1999-2010 on CDC WONDER Online Database, released January 2013. Data are compiled
from Compressed Mortality File 1999-2010"
"Series 20 No. 2P, 2013. Accessed at http://wonder.cdc.gov/cmf-icd10.html on Dec 4,
2013 3:04:31 PM"

Total Suicides1999-2003

Total suicides, 1999-2003

| "Notes" | "State" | "State Code" | Deaths | Population | Crude Rate |
|---|---|---|---|---|---|
| | "Alabama" | "01" | 2681 | 22328455 | 12.0 |
| | "Alaska" | "02" | 590 | 3176176 | 18.6 |
| | "Arizona" | "04" | 4035 | 26334551 | 15.3 |
| | "Arkansas" | "05" | 1815 | 13447574 | 13.5 |
| | "California" | "06" | 15460 | 171975312 | 9.0 |
| | "Colorado" | "08" | 3363 | 21972104 | 15.3 |
| | "Connecticut" | "09" | 1392 | 17167886 | 8.1 |
| | "Delaware" | "10" | 443 | 3978461 | 11.1 |
| | "D.C." | "11" | 160 | 2858436 | 5.6 |
| | "Florida" | "12" | 11048 | 81792220 | 13.5 |
| | "Georgia" | "13" | 4515 | 41740505 | 10.8 |
| | "Hawaii" | "15" | 659 | 6138552 | 10.7 |
| | "Idaho" | "16" | 974 | 6593341 | 14.8 |
| | "Illinois" | "17" | 5307 | 62348320 | 8.5 |
| | "Indiana" | "18" | 3504 | 30605819 | 11.4 |
| | "Iowa" | "19" | 1563 | 14652188 | 10.7 |
| | "Kansas" | "20" | 1607 | 13505457 | 11.9 |
| | "Kentucky" | "21" | 2588 | 20334999 | 12.7 |
| | "Louisiana" | "22" | 2433 | 22425971 | 10.8 |
| | "Maine" | "23" | 792 | 6429896 | 12.3 |
| | "Maryland" | "24" | 2327 | 26862344 | 8.7 |
| | "Massachusetts" | "25" | 2111 | 31903847 | 6.6 |
| | "Michigan" | "26" | 5130 | 49883542 | 10.3 |
| | "Minnesota" | "27" | 2346 | 24848263 | 9.4 |
| | "Mississippi" | "28" | 1604 | 14253053 | 11.3 |
| | "Missouri" | "29" | 3488 | 28182529 | 12.4 |
| | "Montana" | "30" | 859 | 4537960 | 18.9 |
| | "Nebraska" | "31" | 934 | 8602798 | 10.9 |
| | "Nevada" | "32" | 2046 | 10454015 | 19.6 |
| | "New Hampshire" | "33" | 723 | 6262246 | 11.5 |
| | "New Jersey" | "34" | 2850 | 42420658 | 6.7 |
| | "New Mexico" | "35" | 1696 | 9191701 | 18.5 |
| | "New York" | "36" | 5970 | 95255759 | 6.3 |
| | "North Carolina" | "37" | 4791 | 40957498 | 11.7 |
| | "North Dakota" | "38" | 392 | 3202506 | 12.2 |
| | "Ohio" | "39" | 5764 | 56918675 | 10.1 |
| | "Oklahoma" | "40" | 2480 | 17348873 | 14.3 |
| | "Oregon" | "41" | 2581 | 17344077 | 14.9 |
| | "Pennsylvania" | "42" | 6584 | 61549518 | 10.7 |
| | "Rhode Island" | "44" | 428 | 5283200 | 8.1 |
| | "South Carolina" | "45" | 2239 | 20309781 | 11.0 |
| | "South Dakota" | "46" | 499 | 3786977 | 13.2 |
| | "Tennessee" | "47" | 3703 | 28722508 | 12.9 |
| | "Texas" | "48" | 10938 | 106450918 | 10.3 |
| | "Utah" | "49" | 1574 | 11405318 | 13.8 |
| | "Vermont" | "50" | 385 | 3059033 | 12.6 |
| | "Virginia" | "51" | 3961 | 35930901 | 11.0 |
| | "Washington" | "53" | 3864 | 29878871 | 12.9 |
| | "West Virginia" | "54" | 1297 | 9039333 | 14.3 |
| | "Wisconsin" | "55" | 3090 | 27027541 | 11.4 |
| | "Wyoming" | "56" | 478 | 2483689 | 19.2 |
| "Total " | | | 152061 | 1423164155 | 10.7 |

"Dataset: Compressed Mortality, 1999-2010"
"Query Parameters:"
"ICD-10 Codes: X60-X84 (Intentional self-harm)"
"Year: 1999, 2000, 2001, 2002, 2003"
"Query Date: Dec 4, 2013 3:08:23 PM"
"Suggested Citation: Centers for Disease Control and Prevention, National Center for Health Statistics. Compressed Mortality File"
"1999-2010 on CDC WONDER Online Database, released January 2013. Data are compiled from Compressed Mortality File 1999-2010"

Total Suicides1999-2003

"Series 20 No. 2P, 2013. Accessed at http://wonder.cdc.gov/cmf-icd10.html on Dec 4, 2013 3:08:23 PM"

# Exhibit 8

**CIUS Home**   **Offenses Known to Law Enforcement**   **Violent Crime**   **Property Crime**   **Clearances**   **Persons Arrested**   **Police Employee Data**   **About CIUS**

Return to Previous Page

# Table 20

## Murder

by State, Types of Weapons, 2009

Data Declaration   Download Excel

| State | Total murders[1] | Total firearms | Handguns | Rifles | Shotguns | Firearms (type unknown) | Knives or cutting instruments | Other weapons | Hands, fists, feet, etc.[2] |
|-------|------------------|----------------|----------|--------|----------|-------------------------|-------------------------------|---------------|------------------------------|
| **Alabama** | 318 | 229 | 196 | 1 | 32 | 0 | 29 | 40 | 20 |
| **Alaska** | 22 | 13 | 1 | 0 | 0 | 12 | 4 | 3 | 2 |
| **Arizona** | 328 | 197 | 164 | 10 | 10 | 13 | 61 | 53 | 17 |
| **Arkansas** | 171 | 107 | 54 | 5 | 5 | 43 | 21 | 38 | 5 |
| **California** | 1,972 | 1,360 | 1,022 | 45 | 49 | 244 | 291 | 214 | 107 |
| **Colorado** | 167 | 94 | 55 | 6 | 6 | 27 | 23 | 30 | 20 |

JA 750

| State | Total murders[1] | Total firearms | Handguns | Rifles | Shotguns | Firearms (type unknown) | Knives or cutting instruments | Other weapons | Hands, fists, feet, etc.[2] |
|---|---|---|---|---|---|---|---|---|---|
| Connecticut | 107 | 70 | 51 | 0 | 2 | 17 | 17 | 14 | 6 |
| Delaware | 41 | 31 | 20 | 2 | 0 | 9 | 6 | 1 | 3 |
| District of Columbia | 144 | 113 | 80 | 1 | 1 | 31 | 17 | 9 | 5 |
| Georgia | 543 | 378 | 323 | 17 | 19 | 19 | 56 | 97 | 12 |
| Hawaii | 21 | 8 | 4 | 2 | 1 | 1 | 3 | 4 | 6 |
| Idaho | 22 | 5 | 3 | 0 | 0 | 2 | 3 | 9 | 5 |
| Illinois[3] | 479 | 386 | 360 | 5 | 8 | 13 | 39 | 48 | 6 |
| Indiana | 293 | 209 | 136 | 8 | 14 | 51 | 34 | 40 | 10 |
| Iowa | 34 | 11 | 3 | 1 | 3 | 4 | 8 | 6 | 9 |
| Kansas | 118 | 85 | 38 | 9 | 0 | 38 | 14 | 11 | 8 |
| Kentucky | 170 | 112 | 90 | 5 | 6 | 11 | 22 | 27 | 9 |
| Louisiana | 486 | 402 | 330 | 20 | 11 | 41 | 32 | 37 | 15 |
| Maine | 26 | 11 | 4 | 0 | 0 | 7 | 6 | 6 | 3 |
| Maryland | 438 | 305 | 297 | 2 | 6 | 0 | 58 | 57 | 18 |
| Massachusetts | 169 | 93 | 47 | 2 | 1 | 43 | 40 | 29 | 7 |
| Michigan | 625 | 437 | 239 | 25 | 19 | 154 | 47 | 112 | 29 |
| Minnesota | 72 | 38 | 35 | 1 | 1 | 1 | 14 | 8 | 12 |
| Mississippi | 151 | 105 | 83 | 9 | 6 | 7 | 22 | 15 | 9 |
| Missouri | 381 | 276 | 170 | 8 | 11 | 87 | 40 | 50 | 15 |

JA 751

| State | Total murders[1] | Total firearms | Handguns | Rifles | Shotguns | Firearms (type unknown) | Knives or cutting instruments | Other weapons | Hands, fists, feet, etc.[2] |
|-------|-----------------|----------------|----------|--------|----------|-------------------------|-------------------------------|---------------|------------------------------|
| Montana | 28 | 19 | 9 | 2 | 5 | 3 | 4 | 2 | 3 |
| Nebraska | 40 | 23 | 22 | 1 | 0 | 0 | 8 | 4 | 5 |
| Nevada | 156 | 91 | 66 | 1 | 3 | 21 | 25 | 27 | 13 |
| New Hampshire | 10 | 4 | 1 | 0 | 0 | 3 | 3 | 2 | 1 |
| New Jersey | 319 | 220 | 189 | 3 | 6 | 22 | 44 | 36 | 19 |
| New Mexico | 144 | 78 | 54 | 2 | 3 | 19 | 24 | 29 | 13 |
| New York | 779 | 481 | 117 | 8 | 13 | 343 | 166 | 109 | 23 |
| North Carolina | 480 | 335 | 243 | 17 | 20 | 55 | 49 | 64 | 32 |
| North Dakota | 9 | 3 | 1 | 1 | 1 | 0 | 0 | 3 | 3 |
| Ohio | 502 | 311 | 193 | 2 | 9 | 107 | 52 | 95 | 44 |
| Oklahoma | 225 | 125 | 104 | 10 | 4 | 7 | 45 | 25 | 30 |
| Oregon | 83 | 41 | 9 | 2 | 10 | 20 | 21 | 19 | 2 |
| Pennsylvania | 658 | 468 | 373 | 13 | 11 | 71 | 66 | 100 | 24 |
| Rhode Island | 31 | 18 | 0 | 0 | 0 | 18 | 6 | 5 | 2 |
| South Carolina | 286 | 197 | 115 | 4 | 12 | 66 | 28 | 41 | 20 |
| South Dakota | 11 | 4 | 0 | 1 | 2 | 1 | 5 | 1 | 1 |
| Tennessee | 461 | 295 | 200 | 13 | 22 | 60 | 45 | 92 | 29 |
| Texas | 1,325 | 862 | 661 | 55 | 58 | 88 | 197 | 153 | 113 |
| Utah | 37 | 25 | 15 | 0 | 5 | 5 | 8 | 2 | 2 |

JA 752

| State | Total murders[1] | Total firearms | Handguns | Rifles | Shotguns | Firearms (type unknown) | Knives or cutting instruments | Other weapons | Hands, fists, feet, etc.[2] |
|-------|-----------------|----------------|----------|--------|----------|------------------------|-------------------------------|---------------|----------------------------|
| Vermont | 7 | 0 | 0 | 0 | 0 | 0 | 4 | 1 | 2 |
| Virginia | 347 | 229 | 108 | 8 | 7 | 106 | 41 | 55 | 22 |
| Washington | 169 | 101 | 75 | 16 | 4 | 6 | 35 | 14 | 19 |
| West Virginia | 76 | 38 | 20 | 2 | 3 | 13 | 19 | 13 | 6 |
| Wisconsin | 144 | 95 | 65 | 3 | 9 | 18 | 22 | 13 | 14 |
| Wyoming | 11 | 8 | 7 | 0 | 0 | 1 | 1 | 1 | 1 |

[1] Total number of murders for which supplemental homicide data were received.

[2] Pushed is included in hands, fists, feet, etc.

[3] Limited supplemental homicide data were received.

Back to Top

## Data Declaration

Provides the methodology used in constructing this table and other pertinent information about this table.

THE **FBI** *FEDERAL BUREAU OF INVESTIGATION*

A-Z INDEX • SITE MAP

Search Site   SEARCH

CONTACT US | ABOUT US | MOST WANTED | NEWS          STATS & SERVICES | SCAMS & SAFETY | JOBS | FUN & GAMES

*Uniform Crime Reports*          Select Language ◆    ✉ Get FBI Updates

Home • About Us • CJIS • UCR • Crime in the U.S. • 2010 • Crime in the U.S. 2010 • Tables • Table 20

U.S. Department of Justice
Federal Bureau of Investigation

# CRIME IN THE UNITED STATES 2010

Criminal Justice Information Services Division        Feedback | Contact Us | Data Quality Guidelines | UCR Home

| CIUS Home | Offenses Known to Law Enforcement | Violent Crime | Property Crime | Clearances | Persons Arrested | Police Employee Data | About CIUS |

## Table 20

### Murder
by State, Types of Weapons, 2010

Data Declaration   Download Excel

| State | Total murders[1] | Total firearms | Handguns | Rifles | Shotguns | Firearms (type unknown) | Knives or cutting instruments | Other weapons | Hands, fists, feet, etc.[2] |
|---|---|---|---|---|---|---|---|---|---|
| Alabama | 199 | 135 | 112 | 0 | 23 | 0 | 23 | 24 | 17 |
| Alaska | 31 | 19 | 3 | 5 | 1 | 10 | 4 | 4 | 4 |
| Arizona | 352 | 232 | 152 | 14 | 10 | 56 | 51 | 62 | 7 |
| Arkansas | 130 | 93 | 49 | 7 | 4 | 33 | 12 | 21 | 4 |
| California | 1,811 | 1,257 | 953 | 59 | 44 | 201 | 250 | 201 | 103 |
| Colorado | 117 | 65 | 34 | 0 | 4 | 27 | 20 | 21 | 11 |
| Connecticut | 131 | 97 | 72 | 0 | 1 | 24 | 20 | 8 | 6 |
| Delaware | 48 | 38 | 25 | 0 | 2 | 11 | 8 | 0 | 2 |
| District of Columbia | 131 | 99 | 32 | 0 | 0 | 67 | 20 | 7 | 5 |
| Georgia | 527 | 376 | 315 | 19 | 21 | 21 | 64 | 85 | 2 |
| Hawaii | 24 | 7 | 6 | 0 | 0 | 1 | 6 | 5 | 6 |
| Idaho | 21 | 12 | 12 | 0 | 0 | 0 | 4 | 2 | 3 |
| Illinois[3] | 453 | 364 | 355 | 3 | 1 | 5 | 30 | 43 | 16 |
| Indiana | 198 | 142 | 83 | 11 | 7 | 41 | 19 | 25 | 12 |
| Iowa | 38 | 21 | 9 | 1 | 4 | 7 | 4 | 9 | 4 |
| Kansas | 100 | 63 | 30 | 4 | 1 | 28 | 13 | 18 | 6 |
| Kentucky | 180 | 116 | 76 | 6 | 16 | 18 | 19 | 25 | 20 |
| Louisiana | 437 | 351 | 263 | 19 | 11 | 58 | 42 | 31 | 13 |
| Maine | 24 | 11 | 4 | 2 | 1 | 4 | 6 | 1 | 6 |
| Maryland | 424 | 293 | 272 | 3 | 12 | 6 | 59 | 53 | 19 |
| Massachusetts | 209 | 118 | 52 | 0 | 1 | 65 | 50 | 31 | 10 |
| Michigan | 558 | 413 | 239 | 25 | 14 | 135 | 43 | 71 | 31 |
| Minnesota | 91 | 53 | 43 | 2 | 8 | 0 | 14 | 16 | 8 |
| Mississippi | 165 | 120 | 98 | 3 | 12 | 7 | 21 | 19 | 5 |
| Missouri | 419 | 321 | 189 | 26 | 4 | 102 | 35 | 49 | 14 |
| Montana | 21 | 12 | 6 | 2 | 4 | 0 | 3 | 5 | 1 |
| Nebraska | 51 | 32 | 29 | 1 | 2 | 0 | 8 | 5 | 6 |

JA 754

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Nevada | 158 | 84 | 57 | 5 | 6 | 16 | 22 | 34 | 18 |
| New Hampshire | 13 | 5 | 2 | 0 | 2 | 1 | 5 | 3 | 0 |
| New Jersey | 363 | 246 | 216 | 7 | 2 | 21 | 50 | 39 | 28 |
| New Mexico | 118 | 67 | 36 | 6 | 2 | 23 | 29 | 15 | 7 |
| New York | 860 | 517 | 135 | 6 | 12 | 364 | 173 | 148 | 22 |
| North Carolina | 445 | 286 | 188 | 21 | 25 | 52 | 56 | 72 | 31 |
| North Dakota | 9 | 4 | 3 | 0 | 1 | 0 | 0 | 4 | 1 |
| Ohio | 460 | 310 | 176 | 7 | 2 | 125 | 40 | 93 | 17 |
| Oklahoma | 188 | 111 | 86 | 8 | 7 | 10 | 24 | 32 | 21 |
| Oregon | 78 | 36 | 20 | 1 | 2 | 13 | 16 | 17 | 9 |
| Pennsylvania | 646 | 457 | 367 | 8 | 11 | 71 | 67 | 94 | 28 |
| Rhode Island | 29 | 16 | 2 | 1 | 1 | 12 | 5 | 6 | 2 |
| South Carolina | 280 | 207 | 136 | 8 | 7 | 56 | 22 | 34 | 17 |
| South Dakota | 14 | 8 | 3 | 0 | 1 | 4 | 2 | 4 | 0 |
| Tennessee | 356 | 219 | 146 | 12 | 11 | 50 | 35 | 83 | 19 |
| Texas | 1,246 | 805 | 581 | 34 | 48 | 142 | 202 | 130 | 109 |
| Utah | 52 | 22 | 16 | 0 | 1 | 5 | 7 | 12 | 11 |
| Vermont | 7 | 2 | 1 | 1 | 0 | 0 | 1 | 2 | 2 |
| Virginia | 369 | 250 | 137 | 9 | 12 | 92 | 47 | 50 | 22 |
| Washington | 151 | 93 | 73 | 4 | 2 | 14 | 24 | 22 | 12 |
| West Virginia | 55 | 27 | 16 | 0 | 4 | 7 | 11 | 9 | 8 |
| Wisconsin | 151 | 97 | 63 | 5 | 6 | 23 | 13 | 22 | 19 |
| Wyoming | 8 | 5 | 0 | 2 | 0 | 3 | 1 | 1 | 1 |
| Virgin Islands | 50 | 41 | 36 | 1 | 0 | 4 | 4 | 5 | 0 |

[1] Total number of murders for which supplemental homicide data were received.

[2] Pushed is included in hands, fists, feet, etc.

[3] Limited supplemental homicide data were received.

*Data Declaration*

Provides the methodology used in constructing this table and other pertinent information about this table.

Contact Us | About Us | Most Wanted | News | Stats & Services | Scams & Safety | Jobs | Fun & Games | Mobile | Español
Resources for: Law Enforcement | Intel Partners | Researchers/Students | Communities | Parents | Victims | Businesses
Follow Us On: Facebook | You Tube | Twitter | iTunes | All Sites

Accessibility | eRulemaking | Freedom of Information Act | Legal Notices | Legal Policies and Disclaimers | Links | Privacy Policy | USA.gov | White House
FBI.gov is an official site of the U.S. government, U.S. Department of Justice

JA 755





Criminal Justice Information Services Division

Feedback | Contact Us | Data Quality Guidelines | UCR Home

**CIUS Home   Offenses Known to Law Enforcement   Violent Crime   Property Crime   Clearances   Persons Arrested   Police Employee Data   About CIUS**

## Table 20

### Murder
by State, Types of Weapons, 2011

Data Declaration   Download Excel

| State | Total murders[1] | Total firearms | Handguns | Rifles | Shotguns | Firearms (type unknown) | Knives or cutting instruments | Other weapons | Hands, fists, feet, etc.[2] |
|---|---|---|---|---|---|---|---|---|---|
| Alaska | 29 | 16 | 5 | 0 | 3 | 8 | 6 | 5 | 2 |
| Arizona | 339 | 222 | 165 | 14 | 9 | 34 | 49 | 59 | 9 |
| Arkansas | 153 | 110 | 52 | 4 | 6 | 48 | 22 | 17 | 4 |

JA 756

| State | Total murders[1] | Total firearms | Handguns | Rifles | Shotguns | Firearms (type unknown) | Knives or cutting instruments | Other weapons | Hands, fists, feet, etc.[2] |
|---|---|---|---|---|---|---|---|---|---|
| California | 1,790 | 1,220 | 866 | 45 | 50 | 259 | 261 | 208 | 101 |
| Colorado | 147 | 73 | 39 | 3 | 5 | 26 | 22 | 31 | 21 |
| Connecticut | 128 | 94 | 54 | 1 | 1 | 38 | 18 | 10 | 6 |
| Delaware | 41 | 28 | 18 | 0 | 3 | 7 | 8 | 2 | 3 |
| District of Columbia | 108 | 77 | 37 | 0 | 1 | 39 | 21 | 9 | 1 |
| Georgia | 522 | 370 | 326 | 16 | 16 | 12 | 61 | 83 | 8 |
| Hawaii | 7 | 1 | 0 | 1 | 0 | 0 | 2 | 1 | 3 |
| Idaho | 32 | 17 | 15 | 1 | 0 | 1 | 4 | 8 | 3 |
| Illinois[3] | 452 | 377 | 364 | 1 | 5 | 7 | 29 | 29 | 17 |
| Indiana | 284 | 183 | 115 | 9 | 12 | 47 | 36 | 43 | 22 |
| Iowa | 44 | 19 | 7 | 0 | 2 | 10 | 10 | 10 | 5 |
| Kansas | 110 | 73 | 31 | 3 | 5 | 34 | 11 | 16 | 10 |
| Kentucky | 150 | 100 | 77 | 6 | 5 | 12 | 13 | 24 | 13 |
| Louisiana | 485 | 402 | 372 | 10 | 8 | 12 | 28 | 29 | 26 |
| Maine | 25 | 12 | 3 | 1 | 1 | 7 | 4 | 7 | 2 |
| Maryland | 398 | 272 | 262 | 2 | 5 | 3 | 75 | 34 | 17 |
| Massachusetts | 183 | 122 | 52 | 0 | 1 | 69 | 30 | 22 | 9 |
| Michigan | 613 | 450 | 267 | 29 | 15 | 139 | 43 | 89 | 31 |
| Minnesota | 70 | 43 | 36 | 3 | 3 | 1 | 12 | 12 | 3 |
| Mississippi | 187 | 138 | 121 | 6 | 4 | 7 | 26 | 14 | 9 |
| Missouri | 364 | 276 | 158 | 13 | 9 | 96 | 28 | 42 | 18 |
| Montana | 18 | 7 | 2 | 3 | 1 | 1 | 4 | 5 | 2 |

JA 757

| State | Total murders[1] | Total firearms | Handguns | Rifles | Shotguns | Firearms (type unknown) | Knives or cutting instruments | Other weapons | Hands, fists, feet, etc.[2] |
|-------|------------------|----------------|----------|--------|----------|-------------------------|-------------------------------|---------------|------------------------------|
| Nebraska | 65 | 42 | 35 | 2 | 1 | 4 | 7 | 9 | 7 |
| Nevada | 129 | 75 | 46 | 2 | 1 | 26 | 20 | 25 | 9 |
| New Hampshire | 16 | 6 | 1 | 2 | 1 | 2 | 4 | 6 | 0 |
| New Jersey | 379 | 269 | 238 | 1 | 5 | 25 | 51 | 41 | 18 |
| New Mexico | 121 | 60 | 45 | 2 | 2 | 11 | 21 | 32 | 8 |
| New York | 774 | 445 | 394 | 5 | 16 | 30 | 160 | 143 | 26 |
| North Carolina | 489 | 335 | 235 | 26 | 19 | 55 | 60 | 57 | 37 |
| North Dakota | 12 | 6 | 3 | 0 | 0 | 3 | 4 | 0 | 2 |
| Ohio | 488 | 344 | 187 | 8 | 13 | 136 | 44 | 80 | 20 |
| Oklahoma | 204 | 131 | 99 | 8 | 9 | 15 | 26 | 21 | 26 |
| Oregon | 77 | 40 | 13 | 1 | 2 | 24 | 22 | 10 | 5 |
| Pennsylvania | 636 | 470 | 379 | 8 | 19 | 64 | 73 | 66 | 27 |
| Rhode Island | 14 | 5 | 1 | 0 | 0 | 4 | 5 | 4 | 0 |
| South Carolina | 319 | 223 | 126 | 10 | 12 | 75 | 38 | 40 | 18 |
| South Dakota | 15 | 5 | 3 | 1 | 0 | 1 | 4 | 3 | 3 |
| Tennessee | 373 | 244 | 172 | 7 | 13 | 52 | 51 | 62 | 16 |
| Texas | 1,089 | 699 | 497 | 37 | 48 | 117 | 175 | 134 | 81 |
| Utah | 51 | 26 | 15 | 4 | 1 | 6 | 5 | 9 | 11 |
| Vermont | 8 | 4 | 2 | 0 | 0 | 2 | 2 | 2 | 0 |
| Virginia | 303 | 208 | 110 | 10 | 15 | 73 | 33 | 41 | 21 |
| Washington | 161 | 79 | 58 | 1 | 3 | 17 | 29 | 36 | 17 |
| West Virginia | 74 | 43 | 23 | 10 | 3 | 7 | 11 | 13 | 7 |

JA 758

| State | Total murders[1] | Total firearms | Handguns | Rifles | Shotguns | Firearms (type unknown) | Knives or cutting instruments | Other weapons | Hands, fists, feet, etc.[2] |
|---|---|---|---|---|---|---|---|---|---|
| Wisconsin | 135 | 80 | 60 | 7 | 3 | 10 | 21 | 13 | 21 |
| Wyoming | 15 | 11 | 7 | 0 | 0 | 4 | 0 | 1 | 3 |
| Virgin Islands | 38 | 31 | 27 | 0 | 0 | 4 | 5 | 2 | 0 |

[1] Total number of murders for which supplemental homicide data were received.

[2] Pushed is included in hands, fists, feet, etc.

[3] Limited supplemental homicide data were received.

## *Data Declaration*

Provides the methodology used in constructing this table and other pertinent information about this table.

Accessibility | eRulemaking | Freedom of Information Act | Legal Notices | Legal Policies and Disclaimers | Links | Privacy Policy | USA.gov | White House
FBI.gov is an official site of the U.S. government, U.S. Department of Justice

Close

JA 759

4 of 4

12/11/2012 9:32 PM

Exhibit 9

| | |
|---|---|
| **From:** | Shelton, Jon (MPD) [jon.shelton@dc.gov] |
| **Sent:** | Friday, April 10, 2009 11:20 AM |
| **To:** | Hall, Colin (MPD) |
| **Subject:** | RE: 11 states list for registration |

Copy, swamped up here so need a few minutes.

Jon

**From:** Hall, Colin (MPD)
**Sent:** Thursday, April 09, 2009 3:31 PM
**To:** Shelton, Jon (MPD)
**Cc:** Hibbard, Gregory (MPD)
**Subject:** 11 states list for registration

Jon,

Can you fax me the list of 11 states that have registration like ours for Hibbard's project. He has already checked several states (PA, MA, CA and MD) and so far none do what you asked. He just needs the rest of the list to finish up.

*Colin Hall*
*Sergeant Gun Control Unit*
*Police Business Services Division*
*Corporate Support Bureau*
*Phone 202-727-9889*



EXHIBIT

59

AD   7/29/13

JA 761

HELLER DC 003881

# Exhibit 10

| | |
|---|---|
| **From:** | Hall, Colin (MPD) [colin.hall@dc.gov] |
| **Sent:** | Tuesday, April 21, 2009 12:39 PM |
| **To:** | Shelton, Jon (MPD) |
| **Subject:** | Dispatching firearms registration on calls |

Hibbard checked all of the states you requested him to and none dispatch firearms registration information to officers in the field when responding to calls.

*Colin Hall*
*Sergeant Gun Control Unit*
*Police Business Services Division*
*Corporate Support Bureau*
*Phone 202-727-9889*



EXHIBIT

S10

RD   7/24/13

HELLER DC 003553

Exhibit 12



HOUSE OF COMMONS
CHAMBRE DES COMMUNES
CANADA

# Standing Committee on Public Safety and National Security

SECU     •     NUMBER 011     •     1st SESSION     •     41st PARLIAMENT

**EVIDENCE**

## Tuesday, November 15, 2011

———

### Chair

**Mr. Kevin Sorenson**

# Standing Committee on Public Safety and National Security

**Tuesday, November 15, 2011**

● (1100)

[*English*]

**The Chair (Mr. Kevin Sorenson (Crowfoot, CPC)):** Good morning, everyone.

We will call this meeting to order. This is meeting number 11 of the Standing Committee on Public Safety and National Security, Tuesday, November 15, 2011.

This morning we begin our consideration of Bill C-19, An Act to amend the Criminal Code and the Firearms Act. We will be hearing from the Hon. Vic Toews, Minister of Public Safety.

Before we proceed to the panel of witnesses in our second hour, I'll just remind our committee that we're going to pause for about five minutes to do some committee business and ratify our steering committee report. Then we will move to our first panel of witnesses on this very important study that we begin this morning.

Our committee welcomes the minister and thanks him for appearing this morning and for the many times he has appeared before our committee in the past. We certainly look forward to his presentation this morning.

Mr. Minister, we invite you to make your opening comments, and then we'll move into a number of rounds of questions.

**Hon. Vic Toews (Minister of Public Safety):** Thank you very much, Mr. Chair.

My comments this morning will be relatively brief, and if there are no questions after that I'll be out of here very quickly.

I want to thank all of the honourable committee members for the invitation to appear here before you today to help with your deliberations on Bill C-19, the Ending the Long-gun Registry Act. So if there are any committee members with some questions about where they stand on this bill, I'd be more than happy to answer those.

For too long, law-abiding farmers, duck hunters, and sports shooters have been criminalized by the wasteful and ineffective long-gun registry. Bill C-19 is fulfilling our government's long-standing commitment to scrap this failed boondoggle once and for all.

For many years it has been clear that the long-gun registry does not work, does nothing to prevent crime or protect front-line officers. We have, on record, testimony after testimony by police officers who have told us in no uncertain terms that they do not trust the accuracy of the registry, and they openly question its value as a tool to protect police officers responding to a house call. These witnesses have provided eye-opening accounts of how truly flawed the registry is. One officer went so far as to say that he wouldn't risk the lives of his own staff, based on the results of a registry search. That is very troubling, Mr. Chair.

Furthermore, we know that the long-gun registry has no ability to prevent crime, and there is no evidence that it has stopped a single crime or saved a single life. It does not prevent anyone from using a firearm for violence and it does not keep guns out of the hands of criminals. It is clear that on all fronts it is a failure.

Our government believes in measures that actually protect law-abiding Canadian families. As committee members are aware, we have taken decisive action to ensure that those who commit serious crimes face serious consequences. This includes putting in place tough punishment for gun-related crimes such as drive-by shootings and gang-related violence. It includes increasing the minimum penalties for specific offences involving firearms, including attempted murder, sexual assault, and kidnapping, among others.

We have also introduced legislation that requires people charged with serious firearms offences to show the court why they shouldn't be kept in jail while awaiting their trial. They will not benefit from a presumptive entitlement to bail.

We believe that these amendments are starting to have a positive impact on homicide rates in this nation. The fact remains, however, that even one murder a year is too many and we must continue to work hard to improve our laws and focus on the most effective measures to crack down on crime.

It's telling that in a place like Winnipeg, which has the highest per capita murder rate in Canada, the provincial NDP government does not support the long-gun registry and views it as a waste of time, a waste of resources. And it's clearly onboard with our government in respect to the amendments that we're bringing forward in Bill C-10, which police officers admit would do a much better job of focusing on criminals and preventing crime.

It is our belief that laws should protect and not burden law-abiding citizens. That is why, with Bill C-19, we are moving to scrap the failed long-gun registry once and for all.

First of all, Bill C-19 will eliminate the requirement for firearm owners to register their long guns—in other words, their rifles and shot guns.

The second part of Bill C-19 would see the destruction of all records related to the registration information on long guns in the Canadian Firearms Registry and under the control of the chief firearms officers. This item has been the subject of much discussion since we tabled this legislation, but we have plainly stated that we will not share the personal and private information of more than seven million Canadians who have registered their long guns.

These, in simple terms, are the proposed changes to the Firearms Act and the Criminal Code.

I'd like to take just a moment to mention what will not change under Bill C-19.

What will not change, Mr. Chair, is the current and strict licensing system that is in place for controlling firearms. Firearm owners will still require a valid licence to purchase or possess firearms and to purchase ammunition. They will still be required to undergo background checks, pass the Canadian firearms safety course, and comply with firearm safe storage and transportation requirements. We believe this to be a reasonable requirement for those who want to legally acquire and use firearms. Moreover, owners of restricted and prohibited firearms will still be required to register their firearms with the RCMP.

●(1105)

We believe that this is the most effective measure of control regarding restricted and prohibited firearms such as handguns. Handguns are the firearms of choice in homicide crimes in Canada. It's time to stop burdening legal long gun owners with red tape. When you step back and think about it, the long-gun registry isn't actually targeting criminals. Rather, it targets the law-abiding Canadians who own long guns and who have to jump through various bureaucratic hoops to register a rifle or shotgun for which they already have a legal licence. It's an unfair burden, and it does nothing to stop criminals from using illegal or smuggled handguns to commit violent crimes in our community.

In closing, I would urge all committee members to consider carefully the important amendments we are proposing to this bill. After a legacy of waste that has lasted almost 17 years, it is time to swiftly and decisively end the long-gun registry once and for all.

Thank you, and if there are questions, I will take them now.

**The Chair:** Thank you, Minister.

We'll move into the first round of questioning.

Ms. Hoeppner.

**Ms. Candice Hoeppner (Portage—Lisgar, CPC):** Thank you, Mr. Chair.

Minister Toews, I want to thank you personally for your persistent support for those like me in our caucus who stand against the long-gun registry.

Bill C-391 and C-19 are both straightforward bills that end the requirements for individuals and businesses to register non-restricted, non-prohibited firearms. I was concerned this morning when I read media reports of an analysis done by officials. A certain official thought that both C-391 and C-19 could have a number of

unintended consequences, including the trafficking of firearms at the border.

I was concerned about this report. Is it accurate? Can you comment on this official's opinion?

**Hon. Vic Toews:** I had a chance to take a look at that article. I wasn't familiar with the memorandum, which an official in my department had prepared, I assume, for internal purposes. But now that I've seen it, it's clear that the analysis presented by this official is factually flawed; it's incorrect. I've asked my deputy minister to look into the matter.

Contrary to the suggestion made in the analysis, neither Bill C-19 nor Bill C-391 removes any controls on the importation of firearms. In fact, we have increased penalties for the illegal importation of firearms. Canadians gave our government a strong mandate to end this wasteful, ineffective long-gun registry once and for all. That's exactly what we're doing. We're not getting into the areas this memorandum suggested we might get into. I think the memorandum is phrased to suggest that if we did something else, the repercussions would be such and such. But we're not going down that road.

●(1110)

**Ms. Candice Hoeppner:** Just to be clear, C-19 doesn't change the way our border officials are able to monitor, track, or stop legal guns from coming into the country.

**Hon. Vic Toews:** No. The analysis of whether or not something is a prohibited or non-restricted firearm has nothing to do with the registry. That's an analysis that the officers make at the border and elsewhere throughout the country. Tying that to C-19 is a bit of a red herring. As I said, the analysis is quite flawed.

**Ms. Candice Hoeppner:** Thank you for clarifying that. I'm sure it will be clarified in future media reports as well.

**Hon. Vic Toews:** Don't bet on it.

**Ms. Candice Hoeppner:** I also want to ask you about something else that's been discussed a lot.

Bill C-391, my private member's bill, did not explicitly contain a provision for destroying all of the data. Whenever I was asked if we were going to destroy the data, my answer was that we were ending the long-gun registry, of course we were going to end the data.

You've been criticized, our government has been criticized, for explicitly saying that we will destroy the data contained in the long-gun registry. Can you explain how the long-gun registry is not just a concept or something that happens in the future? It actually is the data. Can you explain why we're destroying the data and how it represents the long-gun registry?

**Hon. Vic Toews:** I don't know how much clearer I can be. The suggestion—and I think it's an artificial distinction without a difference—that somehow the registry is separate from the data.... The registry is the data; without the data there is no registry. So when our government and our party made the very clear commitment that we would scrap the long-gun registry, that we would end it, implicit in that, indeed explicit, is that we would be destroying the information that's been collected under the authority of that legislation. There's simply no other answer to that.

It's disingenuous for someone to say to Canadians that when we were going to end the registry, we were actually going to keep the information. I think if any politician had made that claim on the campaign trail, they would have been thoroughly discredited. This is a revisionist type of excuse that some are making in order to try to justify flipping their position on the registry.

**Ms. Candice Hoeppner:** We've been told that the data is extremely flawed, and we're going to be hearing testimony later today from front-line officers who will tell us that they have great concerns about the data. Can you talk a little bit about your understanding of how accurate it is, in terms of how many long guns are actually in the country as opposed to how many are contained in the registry?

Can you talk a bit about the accuracy of the data as it is right now?

**Hon. Vic Toews:** I can only agree that the information is quite inaccurate. Indeed, the premise of the former government about the numbers of long guns in the country.... You'll notice that over the years it kept on reducing its numbers for how many long guns were actually in the country and that the compliance rate was increasing more and more. If you say at one point that there are 14 million long guns, and you have only one million registered, you obviously have a low compliance rate. But if you lower the number of long guns, which you saw the former government doing consistently— and I don't know what number they eventually ended up with—you could then show a much higher compliance rate. So it doesn't give you any indication of how many long guns there actually are in this country.

What we can say with accuracy is that when we license individuals, we know those individuals are licensed owners and that they are the ones who are qualified to own and use firearms. That is a much better system, a much better tool, and more accurate than the long-gun registry, which we know is not utilized by criminals. That being said, criminals don't license themselves either. However, I think that licensing is a much better screen of individuals who may, for various reasons, want a firearm, but perhaps because of a medical or other condition should not own a firearm. We can have that discussion in a very appropriate way in the licensing process.

The registry doesn't assist in that respect.

●(1115)

**The Chair:** Thank you very much, Mr. Minister.

We'll now move to the official opposition.

Mr. Harris, welcome.

**Mr. Jack Harris (St. John's East, NDP):** Thank you, Chair, and I want to thank the minister for coming to the meeting today.

Minister, we've heard from you and your government consistently over the past several years about your concern for victims and the importance of the position of victims in this country. Now, even allowing for a certain amount of hyperbole—you tell us that the opposition could care less about victims and they're really more interesting in helping criminals, etc.—this has been the general tone of some of your comments.

So I want to ask you why you don't listen to victims when it comes to the protection they're seeking, that they believe is received

by having strict control of and registration of non-prohibited and non-restricted weapons, such as the long guns you talk about, but also semi-automatics and other guns? I'm speaking here of Sue O'Sullivan, the Federal Ombudsman for Victims of Crime, who says the majority of victims' groups they have spoken with continue to support keeping the long-gun registry; the victims of the École Polytechnique in Montreal, including individual survivors and their families, who are strongly supportive of strong gun control, including the ability to track guns and the registration of guns; the Dawson College victims; and Priscilla de Villiers, a well-known gun violence activist whose daughter, Nina, was abducted and killed with an unrestricted, legally owned rifle in 1991, who is also very concerned about a gun control law, including registration and rigorous implementation, making it harder for dangerous people to get firearms and for firearms to fall into the wrong hands.

Recently, Elizabeth Pousoulidis, the president of the Association of Families of Persons Assassinated or Disappeared, who appeared before the Standing Committee on Justice and Human Rights last week in support of certain aspects of Bill C-10, is also adamantly in favour of the long-gun registry.

Why aren't you listening to those kinds of victims who say they are concerned and fearful of an unrestricted and unregulated system? Why aren't you adopting instead some of the approaches that were suggested by the NDP to achieve balance with the one-time, no-fee registration forever? It's not a massive red tape situation, as you've suggested. Why aren't you trying to achieve some balance in this to ensure the safety of Canadians as victims of gun violence, victims of domestic violence, and victims of others, with a registry that the chiefs of police, of course, have stated is a useful tool?

Why aren't you trying to fix it? Why aren't you trying to improve it? Why aren't you listening to victims?

**The Chair:** Thank you, Mr. Harris.

Mr. Minister.

**Hon. Vic Toews:** Let's first look at your preamble to the question and then the question itself. You'll notice, whether it's deliberate or not, a mixing of terms. You talk about gun control and the registry interchangeably. You talk about it being unrestricted. It depends on what type of question you ask of victims' groups.

If you were to ask victims' groups, do you believe in gun control, they obviously all believe in gun control. I believe in gun control. I believe in effective gun control, and I listen to the victims who have indicated to me the best way of achieving an appropriate gun control system. But you're confusing—again, deliberately or not—the registry and gun control.

For example, I see gun control as including the reverse onus on bail applications when individuals are caught with an illegal firearm in downtown Surrey or Vancouver. The onus then is shifted onto them to demonstrate why they should get bail, as opposed to the crown doing it. That's a much more effective version of gun control than the registry itself. The fact that individuals who now smuggle firearms into the country are met with a much more serious penal sanction is a much more effective gun control measure than a registry that, again, does nothing to prevent the illegal acquisition of firearms, including those smuggled into the country, as many of them are, especially the hand guns.

I've listened very carefully and closely. I've worked with provincial governments. Your colleagues in the NDP government in Manitoba have clearly indicated that this is not an effective gun control measure. They oppose the long-gun registry and have specifically instructed their conservation officers not to enforce the registry, and have specifically instructed the RCMP in those ridings in that province that these are not effective mechanisms for focusing on the crime situations they're facing.

● (1120)

**Mr. Jack Harris:** Mr. Toews, you're the Minister of Public Safety. We have the national police force, the RCMP, saying in a report last February that firearms registration is a critical component of the entire firearms program, and talking about it as an important tool for law enforcement.

In fact, as I'm sure you're aware, one particular aspect of firearms registration is the ability to trace firearms. In the unfortunate and tragic loss of four RCMP officers in Mayerthorpe, Alberta—which was devastating to them and to everybody aware of this—the guns that were used were basically traced through the firearms registry, leading to the capture and conviction of two individuals. The Canadian Association of Chiefs of Police have talked about the registry and the tracing element as an important investigative tool, a tool that they would use if someone, as you suggested, might be incapable of carrying a gun because of a mental disability or a court order prohibiting them from doing it. The police officials have the ability to find the guns, because they are required to be registered. They know what guns are available and can trace guns and do all of the other associated investigative work.

As Minister of Public Safety, why are you discounting that when it has in fact been used to prosecute people who've killed Mounties?

**The Chair:** We're already 20 seconds over the time on the NDP's question.

Make it a quick answer, please.

**Hon. Vic Toews:** Let me very quickly state and quote the Canadian Police Association, which said:

> We're quite satisfied with the efforts this government has made to work on behalf of front-line police officers, specifically with respect to the comprehensive justice legislation that has been a priority since the last election.

We're working on issues and on legislation that actually works, as opposed to that which does not.

**The Chair:** Thank you, Mr. Minister.

We'll move to the second questioner.

Mr. Rathgeber, please, for seven minutes.

**Mr. Brent Rathgeber (Edmonton—St. Albert, CPC):** Thank you, Mr. Chair.

Thank you, Minister, for your attendance here today and for your good work on this and other bills.

I always shake my head in disbelief when my friends on the opposite side of the table raise Mayerthorpe as somehow being an example of success with the long-gun registry. Although it is true that there was a weapon traced to the grandfather of an individual who was subsequently convicted of aiding and abetting four homicides, it was done through a very elaborate "Mr. Big" sting operation, which was likely the real cause of that conviction—and a debate for another day. But the reality is that the long-gun registry did nothing to save the lives of four brave mounted police on that March morning in Mayerthorpe, Alberta.

My friend, Mr. Harris, in his premise to his question also referred to your preference for a so-called unregulated system. There's much confusion, and I suspect it's deliberate, from the opponents of this legislation, the people who support the long-gun registry, on the whole issue between licensing and registration.

As you know, Mr. Minister, I come from Alberta. In western Canada support for the long-gun registry is perhaps the lowest you'll find anywhere in Canada. Even in my province, some media sources, some bloggers and others, have envisioned people walking down the streets of Edmonton with concealed weapons or rifles, shooting them up in the air in a sort of wild-west scenario. But I think you and I know that nothing could be further from the truth.

For the people who are watching at home, I was wondering if you could once again clarify the issues as between registration and licensing.

● (1125)

**Hon. Vic Toews:** Thank you.

I'm glad that you also caught that seemingly careless use of very important terms in the control of firearms. The licensing is one aspect; the gun registry is a different issue altogether.

Every individual, before they can acquire a firearm, whether it's restricted or non-restricted, must obtain a licence. You go through the testing process, and then there are other applications that you have to make, and your background is checked to ensure that we can, as much as humanly possible, weed out those who should not have firearms for one reason or another. I think those reasons are clear, and I don't need to go into them.

The gun registry has nothing to do with that. The gun registry is after the fact. It is about somebody who has a licence already and registers that firearm, or somebody who doesn't register the firearm at all and doesn't use the licensing provisions either. Most of the homicides are in that category, by individuals who are using handguns illegally and causing the concern that many citizens feel.

My wish is that we would have a clear discussion on the tremendous steps that we have taken as a government in terms of gun control and actually controlling guns from coming into the hands of criminals or of those who are otherwise unfit to own a firearm. It's disappointing that for political purposes, the distinction between the various components of gun control on the one hand and the registry on the other hand are blurred. That does nothing to forward a proper discussion about what the most effective mechanisms are for ensuring that gun crime is reduced.

**Mr. Brent Rathgeber:** For further clarification, Bill C-19 does nothing to affect the licensing provisions that are currently in place?

**Hon. Vic Toews:** No, it does nothing to affect the licensing provision.

As I look at this memo that was produced for a newspaper in the last day or so, perhaps in anticipation that I would be here at committee, even it is based on pretty inaccurate assumptions that somehow the jobs of CBSA officers at the border are going to be changed by Bill C-19. Their jobs remain exactly the same. If you came across the border and you had a firearm, you would have to have a licence for it, whether it was registered or not. The registry has no impact on that scenario.

Unfortunately, it's a misleading discussion paper, which I saw only this morning.

**Mr. Brent Rathgeber:** Mr. Harris also talked about the police association's support for the registry—or which we anticipate, based on the experience with Ms. Hoeppner's bill and other attempts to get rid of this boondoggle.

I'm always perplexed by the following. When we talk to front-line officers—and as you know, I sat on this committee when Bill C-391 was here just over a year ago—they tell us that they cannot rely on the registry. It doesn't matter what situation they go into, they always have to assume the worst; they have to assume that there are firearms in a residence or a vehicle, and they have to be prepared. If they're not prepared for the existence of firearms, they do so at their own peril.

Why do you think the police association takes a contrary view when front-line officers invariably tell us that they cannot and will not rely on the accuracy of the long-gun registry?

**Hon. Vic Toews:** Your experience is the same as mine.

I've never met a police officer who has seen registry data come up in his patrol car indicating that no firearm is associated with an individual in a stopped car, such that he would then approach the car as if there were no firearm in that car. It's simply foolish. No one would put their own life at risk by relying on the registry—or in fact put the life of their partner or a civilian at risk by doing that. It's simply foolish. In the same way, you don't go into a domestic disturbance and say, "Well, we're pretty safe here because there's no firearm licence or registry here". Whether there's a licence or a registry is quite irrelevant. You go into a home expecting a firearm. That's the prudent and the proper thing for any officer to do.

I have met with officers on a daily basis who have talked to me about the issue. One thing they point out to me is that long-gun registry has created a division between law officers on the one side and ordinary law-abiding Canadian citizens who may own firearms

on the other side. There's a mistrust of police officers because somehow people feel that the police are out to get their guns. It's really unfortunate because most of these people are exactly the kind of people who should be assisting the police in investigations of crime and yet now this long-gun registry has created a barrier between police and law-abiding citizens. That should never be the intent or result of the law.

● (1130)

**The Chair:** Thank you very much, minister.

We'll now move to Mr. Scarpaleggia.

Mr. Scarpaleggia, you have seven minutes, please.

**Mr. Francis Scarpaleggia (Lac-Saint-Louis, Lib.):** Thank you, Chair.

A few weeks ago, the RCMP recalled 50 long guns it had allowed into Canada as non-restricted weapons, only to change its mind after the fact, reclassify them as restricted, and then send letters to the 50 people who bought those guns that were later reclassified. Without the registry, how would the police know where to address those letters? Are you saying that from this point on it is absolutely impossible that the RCMP could make an error or decide after the fact to change the classification of a long gun—in other words, to second-guess its original decision? Are you saying that is impossible from now on?

**Hon. Vic Toews:** No.

**Mr. Francis Scarpaleggia:** So how would the RCMP contact people who bought guns into the country as non-restricted weapons but then became restricted because the RCMP realized the guns could be converted into more dangerous weapons and wanted those guns back? How could it do that without the addresses of the gun owners who are in the gun registry?

**Hon. Vic Toews:** They can still do that through the records of the shop that sold the firearms, the importer to whom that gun was sent. In the case you're mentioning, most of those guns would probably never even have been sold in that brief period of time.

Gun shops, in fact, keep records of their sales and those records can be accessed through a warrant or other appropriate provisions. You don't need the registry for that.

**Mr. Francis Scarpaleggia:** You're saying that the shop owners are now the ones keeping the gun registry?

**Hon. Vic Toews:** No. They keep records on their own. They do that for various purposes, including the Income Tax Act, but the access to that is through an appropriate legal search warrant.

**Mr. Francis Scarpaleggia:** After the Dawson shooting, the police seized a weapon from someone they thought could be a copycat killer and commit the same horrible crime. They seized the weapon, which means there was a possibility that the person could have killed someone with it. It's not a certainty, but a possibility.

How can you make the categorical statement, the sweeping statement, that the registry could not possibly have saved even one life over the course of 10 years, when the police went and got a gun from a possible copycat? How can you make such a sweeping statement? I know it's very hard to come up with anecdotal, 100% certain evidence that a life has been saved. I could say I'm not here today because of the 100-kilometre-an-hour speed limit. I could say there's no proof that the 100 kilometre-an-hour-speed limit has saved my life, but we know that in the aggregate, the speed limit does save lives.

How can you make such categorical sweeping statements?

● (1135)

**Hon. Vic Toews:** I'm not familiar with the case you mention. I don't see how the police were alerted through the registry that this individual would be a dangerous person. That doesn't even make any sense.

**Mr. Francis Scarpaleggia:** Let me ask you another question. How many firearms licences have been repealed in the last five or ten years? Is it thousands? Is it hundreds?

**Hon. Vic Toews:** I could get those figures for you through official —

**Mr. Francis Scarpaleggia:** You came to committee without those figures? That's a very important piece of information. The question becomes, if you're repealing licences—

**Hon. Vic Toews:** No. We're not repealing—

**Mr. Francis Scarpaleggia:** —it means that you think that person is dangerous with a gun.

**Hon. Vic Toews:** We're not repealing licences. I don't know why you get that idea. We're not repealing licences.

**Mr. Francis Scarpaleggia:** The government has never repealed a gun owner's licence?

**Hon. Vic Toews:** Nothing in this legislation affects the process of repealing licences.

**Mr. Francis Scarpaleggia:** But have you ever repealed a gun licence because you feel that someone is no longer fit to own a gun?

**Hon. Vic Toews:** I have never.

**Mr. Francis Scarpaleggia:** If your department has ever done that, wouldn't it want to get its hands on the guns owned by the person whose license was repealed? And how could it do that without the gun registry?

**Hon. Vic Toews:** They were doing that long before the gun registry.

**Mr. Francis Scarpaleggia:** It seems to me, Mr. Chair, that without a registry, we have no idea how many guns that person owns.

Even if you were doing it before, the registry gives you some added information about what you're looking for.

**Hon. Vic Toews:** How many guns are there in Canada, now that we have the registry? How many guns are there?

**Mr. Francis Scarpaleggia:** I'll be asking the questions, Minister.

**Hon. Vic Toews:** But that's—

**Mr. Francis Scarpaleggia:** I'd like to ask you how many gun licences have been revoked.

**Hon. Vic Toews:** But that's—

**The Chair:** Just let the minister finish.

**Hon. Vic Toews:** That's the problem: You have no idea. Your predecessor ministers in the Liberal Party kept on reducing the number of long guns in this country because they had no idea how many long guns there were, and so they reduced the number very deliberately to say, "Oh, we had a 30% compliance rate"—

**Mr. Francis Scarpaleggia:** But now you're saying that—

**Hon. Vic Toews:** —"and now a 40% compliance rate."

**Mr. Francis Scarpaleggia:** —that no information—

**Hon. Vic Toews:** That was playing games.

**Mr. Francis Scarpaleggia:** But now you're saying that no information—

**Hon. Vic Toews:** Wait, wait, wait. That was playing games.

**Mr. Francis Scarpaleggia:** You're saying that no information is better than imperfect information.

I think that describes the ideology of this government on many issues, Mr. Chair—

**The Chair:** Mr. Scarpaleggia, your time is almost up. You have a little time left; you have a choice of whether you want to use it or allow the minister—

**Mr. Francis Scarpaleggia:** Now, I would like to say that—

**The Chair:** —but we can't have two people speaking at the same time.

**Mr. Francis Scarpaleggia:** The minister must know that the demographics of gun ownership are changing. We all know that farmers need to have guns to run their farms, to kill gophers and animals that are impeding the growth of their crops. No one has any problems with rural hunters passing on time-honoured traditions to their children. But the demographics of gun ownership are changing. People now are not necessarily rural. They're urban people buying knock-offs of weapons they see in video games and in movies such as *Call of Duty*.

How much do we know about that new demographic?

**The Chair:** Very quickly—

**Hon. Vic Toews:** What I can say is that this bill has nothing to do with the classification of firearms.

**The Chair:** Thank you very much. Our time is up.

I'll just remind committee members to bring your questions through the chair, and likewise, we'll bring the answers through the chair back to the member.

We'll now move to Madame Boivin.

[*Translation*]

You have five minutes.

**Ms. Françoise Boivin (Gatineau, NDP):** Thank you, Mr. Chair.

I am sure that those listening to us, especially the victims, feel some sadness. And today I am thinking about the victims. Mr. Minister, you have reminded us that the gun registry was created under the Liberal government at a very high price, and I agree. As a result, police forces and hunters have been divided. Perhaps because the Conservative government has been relentlessly opposed to this registry for years now, even before being elected, the victims, the Conservative government, hunters, police forces and other groups are unfortunately working against each other instead of working together as they would normally do.

Why is that? You are saying that it is to provide more safety. That is what the government has been telling us all along. But instead, it has managed to pit victims, hunters and police officers against each other. The victims want to feel safe and confident, and they thought they would get that with the registry. The hunters did not want to pay the fees for a registry and they felt they were being criminalized, although I don't think anyone intended to criminalize them. And the police officers have a tough job on a daily basis and their lives are on the line.

Here we are with a tool that may appear to be a lame duck to some. We could work on improving it and removing the irritants. Let us remember what the Conservatives keep saying. They say that we are using law-abiding hunters and citizens of Canada and that we want to criminalize them.

● (1140)

But if we made improvements to this, we would get all police associations on the same side. I understand that there could be views to the contrary.

Sir, you are the Minister of Public Safety. Your top priority should be public safety and communicating this feeling of safety to Canadians.

I have a a bit of trouble when I get emails, as we all do, from Ms. Thibeault, one of the survivors of the École Polytechnique massacre. She is making a heartfelt appeal to us. She is asking us to keep the long gun registry and to make sure that victims will not have to go through what those women have needlessly experienced.

Mr. Minister, I am looking at the types of weapons that are going to be excluded from the registry. When we are talking about non-restricted firearms, such as a Ruger Mini-14, a Steyr HS.50 M1 and a L115A3, we are talking about long range sniper rifles. We are not talking about shotguns that people use to hunt deer or moose. We are talking about rifles that can have rather dangerous consequences.

Previous bills have always included a provision for licence verification when firearms are transferred. Bill C-19 does not include any obligation of verification, which means that the person transferring the gun must simply have no reason to believe that the person they are giving it to is not authorized to have it. But verification is optional, Mr. Minister.

How can we go back to our ridings and tell people that we are feeling any safer by passing Bill C-19?

[*English*]

**The Chair:** Thank you.

[*Translation*]

Thank you, Ms. Boivin.

[*English*]

Mr. Minister.

**Hon. Vic Toews:** Thank you.

I think the problem the member illustrates is her concern that people feel they are safe. We're not only concerned about their feeling safe, but are also actually concerned about them being safe. That I think is the distinction between the NDP and my government. We actually take measures that increase public safety, that will result in people feeling safe, and we do not simply say we're going to do something that is ineffective, that is wasteful in terms of money, because we think you might feel safe. It's irresponsible to go down that road.

There are many more cost-effective measures that we can take to ensure that crime is reduced, and we are taking those. I mentioned some of those in my speech and opening remarks, and we are committed to doing that, including in Bill C-10.

Again, the member talks about the issue of the classification. This has nothing to do with the classification of firearms; this has to do with the registry of non-restricted firearms. If the member has a concern about classification, about whether a firearm should be restricted or prohibited rather than unrestricted, that's another issue. She should address that in legislation or a motion, or elsewhere. Again, this has nothing to do with the classification.

You see, Mr. Chair, the NDP is trying to confuse the issues of registration, licensing, classification, and to jumble all of that up to make people feel safe.

[*Translation*]

**Ms. Françoise Boivin:** I would like to ask you another question.

[*English*]

**The Chair:** Let him....

**Hon. Vic Toews:** The last thing is the issue of licence verification. This has nothing to do with licensing. I don't know how many times I can say that, Mr. Chair.

This has to do with non-restricted firearms, which would then be owned by people who are licensed.

● (1145)

**The Chair:** Madame, you have 30 seconds.

[*Translation*]

**Ms. Françoise Boivin:** Okay, thank you.

You talk a lot about the confusion in the debate. But you also talk about working together with the provinces. The Province of Quebec has bluntly told you that it wants to get the registry data. But you want to destroy them. I can see that the feds no longer want the data to be available, but if a province decides to use the data from the registry, why would access be denied when it is entirely legitimate according to the Information Commissioner?

[*English*]

**The Chair:** Thank you, Madame Boivin.

We'll now move to Mr. Norlock please.

**Mr. Rick Norlock (Northumberland—Quinte West, CPC):** Thank you, Mr. Chair. Through you, I want to say to the witness, thank you for coming.

Minister, there were so many questions that I wanted to ask, but I do want to perhaps assist my Liberal friend by telling her that it is the police who actually instigate section 100 orders. In other words, when they find....

**Hon. Vic Toews:** This is in respect of a licence.

**Mr. Rick Norlock:** Yes, when they find a person who shouldn't own a firearm, they can make an application before the court. To suggest that a minister of the crown who comes before any committee and doesn't have every statistic available in their department.... Well, I'll just leave it as it is.

Wouldn't you agree with me, Minister, that the real filter, the real ability of the state to make sure that only the people who should own firearms do is that they be put through a process—and we already have that process—to make sure they're not mentally ill, to make sure they're not spousal abusers, to make sure they don't have a violent criminal background? That would be my first question. In particular, does this revocation of the firearms registry have any effect on that?

The other question, Mr. Minister, is this. You were talking to us about giving the police the tools to do their job. Would you not agree that most police officers agreed with or lobbied our government to hire more police officers, both provincial and municipal, as well as RCMP? I'd like to talk about whether the government is delivering on that.

Also, with regard to the registry and its accuracy, I can tell you, Minister, that shortly after being elected I had a constituent come to me with an envelope. They had registered their firearm, and attached to it, on a page stuck to it—and I represent a riding in Ontario—was all the personal information of someone who had registered two firearms through the Province of Quebec. Doesn't that indicate how inaccurate the firearms registry is? Why would we want to perpetrate an inaccurate registry and give that inaccurate information to a province for them to instigate something that doesn't work anyway?

I wonder if you could make comment on those questions, Mr. Minister.

**Hon. Vic Toews:** Well, those are all very good questions.

First of all, of course I agree that it's important not to confuse licensing with registration, in the same way that we should not confuse gun control generally with the issue of registration. You'll see the proponents of the registry talking about gun control and trying to use studies from gun control matters generally on licensing and the like, and attributing those characteristics to the registry when they're quite frankly not attributable.

Secondly, our government took huge steps in hiring and facilitating the hiring of police officers by local jurisdictions—provinces and municipalities. That was a commitment our government made, and we delivered on that commitment. It was not only in the context of provincial and municipal police forces, but also in the context of the RCMP, which of course has an impact on many provinces who choose to have the RCMP as their provincial police or municipal police forces.

Back in 1998 when I was the attorney general of Manitoba, the former Liberal government shut down Depot, shut down the training of RCMP officers in this country, at a time when half of the RCMP officers would be eligible for retirement within five years. It was one of the most foolish things that could ever have been done, causing us huge problems in actually going after the bad guys and getting criminals. They shut down the police training.

When we came into government, on average we were only producing 300 officers out of Depot every year. I think to reach a break-even point there have to be around 1,000. We ramped this up to 1,800 coming out in the first year, because of the neglect of the prior government in actually getting police officers. They stressed things such as the gun registry and said that it was going to protect the public—that it was going to "make them feel safe", as the NDP said—but they neglected to actually put officers out on the street.

Our government has consistently put out many troops through Depot, and we've encouraged provincial and municipal governments to hire more officers as well in order to meet the true criminal safety needs of Canadians.

●(1150)

**The Chair:** Thank you, Minister.

We'll now move back to the official opposition.

We'll go to Mr. Harris, please, for five minutes.

**Mr. Jack Harris:** Thank you, Chair.

Mr. Toews, I've heard you say in the House, for example, that this is not about the changes that are going to affect the categorization of arms. Nevertheless, some of the consequences of your bill I find frankly irresponsible. There is the straight-up destruction of the registry and the destruction of the data when, first of all, the Canadian Association of Chiefs of Police say they want it and provincial governments such as Quebec's want it in the interests of public safety, and when the chiefs of police across this country have an important role to play in that.

You are also weakening the international obligation on tracing. That is also necessary for our own public safety, and the chiefs of police have pointed that out.

Thirdly, you are weakening the transfer requirements. That's what my colleague, Madame Boivin, was getting at—the weakening of the licensing verification requirements for transfer, thereby allowing guns to fall into the wrong hands. This is in clause 11 of the bill.

Importantly, you're also ignoring the consequences of no longer having merchants required to keep track of the guns they're selling, who they're selling them to, and the serial numbers and all of that, which was in place before the registry was there. By destroying the registry, you're not putting back that requirement.

You are going to be allowing semi-automatics such as the Ruger Mini-14. We're going to be allowing sniper rifles. We even have a sawed-off shotgun for sale that's manufactured as a sawed-off shotgun with a twelve-and-a-half-inch barrel so that it's not illegal. It's actually marketed as the Outlaw shotgun and is a double-barrelled 12-gauge shotgun on sale in this country for $325. These will not be restricted weapons; these will not be prohibited weapons. They will not be required to be registered or tracked in any way.

That, sir, is irresponsible. I'd like you to respond to those comments.

**The Chair:** Thank you, Mr. Harris.

Mr. Minister, please.

**Hon. Vic Toews:** All I can say is that if you have concerns about firearms that should be restricted and are not, that is outside the context of this bill. This bill does not change the classification system.

I don't know about all of the firearms you're talking about, but it is something that the experts do in classifying firearms. If you think there is a problem with that classification, we can have that discussion, but it has nothing to do with Bill C-19, and we shouldn't confuse the registry and the classification of firearms.

**Mr. Jack Harris:** They're now required to be registered.

**Hon. Vic Toews:** On the issue, though, of the registry, if that's what the question is, we have made our position very clear on the registry's ineffectiveness. But we're not changing the classification of that firearm or the necessity of someone obtaining a licence to possess that firearm.

**The Chair:** Quickly, Mr. Harris.

**Mr. Jack Harris:** Yes, Mr. Chair.

Very quickly, you've complained about the inaccuracy of the registry, yet you've had an amnesty in place for a number of years and, therefore, the records are obviously incomplete. You've also discouraged, through your political activity, people taking seriously the need for gun control, so it's not a surprise that the registry would not be complete. That's your fault. You have to take responsibility for that.

**The Chair:** Thank you, Mr. Harris.

● (1155)

**Hon. Vic Toews:** All I can say is that we made our position clear on the registry. There were certain amnesties that were put in place, and at least you're being frank with the committee in admitting that not only is the registry incomplete, it's inaccurate.

**The Chair:** Thank you, Minister.

We'll now move to the last question of the day and go back to Ms. Hoeppner for five minutes.

**Ms. Candice Hoeppner:** Thank you.

I'm quite surprised by the opposition members' lack of under-standing of the Canadian firearms program and the classification of firearms. If you saw off a shotgun, it becomes an illegal weapon. If you change a semi-automatic firearm into an automatic firearm, it becomes a prohibited, restricted firearm automatically. The long-gun registry deals with non-restricted, non-prohibited firearms.

Mr. Scarpaleggia talked about licensing. When an individual has his licence revoked, police officers are able to go in and apprehend the firearms in that individual's home. If two individuals have a licence to own firearms, the registered firearms can be transported between both places. So police officers could go out to a home where there are five firearms registered, and those firearms may not be legally stored at that individual's home. That's why police officers are telling us that when they go to someone's home, they don't look at the registry and say, "Well, there are two guns, so we'll go and apprehend those two guns from this individual whose licence was revoked, and then we'll know we're clear". No, they sweep the home and make sure that all weapons, all firearms, are accounted for.

I'm wondering, Minister, if you can talk a little bit about what front-line officers are doing when it comes to gun crime and what they're telling you when you meet with them. We have 11 police officers in our own caucus.

Can you tell us what they are actually doing when it comes to fighting crime and what they're asking us for, because the registry is not helping them? It's inaccurate. They can't count on it. And the way the system is set up, firearms can be stored at different locations.

**Hon. Vic Toews:** The point you make about the presence of 11 police officers in our own caucus is a good one. It's not a coincidence that police officers, generally speaking, support our political party because of the effective measures that we take on crime and gun control. This is a caucus of 11 that I consult with regularly, because they are the experts. They have that background and they have their ears to the ground in ways that I simply cannot match.

I hear on a regular basis from law enforcement officers who strongly support the legislative initiatives we have taken. Bill C-10 is generally supported by the police officers, the police chiefs. They are frustrated that for years this legislation has been stalled in the House of Commons because, prior to the last election, the Liberals and New Democrats consistently found ways to thwart the passage of legislation that would not just make people feel safe but would actually make them safer.

**Ms. Candice Hoeppner:** Thank you. That's all.

**The Chair:** You have another minute.

**Ms. Candice Hoeppner:** That's all I have.

**The Chair:** All right, does anyone else want to conclude in that minute left? I think our time is coming to an end.

Ms. Young, please make just a summary comment.

**Ms. Wai Young (Vancouver South, CPC):** Minister, thank you for coming here today and being clear about the differences between classifications, licensing, and the long-gun registry, which is Bill C-19.

I'm from Vancouver, and we've had several drive-by shootings in my own riding. In your experience, can you tell me whether criminals register their guns?

**Hon. Vic Toews:** That hasn't been the practice. Not only do they not register their guns, but they're also rarely licensed gun-owners. I think licensing can be justified as a means of qualifying people. It's a serious offence to have a firearm without a licence.

● (1200)

**Ms. Wai Young:** So the registry does not prevent people from being shot?

**Hon. Vic Toews:** No, it doesn't, because those are issues that are far removed from the registry. The last thing a young gang member is thinking about when he acquires a firearm is whether or not it is registered.

**Ms. Wai Young:** Thank you.

**The Chair:** Thank you, Minister, for coming and highlighting some parts of Bill C-19. This committee looks forward to continuing this study and reporting back to the House.

**Hon. Vic Toews:** Thank you.

**The Chair:** To the committee, we do want to ratify the steering committee report that is before you today. Our steering committee met the week before break week. We came up with the report that you see before you today. I'll quickly go through it.

The report recommends that the committee allocate five meetings to the consideration of Bill C-19, An Act to amend the Criminal Code and the Firearms Act, including its clause-by-clause consideration.

Also, the minister was to appear that day, November 3. If the committee remembers, we had votes that day, so the minister was unable to appear. He was here today because of it. That's taken up in the next part of the report.

The report also recommends that the committee adduce the evidence from the consideration of Bill C-391, An Act to amend the Criminal Code and the Firearms Act (repeal of long-gun registry), heard in the third session of the 40th Parliament. In the last Parliament, a short Parliament, we did a lot of this work, so the report recommends that this be referenced as well.

Mr. Garrison.

**Mr. Randall Garrison (Esquimalt—Juan de Fuca, NDP):** Thank you, Mr. Chair.

With regard to the five sessions, the NDP believes these are inadequate to deal with this bill. I know the other side says that this bill has been dealt with many times, but it's not the same bill. There are things in this bill, such as the destruction of data, that were not in the previous bill. There are serious omissions in the bill. There is no provision for restoring business tracking and licence verification.

As well, a very large number of witnesses would very much like to appear before this committee. And as I always remind the committee, nearly a third of the members of this House are new and have not had a chance to have the full benefit of these kinds of things.

We still do believe that five sessions will be inadequate and will not do justice to this bill, so we will be voting against this.

**The Chair:** All right.

Ms. Hoeppner.

**Ms. Candice Hoeppner:** Mr. Chair, I move that we accept this report.

**The Chair:** The question has been called.

All in favour of the steering committee report, please signify that.

(Motion agreed to [See *Minutes of Proceedings*])

**The Chair:** It is carried.

In our second hour today, we will continue our consideration of Bill C-19, An Act to amend the Criminal Code and the Firearms Act.

Appearing before us on this panel, from the Ontario Federation of Anglers and Hunters, is Greg Farrant, manager of government affairs and policy.

From the Canadian Labour Congress, we have Barbara Byers, executive vice-president; and Vicky Smallman, national director of the CLC women's and human rights department.

We have two people appearing as individuals: Sergeant Murray Grismer of the Saskatoon Police Service is master instructor for the Canadian firearms safety courses; and Ontario criminal defence lawyer Solomon Friedman created and maintains the firearmslaw.ca blog, a legal resource site devoted to Canadian firearms law and policy.

I invite each one of you to make a brief opening statement. We're going to try to hold these statements to about seven or eight minutes, if possible. Likewise, we'll try to get in as many questions as possible.

Welcome to the public safety and national security committee. We look forward to your input into this important work that we're conducting.

Perhaps I'll begin with Ms. Byers.

**Ms. Barbara Byers (Executive Vice-President, Canadian Labour Congress):** Thank you very much. On behalf of the 3.2 million members of the Canadian Labour Congress, we want to thank you for this opportunity to be here.

As you know from our previous appearances, we represent Canada's national and international unions and provincial and territorial federations of labour and 130 district labour councils. Our members work in virtually all sectors of the Canadian economy in all occupations in all parts of Canada.

The CLC opposes Bill C-19 and urges the standing committee to ensure that the long-gun registry is maintained. We support the long-gun registry as an effective tool for workplace and community safety. Eliminating it will put workers and Canadians at risk. Our brief to you outlines some of the legislative and political context, but in the interests of time, I'm not going to repeat all of that. I think you're certainly aware of some of the background.

As we stated 15 years ago to the parliamentary committee of that day, there are compelling arguments in favour of a gun registry: to ensure safe storage requirements, to ensure that gun owners are held accountable for the guns they purchase, to compel gun owners to report missing or stolen firearms, to reduce the illegal trade in rifles and shotguns, to give the police and first responders modern tools to take preventive action, and to trace stolen guns to their rightful owners.

After a decade of use, we've seen crimes solved and criminal prosecutions because of the registry. For example, two people were convicted as accessories in the 2005 killings of four RCMP officers in Mayerthorpe, Alberta, in part because a registered rifle left at the scene was traced back to its owner through the registry. That's a real example of law and order results. That's going after the bad guys.

The CLC has a long history of support for campaigns to end violence against women. Women's equality is a fundamental component of trade union policy in Canada. For more than 20 years, we have joined with women's organizations to commemorate December 6 and to propose actions to reduce violence against women. Our support of the gun registry has always included an understanding of its importance as a tool to help reduce violence against women. It was the massacre of 14 young women at l'École Polytechnique on December 6, 1989, that prompted the creation of a federal gun registry.

Gun violence is one very dangerous component of the issue of violence against women. More women are killed by their intimate partners than by strangers. Sixty-five percent of women are murdered by intimate partners compared to 15% of men. Most are killed in their homes. In 1991, before the first restrictions were introduced, one-third of the women who were murdered were killed with guns, and 88% of the guns used were long guns. A study conducted between 2005 and 2007 of rural domestic violence in Prince Edward Island and New Brunswick showed that 66% of the women interviewed felt that having a firearm in their home made them fearful for their safety.

Since the Firearms Act was introduced, the rate of women murdered with firearms by their intimate partner has decreased by 69%. That's not just making women feel safe, it's helping them be safe. There's no question that the gun registry has helped save women's lives. This government has said that one of its priorities is to reduce violence against women, yet this legislation will have the opposite effect by putting women's lives at risk.

Rifles and shotguns are the guns most available in people's homes. They are the guns most often used to kill police officers. Rifles and shotguns are the guns most often used in suicides, particularly those involving youth. In communities where there is high gun ownership rates, you see higher youth suicide rates. However, since the gun registry and its related requirements for safe storage of guns were introduced, youth suicide rates by firearms have declined in relation to suicide rates by other means.

Also because rifles and shotguns are the firearms that are most readily available, they also figure prominently in workplace violence involving guns. In 1999, a devastating incident of workplace violence occurred right here in Ottawa at the OC Transpo bus yard

on St. Laurent Boulevard. Those murders were committed by a gunman with a high-powered hunting rifle.

● (1205)

Increasingly, as we learn more about the challenges of maintaining healthy and safe workplaces, we are paying more attention to the importance of understanding the risk factors associated with both suicide and interpersonal violence. The risk factors for suicide and violence are closely linked. Access to a firearm coupled with a personal or a job crisis is a lethal combination. We need to promote more awareness of the real risks associated with any firearm in the hands of a depressed or stressed individual. We need to ensure that police, who are the first responders to these situations, know as much about the situation as possible, including what kind of gun is involved.

Everyone on this committee knows how useful the registry is to our nation's police forces and first responders. The registry provides police with vital knowledge of the number of guns and, more importantly, the types of guns owned. That vital knowledge allows them to assess risk to themselves and to others and to remove guns from homes in situations that are a risk to the home and the public. It lets firefighters know when guns and ammunition are likely to be stored on a property, which is a lifesaving piece of information when you're about to enter a burning building.

For law enforcement, firefighters, emergency personnel, and social workers—like I was—information about potential risks is crucial in ensuring their safety on the job. Like any worker, they have a right to a safe workplace. By denying them access to information about the possibility of guns in a home, this legislation puts their safety at risk.

Destroying the data is the real boondoggle. Most of the costs associated with setting up the registry were incurred a long time ago and will never be recovered. The taxpayers of Canada will never get their money back. The annual costs of maintaining the registry today are cost-effective for the job that it does—and the registry is even more efficient now that it no longer receives a revenue stream from licence renewals. Most of the costs of the registry frequently cited by its opponents are in fact costs related to licensing, including background criminal checks of applicants.

Over 7.4 million guns are registered to date, with long gun—

● (1210)

**The Chair:** We're coming to the end. We're actually over our time, so if you wouldn't mind, just draw everything very quickly to a close.

**Ms. Barbara Byers:** Okay, I'll just point out a couple of things.

First off, the database is consulted over 17,000 times a day by police across the country. We know that, and it can't be dismissed.

The proposal to throw out the data will absolutely put the lives of people at risk, not just in their communities but also in their workplaces—and for many people, these workplaces are other people's homes.

Our taxes have been spent on the registry. We believe that we need to keep the registry and to make sure that people's lives and communities and workplaces are safe.

Thank you.

**The Chair:** Thank you very much.

We'll maybe just move down the line here.

Mr. Farrant, welcome, and we look forward to your comments.

**Mr. Greg Farrant (Manager, Government Affairs and Policy, Ontario Federation of Anglers and Hunters):** Thank you very much, Mr. Chair.

Good afternoon, members of the committee, and my fellow panellists. On behalf of the Ontario Federation of Anglers and Hunters, one of the oldest and largest non-profit conservation-based organizations in Canada, we appreciate this opportunity to appear before you today to comment on Bill C-19.

Although we've provided the clerk with a longer written presentation, it will not meet the seven-minute test, so I'll use my time to home in on a few specific issues referred to in that document.

As I noted during my appearance before this committee last year in support of Ms. Hoeppner's private member's legislation, Bill C-68, as has been noted by Ms. Byers, was born partly out of tragedy attributable to public concerns in the aftermath of the horrific 1989 shooting at École Polytechnique. There's no doubt that the impact of that event on the families of the victims and the survivors cannot be underestimated or understood by those of us who have not experienced such loss. However, that loss cannot be used to justify a system that has been an abysmal failure, and we strongly support the fact that the Harper government has moved quickly to introduce a bill to address this issue.

When Bill C-68 was created, the Coalition for Gun Control attempted to explain the need for this registry and other components in the bill, and I quote:

> The argument for gun control has never been based on individual cases.... [It] has always been based on the general principle that if you have adequate control of all guns you reduce the chances that dangerous people will gain access to them.

At best the coalition was being disingenuous. The entire debate over gun control and the creation of a long-gun registry under Bill C-68 was in fact a direct result of the misguided actions of a lone individual. Prior to that, gun control in Canada was not a major public policy issue, and the creation of a regime to regulate legal firearms, particularly non-restricted long guns, as a means of protecting the public from individuals with a grudge was flawed from the start.

A paper trail of trained, legal, licensed firearm owners does not address the real problem. Even a well-run registry, which this is not, will not prevent random violent crime. Believing in that ignores the

glaring reality that the vast majority of criminals don't register firearms; and in the rare case when they do, a piece of paper and the creation of a system where possibly 50% of the firearms in Canada are not included does nothing to anticipate the actions of an individual, nor do anything to prevent such actions in the first place.

It also ignores the fact that police in this country have noted repeatedly that anywhere from 70% to 90% of illegal guns in Canada are smuggled in from south of the border. Despite this, we hear little from gun control advocates about the need to address this serious problem, which is indeed directly linked to dangerous people gaining access to these guns.

The OFAH represents a large number of hunters and recreational sport shooters in Ontario, responsible firearms owners who believe in effective gun control. In the early 1960s, we called upon the provincial government of the day to create a formal structure for the delivery of hunter education. For more than 26 years, we have delivered some form of hunter education on behalf of the provincial government, and since 1998 we have done so under formal agreement.

The success of that program is readily apparent: 310 hunter education instructors, most of whom are also firearm safety instructors, have trained over 170,000 first-time hunters. The program has an admirable safety record, as do the majority of responsible firearms owners in this country who understand how to use them safely, how to store them safely, and how to transport them safely and use them precisely for what they are intended for—recreational shooting and hunting.

As a conservation-based organization, the OFAH is involved in a vast number of conservation programs based on the best available science. Science relies on fact. Scientific theory is tested, and if the facts are found wanting, a theory is rejected and the search continues for a rational explanation. In the case of the long-gun registry, there's a glaring absence of fact-based evidence to support its existence. Suggestions that gun crime in Canada has declined since the introduction of the long-gun registry under Bill C-68 ignores the fact that gun crime, particularly gun crime using long guns, has been on the decline in this country since the 1970s, two decades before this registry ever came into being. Crimes committed with long guns have fallen steadily since 1981. Bill C-68 was not introduced until 1985 and wasn't mandatory until 2005.

Noted academics like Rosemary Gartner of the University of Toronto have recently commented that experts have had difficulties in accounting for the decrease, and Dr. Ron Melchers, professor of criminology right here at the University of Ottawa, recently stated that the decline cannot be attributed to Canada's gun registry.

●(1215)

Believing that something works without evidentiary material to support that belief is nothing more than supposition and conjecture.

The present system focuses all of its efforts on law-abiding firearms owners and includes no provisions for tracking prohibited offenders, who are most likely to commit gun crimes. Witness the recent arrest of an individual in Newfoundland for gun crimes, an individual who has been under a prohibition order for 10 years.

This should be about who should not have guns rather than about who does. We strongly support the creation of a prohibited persons registry to focus on real, not perceived, threats to public safety.

Another prominent argument we've already heard here today is how many times per day the system is used by police. Some say 9,000 times. Some say 5,000. We've recently heard 14,000 and 17,000. Liberal leader Bob Rae has suggested 11,000. The vast majority of so-called hits on the registry have little or nothing to do with gun crime. The majority of these are cases of an officer maybe stopping a vehicle for a plate identification or an address identification, which automatically touches all databases, including the long-gun registry, despite the fact that the check has nothing to do with firearms in the first place.

The Canadian Labour Congress, with all due respect to my colleagues here on the panel today, suggests that social workers, paramedics, firefighters, and other first responders use the information to keep themselves safe on the job. These groups and individuals do not have access to the database. So unless the CLC is suggesting that each and every time a social worker, firefighter, or paramedic responds to a call, they first contact police and have the database queried specifically to determine if firearms may be present, it's difficult to understand how this happens. In fact, for police to share the information on the database may well be a breach of privacy.

Over the last few years, public support for the registry has eroded. While this confidence has waned, the level of rhetoric from supporters of the registry has increased exponentially. This has resulted in an increase in unfounded generalizations, devoid of factual evidence. For instance, on second reading of Bill C-19, members of the official opposition who voted with the government were punished. The irony of this is not lost on us, nor is the discrediting of these two members—which is interesting given that when Bill C-68 was created, eight of nine NDP members at the time voted against the bill that they so vigorously defend today.

Recently some media sources, members of the official opposition, members of the third party, and registry apologists have suggested that the introduction of Bill C-19 will do various things. For example, they say that scrapping the registry will involve delisting various guns and sniper rifles; that lawlessness will rule the day; that solving gun crimes will end, because police will have no more tools at their disposal; and that this is a Conservative plot to undermine a Liberal-created program.

● (1220)

**The Chair:** Mr. Farrant, your time is pretty well over.

**Mr. Greg Farrant:** I'll be as quick as I can, Mr. Chairman. I appreciate that.

**The Chair:** Yes, just conclude, please.

**Mr. Greg Farrant:** The facts do not support that. The bill has nothing to do with delisting anything. Other components, as you've heard today, remain in place. Police, such as OPP Inspector Ed Medved, have said that losing the registry is not going to shut them down. There are innumerable registration databases across this country—I could list them all for you if I had time—that are still in use by police.

When the bill was created, five provinces challenged the constitutionality of it, including three Liberal governments, which undermines the partisan argument.

**The Chair:** Thank you, Mr. Farrant. We have to leave it there.

**Mr. Greg Farrant:** Sure.

**The Chair:** Maybe you can provide some of the other information in response to questions that will be asked.

**Mr. Greg Farrant:** Thank you, Mr. Chair.

**The Chair:** We'll go to Mr. Friedman, please.

**Mr. Solomon Friedman (Criminal Defence Lawyer, As an Individual):** Mr. Chair, vice-chairs, honourable members, good afternoon.

My name is Solomon Friedman. I'm a criminal defence lawyer in private practice with the Ottawa firm of Edelson Clifford D'Angelo LLP. Although I maintain a comprehensive criminal law practice, I specialize in defending persons charged with firearms offences. My clients, and I as their counsel, experience on a regular basis the onerous and deleterious effects of the long-gun registry.

You will no doubt hear in the coming days and weeks from various interest groups about how the long-gun registry is a minor inconvenience, merely a matter of paperwork. We register our dogs, our cats, and our cars, they say. Why not register our shotguns and rifles, as well?

As you know, the registration scheme for non-restricted long guns, and for prohibited and restricted firearms as well, is enacted as federal legislation under the Criminal Code and under the Firearms Act.

The Supreme Court of Canada, in the Firearms Act reference, held that the Firearms Act is valid federal legislation, because it is enacted pursuant to the federal criminal law power. Indeed, this very aspect of the Firearms Act that makes it valid federal legislation ensures that those who fail to comply, inadvertently or otherwise, are punished harshly and in many cases unjustly. With the criminal law power comes criminal law procedure and, most importantly, for the nearly two million law-abiding licensed gun owners in Canada, criminal law penalties. Unlike a failure to register a pet or a motor vehicle, any violation of the firearms registration scheme, even the mislaying of paperwork, carries with it the most severe consequences: a criminal charge, a potential criminal record, detention, and sometimes incarceration. This is hardly comparable to the ticket under the Provincial Offences Act or the Highway Traffic Act that goes along with the failure to register a vehicle.

In addition, registry violations are often grounds for colourable attempts on the part of police, the crown, and the chief firearms officer to confiscate firearms and revoke lawfully obtained gun licences. As defence counsel, I have seen time and time again alleged long-gun registry violations used as a pretext to detain individuals, search their belongings and their homes, and secure evidence to lay additional charges. It is absurd to think that through the requirement to register long guns and possess and carry registration certificates, it is the law-abiding citizen who is subject to greater police scrutiny than the unlicensed individual, who is truly in unlawful possession of a firearm.

Next, the long-gun registry is simply one more layer of paperwork and complexity in a system of firearms regulation that is already overwrought with process and procedure. I have two law degrees. I clerked at the Supreme Court of Canada, and I practise criminal law for a living. Even I at times find the provisions of the Firearms Act and the gun control portions of the Criminal Code convoluted, complex, and confusing. The long-gun registry is simply one more trap for the unwary, a stumbling block for the blind.

Parliament ought not to be in the business of transforming licensed, law-abiding, responsible citizens into criminals, especially not for paper crimes. Should this piece of paper really determine the difference between lawful possession of a rifle or shotgun and an illegal act punishable by criminal sanction?

I am certain that you will hear about the symbolism of the long-gun registry. Enacted as a knee-jerk reaction in the aftermath of tragedy, the gun registry, like much of the current gun control scheme, was seen as a tribute to individuals who lost their lives at the hands of gun wielding madmen. Honourable members, I can tell you firsthand, from my vantage point in courtrooms across eastern Ontario, laws make terrible memorials. They fail to honour the dead and instead punish only the living, in this case the law-abiding and responsible. In fact, I hope that Bill C-19, the repeal of the long-gun registry, will itself be a symbol. It will be symbolic to millions of licensed gun owners and stand for the proposition that the government will no longer punish the law-abiding for the acts of the lawless.

I hope, and I know many of my clients share this hope, that Bill C-19 will serve as a memorial of sorts, a tombstone marking the final resting place of wrong-headed policy-making. There are millions of Canadian gun owners who will be glad to know that in the halls of

Parliament Hill, hysteria and hyperbole no longer trump reason, facts, and empirical evidence. The long-gun registry has been used as a means to target licensed gun owners for too long. I urge you to pass Bill C-19 without amendment, and end it.

● (1225)

Honourable members, long guns are tools used lawfully and peaceably by Canadians countless times a day without incident. Responsible citizens do not cease to act responsibly due merely to the presence of tools. Similarly, the registration of firearms, aside from having no discernible impact on crime or public safety, has merely alienated law-abiding firearms owners and driven a deep wedge between gun owners and law enforcement.

Gun owners have long been the whipping boys of Canadian politics. I hope that this bill symbolizes a change in attitude by our parliamentarians.

Thank you very much.

**The Chair:** Thank you very much, Mr. Friedman.

We'll now to move to Mr. Grismer, please.

**Det Sgt Murray Grismer (Sergeant, As an Individual):** Mr. Chairman, honourable committee members, and fellow witnesses, it's an honour and a privilege to appear before you today to assist you in your deliberations regarding Bill C-19.

I'm a sergeant with the Saskatoon Police Service, with almost 25 years of service protecting the citizens of Saskatoon and Saskatchewan. I supervise a team of 10 constables, front-line men and women responsible for policing the second-largest geographic area in the city of Saskatoon. The courts of Saskatchewan have qualified me as an expert witness, enabling me to give opinion evidence on firearms. In that capacity, I've provided assistance in over 50 cases to both federal and provincial prosecutions. I'm a master instructor for both Canadian firearms safety courses and an approved verifier certified by the registrar of the Canadian firearms program.

I want to make it clear from the onset that my comments here today are mine, and mine alone. They do not reflect the opinion or opinions of my employer, the chief of police or police service. That said, I am the appointed spokesperson for the Saskatoon Police Association on the Firearms Act and the firearms registry. Further, until the fall of 2002, I was a spokesperson for the Saskatchewan Federation of Police Officers on the issues of the Firearms Act and the firearms registry.

I understand that this august committee will have opportunity to hear from other police officers who share my belief that the registry for non-restricted rifles and shotguns, commonly referred to as long guns, should be abolished. Thousands of police officers across Canada, who are in my opinion the silent or silenced majority, also share this position.

To say that the police community is divided on support of the registry is an understatement. When the Canadian Police Association initially endorsed the registry, they adopted their position without ever formally having polled their membership. The CPA's position is not that of the Saskatchewan Federation of Police Officers, nor that of the Saskatoon Police Association. The Saskatchewan federation is the only provincial police association that polled its entire membership on the issue of the registration of firearms. When polled, the Saskatoon Police Association was 99.46% against the registry, while our compatriots in many of the other Saskatchewan police forces were 100% in opposition to the registry.

There are some who would arrogantly or foolishly consider those opposed to the registry as uninformed or uneducated. Nothing could be further from the truth. Instead, we recognize that the true cornerstone of public safety is training, screening, and the licensing of owners, not the registration of non-restricted rifles and shotguns.

Although the mantra of the former government, the CACP, and the CPA was "gun control is crime control", the registry misses the target of the criminal use of firearms. Instead, it targets millions of lawful, legitimate firearms owners in the name of crime control. The fact is, the registry can do nothing to prevent criminals from obtaining or using firearms. École Polytechnique, Mayerthorpe, Spiritwood and Dawson College are synonymous with tragic events involving firearms. However, the firearms registry for long guns would not, could not, and did not stop these tragic events. The retention of the firearms registry or records will do nothing to prevent any further such occurrences. Training, enhanced screening and licensing of firearms owners, as we see today, may have prevented those individuals from being able to obtain a firearm in the first instance. However, even Canada's strict licensing regime and firearms registry cannot prevent random acts of violence. The best example of this failure is the shooting rampage at Dawson College by Kimveer Gill.

The CACP contends that Canadians continue to support a registry that costs over $2 billion and which cannot be shown in over a decade to have prevented even one death. Unfortunately, public opinion polls do not support their position. The CACP and others will attempt to convince you that retention of the registry is an officer safety issue. Further, they will advocate for the retention of the records accessible on a database to police investigators if the registry is abolished. To the layperson having little or no knowledge of firearms or the registry, this may appear reasonable. However, once one knows and understands the failing of the registry, the issue of officer safety takes on a far more sinister meaning. For the officers using the registry, trusting in the inaccurate, unverified information contained therein, tragedy looms at the next door.

The argument to retain the registry for investigative purposes is disingenuous or specious at best. Once the registry is abolished, the information contained therein is immediately stale-dated. The limited evidentiary value of such erroneous information deteriorates by the minute as firearms across Canada are acquired, sold, altered, or destroyed.

● (1230)

Knowing what I do about the registry, I cannot use any of the information contained in it to square with a search warrant. To do so would be a criminal act. Thus, I cannot in good conscience tell any

officer—junior or senior—to place any faith in the results of a query to the Canadian Firearms Registry.

Projections from within the Canadian Firearms Centre privately state that it will take 70 years of attrition to eliminate all of the errors in the registry and to have all of the firearms currently in Canada registered. This level of inaccuracy is unacceptable for any industry, let alone law enforcement. Police officers deserve better. The public and the courts demand better. If the National DNA Data Bank or the automated fingerprint identification system had the same potential error, the public and the courts would be outraged, and with just cause. Every entry in these latter databases is empirical—a level of accuracy that the registry has not attained.

As a team leader for the Olympics security force, I had the opportunity to speak with officers from across Canada. The vast majority of those I spoke to do not support the registry. They do not trust the information it contains, and see it as a waste of time and money.

Again I take you back to the issue of officer safety. Police across Canada cannot and must not place their trust in, or risk their lives on the basis of, the inaccurate, unverified information contained in the registry. From my perspective, if doing away with the registry saves one of Canada's front-line police officers, it's elimination is worth it. Retaining the registry at the risk of one police officer's life is too great a price to pay.

In closing, I wish to thank you for your attention and will leave you with these thoughts. Polls indicate that the majority of Canadians want the registry for non-restricted rifles and shotguns abolished. This position is supported by a majority of front-line police officers in Canada. Further, this government ran on a platform of ending the long-gun registry. The last election represented a referendum on that platform, and a majority of Canadians voted to support it.

Bill C-19 is worthy of your consideration and support, for it brings to an end a registry that represents the largest and most contentious single waste of taxpayer dollars. It is full of errors and inaccurate data. It is a registry that front-line police officers do not trust, use, or support. More importantly, it risks the safety of front-line police officers across Canada.

Thank you.

**The Chair:** Thank you very much.

I want to thank all our presenters today for presenting their perspectives. They did a good job.

We'll now move to the government side for seven minutes.

Mr. Leef, please.

**Mr. Ryan Leef (Yukon, CPC):** Thank you, Mr. Chair, and thank you to all our witnesses here today.

This line of questioning will be for Mr. Grismer.

We've heard some conflicting testimony today. It's indicative of what we've heard throughout the debate on the long-gun registry itself and what the community feels about it. Maybe you can clarify one question I have, to see if we can bring some resolution to the conflicting information before us.

I was formerly a conservation officer in the Yukon territory. I checked hunters all the time and hundreds of firearms in a season. I never had access to the firearms registry. I never felt that put me at greater risk, because we used universal precautions training to protect ourselves. We didn't have a great deal of faith in the registry anyway. The point is that we did not have access to the registry.

We heard Ms. Byers indicate that firefighters and social workers have access to it. Mr. Front said that was absolutely inaccurate. Can you give us the facts on that? Do social workers and firefighters have direct access to the registry, or are they able to call the police and just access registry information?

● (1235)

**Det Sgt Murray Grismer:** The registry is a police-access database. To the best of my knowledge, firefighters do not have access to it, paramedics do not have access to it, social workers do not have direct access to it.

From my experience and my position when I was in professional standards, to divulge any information contained in that database to any unauthorized person is a breach of security, and a breach of the Privacy Act in regard to the individual to whom that information pertains.

**Mr. Ryan Leef:** Being in a rural part of Canada, so to speak, I'm sure at some point in your career you have worked with other agencies like the Canadian Wildlife Service, conservation officers, and Fisheries and Oceans officers.

**Det Sgt Murray Grismer:** I've worked with the wildlife officers within our jurisdiction. I don't come into much contact with federal fisheries and wildlife officers.

**Mr. Ryan Leef:** Okay.

So when we're talking about officer safety, which is one of the things that is unfortunately really being spread out across the public, to the masses.... On this, I've spoken with numerous front-line police officers—and not to run my resumé, but I've been a member of the Royal Canadian Mounted Police—I know that the members I worked with daily have no confidence in the registry and don't support it.

But let's talk about the safety. When you're called to a residence, would the absence of firearms or a hit on that registry provide any greater measure of safety for an officer?

**Det Sgt Murray Grismer:** Universal precautions are used any time any one of my people go to a residence. I try to get to as many domestic disturbances as I can, because I find that the presence of a supervisor there, someone of senior rank, tends to help people out. And to the best of my knowledge, I know of no front-line police officer in Saskatoon who queries the registry en route to a call. It's just not anything that happens. Their first priority is to get there. They use precautions in approaching a residence.

As for a hit on that registry, if they were to query that registry and they were to believe the information saying there were no firearms there, they would be placing themselves at great jeopardy in proceeding further if they didn't take precautions in approaching that residence. If you go there with the thought process in mind that there are no firearms there—that's what I've tried to convey—you're putting yourself at risk. You are doomed to some kind of terrible tragedy.

We take every precaution. Once we find there's a firearm there, or if we have any indication there are firearms there, we seek to cordon off the area to secure it so that we can bring in qualified people, people from our emergency response team, who have the tools and the ability to deal with armed or barricaded individuals.

**Mr. Ryan Leef:** In respect to weapons across the board, which ones are really of most concern to front-line police officers?

**Det Sgt Murray Grismer:** Handguns.

**Mr. Ryan Leef:** Handguns?

**Det Sgt Murray Grismer:** Handguns and knives.

**Mr. Ryan Leef:** And knives?

● (1240)

**Det Sgt Murray Grismer:** Knives are a far more predominant as weapons than rifles, shotguns, and handguns.

**Mr. Ryan Leef:** When you're searching a detained or arrested individual, what would you say would be the greatest issue of concern for an officer going hands on with a detained or arrested individual in terms of weapons or objects that would be a safety issue for officers?

**Det Sgt Murray Grismer:** Mostly we encounter knives—

**Mr. Ryan Leef:** Knives—

**Det Sgt Murray Grismer:** —because they are secreted on the person, and often when they are found, they are found in various places like.... For some people we've transported to our detention centre, when they get searched really closely or skin-searched in our detention area, we end up finding weapons on them, and generally they are knives, cutting instruments.

**Mr. Ryan Leef:** Would you say that, on a daily basis, street checks, vehicle checks, and person checks are more frequent than residence-based checks? This may be a rough figure.

**Det Sgt Murray Grismer:** Oh, by far.

**Mr. Ryan Leef:** When you're doing a street check, would you have an immediate and accurate access to the registry that would provide a greater measure of safety for front-line officers?

**Det Sgt Murray Grismer:** We don't do that on street checks. When we're doing a street check of an individual, that's not something that my people do: we query CPIC. Through CPIC, running somebody's licence plate will automatically generate a CPIC query on the individual. That will bring up whether he has wants or warrants and that kind of thing.

**Mr. Ryan Leef:** And that's something that would happen thousands of times a day across this country, in checking—

**Det Sgt Murray Grismer:** Absolutely.

**Mr. Ryan Leef:** —cars.

**Det Sgt Murray Grismer:** Yes.

**Mr. Ryan Leef:** Would officers ever stop a vehicle and proceed with a check without accessing a registry? If so, how do they stay safe doing that?

**The Chair:** Thank you, Mr. Leef—

**Det Sgt Murray Grismer:** I have one question for Mr. Leef.

**The Chair:** Yes, go ahead.

**Det Sgt Murray Grismer:** When you say "accessing a registry", what are you asking?

**Mr. Ryan Leef:** The firearms registry.

**Det Sgt Murray Grismer:** Well, they don't. The point that I've tried to make—and I speak for my jurisdiction—is that we conduct checks on CPIC and on the individual just in running the plate. That may not be the individual in the vehicle; that's just to whom it is registered. Those queries come back, and from there on, if an officer feels the need, he can delve deeper into the individual he's dealing with.

**The Chair:** Thank you, Mr. Grismer.

We'll now move to the official opposition.

Mr. Harris, go ahead, please, for seven minutes.

**Mr. Jack Harris:** Thank you, Mr. Chair.

Thank you to all of the presenters here today. It was most interesting to hear the various views.

Sergeant Grismer, first of all, I take it that when you were certified as an expert in firearms and you dealt with prosecutions in the Saskatchewan court, it was in relation to the operation of firearms and training. You weren't certified as an expert in firearms control and registration policies? So it was related to ballistics or the use of firearms in a particular criminal act. Is that correct?

**Det Sgt Murray Grismer:** When they qualified me, the courts gave me very broad latitude. In addition to the operation and classification of firearms, I also provide the crown with opinions on aspects of the law pertinent to a particular case at hand.

**Mr. Jack Harris:** So it wasn't in terms of policy. For example, when the paper you gave us says that the registry can do nothing to prevent the criminals from obtaining or using firearms, that's not part of your expertise in terms of an opinion you would offer to a court, for example.

**Det Sgt Murray Grismer:** That's true. I've not been qualified by the court with it. That comes from 25 years of being on the street as a front-line police officer and as a person who worked in major crimes for a period of time.

**Mr. Jack Harris:** I take it then, from that statement and your comment, that you would disagree with the Royal Canadian Mounted Police firearms program evaluation, which says that "without registration there is a failure of accountability on behalf of the owner, and it is registration that drives accountability. Without registration, anyone can buy and sell firearms privately and there would be no record."

You disagree with that. In your opinion, that it is a false statement and, based on your experience, that is not accurate.

● (1245)

**Det Sgt Murray Grismer:** I disagree with their statement.

**Mr. Jack Harris:** Okay. Thank you.

They also say "registration further helps to reduce the general proliferation of firearms. This is very useful in investigating licensed owners in the trafficking of firearms to unlicensed owners. Without the registry it becomes almost unenforceable."

Do you disagree with that?

**Det Sgt Murray Grismer:** I submit, sir, that there are other tools by which to do that.

**Mr. Jack Harris:** When they say, "Firearms registration is a critical component of the entire firearms program," you disagree with that as well?

**Det Sgt Murray Grismer:** I do. As I said in my presentation, I believe that training, screening, and licensing of owners are the cornerstones of it.

**Mr. Jack Harris:** Yes, and I wanted to get to that actually. So the training, screening, and licensing are the cornerstones of it, but as a police officer, wouldn't you be concerned about the proliferation of firearms? Wouldn't you be concerned about the smuggling of firearms? Wouldn't you be concerned about all sorts of firearms in use throughout the country? Wouldn't that be a cornerstone of public safety when it comes to firearms?

Training is for those who seek it. Licensing and public education are also for those who seek it. These are useful, but if you're saying you'd ignore the other aspects of enforcement and proliferation, the present legislation—and I assume that you read it—says that a person may transfer a firearm that's neither prohibited nor restricted if the transferee holds a licence. There's no mechanism for enforcement. In fact, if one actually voluntarily goes to the registrar to see whether there's any particular issues with respect to the proposed licensee, there's a provision that says that "neither the Registrar or his or her delegate nor a designated person shall retain any record of a request made under subsection (1)".

So it seems that this legislation is designed to ensure that firearms can be transferred without being traced, without being tracked. They can go anywhere. Even though there's a voluntary requirement here, there's no mechanism to enforce it, and we're talking about this ability with regard to unrestricted and not prohibited firearms, including semi-automatics and sawed-off shotguns that are manufactured as sawed-off shotguns. In other words, they're not manufactured big and cut short.

These can proliferate without any restriction whatsoever. In your opinion, that's okay because licensing, training, and public education are really all that's necessary.

**Det Sgt Murray Grismer:** I want to take you back to the first part of your dissertation. You talked about the traffic in firearms and firearms being smuggled. The firearms that are being smuggled into Canada from the United States are not long guns, rifles, and shotguns, but handguns.

The gangster on the street doesn't want a big, unwieldy firearm. He wants something small, something he can hide, and it becomes a status symbol to him to have that in his possession.

Those firearms, sir, are restricted and have been restricted since 1934. We still see a huge proliferation of them on our streets. We still do drug raids and find unregistered handguns and firearms that have been smuggled into this country from the United States. We're not finding rifles and shotguns smuggled in. Those are not what the gang underworld uses.

If I run into firearms, by far handguns or prohibited weapons are what I encounter most—things that have been sawed-off and chopped up, and some very crudely done.

So do I think the registry is going to stop any of that stuff? No. Do I think the registry of long guns will stop any of that? Absolutely not.

**The Chair:** Jack, you have five seconds.

**Mr. Jack Harris:** I'm done?

**The Chair:** Yes. Thank you very much.

We'll now move to Ms. Hoeppner, please.

**Ms. Candice Hoeppner:** Thank you very much, Mr. Chair.

I just have a few minutes so I'm going to try to go rather quickly.

Mr. Friedman, I'm wondering if you could comment on previous testimony on Bill C-391, which will be part of this study.

We heard that certain studies have shown that if you are a licensed gun owner, you're actually 50% less likely to commit a homicide or a gun crime because, by and large, that means you are a law-abiding individual who complies with rules and regulations as they are established.

We heard testimony from Mr. Grismer that the best way to prevent gun crime is education, training, and licensing, all of which—as even Mr. Harris acknowledged—would be complied with by somebody who had agreed to be trained, to be educated, and to be licensed. As well, those would be individuals who would agree to register their firearms. All of this has to do with compliance, with people who are complying with the laws.

Mr. Friedman, approximately a year and a half ago, the Toronto police department did a sweep of the city and they looked at who had a licence and who had a registration. They ended up spreading about 1,500 long guns on a table, saying, "Look at all the guns we got off the street." I asked them, "Did you arrest one drug dealer, one person who had been domestically violent, one person who was involved in gang activity, or did you make any arrest for criminal activity?" The answer was "No."

Can you explain, Mr. Friedman, who was being targeted and what kind of effect that had on the law-abiding gun owners in Canada?

● (1250)

**The Chair:** Mr. Friedman.

**Mr. Solomon Friedman:** Absolutely.

I think the very first point you raised is the answer to your question, which is that we already have a wonderful database in this country of law-abiding citizens. It is the firearms licensing system.

Those individuals are pre-approved through rigorous background checks. In fact, if I were to compare the screening I underwent to obtain a secret security clearance for the Government of Canada with the screening that a law-abiding firearm owner goes through to obtain a possession and acquisition licence, without a doubt the licence screening is far more rigorous. We have a list of individuals who have been pre-cleared as law-abiding citizens, who are legitimate gun users. They are not the ones who are trafficking in firearms; they are not the ones who are smuggling firearms.

When we talk about the abolition of the registry and perhaps allowing firearms owners to transfer their firearms without a record, these are individuals who have already been pre-qualified by the Government of Canada as law-abiding citizens. They are not the ones who have anything to do with the proliferation of illegal firearms into this country.

The answer, of course, as you alluded to, is drug dealers—individuals with lengthy criminal records that would make them ineligible for a firearms licence, and in many cases, individuals with outright firearms prohibitions imposed by our courts, meaning that under no circumstances could they lawfully possess a firearm, transfer one legitimately, or obtain a licence. That has absolutely nothing to do with the registry. The registry targets one group, and one group alone, and that's law-abiding firearms owners.

**Ms. Candice Hoeppner:** Thank you very much.

Sergeant Grismer, in regard to the police using the registry—or not using it, because it's so unreliable—you referred very briefly to our current fingerprint database as well as our DNA database, and the reliability of both those databases as compared to the long-gun registry.

If we do truly depend on it, and if you can get warrants based on the fingerprint database or the DNA database, can you explain a little further why you can't you get a warrant based on the long-gun registry database? That's a huge gap.

**Det Sgt Murray Grismer:** My presentation says I cannot and will not swear out a warrant based on the information contained in it. For me to obtain a search warrant, I have to swear before a judge or justice that I invariably believe the information contained in it to be true. If I include anything from the firearms registry, I can't swear out the warrant. That would be a false declaration.

I can't do that because I know of the errors. I know that in excess of a million guns and other firearms in Canada aren't in the registry. I know of the tens of thousands of firearms that are registered using patent and model numbers, and I know of the number of firearms in the registry that hold multiple registration certificates.

It's a database that, by all accounts from people within the registry, will take 70 years of attrition in order to be anywhere near accurate. I'm not going to swear before a judge, justice, or court that I believe information from it be true. I can't do that.

**Ms. Candice Hoeppner:** Thank you.

Mr. Farrant, you spoke briefly about something that is very disturbing to me and, I think, to all Canadians. That's the fact that two NDP members of Parliament who represented their constituents —whom you also represent with your organization in Ontario, because these two NDP MPs are from Ontario—were penalized severely by their party for consistently representing the constituents' views on this issue. They say they were never told this was a whipped vote. No one ever went to them and advised them of the consequences.

Bruce Hyer and John Rafferty have consistently stood up for their constituents, and they have now been severely penalized by the NDP, which would rather hear from some union representatives than their own members of Parliament who represent their party.

Can you please explain to all of us on this panel what message that sends to the people you represent in Ontario about how well respected their views are by the NDP?

● (1255)

**The Chair:** Thank you.

**Mr. Greg Farrant:** Thank you very much, Ms. Hoeppner, for the question.

Quite clearly, members of Parliament are sent here to represent constituents. They're elected by people locally to come to Ottawa to represent the views of the people in the community in which they reside. The two individuals in question have consistently represented the views of our members and the vast majority of legal, law-abiding hunters and recreational sport shooters in the Thunder Bay area. In the process they have been told they are not allowed to do that; they're supposed to toe the party line.

The message that sends back to our members in Thunder Bay, and indeed all legal, law-abiding firearms owners, is that when you send somebody to Ottawa to represent your interests, don't count on it if they don't fall within the party paradigm. I think that's a dangerous message to deliver.

**The Chair:** Thank you very much.

We'll now go to the final question of the day.

Mr. Scarpaleggia, you have seven minutes, please.

**Mr. Francis Scarpaleggia:** Thanks very much.

There has been very interesting testimony by individuals who have a lot of experience and knowledge of this issue.

Mr. Friedman, you quoted the Supreme Court. There's another quote from the case Regina v. Wiles, which I guess you're familiar with. The court said that the possession and use of firearms—I'm translating here—was a heavily regulated privilege. I don't think we can make a case against the registry based on the fact that gun owners have rights maybe tantamount to what exists in the United States.

On that note, I'd like to say for the record that the gun owners I know in my community happen to be the pillars of the community. So we're not impugning gun owners by being in favour of the registry. I don't think that long-gun owners should be made to feel like criminals because they have to register their guns. I believe the government has torqued that rhetoric. Previous governments never

suggested they were criminals, but over time the government has told them they should feel like criminals if they register their rifles, and it snowballed from there. That's a bit of a tangent.

I understand your point about a gun owner perhaps feeling that they're breaking the law because some paper has been misplaced, or they haven't done their homework properly, or whatever. Our party recommended decriminalizing the failure to register the first time. I think if you fail to register two or three times, there might be a problem that needs to be addressed—maybe through the Criminal Code.

If we decriminalize the need to register the first time, would that not satisfy a lot of people who feel that maybe it's a little heavy-handed?

**Mr. Solomon Friedman:** Thank you very much for the question. The reason I mentioned the Firearms Act reference, the Supreme Court case, was that it's the case in which the validity of the law, in fact the federal regulation of firearms, was disputed by several provinces.

The way the Supreme Court solved this issue, and it's key to your point, was by saying that the federal government has jurisdiction to regulate personal property that is otherwise under the jurisdiction of the provincial governments, because it does so using the criminal law power. Not testifying as a constitutional expert here, but as a criminal defence lawyer, I would in fact question whether or not Parliament would be allowed to enact simple regulatory provisions regarding private property such as firearms.

The issue of firearms' owners feeling targeted by Parliament, being treated as criminals, is why they end up at my door. I'm a criminal defence lawyer and this is a strong segment of my practice.

● (1300)

**Mr. Francis Scarpaleggia:** Well, the thing is—

**Mr. Solomon Friedman:** I wish that segment of my practice would disappear. The end result is that firearms owners are targeted; they're charged and they're prosecuted to the fullest extent of the law.

The question of whether or not that could occur by decriminalizing it doesn't take it out of the realm of criminal jurisdiction. You're telling gun owners, "You are governed under the same statute"—the Criminal Code—"that governs assault, murder, etc., simply because you've licensed your gun and have complied voluntarily with this scheme." That's the targeting of gun owners.

**The Chair:** The last word is yours, Mr. Scarpaleggia. You get to conclude for the day.

**Mr. Francis Scarpaleggia:** There were a couple of points made that I would like to address. One is that this registry was a reaction to a media story and that there's no evidence the registry is useful. We see that a lot in Parliament. For example, the government introduced anti-smuggling legislation in response to a highly sensationalized story about the arrival of a boat of refugees on the west coast. Respectfully, we also see the government constantly harping on about minimum sentences when there is no real evidence to suggest they work.

For the sake of consistency, I thought I'd mention that, Mr. Chair.

**The Chair:** Thank you very much, Mr. Scarpaleggia.

On behalf of this committee, I want to thank all of the witnesses for coming here and bringing their perspective. We have a number of other meetings and we'll hear from many other witnesses. We want to thank you for the presentations you've made today.

The meeting is adjourned.

**MAIL ➤ POSTE**

Canada Post Corporation / Société canadienne des postes

Postage paid          Port payé
**Lettermail**        **Poste–lettre**

**1782711**
**Ottawa**

*If undelivered, return COVER ONLY to:*
Publishing and Depository Services
Public Works and Government Services Canada
Ottawa, Ontario K1A 0S5

*En cas de non-livraison,*
*retourner cette COUVERTURE SEULEMENT à :*
Les Éditions et Services de dépôt
Travaux publics et Services gouvernementaux Canada
Ottawa (Ontario) K1A 0S5

**Published under the authority of the Speaker of the House of Commons**

**Publié en conformité de l'autorité du Président de la Chambre des communes**

## SPEAKER'S PERMISSION

## PERMISSION DU PRÉSIDENT

Reproduction of the proceedings of the House of Commons and its Committees, in whole or in part and in any medium, is hereby permitted provided that the reproduction is accurate and is not presented as official. This permission does not extend to reproduction, distribution or use for commercial purpose of financial gain. Reproduction or use outside this permission or without authorization may be treated as copyright infringement in accordance with the *Copyright Act*. Authorization may be obtained on written application to the Office of the Speaker of the House of Commons.

Reproduction in accordance with this permission does not constitute publication under the authority of the House of Commons. The absolute privilege that applies to the proceedings of the House of Commons does not extend to these permitted reproductions. Where a reproduction includes briefs to a Committee of the House of Commons, authorization for reproduction may be required from the authors in accordance with the *Copyright Act*.

Nothing in this permission abrogates or derogates from the privileges, powers, immunities and rights of the House of Commons and its Committees. For greater certainty, this permission does not affect the prohibition against impeaching or questioning the proceedings of the House of Commons in courts or otherwise. The House of Commons retains the right and privilege to find users in contempt of Parliament if a reproduction or use is not in accordance with this permission.

Il est permis de reproduire les délibérations de la Chambre et de ses comités, en tout ou en partie, sur n'importe quel support, pourvu que la reproduction soit exacte et qu'elle ne soit pas présentée comme version officielle. Il n'est toutefois pas permis de reproduire, de distribuer ou d'utiliser les délibérations à des fins commerciales visant la réalisation d'un profit financier. Toute reproduction ou utilisation non permise ou non formellement autorisée peut être considérée comme une violation du droit d'auteur aux termes de la *Loi sur le droit d'auteur*. Une autorisation formelle peut être obtenue sur présentation d'une demande écrite au Bureau du Président de la Chambre.

La reproduction conforme à la présente permission ne constitue pas une publication sous l'autorité de la Chambre. Le privilège absolu qui s'applique aux délibérations de la Chambre ne s'étend pas aux reproductions permises. Lorsqu'une reproduction comprend des mémoires présentés à un comité de la Chambre, il peut être nécessaire d'obtenir de leurs auteurs l'autorisation de les reproduire, conformément à la *Loi sur le droit d'auteur*.

La présente permission ne porte pas atteinte aux privilèges, pouvoirs, immunités et droits de la Chambre et de ses comités. Il est entendu que cette permission ne touche pas l'interdiction de contester ou de mettre en cause les délibérations de la Chambre devant les tribunaux ou autrement. La Chambre conserve le droit et le privilège de déclarer l'utilisateur coupable d'outrage au Parlement lorsque la reproduction ou l'utilisation n'est pas conforme à la présente permission.

**Additional copies may be obtained from: Publishing and Depository Services**
**Public Works and Government Services Canada**
**Ottawa, Ontario K1A 0S5**
**Telephone: 613-941-5995 or 1-800-635-7943**
**Fax: 613-954-5779 or 1-800-565-7757**
**publications@tpsgc-pwgsc.gc.ca**
**http://publications.gc.ca**

**Also available on the Parliament of Canada Web Site at the following address: http://www.parl.gc.ca**

**On peut obtenir des copies supplémentaires en écrivant à : Les Éditions et Services de dépôt**
**Travaux publics et Services gouvernementaux Canada**
**Ottawa (Ontario) K1A 0S5**
**Téléphone : 613-941-5995 ou 1-800-635-7943**
**Télécopieur : 613-954-5779 ou 1-800-565-7757**
**publications@tpsgc-pwgsc.gc.ca**
**http://publications.gc.ca**

**Aussi disponible sur le site Web du Parlement du Canada à l'adresse suivante : http://www.parl.gc.ca**

Exhibit 13

23

```
1      A     That's right.

2      Q     Okay.  Now, this operation took place

3  before 9/11, correct?

4      A     It did.

5      Q     And would you agree that the physical

6  integrity of driver's licenses against forgery has

7  improved in many states since 9/11?

8      A     I don't know about many states, but I

9  know in some states, yes.

10     Q     Okay.  In Virginia, for instance -- I'm

11 going to just show you something.  I'm going to get

12 out my own identification --

13     A     Okay.

14     Q     -- and show it to you.  I'm a Virginia

15 resident.

16     A     Okay.

17     Q     And we're also going to mark an exhibit

18 and put it into evidence.

19           MS. PETERSON:  This will be Webster 4.

20           (Exhibit W4 marked for identification.)

21 BY MS. PETERSON:

22     Q     I just ask you to take a look at this.  I
```

24

1   redacted my state identifying numbers, the bar

2   codes, various other features like that that might

3   compromise privacy.  But I just ask you to look at

4   this driver's license.  I'm going to hand it to

5   you.

6           It's a solid piece of plastic, right?

7       A    Uh-huh.

8       Q    I mean it's not a piece of paper; it's

9   laminated?

10      A    Honestly, I can't tell.

11      Q    Okay.  I mean does it look like a piece

12  of paper in there, or does it look like a solid

13  piece of plastic?

14      A    I'll just say again:  Honestly, I can't

15  tell.

16      Q    Okay.  All right.  But certainly it has a

17  number of what I would call antiforgery features on

18  here; underneath this little oval, for instance,

19  it's got my name in kind of a swirly fashion, like

20  you see on computer security things?

21      A    Yes.

22      Q    And there's a variety of very fine and

25

1   feathery markings, like over here on the right-hand

2   side.  I don't know if you can see or not.

3        A    Uh-huh.

4        Q    Other things that are perhaps difficult

5   to reproduce.

6             They're trying to make them hard to

7   forge, aren't they?

8        A    Yeah.

9        Q    Yeah.  Okay.  And my favorite actually on

10  here -- hold this up -- there's a clear oval there

11  that's got a --

12       A    Uh-huh.

13       Q    -- holographic picture of myself.  If you

14  could hold it up to the light, you can see me sort

15  of suspended in air.

16       A    It's very hard to make out.

17       Q    If you hold it against a darker place,

18  you'll probably see it better.

19       A    All right.  You know, I see an image

20  there, but --

21       Q    Yeah, right.  Well, it's my smiling face

22  looking back at you.

26

1              So anyway, my point on all of this is

2     that since 2000 or before, when driver's licenses,

3     many of them were typically paper, you could

4     laminate them, that sort of thing, we've come some

5     distance since that time, haven't we probably, in

6     terms of identification?

7          A    Yes.

8          Q    Okay.  You're a Maryland resident, right?

9          A    I am.

10         Q    Okay.  Does Maryland have similar

11    antiforgery features?

12         A    Yeah.

13         Q    Okay.  Does that one have all the

14    rainbows?  Where it says MVA, you look at it, and

15    you get shimmering rainbows --

16         A    Uh-huh.

17         Q    -- coming back at you?

18         A    Yeah.

19         Q    Okay.  A little bit harder to do that

20    with a -- just with a printer, isn't it?

21         A    I've never tried.

22         Q    Okay.

Capital Reporting Company
Webster, Sc.D., Daniel  07-31-2013

27

```
 1      A     Don't know.

 2      Q     Well, typically with a laser printer you

 3  can't make holograms and things, correct?

 4      A     I suspect not, yeah.

 5      Q     Yeah, right.  Okay.  So I guess, you

 6  know, the only point I'm making is that this

 7  study -- and I'm not saying that -- I'm not

 8  commenting at all on the convincing nature of the

 9  forged IDs at that point in time.  Certainly they

10  had fooled people.

11            But it's probably a little more difficult

12  to forge a driver's license these days, wouldn't

13  you say?

14      A     I suspect it is.

15      Q     Okay.  Fair enough.  Now, being around

16  firearm circles and being familiar with this case,

17  I'm sure you're probably aware right now that

18  Mr. Charles Sykes is the only FFL in the District?

19      A     I have heard that, yes.

20      Q     Okay.  And are you aware of any instances

21  in which forged IDs have been used to obtain or try

22  to obtain a firearm from Mr. Sykes?
```

28

```
 1      A     I'm not aware of any.

 2      Q     Okay.  Are you aware of any instances in

 3 which an individual presented a forged

 4 identification document to the Metropolitan Police

 5 Department to try to register his gun in the

 6 District?

 7      A     Yeah, I mean in -- in either case, I

 8 wouldn't necessarily be in a position that no one

 9 has my number to call me up when that happens.  And

10 if it does happen and they don't catch it,

11 obviously there's no way to record it, so --

12      Q     Sure.

13      A     Yeah.

14      Q     Would you feel comfortable relying upon

15 the statements of MPD officials who were in charge

16 of -- of issuing the registration in D.C. as to

17 whether or not that's a problem?

18      A     What specifically is a problem?  You mean

19 the use of --

20      Q     Use of forged identification documents.

21      A     Oh, I -- I'm confidant that in their

22 statement -- I mean that -- I'm not sure, frankly,
```

39

1   of page 3, you state that, For example, prospective

2   purchasers could more easily put inaccurate

3   information on their application forms, such as

4   using a slightly different spelling of a name or

5   misrepresentation of a date of birth, in order to

6   avoid denial of the application.

7           Now, assuming the dealer checks the

8   identification carefully, that wouldn't work if

9   there is a discrepancy, right?

10      A    If they checked carefully and are -- are

11  willing and motivated to deny the purchase or --

12  yes.

13      Q    Okay.

14      A    Or -- or correct the form, I guess.  I

15  don't know, yeah.

16      Q    And do you know of any instances where a

17  gun has been obtained by using these slight

18  misrepresentations, such as an altered date of

19  birth or a misspelled name?

20      A    I don't.  But there hasn't been an

21  investigation to examine that question.

22      Q    Okay.

40

1       A      So it's not as though someone has looked

2    and found that all of these are accurate --

3    accurately reflect what the true identifying

4    information is.  But I don't know of any -- any

5    study that's verified either way, that there's a

6    lot of errors or there -- it's all perfect.

7       Q      Okay.  You're just supposing that it

8    could take place?

9       A      Yes.  And again, this is based upon my --

10   my expert opinion and research as it relates to gun

11   dealer practices, at least a subset.  Obviously,

12   I'm not casting -- you know, painting with a

13   broadbrush here.  But I'm saying that there are

14   enough dealers who are either negligent or frankly

15   crooked that -- that this could very easily happen.

16      Q      Okay.  But you don't have any data as to

17   the number of instances in which it has happened or

18   whether it has even happened at all?

19      A      Again, I don't, because it's not been

20   something that -- really the AFT would have to be

21   the ones I guess who would undertake that.

22      Q      Okay.  Are you yourself a firearms owner?

Capital Reporting Company
Webster, Sc.D., Daniel  07-31-2013

82

1      Q      Okay.  Fair enough.

2             The study by Dr. Wintemute and others

3  that we discussed, that one does rely on trace

4  data, correct?

5      A      Yes, I believe it does.  Let me just

6  check myself here.

7             (Witness looked at document).  Yes.

8      Q      Okay.  And jumping ahead a little bit,

9  just so I don't forget, you've done two studies or

10 preliminary studies regarding Missouri.  And we

11 haven't discussed those yet.

12            But the one that relates to time-to-crime

13 rather than the homicide rates, that is also

14 reliant on trace data, correct?

15     A      That's correct.

16     Q      Okay.  Now, it's true, isn't it, that

17 trace data statistics from AFT include only

18 firearms that are recovered by law enforcement?

19     A      That's correct.

20     Q      Okay.  In other words, if a gun's in the

21 hand of a criminal -- or the hands of a criminal,

22 and the criminal isn't caught or the guns are not

83

1   recovered in some way, then the gun won't be

2   traced, right?

3        A    Yes.

4        Q    Okay.  And of the guns that are recovered

5   by law enforcement, not all of them are submitted

6   for tracing, true?

7        A    Yes.

8        Q    Okay.  And law enforcement basically

9   selects the ones to submit for tracing, right?

10       A    Well, there are many agencies, law

11   enforcement agencies, who have policies that every

12   gun that is recovered, at least any gun that is

13   connected to a crime, a criminal suspect, or

14   something of that nature, that they -- their policy

15   is to submit that information to the AFT for

16   tracing.

17       Q    Right.  But not all law enforcement

18   agencies have that policy, correct?

19       A    That's correct.

20       Q    Okay.  And isn't it also true that AFT

21   tracing data includes only guns that are

22   successfully traced?

84

1      A     Yeah, it -- it sort of depends on what

2   data are willing reported.  So in some cases they

3   will report information on recovered guns.  And

4   then there's a subset of recovered guns that they

5   will have traced to the first retail sale.

6      Q     Right.  Right.  And it's true in general,

7   isn't it, that it's easier to trace a gun if it's

8   recently come from the manufacturer and recently

9   been sold by a dealer?

10     A     Yes, generally.  That used to be more the

11  case historically.  AFT had sort of a category they

12  called too-old-to-trace guns.  But in more resent

13  years, my understanding is that they do try their

14  best to trace every single gun regardless of it's

15  age.

16     Q     But their not successful of that in many

17  instances?

18     A     Not in every instance.

19     Q     Right.

20     A     Because certain dealers go out of

21  business, for example.  And that makes it hard if

22  someone bought a gun from an out-of-business

106

1   District of Columbia, we had the Supreme Court

2   decision in Heller which allowed handguns to be

3   purchased and owned and kept by private citizens,

4   where before they had been banned.  And I don't

5   know if you've looked a the data, but the homicide

6   rates have been going down ever since the Heller

7   decision.

8          And I doubt that you individually would

9   attribute that decrease in homicides to increased

10  handgun ownership on behalf of D.C. citizens,

11  right?

12     A    That's correct.  Yes.

13     Q    Okay.  So I think we're agreed on the

14  general principle here, at any rate.

15         And I don't know if I asked you this

16  question before -- forgive me -- but this says

17  Study doesn't purport to show an actual increase --

18  this study on time-to-crime -- an actual increase

19  in crime after repeal in Missouri, does it?

20     A    That's correct.

21     Q    Okay.  Now, the District of Columbia,

22  whose laws we are actually examining here, has a

107

1    considerable gun trafficking problem, wouldn't you

2    say?

3         A    Uh-huh.  Yes.

4         Q    And it doesn't relate to trafficking out,

5    as some of these studies that you've referenced,

6    that referred to --

7         A    Right, guns imported --

8         Q    -- as some other the studies that you

9    have referenced relate to trafficking out?

10        A    Correct.

11        Q    The District's problem is trafficking in?

12        A    That's correct.

13        Q    Okay.  Do you see fingerprinting

14   requirements, the requirement to show up in person,

15   the requirement to have the applicant be

16   photographed, put any kind of substantial dent in

17   trafficking of illegal guns into the District, in

18   your opinion?

19             MR. NASO:  Objection.  Vague.

20             THE WITNESS:  Did the District of

21   Columbia is what -- are we -- are you asking a

22   question about the District of Columbia's law in

JA 804

108

1   question?

2   BY MS. PETERSON:

3       Q    Right.   The particular things:   Requiring

4   the applicant to be photographed, requiring the

5   applicant to show up in person, and the

6   fingerprinting requirements, I'm wondering if it's

7   your opinion that those measures have reduced in

8   some substantial measure the trafficking of illegal

9   guns into the District?

10      A    No.

11      Q    Okay.   In fact I have one more exhibit to

12  mark here.

13      A    The point of the regulation is to prevent

14  diversion within the District of Columbia.   And of

15  course we're in a new era here, where, you know,

16  now you have one FFL, but --

17  BY MS. PETERSON:

18      Q    Okay.   I will talk a little bit about

19  within the District in a moment.

20      A    Sure.

21          MS. PETERSON:   So I'm marking W13.

22          (Exhibit W13 marked for identification.)

136

1    Q   All right.

2    A   I mean as -- as you well know, the

3 District banned such sales up until relatively

4 recently.

5    Q   Right.  Right.  As far as reporting of a

6 theft or loss, isn't it pretty common in most areas

7 of the country that citizens will voluntarily

8 report thefts and losses of their property without

9 it being made a crime not to report?

10    A   Sure.

11    MR. NASO:  Object to the form.

12    THE WITNESS:  Sure.  People report stolen

13 guns.  If that's -- if that's what you're asking:

14 Do people report stolen guns?  The answer is of

15 course, yes.

16 BY MS. PETERSON:

17    Q   Right.  Okay.  And --

18    A   They also don't report stolen guns.

19    Q   Well, sometimes, I suppose.

20    A   Yeah.

21    Q   Is this really enforceable, in the sense

22 that if a registered gun owner didn't report a

138

1    in the next section on the importance of renewing

2    firearms registration every three years and the

3    importance of that in your view, pages 11 and 12.

4    Let me find the right sentence here.

5             You say that -- at the bottom of page

6    11 -- that Requirements to reregister one's gun

7    would serve as an additional deterrent to illegal

8    transfers or negligent storage practices that might

9    result in the theft of firearms.

10            And do you have any evidence, data, or

11   other information relating to how many registered

12   D.C. guns are illegally transferred within the

13   District?

14       A    No.

15       Q    Okay.  And again, we are saying that

16   that's a crime to do so in the District, right,

17   without going through an FFL?

18       A    Yes.

19       Q    Okay.  Do you know of any other states

20   that require reregistration of every single firearm

21   separately every few years?

22       A    I think Hawaii might be the only state

139

1   that does that.

2        Q     Okay.  And do we have any -- or do you

3   have any data as to how effective that has been in

4   Hawaii in --

5        A     I don't.

6        Q     Okay.  You state that the,

7   Reregistration -- and I'm at the top of page 12 --

8   quote, provides a time when police can reassess

9   whether someone with a registered firearm has

10  subsequently been convicted of an offense that

11  would prohibit them from possessing firearms so

12  that the firearms can be recovered.

13            Do you know whether the District of

14  Columbia has the ability to run criminal background

15  checks on registered firearms owners apart from any

16  reregistration requirement?

17       A     I suspect they probably do.

18       Q     And do you know whether the firearms

19  registration section periodically receives

20  information from the court system on things like

21  criminal convictions, civil protective orders, and

22  other disqualifiers, and compares those on an

140

1  ongoing basis to the list of registered firearms

2  owners?

3      A    I do not know that information.

4      Q    Okay.  Do you have any actual evidence

5  that reregistration reduces crime or protects

6  police officers?

7      A    Do I have data?  No.

8      Q    I think we are on the final section of

9  your report, which has to do with a firearms safety

10  training course and being knowledgeable about the

11  District's firearms laws, especially those related

12  to the safe responsible use, handling, and storage

13  of firearms.

14          And on pages 13 and 14 of your report you

15  discuss the importance of safe storage practices

16  and certain laws and practices related to safe

17  storage, right?

18      A    Yes.

19      Q    And this discussion overall relates to

20  how guns are stored within the home, correct?

21      A    That's correct.

22      Q    And you're aware, I'm sure, that the

142

1   document, entitled Firearms Registration

2   Examination, was furnished to us by the District's

3   attorneys in connection with discovery in this

4   case, and has been represented as the test that is

5   actually used to test applicants for registration.

6              And my question to you is how many

7   questions on this test relate to the safe storage

8   of firearms within the home?

9        A    You know, I don't see any, which is a

10  disappointment.

11       Q    Okay.  Well, I'm going to point you to

12  one.

13       A    Okay.  Where is it?

14       Q    I'm going to help you out.

15       A    Thank you.

16       Q    Number 13.

17       A    Oh, okay.  Yes.

18       Q    Which states that, The District of

19  Columbia recommends that each registrant keep any

20  firearm in his or her possession:  Unloaded; either

21  disassembled or secured by a trigger lock, gun

22  safe, locked box, or other --

143

```
1       A     Right.

2       Q     -- secure device; or both A or B.

3       A     Right.

4       Q     That's the only one I could find.

5       A     Yes.

6       Q     So this is just a recommendation, right?

7       A     Yes.

8       Q     Okay.  So people are free to follow it or

9   not to follow it, correct?

10      A     Yes.  I mean if when it concerns access

11  to under-age youth, I believe they have a law -- am

12  I right? -- requiring --

13      Q     It appears that there's a fairly narrow

14  provision, I think, regarding liability if --

15      A     Under age?

16      Q     -- children -- certain children are

17  injured, or something like that.

18      A     Yeah.

19      Q     But this here only talks about the

20  recommendation that it be kept --

21      A     Yes.  Yes.

22      Q     -- and so forth, right?
```

Capital Reporting Company
Webster, Sc.D., Daniel  07-31-2013

144

1      A     I'm sorry.

2      Q     I was saying that this test only has a

3  question about the recommendation by the District

4  that firearms be kept unloaded and locked or

5  otherwise secured?

6      A     And I was just agreeing with what was

7  said, as far as what's here.

8      Q     And I think maybe my question was that

9  that was only a recommendation that people can

10  follow or not follow?

11      A     That's correct.

12      Q     Now, do you think that if somebody felt

13  that they needed to have a loaded gun in the home

14  to protect against home invasion or attack in a

15  dangerous neighborhood, that this recommendation by

16  the District would persuade them to abandon having

17  a gun at the ready to defend their life or their

18  loved ones?

19           MR. NASO:  Objection to form.

20           THE WITNESS:  I don't know.

21  BY MS. PETERSON:

22      Q     Okay.  Do you think that this one mention

145

1    of a recommendation in an examination is enough to

2    cause a substantial change in behavior by

3    registrants?

4        A    Seem unlikely.

5        Q    Do you have any evidence that registered

6    guns are frequently involved in unintentional

7    shooting deaths of teens and children in the

8    District?

9        A    I don't think that data is tracked, at

10   least not to my knowledge.

11       Q    All right.  And if there's no data, I

12   guess then there's probably no studies to indicate

13   that a mere mention on the test would reduce such

14   deaths, right?

15       A    That's correct.

16       Q    And if they took this particular question

17   off the test, do you think that unintentional

18   shootings with registered firearms would rise by a

19   measurable amount?

20           MR. NASO:  Objection to form.

21           THE WITNESS:  I don't know.  This is --

22   this is a mechanism to reinforce safe gun storage

# Exhibit 14

**From:** Kane, Morgan (MPD) [morgan.kane@dc.gov]
**Sent:** Wednesday, May 19, 2010 10:35 AM
**To:** Lanier, Cathy (MPD)
**Subject:** Fw: guns registered since Heller

**From:** Breul, Nicholas (MPD)
**To:** Crump, Gwendolyn (MPD); Lanier, Cathy (MPD); Kane, Morgan (MPD); Keller, Patrick (MPD); Ennis, Ralph (MPD)
**Sent:** Wed May 19 09:59:15 2010
**Subject:** RE: guns registered since Heller

Also, there have been no arrests of any off the registered firearms owners for any gun related crimes or violations. Further, the gun registry Unit monthly; checks the registered owners for any CPO/TPO violations or Domestic violence related charges.

**From:** Crump, Gwendolyn (MPD)
**Sent:** Wednesday, May 19, 2010 9:57 AM
**To:** Lanier, Cathy (MPD); Kane, Morgan (MPD); Keller, Patrick (MPD); Ennis, Ralph (MPD); Breul, Nicholas (MPD)
**Subject:** guns registered since Heller

Here is the latest number of guns registered since Heller

**From:** Hall, Colin (MPD)
**Sent:** Tuesday, May 18, 2010 9:47 AM
**To:** Crump, Gwendolyn (MPD); Keller, Patrick (MPD); Shelton, Jon (MPD)
**Cc:** Breul, Nicholas (MPD)
**Subject:** RE: COP

Gwyn,

Since heller there have been **1148 firearms registered**. Below is a further breakdown of those firearms.

**Total Firearms Registration Statistics from the Heller Supreme Court Decision to the present:**
(Please note tracking begins after D.C. Code Handgun amendment 7/17/08)
2921 firearms applications disseminated to the public
 897 handgun applications submitted
 804 handguns registered
 177 revolvers registered
 627 semi-automatic handguns registered
  57 handgun applications denied
 392 rifle/shotgun applications submitted
 342 rifles/shotguns registered
  76 semi-automatic rifles/shotguns registered
 266 non semi-automatic rifles/shotguns registered
  13 rifles/shotguns applications denied

*Colin Hall*
*Sergeant*
*Gun Control/Firearms Registration Unit*
*Metropolitan Police Department*
*202-727-9889-Desk*
*202-727-4275-main office*


EXHIBIT
JA 815

**From:** Crump, Gwendolyn (MPD)
**Sent:** Monday, May 17, 2010 6:31 PM
**To:** Hall, Colin (MPD); Keller, Patrick (MPD); Shelton, Jon (MPD)
**Cc:** Breul, Nicholas (MPD)
**Subject:** RE: COP

Can I get update gun totals for the COP?

```
Gwendolyn Crump, Director
Office of Communications
METROPOLITAN POLICE DEPARTMENT
300 Indiana Avenue, NW, Room 5130
Washington, DC 20001
(202) 727-4383 Public Information Office
(202) 553-8741 cell
```

Have you heard the knock at your door?
U.S. Census workers are here to assist you with filling out the **2010 Census Form**.
www.census.dc.gov

HELLER DC 001138

# Exhibit 15

**From:**      Hall, Colin (MPD) [colin.hall@dc.gov]
**Sent:**       Wednesday, May 19, 2010 10:19 AM
**To:**         Breul, Nicholas (MPD)

Lt.

I just wanted to add, that as I told you we constantly check for CPO's issued to our gun registrants and we have found several and revoked the registrations.

***Colin Hall***
***Sergeant***
***Gun Control/Firearms Registration Unit***
***Metropolitan Police Department***
***202-727-9889-Desk***
***202-727-4275-main office***

Have you heard the knock at your door?
U.S. Census workers are here to assist you with filling out the **2010 Census Form**.
www.census.dc.gov


EXHIBIT
L-6

HELLER DC 001548   JA 818

Exhibit 16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DICK ANTHONY HELLER, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:08-cv-01289 (JEB) |
| | ) | |
| THE DISTRICT OF COLUMBIA, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## **DECLARATION OF DICK ANTHONY HELLER**

I, Dick Anthony Heller, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1.      My name is Dick Anthony Heller.  I am over eighteen years of age, am fully competent to make this Declaration, and have personal knowledge of the matters stated herein.

2.      I am one of the plaintiffs in the above-captioned case.

3.      I am a resident of the District of Columbia and a citizen of the United States, and am eligible under the laws of the United States and of the District of Columbia to receive and possess firearms.

4.      Since the case of *District of Columbia v. Heller* was decided by the United States Supreme Court in 2008, I have registered several firearms with the Metropolitan Police Department's Firearms Registration Section.  I have also attempted to register a rifle and three handguns for which my applications were rejected, because the rifle and handguns were of types banned by the District at that time, even though they were models and types commonly possessed in most other states and cities in the United States.

1

JA 820

5.      In July of 2008, I registered a .22 caliber High Standard "Buntline" revolver. This firearm was owned by me but was kept in Maryland because DC had previously banned handguns.  Two trips to the MPD were required to register this firearm, during which I was fingerprinted and took a written test.  Round trips to the MPD take about 30-40 minutes on my bicycle. I went by bicycle on my first trip.   The time spent at MPD headquarters was approximately 45 minutes on the first trip, and 30 to 45 minutes on the second trip.  The second trip required a subway ride to Maryland to pick up the firearm and to return to the MPD.  The subway trip took about two hours.  Obtaining a passport photo took about half an hour.  Filling out the application itself may have taken 15 minutes.  Total time to register this handgun was in the vicinity of five hours.  The registration process for this particular handgun was shorter than it otherwise would have been because the gun was already owned by me, and thus did not have to be transferred through a federally licensed dealer.

6.      In August of 2011, I registered a .22 Marlin semi-automatic rifle.   This registration required two trips to the District Building, because MPD required the wooden stock to be attached.  On the first trip, I had taken the stock off to facilitate traveling to the MPD registration unit on my bicycle.  So I had to return home, re-attach the stock, and go to MPD again.  These trips took approximately two hours or so, perhaps longer.

7.      In April of 2012, I registered a .38 cal Charter Arms "Goldfinger"  revolver. This revolver was shipped from the factory to the DC licensed dealer for pickup.  This process took about two hours for registration time and travel time.  This revolver was later returned to the manufacturer, and the District Firearms control unit was given written notification of this disposition.

2

8.      On October 18, 2012, I registered a .22 caliber Charter Arms "Pathfinder" revolver.  It was shipped from the factory to the DC licensed dealer for pickup.  This registration took over 3 hours registration and travel time including up to an hour waiting to pay the $13 fee at the payment station.

9.      In August and October of 2013 I registered two additional long guns. Registration of these firearms generally followed the pattern described above.

10.      Prior to the changes in the registration laws in 2012, the time it took me to register a firearm was shorter than it would have been for other residents of the District, because as a licensed special police officer I had received firearms training and was exempt from the hands-on training course requirement.  Because I am knowledgeable about firearms, I also can sometimes order them from an out of state vendor, whereas a first or second-time purchaser would generally have to go out of the District to a dealer in another state to examine the firearm to see if it is suitable for that person, and then have the firearm transferred to the licensed dealer in the District.  That process incurs additional fees, additional travel time, and more delays.

11.      In addition, the "one handgun per month" law creates additional and unnecessary time burdens on an individual like me who may wish to register several handguns at one time. Instead of being able to register two or more handguns at the same time, I must delay additional transfers and registrations, and then take one or more additional trips to MPD in order to register only one handgun per trip.  I own a collection of several specialty handguns that are kept out of state, and I am prevented from transferring them into the District at one time because of the "one handgun per month" law.

3

JA 822

12.     If the District's re-registration process, as proposed by rule on November 15, 2013, goes into effect in December 2013 in the form proposed, it will impose a severe burden on individuals who own and possess several firearms inside the District.  Under the proposed rule, a registrant would be required every three years to appear in person at MPD headquarters; submit fingerprints; and confirm possession of previously-registered firearms, home address, and continued compliance with the Act's registration requirements.  A fee of $13, presumably per firearm, would have to be paid every three years, plus fingerprinting fees of $35, and perhaps other fees.  Should the re-registration be late for any reason, fees would double.  If the re-registration is more than 90 days late, the prior registration would be cancelled and the registration treated as a new application.  I am not aware of anything that would prevent a cancelled registrant from being charged with possession of unregistered firearms, which can result in jail time, being listed in the Gun Offender Registry, and loss of the ability ever to own firearms in the District.  These potential penalties are vastly out of proportion to any purpose served, discourage registration, and in my opinion are simply an attempt to harass, intimidate, and/or trap law-abiding people who wish to possess a firearm in the District for legitimate purposes.

13.     Because of the many years I have spent challenging DC firearms laws, I am perhaps as knowledgeable about DC firearms registration laws as almost any other non-police, non-attorney individual in the District.  As mentioned, I am also exempt from some of the requirements.  Even so, I find the District's registration laws to be complex, sometimes confusing, and a heavy burden on the exercise of my individual right to keep and bear arms under the Second Amendment to the U.S. Constitution.  Such restrictions and burdens would never be tolerated for other constitutionally protected rights, such as freedom of speech and of

4

the press.  These harassments, hurdles, and restrictions on the Second Amendment rights of the

people should also not be tolerated.

I declare under penalties of perjury that the foregoing is true and correct.

Executed on _12-3-13_____, 2013

_____
Dick Anthony Heller

# Exhibit 17

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DICK ANTHONY HELLER, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:08-cv-01289 (JEB) |
| | ) | |
| THE DISTRICT OF COLUMBIA, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## <u>DECLARATION OF WILLIAM CARTER</u>

I, William Carter, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1.      My name is William Carter.  I am over eighteen years of age, am fully competent to make this Declaration, and have personal knowledge of the matters stated herein.

2.      I am one of the plaintiffs in the above-captioned case.

3.      I am a resident of the District of Columbia and a citizen of the United States, and am eligible under the laws of the United States and of the District of Columbia to receive and possess firearms.

4.      Since the summer of 2008, I have registered several handguns and one shotgun in the District.  The following is a typical scenario of the steps involved, and the estimated time spent.  This description of steps relates principally to the time period when Mr. Charles Sykes, the only active licensed firearms dealer in the District, did not have his business premises in MPD headquarters.

1

JA 827

5.    Because of the District's restrictive laws relating to firearms, there is no licensed dealer in the District who carries an inventory of firearms.  Therefore, it was necessary for me to go to a dealer in Maryland to pick out and pay for a firearm to purchase.

6.    The first step is to notify Mr. Sykes, the only licensed firearm dealer in the District, of the gun selected at an out of state dealer.  Mr. Sykes then goes and picks up the firearm.  Time spent is perhaps 15 minutes to talk by telephone with Mr. Sykes, and a delay of one to several days for Mr. Sykes to pick up the firearm and bring it back to his place of business.

7.    Drive over to Mr. Sykes' dealership and pay him a processing fee and complete certain paperwork.  Complete the registration application.  Time spent is perhaps an hour to an hour and a half, round trip.

8.    Drive to MPD headquarters, park, and deal with MPD officials to get preliminary approval for firearm.  Submit application and photo.  Time spent may be estimated at an hour and a half.

9.    Drive to Mr. Sykes' dealership to pick up firearm.  Complete federal paperwork and background check at dealer's.  Drive to MPD headquarters that day or next day.  Time spent estimated at one to one and a half hours.

10.    Find parking at MPD headquarters and walk with firearm to MPD offices.  Present gun locked in case to security officials.  Get fingerprinted.  Have ballistic test done, when that was a requirement.  Wait while MPD processes paperwork and approves or rejects

2

JA 828

application.   Pay registration and fingerprint fees.   Be escorted out of building and have firearm returned to me.   Time spent estimated at one and a half to two hours at MPD.

11.      Walk to car carrying gun in case.   Drive home, park, remove gun from car, and immediately transport and store firearm in home.   Estimated time perhaps thirty minutes, depending on parking, time of day, traffic, and other factors.

12.      Total estimated time is perhaps 7 to 8 hours, not counting delays occurring between steps.   There is also a ten day waiting period between the time of purchase and when the gun can be registered, adding to the delays.

13.      I was also required to take a four hour training course to purchase some of my firearms.   Travel time and waiting time to complete the course in Virginia probably added an hour on each end, for a total of approximately six hours.

14.      I also consider it a burden to be required to carry my firearm to and from MPD headquarters.   While walking with it to or from the car, there is a risk that I will be attacked or the gun will be stolen, since it is required to be in a locked case and it cannot be used for defense. While walking or driving, there is a risk that I will be stopped by an officer and arrested for having a firearm outside my home.   The District's procedures for registration cause these dangers that are not present in other states.

15.      Prior to the change in the law, I also had to get a passport size photo taken prior to completion of the application.

16.     In addition to registration fees and fingerprinting fees, Mr. Sykes charges $125 to transfer a firearm.

17.     When I went to the Metropolitan Police Dept. to register my next handgun after the law had changed in 2009, I was told that I needed to take a training course.  I informed the officer at MPD headquarters that I had completed the course at the NRA range in Virginia where I am a member.  I showed the officer my certificate that was a copy.  The officer said I needed to bring in the original and not a copy. I had to go home to get the original copy and return the next day. The officer then had a copy made from my original certificate to put into my file.  I think that was an unnecessary delay and waste of time when I had shown the officer the certificate copy the day before.

18.     The MPD Firearms Registration Section, which is the only place a person can register a firearm, is only open during daytime business hours, Monday through Friday, and is not open in the evenings or on weekends.  I work full time during the day, so I had to take time off work on multiple days in order to register my firearms.

19.     The re-registration requirement will add to these burdens.   Although that requirement will be a needless burden to all law-abiding firearms registrants in the District, it will be an even harsher burden on me because I own more than half a dozen firearms.  If the regulation proposed in November 2013 relating to re-registration goes into effect, every three years I will have to pay something in excess of $100 at the current fee structure, and possibly more, merely to keep the firearms I already own and have already registered.

4

JA 830

I declare under penalties of perjury that the foregoing is true and correct.

Executed on __12/04__, 2013

William Carter

Exhibit 18

  

METROPOLITAN
# POLICE

*Gun Control and Firearms Registration*

300 Indiana Avenue NW Room 3077, Washington, DC 20001   (202) 727-4275   FAX (202) 442-4247

# FIREARMS REGISTRATION WRITTEN EXAMINATION

APPLICANT'S NAME: _____  AGE: _____

FOR EXAMINER ONLY: SCORE: _____DATE: _____EXAMINER: _____

INSTRUCTIONS:  Please place an **X** in the □ next to the correct answer. You must answer at least 70% of the questions correctly in order to pass the exam.

1. When a resident of the District of Columbia transports a firearm from one location to another by vehicle it must be:
   - □ (A) Unloaded, and neither the firearm nor any ammunition shall be readily accessible from the passenger compartment of the transporting vehicle; or if there is no separate compartment, the firearm or ammunition shall be contained in a locked container other than the glove compartment or console, with the firearm unloaded.
   - □ (B) Loaded, wrapped in a package in open view.
   - □ (C) Loaded and in open view.

2. A registration certificate may be revoked if the registrant fails to notify the Chief of Police in writing of any change in his or her:
   - □ (A) Address.
   - □ (B) Occupation.
   - □ (C) Telephone number.

3. Firearms may be lawfully discharged on public space in the District of Columbia:
   - □ (A) Into the air on New Year's Eve.
   - □ (B) At registered turkey hunts on Thanksgiving.
   - □ (C) After obtaining a special written permit from the Chief of Police authorizing the weapon to be discharged on public space.

4. If an owner of a registered firearm passes away, the estate executor or administrator:
   - □ (A) Has no responsibility for the firearm.
   - □ (B) Can dispose of the firearm however he or she wishes.
   - □ (C) Must notify MPD within 30 days of his or her appointment, and, until the lawful disposition of the firearm, is legally responsible for complying with firearms laws in the District.

5. Persons with a legally registered firearm may possess ammunition of any caliber except restricted pistol bullets (also known as "cop killer bullets").
   - □ (A) True
   - □ (B) False

6. When in possession of a registered firearm, the registrant must:
   - □ (A) Have it in his or her possession with the firearm and exhibit the registration upon request of a law enforcement officer.
   - □ (B) Keep the registration locked in a safe separate from the firearm and mail it to MPD upon request of a law enforcement officer.

EXHIBIT W-16
BH
7/31/13

UN-354 Rev. 05/12

HELLER DC 000068

7.  When handling any firearm, you should always:
    - ☐ (A) Treat it as if it is loaded.
    - ☐ (B) Point it in a safe direction.
    - ☐ (C) Both A and B

8.  The owner of a lawfully registered firearm may sell it to any pawn shop in the District.
    - ☐ (A) True
    - ☐ (B) False

9.  When a registered firearm is lost, stolen, or destroyed, the registrant must report it and return the registration certificate to MPD:
    - ☐ (A) Immediately upon discovery of such loss, theft or destruction.
    - ☐ (B) Within 30 days of the discovery.
    - ☐ (C) Within one year of the discovery.

10. Private individuals may sell or transfer legal firearms in the District of Columbia to:
    - ☐ (A) Relatives.
    - ☐ (B) Licensed dealers only.
    - ☐ (C) Any person.

11. A person who has had their Firearms Registration Certificate revoked may dispose of their firearm by:
    - ☐ (A) Giving or selling the firearm to a friend.
    - ☐ (B) Putting the firearm carefully into the trash.
    - ☐ (C) Selling the firearm to a licensed dealer; turning the firearm over to the police; or lawfully removing the firearm from the District of Columbia.

12. A District resident with a valid firearms registration can lawfully carry that firearm:
    - ☐ (A) Within the location for which it is registered, either the registrant's home or business.
    - ☐ (B) While it is being used for lawful recreational purposes.
    - ☐ (C) While it is being transported for a lawful purpose as expressly authorized by District or federal statute and in accordance with the requirements of that statute.
    - ☐ (D) All of the above

13. The District of Columbia recommends that each registrant keep any firearm in his or her possession:
    - ☐ (A) Unloaded.
    - ☐ (B) Either disassembled or secured by a trigger lock, gun safe, locked box, or other secure device.
    - ☐ (C) Both A and B.

14. To purchase ammunition in the District of Columbia you must have the following in your possession:
    - ☐ (A) A U.S. Passport.
    - ☐ (B) A valid firearm registration certificate.
    - ☐ (C) A valid driver's license.

15. In the District of Columbia, a person may voluntarily and without arrest or prosecution surrender unwanted firearms, ammunition, and destructive devices to:
    - ☐ (A) Any police station in the District of Columbia.
    - ☐ (B) Any library in the District of Columbia.
    - ☐ (C) Any U.S. Post Office.

UN-354 Rev. 05/12

HELLER DC 000069

Exhibit 19

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DICK ANTHONY HELLER, *et al.*                )
                                             )
        Plaintiffs,                          )
                                             )
            v.                               )        No. 1:08-cv-01289 (JEB)
                                             )
THE DISTRICT OF COLUMBIA, *et al.*           )
                                             )
        Defendants.                          )

## <u>DECLARATION OF ABSALOM JORDAN</u>

I, Absalom Jordan, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1.      My name is Absalom Jordan.  I am over eighteen years of age, am fully competent to make this Declaration, and have personal knowledge of the matters stated herein.

2.      I am one of the plaintiffs in the above-captioned case.

3.      I am a resident of the District of Columbia and a citizen of the United States, and am eligible under the laws of the United States and of the District of Columbia to receive and possess firearms.

4.      There is no parking for persons attempting to register a firearm at the MPD Headquarters so it means that I either have to park and walk several blocks with the firearms in public or have someone take me to the headquarters and pick me up.  I have experienced long waits outside of the headquarters waiting for my ride with the firearms in cases in view.  At my age, 72, it is difficult to carry the firearms from a parking space blocks away from the headquarters and there is the threat of someone taking the firearms from me.

5.      In 2008 and 2009, I registered several handguns, shotguns, and rifles in the District.  These were previously owned by me and stored outside the District.

1

JA 836

6.      The steps and estimated time taken to register each firearm were as follows:

a.      I obtained the new registration forms from the MPD Headquarters.  Travel time to obtain the forms was approximately 30 minutes, and the time to pick up the application inside was about 15 minutes.

b.      I filled out the registration forms at home, which took about 20 minutes for each form.

c.      I had to locate a notary public to notarize the required form, which took approximately 45 minutes to 1 hour.  To actually get the form notarized, including travel and waiting time, took about 45 minutes.

d.      The time to obtain a passport size photograph (when needed) was approximately 30 minutes.

e.      I then either arranged for transportation to the MPD Headquarters or drove to the headquarters, which took about 30 minutes to 1 hour.

f.      If I drove, I walked from the parking space to the headquarters.  Locating a parking space and parking would take around 20 to 30 minutes, and walking to headquarters another 25 minutes.

g.      There was typically a wait at the gun registration entrance for an officer to assist me.  For each registration, I submitted the application forms, waited for the ballistics testing of the pistol, and went to the cashier to pay for the registration.  I then returned to the gun control office and waited for the processing to be completed.  I was then informed that the firearm was either registered or denied registration.  Completion of these steps generally took about 1 hour to 1 hour 40 minutes.

h.      Being escorted to the front entrance by an officer took around 5 minutes.

i.    I then either waited for my transportation or walked back to the vehicle I was using.  Waiting for transportation took approximately 30 minutes to 1 hour; walking to the parking space took about 25 minutes.   I then traveled to my home, the time for which was similar to that described above to get to the MPD Headquarters.

7.    Total time to complete the registration process was therefore on the order of 6 to 9 hours per firearm.

8.    These times would be even greater if had I been required, like most residents, to complete a training course and pass a test on firearms safety.  Because I received firearms training in the military I was exempt from those requirements.  The times to register handguns would have also been greater had I not previously owned these firearms and stored them outside the District, because I would have had to travel out of the District to view and select firearms to purchase, and then transfer them through licensed dealers into the District.

9.    Registration was of no benefit to me when firearms were stolen from me some years ago in the District.  I notified the District of the theft.  MPD never notified me that any firearm had been recovered and, if it was recovered, MPD did not return it to me.

10.    I am a person who is in poverty.  I reside in Section 8 subsidized housing and am on the Medicaid health plan.  My annual income is approximately $16,800.  Because I am a low-income, retired individual, the costs of travel to and from MPD headquarters, parking, registration fees, fingerprint fees, and other costs are a substantial financial burden on me, especially since most of these costs have to be incurred for each firearm separately.  If the regulation proposed in November 2013 relating to re-registration goes into effect, the fees and costs associated with in-person re-registration and fingerprinting every three years for each firearm will impose an even greater, continuing burden on me and on others with very limited

financial resources.   This burden will be especially heavy for individuals who own multiple firearms.

I declare under penalties of perjury that the foregoing is true and correct.

Executed on December 4 , 2013

_____
Absalom Jordan

Exhibit 20

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DICK ANTHONY HELLER, *et al.*           )
                                        )
    Plaintiffs,                      )
                                        )
        v.                       )           No. 1:08-cv-01289 (JEB)
                                        )
THE DISTRICT OF COLUMBIA, *et al.*      )
                                        )
    Defendants.                      )

## DECLARATION OF WILLIAM SCOTT

I, William Scott, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1.      My name is William Scott.  I am over eighteen years of age, am fully competent to make this Declaration, and have personal knowledge of the matters stated herein.

2.      I am one of the plaintiffs in the above-captioned case.

3.      I am a resident of the District of Columbia and a citizen of the United States, and am eligible under the laws of the United States and of the District of Columbia to receive and possess firearms.

4.      In the 1970s, I legally registered a pump shotgun, a .22 cal. Winchester bolt action rifle, and an Astra .22 semi-automatic handgun.  In 1990, I legally registered a Remington Model 11-87 shotgun.

5.      In July of 2012, I registered a .38 cal Charter Arms Undercover revolver.  I had to make two trips to MPD to get my Charter Arms revolver registered.  Each time I drove and had to look to find parking.  On the first day, July 16, 2012, I had to take a course that lasted perhaps 15 minutes, and take an exam.  I filled out an application, and paid the registration fee.  I also

1

JA 842

was fingerprinted and paid for that on the 16th.  I had to stop by the office of Mr. Sykes, the dealer, to have him complete some paperwork and to pay his fee.  I also had to have my photograph taken.  On the second day, I had to get the application approved, and to visit Mr. Sykes the dealer to pick up the firearm.  They escorted me out of the building with the gun in a locked case and I went to my car to drive home.  Each visit took several hours counting travel time.

6.      For registrations in the 1970s and in 1990, each registration probably took several hours.  In 1990 for the Remington shotgun they couldn't fingerprint me when I was there, and I had to wait a couple of days and come back for that.

7.      Because of DC's registration laws, the time to obtain a firearm is also lengthened because one must wait ten days between the time of purchase and the time of registration.  This adds to the time spent and burdens of registration.

8.      The .22 caliber Astra mentioned above was stolen as the result of a break-in at my residence.  Although the handgun was registered, I was never notified by MPD that it had been recovered, and it was not returned to me.

9.      I live in subsidized public housing, and my income is $13,368 per year.  Because I am a low-income, retired individual, the costs of travel to and from MPD headquarters, parking, registration fees, fingerprint fees, and other costs are a substantial financial burden on me, especially since most of these costs have to be incurred for each firearm separately.  If the regulation proposed in November 2013 relating to re-registration goes into effect, the fees and costs associated with in-person re-registration and fingerprinting every three years for each

2

firearm will impose an even greater, continuing burden on me and on others with very limited financial resources.

I declare under penalties of perjury that the foregoing is true and correct.

Executed on __11~30__, 2013

_William Scott_
William Scott

Exhibit 21

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DICK ANTHONY HELLER, *et al.* | ) |
| | ) |
| Plaintiffs | ) |
| | ) |
| v. | ) CASE: 1:08-cv-01289 |
| | ) Hon. Ricardo M. Urbina |
| THE DISTRICT OF COLUMBIA, *et al.* | ) |
| | ) |
| | ) |
| Defendants | ) |

## DECLARATION OF ABSALOM F. JORDAN, JR.

I, Absalom F. Jordan, Jr., do hereby swear or affirm:

1. My name is Absalom F. Jordan, Jr. I am a resident of the District of Columbia and a citizen of the United States.

2. I am eligible under the laws of the United States and of the District of Columbia to receive and possess firearms.

3. I am a Firearms Instructor certified by the National Rifle Association of America, Inc. I formerly held a Federal Firearms License to engage in the business of dealing in firearms in the District of Columbia. My last license expired in 1993. I am knowledgeable about firearm makes and models, the market for firearms, and the common uses of firearms.

4. On or about February 17, 2009, I submitted to the District of Columbia Metropolitan Police Department (MPD) an Application for Firearms Registration Certificate for a Smith & Wesson Model 59, 9mm caliber pistol, to be used for "personal protection, sport and recreation." By letter dated February 18, 2009, the MPD notified me that the pistol is unregisterable because: "The listed weapon is not on the California Roster of Handguns Certified for Sale as required by

1

D.C. Code 7-2505.04."

5. At a later date, the District adopted regulations which allowed the registration of the above pistol. By application dated July 6, 2009, I applied to register the above Model 59 S&W pistol to be used for "personal protection, sporting activities, recreation," and paid the required fees therefor. The MPD issued the registration on the same date.

6. I store outside the District two other pistols which I wished to apply to register at the same time as the above application, but I could not do so because D.C. Code § 7-2502.03(e) provides in part: "The Chief shall register no more than one pistol per registrant during any 30-day period . . . ." As a result, I am required to undertake the effort and expense of submitting registration applications on two more occasions, with a minimum 30-day period between the dates on which the Chief registers each pistol.

7. On or about February 17, 2009, I submitted to the MPD an Application for Firearms Registration Certificate for an Armalite AR-180 .223 caliber semiautomatic rifle, to be used for "personal protection." By letter dated February 18, 2009, the MPD notified me that the rifle is unregisterable because: "The listed weapon is defined as an 'assault weapon' and prohibited from being registered in the District of Columbia per the Firearms Registration Act of 2009, amendment 12-22-08, D.C. Code 7-2501.01."

8. D.C. Code § 7-2501.01(3A)(A)(I)(qq) defines the term "assault weapon" to include an "Armalite AR-180" rifle. The Armalite AR-180 is a semiautomatic rifle which uses a detachable magazine and has a pistol grip that protrudes about 4 inches beneath the action. Rifles of this type are commonly possessed for protection, target shooting, competitions, and sporting purposes.

2

9.  Magazines that have a capacity of more than 10 rounds of ammunition are commonly sold with and are available for numerous makes and models of pistols and rifles. Such magazines are commonly possessed for self defense, target shooting, hunting, and sporting purposes. The Model 59 S&W pistol, for instance, was originally sold with a magazine holding 14 rounds of ammunition. As a result of D.C. Code § 7-2506.01(b), which prohibits possession of any magazine with a capacity of more than 10 rounds of ammunition, I cannot possess such magazine in the District but must keep it stored elsewhere.

10. When I had a Federal Firearms License, I was the agent for Glock when the MPD evaluated and, subsequently, purchased the Glock Model 17 pistol, magazines for which hold 17 rounds. The year in which the MPD officially adopted the Glock 17 as its service pistol was 1989. It later adopted the Glock 19 pistol, magazines for which hold 15 rounds.

I declare under penalty of perjury that the foregoing is true and correct.

ABSALOM F. JORDAN, JR.

Date: July 27, 2009

3

P.D. 219 Rev. 9/76

85—8P706

## METROPOLITAN POLICE DEPARTMENT WASHINGTON, D.C.
## APPLICATION FOR FIREARMS REGISTRATION CERTIFICATE
### $10.00 FEE REQUIRED WITH THIS APPLICATION · PRINT ALL INFORMATION

REGISTRATION NUMBER **1-0406/6**
DATE REGISTERED **7/6/09**

DEALER'S LICENSE NO.

This application for a Firearms Registration Certificate must be handcarried to the Metropolitan Police Department, Firearms Registration Section, 300 Indiana Avenue, N.W. Washington, D.C. 20001 by the purchaser.
The purchaser MUST 1) be fingerprinted by the Metropolitan Police Department, however, if the purchaser has been finger-printed by this department within five (5) years prior to submitting this application he need not be fingerprinted again if he offers other satisfactory proof of identity 2) submit with this application two full-face photographs of himself, 1⅛ × 1-⅞ inches taken within 30 days of filing this application 3) have vision better than or equal to that required to obtain a valid driver's license in the District of Columbia (a current driver's license will be prima facie evidence that the applicant's vision is sufficient) 4) demonstrate satisfactory knowledge of the laws in the District of Columbia pertaining to firearms and the safe and responsible use of same.
No transfer of a firearm between the seller and the purchaser may be made until a reply from the Chief of Police has been received by both parties involved.

SELLER'S NAME

PURCHASER/OWNER'S NAME **Absiôn Jordan**

STREET ADDRESS                     APT. NO.

STREET ADDRESS **4335 4th Street, SE #3**     APT. NO.

CITY                     ZIP CODE

CITY **Washington DC**     ZIP CODE **20032**

| DESCRIPTION OF FIREARM | | | DESCRIPTION OF PURCHASER/OWNER | | |
|---|---|---|---|---|---|
| ☐ NEW  ☑ USED | MAKE OF WEAPON **Smith + Wesson** | | DATE OF BIRTH **5-14-41** | PLACE OF BIRTH **Washington DC** | |
| MODEL **59** | SERIAL NUMBER **A-341775** | | OPERATOR'S PERMIT NUMBER **1599263** | RACE **Black** | SEX **Male** |
| MFG. I.D. NUMBER | NO. OF SHOTS **10** | CALIBER **9 MM** | OCCUPATION **N/A** | BUSINESS NAME **N/A** | |
| NO. OF BARRELS/LENGTH **1 Barrel - 4½** | FINISH **Black** | TYPE OF ACTION **Semi. Auto** | BUSINESS ADDRESS **N/A** | | |
| IDENTIFYING MARKS **N/A** | | | HOME PHONE NUMBER **2/574-5657** | BUSINESS PHONE NUMBER **N/A** | |

PURCHASER/OWNER'S ADDRESSES FOR THE PAST FIVE -5- YEARS WITH DATES OF RESIDENCE
**4335 4th Street, SE Apt# 3 Washington DC     Since 1995**

PURCHASER/OWNER'S OCCUPATION, BUSINESS NAME AND ADDRESSES FOR THE PAST FIVE -5- YEARS WITH DATES OF EMPLOYMENT
**N/A**

HAVE YOU PREVIOUSLY BEEN DENIED IN THE DISTRICT OF COLUMBIA OR ELSEWHERE ANY PISTOL, RIFLE OR SHOTGUN LICENSE OR REGISTRATION CERTIFICATE? ☐ NO  ☑ YES  IF YES, EXPLAIN WHY AND BY WHOM
**Attempted to Register My Smith. Model 59**

**APPROVED**

HAVE YOU EVER BEEN INVOLVED IN ANY MISHAP INVOLVING A PISTOL, RIFLE OR SHOTGUN? ☐ NO  ☐ YES  IF YES, EXPLAIN CIRCUMSTANCES, INCLUDING DATES, PLACES, AND NAMES OF ANY PERSONS INJURED OR KILLED.

GIVE A BRIEF STATEMENT OF YOUR INTENDED USE OF THE FIREARM AND WHERE THE FIREARM WILL BE KEPT
**Personal Protection - Sporting Antivities - Recreation**

I HEREBY CERTIFY THAT I AM NOT FORBIDDEN BY EXISTING LAWS AND REGULATIONS FROM PURCHASING OR POSSESSING A FIREARM AND THAT THE INFORMATION GIVEN BY ME ON THIS APPLICATION IS CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF AND DOES NOT KNOWINGLY CONTAIN ANY MATERIAL MISREPRESENTATION OF FACT.

SIGNATURE OF SELLER          DATE

SIGNATURE OF PURCHASER/OWNER          DATE **7/6/09**

The Seller and the Purchaser MUST SIGN IN THE PRESENCE OF EACH OTHER.

## NOTICE

This application is **VALID as a FIREARMS REGISTRATION CERTIFICATE** only when stamped **APPROVED** by the Chief of Police and a **REGISTRATION NUMBER** is affixed thereto.

### THIS IS NOT A LICENSE TO CARRY A CONCEALED FIREARM.

JA 850

The following is an excerpt from the "Firearms Control Regulations Act of 1975"

Title II - Firearms and Destructive Devices

Section 208 - Additional Duties of Registrants

Each person and organization holding a registration certificate, in addition to any other requirements imposed by this act, or the Acts of Congress, shall

(a) notify the Chief in writing of:

(1) the loss, theft, or destruction of the registration certificate or of a registered firearm (including the circumstances, if known) immediately upon discovery of such loss, theft or destruction;

(2) a change in any of the information appearing on the registration certificate or required by Section 203 of this act;

(3) the sale, transfer or other disposition of the firearm not less than forty-eight (48) hours prior to delivery, pursuant to such sale, transfer or other disposition, including-

(A)   identification of the registrant, the firearm and the serial number of the registration certificate;

(B)   the name, residence, and business address and date of birth of the person to whom the firearm has been sold or transferred; and

(C)   whether the firearm was sold or how it was otherwise transferred or disposed of.

(b) Return to the Chief, the registration certificate for any firearm which is lost, stolen, destroyed, or otherwise transferred or disposed of, at the time he notified the Chief of such loss, theft, destruction, sale, transfer, or other disposition.

(c) Have in his possession, whenever in possession of a firearm, the registration certificate for such firearm, and exhibit the same upon the demand of a member of the Metropolitan Police Department, or other law enforcement officer.

Title VII - General Provisions

Section 702 - Except for law enforcement personnel described in Section 201 (b) (1), each registrant shall keep any firearms in his possession unloaded and disassembled or bound by a trigger lock or similar device unless such firearm is kept at his place of business, or while being used for lawful recreational purposes within the District of Columbia.

P.D. 219 Rev. 9/76          85—8P706

## METROPOLITAN POLICE DEPARTMENT WASHINGTON, D.C.
## APPLICATION FOR FIREARMS REGISTRATION CERTIFICATE
### $10.00 FEE REQUIRED WITH THIS APPLICATION - PRINT ALL INFORMATION

This application for a Firearms Registration Certificate must be handcarried to the Metropolitan Police Department, Firearms Registration Section, 300 Indiana Avenue, N.W. Washington, D.C. 20001 by the purchaser.
The purchaser MUST 1) be fingerprinted by the Metropolitan Police Department, however, if the purchaser has been finger-printed by this department within five (5) years prior to submitting this application he need not be fingerprinted again if he offers other satisfactory proof of identity 2) submit with this application two full-face photographs of himself, 1¾ x 1-7/8 inches taken within 30 days of filing this application 3) have vision better than or equal to that required to obtain a valid driver's license in the District of Columbia (a current driver's license will be prima facie evidence that the applicant's vision is sufficient) 4) demonstrate satisfactory knowledge of the laws in the District of Columbia pertaining to firearms and the safe and responsible use of same.
No transfer of a firearm between the seller and the purchaser may be made until a reply from the Chief of Police has been received by both parties involved.

REGISTRATION NUMBER | DATE REGISTERED | DEALER'S LICENSE NO.

SELLER'S NAME

PURCHASER/OWNER'S NAME  Absalom F. Jordan, Jr.

STREET ADDRESS          APT. NO.

STREET ADDRESS  4235 4th Street, SE   APT. NO. #3

CITY          ZIP CODE

CITY  Washington DC   ZIP CODE 20032

| DESCRIPTION OF FIREARM | DESCRIPTION OF PURCHASER/OWNER |
|---|---|

☐ NEW  ☑ USED   MAKE OF WEAPON  Armalite

DATE OF BIRTH  5-14-41   PLACE OF BIRTH  Washington DC

MODEL  AR 180   SERIAL NUMBER  S-24151

OPERATOR'S PERMIT NUMBER  1599263   RACE Black   SEX Male

MFG. I.D. NUMBER   NO. OF SHOTS 10   CALIBER .223

OCCUPATION  N/A   BUSINESS NAME  N/A

NO. OF BARRELS/LENGTH 1 bbrl /   FINISH 19.2675   TYPE OF ACTION Semi

BUSINESS ADDRESS  N/A

IDENTIFYING MARKS

HOME PHONE NUMBER  574-0657   BUSINESS PHONE NUMBER  N/A

PURCHASER/OWNER'S ADDRESSES FOR THE PAST FIVE 5 YEARS WITH DATES OF RESIDENCE

Same as above

PURCHASER/OWNER'S OCCUPATION, BUSINESS NAME AND ADDRESSES FOR THE PAST FIVE -5- YEARS WITH DATES OF EMPLOYMENT

N/A

HAVE YOU PREVIOUSLY BEEN DENIED IN THE DISTRICT OF COLUMBIA OR ELSEWHERE ANY PISTOL, RIFLE OR SHOTGUN LICENSE OR REGISTRATION CERTIFICATE? ☐ NO  ☑ YES  IF YES, EXPLAIN WHY AND BY WHOM

Attempted to register my S&W model 57

HAVE YOU EVER BEEN INVOLVED IN ANY MISHAP INVOLVING A PISTOL, RIFLE OR SHOTGUN? ☐ NO  ☐ YES  IF YES, EXPLAIN CIRCUMSTANCES, INCLUDING DATES, PLACES, AND NAMES OF ANY PERSONS INJURED OR KILLED.

GIVE A BRIEF STATEMENT OF YOUR INTENDED USE OF THE FIREARM AND WHERE THE FIREARM WILL BE KEPT

Personal Protection

I HEREBY CERTIFY THAT I AM NOT FORBIDDEN BY EXISTING LAWS AND REGULATIONS FROM PURCHASING OR POSSESSING A FIREARM AND THAT THE INFORMATION GIVEN BY ME ON THIS APPLICATION IS CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF AND DOES NOT KNOWINGLY CONTAIN ANY MATERIAL MISREPRESENTATION OF FACT.

SIGNATURE OF SELLER     DATE          SIGNATURE OF PURCHASER/OWNER     DATE

The Seller and the Purchaser MUST SIGN IN THE PRESENCE OF EACH OTHER.

## NOTICE

This application is VALID as a FIREARMS REGISTRATION CERTIFICATE only when stamped APPROVED by the Chief of Police and a REGISTRATION NUMBER is affixed thereto.

### THIS IS NOT A LICENSE TO CARRY A CONCEALED FIREARM.

DISAPPROVED

JA 852

The following is an excerpt from the "Firearms Control Regulations Act of 1975"

Title II - Firearms and Destructive Devices

Section 208 - Additional Duties of Registrants

Each person and organization holding a registration certificate, in addition to any other requirements imposed by this act, or the Acts of Congress, shall

(a) notify the Chief in writing of:

(1) the loss, theft, or destruction of the registration certificate or of a registered firearm (including the circumstances, if known) immediately upon discovery of such loss, theft or destruction;

(2) a change in any of the information appearing on the registration certificate or required by Section 203 of this act;

(3) the sale, transfer or other disposition of the firearm not less than forty-eight (18) hours prior to delivery, pursuant to such sale, transfer or other disposition, including-

(A) identification of the registrant, the firearm and the serial number of the registration certificate;

(B) the name, residence, and business address and date of birth of the person to whom the firearm has been sold or transferred; and

(C) whether the firearm was sold or how it was otherwise transferred or disposed of.

(b) Return to the Chief, the registration certificate for any firearm which is lost, stolen, destroyed, or otherwise transferred or disposed of, at the time he notified the Chief of such loss, theft, destruction, sale, transfer, or other disposition.

(c) Have in his possession, whenever in possession of a firearm, the registration certificate for such firearm, and exhibit the same upon the demand of a member of the Metropolitan Police Department, or other law enforcement officer.

Title VII - General Provisions

Section 702 - Except for law enforcement personnel described in Section 201 (b) (1), each registrant shall keep any firearms in his possession unloaded and disassembled or bound by a trigger lock or similar device unless such firearm is kept at his place of business, or while being used for lawful recreational purposes within the District of Columbia.

**METROPOLITAN POLICE DEPARTMENT**
**RECORDS DEPARTMENT**
**RECEIVED DATE**
2/17/09

 

# POLICE
### *Gun Control and Firearms Registration*

**300 Indiana Ave. N.W. Room 3077, Washington D.C., 20001   (202) 727-4275   FAX (202) 442-4247**

February 18, 2009

Mr. Absalom Jordan Jr.
4335 4th Street S.E. #3
Washington, D.C. 20032

Dear Mr. Jordan

☑ This is to advise you that your Firearms Registration Application for a Armalite, model AR-180, .223 caliber semi-automatic rifle has been **disapproved** for the following reason(s):

- **1. Unregisterable Firearm**
- **(The listed weapon is defined as an "assault weapon" and prohibited from being registered in the District of Columbia per the Firearms Registration Act of 2008, amendment 12-22-08,  D.C. Code 7-2501.01 )**

You have 15 days from the date this notice is received to appeal this decision.  A copy of the regulations governing such appeals is attached for your information.  Appeals should be sent to the Director, Identification and Records Division, Metropolitan Police Department, 300 Indiana Avenue, N.W., Washington, D.C. 20001.

If you do not file your appeal within the time allowed, you shall be deemed to have conceded the validity of the reason or reasons stated in this notice, and the **denial** shall become final.

In the event you do not submit further evidence, you must do one of the following within 7 days after the decision becomes final:  (1) peaceably surrender to the police the firearm for which registration was revoked or disapproved; (2) lawfully remove such firearm from the District of Columbia for so long as you have an interest in such firearm; or, (3) otherwise lawfully dispose of your interest in such firearm.

☐ Your application has not been acted upon within the 60 day period because
_____
_____

You will be notified as soon as the missing information is received and the application review process is completed.

FOR APPEALS INSTRUCTIONS SEE REVERSE SIDE

FL-63 REV 7/08

### Page 1 of 2

JA 854

## REGULATIONS GOVERNING APPEALS

### Denial and Revocation Procedures

Effective January 1, 2009, the Metropolitan Police Department no longer adjudicates appeals as it relates to Firearms Registration. Section 2 of Act #17-651, Firearms Registration Emergency Amendment Act of 2008, now makes the Office of Administrative Hearings responsible for handling appeals of denials and revocations of gun registrations. The address to the Office of Administrative Hearings is:

Office of Administrative Hearings
441 4th Street, Northwest, Suite 870-N
Washington, D.C. 20001-2714

Please forward any request to appeal the decision made by the Firearms Registration Unit to the Office of Administrative Hearings so the matter can be reviewed as outlined by current law.

**Page 2 of 2**

Exhibit 22

# Testimony of Prof. David B. Kopel
# before the
# District of Columbia Council,
# Committee on the Judiciary

# Testimony on
# Bill 19-614, Firearms Amendment Act of 2011

Written Testimony, Feb. 13, 2012, for Committee hearing held Jan. 30, 2012

Presented by David B. Kopel

Adjunct Professor of Advanced Constitutional Law, Denver University, Sturm College of Law

Research Director, Independence Institute, Denver, Colorado

727 E. 16th Ave.
Denver, Colo. 80203

Attachments:

Bureau of Alcohol, Tobacco, Firearms & Explosives, 2010 Firearms Trace Reports for the District of Columbia (#113605), Maryland (#113579), and Virginia (#113610).

FBI, Uniform Crime Reports, Table 20. For 2009 and for 2010.

1

HELLER DC 000197

Bill 19-614 contains many improvements in the District's firearms registration law. These are commendable, and bring the District closer to compliance with the Second Amendment of the Constitution of the United States of America. There are some provisions, however, in which the Bill does not go far enough in reforming inappropriate provisions of existing statutes.

# I. Discrimination against people with visual impairments

The Council is considering eliminating the law that forbids gun ownership by people whose eyesight is not good enough to obtain a driver's license.[1] This is commendable, and eliminates an irrational law. In order to drive safely, a person must be able to read road signs and to see objects that may be dozens or hundreds of yards away. A person engaged in long-distance hunting, without any guide or companion, might need similar visual acuity in order to shoot safely at a target that might be 500 yards away, and might be partially concealed by vegetation.

## A. Vague and excessive standard for vision

Unfortunately, there is a proposal to replace the first visual ban with a narrower, but still inappropriate, visual ban: on persons who are defined as "blind" according to D.C. law.

To understand the defects of the D.C. definition, particularly as applied to firearms owners in the home, let us start with the federal definition, which is precise:

[T]he term "blindness" means central visual acuity of 20/200 or less in the better eye with the use of a correcting lens. An eye which is accompanied

---

1 The District's firearms registration law currently provides that to register a firearm an applicant must demonstrate "vision better than or equal to that required to obtain a valid driver's license under the laws of the District of Columbia . . . ." § 7-2502.03(a)(11).

    A common line of argument is that issuance of a driver's license requires a vision test, so registration of firearms should be limited to persons who meet vision requirements. The analogy is inapt. A driver's license is required to *operate* a motor vehicle. There is no vision requirement in order to *own* or *possess* a motor vehicle, and any such requirement would surely be discriminatory and illegal. As noted above, there will be many instances in which residents of the District have a perfectly legitimate reason to *own* or *possess* a firearm in the home, but may never have any reason or intention to fire it.

HELLER DC 000198

by a limitation in the fields of vision such that the widest diameter of the visual field subtends an angle no greater than 20 degrees shall be considered for purposes in this paragraph as having a central visual acuity of 20/200 or less.

42 U.S.C. § 416(i)(1)(B).

In other words, the person sees at 20 feet about as well as a person with perfect vision would see at more than 200 feet. There are nearly one million Americans aged 40 or over in this category.[2] Of the persons defined as "legally blind," only about 10% have no vision (that is, they are "blind" in the common usage of the word). "The rest The rest have some vision, from light perception alone to relatively good acuity."[3]

The proposed D.C. amendment to § 7-2502.03(a)(11) adopts the definition of "blind" contained in § 7-1009(1):

"The term 'blind person' means, and the term 'blind' refers to, a person who is totally blind, has impaired vision of not more than 20/200 visual acuity in the better eye and for whom vision cannot be improved to better than 20/200, or who has loss of vision due wholly or in part to impairment of field vision or to other factors which affect the usefulness of vision to a like degree."

The D.C. and federal definitions have the same standards for a person who has trouble seeing things clearly at a distance. The D.C. and federal definitions diverge for persons whose distance vision is fine, but who have a narrow field of vision. The federal definition is that "legally blind" includes people whose field of vision is 20 degrees or less. The D.C. definition fails to specify what field of vision is so narrow that a person will lose her Second Amendment rights.

For a person with perfect eyesight, the total field of vision is commonly said to be 160 to 208 degrees. What if a person has a 100 degree field of vision? Can that person be refused a D.C. firearm registration? The proposed language does not tell us.

---

2 National Eye Institute, National Institutes of Health, *Prevalence of Blindness Data*, http://www.nei.nih.gov/eyedata/pbd_tables.asp.
3 *When are you Legally Blind*, Disability World (2007/12/06), http://www.disabled-world.com/artman/publish/legally-blind.shtml.

3

HELLER DC 000199

Peripheral vision is very important for driving. It is of much less significance for firearm defense in the home, because focusing on the gun's sights and on the target takes place in the center of the field of vision.

The proposed language about "other factors which affect the usefulness of vision to a like degree" is also vague, and does not provide the registering officials with appropriate guidance.

## B. The Americans with Disabilities Act

Discrimination against individuals who have the misfortune to be actually or "legally" blind is a straightforward violation of the Americans with Disabilities Act ("ADA"), and perhaps of other laws aimed at securing to disabled persons the full enjoyment of societal rights—of which the most important are, by definition, "fundamental" constitutional rights. Advocates of a law to completely outlaw the exercise of constitutional rights by a person merely because the person has a physical handicap carry a very heavy burden of proof.

The ADA, 42 U.S.C. ch. 26, comprehensively prohibits discrimination against disabled individuals by state and local governments, including the District of Columbia. In Subchapter II of the ADA, relating to public services, 42 U.S.C. § 12132 provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or *be subjected to discrimination by any such entity*." Yet that is what the District of Columbia is currently doing, and what some propose to continue doing.

Individuals who are legally blind are clearly protected by the ADA. Section 12102(1) of the ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual," and defines "major life activities" to include "seeing." Presumably, the District has prohibited blind or visually impaired persons from possessing firearms precisely because they are "disabled," in the sense that their impairment "limits" their ability to perform life activities such as "seeing," and thus, by inference, they are assumed to be unable to safely own a firearm. There would seem to be no other reason for enacting such a prohibition.

4

HELLER DC 000200

The District's ban against the mere possession of firearms by visually impaired persons is absolute: "no person...in the District shall possess or control any firearm, unless the person...holds a valid registration certificate for the firearm...." § 7-2502.01(a). The current ban on possession is for anyone who cannot pass the vision test for driving, and under the Act would still include many individuals protected by the ADA.

The District's current, and proposed, discrimination against persons with visual disabilities is a particular easy case under the ADA. No-one is requesting that the District make any "reasonable accommodation" in its employment practices, or make any modification of its buildings or other facilities. The only request is that the District *not* practice deliberate, targeted discrimination against the visually handicapped *regarding something in their own home, and not in public.*

It is well-established that the ADA provides statutory federal protection against state or local government policies which discriminate against the disabled based on stereotypes or generalizations. The assertion that the District discrimination against the visually handicapped is necessary for public safety, is ludicrous. Not a single state in the Union prohibits firearms ownership in the home by the legally blind. Over the course of three centuries—from the early colonial period to the present—not one state has *ever* discriminated against the visually impaired regarding gun ownership in the home. After three centuries, in fifty states, in a nation of more than 300 million people and just as many firearms, the D.C. City Council has not been presented with a scintilla of evidence that non-discrimination against the visually disabled has harmed public safety.

Of course under the ADA, it takes considerably more than a scintilla in order to make discrimination lawful. Putting the ADA aside, discriminating against the disabled simply because of "vague, undifferentiated fears" is a violation of the Fourteenth Amendment. *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432 (1985).

## C. Prohibition on various forms of firearms ownership or use

The discrimination seems premised on the notion that the only possible reason to own a firearm is to shoot someone with it in self-defense. This reason is the "core" of the Second Amendment right, according to *District of*

HELLER DC 000201

*Columbia v. Heller* and *McDonald v. Chicago*; but according to those same cases, the right is not limited to defensive shooting, but instead compasses legitimate uses in general, including hunting.

Many individuals own firearms without ever firing them for any purpose, and without any intention of ever firing them. Some of these individuals are heavily engaged in the hobby of gun collecting. Others simply enjoy owning their firearms, showing them to visitors to their home, and so on. By analogy, the First Amendment protects people who buy the leatherbound editions of the *Library of America*, regardless of whether those people read any of those books, or simply enjoy owning them.

Like leather-bound books, firearms are often handed down from generation to generation; they may be financially valuable, have sentimental value, or simply be part of the family's inheritance. Although Grandpa may never read his leather-bound edition of Frederick Douglass's autobiography (and even if he cannot read it because he is totally blind), he keeps it in the family for his children and grandchildren, who may read it one day. The same is true for a firearm. Merely because an individual does not want to or cannot use something today is no reason to outlaw his ownership of it for his descendants.

It is not unusual that when an individual passes away, any firearms he possessed will remain in possession of the surviving spouse. Should the surviving spouse be automatically barred from such possession, and be subject to financial loss and criminal penalties, solely because he or she happens to be visually impaired or blind? By banning mere ownership or possession because of disability, the District's law cuts far too wide a swath.

Additionally, people who are legally blind can and do *use* firearms safely and responsibly. With appropriate assistance, they can engage in target shooting at a range, or in another safe location. Some states have programs so that legally blind persons can hunt—if accompanied by someone to provide visual assistance. Persons in the District of Columbia have the right to own firearms so that they can use them in states where they can lawfully practice target shooting or hunting.

HELLER DC 000202

### D. Defensive Use

In addition, firearms are highly useful in connection with the core Second Amendment right of self-defense, even if they are not fired. Indeed, in the large majority of defensive uses, they are *not* fired. Professor Gary Kleck has conducted numerous studies regarding the use of firearms for self-defense. While there are academic disputes about Kleck's findings regarding *how often* guns are used defensively, there has never been a dispute regarding his findings about *how* guns are used defensively. Kleck's research about the *how* of defensive gun use has not even been disputed by the gun prohibition lobbies.

Kleck found that in approximately 76% of defensive gun uses (DGUs), no shot is fired. Merely displaying the gun (or the criminal hearing the distinctive sound of shotgun being racked, or the hammer of a gun being cocked) was sufficient to frighten away the attacker. Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 JOURNAL OF CRIMINAL LAW & CRIMINOLOGY 150 (1995).

Thus, even if defensive gun use were the *only* lawful purpose for gun ownership, the data show even for the 10% of the "legally blind" population which is totally blind, that in 3/4 of the cases when *they* would use guns, no shot is fired, and hence there is no issue of public safety.

As for that minority of situations in which a shot is fired, the person who is legally blind will be in her home (pursuant to District law), and therefore in familiar surroundings. She will not be a police sniper who has to pick someone out of a crowd at a distance. To the contrary, she will be reacting to a sudden, violent, entry into the home by an intruder. Her defensive gun use will be against a target just a few feet away. The vast majority of defensive gun uses take place at distances of five feet or less. Even a person with very poor eyesight (who can see at 20 feet what a person with perfect vision can see at 200) can see well enough to aim at a violent attacker five feet away.

The notion that a legally blind person would fire wildly at targets he or she could not properly identify is supported by no evidence. It is mere prejudice and fear. The ADA and the Constitution both stand firm against irrational fears that because a person has a physical handicap, he must be morally or emotionally defective, and therefore dangerous. Simply because an individual is blind or visually challenged does not mean that he or she is careless, irresponsible, negligent, or lacking in good judgment. Such persons

HELLER DC 000203

are aware of their disabilities and as responsible citizens would no more start firing a weapon at an unidentified target than a person with perfect vision would fire when lighting conditions did not permit proper identification.

When Congress passed the ADA, it expressly found that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, . . . overprotective rules and policies, failure to make modifications to existing facilities and practices, [and] exclusionary qualification standards and criteria. . . ." 42 U.S.C. § 12101(a)(5). The "exclusionary qualification standards and criteria" in both the current and proposed versions of § 7-2502.03(a)(11) are "overprotective rules and policies" which fail to recognize that persons who are blind or visually challenged are capable of responsible firearm ownership, and that they cannot be discriminated against as a class in the exercise of their fundamental constitutional rights.

Putting the ADA aside, it is irrational and unconstitutional under the Fourteenth Amendment for governments motivated by fear and prejudice to discriminate against people with disabilities. *Cleburne Living Center, supra.*

Putting aside the Fourteenth Amendment, it is a violation of the Second Amendment for a city government to completely law-abiding, responsible citizens from exercising a "fundamental" constitutional right when there is *no* factual predicate to indicate that such persons are a menace to society, and especially when the experience of centuries in the rest of the United States of America proves that such persons are, as a class, responsible and safe, rather than dangerous and wild.

## II. The Registration System is Aberrational, Extreme, and Calculated to Suppress the Exercise of Constitutional Rights

The District's current law, and Bill 19-614's failure to sufficiently reform the current law, force one to address the question raised by Justice Breyer in *McDonald*: "When do registration requirements become severe to the point that they amount to an unconstitutional ban?"

8

JA 864

HELLER DC 000204

## A. Repetitive Re-registration

Not one state in the Union requires that gun owners periodically –re-register their firearms, and that they pay an additional tax/fee for doing so. Every state which has some form of gun registration requires that the gun be re-registered only when ownership is transferred to another person.

A very few cities, most notably Chicago, do require periodic re-registration. To state the obvious, Chicago is not exactly a model for cities which are trying to enact gun laws compliant with the Constitution of the United States of America. *See McDonald v. Chicago*, 561 U.S. 3025 (2010); *Ezell v. Chicago*, 651 F.3d 684 (7th Cir., 2011).

To require a registered owner to re-register over and over again, and pay a fee every time he does so, amounts to unending bureaucratic harassment for its own sake. The repetitive charges for registration amount to a tax particularly aimed at the exercise of constitutional rights, rather than a generally-applicable tax for raising revenue for government operations. As such, the current law's unending collection of money from gun-owners simply for continuing to own their already-registered guns is unconstitutional. *Grosjean v. American Press Co.*, 297 U.S. 233 (1936) (special tax on First Amendment rights).

## B. Long gun registration in the United States

The only state in the Union which registers long guns as a general class is Hawaii. California will start doing so in July 1, 2012—simply by retaining data on dealer sales from that date forward. The state was already collecting that data as part of its background checks. Thus, no action is required on the part of the gun purchaser to complete the registration.[4]

So as of early 2012, the only evidence, based on experience, about the benefits of comprehensive long gun registration in the United States, would be those from Hawaii.

Notably, not a single witness at the January 30 Committee hearing presented *any* evidence specifically about Hawaii. If there were data showing that Hawaiian long gun registration were beneficial to public safety, one may

---

4 Cal. Penal Code §§ 11106, 26905, as amended by Assembly Bill 809 (2011).

JA 865

HELLER DC 000205

presume that at least one witness from the many gun control organizations which testified would have presented that data.

Not one state in America today, nor ever in the history of the United States, has required long gun purchasers to make multiple trips to a police station for every single long gun purchase. To the extent that any local governments, such as Chicago, have done so, they have done so based on the explicit and incorrect premise that the Second Amendment did not apply to their anti-gun laws.

In *Lamont v. Postmaster General*, 381 U.S. 301 (1965), the Supreme Court held that requiring a person to go to the post office to pick up "communist political propaganda", rather than have the propaganda delivered to his home, was too great a burden on freedom of the press. Surely under the Constitution today, a person who wishes to acquire a firearm for lawful self-defense is not supposed to be treated far worse than a person who wishes to acquire communist political propaganda.

# III. Empirical Information

## A. Trace Data

If the instructions for a computer printer warn "Do not submerge the printer in water," then a reasonable person will not put the printer in his bathtub. Printed warnings and cautions exist for a reason.

Some advocates of the long gun registration plan, however, do not seem to pay attention to printed warnings.

The Bureau of Alcohol, Tobacco, Firearms & Explosives provides a printed warning to accompany its firearms tracing information:

"Firearms selected for tracing are not chosen for purposes of determining which types, makes or models of firearms are used for illicit purposes. The firearms selected do not constitute a random sample and should not be considered representative of the larger universe of all firearms used by criminals, or any subset of that universe."

HELLER DC 000206

In other words, just because a type of firearm appears in a particular number or percentage in the ATF report does not mean that those firearms were used for an illicit purpose, or that the percentage is representative of use in crime.

Yet surprisingly, some of the oral testimony about long gun registration at the Committee's hearing on January 30 was apparently based on BATFE traces—heedless of BATFE's own warnings. A prudent person should not take advice about how to use guns from a person who ignores the printed warnings in the owner manual that comes with the gun. A prudent legislator should not take advice about gun policy from a person who ignores BATFE's printed warning about gun traces.

One witness, Mr. Daniel Webster, of the Center for Gun Policy and Research, presented some testimony about the percentage of firearms "recovered" by the Metropolitan Police Department (MPD) in the "past year" were long guns. Although he provided no citation in his oral testimony, his figures appear to be based on BATFE traces in 2010. (Which is not technically the "past year.")[5]

As such, his testimony makes precisely the error which BATFE warned about: conflating traced guns with illicit or criminal guns. His figure that 17% of "recovered" guns in the District were long guns is actually the percentage of *traced* guns that were long guns. But about a third of the guns "recovered" by the MPD were never submitted for tracing.[6]

Moreover, just because a firearm is "traced" (or "recovered) does not mean that it is an illicit or criminal gun. In fact, most of the recovered firearms were not reported as being associated with any of the categories of crimes of violence specifically listed in the ATF report. The largest category was "possession of weapon" (571 firearms), which is not a crime in most states, but is a crime in the District if the gun is not registered, is of a type that the District bans, or is possessed outside the home (possession by felons or other

---

5 Mr. Webster said that 17% of guns recovered in the past year in D.C. were long guns, as were 40% in Maryland, and 34% in Virginia. These figures are close to the BATFE 2010 data (the most recent available) on the types of firearms traced in the respective jurisdictions: 16.8% for the District, 40.6% for Maryland, and 33.9% for Virginia. The BATFE reports for the three jurisdictions for 2010 are attached to this testimony.

6 According to ATF, 1,545 firearms from the District were recovered and submitted for tracing in 2010. That is significantly different from total firearms recovered, because not all recovered guns are submitted to the ATF for tracing (the MPD Annual Report for 2010, at page 23, shows 2,248 firearms recovered). Of the 1,545 submitted to ATF, 260 were shotguns or rifles, or approximately 17%.

HELLER DC 000207

disqualified persons is a federal offense). Citing violation of restrictive registration and possession requirements as a reason to support restrictive registration and possession requirements is circular reasoning.

The next two largest categories were "firearm under investigation" (433 firearms) and "found firearm" (318 firearms). Only 206 recovered firearms submitted for tracing were associated with the categories "dangerous drugs, aggravated assault, homicide, robbery, family offense, burglary, and simple assault." It is unknown what percentage of these were rifles or shotguns, but other evidence, discussed below, indicates that the number of long guns actually used in violent crimes in the District is minimal.

### B. Police and FBI Data on long gun use in crime in the District

According to the FBI's Uniform Crime Reports ("UCR"), the number of shotguns and rifles used in the commission of homicides in the District in 2010 was zero. Table 20 of the UCR for 2010 is attached. For 2009, according to the UCR, there was one homicide committed in the District with a rifle and one with a shotgun. Table 20 of the UCR for 2009 is attached. For the years 1995-2008, the UCR did not provide a breakdown of the use of handguns or long guns in homicides in the District, because the District did not submit that supplemental data, the data was incomplete, or it did not meet UCR guidelines. The UCR does record one homicide with a shotgun in the District in 1997. See summary with links, attached. For both 2009 and 2010, according to the UCR, the number of homicides in the District committed with knives or cutting weapons exceeds the number of long gun homicides. For both years, the number of homicides using weapons other than firearms or knives exceeds the number of long gun homicides. For both years, the number of homicides committed using hands, fists, and feet exceeds the number committed using shotguns and rifles combined. See Table 20 for each year.

### C.    Anecdotes

The rarity of use of long guns in crime in the District is underscored by Chief Lanier's testimony. Rather than presenting statistics on the use of long

HELLER DC 000208

guns in crime, Chief Lanier offered some anecdotes of long gun misuse. These anecdotes do not have anything to do with the D.C. registration system:

- The Holocaust museum shooter was James W. von Brunn, an 88 year old man who was a mentally deranged, anti-Semitic, white supremacist. He was a convicted felon, and was thus legally forbidden from possessing a firearm. He was a resident of Maryland, not the District.[7] It is thus unclear how registration of long guns in the District would have prevented this shooting, through verifying Von Brunn's eligibility to possess the firearm, or tracking the firearms after the crime was committed, or otherwise helping solve the crime.

- The individual who fired a rifle at the White House last fall was Oscar Ortega-Hernandez, a resident of Idaho.[8] Again, a requirement to register rifles in the District, which is already in effect, did not prevent and could not have prevented this shooting, through verifying Ortega-Hernandez's eligibility to possess the firearm, or tracking the firearms after the crime was committed, or otherwise helping solve the crime

- The person who shot at military facilities five times was Yonathan Melaku, a naturalized citizen from Ethiopia, who was a resident of Virginia, and who shouted "God is great" in Arabic as he fired at military facilities, all of which were located in Virginia.[9] It is again unclear how this incident supports registration requirements for long guns in the District of Columbia.

- A shotgun was used several years ago in a street battle several years ago on E Street, and in a robbery in the 4th District. Chief Lanier's testimony did not explain whether either of these shotguns was registered, or how registration would have prevented or led to the solution of these two crimes.

---

7 Nafeesa Syeed & David Espo, *Holocaust Museum Shooting In Washington D.C.*, HUFFINGTON POST, June 11, 2009;  http://www.huffingtonpost.com/2009/06/10/holocaust-museum-shooting_n_213831.html; *Guard killed during shooting at Holocaust museum*, CNN.com, June 10, 2009, http://articles.cnn.com/2009-06-10/justice/museum.shooting_1_holocaust-museum-von-brunn-security-guard?_s=PM:CRIME.
8 *Accused White House shooter pleads not guilty*, REUTERS, Jan. 24, 2012, http://www.reuters.com/article/2012/01/24/us-usa-security-whitehouse-idUSTRE80N24I20120124.
9 Associated Press, *Pentagon shooter pleads guilty, agrees to 25 years*, FOXNEWS.COM, Jan. 26, 2012, http://www.foxnews.com/us/2012/01/26/accused-pentagon-shooter-former-marine-melaku-pleads-guilty/.

JA 869

HELLER DC 000209

### D. Social Science

Mr. Webster is the author of a comparative state-level study which concludes that state gun licensing and registration laws are associated with lower crime levels. Taking the study at face value, the study offers nothing to bolster the District's odd laws. At the time of the study, Hawaii was the only state which had long gun registration. Accordingly, whatever the study found about registration was a finding about *handgun* registration, which, as the Court of Appeals observed in *Heller II*, is much more prevalent than long gun registration.

More relevant to the purposes of Bill 19-614 is another study which actually included the District of Columbia, and compared its laws to other cities. The largest, most detailed comparative study of the effects of various firearms laws was conducted by Florida State University criminologist Gary Kleck, and published in his book *Point Blank: Guns and Violence in America*. That book was awarded the highest honor by the American Society of Criminology: the Michael Hindelang Book Award "for the greatest contribution to criminology in a three-year period."

The Kleck study examined many years for crime data for the 75 largest cities in the U.S., including the District of Columbia. The study controlled for numerous variables such as poverty, race, arrest rates, and so on. Kleck's study found *no* crime-reductive benefits from gun registration.[10]

Another study examined the overall strength of gun control in the 50 states and D.C., and its effects on crime. The measure for control strength was a

> "comprehensive index, published by the Open Society Institute, covering 30 different facets of state gun laws, enforcement effort, and the stringency of local gun ordinances. The index weights upstream measures such as gun registration more heavily than downstream measures such as safe storage laws. It also weights regulations governing handguns more heavily than those on long guns."

---

[10] This is not a novel finding. A 1958 comparative examination (although much less sophisticated than Kleck's), also found no benefits from registration. William C. Shead, Comment, *Do Laws Requiring Registration of Privately Owned Firearms Lower Murder Rate?* 3 S. TEX. L.J. 317 (1957-1958).

14

HELLER DC 000210

At the time of the study, the District of Columbia's handgun ban and ban on home self-defense was in effect.

The multivariate study found no crime reductive benefits from a higher score on the gun control index. John C. Moorhouse and Brent Wanner, *Does Gun Control Reduce Crime Or Does Crime Increase Gun Control?* 26 CATO JOURNAL 103 (Winter 2006). Unlike the Kleck study, the Moorhouse and Wanner study did not specifically examine registration in isolation; but it did find that in a scoring system in which many points were awarded for registration, high scores did not yield positive results for public safety.

. The Centers for Disease Control, and the National Academies of Science each conducted comprehensive meta-studies of firearms control laws. (A meta-study is a study of a collection of studies on a topic.) Examining all the research, both studies reported that there was insufficient evidence to determine that gun control in general, and, specifically, firearm registration, had beneficial effects. NATIONAL RESEARCH COUNCIL OF THE NATIONAL ACADEMIES, FIREARMS AND VIOLENCE: A CRITICAL REVIEW (National Academies Press 2004); Task Force on Community Preventive Service, Centers for Disease Control, *First Reports Evaluating the Effectiveness of Strategies for Preventing Violence: Firearms Laws*, 52 MORBIDITY AND MORTALITY WEEKLY REPORT 11 (OCT. 3, 2003).

**E. Long gun registration in other nations.**

There are substantial differences between the United States and other nations, including the fact that gun laws in other nations do not have to comply with the Second Amendment. Even so, they are of some interest because they illustrate the great potential for failure for the long gun registration project on which the District is embarking.

*1. Canada*

Across the spectrum of Canadian political observers, it is widely expected that Canada's long run registration system is going to be repealed. The system was enacted in 1995, with the promise that the registry would cost only $2 million (Canadian). Instead, the cost has reached over $2 billion and

HELLER DC 000211

is still climbing.[11] (To put this in perspective, the total annual expenditures on policing nationwide are less than 8 billion.) The $2 billion that was wasted on the registry could have been spent on putting police on the street (rather than shuffling paperwork). Or it could have upgraded forensics laboratories. Or it could have paid for social worker outreach to potentially violent people.

Rather than improving public safety, the long gun registry has been a gigantic waste of limited resources, a notorious fiasco. Allan Rock, then Justice Minister, claimed that universal firearm registration would reduce criminal violence, total suicides, and domestic abuse. He spoke forcefully against the use firearms for self-defense, except by police and military, and said that the strict gun laws would distinguish Canada from the US. (Put another way, Mr. Rock was saying that his long gun registry was the opposite of the Second Amendment.)

The Canadian gun prohibition lobby contends that the registry helps police know when they are entering a home that contains a firearm. But since violent criminals rarely register their guns, a prudent police officer must assume that any home could contain an unregistered gun.

### 2. New Zealand

New Zealand's Arms Act of 1983, enacted at the request of the police, abolished the registration of rifles and shotguns. Rifle registration had been the law since 1920, and shotgun registration since 1968. The New Zealand Police explained that long gun registration was expensive and impractical, and that the money could be better spent on other police work. The New

---

11 Auditor General of Canada, *Costs of Implementing the Canadian Firearms Program* (2002), http://www.oag-bvg.gc.ca/domino/reports.nsf/html/20021210ce.htm; Philip C. Stenning, *Long Gun Registration: A Poorly Aimed Longshot*, 45 CANADIAN JOURNAL OF CRIMINOLOGY AND CRIMINAL JUSTICE (no. 4, October 2003); Gary A. Mauser, *The Failed Experiment: Gun Control and Public Safety in Canada, Australia, England and Wales*, 71 PUB. POL'Y SOURCES 4 (2003), http://www.fraserinstitute.ca/admin/books/files/FailedExperiment.pdf ("The final costs are unknown but, if the costs of enforcement are included, the total cost could easily reach $3 billion."); Gary A. Mauser, *After the Gun Registry*, FRASER FORUM (May 2006): 18-20; Gary Mauser & W.T. Stanbury, *Can the Canadian Firearm Registry Reduce Gun Deaths?* FRASER FORUM (July 2003): 26-27; Jason Fekete, *Redirect Gun Registry Funds*, THE OTTAWA CITIZEN, July 8, 2003, *available at* http://lufa.ca/news/news_item.asp?NewsID=2226 ("The federal government should abolish the $2-billion firearms registry for long guns and redirect the tax dollars to municipalities, health care, education and law enforcement, says a report to be presented to a city committee.").

HELLER DC 000212

Zealand Police pointed out that data base management is an enormously difficult and expensive task, that the long gun registration data base was a mess, and that it yielded virtually nothing of value to the police. Superintendent A.G. McCallum, *Firearm registration in New Zealand*, NZ Police, Sept. 1982.

Instead, New Zealand now has a system for the licensing of gun owners (as do a few U.S. states). Once the license is issued, the police do not waste their time, or the gun owners' time, trying to keep a record of every single long gun possessed by the licensed owner.

Although some gun control advocates began pushing in 1997 to revive the registry, since, supposedly, computers would make it work this time, the plan was rejected after extensive debate and analysis over several years.

# Conclusion

From 2008 until the present, advocates of the District's onerous system of long gun registration have failed to produce what they have failed to produce a single example, from anywhere in the world, in which a long gun registration system like that in the District has been shown to reduce crime.

According to the Constitution, when a substantial burden (such as D.C.'s onerous and aberrational registration system) is imposed on the exercise of fundamental constitutional rights, that there be substantial benefits, not speculative ones, and not ones that are contrary to present body of social science evidence and of experience. After four years of trying, the advocates of highly repressive gun laws in the District have still failed to demonstrate what *Heller II* called "a close fit between those requirements" and important or compelling governmental interests.

HELLER DC 000213

# WRITTEN TESTIMONY OF EMILY MILLER
## Before the District of Columbia Council Committee on the Judiciary
### Hearing regarding Bill 19-614, Firearms Amendment Act of 2011

## JANUARY 30, 2012

**Table of Contents**

| | |
|---|---|
| Recommendations to the Committee for Amending the Bill | Page 2 |
| Oral Testimony at Hearing (Summary of Points) | Pages 3 - 4 |
| Addendum to Testimony: Gun Ownership and Firearm Sales | Page 5 |
| Fully Written Testimony on Current Registration Process | |
| • Introduction | Pages 6 - 7 |
| • Registry Office and Paperwork | Pages 8 - 15 |
| • Firearms Safety Course | Pages 16 - 21 |
| • Purchasing & Transferring Guns | Pages 22 - 28 |

COUNCILMEMBER MENDELSON
2012 FEB -9 PM 3:40

# ORAL TESTIMONY OF EMILY MILLER (Summary points)

Mr. Chairman and committee members, thank you for giving me this opportunity to share my experiences with you.

My name is Emily Miller. I'm a District resident, and I want to get a gun to protect myself. As I've been going through the gun registration, I've documented every detail in my newspaper, The Washington Times. But today, I'm here to testify as a private citizen of D.C. about my personal views and experiences trying to get a legal gun in this city.

I always knew getting a legal gun would be a challenge, but I had no idea it would be this frustrating, time-consuming, expensive and complicated. As of now, I'm in the 10-day waiting period to see if my registration application is approved for a handgun. Or as I've tracked it, I've completed 14 of the 17 steps the city requires to register a gun.

For me, the safety class has been the biggest barrier to gun ownership - in time, expense and my personal safety.

It took me a long while to find an instructor for the course - it seemed the District was making it as difficult as possible. As you know, the police give out the list of certified instructors with only their names and phone numbers. I called every single one of the 47 people on that list. And only found four instructors willing and able to teach the class. The prices were mostly in the range of $200 to $250.

It doesn't say it in the registration packet, but from making all these calls, I quickly learned that the instructors are not allowed to teach the course within the District city limits. I just don't understand how it can be constitutional that I have to go outside Washington in order to exercise my Second Amendment right to keep and bear arms in D.C.

All of the instructors are in Maryland and Virginia and teach the class out of the their homes - or more specifically, as one man said, in his basement. They all live from 30 minutes to an hour drive each way. None were near a Metro stop. I don't know what a D.C. resident who doesn't have a car would do to take the mandatory class.

Above all that, the biggest problem is being a woman and trying to find a way to feel safe while taking a class at a strange man's house. Since the list only gives the instructors' phone numbers - but no important details such as address, website or business affiliation- they are almost impossible to investigate.

I don't believe it is right that the DC police require me to go to an armed stranger's house - in another state - for any reason. I already don't feel safe. That's why I wanted a gun in the first place.

Another huge hurdle in the gun registration process is buying the gun. Nowhere in the 22-page packet does it say that Charles Sykes is the only gun dealer in DC. And since it is mandatory to use his services - because we aren't allowed to pick up guns ourselves from stores in neighboring states - I think you should tell people in the instructions that they will have to pay his $125 transfer fee.

Which brings me to the astronomical cost of registering a gun in DC. On top of Sykes's fees, I paid $225 for the class. $35 for range fees and ammunition. The passport photos cost $20. Then I paid the city $35 for fingerprints, $13 for gun registration and $12 for a ballistics test. So I have spent a total of $465 in fees. And that doesn't include the cost of the gun!

HELLER DC 000250

I had no idea registering a gun would be this expensive. I think the registration packet should state these costs up front. This is a lot of money for me, and I have a good job. So I don't know how a lower-income DC resident could afford almost $500 in fees to have a legal gun.

Mr. Chairman, I was pleased to see your bill would have the police take photos instead of our having to buy passport photos. And you would eliminate the ballistics test. Those things would save us $32 in fees, but it helps more in saving time.

And that's the other and final huge hurdle I want to mention today. It takes way too much time to get a gun legally in D.C. From taking the written test, the five-hour class, waiting in line at the DMV to pay the fees, getting fingerprinted, meeting with Sykes to transfer the gun and on and on. No one can register a gun in DC without taking at least two or three days off work. And as you know, the registry office is closed on weekends.

Members of the committee, in my opinion, this complicated registration process doesn't stop people from getting guns, it just drives them to get guns illegally because it's faster and cheaper and a lot less frustrating.

I think you should encourage people like me -- who are trying to abide by the law -- by making this gun registration process less burdensome on the citizen.

I've only touched on some of my main issues with the registration process. My written testimony will give you a complete perspective of what we go through.

Thank you for your time.

# GUN MANUFACTURING AND OWNERSHIP STATISTICS

- Gun manufacturing has increased by 45% between 2000 and 2009 (the most recent date for which data is available)

  *The Bureau of Alcohol, Tobacco, Firearms, and Explosives, 2011 Report, http://www.atf.gov/publications/firearms/121611-firearms-commerce-2011.pdf*

- Gun ownership has increased: 47% of Americans report having a gun on their property, the highest recorded since 1993, up from 41% a year ago.

  *Gallup Report, published October 26, 2011, http://www.gallup.com/poll/150353/self-reported-gun-ownership-highest-1993.aspx*

- Another indicator of ownership is the number of FBI background checks conducted for potential gun owners. The FBI recorded that background checks have increased every year since 2002, reaching a record high of 14.4 million checks last year.

  *FBI Total NICS Background Checks, November 30, 1998-April 30, 2011, http://www.fbi.gov/about-us/cjis/nics/reports*

- Daniel Vice of the Brady Campaign to Prevent Gun Violence cited the Violence Policy Center's (VPC) interpretation of a General Social Survey (GSS) by the National Opinion Research Center (NORC). The study examines the shift in data from 1973 through 2010. The Gallup Poll, conducted in 2011, shows more current data and trends.

  *http://www.vpc.org/studies/ownership.pdf*

HELLER DC 000252

# COMPLETE WRITTEN TESTIMONY

## MOTIVATION FOR BUYING A GUN

I want a gun. I don't feel safe living in Washington, D.C. and want to protect myself. I'm starting today by going down to City Hall to find the gun permit office to tell them, "I want a gun." This series will follow me as I navigate the city bureaucracy and outdated rules in order to legally buy a firearm.

My desire for a gun started when I had to face down over a dozen criminals on an empty cul de sac in Washington, D.C., armed only with a Blackberry.

It was New Year's Day 2010, and I'd been staying in the house to dog sit for friends who were on vacation. I'd returned from walking the dog when I saw a man coming from the house. "What are you doing?" I asked, sensing something was off with the situation. The Golden Retriever just stood next to me with a slack leash.

"We're here to clean the pool," the man said. He looked nervous and his eyes were blood-shot.

I was pretty sure my friends hadn't called in a swimming pool emergency during the middle of winter. "No, we didn't call for you," I said.

"Oh, then it must be the house next door," he said, smiling nervously. He turned and walked away quickly.

I'd left the front door unlocked since I was walking the dog for less than ten minutes. (I know, lesson learned.) After the man left, I was still suspicious so I went inside, grabbed my Blackberry and clicked on the icon for the camera. I walked down the street, and as I turned the corner, I saw about 15 scruffy young men standing around two pickup trucks. We were at the end of a woody, dead-end road.

I nervously held up my Blackberry to take a quick photo of them and the license plates. Suddenly, the blood-shot-eyed guy darted out, blocking the shot. "What are you doing?" he asked. I looked around at all the men staring at me and was suddenly scared. "Nothing, I'm um, just going now," I said as I put my Blackberry down instead of taking the picture around him and went home.

Hours later, I was at a New Year's Day party when my phone rang. It was my credit card company asking if my card was in my possession because there were odd charges on it. I looked at my wallet and saw that all my cash was gone and the cards. It suddenly dawned on me that the "pool guy" had been inside the house.

I called 911 and the D.C. police met me at the house. When they heard the story, they called in a detective. I got a long lecture about facing down criminals alone. They searched the big house top-to-bottom to look for windows or doors left unlocked by the bad guys to come back for more. Now I was scared. I had promised to watch my friend's dog, which meant I was spending the night.

I was alone in an empty house with a useless dog. I spent the night in the master bedroom with a dresser pushed up against the inside of the door. I didn't sleep much. I kept thinking how safer I would feel if I had a gun next to the bed.

The next day, I took to Twitter to ask about how to get a gun. The replies were disappointing: "No 2nd amend in D.C." "Only one guy can sell weapons in DC- good luck with that." "Call the

NRA." I knew that the Supreme Court had recently overturned the Washington's gun ban, so I didn't understand why gun owners were so down on my idea. My friends came back the next day, but I sill wondered why I couldn't get a gun.

The following summer, D.C. mayoral candidate and then-city council Chairman Vincent Gray was at my neighborhood picnic. I approached Mr. Gray as he was glad-handing in the basketball courts and told him that I wanted two things: to stop the parking ticket assault in this city and a gun.

His smile faded. "A what?" he asked, leaning down to hear me.

"A GUN. I want a gun." I said emphatically. "I don't know what's going on in this city, but apparently no one is listening to the Supreme Court."

"Well, um, Emily is it? Let me introduce you to my campaign chairman," Mr. Gray said, leading me away toward a guy with a clipboard. That would be the politician's equivalent of "talk to the hand." Mr. Gray went on to be elected mayor of D.C.

Recently, current city council chairman Kwame Brown came to The Washington Times for a roundtable interview. After he'd been asked about the budget, lottery, ethics and education, I raised my hand. "Can I ask you about guns in DC?"

"You say guns?" the chairman asked.

"Guns," I replied as I held up both of my hands in the shape of a handgun, like they do in "Charlie's Angels."
"Oh you used both your fingers," Mr. Brown said, laughing. "You're a shooter, you use both of them."

I didn't laugh with him. "Well, I'm trying to get a gun," I said.

"You're trying to get a gun?" he repeated.

This is not going to be easy.

I want a gun to protect myself, but it seems my city government officials may work against me. There's only one way to find out if that's the case and that by going through all the hoops.

**GUN REGISTRY OFFICE**

The D.C. Gun Registry office is not where you go for help getting a legal gun; it's where you go to get more confused by bureaucracy.

After going thorough the magnetometers at D.C Police headquarters on Wednesday, the first door I saw said "GUN REGISTRY." That was easy, I thought. I went through the glass doors and entered a narrow office with a desk in front manned by a single female unformed police officer.

"I'm here to get a gun," I told her. I was the only one there. Her name tag said "D.A. Brown."

"You want to register your gun?" Officer Brown asked.

"No, no, I don't have a gun yet. I mean I'm here to get a gun permit," I said.

"This is D.C., you can't get a gun permit. You can't be carrying a gun around with you. It's for home protection," she said. I was totally confused. I asked what was the difference. "You can't carry it around like I do," she said, pointing at the gun in her holster. "You can't get a license. You can buy a gun and register it."

She started putting piles of paper on the desk between us. "Here's everything you need to know," she said. "You fill out this form. This one has a trick question so be careful. This one you give to Sykes."

"What do I do first?" I asked picking up all the papers.

"You get a gun and then get it registered," she said.

"Oh, okay, well where do I go to buy the gun?" I asked.

The officer seemed very annoyed with my questions. "You can go to any licensed dealer in another state or on the internet," she said. "But you can only get a gun on the DC approved list."

"Where do I see the list? And can I get any gun?"

"You can get a Glock if that's what you want," she said. I'd heard of a Glock on TV. "You just buy it. Then give the form to Charles Sykes downstairs and he'll go pick it up for you and transfer it. And if you get a semi-automatic, you can only get a 10-round magazine."

"A ten what?"

"Magazine, magazine, where the ammunition is," she said, clearly tired of the question. "Look it's all in the packet here. I'm only telling you these things to help you, but you need to go through the packet."

I thanked her and sat outside her door for a while to go through the piles of paper. A few minutes later, Officer Brown came out and handed me another piece of paper. "Here, you need to take a safety class, these people teach them. It's all in your packet but here are some names."

I added the paper to the pile and kept reading. In all the time I was there, only one other person came into the office. It seems there is no rush in Washington to register legal guns. At 3:15pm, she walked briskly out of the office, carrying a large black folder. She locked the door and posted a sign that said: "OUT OF OFFICE BE BACK SHORTLY."

## A 17-POINT CHECKLIST FOR THE REGISTRY PROCESS

My quest to get a legal handgun in Washington, D.C. feels daunting. I went to the D.C. Firearms Registration office two weeks ago to start the process of getting a legal gun by picking up a 22-page packet of forms and instructions.

Since then, I've been overwhelmed by all that is required before I can take legal possession of a purchased gun.

I needed to get organized, so I made a checklist of the required steps, bringing order to the complicated mess of instructions given by the city.

I'm going to work my way down this list:

1) Fill out the eligibility form and get it notarized

2) Find a D.C.-certified instructor to sign up for a firearms safety course

3) Take four hours of classroom instruction and one hour of range instruction on safety and have the instructor fill out the compliance form

4) Provide proof that my vision is okay (my driver's license suffices, one down!)

5) Provide proof of residency (my license works, two down!)

6) Get two passport photos

7) Study D.C.'s laws and regulations for firearms (guide provided in the packet)

8) Pass a 20-question multiple choice test on No. 7

9) Be fingerprinted

10) Pay fees totaling $60

11) Buy the gun

12) Arrange with D.C.'s only legal gun broker, Charles Sykes, to transfer the gun (cost $125) to him

13) Have Mr. Sykes fill out the his section in the application for firearms registration certificate

14) Take all the applications requirements from above to the registration office

15) After the application is in, wait five days for the application to be approved

16) After the five days are up, wait another 5 days for Mr. Sykes to be legally allowed to release the firearm

17) Pick up the gun from Mr. Sykes and take it to the police department for a ballistics test

If I pass all these tests, then I get the gun, but have to go straight home since it's illegal to carry in the city.

So far, I've completed No. 4, 5, half of No. 1 (not yet notarized) and started on No. 2 by calling some instructors to sign up for a class.

At this rate, I should be an owner of a legal handgun about the same time I'm eligible for Social Security.

## THE ELIGIBILITY FORM AND NOTARY PUBLIC

The right to keep and bear arms only applies to certain people in the nation's capital. One of the 17 steps that I still have in order to register a gun in Washington, D.C. is filing out a "Statement of Eligibility." The form contains 10 yes-or-no questions intended to weed out those ineligible to legally possess a pistol.

Some of the barriers to gun ownership are expected. It's easy to choose 'no' for: conviction (or indictment) of a violent crime or weapons offense; conviction in the past five years of serious drug charge, assault, threat to do bodily harm; acquitted of a criminal charge by reason of insanity or alcoholism; or committed to a mental hospital in the past five years.

The five-year limit makes me wonder. Can Marion Barry -- the former D.C. mayor and current councilman -- register a gun? He was charged with smoking crack cocaine. But the conviction was just a misdemeanor and 20 years ago, so he's in the clear.

Moving on: "Do you suffer from any physical defect which makes it unsafe for you to possess and use a firearm safely and responsibly?" What about a bad knee from running? Long hair? What about being only 5'2" tall? I checked off 'no.'

Number 7: "Have you ever been found negligent in any firearm related mishap causing death or injury to another human being?" Since I have never owned a gun, this one was easy. But I wondered if this meant that you could shoot yourself in the foot and still get a gun? Plaxico Burress would benefit from this wording.

The next qualification makes it clear that D.C. doesn't want to give guns to non-violent but seedy characters. If you've been convicted of prostitution or "operating a bawdy house", which I Googled to learn means running a brothel. So the pimps can't get guns, but the D.C. Madam may be allowed to bear arms since her conviction is outside the statute of limitations. (Correction: The D.C. Madam died in 2008.)
Also, if you've ever been convicted of "vagrancy", you're out of luck. I'm not sure why hanging around the 7-Eleven parking lot too long makes you unqualified to have a gun, but someone in the city government does.

I went back to Google to figure out what "abrogating strikes" means. I went through three page of search results, and I still don't know. It's something union-related so as a conservative, I'm sure I haven't done it.

Straight check marks in the "no" column down the page. When I picked up the big packet of paperwork at the DC Firearms Registry, the police officer told me to be careful filling out the eligibility form because there was a "trick question" on it. I've reading the questions slowly to be sure that I could get to the next stage in this process.

Next question 9 asks, "Have you provided accurate and true facts on your application for a Firearms Registration Certificate?" Bingo! The trick question is found second to last. I check my first "yes".

The last question was easy. I've never been in the military so not dishonorably discharged either.

I sign my name to affirm that I have given accurate information on the document. I'm about to check this off my to-do list when I read the bottom, which requires the signature of a notary public.

Now my to-do list is back to 17 steps to do. They just keep putting up more walls to getting a legal handgun in D.C. I'm off to the bank to get this notarized so I can move on to the next form in the stack of paperwork.

## RETURNING TO THE REGISTRY OFFICE FOR MORE PAPERWORK

Like every time I've been to the gun registry office, I was the only one. People aren't lining up to be put through the hassle and expense needed to legally register a firearm. I approached the counter that comes up to my chest and saw a female police officer sitting at her desk. When she looked up, I recognized Officer Brown.

"Hi, I bought a gun, but it hasn't come in yet to Sykes, so I want to take the written test while I'm waiting," I said, referring to Charles Sykes, D.C. only gun dealer, who transfers the firearms into the city.

In the mandatory ownership class, four of the five hours are spent going over the gun-control law in D.C. which are also written out in the registration packet. This mind-numbing exercise more than prepared me for this written test on the District's gun laws, but I'd studied my papers on the Metro just as a refresher of the more obscure regulations.

"You get your paperwork from him, and then you come up and start the process," Officer Brown responded.

"I can't take the test in the meantime?" I asked.

"You can't do anything until that 219 is filled out by him," she said holding up a form from about ten feet away from me.

"I called yesterday and talked to an officer, and he said come in anytime between 9am and 5pm," I protested.

"Did he know you didn't fill out your 219 yet?" she asked.

"No, as I told you, I don't have the gun yet," I said.

"You're not going to do anything until I get the 219 from Charles Sykes. He needs to fill this out to start the process," she answered.

"Why?" I asked, frustrated by this nonsensical conversation.

"That's the process," she said.

I pulled out the registration packet list of instructions that she was quoting from and said, "It doesn't say that in here. It doesn't say you have to do these things in order."

"But it is the process," she said. (I am not exaggerating this conversation.)

"But it doesn't say that anywhere," I protested.

"You're going to go to Sykes and get this all filled out," she said as if I'd said nothing. "Because I need to check your gun to be sure we can approve your weapon."

"Why do you need to check my gun before anything else?"

"The process," she said again. "We may not approve it. I have to look at it and be sure it's on the list."

"What if it's not? I just wasted $250 on a safety class?" I said, referring to the mandatory five-hour gun ownership class. "Because I was required to do that to get the form signed before coming in here, isn't that right?"

"At this time, I'm not trying to fuss over the issue," she said. "Before you spend any money with us,  I have to be sure the weapon..."

"I already spent $250...."

"Not with us, that's not my part of it," she said. "I'm talking about the process."

She picked up the phone and asked someone to come talk to me.

"That's fine, I'll leave," I said.

"That is the process," she said again as I walked out the glass doors.

## TRANSFER FOR APPLICATION DOCUMENTS, NOTARY PUBLIC

Once my gun was delivered by UPS at the office of D.C.'s only legal gun dealer, Charles Sykes, I was able to finalize the paper work. Mr. Sykes handed me a couple of papers to fill out, including the 219 that Officer Brown wanted so much. At the bottom of the form in all caps and bold, it said: "THIS IS NOT A LICENSE TO CARRY A CONCEALED FIREARM." No mistaking that I have no right to bear arms in this city.

I'd already filled out the D.C. eligibility form, but it needed to be notarized. Mr. Sykes once told me that he was a notary and would take care of that form, gratis, which he does this for all his clients. While I was there, he called the FBI to do a background check. I passed. He gave me the receipt for the gun from the box.

After filling out the papers, it was time to pay him $125. I was about to write a check, until he said he only accepts cash and money orders. Thankfully, there's an ATM machine in the hallway outside ticket payments so I was able to pay him on the spot. It was almost 3pm, so with my completed forms in hand, I headed back to the police station.

## DC GUN LAWS: THE WRITTEN TEST

Officer Brown was gone when I got back, replaced by a female civilian staffer and Officer Hall, who seemed to be the boss of the registry office.  The woman was extremely polite and clearly new to her job, as Officer Hall directed her every move. "How has the registration process been for you? It is as easy as you like?" she asked, without any sarcasm.

HELLER DC 000259

I felt bad hurting her feelings, but I said, "It's been horrible. So much worse then I expected."

"Are you from another state where it's easier?" she asked innocently. I told her that I'd never owned a gun before.

She took my papers and handed me the gun test, which consisted of 20 multiple-choice questions covering the laws in D.C. While there were two ridiculously difficult questions about some obscure facets of the regulations -- one about antique guns -- the rest were easy after mandatory four hours of study.

Check, sawed-off shotguns are illegal here. It was easy to remember that there's no right to bear arms in the nation's capital - not open carry and certainly not concealed carry.

If I transport my gun, I need to put both the gun and ammunition in the trunk. Since I have an SUV, the gun has to be inside a locked container in the far back and seperate from the ammunition. (I don't understand where I should then put the ammunition. It has to be in a separate location, out of reach, but specifically not in the glove compartment or console. I'll figure that out when I want to take it to shoot outside the city limits to shoot.)

It is illegal to posses ammunition that is not the same caliber as my registered gun. It's also illegal to buy ammunition in the city unless from a licensed firearms dealer, and our only dealer, Mr. Sykes doesn't sell it. I'm not sure how or where to get ammo for my gun.

I have to keep my registration certificate with me at all times if I have my gun. (It would be easier to do this if it came in a card-size for my wallet instead of a large paper form. I will just have to put the certificate next to the gun to remember to take with me when I leave the city.) Also, if anyone under the age of 18 could gain access to my gun, I have to have it in a locked box or carry it on me at all times.

## D.C. REGISTRY OFFICE OFFICER: "MOVE SOMEWHERE ELSE"

I checked all the boxes on the test, only to be handed more forms to sign. I only skimmed the "Background Investigation release form" and the "Notification of fingerprinting services fee" because I was drowning in paper.

While I was sitting out of sight behind the counter filling out the papers, I overheard a phone conversation with Officer Hall and a District resident who was clearly frustrated with the gun registration process.

The police officer was trying to calm the person down, but clearly having the opposite effect. "Some states are even tougher than D.C. - California I believe," he told the caller. I wanted to yell out, but held my tongue. I kept writing my name while Officer Hall continued to politely listen to the caller and answer his questions, but ceded no ground regarding the difficulty of the process.

After he hung up, he said to the woman in the office, "I always say, 'When in Rome, do what the Romans do. And if you don't like Rome, move somewhere else.'"

I was appalled. I stood up and held out the forms. "All done, now what?" I yelled out. "You passed your test," the woman told me. "You got one wrong, so that's a 95 percent. Good job." I confirmed that the question I got wrong was about the antique guns.

HELLER DC 000260

## GO TO DMV TO PAY MORE FEES

Officer Hall handed me a slip of multi-sheet paper. "Here are your fees. Take it to room 1157 and pay this and bring back the receipt to get your fingerprints done. The forms checked off the box for $35 for fingerprints, $13 for gun registration, $12 for ballistics.

Once again, I walked around the building to the DMV and got in line with everyone else there to pay parking tickets. After getting through the first line, I got in another line for the cashier, but there was no one at the desk.

After ten minutes, I asked the teller next to the empty desk if anyone was working there. She said he was on break and would be back "soon."

Others were mumbling, looking around irritably, pacing. Finally I found someone who looked to be a manager. I told her the problem. She went to the back,  and suddenly a man appeared at his desk to take our money. When it was my turn, I handed him the paper and $60 in cash (the DMV also doesn't take credit cards or checks) and got my receipt for payment.

For the third time in one day, I headed back to the police department. Entering the registry office at 4:30pm, I was worried that they wouldn't finish the process with the office hours ending soon. As I was still the only person in the office, Officer Hall knew where I was in the process. "Got the receipt now?" he asked. I handed him the yellow paper, and he told me to follow him into the back of the office.

## FINGERPRINTS AND "COOL DOWN LAW"

In the back of the office, past the Keurig coffee maker and the police jacket on a hook, was a computer with a foot pedal. Officer Hall held my right thumb onto the computer and slid it side-to-side until my thumbprint was clear on the screen.

The machine dinged "good print" and he tapped the foot pedal and held my right index finger to the screen. We did this for all my fingers plus all four fingers at once. I thought, if I ever commit a crime, they sure will find me now.

Back at the front, they went through my papers. "Do you have your passport photos?" the woman asked.

Oh no, I thought, they aren't going to accept my application. I apologized and explained I'd forgotten to take them. Officer Hall, to my surprise, said it was okay to just bring the photos "next time."
What's next? "Now we have the 'Cool Down Law'" said the police officer. "You have ten days for us to approve your registration."

I'd been working on getting a gun for months. If I cooled down any further, my body would be frozen in suspended animation like Walt Disney.

He paused, and I thought we were finished. "But If you have your receipt and it shows you bought your gun earlier, we can count those days to the cool down," said Officer Hall. Now I know why Mr. Sykes gave me the receipt instead of leaving it in the box. I showed it to him.

"Says here you bought it on Monday, so that means your period ends, the 26th, 27th..." As he counted out the days in the month, I wondered what he would do if I'd let the gun sit in Mr. Sykes

office for two weeks an then handed him the receipt. Would Officer Hall have to approve my registration on the spot?

"February 3rd," he said. "So you have eight days. You can call on the 2nd and find out if we approved your registration, but don't come back until the 3rd."

At a little before 5pm, I left police headquarters with less paper, but no gun. Frankly the seven days left of cooling off is just getting me more fired up about D.C.'s gun-control laws.

## A MAJOR OBSTACLE: ENROLLING IN A GUN SAFETY COURSE

To legally own a gun in the nation's capital, you have to take a gun safety class from a D.C.-certified instructor. Whether you have owned your guns (in another state) for 20 years or never touched one before (like me), you must take four hours of classroom instruction and one hour at the shooting range before Washington will let you register your gun.

This requirement has become my biggest source of frustration in getting a legal handgun because the city makes finding a class so difficult.

The safety class is not offered by the police so you have to find a "certified firearms instructor" to teach it.

In the large stack of papers handed to me at the D.C. Gun Registry office, there were two pages listing certified instructors. At the top of the page is a clarification: "It should be noted that these individuals do not work for, nor do they represent the Metropolitan Police Department."

So who are these people?  I have no idea.


## TRYING TO FIND AN INSTRUCTOR

The list has 47 random names with phone numbers. The numbers are mostly D.C.'s 202 area code, which doesn't help to figure out where they are located because the city's laws ban the class from being taught inside the Beltway. The list does not give the instructor's address, background information, website or certification. It is less informative than a phone book.

As a woman facing the prospect of going alone to this class in neighboring states of Virginia or Maryland, I'd like to find someone who seems legit. The way I see it, I'm calling a strange man and saying, "I'm unarmed. I know you are armed. And yes, I'd like to meet you in a strange place." Feeling safe is the reason I want the gun in the first place.

I looked through this list for weeks for a hint as to where to start. I searched Google for all the names with a 703 area code (Virginia is closer), but none came back with any results.

I called Christopher Miller because at least a shared last name was a hint. The number went to a security company and the receptionist said Mr. Miller was teaching a class. She gave me his cell phone number and email. He never returned any of my messages.

A little more searching and I found that the city posted the same paper list online with some affiliations given. However, of the 45 instructors, 20 were listed as "independent." I Googled several of the local companies but found nothing. So the online list wasn't any more informative.

The police department was no help. When I started this gun ownership process, I got my paperwork from Officer Brown at the registry office. She gave me a piece of paper with copies of business cards on it and told me that the names were good instructors for the gun safety course.

The card for Atlantic Guns gave the president of the company, Stephen Schneider, and in handwriting the name "Art Keiser" scratched out. Neither of these men are on the list of certified instructors.

I called the store and was told that no one affiliated with them teaches a class, but referred me to a company called Worth-A-Shot owned by Donna Worthy, which may have D.C.-certified instructors. However, Mrs. Worthy's name isn't on police lists, which haven't been revised since

HELLER DC 000263

September 9, 2009. The other names on the business cards were Ricardo Royal, Larry Wheeler and Eric Sahota, but only Mr. Royal is on the list of certified instructors.

## REGISTRY OFFICE INFORMATION ABOUT THE INSTRUCTORS

I called the gun registry office and asked about finding an instructor from their paper handout. Officer Harper told me that "all of the names on that sheet are also on that list that was given to you." Not true, but I was looking for answers, not conflict.

So I asked the officer about my safety when going to meet the other men on the list. "We give them a license to say it's okay for them to teach firearms safety. They are licensed through the Metropolitan Police Department," he said, which told me absolutely nothing.

But he helpfully added that, "At some point, there was a criminal background check done on them."

What about knowing their location? "If they have an address, you can go on the Internet and Google it," he said. Of course, the list doesn't have addresses. He said that it didn't matter since they mostly would teach the class at a shooting range. That was helpful.

I added that I'd Googled about 10 names for general information, but found no results. "That's why we put that list together, ma'am. We try to make it convenient for you." Huh?

As for picking an instructor from the list of 47, he suggested "calling several of them, writing down the prices and location, then pick the one that best fits your pocket and your time." What's the appropriate price range for the class?  "That I don't know," he replied, before correcting himself.

"Well, I can't say that I don't know," Officer Harper said. "I don't give the information out. That's between you and them. We don't set the prices." I don't know if I should be charged $30 or $300 for the class.

Then I called on the big guns. When I was at the National Rifle Association (NRA) to learn how to shoot at their awesome firing range, I discussed the safety class hurdle with ILA Executive Director Chris Cox.

I explained to Mr. Cox how a woman alone going to a gun safety class at a known place like the NRA would go far to helping ease this difficult D.C. registry process. But, I told him, the D.C. course was not available at the NRA range. He was surprised and started talking to his staff about getting someone certified to teach the course, possibly free of charge.

In the meantime, I still need to find someplace safe to take this class. I'm calling Worth-A-Shot because, I figure, it's worth a shot.

## MORE TROUBLE FINDING A SAFE 'SAFETY CLASS'

In all my struggles so far with the red tape the District requires before I can get my hands on a legal gun, the safety class requirement was the most time-consuming, expensive and difficult to fulfill. I finally took a class and have the signed form. But the more I dig into this regulation, the more I wonder: How can it be constitutional for D.C. residents to be forced to go to another state to exercise their 2nd Amendment right to keep and bear arms?

Page 17 of 28
HELLER DC 000264

In order to register a gun for self defense in the home, the city requires residents to take four hours of classroom instruction and one hour on the shooting range with one of the firearms instructors they have certified.

But, here's the kicker: the instructors aren't allowed to teach any part of it -- even the classroom -- within the city limits.

Therefore, residents must go to another state - at their own expense - in order to fulfill the requirements of D.C.'s gun laws. Also, D.C. citizens have to take a day off work to do it since the whole trip and class time takes at least seven hours to complete.

The District also makes finding an instructor as difficult as possible. At the gun registry office, the police give out a two-page sheet listing the 47 firearm instructors approved to teach this class. I called them all.

Over half -- 27 -- went straight to voice mail. Most were individual cell phones and not a company that could set up the appointment. For the voice mails that were corporate sounding, none gave an option to get in touch with the instructor listed on the D.C. forms.

On the bottom of the police phone list, it says "Revised on September 9, 2009." This two-year lag was apparent when 7 of the 47 numbers I called were out of service. Two instructors, Michael Morgan and John Cutler, told me that they no longer teach the course and shouldn't still be listed on the form. Going through the list, three said they don't have a class scheduled for the next few months.

The most absurd conversation I had was with instructor Stuart Asay, whose cell phone number begins with a Colorado area code. He said that his company taught the class in the Rocky Mountain State and Atlanta, but he had no plans to teach the class in D.C. any time soon.

I was utterly confused and asked why he would teach a class for D.C. residents to register a gun only in those far away states. He told me that the classes were "in demand" in those places.

Since less than 500 guns are registered a year in D.C., I can't imagine how there would be a demand for flying so far to take a class that is available in neighboring Virginia and Maryland. I asked him repeatedly to explain his rationale to me, but to no avail. If I happen to be in Georgia or Colorado and want to take the class with him, he charges $150 for it.

I finally found four instructors -- all in Maryland -- who were willing to teach the gun class. I would have to drive anywhere from 30 minutes to an hour each way to take the class.

I've yet to find a class offered near a Metro stop.  I don't know what a D.C. resident without a car would do to take the class.

Of these four, the cheapest class I found cost $130. The others range from $175 for a group or $200 to $250 for individual.

All the instructors teach out of their own homes, or more specifically, as one said, "in my basement." The police do a criminal background check on everyone appearing on their list, but I still don't feel safe going alone to an armed stranger's basement.

It seems the D.C. politicians who came up with this requirement never considered the impact on a woman trying to register a gun. Forcing us to go to a strange man's house in another state to take a gun safety class is not something the police should be requiring.

HELLER DC 000265

For men who have a lot of experience with guns, I'd suggest taking the class with Ricardo Royal. He's near Annapolis and charges $200. He seems the most well-versed on knocking out this class requirement. He told me he's been petitioning local politicians for years to let him teach the class within the city limits.

"I just keep asking them to at least let me teach the classroom part in D.C., not even the firing range," Mr. Royal told me. But the city officials won't allow him.

In the end, I went back to a referral from a gun store to take the class with Donna Worthy, who isn't on the list at all. When I met her, she told me that the police at the registry office "said they were adding me on the next update, that was last year." She has called repeatedly to ask to be included, to no avail.

I am going to ask local officials in D.C. how this gun safety class requirement can be constitutional if it can't be completed within the city.

## TAKING THE GUN SAFETY CLASS SAFELY

It took weeks of research and dozens of phone calls to finally find a suitable place to take the required gun safety class to register a handgun in the nation's capital. Thanks to a referral from Atlantic guns, I found Donna Worthy -- even though she's not on the list of certified instructors given out by Metropolitan Police Department.

Mrs. Worthy is a retired Baltimore police firearms training instructor. She is now the owner of Worth-A-Shot , which is located in Millersville, Maryland, about a 45 minute drive from Northwest D.C., without traffic. When I pulled up to her office, I immediately liked that it had a bright and clearly marked storefront.

Inside, Mrs. Worthy and two other employees greeted me, wearing uniforms with the company logo. I'd talked to a lot of possible instructors for this course, and they all taught in their homes and seemingly without any business structure. In contrast, Worth-A-Shot is a real, professional, storefront business. Unlike the option of taking the class in some stranger's basement, I felt safe.

This safety issue wouldn't be a concern for most men, but for many women, it feels as if the city forces us into uncomfortable and possibly unsafe environment to take this "safety" class. Clearly, the D.C. politicians who came up with this half-baked process weren't concerned about women or their particular needs. Fortunately, Mrs. Worthy's well-run business addresses these concerns.

Mrs. Worthy led me to her large classroom, with rows of desks and the course lesson on overhead projector. She taught my class herself, but she has a team of male and female instructors for the various classes she offers.

Her specific methodology had been honed through years of teaching. The first thing she asked me was why I wanted the gun. "Self defense," I told her. She explained that she would tailor the class to my needs, which would be different than someone who was registering a gun for, say, hunting.

It's noteworthy that D.C. gun class requires everyone to master shooting a handgun, even if you are registering a shotgun. This makes absolutely no sense, but then, what does in this maze of D.C. gun restrictions?

We started with D.C.'s mandatory part, which was reading over the gun ownership rules, restrictions and laws. This same packet of paper was given to me by the registry office, so I don't

know why the city makes the instructors read it out loud and review with me like it's new, but it does. We went through the packet word-for-word. There are a bunch of convoluted rules that I will need to memorize for the written test the District forces all applicants to take.

There is just no way to stretch the packet of paper and the simple rules to fill the required four hours. I'm quite sure that most instructors sign the forms and let you off with less time. Mrs. Worthy makes up the extra time by throwing in her basic firearms fundamental course, which she normally charges for $100 in the class and $100 at the range. She charged me $225 for the D.C. course ($150 if I waited for a group class). I learned a lot from this bonus lesson.

After the paper work, Mrs. Worthy turned to the required fundamentals. She had five guns lined up on the table - a Glock 17 9mm, a plastic model of the Glock 17, a Glock 26 9mm, an old Smith and Wesson 38 caliber revolver and her own pink concealed carry weapon - a Ruger LCP in 380 caliber. She pointed out that her guns did not have the D.C.-mandated, ten-round limit on the magazine, as mine must have.

First she taught me how to load and unload the gun. She corrected me repeatedly when I picked up the magazine off the floor after releasing it from the gun. "What you are trained to do is what you will do under a high-stress situation," she said. "We've had police officers on duty who stopped to pick up their shell casings because that was their habit from the range. You just have to let the mag drop."

She taught me to rack the slide three times to make sure there was no bullet in the chamber. (The second time is to make sure a second bullet isn't stuck on the side. The third time is in case you mistook a bullet flying out.)

I'd already mastered the basics from my editor's lesson, so the new things I learned from her included loading the gun while holding it upright in front of me. "No one can see if the slide is open from in front of you. So if you're caught with an unloaded gun, the bad guy doesn't know it until you have loaded," she explained.

She taught me how to hold the gun with the sides of my hands pushed together in a line. She had me practice not holding all the pressure in my dominant right hand, but to balance evenly. "Let me see your right hand," she said. I held out my palm, and she laughed at the telltale red waffle marks. Also, she showed me to hold the gun by pulling backward with my right hand, while pushing forward with my left.

Mrs. Worthy had me stand with two feet forward, shoulders straight, chin up (the hardest part, I kept lowering it later at the range), arms straight from the shoulder. She taught me to shoot higher or lower by moving my wrists, not my arms. We practiced this over and over by aiming at a bullseye on the projector screen.

"Your eyes can only focus on one thing at a time. Keep focused on the white dot on the front sight. The rear sight and the target should be out of focus," she said. "And when you're at the range, don't stop to look at your target, just keep focusing on the front sight and shooting." After four long hours in the classroom, we were ready to go to the firing range.

She packed up the guns on the class table. We drove separately about 15 minutes to a range in a strip mall that she uses for her class. Inside, Mrs. Worthy said that D.C. tells the instructors that they need to verify that the resident can safely handle a gun. "That means you can basically hit the paper," she told me. "But, I want more for the people I teach. I want you hitting bullseyes."

She did just that. The target was 25 feet away and, at first, I was hitting a lot of white. She had me switch guns with every five or so rounds to help figure out what kind of gun I wanted to buy. I

hated the small carry gun because it had a lot of kick and was hard to handle. I was terrible with the revolver, barely hitting the silhouette at all.

But after going back and forth with the two Glocks, I was much improved. She kept correcting my mistakes - keeping my chin up, slowing down trigger pulls for a "surprise" and balancing the gun in both hands to avoid the telling waffle marks. After an hour, I was feeling good. And I felt comfortable with the gun. I hit almost all in the center of the red, some well grouped in the dead center.

By the time I shot all the bullets in the box, I'd decided that I liked the full-size Glock best because it was easiest to control and gave me the best results. Mrs. Worthy recommended that gun for me because it is doesn't have a lot of bells and whistles that I might forget about in the middle of the night.

(She had repeatedly told me that accuracy goes down 70 percent from the static environment at the range to the real-life, life-or-death situations.)

Mrs. Worthy filled out the D.C. safety class form, copied it and put it in a red Worth-A-Shot folder. I felt like I'd just graduated from... well a long bureaucratic test.

## FINDING A GUN WITH A TEN-ROUND MAGAZINE

After careful consideration, I have decided to buy the Sig Sauer P229 two-tone. I knew I wanted a full-size 9mm that I could handle well and that felt comfortable in my hands (click to watch a video of me shooting it.)

To help with the final decision, The Washington Times launched a poll seeking input from gun enthusiasts. The Sig Sauer won with 27 percent of the vote. The Springfield Armory XD(M) was a close second with 23 percent, and the Glock 17 came in a distant third at 15 percent.

Along the way, I realized I should choose one made in the USA. This narrowed down my options significantly, but I discovered that the P229 was manufactured at Sig's plant in Exeter, NH. Plus I think their guns look cool -- especially the two-tone (black and stainless) version.

Quality guns are expensive. As I am new to the gun world, I thought it would cost maybe $400. So I was surprised to find that a new ones ranges from about $600-$1,200.

To find the best price, I called two local gun stores. Atlantic Guns in Maryland and Virginia Arms, but neither had what I wanted in stock. Sharpshooters Small Arms Range in Virginia could get it in a couple days, but the price was higher than online dealers.

I asked around for suggestions of well-priced online stores and also googled the model number. In the end, I looked at about 18 dealers and found the best price at BudsGunShop.com, CheaperThanDirt.com and GrabaGun.com - all about $750.

Before I made the purchase, I checked the paper packet from D.C. Gun Registry to be sure I was getting a gun eligible for registration. Three pages explain the firearms that cannot be legally owned in the nation's capital. The list of prohibited guns didn't seem to apply to mine, including things like sawed-off shotguns, automatic firearms, short-barrelled rifles and .50 BMG rifles.

The city also has a whole page of illegal "assault" weapons, which lists specific makes and models, as well as prohibited features that range from a grenade launcher to a grip that protrudes conspicuously beneath the action of the weapon or a gun that can accept a threaded barrel.

The end of the document explains that guns eligible for registration must be on the California Roster of Handguns Certified for Sale. That list is conspicuously missing from the registration packet.

However, on the city's website, there is a list of firearm makes and models, which appears to be the California roster with the D.C logo stuck on the top. One of the regulations to getting a gun registered is proving you have good eyesight, which the city must be testing by posting a 13-page list of guns in about 6pt font.

Squinting at my laptop screen, I scrolled down to the Sigs and found my gun listed: "P229 (Two-Tone)/Stainless Steel, Alloy, P, 3.9", 9m." Yes, the District actually believes it's important to approve the gun's color scheme.

But still, I was nervous about making such a big purchase without being 100 percent sure it was legal. I called the city's only legal gun dealer, Charles Sykes. He had some news since we last spoke. "Remember I told you that you could buy any gun on the three state lists- Maryland, Massachusetts and California - but only ones that had been on the lists since 2009?" It rang a quiet bell. "Well they upgraded it, now you can buy any gun that is on those lists as of today."

"Really? I'm surprised D.C. would do something like that. When did this happen? Did they tell you" I asked.

"Nope," he replied and was silent for a moment. "Why would they be to informative to me? What time, when, how this happened - I have no idea. It just happened."

I asked him for more help on having the gun sent from the online dealer to him. "Ask if they have my new address," Mr. Sykes said referring to his new office in the same building as police headquarters. "Make sure they have my licence on file. If not,  get their name and fax number for me to send it."

He added, "Try to get them to send UPS or, second, FedEx but not the postal service because they don't deliver at police headquarters, and I want my guns passing through as few hands as possible." The post office doesn't deliver to the police department? This city never ceases to amaze me.

Anything else?  "You know to make sure they only send the 10-round magazine and keep the 'high-capacity' at the store."

Gulp. I quickly thumbed through the three pages of guns that are illegal in D.C. and saw no reference to the legal-limit magazine. But near the front of the 22-page packet, there was one line that said, "Please note that it is illegal to posses a magazine that holds more than ten rounds of ammunition in the District of Columbia."  So now what?

I asked Mr. Sykes, "Can they just swap out the magazine at the stores?"

"'Doesn't matter to me," said Mr. Sykes. "Just make sure they don't send me a gun with a high-capacity magazine because you can't register it."

I was back at square one. I called the three stores where I'd found the best prices to ask to switch out the magazines. After explaining the situation to a man at CheaperThanDirt.com, he said they can't switch the magazine, and, anyway, "we don't ship to D.C."  I explained that it's legal to send to Mr. Sykes, but he refused. I called GrabaGun.com twice in two days, but kept getting voicemail.

A nice man at BudsGunShop.com checked the Sig Sauer model list and explained to me that the manufacturer doesn't make the two-tone model with a lower-round magazine. I thought they were interchangeable, but I guess not. He had an all-black model in a 9-round capacity - marked "California legal" - for $833.

I pulled up the websites of eight online stores look for the 10-round version of the P229 in black. It seemed I'd have to pay anywhere from $50-$75 more to get a gun with a magazine holding 3 fewer rounds. And I couldn't buy the two-tone style I preferred.

I was so frustrated at this point, I considered giving up trying to buy American and just getting the Glock or Beretta I liked, but I wanted to figure this out for other residents who hit this same wall.


## PURCHASING A GUN ELIGIBLE TO REGISTER IN D.C.

After days of calls, emails, tweets, comments and posts, I finally bought the exact gun I wanted, the two-tone version of the Sig Sauer P229 9mm.  I'm so excited to shoot my new purchase, but in the nation's capital, it's not that simple. Buying a gun doesn't mean you get to have the gun.

HELLER-DC-000270
Page 23 of 28

Washington, D.C. has a list of firearms that are eligible to be registered. The make, model and even the color (two-tone) of the gun I wanted was on the list, but I had a bear of a time finding one with a D.C.-legal 10-round magazine. The standard version has a 13-round capacity.

I called Sig Sauer's customer service number to ask for help finding a dealer who had the model I wanted in the lower-capacity magazine.

The agent, Andy, said that he could not help me find a dealer. I asked if the the P229 was made with the 10-round magazine or could be switched out to it. He said, no.

Andy was wrong, and many people following my story called the company to complain about the incorrect information.

Luckily, kind Second Amendment supporters came to the rescue, sending links to guns that matched my needs. In calling the stores, I found they were out of stock or would take a week or weeks to get, and I've waited long enough. Some, like GrabAGun.com, were at the SHOT show all week and got back to me too late.

At the same time, gun enthusiasts at the Las Vegas gun convention discussed my plight, talked to dealers and sent advice.

Through comments on our website, Facebook and Twitter, I was assured that the low- and regular-capacity magazines were interchangeable on this model.

The two magazines are almost impossible to tell apart unless you look inside and see the one has space for three less rounds.

Nevertheless, without the 10-round magazine inserted into my gun, I can't have it sent to Charles Sykes, D.C.'s one gun dealer. So I needed to find a dealer willing to make the switch before sending.

While the best prices were available from online dealers, I learned that they often just ship boxes from warehouses and are unable to do any kind of modifications to an order, even something as simple as switching out a magazine.


**TRANSFERRING A GUN INTO D.C.**

Room 1140 on the DMV hallway is marked with a small sign "CS Exchange" and a taped-up paper that warns away anyone who might be looking to fight parking ticket.  Behind the nondescript brown door is the private office of Washington D.C.'s only legal gun broker: Charles Sykes.

You can't just go out and legally buy a gun in the nation's capital. If you purchase a pistol from another state, whether in person or over the Internet, you can't ship it to your residence in the District, nor can you drive it back over the Potomac river.

In the 21-page packet of papers given to potential gun owners from the Firearm Registration Section, there is not a single word to explain how one would go about bringing a purchased gun into the city after registering it. The one clue the police do provide is a Xerox copy of Mr. Sykes's business card stapled to the registration form.

HELLER DC 000271

Last week, I went to find his office, which is also in the same massive government building as police headquarters. The door was closed and locked. I waited in the hallway awhile until a gruff man came up to me and asked, "What are you doing?"

"I'm just waiting to talk to Mr. Sykes about getting a gun," I said. He stared at me hard.

"Do you have an appointment?" he asked. I said that I did not, but I was just hoping to talk to him briefly.

"I am Charles Sykes," he said. "I only see people who have an appointment. But you're here, so come in for a minute." He led me into his run-down government office.

I asked him about the gun ownership process, and, after a few minutes, he relaxed and spoke more openly. A dealer since 1994, Mr. Sykes is all too familiar with the rules and regulations put in place to slow or stop law-abiding citizens from owning guns. "I don't understand why they try to make it so difficult for the honest people from getting a gun the right way," he told me.

Until the District's gun ban was repealed by the U.S. Supreme Court in 2008, Mr. Sykes's business was limited to transferring guns for police officers and security businesses. He said that since the high court's decision in the Heller case, the city has only registered about 1,500 guns, about half of which were new purchases. So while gun sales have been skyrocketing in the rest of the country, D.C. residents have been buying at a rate of about 250 a year.

Despite having a complete monopoly on gun transfers in the District, Mr. Sykes said, "I'm not making much." He charges $125 to pick up the gun and do the transfer. The demand is not there for Mr. Sykes to devote an entire day to the work of selling or transferring guns. He works by appointment for about four hours in the midday. He does other work in the evenings to supplement his income.

During the 45 minutes that we spoke, no one else came to the office. "You don't see a big line outside that door? It's not like it's a sale on iPads or iPhones where people camp out the night for the door to open in the morning to get in here," he said, laughing.

Last May, Mr. Sykes lost his lease when his office building was sold. The city then took advantage of a stray word in the law to classify his business as a "firearms retail sales establishment," which made it almost impossible for him to relocate. The designation meant he couldn't be within a football field's distance from a school, church, apartment, house or library. In this tightly packed city, that left no reasonably priced options. The city gave him a small-scale map of where he could set up shop, but the map didn't even have street names on it.

Thanks to a pending lawsuit, however, city officials realized the court could rule against them for wholly denying residents the ability to buy a gun within the law. When Mr. Sykes proposed the idea of leasing government space, they relented and agreed to a spot downstairs from the police headquarters. There are six newly framed licenses on his wall that showcase what was required to set up shop inside the government building. He re-opened in August with a one-year lease.

Recently, I asked D.C. City Council Chairman Kwame Brown whether he supported the Second Amendment. "I don't support having more guns in the District of Columbia," he replied "I don't think we need more guns in our streets."

Mr. Sykes shook his head when he heard this. "In all other cities, you can have guns. Why do they say, 'We don't want guns in the nation's capitol?' They are here. And you can go a lot of different places and get them just like that," he said, snapping his fingers.

HELLER DC 000272

Clearly, the city's political leaders have deliberately made owning a legal handgun a difficult process. But, I'm determined to get through all their barriers. My next step is to tackle the paperwork and forms required by the registration office.

## TRANSFERRING MY GUN INTO D.C.

At this point, I'd done enough research to write a Ph.D. thesis on finding a D.C.-legal P229. It is absurd that the District's registration system makes things this complicated. If it weren't for this platform and the generosity of gun enthusiasts , I am sure that I would have bought the wrong gun and not been able to return it. I'm grateful for the help.

Three dealers, however, realized that making a sale would just mean offering to get the magazine and the gun quickly and do the swap for me. They all contacted me through my Facebook page. I called Kyle's Gunshop in Cincinnati and two Virginia stores, Guns & Ammo Warehouse in Manassas and Immortal Arms in Culpeper.

In the end, I went with Immortal Arms because it is local and the price was the best, $781, which included switching the two 13-round magazines for two 10-round ones and shipping.

The owner, Mark Attanasio, is a disabled U.S. Army veteran, who started the appointment-only business in 2010. He'd been following my series on getting a legal gun in D.C. and posted to my wall when he saw my troubles in the search for a D.C.-legal Sig.

Mr. Attanasio said he'd have the gun in in two days. He apparently assumes that speed of delivery would be a selling point, as it is for Virginia citizens, but it doesn't matter much for a D.C. resident.

And, that is the "but" in this story. Although I have paid and ordered the gun, I can't take possession of it until it is transferred to Mr. Sykes, and I get an approved registration certificate.

In order to get this certificate, I still have to do the following: take a written test on the city's firearm laws; get Mr. Sykes to fill out the application form; have the eligibility form notarized; get two passport photos and prove that my eyesight is better or equal to the driver's license requirement (20/70 in best eye and field of vision of at least 140 degrees).

Next, I have to take all the forms to the registry office; pay $60 in fees; wait five days for the application to be approved; wait an additional five days for Mr. Sykes to be able to release my gun; and take the gun to the police for a ballistics test.

Finally, if I pass all of these steps, I should be able to take possession of the gun that I already bought.

I bought my new 9mm Sig Sauer from a dealer in Virginia and needed to get it to into the District. When it comes to firearms, a distance of 70 miles might as well be thousands of miles across international borders.

There is no open-carry right in the nation's capital. It is against the law to posses a firearm in a public space unless traveling directly to or from a lawful, firearm-related activity, such as registering, hunting, shooting with it at a practice range. So a D.C. resident must use the city's one legal gun dealer, Charles Sykes, to physically transfer the gun into the city.

Mr. Sykes works about four hours a day to handle transferring the few hundred new guns registered each year. He charges the same transfer fee - $125 - whether he picks up your gun at a local store or he receives it in the mail. Either way, he holds the gun until you can provide the certified registration certificate.

His business is located inside the same building as Metropolitan Police Department, which is convenient for residents, though inconvenient when it comes time to mail the gun. The U.S. postal service does not deliver to the police headquarters in D.C. Mr. Sykes, therefore, recommends guns be sent to him via UPS or FedEx, so that the guns are "passing through as few hands as possible."

I bought my gun from Mark Attanasio of Immortal Arms in Culpeper Virginia. When I made the purchase on the phone, the dealer offered to deliver the gun to Mr. Sykes. I had a feeling that he couldn't do that, but he believed that his Federal Firearms License (FFL) would suffice.

After sorting through the D.C. gun laws, Mr. Attanasio called me back. "I'm a FFL licensed dealer and I can't drive it into the city to Sykes, another licensed dealer," he told me, astounded. "But I can send it to him and pass through who-knows-how-many unlicensed hands." I'm watching first-hand how gun-control restrictions aren't based on common sense.

Mr. Attanasio was supposed to switch the standard 13-round magazine in my gun for a D.C.-legal, 10-round one and convert to E2 grips. Then he sent the gun to Mr. Sykes through UPS. It cost $43 to ship the short distance because guns have to be sent overnight delivery and require "adult signature."

After my gun gets to Mr. Sykes, I still need to pass a written test, get paper work filled out and signed, get approved for the registration and endure a 10-day waiting period. It is illegal for Mr. Sykes to release the gun to me before all of these steps have been completed.

I wondered what would happen if I didn't pass the registration requirements? I paid $781 for a gun and, generally, such purchases are non-refundable. Mr. Sykes has seen this happen before.

"Registration is not 100 percent. The FBI may say yes, but D.C. says no. Or D.C. says yes, and the FBI says no," the long-time gun dealer explained. "I just send it back to where it came from. Then it's up to you to work it out to get your money. But I'll tell you, the average company is not going to want to talk about returning a gun that's been out of their possession for three or four months."

When I first went to the gun registry office and was told about the written test on the laws, I asked the officer what happens to the gun if you don't pass the test. "That doesn't happen very often," she said. "And we let you take it over once without paying." This was not very reassuring. So if you fail anywhere along the line in the registration process, you're out hundreds of dollars and the right to keep arms.

I put a lot of thought and effort into making sure my purchase was exactly what I wanted for another reason. You are stuck with what you picked as long as you live in the city.

The law in D.C. says you can't pawn a gun or sell to anyone who isn't a licensed dealer. That sounds like standard practice until you realize that the only licensed gun dealer in the city is Charles Sykes, and he doesn't buy and sell. He only transfers. If you buy a gun in this town, there's no returns or exchanges. So you better be sure you will like it.

While my new gun was being transferred to the District from Virginia, I returned to D.C.'s Gun Registry Office to turn in my registration application. As you will see in what follows, this

HELLER DC 000274

should have been simple step, but it took all day. Like everything else in my effort to get a legal handgun in this city has been far more complicated and time-consuming that it needed to be.

My gun dealer in Virginia provided the UPS tracking number of my package so I knew that it was going to be delivered to our one gun dealer, Charles Sykes, sometime on Wednesday. Late morning, I took the Metro down to Judiciary Square and walked over to the Metropolitan Police headquarters.

# Bill 19-614, "Firearms Amendment Act of 2011": Supplemental Testimony

**Statement of Charles H. Cunningham, Director of State and Local Affairs**
**National Rifle Association of America**
**11250 Waples Mill Road; Fairfax, Virginia 22030-7400**
**(703) 267-1228**

In response to testimony at the January 30 hearing on this bill, we would like to offer the following additional information.

<u>In-Person Registration and False Identification</u>

In his January 30 testimony, Prof. Daniel Webster of the Johns Hopkins Bloomberg School of Public Health argued that requiring in-person application by registrants will prevent the use of fraudulent identification to purchase firearms. To support his view, Prof. Webster pointed to a study by the United States General Accounting Office.[1]

All that study demonstrated, though, is that retail store clerks could be fooled by government agents using "counterfeit driver's licenses with fictitious names and identifiers."[2] This provides little support for the requirement that gun owners apply to register in person. If registrants could apply by mail, the Metropolitan Police—unlike a retail store—would have the ability to verify the authenticity of a driver's license or other identification document through driver's license databases.

In addition, anti-forgery technology for government-issued identification documents has developed considerably since the GAO investigation occurred more than 10 years ago. Licenses today have features such as holograms, microscopic printing, bar codes, dot codes and other characteristics that make it far harder to fool even a casual eye.[3]

---

[1] *See* United States General Accounting Office, *Firearms Purchased from Federal Firearm Licensees Using Bogus Identification*, GAO-01-427 (March 2001), *available at* http://oversight-archive.waxman.house.gov/documents/20040608093000-01743.pdf (last visited Feb. 13, 2012).

[2] *Id.* at 5.

[3] *See* American Association of Motor Vehicle Administrators, *Personal Identification – AAMVA North American Standard – DL/ID Card Design* (July 2011), *available at* http://www.aamva.org/aamva/DocumentDisplay.aspx?id={28D7CA91-8FDA-404D-A88E-A5B6457804E9} (last visited Feb. 13, 2012).

1

HELLER DC 000280

Murders of Police Officers

Chief Lanier stated that nationally, 71 police officers had been killed with firearms in 2011. While the recent increase in attacks on officers is outrageous, it also is not a result of gun possession by law-abiding people in the District or elsewhere.

The final FBI data for 2011 have not been released, but a preliminary analysis by the Department of Justice's Community Oriented Policing Services Office noted that 73 percent of shooting deaths analyzed "were the result of ambush or surprise attacks."[4]

Assailants who would deliberately target officers this way are surely the least likely individuals to register firearms under the District's system or any other system. A major FBI study of violent attacks on law enforcement officers, which featured interviews with the officers as well as the assailants, found that "Of 33 handguns used to assault the officers … 32 (97 percent) were obtained illegally."[5]

Firearms Accidents

Chief Lanier also testified that there are "a couple of dozen" accidental firearms discharges causing injury in the District each year. Fortunately, there appears to be little correlation between the prevalence of lawfully possessed firearms and the number of fatal accidents. The number of firearms Americans own has risen by about 5.3 million annually in recent years, to an all-time high of roughly 275 million.[6] At the same time, the firearm accident death rate is down 95 percent from the all-time high recorded in 1904. The annual number of firearm accident deaths has decreased by an estimated 83 percent since 1930, while the U.S. population has more than doubled and the number of firearms has quintupled.[7]

---

[4] Kevin Johnson, *More police officers die in ambush attacks*, USA Today, Dec. 22, 2011, *available at* http://www.usatoday.com/news/nation/story/2011-12-21/police-officer-ambush-deaths/52147034/1 (last visited Feb. 13, 2012).

[5] Anthony J. Pinizzotto, Edward F. Davis and Charles E. Miller III, *Violent Encounters* 50 (2006).

[6] Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearm Commerce in the United States 2011* 11-15, available at http://atf.gov/publications/firearms/121611-firearms-commerce-2011.pdf (last visited Feb. 13, 2012); total number projected based on Police Foundation, *Guns in America* (1996), *available at* www.policefoundation.org/pdf/GunsinAmerica.pdf (last visited Feb. 13, 2012), plus ATF production data.

[7] National Safety Council, *Injury Facts 2011 Edition* 48; Centers for Disease Control and Prevention Wisqars data query system, www.cdc.gov/injury/wisqars/fatal_injury_reports.html; Gary Kleck, *Targeting Guns* 96 (1997), with estimate for 1930 firearm number projected from the figure for 1945.

2

HELLER DC 000281

Rates of Gun Ownership

In his Jan. 30 testimony, Daniel Vice of the Brady Center to Prevent Gun Violence claimed that "gun ownership rates have been steadily dropping and that they're at their lowest rates in decades."

However, Mr. Vice's testimony relied on the General Social Surveys (GSS) conducted by the National Opinion Research Center. As Professor Gary Kleck, a criminologist at Florida State University, has noted, these

… are among the few national surveys done-face-to-face in the [respondents'] homes, a format where [respondents] necessarily are identifiable. Since 1990, the GSS has yielded gun prevalence estimates three to 6 percentage points lower than other surveys done at the same time, a difference that cannot be entirely attributed to sampling error.[8]

Comparing GSS data to a comparably phrased question on gun prevalence in the home, that gap has persisted or widened since Prof. Kleck's 1997 observation. In biennial surveys from 2000 to 2010, the GSS showed household ownership rates lower than the Gallup survey:[9]

|      | Gallup | GSS  |
|------|--------|------|
| 2000 | 39     | 34.3 |
| 2002 | 41     | 36.4 |
| 2004 | 38     | 37.3 |
| 2006 | 43     | 34.5 |
| 2008 | 42     | 36   |
| 2010 | 39     | 32.3 |

More recently, Gallup (reporting on a slightly more broadly worded question) reports that:

Forty-seven percent of American adults currently report that they have a gun in their home or elsewhere on their property. This is up from 41% a year ago and is the highest Gallup has recorded since 1993, albeit marginally above the 44% and 45% highs seen during that period.[10]

---

[8] Kleck, *Targeting Guns* at 65.

[9] *See* "Guns," *Gallup*, http://www.gallup.com/poll/1645/Guns.aspx (last visited February 13, 2012); GSS results from query of "General Social Survey 1972-2010 Cumulative Datafile," National Opinion Research Center, The University of Chicago, http://sda.berkeley.edu/cgi-bin/hsda?harcsda+gss10 (last visited Feb. 13, 2012).

[10] Lydia Saad, "Self-Reported Gun Ownership in U.S. Is Highest Since 1993," *available at* http://www.gallup.com/poll/150353/Self-Reported-Gun-Ownership-Highest-1993.aspx (last visited Feb. 13, 2012).

3

HELLER DC 000282

Multiple Firearm Sales

Mr. Vice also defended the District's one-gun-a-month law based on the claim that "20 percent of handguns sold and traced were sold in multiple sales." Like any attempt to draw broad policy conclusions from firearm trace data, this claim should be disregarded.

As the Congressional Research service has noted, "Neither the Federal Bureau of Investigation (FBI)—the principal federal agency charged with the collection of national crime statistics, nor the ATF have endorsed the use of firearm trace data for purposes other than assisting in ongoing criminal investigations." This is because "there are significant questions about the consistent and unbiased collection of ATF firearm trace data," which therefore "may not be representative of the types of firearms recovered by police and, hence, may not be representative of guns used in crime."[11]

Long Gun Registration in Canada

Mr. Vice discussed a study on the supposed law enforcement benefits of long gun registration in Canada. That study claimed that police are safer because they can determine in advance whether a suspect may be armed.[12] Modern police training, however, teaches officers that anyone the police encounter may be armed—regardless of whether the suspect is legally authorized to possess any firearms at all. The study also claimed that the registry is useful in helping seize firearms from registered owners who violate the law by (for instance) threatening coworkers. But this reasoning is circular; if there were no registration requirement, officers would most likely be able to seize all firearms possessed by a suspect who was arrested in such a case.

Mr. Vice also suggests in his written testimony that long gun registration is especially necessary in the District because "It is crucial that law enforcement know, for example, if a person overlooking a government building, embassy, or motorcade route is stockpiling long-range rifles." The idea that a would-be assassin would buy or rent an apartment overlooking his intended target's travel route, then register his intended murder weapons, is simply absurd.

More generally, in Canada's most recent experiment in restrictive gun control that nation prohibited over half of registered handguns, required the licensing of gun owners, and imposed a long gun registration requirement that took effect in 1998. Since 1997, however, while the U.S. murder rate has decreased 29 percent, Canada's murder rate has decreased only 17 percent.[13]

---

[11] William J. Krouse, *CRS Report for Congress: Semiautomatic Assault Weapons Ban* 13 (Dec. 16, 2004), *available at* http://www.gunbanfacts.com/Documents/CRS_AWReport2004.pdf (last visited Feb. 13, 2012).

[12] Royal Canadian Mounted Police, *Canadian Firearms Program Evaluation* 45 (Feb. 2010), available at http://www.rcmp-grc.gc.ca/pubs/fire-feu-eval/eval-eng.pdf (last visited Feb. 13, 2012).

[13] Gary Mauser, "After the Gun Registry," *Fraser Forum*, May 2006 at 19; for U.S. murder rates, *see* FBI Uniform Crime Report data tool *at* http://www.ucrdatatool.gov/Search/Crime/Crime.cfm; Canadian murder rate, *see*

4

HELLER DC 000283

Ballistic Testing

Mr. Vice referred to a case in Maryland in which the prosecutor said ballistics testing was crucial. However, while the prosecutor did make that claim, the "state police contend that the database didn't reveal a match" and that "Prince George's County police didn't even check it."[14]

Vision Testing

Mr. Vice incorrectly suggested that the District's one-of-a-kind vision testing requirement is defensible because firearm use in the District is limited to the home. This ignores the possibility that a visually impaired gun owner in the District might want to use his firearm outside the District (for hunting or target shooting with assistive technology, for example). Visually impaired or even blind persons may also be interested in possessing firearms for non-shooting purposes, such as gun collecting or simply to retain a valuable family heirloom.

Even for self-defense in the home, people with little or no vision may be able to use firearms effectively for self-defense in extreme circumstances, such as a contact-distance struggle in which aiming is not necessary. In those circumstances, cases of mistaken identity are highly unlikely.

In addition, District law currently allows for the possibility of lawful recreational shooting activities in the District.[15] If a suitable shooting range opens in the District in the future, people with visual handicaps should not be prevented from possessing firearms for safe and responsible use in the District itself.

Long Gun Use in Crime

In our previous testimony, we noted that for many years the District had not reported to the FBI the types of firearms used in murders and non-negligent manslaughter. It has since been called to our attention that the District resumed reporting this information in 2009 and continued reporting it in 2010.  We apologize for that error.

---

Statistics Canada, "Homicide Rate Canada, 1961-2010," *available at* http://www.statcan.gc.ca/pub/85-002-x/2011001/article/11561/c-g/desc/desc01-eng.htm (last visited Feb. 13, 2012).

[14] *House Panel Could Soon Vote on Ballistics Database*, WBAL (Baltimore, Md.) April 4, 2005, *available at* http://www.wbaltv.com/r/4345170/detail.html (last visited Feb. 13, 2012).

[15] *See, e.g.*, D.C. Code § 2502.01(b)(3) (authorizing nonresidents to possess unregistered firearms while "participating in any lawful recreational firearm-related activity in the District" ); D.C. Code § 22-4504.01 (authorizing registrants to carry a firearm "[w]hile it is being used for lawful recreational purposes").

HELLER DC 000284

Notably, though, in 2009 (the first full year after the *Heller* decision), only one criminal homicide was known to have been committed in the District with a rifle and one with a shotgun.[16] No criminal homicides were known to have been committed with long guns in 2010.[17]

The sole homicide committed with a rifle in 2009 was the murder of a security guard at the United States Holocaust Memorial Museum. That crime was committed by a Maryland resident who was also a convicted felon. Therefore, he could not have registered any firearm even if he had lived in the District. Even if the rifle had been registered in the District, the registration system would have provided little or no help in investigating the crime, because the murderer was shot and apprehended at the scene. [18]

---

[16] *See* FBI, *Crime in the United States 2009*, Table 20, *available at* http://www2.fbi.gov/ucr/cius2009/data/table_20.html (last visited Feb. 13, 2012).

[17] *See* FBI, *Crime in the United States 2010*, Table 20, *available at* http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/10tbl20.xls (last visited Feb. 13, 2012).

[18] Cam Simpson and Gary Fields, *Gunman Kills Holocaust Museum Guard*, *Wall Street Journal*, June 11, 2009.

HELLER DC 000285

Exhibit 23

### GOVERNMENT OF THE DISTRICT OF COLUMBIA
#### OFFICE OF THE ATTORNEY GENERAL

Equity Section
Public Interest Division



December 19, 2012

Stephen P. Halbrook, Esq.
Richard E. Gardiner, Esq.
Suite 403
3925 Chain Bridge Road
Fairfax, VA 22030
regardiner@cox.net
protell@aol.com

*Via E-Mail*

**Re:** *Heller, Dick Anthony, v. District of Columbia*, **No. 08-01289 (JEB)**

Gentlemen:

This letter responds to your e-mail of December 12, 2012. I also want to point out that the District has not received a satisfactory response to its e-mail of November 13, 2012, in which we explained that we were entitled to narrative responses to our contention interrogatories setting forth "all facts" upon which plaintiffs based their contentions. If plaintiffs do not plan to further respond, please let us know, as we believe we would then have grounds to file a motion to compel and/or a motion to preclude, and should raise the issue in a conference call to chambers.

As to your e-mail of December 12, as you know, Fed. R. Civ. P. 33(a)(1) limits a party to 25 interrogatories, including all discrete subparts. On September 24, 2012, plaintiffs propounded 25 interrogatories here, which the District has answered. The District has also provided considerable additional information in its several e-mails responding to your inquiries. Consequently, any further responses to plaintiffs' interrogatories would exceed the limit set by the federal rules, to which the parties both agreed to be bound in our Rule 16.3 Report. Notwithstanding this, it would appear that the most efficient method for you to obtain any follow-up information you desire would be through the use of depositions. Additionally, I have checked with MPD to determine how burdensome it would be to provide copies of the 37 police reports you referenced in respect to Interrogatory 13. We should be able to provide copies of those reports, suitably redacted, after the holidays.

As to your Requests for Production 3–47, I'm afraid your "narrowing" does not assist the District. As to your point A, the request is clearly premature; the "studies, data, and other evidence" is almost all in the public record, with the exception of any reports generated by any experts in this matter. That information will be disclosed according to the timeline set forth in the Scheduling Order. As to your point B, the District's answer remains the same: The requests for production are vague, overbroad and unduly burdensome. The District does not have any studies on these topics that are not otherwise

publicly available. In other words, there are no "secret" studies or documents that the District will try to introduce later that are not available to the public or plaintiffs, aside from any reports that may be generated by experts retained by the parties here.

Finally, the District will stipulate that the information in our December 5 letter may be treated as if it were supplemental responses to interrogatories given under oath.

Sincerely,

IRVIN B. NATHAN
Attorney General for the District of Columbia


_____/s/ Andrew J. Saindon_____
BY:      ANDREW J. SAINDON
         Assistant Attorney General

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                            )
DICK ANTHONY HELLER, et al.          )
                                                            )
     Plaintiffs,                                )
                                                            )
     v.                                             )          Civil Action No. 08-01289 (JEB)
                                                            )
DISTRICT OF COLUMBIA, et al.,          )
                                                            )
     Defendants.                             )
_____ )

DEFENDANTS' RESPONSE TO PLAINTIFFS'
STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE

       Defendants the District of Columbia and Mayor Vincent C. Gray (collectively, "the District"), by and through their undersigned counsel, submit the following Response to Plaintiffs' Statement of Material Facts As to Which There is No Genuine Issue ("PSMF").

       Plaintiffs' Statement is well over 100 paragraphs, almost none of which are material (or even relevant) or "facts," in clear violation of LCvR 7(h). The PSMF reflects plaintiffs' erroneous conception of the case and the District's burden.

       The PSMF also violates the Rules of this Court. *See, e.g., Davis v. District of Columbia*, 503 F.Supp.2d 104, 115 (D.D.C. 2007) ("a plaintiff should not rely on its 'relevant facts' section to meet its burden under [LCvR 7(h)], especially if the plaintiff's presentation of the facts is not concise and mixes factual allegations with legal argument.") (citing *Jackson v. Finnegan, Henderson*, 101 F.3d 145, 153 (D.C. Cir. 1996)). That is the PSMF in a nutshell—22 pages of rambling narrative, liberally mixing factual allegations with legal argument. *See Robertson v. American Airlines, Inc.*, 239 F.Supp. 2d 5, 7 (D.D.C. 2002) (purposes of local rule "clearly are not served when one party, particularly the moving party, fails in his statement to specify the

1

JA 910

material facts upon which he relies.") (quoting *Gardels v. CIA*, 637 F.2d 770, 773 (D.C. Cir. 1980)); *Ramey v. Darkside Productions, Inc.*, 2004 WL 5550485 (D.D.C. 2004) (in motion for summary judgment, LCvR 7(h) requires party "to identify with particularity those material facts necessary" to support motion). *See also Garay v. Liriano*, 943 F.Supp.2d 1, 20 (D.D.C. 2013) ("Nor is it this Court's obligation to dig through hundreds of pages of evidence in search of factual support for plaintiffs' assertions, where they fail to direct the Court to specific facts in the record.") (citing *Jackson*, 101 F.3d at 154).

A statement of undisputed material facts should "logically and efficiently" review relevant background facts and should *not* "contain argument . . . ." *Robertson*, 239 F.Supp.2d at 8. *See also Jackson*, 101 F.3d at 148 (statement impermissibly "[b]lend[ed] factual assertions with arguments regarding their legal significance").

Notwithstanding these arguments, in response to the numbered paragraphs of the PSMF, the District responds as follows:

1.      Paragraph 1 of the PSMF is a legal conclusion, not a material fact.

2.      The District does not dispute paragraph 2 of the PSMF, but avers that the facts therein are not material to the resolution of the instant matter.

3.      The District does not dispute paragraph 3 of the PSMF, but avers that the facts therein are not material to the resolution of the instant matter.

4.      Paragraph 4 of the PSMF is speculation, and not a material fact.

5.      The District does not dispute paragraph 5 of the PSMF, but avers that the facts therein are not material to the resolution of the instant matter.

6.      The District does not dispute paragraph 6 of the PSMF, but avers that the facts therein are not material to the resolution of the instant matter.

7.     The District does not dispute paragraph 7 of the PSMF, but avers that the facts therein are not material to the resolution of the instant matter.

8.     Paragraph 8 of the PSMF is a legal conclusion and not a material fact.

9.     Paragraph 9 of the PSMF contains plaintiffs' legal and factual conclusions and not a material fact.

10.    Paragraph 10 of the PSMF does not contain a material fact, and is irrelevant to the resolution of the instant matter.

11.    Paragraph 11 of the PSMF does not contain a material fact, and is irrelevant to the resolution of the instant matter.

12.    Paragraph 12 of the PSMF does not contain a material fact, and is irrelevant to the resolution of the instant matter.

13.    The District does not dispute paragraph 13 of the PSMF, but avers that the facts therein are not material to the resolution of the instant matter.

14.    The District does not dispute paragraph 14 of the PSMF, but avers that the facts therein are not material to the resolution of the instant matter.

15.    The District does not dispute paragraph 15 of the PSMF, but avers that the facts therein are not material to the resolution of the instant matter.

16.    Paragraph 16 of the PSMF does not contain a material fact, and is irrelevant to the resolution of the instant matter.

17.    The District does not dispute paragraph 17 of the PSMF, but avers that the facts therein are not material to the resolution of the instant matter.

18.    The District does not dispute paragraph 18 of the PSMF, but avers that the facts therein are not material to the resolution of the instant matter.

19.     The District does not dispute paragraph 6 of the PSMF, but avers that the facts therein are not material to the resolution of the instant matter.

20.     The District does not dispute paragraph 20 of the PSMF, but avers that the facts therein are not material to the resolution of the instant matter.

21.     The District does not dispute paragraph 21 of the PSMF. *See* District's SMF ¶ 17.

22.      The District does not dispute paragraphs 22a through 22c of the PSMF, but avers that the "facts" therein are vague and not material to the resolution of the instant matter. As to paragraph 22d, the District avers that the facts therein are not material and that the District, of course, is not responsible for what the free market charges for firearms purchase or transfer.

23.     The District does not dispute paragraph 23 of the PSMF, but avers that the "facts" therein are vague and not material to the resolution of the instant matter.

24.      The District does not dispute paragraphs 24a through 24i and 24k of the PSMF, but avers that the "facts" therein are vague and not material to the resolution of the instant matter. As to paragraph 24j, the District avers that the facts therein are not material and that the District, of course, is not responsible for the time spent traveling to a dealer out of the District.

25.     The District objects to paragraph 25 of the PSMF because it contains argument and legal and factual conclusions, and no material facts.

26.     Paragraph 26 of the PSMF contains no material facts and speculation.

27.     Paragraph 27 of the PSMF contains no material facts.

28.     Paragraph 28 of the PSMF contains no material facts.

29.     The District objects to paragraph 29 of the PSMF because it contains no material facts, and no citations to record evidence.

30.      Paragraph 30 of the PSMF contains no material facts and speculation.

31.     Paragraph 31 of the PSMF contains no material facts and legal conclusions.

32.     The District objects to paragraph 32 of the PSMF because it contains argument and no material facts.

33.     The District objects to paragraph 33 of the PSMF because it contains argument and no material facts.

34.     The District objects to paragraph 34 of the PSMF because it contains argument and speculation.

35.     The District objects to paragraph 35 of the PSMF because it contains argument and speculation, and no material facts.

36.     The District does not dispute paragraph 36 of the PSMF, but avers that the numerous facts therein are not material to the resolution of the instant matter.

37.     The District does not dispute paragraph 37 of the PSMF, but avers that the facts therein are not material to the resolution of the instant matter.

38.     The District does not dispute paragraph 38 of the PSMF, but avers that the facts therein are not material to the resolution of the instant matter.

39.     The District does not dispute paragraph 39 of the PSMF, but avers that the facts therein are not material to the resolution of the instant matter.

40.     The District objects to paragraph 40 of the PSMF because it contains argument. The District does not dispute that plaintiffs made the referenced discovery requests and that the District responded as indicated.

41.     The District objects to paragraph 41 of the PSMF because it contains argument.

42.     The District objects to paragraph 42 of the PSMF because it contains argument. The District does not dispute that plaintiffs made the referenced discovery request.

JA 914

43.     The District objects to paragraph 43 of the PSMF because it contains argument. The District does not dispute that the District responded as indicated.

44.     The District objects to paragraph 44 of the PSMF because it contains argument.

45.      The District does not dispute paragraph 45 of the PSMF, but avers that the facts therein are not material to the resolution of the instant matter.

46.     The District objects to paragraph 46 of the PSMF because it contains argument.

47.     The District objects to paragraph 47 of the PSMF because it contains argument and no material facts.

48.     The District does not dispute paragraph 48 of the PSMF, but avers that the facts therein are not material to the resolution of the instant matter.

49.     The District does not dispute paragraph 49 of the PSMF, but avers that the facts therein are not material to the resolution of the instant matter.

50.     The District does not dispute paragraph 50 of the PSMF, but avers that the facts therein are not material to the resolution of the instant matter.

51.     Paragraph 51 of the PSMF does not contain material facts and is vague.

52.     The District does not dispute paragraph 52 of the PSMF, but avers that the facts therein are vague not material to the resolution of the instant matter.

53.     The District does not dispute paragraph 53 of the PSMF, but avers that the facts therein are vague and not material to the resolution of the instant matter.

54.     The District does not dispute paragraph 54 of the PSMF, but avers that the facts therein are not material to the resolution of the instant matter.

55.     The District objects to paragraph 55 of the PSMF because it contains argument and not a material fact.

56.     The District objects to paragraph 56 of the PSMF because it contains argument and speculation, not a material fact.

57.     The District does not dispute paragraph 57 of the PSMF, but avers that the facts therein are not material to the resolution of the instant matter.

58.     The District does not dispute paragraph 58 of the PSMF, but avers that the facts therein are not material to the resolution of the instant matter.

59.     The District does not dispute the first sentence of paragraph 59 of the PSMF. The District objects to the second sentence of paragraph 59 because it contains argument and no material facts.

60.     The District objects to paragraph 60 of the PSMF because it contains no material facts. The District does not dispute that plaintiffs made the referenced discovery request and that the District responded as indicated.

61.     The District objects to paragraph 61 of the PSMF because it contains argument and not a material fact.

62.     As to paragraph 62 of the PSMF, the District does not dispute that it promulgated the referenced Notice of Proposed Rulemaking, which document is the best evidence of its content, although it has since been superseded by the Notice of Final Rulemaking. The District avers that plaintiffs did not make any comments or suggestions to the proposed regulations.

63.     The District does not dispute paragraph 63 of the PSMF, but avers that the facts therein are not material to the resolution of the instant matter.

64.     The District does not dispute paragraph 64 of the PSMF.

65.     The District objects to paragraph 65 of the PSMF because it contains argument. Plaintiffs do not dispute that training reduces unintentional discharges. *See* Plaintiffs' Response

JA 916

to the District's SMF ¶ 23 ("Plaintiffs do not dispute that training can reduce accidental

discharges . . . .").

66.     The District objects to paragraph 66 of the PSMF because it contains argument.

67.     The District objects to paragraph 67 of the PSMF because it contains argument.

68.     The District objects to paragraph 68 of the PSMF because it contains argument

and is vague.

69.     The District objects to paragraph 69 of the PSMF because it contains argument.

70.     The District does not dispute paragraph 70 of the PSMF, but avers that the facts

therein are vague and not material to the resolution of the instant matter.

71.     The District does not dispute paragraph 71 of the PSMF, but avers that the facts

therein are vague and not material to the resolution of the instant matter.

72.     The District objects to paragraph 72 of the PSMF because it contains argument.

73.     The District does not dispute paragraph 73 of the PSMF, but avers that the facts

therein are vague and not material to the resolution of the instant matter.

74.     The District does not dispute paragraph 74 of the PSMF. *See* District's SMF ¶ 25.

75.     The District objects to paragraph 75 of the PSMF because it contains argument.

The District does not dispute that plaintiffs made the referenced discovery request and that the

District responded as indicated.

76.     The District objects to paragraph 76 of the PSMF because it contains no material

facts.

77.     The District objects to paragraph 77 of the PSMF because it is vague and contains

no material facts.

78.     The District objects to paragraph 78 of the PSMF because it contains no material facts.

79.     The District does not dispute paragraph 79 of the PSMF, but avers that the facts therein are vague and not material to the resolution of the instant matter.

80.     The District objects to paragraph 80 of the PSMF because it contains no material facts and is irrelevant here. In any event, plaintiffs' evidence (a statement from a District expert witness) does not support their conclusion. *See* Matthew Miller, Deborah Azrael, & David Hemenway, *Firearms and Violent Death in the United States, in* Reducing Gun Violence in America: Informing Policy With Evidence and Analysis, 7–13 (Daniel W. Webster & Jon S. Vernick eds., 2013) (numerous empirical studies show that more guns in the home increases the risk of homicide, suicide, and unintentional firearm deaths). The book itself is available online at *http://jhupress.files.wordpress.com/2013/01/1421411113_updf.pdf* (last visited Jan. 10, 2014).

81.     The District objects to paragraph 81 of the PSMF because it contains no material facts.

82.     The District objects to paragraph 82 of the PSMF because it contains argument, and avers that the facts therein are not material to the resolution of the instant matter.

83.     The District objects to paragraph 81 of the PSMF because it contains argument. Plaintiff Heller can transfer one handgun per month into the District until they are all here.

84.     The District objects to paragraph 84 of the PSMF because it contains no material facts. In any event, plaintiffs' evidence (a statement from a District expert witness) does not support their conclusion.

85.     The District does not dispute paragraph 85 of the PSMF, but avers that the facts therein are not material to the resolution of the instant matter.

JA 918

86.     The District objects to paragraph 86 of the PSMF because it contains no material facts.

87.     The District does not dispute paragraph 87 of the PSMF, but avers that the facts therein are not material to the resolution of the instant matter.

88.     The District objects to paragraph 88 of the PSMF because it contains argument, and avers that the facts therein are not material to the resolution of the instant matter.

89.     The District objects to paragraph 89 of the PSMF because it contains argument, but avers that the facts therein are not material to the resolution of the instant matter.

90.     The District objects to paragraph 90 of the PSMF because it contains no material facts. In any event, plaintiffs' evidence (a statement from a District expert witness) does not support their conclusion.

91.      The District objects to paragraph 91 of the PSMF because it contains no material facts. In any event, plaintiffs' evidence (a statement from a District expert witness) does not support their conclusion.

92.     The District objects to paragraph 92 of the PSMF because it is vague and contains no material facts.

93.     The District objects to paragraph 93 of the PSMF because it contains argument, but avers that the facts therein are not material to the resolution of the instant matter.

94.     The District objects to paragraph 93 of the PSMF because it contains argument, but avers that the facts therein are not material to the resolution of the instant matter. The District does not dispute that the witness responded as indicated.

95.     The District objects to paragraph 95 of the PSMF because it contains argument, but avers that the facts therein are not material to the resolution of the instant matter.

96.     The District does not dispute paragraph 96 of the PSMF, but avers that the facts

therein are not material to the resolution of the instant matter.

97.     The District objects to paragraph 97 of the PSMF because it contains argument,

but avers that the facts therein are not material to the resolution of the instant matter.

98.     The District objects to paragraph 98 of the PSMF because it contains no material

facts. In any event, plaintiffs' evidence (a statement from a District expert witness) does not

support their conclusion.

Date: January 15, 2014                          Respectfully submitted,

                                                IRVIN B. NATHAN
                                                Attorney General for the District of Columbia

                                                ELLEN A. EFROS
                                                Deputy Attorney General
                                                Public Interest Division

                                                _____/s/ Grace Graham_____
                                                GRACE GRAHAM, D.C. Bar No. 472878
                                                Chief, Equity Section
                                                441 Fourth Street, NW, 6th Floor South
                                                Washington, DC 20001
                                                Telephone: (202) 442-9784
                                                Facsimile: (202) 741-8892
                                                Email: grace.graham@dc.gov

                                                _____/s/ Andrew J. Saindon_____
                                                ANDREW J. SAINDON, D.C. Bar No. 456987
                                                Assistant Attorney General
                                                Equity Section
                                                441 Fourth Street, N.W., 6th Floor South
                                                Washington, D.C. 20001
                                                Telephone: (202) 724-6643
                                                Facsimile: (202) 730-1470
                                                andy.saindon@dc.gov

_____/s/ Chad A. Naso_____

Chad A. Naso [1001694]
Assistant Attorney General
Office of the Attorney General, DC
441 Fourth Street, NW
Sixth Floor South
Washington, DC 20001
(202) 724-7854 (o)
(202) 741-8951 (f)
chad.naso@dc.gov

*Counsel for Defendant*

12

JA 921

# EXHIBIT N

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

-------------------------------------:
DICK ANTHONY HELLER, et al.,          :
                                      :
            Plaintiffs,               :
        vs.                           :  Case No.
                                      :
DISTRICT OF COLUMBIA, et al.,         :  08-01289 (JEB)
                                      :
            Defendants.               :
-------------------------------------:


                          Washington, D.C.

                        Monday, July 29, 2013


Deposition of:


            LIEUTENANT JON SHELTON

called for oral examination by counsel for

Plaintiffs, pursuant to notice, at the Office of the

Attorney General, 441 4th Street, Northwest,

Washington, D.C., before Amber L. Dill, of Capital

Reporting Company, a Notary Public in and for the

District of Columbia, beginning at 1:00 p.m., when

were present on behalf of the respective parties:

## Capital Reporting Company
### Shelton, Lieutenant Jon  07-29-2013

---

70

1    A    For just privacy reasons.
2    Q    Oh, okay.  Well, let me ask you, as a police
3  officer, if an officer is responding to a call where
4  there might be a domestic disturbance or a crime in
5  progress or things of that nature, and someone told
6  him, we've checked the database and we don't find any
7  guns present, would he be justified in walking in
8  there with his guard down, feeling that he could
9  confidently say that there would be no guns there?
10       MR. SAINDON:  Calls for an opinion.
11       You can answer.
12       THE WITNESS:  I don't think any of us ever
13  go into a call for domestic violence with our hands
14  down.  It's one of the most dangerous situations that
15  you can ever go into.  That's where most officers are
16  injured.
17       My position was it was possible -- possible
18  abuse of having too many people have access to our
19  database.
20  BY MR. PETERSON:
21    Q    Okay.
22    A    I wanted it well restricted, well within our

---

71

1  grips and not, you know, out where it could be -- be
2  possibly abused.
3    Q    Okay.  Is it correct that police officers
4  are trained to treat situations where there might be a
5  crime in progress or domestic dispute or some other
6  situation possibly involving violence as always having
7  a potential to have a dangerous weapon present?
8       MR. SAINDON:  Objection.  Relevance.
9       THE WITNESS:  I would say of course.
10  BY MR. PETERSON:
11    Q    Right.  Okay.
12    A    Yes.
13    Q    Thank you.  I think we already marked
14  Exhibit S8.  This is the December 5th letter from the
15  District's attorneys to counsel for the plaintiff.  If
16  you could get that in front of you, please.
17       And on page 2 of that document -- and it's
18  the one, two, three, fourth paragraph down -- and it's
19  the one that begins, "Regarding your complaint as to
20  the District's response to interrogatory number 21."
21       Do you see that paragraph?
22    A    Yes, I do.

---

72

1    Q    Then there's a statement that says that,
2  "According to Lieutenant Shelton, there have been less
3  than a dozen instances since he's been at SOMB where
4  certain police agencies, like MPD-Narcotics or the
5  U.S. Park Police, have contacted the firearms
6  registration section prior to executing a search
7  warrant in an effort to determine if there were any
8  registered firearms associated with a particular
9  address."
10       Is that a true statement, first of all?
11    A    Yes.
12    Q    Okay.  And how long have you been at SOMB?
13  I'm not sure of that.
14    A    Twelve years.
15    Q    Twelve years.  Okay.  And it states that
16  there's been less than a dozen.  Can you recall some
17  specific instances for us when this has taken place?
18    A    Yeah.  Yes, I can.
19    Q    Okay.  Why don't you give us a couple of
20  those.
21    A    Examples?
22    Q    Yeah.

---

73

1    A    Like I have here, MPD-Narcotics division may
2  be getting ready to execute a search warrant and have
3  contacted us to run the -- you know, after they've
4  gotten the warrant.  Before they hit the door, they've
5  contacted us to see if there was any possible firearms
6  that were legally registered there, just to see, you
7  know --
8    Q    Okay.
9    A    -- what they may be up against.
10    Q    Okay.
11    A    I've also received calls from the United
12  States Park Police and have been incognizant in
13  calling them back to ensure who I was talking to.
14    Q    Okay.
15    A    Okay.  And for the same purposes.
16    Q    All right.
17    A    Park Police do execute search warrants in
18  the District of Columbia.
19    Q    Sure.  And, I mean -- but do you remember
20  specific instances or just that you've talked with
21  them about this?
22    A    Just that I've talked to them.

---

# EXHIBIT O

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DICK ANTHONY HELLER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 08-01289 (JEB) |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF SERGEANT COLIN HALL

Pursuant to 28 U.S.C. § 1746, I, Colin Hall, declare and state as follows:

1. I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information.

2. I have been employed by the Metropolitan Police Department since 1998, and began work at the Security Officers Management Branch ("SOMB") in 2008. I am currently the supervisor for the Firearms Registration Unit ("FRU"), since the retirement of Lieutenant Shelton late last year.

3. My duties include operation and supervision of the FRU and the Gun Control Section, including all staffing and all firearms-registration application procedures and renewals. I also process firearm permits under the federal Law Enforcement Officers Safety Act. I am responsible for maintaining MPD's firearms records and the firearms-registration database, and for preparing certified documents for criminal firearms cases and testifying in court to such documents and procedures.

4. At counsel's request, I reviewed plaintiffs' Motion for Summary Judgment and Opposition to Defendants' Motion for Summary Judgment in this case. Specifically, I reviewed

JA 926

pages 26 and 27, where plaintiffs argue that the background check conducted under the federal National Instant Criminal Background Check System ("NICS") renders the District's local checks "redundant," implying that the NICS will catch everyone our local checks will catch. This assertion is incorrect.

5. As Lt. Shelton noted earlier here, as part of the background check for registering a firearm, the MPD conducts a check of applicants against a number of databases, including the Washington Area Law Enforcement System ("WALES") and the National Criminal Information Center ("NCIC"), a federal database of criminal-justice information. *See* 28 C.F.R. § 25.2.

6. WALES contains local criminal background information, including outstanding warrants and protective or restraining orders, from local law-enforcement agencies. As part of its firearms-registration procedures, MPD also checks information it receives periodically from the D.C. Superior Court, *i.e.*, information on mental-health commitments and domestic-violence convictions.

7. The background checks conducted pursuant to NICS also access the NCIC. *Id.*, § 25.4. NICS checks are only conducted for firearms purchases or transfers conducted by a Federal Firearms Licensee ("FFL"), *id.*, § 25.6(a), therefore any previously owned firearms or estate firearms that a person wished to register in the District would not have another NICS check conducted prior to registration.

8. NICS uses social security numbers and names. NICS checks will flag any violations of *federal* firearms law (Title 18, Ch. 44 of the U.S. Code), however it will not flag or prevent a firearm purchase or transfer based on the standards contained within the District of Columbia's Firearms Registration Act. Examples of information that would disqualify a person from registering a firearm in the District that would not be flagged by a NICS check include:

2

a. Two or more DUIs in the previous five-year period. D.C. Official Code § 7-2502.03(a)(4)(C).

b. A history of violent behavior within 5 years of the application. *Id.*, § 7-2502.03(a)(6A).

c. Appearance as the respondent in an intrafamily proceeding in which a civil or foreign protection order issued against the applicant for a period of 5 years or more. *Id.*, § 7-2502.03(a)(12).

d. Convictions within 5 years of a firearm-registration application for violations in any jurisdiction of any law restricting the use, possession, or sale of any narcotic or dangerous drug. *Id.*, § 7-2502.03(a)(4)(A).

e. Convictions within 5 years of a firearm registration-application for violations of D.C. Official Code § 22-404, regarding assaults and threats, or regarding threats to do bodily harm, or a violation of any similar provision of the law of another jurisdiction. *Id.*, § 7-2502.03(a)(4)(B).

9. Consequently, WALES and MPD's periodic checks of Superior Court information (as described in paragraph 5, above) encompass information that is *not* captured by NICS background checks.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on ___1/10/14___                    _____
                                              COLIN HALL

3

# Exhibit 11
# (Corrected)

U.S. Political Assassinations & Attempts

| Victim or intended victim | Assassin or attempted assassin | Year | Type of weapon |
|---|---|---|---|
| Andrew Jackson | Richard Lawrence | 1835 | Single shot handguns[1] |
| Abraham Lincoln | John Wilkes Booth | 1865 | Single shot handgun[2] |
| James Garfield | Charles J. Guiteau | 1881 | Revolver[3] |
| William McKinley | Leon Czolgosz | 1901 | Revolver[4] |
| Theodore Roosevelt | John F. Schrank | 1912 | Revolver[5] |
| Franklin Roosevelt and mayor of Chicago (Anton Cermak) | Giuseppe Zangara | 1933 | Revolver[6] |
| Huey Long | Dr. Carl Weiss | 1935 | Handgun[7] |
| Harry Truman | Oscar Collazo López & Griselio Torresola | 1950 | Handguns[8] |
| John Kennedy | Lee Harvey Oswald | 1963 | Rifle[9] |
| George Lincoln Rockwell | John Patler | 1967 | Handgun[10] |
| Martin Luther King, Jr. | James Earl Ray | 1968 | Rifle[11] |
| Robert Kennedy | Sirhan Sirhan | 1968 | Revolver[12] |
| Malcolm X | Talmadge Hayer, others | 1965 | Shotgun, handguns[13] |
| George Wallace | Arthur Bremer | 1972 | Handgun[14] |
| Gerald Ford | Lynette "Squeaky" Fromme | 1975 | Handgun[15] |
| Gerald Ford | Sara Jane Moore | 1975 | Revolver[16] |
| Orlando Letelier | Michael Townley, others | 1976 | Bomb[17] |
| Ronald Reagan | John Hinckley, Jr. | 1981 | Handgun[18] |

| George H. W. Bush | Saddam Hussein | 1993 | Car Bomb[19] |
| William Clinton | Frank Eugene Corder | 1994 | Plane[20] |
| William Clinton | Osama Bin Laden | 1996 | Bomb[21] |
| George W. Bush | Robert Pickett | 2001 | Handgun[22] |
| George W. Bush | Vladimir Arutyunian | 2005 | Grenade[23] |
| Barack H. Obama | Everett Dutschke | 2013 | Ricin letter[24] |
| Barack H. Obama | Shannon Richardson | 2013 | Ricin letter[25] |

[1] Smithsonian National Museum of American History, Kenneth E. Behring Center. http://americanhistory.si.edu/presidency/3d1c.html (Accessed 1/31/14)

[2] Smithsonian National Museum of American History, Kenneth E. Behring Center. http://americanhistory.si.edu/presidency/3d1a.html (Accessed 1/31/14)

[3] "A Great Nation in Grief" *The New York Times*, July 3, 1881. http://query.nytimes.com/mem/archive-free/pdf?res=9803E6DC103CEE3ABC4B53DFB166838A699FDE (Accessed 1/31/14)

[4] Leech, Margaret (1959). *In the Days of McKinley*. New York: Harper and Brothers. OCLC 456809

[5] Bloodgood, Wheeler; Cochems, Henry; Remey, Oliver; (Copyright 1912, Republished 2007) *The Attempted Assassination of ex-President Theodore Roosevelt*. (http://www.gutenberg.org/ebooks/21261, Accessed 1/31/14)

[6] "Sam 'Momo' Giancana - Live and Die by the Sword". Crime Library. Archived from the original on 2007-02-08. (http://web.archive.org/web/20070208170403/http://www.crimelibrary.com/gangsters_outlaws/mob_bosses/giancana/guard_4.html, Accessed 1/31/14)

[7] "Who Killed The Kingfish?" *The Athens Observer*, September 12, 1985. (http://www.law.uga.edu/dwilkes_more/other_4kingfish.html, Accessed 1/31/14)

[8] Ayoob, Massad (March-April 2006) "Drama at Blair House: the attempted assassination of Harry Truman" *American Handgunner*. (http://archive.is/yCjt, Accessed 1/31/14)

[9] *Report of the President's Commission on the Assassination of President John F. Kennedy*, Washington, DC: United States Government Printing Office, 1964. 1 volume, 888 pages. (http://www.archives.gov/research/jfk/warren-commission-report/chapter-2.html#assassination, Accessed 1/31/14)

[10] Clark, Charles (December 30, 2010) "Death of an Arlington Nazi" *Northern Virginia Magazine*. (http://www.northernvirginiamag.com/entertainment/entertainment-features/2010/12/30/death-of-an-arlington-nazi/, Accessed 1/31/14)

[11] *Report of the Select Committee on Assassinations of the U.S. House of Representatives,* Washington, DC: United States Government Printing Office, 1979. 1 volume, 686 pages. (http://www.archives.gov/research/jfk/select-committee-report/part-2a.html, Accessed 1/31/14)

[12] Witcover, Jules (1969). *85 Days: The Last Campaign of Robert Kennedy*. New York: Putnam. OCLC 452367

[13] Marable, Manning (2011). *Malcolm X: A Life of Reinvention*. New York: Viking. ISBN 978-0-670-02220-5.

[14] Greider, William (May 16, 1972). "Wallace Is Shot, Legs Paralyzed; Suspect Seized at Laurel Rally". *Washington Post*. (http://www.washingtonpost.com/wp-srv/politics/daily/sept98/wallace051672.htm, Accessed 1/31/14)

[15] Naughton, James M. (September 6, 1975). "Ford Safe As Guard Seizes A Gun Woman Pointed At Him On Coast; Follower Of Manson Is Charged Two Feet Away A Wan President Late Urges Fight On Crime In Sacramento Talk Assassination Attempt Laid To Manson Backer". *The New York Times*. p. 1. (Accessed 1/31/14)

[16] Epstein, Edward (December 27, 2006) "Ford escaped 2 assassination attempts / Both happened in California -- one in capital, other in S.F." *San Francisco Chronicle*. (http://www.sfgate.com/news/article/Ford-escaped-2-assassination-attempts-Both-2481771.php, Accessed 1/31/14)

[17] Binder, David (September 22, 1976). "Opponent of Chilean Junta Slain In Washington by Bomb in His Auto". *New York Times.* (http://www.tni.org/archives/letelier-docs_220976, Accessed 1/31/14)

[18] Wilber, Del Quentin (2011). *Rawhide Down: The Near Assassination of Ronald Reagan* (hardcover). Macmillan. ISBN 0-8050-9346-X.

[19] Von Drehle, David & Smith, R. Jeffrey (Jun 27, 1993), "U.S. Strikes Iraq for Plot to Kill Bush", *The Washington Post*. (http://www.washingtonpost.com/wp-srv/inatl/longterm/iraq/timeline/062793.htm, Accessed 1/31/14)

[20] Dowd, Maureen (Sep 14, 1994). "Crash at the White House: The Overview". *The New York Times*. (http://www.nytimes.com/1994/09/13/us/crash-white-house-overview-unimpeded-intruder-crashes-plane-into-white-house.html, Accessed 1/31/14)

[21] Malanowski, Jamie (Dec 21, 2009). "Did Osama Try to Kill Bill Clinton?". *True/Slant*. (http://trueslant.com/jamiemalanowski/2009/12/21/did-osama-try-to-kill-bill-clinton/, Accessed 1/31/14)

[22] Sanger, David (February 8, 2001). "Officer Shoots Armed Man Near White House Fence". *The New York Times*. (http://www.nytimes.com/2001/02/08/us/officer-shoots-armed-man-near-white-house-fence.html, Accessed 1/31/14)

[23] Nick Paton Walsh (19 May 2005). "FBI says hand grenade thrown at Bush was live". *The Guardian* (London). (http://www.theguardian.com/world/2005/may/19/georgia.usa, Accessed 1/31/14)

[24] Payne, Ed; Smith, Matt; Cratty, Carol (April 19, 2013) "FBI confirms letters to Obama, others contained ricin". CNN.com. (http://www.cnn.com/2013/04/18/politics/tainted-letter-intercepted/index.html, Accessed 1/31/14)

[25] Goldstein, Joseph (June 7, 2013). "Woman From Texas Is Charged in Ricin Case". *The New York Times*. (http://www.nytimes.com/2013/06/08/nyregion/texas-woman-arrested-in-connection-with-ricin-laced-letters.html?_r=0, Accessed 1/31/14)

Exhibit 24

19

1    A    They do.

2    Q    Okay.  And also besides mere possession under

3    federal law to purchase a firearm from a licensed

4    dealer, a background check is run to determine if the

5    person is a felon or has a history of mental illness

6    or is a domestic violence offender, that sort of

7    thing?

8    A    Correct.  But those checks can verify the --

9    the identification of the person the background check

10   is being run on.

11   Q    Okay.  We will get to that in just a minute.

12        You cite people with a history of mental

13   illness such as the Virginia Tech shooter, the shooter

14   in the Gabrielle Giffords case and the Aurora,

15   Colorado shooter.  Did any of those crimes take place

16   in the District?

17   A    No.

18   Q    Okay.  Do you happen to know, were any of

19   those crimes in Arizona, Colorado, or Virginia, which

20   is where I think they did take place, solved by the

21   use of registration data?

22   A    No.

81

1      A      No other numerical data, no.

2      Q      And did you apply any methodologies to any

3   data that you have to arrive at your conclusions?

4      A      No.

5      Q      Okay.  And I think you do contend in here

6   that it would be -- it would promote officer safety to

7   have a photo ID.  Is there anything else in this

8   segment that shows that crime will actually be reduced

9   or officer safety will be improved by these measures?

10     A      No.

11     Q      Turning to the next segment of your report

12   which is entitled, "Preventing gun trafficking," the

13   only -- and I may be wrong; you tell me.  The one that

14   I saw that that is principally addressing is the one

15   handgun a month law; is that right?

16     A      Correct.

17     Q      Any others?

18     A      No.

19     Q      Okay.  And you state here that, quote, in

20   addition to tracing legal guns used in crimes, the

21   District has a strong interest in preventing the

22   trafficking of illegal firearms into the District.

82

1          And by trafficking you don't mean the lawful

2   transfer to an individual in the District of a gun

3   that will be properly registered, do you?

4       A    No.

5       Q    Okay.  I mean, trafficking means bringing in

6   guns illegally that will not be registered?

7       A    Correct.

8       Q    Now, the usual rationale, at least from what

9   I heard, whether it's justified or not, is that laws

10  prohibiting the purchase or receipt of more than one

11  handgun per month are designed to prevent the

12  purchasers from buying large numbers of guns and

13  selling them illegally out of state; is that right?

14      A    Correct.

15      Q    I'm going to engage in a little

16  understatement here.  D.C. has not generally been

17  accused of being a high-volume exporter into other

18  states of guns legally purchased in the District, has

19  it?

20      A    No.

21      Q    And we touched on this before, but

22  Mr. Charles Sykes is the only FFL currently operating

83

1  in the District; is that right?

2      A     That is correct.

3      Q     And he's right there in the District

4  building, true?

5      A     Correct.

6      Q     Just to be clear, this part of the law -- the

7  limit is not on the number of handguns that an

8  individual can purchase in a 30-day period, but on the

9  number that can be registered in a 30-day period; is

10  that right?

11      A     That is correct.

12      Q     Now, let's assume for just a moment that D.C.

13  did not have a one gun a month limit on registration

14  of handguns.  That didn't exist.  Let's review this

15  scenario.  Under those circumstances -- but

16  registration still existed.

17          Is it a plausible scenario, in your view, for

18  a gun trafficker to buy multiple handguns in the

19  District, register them with MPD, and then illegally

20  sell those guns?

21      A     They would be purchased outside of the

22  District.

84

1      Q     Pardon me?

2      A     They be would purchased outside of the

3   District, not inside the District.

4      Q     I'm talking about what if you didn't have a

5   one a month limitation.  A person legally acquired

6   guns, legally registered them.  Would they be

7   intelligent to then turn around and sell those guns

8   illegally?

9      A     You're asking me to speculate on the mindset

10   of a person who registered multiple guns?  I'm not

11   sure what your question is.

12      Q     Well, what I'm saying is --

13      A     You can't purchase the firearms in the

14   District.  You can register them in the District, if I

15   understand your scenario correctly.

16      Q     Let's say that there was no gun a month law.

17   All the rest of the laws stayed in place.  Is this a

18   likely scenario, in your opinion, that someone would

19   purchase multiple guns through Mr. Sykes, register

20   them all with you, and then turn around and sell those

21   guns illegally?

22      A     No, that is not a likely scenario.

Capital Reporting Company
Lanier, Cathy  06-12-2013

85

1      Q     So the District doesn't really need a one

2    handgun a month limit to avoid being an exporter of

3    guns to other states; is that right?

4      A     I'm not sure I understand your question

5    again.

6      Q     Well, you would to be crazy to register a

7    bunch of guns and then sell them illegally, either

8    within the District of outside of the District,

9    wouldn't you?

10     A     That would be not be typical.

11     Q     It would not be typical, okay.  Now, let's

12   consider guns that are being brought illegally to the

13   District.  Lots and lots of guns are brought into the

14   District illegally and not registered, right?

15     A     Correct.

16     Q     And when I say illegally here, I don't just

17   mean because they are not registered, though I do

18   include that.  It's also true, isn't it, that guns

19   brought into the District outside of legal channels

20   are illegally brought in because they are not

21   transferred through the FFLs?

22     A     Correct.

86

1    Q    We're talking about handguns here.  I mean,

2    it's a federal criminal offense in most instances to

3    transfer or receive a handgun across state lines

4    without going through an FFL, correct?

5    A    That is correct.

6    Q    So if a person is willing to violate federal

7    law by transferring the handgun illegally across state

8    lines, are they likely to turn around and try to

9    register that gun in the District?

10    A    That is not a likely scenario either.

11    Q    Right.  And if he doesn't try to register it,

12    then the one handgun per month registration law

13    doesn't really limit him, does it?

14    A    To that particular scenario, no, it doesn't.

15    Q    Okay.  On page 6 of your report you state

16    that, quote, studies have shown that laws restricting

17    the registration or purchase of multiple firearms in a

18    given period are effective in disturbing illegal

19    interstate trafficking of firearms.

20         And in support of that statement, you cite

21    one study by Weil, R. Knox entitled, "The effects of

22    limiting handgun purchases on interstate transfer of

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**DICK ANTHONY HELLER,** *et al.*,

     **Plaintiffs,**

       **v.**

**DISTRICT OF COLUMBIA,** *et al.*,

     **Defendants.**

**Civil Action No. 08-1289 (JEB)**

---

## <u>ORDER</u>

For the reasons set forth in the accompanying Memorandum Opinion, the Court

ORDERS that:

    1.  Defendants' Motion for Summary Judgment is GRANTED;

    2.  Plaintiffs' Cross-Motion for Summary Judgment is DENIED;

    3.  Plaintiffs' challenges to the District of Columbia's firearm laws are DISMISSED

        WITH PREJUDICE, except for their challenge to the vision requirement for gun

        registration, which, having been decided on jurisdictional grounds, is DISMISSED

        WITHOUT PREJUDICE; and

    4.  Judgment is ENTERED in favor of Defendants.

IT IS SO ORDERED.

                           <u>/s/ *James E. Boasberg*</u>
                           JAMES E. BOASBERG
                           United States District Judge

Date:  <u>May 15, 2014</u>

JA 941

*Heller v. District of Columbia,* 2014 WL 1978073 (D.D.C. 2014)

United States District Court, District of Columbia.

Dick Anthony Heller, et al., Plaintiffs,

v.

District of Columbia, et al., Defendants.

Civil Action No. 08–1289 (JEB)

Signed May 15, 2014

MEMORANDUM OPINION

JAMES E. BOASBERG, United States District Judge

*1 The District of Columbia knows gun violence. Notorious for a time as the "murder capital" of the United States, it recorded over 400 homicides annually in the early 1990s—more than one for every 1500 residents. While safety in the District has improved markedly in this millennium, residents will not soon forget the violence of the more recent past: the wounding of seven children outside the National Zoo on Easter Monday in 2000, the triple murder at Colonel Brooks' Tavern in 2003, the five killed in the South Capitol Street shootings in 2010, and the twelve shot to death inside the Washington Navy Yard only a few months ago. These number just a few of the lives lost to guns in our city's recent memory.

In an effort to stem this violence and promote public safety, the District of Columbia has, over the last several decades, passed some of the most restrictive gun laws in the nation. In fact, it was the District's handgun ban that the Supreme Court struck down in District of Columbia v. Heller (Heller I), 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), where the Court concluded that the Second Amendment protected handgun possession for self-defense in the home. Seeking to accommodate that constitutional right while also protecting the community from gun violence,

JA 942

the District responded by enacting a law that banned assault weapons and large-capacity magazines but merely imposed registration requirements for handguns and long guns. Plaintiffs believe that such a law still infringes their Second Amendment rights and have brought this action to challenge it.

A prior district court initially upheld the constitutionality of the law, but on appeal, the D.C. Circuit offered a mixed response. Although it affirmed the bans on assault weapons and large-capacity magazines, as well as the handgun-registration requirement, it remanded the case to this Court to permit the parties to develop a more thorough factual record in relation to the lion's share of the regulations. Having done so, both sides now cross-move for summary judgment, asking the Court to consider their constitutional arguments in light of the new evidence adduced.

The Second Amendment requires the District to justify its firearm-registration requirements by presenting substantial evidence that they will achieve important governmental interests and that they are narrowly tailored to such ends. The Court ultimately concludes that the government has met that burden and that the regulations pass constitutional scrutiny.

The people of this city, acting through their elected representatives, have sought to combat gun violence and promote public safety. The Court finds that they have done so in a constitutionally permissible manner.

I. Background

In 2008, the Supreme Court struck down the District of Columbia's handgun law as violating the Second Amendment right to keep and bear arms. That landmark decision, Heller I, announced that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." Id. at 635, 128 S.Ct. 2783. The Court thus voided the District's total ban on handgun possession as well as its requirement that D.C. residents store their lawfully owned firearms disassembled or bound by a trigger lock. See id. at 574–75, 128 S.Ct. 2783. Because a handgun is "the quintessential self-defense weapon" and because storing firearms disassembled or locked "makes it impossible for citizens to use them for the core lawful purpose of self-defense," the Court found that these two regulations contravened the Second Amendment. Id. at 629–30, 635, 128 S.Ct. 2783.

*2 A few months after Heller I, the D.C. Council enacted the Firearms Registration Amendment Act of 2008, which amended what remained of the District's gun laws in order to create a new and constitutionally compliant scheme for regulating firearms. See D.C. Law 17–372; 56 D.C.Reg. 3438 (May 1, 2009). The Council adjusted this scheme again in 2012. See D.C. Law 19–170; 59 D.C.Reg. 5691 (May 15, 2012). When the Council considered both the 2008 FRA and the 2012 amendments, it held several days of public hearings during which it received oral and written testimony supporting and opposing the legislation. See Def. Mot., Exh. A (Appendix) at 33–49 (Council of the District of Columbia Committee on Public Safety and the Judiciary, Report on Bill 17–1843, "Firearms Registration Amendment Act of 2008") ("2008 Report"); id. at 120–48 (Council of the District of Columbia Committee on the Judiciary, Report on Bill 19–614, "Firearms Amendment Act of 2012") ("2012 Report").

The FRA establishes a city-wide gun registry, which requires that all gun owners in the District individually register each of their firearms with the city government. See D.C.Code § 7–2502.01. It then ties a host of obligations, limitations, and prohibitions to that basic registration mandate. See § 7–2502.02–.11.

More specifically, the regulatory regime adopted by the Council works as follows: To possess a firearm within the District, the owner must register that weapon with the city. See § 7–2502.01(a). This basic registration requirement applies equally to handguns and to long guns. See § 7–2501.01(9) (defining "firearm" without distinguishing between handguns and long guns). The firearm-registration system is run by the District's Metropolitan Police Department, which processes registrants' applications and maintains a database of firearm registrations. See Def. Mot., Exh. B (Declaration of Lieutenant Jon Shelton), ¶¶ 3, 9, 13. The District bars the registration—and thus the possession—of certain kinds of firearms, including sawed-off shotguns, machine guns, and assault weapons. See § 7–2502.02(a). The District also bars blind people from registering—and thus possessing—any firearm at all. See § 7–2502.03(a)(11). Finally, the District does not allow gun owners to register more than one pistol per month, although a new D.C. resident may grandfather in multiple pistols that he owned prior to moving here. See § 7–2502.03(e). Given that this provision refers only to "pistols," the limitation presumably does not apply to other types of firearms, such as rifles or shotguns.

To register a firearm, the owner must appear in person at MPD headquarters with the weapon he seeks to register. See § 7–2502.04(c). He must be photographed and fingerprinted, see § 7–2502.04(a) & (b), complete a background check, see § 7–2502.03(a), and provide, among other things, his current place of employment and his residences going back five years. See § 7–2502.03(b). The background check queries a number of sources, including the Federal Bureau of

Investigation, the Washington Area Law Enforcement System, the National Criminal Information Center, and the D.C. Superior Court. See Shelton Decl., ¶¶ 11–12. According to MPD policy, "personally identifiable information provided by applicants on firearms-registration forms is exempt from disclosure to the public ... as a clearly unwarranted invasion of personal privacy." Id., ¶13. The prospective registrant must also take and pass a test demonstrating knowledge of the District's firearms regulations as well as complete a firearms-training and safety course provided free of charge by the District. See D.C.Code § 7–2502.03(a)(10) & (13)(A). After the registrant has passed the test and completed the course, he need not do so again in order to register additional weapons. See id. Lastly, the registrant must pay a fee to reimburse the District for its registration expenses. See § 7–2502.05(b).

*3 The owner of a registered firearm must keep the registration certificate with him whenever he is in possession of the weapon and he must produce it upon the demand of a law enforcement officer. See § 7–2502.08(c). If the firearm is lost, stolen, or destroyed, he must immediately notify MPD; if he sells or transfers the weapon, he must notify District police within two days; and if he changes his name or address, he must notify the police within 30 days. See § 7–2502.08(a). Registration certificates expire after three years, so gun owners must continually renew the certificates for the firearms in their possession. See § 7–2502.07a. Penalties for violating the District's registration requirements may include fines, revocation of registration certificates, prohibition from possessing firearms, and prison time. See §§ 7–2502.08(e) & 7–2507.06.

Skeptical of the lawfulness of this post- Heller I regulatory regime, Plaintiffs sued the District. They claimed, first, that the D.C. Council lacked the regulatory authority to enact this scheme and, second, that the regulations once again violated the Second Amendment. See Second Am. Compl., ¶¶ 68–80. Judge Ricardo Urbina granted summary judgment for the District on both points. See Heller v. District of Columbia, 698 F.Supp.2d 179, 181 (D.D.C.2010).

On appeal, the D.C. Circuit rejected Plaintiffs' first argument but did not completely decide the second, remanding the case to this Court for further consideration. See Heller v. District of Columbia (Heller II), 670 F.3d 1244, 1264 (D.C.Cir.2011). On the question of the Council's regulatory authority, the court found that the District of Columbia Home Rule Act, D.C.Code § 1–201.01 et seq., empowered the Council to enact the challenged gun laws. See Heller II, 670 F.3d at 1251. On the Second Amendment question, the court upheld the District's basic registration requirement as applied to handguns as well as its ban on assault weapons and large-capacity magazines. See id. at 1253–58, 1260–64. As to the remaining aspects of the regime, however—the basic registration requirement as applied to long guns and the other requirements

as applied to all firearms—the panel majority found the record "inadequate," noting that the District had failed "to present any data or other evidence to substantiate its claim that these requirements can reasonably be expected to promote either of the important governmental interests it has invoked." Id. at 1258–59. The D.C. Circuit therefore vacated the judgment below and remanded the case for this Court, Judge Urbina having since retired, "to develop a more thorough factual record" and so that the District could present "some meaningful evidence" to justify these laws. Id. at 1259–60 (quoting Turner Broadcasting System, Inc. v. F.C.C., 512 U.S. 622, 664–68, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)).

Following the Heller II decision, the parties engaged in discovery. The District provided opinion testimony in support of its gun laws from four expert witnesses: Cathy L. Lanier, Mark D. Jones, Joseph J. Vince, Jr., and Daniel W. Webster. See Def. Mot., Exhs. G, D, H, and I (Declarations of Cathy L. Lanier, Mark D. Jones, Joseph J. Vince, Jr., and Daniel W. Webster). Plaintiffs presented one expert witness opposing the law: Gary Kleck. See Pl. Mot., Exh. 7 (Declaration of Gary Kleck, Ph.D.). As this Opinion cites extensively to the conclusions of these witnesses, their impressive credentials are worth recounting in some detail.

The District's first expert witness, Chief Lanier, has served since 2007 as the Chief of Police of D.C.'s Metropolitan Police Department. See Lanier Decl., ¶ 4. She has worked for MPD since 1990. See id. Lanier received her Bachelor's and Master's Degrees from Johns Hopkins University, and a Master's Degree in National Security Studies from the Naval Postgraduate School in Monterey, California. See id., ¶9. She is also a graduate of the FBI National Academy and the federal Drug Enforcement Administration's Drug Unit Commanders Academy. See id. Prior to her service as Chief, Lanier worked as Commander of MPD's Special Operations Division, as the first Commanding Officer of MPD's Office of Homeland Security and Counter–Terrorism, and as a uniformed patrol officer, including time as Commander of D.C.'s Fourth District. See id., ¶¶ 6–8. As Chief, Lanier has spearheaded a number of efforts to prevent gun violence in the District, including the reinstitution of MPD's Gun Recovery Unit and the creation of a "collaborative information-sharing process among local criminal justice agencies, including police, prosecutors, Superior Court, ... the Court Services and Offender Supervision Agency ... and the D.C. Pretrial Services Agency." Id., ¶5. Lanier testified before the D.C. Council Committees considering the gun laws at issue here in both 2008 and 2012. See id., ¶3.

*4 The District's next witness, Mark Jones, is currently employed as a Senior Law Enforcement Advisor at the University of Illinois's Crime Lab. See Jones Decl., ¶ 3. Before joining the University, Jones spent twenty years as an ATF agent. See id. He received his Bachelor's in Criminal Justice from the University of Illinois and his Master's in Management at Johns

Hopkins. See id. at 15. Jones's most recent assignment was as the Regional Firearms Advisor to several Central American governments, which he helped develop policies to reduce gun violence. See id., ¶¶ 3–4. Based in El Salvador, Jones "led a team of experts who conducted detailed assessments of the regulatory and enforcement environments in six of the seven countries of Central America, ... [and then] formulate[d] a training plan to help the public security agencies in each of those countries to better focus and use their resources to deter illegal small-arms trafficking." Id., ¶4. Before that, Jones served in a variety of capacities at ATF, including seven years in the District. See id., ¶3. Jones has participated in over 100 arrests involving firearms-related crimes and in investigations across the country and around the world. See id. Jones was trained as a firearms instructor by the U.S. Diplomatic Security Service and later received additional firearms training at the Federal Law Enforcement Training Center. See id., ¶7. He has since trained numerous law-enforcement personnel in the safe use, care, and storage of firearms. See id.

Joseph Vince heads the Criminal Justice Program at Mount St. Mary's University, where he teaches courses on criminal justice and law enforcement. See Vince Decl., ¶ 4. He is also the President of Crime Guns Solutions, LLC, a consulting firm that provides training and advice to law enforcement on how to reduce gun-related crime. See id. Vince received his Bachelor's in Criminal Justice from Youngstown State University and his Master's in Criminal Justice from the University of Detroit. See id. at 13. He spent nearly 30 years as an agent with ATF, where he served as Chief of the Bureau's Firearms Enforcement Division and as Chief of its Crime Gun Analysis Branch. See id., ¶4. Given his expertise in investigating gun-related crime, Jones was appointed as the U.S. representative to the United Nations Working Group on Small Arms Proliferation and also served as a member of the U.S. negotiating team that, under the direction of the Office of National Drug Policy, attempted to reach an agreement with Mexico to halt the cross-border trade in drugs and guns. See id., ¶5. Jones is a member of the Firearms Committee of the International Association of Chiefs of Police and the American Bar Association's National Task Force on Stand Your Ground Laws. See id., ¶6. He has testified as an expert on firearms-related crime in numerous cases and provided a statement to D.C.'s Committee on the Judiciary when it considered amendments to the District's gun laws in 2012. See id., ¶¶ 3, 6–7.

The District's last witness, Daniel Webster, is the Director of the Johns Hopkins Center for Gun Policy. See Webster Decl., ¶ 5. He also serves as Deputy Director for Research at the Johns Hopkins Center for the Prevention of Youth Violence. See id. Webster received his Bachelor's Degree from the University of Northern Colorado, his Master's in Public Health from the University of Michigan, and his Doctorate in Health Policy and Management from Johns Hopkins. See id. at 15. At the Johns Hopkins School of Public Health, Webster is a tenured Professor of Health Policy and Management; he also has a joint appointment in the School of

Education's Division of Public Safety Leadership. See id., ¶7. He teaches graduate courses on violence prevention as well as research and evaluation methods, and his research over the past 23 years has focused primarily on gun-related injuries and violence. See id., ¶¶ 6–7. Webster has published nearly 70 articles in peer-reviewed, scientific journals, the majority of which address gun-related violence and its prevention. See id., ¶8. He is the lead editor of the book Reducing Gun Violence in America: Informing Policy with Evidence and Analysis, to which he contributed two chapters as a lead author and three chapters as a co-author. See id. Webster provided a written statement and oral testimony to the D.C. Committee on the Judiciary when it considered amendments to the District's gun laws in 2012. See id., ¶3.

*5 Finally, Plaintiffs' expert witness, Gary Kleck, is a Professor of Criminology and Criminal Justice at Florida State University. See Kleck Decl., ¶ 6. Kleck received his Bachelor's, Master's, and Doctorate in Sociology all at the University of Illinois. See id. at 56. He has worked as a consultant to the National Research Council, the National Academy of Sciences Panel on the Understanding and Prevention of Violence, and Canada's Department of Justice. See id., ¶10. He has also served as a member of the U.S. Sentencing Commission's Drug–Violence Task Force and of the Institute of Medicine and National Research Council Committee on Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-Related Violence. See id. Kleck has authored or co-authored four books on guns and violence, among them Point Blank: Guns and Violence in America, Targeting Guns, The Great American Gun Debate, and Armed. See id., ¶7. He has also published scholarly research in numerous professional journals, addressing subjects such as the relationship between crime rates and gun ownership, gun-control laws, and gun trafficking. See id., ¶¶ 8–9.

As both sides have now cross-moved for summary judgment, the Court turns to the substance of their arguments.

II. Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C.Cir.2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248, 106 S.Ct. 2505; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); Liberty Lobby, 477 U.S. at 248, 106

S.Ct. 2505; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the nonmovant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor." Liberty Lobby, 477 U.S. at 255, 106 S.Ct. 2505; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C.Cir.2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C.Cir.1998). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C.Cir.2007). The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed.R.Civ.P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor. Laningham v. Navy, 813 F.2d 1236, 1242 (D.C.Cir.1987). If the nonmovant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Liberty Lobby, 477 U.S. at 249–50, 106 S.Ct. 2505.

There is some dispute between the parties as to what Plaintiffs must show to prevail in their challenge to the District's gun registry, which alleges that the regulations in question are unconstitutional both facially and as applied. To prevail on their as-applied challenge, the parties agree, Plaintiffs must show that the law in question is unconstitutional as applied to them in particular. See Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). To prevail on their facial challenge, however, the District says Plaintiffs must show the regulations unconstitutional "in all of [their] applications," Def. Mot. at 19 (citing Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 699–700, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995)), while Plaintiffs deride that rule as "inconsistently-applied." Pl. Mot. at 10 (citing Chicago v. Morales, 527 U.S. 41, 44 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999)). The Supreme Court's more recent precedent, however, states clearly that "a plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' i.e., that the law is unconstitutional in all of its applications." Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (quoting United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)). Because, as explained below, the Court finds that the

challenged regulations are constitutional as applied to Plaintiffs, their facial challenge must fail as well.

III. Analysis

*6 To analyze Plaintiffs' Second Amendment challenge to the District's gun laws, the Court begins by defining the appropriate constitutional inquiry. This is no easy task, as the parties dispute exactly what is required of the District in order for it to demonstrate the lawfulness of its firearms regulations. After setting forth the constitutional framework, the Court will then apply this standard to each challenged provision of the D.C. scheme.

A. The Second Amendment Inquiry

1. The Constitutional Framework

In Heller II, the D.C. Circuit followed several of its sister circuits in adopting a two-step approach to resolving Second Amendment cases. See Heller II, 670 F.3d at 1252 (citing Ezell v. City of Chicago, 651 F.3d 684, 701–04 (7th Cir.2011); United States v. Chester, 628 F.3d 673, 680 (4th Cir.2010); United States v. Reese, 627 F.3d 792, 800–01 (10th Cir.2010); and United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir.2010)). It proceeds as follows:

[1] [2] [3] [4] In the first step of the inquiry, the Court asks whether the challenged law "impinges upon a right protected by the Second Amendment." Id. A historically "longstanding" regulation is "presumed not to burden conduct within the scope of the Second Amendment." Id. at 1253 (citing Heller I, 554 U.S. at 626–27 & n. 26, 128 S.Ct. 2783 and McDonald v. City of Chicago, 561 U.S. 742, 130 S.Ct. 3020, 3047, 177 L.Ed.2d 894 (2010)). That presumption is based on the notion that a gun regulation that has "long been accepted by the public ... is not likely to burden a constitutional right" and therefore that a court may assume that "the activities [it] cover[s] ... [are] not protected from regulation by the Second Amendment." Id. "A plaintiff may rebut this presumption," however, "by showing the regulation does have more than a de minimis effect upon his [Second Amendment] right." Id. If the court determines that a challenged law does not burden the right to bear arms—either because it is longstanding and the plaintiff has failed to rebut the presumption of Second Amendment compatibility or because it simply does not burden the right—then there is no constitutional violation. The court may uphold the law without going further.

[5] If, instead, the challenged law does burden the Second Amendment right, then in the second step of the analysis, the Court must determine "whether the provision passes muster under the appropriate level of constitutional scrutiny." Id. at 1252. Because the Supreme Court has not yet stated what level of scrutiny should apply to laws that burden the right to bear arms, see Heller I, 554 U.S. at 628 & n. 27, 128 S.Ct. 2783; Heller II, 670 F.3d at 1256, the Heller II panel considered whether strict or intermediate scrutiny was appropriate for judicial review of the gun-registration laws at issue here. See Heller II, 670 F.3d at 1256–58. Comparing the Second Amendment to the First, the panel reasoned that "the level of scrutiny ... [should] depend[ ] on the nature of the conduct being regulated and the degree to which the challenged law burdens that right." Id. at 1257 (internal quotation marks and citations omitted). Because "registration requirements do not severely limit the possession of firearms" and "none of the District's registration requirements prevent[ ] an individual from possessing a firearm in his home or elsewhere," the D.C. Circuit determined that the more deferential, intermediate level of scrutiny was the better choice. Id. at 1257–58 (internal quotation marks and citation omitted). This Court is bound to follow that lead.

## 2. The Meaning of "Intermediate Scrutiny"

*7 On all of this, the parties are in agreement. Their disagreement centers on what "intermediate scrutiny" actually means.

The basic language used to describe the standard is familiar enough: To satisfy intermediate scrutiny, the District must show that the challenged regulation is "substantially related to an important governmental objective." Id. at 1258 (quoting Clark v. Jeter, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988)). In other words, "the District must establish a tight 'fit' between the registration requirements and an important or substantial governmental interest, a fit 'that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective." Id. (quoting Board of Trustees of State University of New York v. Fox, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)). "The requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and the means chosen are not substantially broader than necessary to achieve that interest." Ward v. Rock Against Racism, 491 U.S. 781, 799, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). "[T]he fit between the challenged regulation and the asserted objective [need only] be reasonable, not perfect." Schrader v. Holder, 704 F.3d 980, 990 (D.C.Cir.2013).

So far, so good. The parties part ways, however, on what exactly the District must do to survive this inquiry—in other words, what it must show to establish that the challenged gun regulations are "substantially related" to its important interests.

According to the District, it need only provide " 'some meaningful evidence' demonstrating that the challenged registration requirements 'can reasonably be expected to promote' an important government interest." Def. Reply at 6 (quoting Heller II, 670 F.3d at 1259) (emphasis added). The District further contends that the "meaningful evidence" it provides "is not required to ... [be] empirical data, but rather may ... [comprise] any evidence that is 'reasonably believed to be relevant.' " Id. at 7 (quoting Renton v. Playtime Theatres, Inc., 475 U.S. 41, 51–52, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986)) (emphasis added).

Plaintiffs claim, by contrast, that the District must establish that the challenged regulations will " actually achieve the governmental interest to a significant degree." Pl. Reply at 6 (emphasis added); see also Pl. Mot. at 48. Plaintiffs, contend, furthermore, that the District must provide "empirical evidence" to substantiate its argument—"[t]he test is evidentiary and objective, and is not dependent on unsupported 'expectations.' " Id. at 7.

This may appear a subtle point. But because it will set the terms of the Court's merits analysis, it is worth considering in detail. There are essentially two issues in contention here. First, whether the District need only show that the D.C. Council "could reasonably believe that the laws" would serve its important interests or if it must establish that the laws "will have th[o]se effects." Def. Reply at 2; Pl. Reply at 6 (emphasis added). And second, whether the District may meet its burden by citing to sources other than empirical data or if it is limited exclusively to statistical evidence. Both parties have excised snippets of language from prior cases that seem to support their side over the other. At the end of the day, however, the District has the better of the argument on both issues.

a. Predictions versus Proof

*8 [6] As to the first point, the Supreme Court has stated explicitly that the government satisfies intermediate scrutiny if its predictions about the effect of a challenged law are rational and based on substantial evidence—it need not establish with certitude that the law will actually achieve its desired end. When applying the intermediate-scrutiny standard, "[t]he question is not whether [the legislature], as an objective matter, was correct [;] ... [r]ather, the question is whether the legislative conclusion was reasonable and supported by substantial evidence in the record."

Turner II, 520 U.S. at 211, 117 S.Ct. 1174; see also Turner I, 512 U.S. at 666, 114 S.Ct. 2445 (to survive intermediate scrutiny, government must show that "in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence"). The Court has emphasized that "[the legislature's] predictive judgments are entitled to substantial deference" because "[s]ound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable. " Turner I, 512 U.S. at 665, 114 S.Ct. 2445 (emphasis added); see also Turner II, 520 U.S. at 212, 117 S.Ct. 1174 ("Congress is allowed to make a rational predication [ sic ] of the consequences of inaction and of the effects of regulation in furthering governmental interests.") (internal quotation mark and citation omitted); 84 Video/Newsstand, Inc. v. Sartini, 455 Fed.Appx. 541, 551 (6th Cir.2011) ("This court has repeatedly held that [under intermediate scrutiny] governments are not required to demonstrate empirically that [their] proposed regulations will or are likely to [have their intended effects;] ... the touchstone is whether the legislature 'reasonably believed [the evidence it relied on] to be reasonable' and whether the evidence 'fairly support[s] the [legislature's] rationale' for the law.") (internal quotation marks and citations omitted)). The Court has stressed, furthermore, that when the evidence regarding a law's probable effect is in conflict, the judiciary should defer to the legislature. See Turner II, 520 U.S. at 199, 207–08, 211, 117 S.Ct. 1174; see also City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 437, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) (government "does not bear the burden of providing evidence that rules out every theory ... that is inconsistent with its own").

Notably, the D.C. Circuit has instructed that courts should be especially deferential to legislative predictions when it comes to gun policy: "In the context of firearm regulation, the legislature is far better equipped than the judiciary to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." Schrader, 704 F.3d at 990 (internal quotation marks and citation omitted).

Given that the Supreme Court urges judicial deference to legislative predictions as well as to legislative judgments regarding conflicting evidence, it is plain that Plaintiffs are mistaken about the burden of proof in this case. The District need not prove that the gun-registration laws will actually further its asserted interests in order to prevail. This is evident notwithstanding the fact that the Court has occasionally used language that, taken in isolation, might seem to support Plaintiffs. See, e.g., Rubin v. Coors Brewing Co., 514 U.S. 476, 487, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995) (intermediate scrutiny "is not satisfied by mere speculation or conjecture; rather, a governmental body ... must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree"); Turner I, 512 U.S. at 664, 114 S.Ct. 2445 (to survive intermediate scrutiny, government must demonstrate "that the regulation will in

fact alleviate [the asserted] harms in a direct and material way"). This interpretation is consistent with Heller II itself, where the D.C. Circuit upheld the District's ban on assault weapons because "the evidence demonstrates [that it] is likely to promote the Government's interest in crime control." Heller II, 670 F.3d at 1263 (emphasis added).

While the legislature is entitled to make predictions about the effect of its chosen policies, especially in the context of firearm regulation, those predictions must still have a sound basis:

That Congress' predictive judgments are entitled to substantial deference does not mean ... that they are insulated from meaningful judicial review altogether. On the contrary, we have stressed ... that the deference afforded to legislative findings does not foreclose our independent judgment of the facts bearing on an issue of constitutional law. This obligation to exercise independent judgment ... is not a license to reweigh the evidence de novo, or to replace Congress' factual predictions with our own. Rather, it is to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence.

Turner I, 512 U.S. at 666, 114 S.Ct. 2445 (internal quotation marks and citations omitted).

*9 [7] The D.C. Council may rely on predictions about the effect of the gun-registration laws, then, but its predictions must be reasonable ones drawn from "substantial evidence." The Supreme Court has emphasized that "substantiality is to be measured in this context by a standard more deferential than we accord to judgments of an administrative agency," Turner II, 520 U.S. at 195, 117 S.Ct. 1174, but it has also made clear that the "substantial evidence" requirement has teeth, rejecting legislative predictions that were not backed by sufficient evidence. See, e.g., Turner I, 512 U.S. at 666–68, 114 S.Ct. 2445. The Heller II court followed suit here, remanding this case for further consideration because the District had "fail [ed] to present any data or other evidence to substantiate its claim that these [gun-registration] requirements can reasonably be expected to promote either of the important governmental interests it has invoked." Heller II, 670 F.3d at 1259. To satisfy intermediate scrutiny, therefore, the District need not meet Plaintiffs' demanding standard by proving definitively that the challenged gun regulations will actually further its important interests. Instead, its predictions about the effect of the gun regulations are entitled to significant deference, and the District need only show that they reflect "reasonable inferences based on substantial evidence." Id. at 1259 (quoting Turner II, 520 U.S. at 195, 117 S.Ct. 1174) (internal quotation marks omitted).

b. Data versus Other Evidence

On the second point in contention—whether the District must rely only on hard data or if it may supplement the record with other forms of evidence—the government once again prevails. The Supreme Court has specifically addressed this matter: "[W]e have permitted litigants to justify ... restrictions [under intermediate scrutiny] by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and simple common sense." Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 555, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001) (emphasis added) (internal quotation marks omitted); see also Alameda Books, 535 U.S. at 439–40, 122 S.Ct. 1728 ("A municipality considering an innovative solution may not have data that could demonstrate the efficacy of its proposal because the solution would, by definition, not have been implemented previously."); National Ass'n of Mfrs. v. Taylor, 582 F.3d 1, 15 (D.C.Cir.2009) ("[Plaintiff] maintains that the congressional findings ... are insufficient to support [the government's asserted interest] and thus to satisfy strict scrutiny. Rather, there must be 'studies, statistics, or empirical evidence....' We disagree."); National Cable & Telecommunications Ass'n v. FCC, 555 F.3d 996, 1000 (D.C.Cir.2009) ("The Supreme Court has found 'various unprovable assumptions' sufficient to support the constitutionality of state and federal laws.") (quoting Paris Adult Theatre I v. Slaton, 413 U.S. 49, 61, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973)).


The proper standard, the Supreme Court has suggested, is that the government may rely on "whatever evidence ... is reasonably believed to be relevant to the problem that [the government is] address[ing]." City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 51–52, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); see also Alameda Books, 535 U.S. at 438–39, 122 S.Ct. 1728. When the D.C. Circuit remanded this case for further factual development, it accordingly did not limit the District exclusively to statistics, but instructed only that "the District needs to present some meaningful evidence, not mere assertions, to justify its predictive judgments." Heller II, 670 F.3d at 1259 (emphasis added); see also id. (the District "fails to present any data or other evidence to substantiate its claim") (emphasis added). That is a much broader mandate than what Plaintiffs claim is required here.


Relatedly, Plaintiffs attempt to discredit three of the District's expert witnesses—Lanier, Jones, and Vince—whose opinions rely primarily on their personal experiences working in law enforcement. Plaintiffs urge that "formal training in statistical analysis and research design is necessary to evaluate the effectiveness of gun control measures, as is a thorough knowledge of the methods and findings of prior research on this topic. These witnesses have neither that training nor that knowledge." Pl. Mot. at 21 n.16. Plaintiffs therefore suggest that the Court "give little or no weight to the unsupported personal opinion testimony of these three witnesses." Id.

*10 The Court will not disregard the District's expert testimony on that basis. While a police officer's personal experience may not always carry the same heft as a criminologist's data, this is no reason for the Court to entirely disregard the former in favor of the latter. Indeed, in some cases, the reverse might be true. Just as Justice Holmes once observed that "a page of history is worth a volume of logic," New York Trust Co. v. Eisner, 256 U.S. 345, 349, 41 S.Ct. 506, 65 L.Ed. 963 (1921), so too, sometimes, a page of professional experience is worth a volume of statistics. That is hardly to say that an anecdote or two from "life on the beat" would suffice, yet in this case, the experience of the District's witnesses far exceeds that measure. The D.C. Circuit, moreover, routinely permits law-enforcement officers to testify as expert witnesses based on their professional experiences, without the kind of formal statistical training that Plaintiffs insist is indispensable to any legitimate policy judgment. See, e.g., Burkhart v. Washington Metropolitan Area Transit Authority, 112 F.3d 1207, 1211–12 (D.C.Cir.1997); United States v. Spriggs, 996 F.2d 320, 325 (D.C.Cir.1993). This is because Federal Rule of Evidence 702 allows a witness to qualify as an expert "by knowledge, skill, experience, training, or education," Fed.R.Evid. 702 (emphasis added), and "experience" includes " employment in the field as well as experience in performing tests or studies." Groobert v. President and Directors of Georgetown College, 219 F.Supp.2d 1, 7 (D.D.C.2002) (emphasis added).

[8] Statistical data can, of course, be powerful validation for a particular position, and depending on the context, it may well be a practical necessity in order for the government to show that it had "substantial evidence" to support its policy judgments. As the Supreme Court has observed, "The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 391, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000). There is no per se rule, however, requiring the government to confine its justifications to objective evidence or empirical studies. So long as the District provides "meaningful evidence" that satisfies intermediate scrutiny, it will have met its burden under the law.

In sum, to survive intermediate scrutiny, the District must show that its predictions about the effect of its gun-registration laws reflect "reasonable inferences based on substantial evidence." Turner I, 512 U.S. at 666, 114 S.Ct. 2445. The standard for substantiality is doubly deferential in this case, where the Court is reviewing a legislative judgment on firearms policy. See Turner II, 520 U.S. at 195, 117 S.Ct. 1174 (substantiality requirement more deferential when reviewing legislative judgments); Schrader, 704 F.3d at 990 (courts should be especially deferential when reviewing legislative judgments on gun policy). "Substantial evidence," furthermore, is not limited solely to empirical data, but may also include all "meaningful evidence," Heller II, 670

F.3d at 1244, including "anecdotes ... history, consensus, and simple common sense." Lorillard Tobacco, 533 U.S. at 555, 121 S.Ct. 2404 (internal quotation marks omitted).

B. The District's "Substantial Interests"

Having lined the field for this Second Amendment inquiry, the Court may now referee the merits of the case. As the D.C. Circuit noted in Heller II, the challenged gun-registration requirements here are intended to further two "substantial government interests": "[P]rotect[ing] police officers" and "aid [ing] in crime control." Heller II, 670 F.3d at 1258. On remand, the District has slightly expanded the second interest to "promoting public safety." See Def. Mot. at 22. "Crime control" and "public safety" are not synonymous terms as they relate to guns, since the latter also incorporates suicides and firearm accidents. Plaintiffs have not disputed that these are indeed important interests, at least in the abstract. See Pl. Mot. at 7. The Court must now assess, however, whether those interests are actually in play in this case, before it moves on to analyze whether each of the challenged provisions is "substantially related" to such interests.

*11 [9] The first interest, the District says, is the protection of police officers. Gun registration allegedly provides law-enforcement officers with a centralized record system that "allows officers to determine in advance whether individuals involved in a call [for police assistance] may have firearms." Heller II, 670 F.3d at 1258; see also 2012 Report at 6; 2008 Report at 3–4; Lanier Decl., ¶ 17; Jones Decl., ¶ 11. Plaintiffs question this justification, however, noting that when D.C. police officers respond to a call, they do not routinely check registration records to determine if a firearm is present, see Pl. Mot., Exh. 3 (Plaintiffs' Excerpted Deposition of Cathy Lanier) at 36, and that, in fact, such record checks are cumbersome and relatively rare. See id., Exh. 1 (Plaintiffs' Excerpted Deposition of Lieutenant Jon Shelton) at 19; id., Exh. 2 (Plaintiffs' First Set of Interrogatories), Resp. No. 6. Still, these checks do occur, see Def. Reply, Exh. N (Defendant's Excerpted Deposition of Lieutenant Jon Shelton) at 3, and so the Court finds that this justification provides some, albeit limited, support for the District's registration policy.

Much more persuasive is the District's second, public-safety, justification for the gun registry. The registration system ostensibly serves this interest by allowing the city government to screen out dangerous or irresponsible people who try to obtain a firearm, to ensure that gun owners are familiar with gun safety and D.C. firearm regulations, and to inhibit the illegal trafficking of firearms. See 2012 Report at 6–8; Lanier Decl., ¶¶ 17–18; Jones Decl., ¶¶ 10–16. In other words, the basic registration requirement allows the District to keep track of who is responsible for which guns, while also acting as a "hook" onto which the District can attach additional public-safety regulations. This interest is particularly compelling in the District of Columbia, a "densely

populated urban area" that "shares the problem of gun violence with other dense, urban jurisdictions." Heller II, 670 F.3d at 1263 (quoting Comm. On Pub. Safety, Report on Bill 17–593 (Nov. 25, 2008) at 4) (internal quotation marks omitted); see also Lanier Decl., ¶¶ 11–16; Vince Decl., ¶ 12. The empirical data bear this out: D.C.'s age-adjusted rate of firearm deaths, intentional and unintentional, is 14.62 per 100,000, significantly higher than the national rate (10.07) and the rate in neighboring jurisdictions (9.26 in Maryland and 10.69 in Virginia). Def. Mot. at 22 (citing Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System ("WISQARS"), available at www.cdc.gov/ncipc/wisqars). Approximately three-quarters of all homicides in the District involve firearms. See 2012 Report at 3. Plaintiffs do not appear to dispute that public safety is a substantial government interest that the registration requirements are at least intended to address, and, indeed, the Court finds that this is a powerful justification for the District's gun-registration regime.

C. Are the Challenged Provisions "Substantially Related" to the District's Interests?

Given that police protection and, especially, the promotion of public safety are significant government interests in this case, the Court now turns to the question of whether the various provisions of the District's gun registry challenged here are "substantially related" to those interests. As explained earlier, to prevail on these points, the District must show that its predictive judgments about the effect of each provision at issue reflect "reasonable inferences based on substantial evidence," Turner I, 512 U.S. at 666, 114 S.Ct. 2445, and that the provisions are narrowly tailored to its important interests in this case.

In Heller II, the D.C. Circuit upheld two aspects of the District's gun-registration scheme: the basic registration requirement as applied to handguns and the prohibition on assault weapons and high-capacity magazines. See Heller II, 670 F.3d at 1264. The basic registration requirement as applied to handguns was "longstanding," according to the court, and thus presumptively lawful. Id. at 1254. There was no basis in the record to rebut that presumption, and so the Court upheld the requirement without further analysis. See id. at 1254–55. The ban on assault weapons and high-capacity magazines, by contrast, was not longstanding and did impose a burden on the Second Amendment right. See id. at 1260–64. The Heller II court nonetheless upheld that law as satisfying intermediate scrutiny. See id.

*12 That leaves the remaining provisions of the District's gun-registration regime: the basic registration requirement as applied to long guns and the accompanying registration requirements as applied to all guns. The Heller II court found that these rules were "novel, not historic," and so

remanded the case for further factual development and consideration under the remaining steps in the Second Amendment inquiry. Id. at 1255–1260. It is to that analysis that this Court now turns.

1. Basic Registration for Long Guns

The Court begins by examining the constitutionality of the District's basic registration requirement as applied to long guns. It first must determine whether long-gun registration imposes a burden on the right to keep and bear arms. If it does not, then the Court may uphold the requirement without going further, since it will fall outside the domain of the Second Amendment's protection. If the registration requirement does burden the Second Amendment right, then the Court must subject it to intermediate scrutiny in order to determine whether it passes constitutional muster.

a. Burden of Long–Gun Registration

While this perhaps represents Plaintiffs' most significant remaining challenge to the D.C. scheme, it is, ironically, practically foreclosed by Heller II, where the D.C. Circuit suggested strongly that long-gun registration does not burden the right to bear arms. There, in upholding the basic handgun-registration requirement as longstanding and thus presumptively lawful, the panel majority also observed that the law hardly imposed much of a burden on gun ownership: "[B]asic registration requirements are self-evidently de minimis, for they are similar to other common registration or licensing schemes, such as those for voting or for driving a car, that cannot reasonably be considered onerous." Id. at 1254–55. The court then added:

The requirement of basic registration as applied to long guns may also be de minimis. For now, however, we assume this requirement, too, impinges upon the Second Amendment right because ... the record is devoid of information concerning the application of registration requirements to long guns. On remand and with the benefit of additional evidence, the district court will be better able to address this question in the first instance.

Id. at 1255 n. * *.

On remand, Plaintiffs have offered no evidence to suggest that the basic registration requirement—the mere fact of having to register one's gun, in isolation from the means

prescribed by the District for doing so—is any more burdensome as applied to long guns than it is as applied to handguns. Indeed, if the basic registration requirement is "self-evidently de minimis" as applied to handguns, then the Court is at a loss to imagine how that same requirement could become anything more than de minimis as applied to long guns. Id. at 1254–55. The requirement appears to be identical for each kind of weapon, and in either case, it is "similar to other common registration or licensing schemes, such as those for voting or for driving a car, that cannot reasonably be considered onerous." Id. The language of the Heller II opinion, then, should compel this Court to find that the basic registration requirement as applied to long guns is de minimis, and to uphold it as constitutional on that basis alone.

Because the relevant language from Heller II is technically dicta, however, and because the District's justifications for the basic registration requirement are central to the legality of the rest of the firearm-registration regime, the Court will follow the Court of Appeals's lead by assuming that the requirement as applied to long guns burdens the Second Amendment right and then subjecting it to intermediate scrutiny. The Court has already established that the District has important interests in protecting police and promoting public safety, see Part III.B, supra, so it next must determine whether long-gun registration is "substantially related" to those interests.

b. Evidence Regarding Long–Gun Registration

*13 [10] The evidence suggesting that a basic registration requirement for long guns will promote public safety and protect police consists of expert testimony from Chief of Police Lanier, see Lanier Decl., ¶¶ 16–18, 21–22, 26–30, former ATF agent Jones, see Jones Decl., ¶¶ 10–16, former ATF agent and Professor Vince, see Vince Decl., ¶¶ 10–11, 26, and Professor Webster. See Webster Decl., ¶¶ 12–13, 19–26, 35; see also 2008 Report at 3–4; 2012 Report at 5–8.

(i) Gun Registration Generally

Lanier, Jones, and Vince recount that, in their professional opinions, firearm registration protects police and reduces gun-related crime. Lanier notes that mandatory gun registration helps keep guns away from felons and mentally ill individuals, who may pose a threat to the general public. See Lanier Decl., ¶ 18; see also Vince Decl., ¶ 10 (emphasizing "the many benefits of strong firearm-registration requirements, perhaps the main one being to keep weapons out of the hands of criminals or others who pose a safety risk to themselves or the public"). She further observes that registration allows law enforcement to monitor whether a gun owner subsequently became ineligible to possess a firearm—for instance, if he was later convicted of a felony or a domestic-

violence offense, or if he was committed by a court for mental-health treatment—and to ensure that the registrant surrenders the gun in accordance with the law. See Lanier Decl., ¶ 21. Registration, according to Lanier, also makes it easier for law enforcement to combat gun trafficking by tracking lost or stolen weapons. See id., ¶ 28.

Jones follows suit, endorsing the system based on his own personal experience:

Based on my experience, firearm registration provides necessary information for public safety agencies and first responders such as presence of documented firearms and ammunition in homes and businesses to which they answer calls for service, and the identity of citizens who legally possess firearms and ammunition at those homes and businesses. In my opinion, registration requirements also provide a framework within which public safety agencies may formulate firearms safety, training, and education programs focused on the needs of their constituent legal firearms owners. In my observation, a well-regulated firearms registration process also increases the likelihood that law enforcement may successfully trace guns they recover.

Jones Decl., ¶ 11. Vince does the same: "Registration has proven to be effective in keeping weapons away from criminals. For instance, since 1934, the National Firearms Act has required the registration of weapons like machine guns and sawed-off shotguns, and I learned at the ATF that NFA-registered weapons are very rarely used in crime." Vince Decl., ¶ 11. He adds that "[r]egistration also makes it easier to trace guns used in crime to their last known legal owner, and to investigate possible illegal transactions, providing law-enforcement officers with critical information to track firearms when investigating gun crimes and gun smuggling." Id.

Webster provides empirical evidence to back up these perspectives. He recounts a study he led finding that Missouri's repeal of a similar gun-registration scheme quickly led to a dramatic increase in illegal gun trafficking in that state. See Webster Decl., ¶¶ 14–18. Not only did trafficking increase, but also homicide—just one year after Missouri repealed its law, its firearm-homicide rate increased by approximately 30%. Id., ¶¶ 19–20. "This increase was out of synch with changes during that period in age-adjusted homicide rates nationally and in other states in the Midwest." Id. Webster also describes a study that compared the proportion of guns used in crimes "that were originally sold by a licensed retail gun seller inside the state versus outside the state" and found that the ratio "was significantly lower in the cities located in states with ... licensing and handgun registration (33.7%) ... than in states that had neither of those laws (84.2%)." Id., ¶23. States with firearm registration, in other words, saw comparatively fewer of

their locally sold weapons used in crime. Webster further notes that the states with "permit-to-purchase licensing requiring prospective purchasers to apply directly with a law enforcement agency"—"the same firearm sales regulations used by the District of Columbia"—"have some of the lowest age-adjusted firearm morality rates ... in the nation." Id., ¶¶ 22, 23. "[T]he three states that exported the fewest crime guns per capita," moreover, "had handgun registries and permit-to-purchase licensing." Id., ¶25. Relatedly, Webster recounts a study he led that "examined the association between state gun sales regulations and the diversion of guns to criminals" and found that "[d]iscretionary [permit-to-purchase] licensing was independently associated with lower levels of diversion of guns sold by in-state dealers." Id., ¶24.


(ii) Long–Gun Registration Specifically

*14 There is also evidence to suggest that the basic registration requirement should be applied to long guns just as it is applied to handguns. Approximately 20% of the illegal firearms recovered by the District in 2010 were long guns, see 2012 Report at 19, and Plaintiffs' own expert, Professor Kleck, concedes that long guns are "more lethal" than handguns and should be regulated in the same way. Def. Mot., Exh. M (Defendant's Excerpted Deposition of Gary Kleck, Ph.D.) at 3. Between 2006 and 2010, 4,000 homicides were committed with long guns nationwide. 2012 Report at 19. Both Lanier and Jones affirm that "[a]ll firearms, be they rifles, shotguns[,] or handguns, pose a similar threat to public safety in the wrong hands and ... should be regulated similarly." Jones Decl., ¶ 13; see also Lanier Decl., ¶¶ 31–35; 2012 Report at 20 ("The justifications that exist for registration of firearms in general ... apply equally with regard to long arms."). The D.C. Council also observed that long guns are a significant concern in the nation's capital because their long-range accuracy "poses a special threat to government officials, diplomats, and motorcades." 2012 Report at 20; see also Lanier Decl., ¶ 32; Jones Decl., ¶ 15; 2008 Report at 3. Finally, as the District notes, leaving long guns outside the registration scheme would create a gap in the city's oversight system that might encourage criminals to use those weapons instead of handguns in order to cover their tracks from law enforcement. According to this evidence, then, the differences between long guns and handguns do not justify varied treatment with respect to the basic registration requirement.


Considered in total, this combination of professional opinion and empirical data suggesting that mandatory gun registration, including long guns, reduces gun crime and allows first responders to determine in advance the presence of registered firearms easily surpasses the "substantial evidence" threshold. The D.C. Council could reasonably infer from this evidence that the basic registration requirement would serve its interests in promoting public safety and protecting police and that the requirement should apply to long guns as well as handguns. Given the powerful evidence in favor of gun registration and the overwhelming consensus among the

experts—even Plaintiffs' own—that long guns pose an equal danger to handguns and should be regulated in the same manner, basic registration of long guns is narrowly tailored to achieve the District's interests in this case. The provision therefore survives intermediate scrutiny.


c. Plaintiffs' Counterarguments

Plaintiffs put forward a number of reasons to reject the basic registration requirement—comprising both general attacks on all firearm registration and more focused critiques of the requirement as applied to long guns in particular. In the final analysis, however, none of their arguments is persuasive.


First, Plaintiffs suggest that firearm registration is not "narrowly tailored" to the government's interests in promoting public safety and protecting police because "criminals ... circumvent the process[ ] by purchasing guns on the street and bypassing registration altogether. Only the law-abiding register their guns." Pl. Mot. at 29; see also Pl. Reply at 8. According to Plaintiffs, it seems, municipalities should be limited to enacting only those firearms regulations that lawbreakers will obey—a curious argument that would render practically any gun laws unconstitutional. This argument, moreover, misses several of the benefits to which the registry is tailored, such as helping the District to ensure that law-abiding gun owners are not subsequently rendered ineligible to possess their weapons, see Lanier Decl., ¶ 18; Vince Decl., ¶ 10, and allowing law enforcement to track recovered weapons and identify unregistered ones likely intended for trafficking or other crimes. See Lanier Decl., ¶ 28; Jones Decl., ¶ 11; Vince Decl., ¶ 11. Nor do Plaintiffs suggest a narrower approach to achieving the District's interests here.


Plaintiffs, in any event, overstate what narrow tailoring demands in these circumstances. "Narrow tailoring" in the context of intermediate scrutiny requires only that "the fit between the challenged regulation and the asserted objective [be] reasonable, not perfect." Schrader, 704 F.3d at 990. Although a few criminals may slip through the cracks of the registry, the significant evidence linking gun registration to crime reduction demonstrates that the "fit" is certainly reasonable in this case. As the Supreme Court has explained, "[T]he requirement of narrow tailoring is satisfied so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." Turner I, 512 U.S. at 662, 114 S.Ct. 2445 (internal quotation marks and citation omitted) (emphasis added). Not all gun owners will register their weapons and the registry will not stop all gun violence, but there is more than enough evidence to support the District's conclusion that its goals of promoting public safety and protecting police would be "achieved less effectively" absent the basic registration requirement. Id. That is all the law requires.

*15 Next, Plaintiffs question the methodology of Webster's empirical studies on gun registration. They contend, first, that "preventing 'diversion' [of guns] to criminals"—one subject on Webster's studies—"is not the same as causing an actual reduction in violent crime." Pl. Mot. at 28–29. That may well be true, but the relation of one to the other is not unreasonable, and the District may pursue its substantial interests in police protection and public safety not only by directly seeking to reduce violent crime, but also by striving to prevent the illegal gun trafficking that exacerbates it. Cf. 2012 Report at 8 ("The government's interest in preventing the trafficking of guns—i.e., the acquisition of guns by criminals—cannot be overstated.").

Plaintiffs also highlight several technical flaws in Webster's work, as described by Professor Kleck:

Webster's analysis of Missouri's permit-to-purchase licensing law is based on a fundamental misunderstanding of ATF trace data. He claims that the time from when a gun was first sold at retail to when it is recovered by police ("time-to-crime," or TTC) is "indicative of possible trafficking." ... It is not. First, trace data cannot tell us whether a gun has been trafficked or otherwise "diverted." As a National Research Council panel concluded, "trace data cannot show whether a firearm has been illegally diverted from legitimate firearms commerce." ... Second, and more specifically, the trace-based "short TTC" measure has been empirically shown to not be correlated with another, more widely accepted indicator of gun trafficking, the prevalence of obliterated serial numbers.... In fact, the share of traced guns with a short TTC is actually far more strongly correlated with gun theft rates .... D.C.'s registration laws do nothing to affect rates of gun theft.... Webster's analysis is therefore distorted by an outdated, discredited interpretation of the meaning of short TTC.

Kleck Decl., ¶¶ 27–28. Plaintiffs further note that Kleck questions Webster's conclusions linking Missouri's repeal of its permit-to-purchase law with an increase in homicides, claiming that his study was skewed by a brief increase in homicides in the state in 2008, that it failed to consider the fact that neighboring Iowa's homicide rate also increased over the same time period even though that state did not change its gun laws, and that his choice of control variables and control areas was arbitrary. See id., ¶¶ 31–35.

Kleck's testimony scores some blows against Webster's research. Yet his critique does not entirely vitiate Webster's endorsement of the D.C. gun-registration scheme. The testimony cited

by Plaintiffs, if accurate, undermines only the part of Webster's research related to measuring gun trafficking and homicide rates; it does not affect the studies he cites examining the relationship between gun registration and the use of guns in crime. See Webster Decl., ¶¶ 22–25. Even without the criticized aspects of Webster's research, the expert testimony of Lanier, Jones, and Vince, and Webster's studies involving the effect of gun registration on the use of guns in crime exceed the "substantial evidence" threshold necessary to justify the District's policy.

The District, moreover, has provided additional research defending Webster's analyses and critiquing Kleck's, which data restore some credibility to Webster's findings regarding the relationship between firearm registration, gun trafficking, and homicide. See Def. Mot., Exh. A (Appendix) at 279–93 (Anthony A. Braga, et al., Interpreting the Empirical Evidence on Illegal Gun Market Dynamics, 89 J. Urban Health: Bull. of the New York Acad. of Med. 779 (2012)); Fact Sheet—National Tracing Center, ATF (Feb.2013), available at http://goo.gl/LvZyi3 (last visited May 15, 2014). In the face of these "conflicting views" of Webster's work, the Court need not "put [its] imprimatur" on his research, but merely must decide whether the District has provided "substantial evidence for [the D.C. Council] making the judgment that it did." Turner II, 520 U.S. at 208, 117 S.Ct. 1174; see also Gonzales v. Carhart, 550 U.S. 124, 163, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007) (courts should give legislatures "wide discretion to pass legislation in areas where there is ... scientific uncertainty") (collecting cases). In the D.C. Circuit, furthermore, deference of this sort is considered especially appropriate when it comes to the regulation of firearms. See Schrader, 704 F.3d at 990. Despite Kleck's critiques, then, the Court finds that Webster's analyses, the accompanying defense of his methods, and the other expert testimony submitted by the District clears the substantial-evidence threshold.

*16 Plaintiffs next train their fire on the necessity of the basic registration requirement as applied to long guns. They note that homicides in the District are rarely committed with long guns—just three out of a total of 383 area murders between 2009 and 2011. See Pl. Mot., Exh. 8 (Murder Statistics by State, Types of Weapons). They also highlight the fact that between July 2008 and October 2012, a paltry two registered shotguns and zero registered rifles were recovered from crime scenes in the District, see Def. Mot., Exh. J (D.C. Attorney General Letter of Dec. 5, 2012) at 2; Plaintiffs' Excerpted Deposition of Lieutenant Jon Shelton at 22–23, while during an only slightly longer time period, more than 12,000 unregistered firearms were recovered. See Plaintiffs' Excerpted Deposition of Cathy Lanier at 2. Plaintiffs add that most of the studies Webster describes either focused solely on handguns or did not distinguish between handguns and long guns. See Kleck Decl., ¶ 13. Finally, in a particularly macabre exhibit attached to their pleading, Plaintiffs observe that very few assassination attempts in the District were committed with long guns; rather, hand guns, bombs, and biological agents seem to be the assassin's weapons of choice. See Pl. Mot., Exh. 11 (Table of U.S. Political Assassinations and Attempts).

Although Plaintiffs have raised some important points, these are not enough to undermine the constitutionality of long-gun registration. The District notes, first of all, that there are reasons to be skeptical of Plaintiffs' numbers, see Plaintiffs' Excerpted Deposition of Cathy Lanier at 49–50 (questioning accuracy of Plaintiffs' homicide statistics), but that even if there were not, the D.C. Council is "entitled to rely on the experiences of ... other cities" in setting its own policy, Renton, 475 U.S. at 51, 106 S.Ct. 925, and to take pre-emptive action to prevent potential harms before they occur. See Turner II, 520 U.S. at 212, 117 S.Ct. 1174. In other words, the District could appropriately consider the nation's long-gun homicide rate—4,000 between 2006 and 2010, 2012 Report at 19—when setting its own local gun policy. Plaintiffs' homicide statistics, moreover, ignore the fact that long guns may pose a public-safety threat when used to perpetrate other kinds of violent crime, such as armed robbery and assault with a dangerous weapon, see 2012 Report at 3, and that the District was entitled to consider those concerns as well. While the studies cited by Webster do not always distinguish between handguns and long guns, it was not unreasonable for the District to extrapolate from them in determining its long-gun policy, especially given the opinion of multiple experts that long guns and handguns pose similar dangers and should be regulated similarly. See Jones Decl., ¶ 13; Lanier Decl., ¶¶ 31–35; Defendant's Excerpted Deposition of Gary Kleck, Ph.D. at 3. As for the debate over political assassins' preferred weaponry, the Court need not wade into that gruesome calculus—although it does note the recent long-gun shooting at the White House, see Ann E. Marimow, Man Admits Firing 8 Rounds at White House, Wash. Post, Sept. 19, 2013, at B3—because the quotidian danger posed by long guns is sufficient on its own to justify the District's registration policy. The D.C. Council could reasonably conclude from the substantial evidence before it that long guns, as well as handguns, should be registered with the city government.


Finally, Plaintiffs point to contrary evidence suggesting that long-gun registration does not protect police or promote public safety. Canada established a long-gun registry in the mid–1990s but repealed it in 2012 because it found, as the Canadian Minister of Public Safety put it, that "the long-gun registry does ... nothing to prevent crime or protect front-line officers." Pl. Mot., Exh. 12 (House of Commons Standing Committee on Public Safety and National Security, Tuesday, November 15, 2011, Transcript) at 1. Some empirical data backs up the Minister's insight: According to Kleck, "U.S.-based cross-sectional research [on] ... [f]irearms registration laws show [s] no statistically significant violence-reducing effect on any type of violence," and the one "serious empirical assessment of the impact of Canada's requirement that long guns (rifles and shotguns) be registered ... found no evidence that the law had any beneficial effects, either immediate or lagged." Kleck Decl., ¶¶ 94–95.

*17 Faced with this evidence, the District questions whether Canada's experience is relevant to its own, given that our northern neighbor comprises several sparsely populated, rural provinces while D.C. is a dense, entirely urban jurisdiction. It cannot be denied, however, that the Canadian example at the very least offers an important counterpoint to the District's own conclusions on this matter. Kleck, moreover, has offered a U.S.-based argument suggesting that gun registries are not as effective as the District might hope. These counterpoints, nevertheless, are better presented to the D.C. Council than to the federal judiciary. As noted earlier, a court applying intermediate scrutiny may invalidate a law only if the legislature lacked substantial evidence to support its ultimate conclusion on the matter—a circumstance not present here. When there is merely conflicting evidence in the record, the judiciary must defer to the legislature's choice. See Turner II, 520 U.S. at 199, 207–08, 211, 117 S.Ct. 1174; Alameda Books, 535 U.S. at 437–38, 122 S.Ct. 1728; see also Woollard v. Gallagher, 712 F.3d 865, 881 (4th Cir.2013) ("[I]t is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments."). Here, the D.C. Council chose to go with the substantial evidence indicating that long-gun registration would promote public safety and protect police, rather than the data points suggesting otherwise. That is all the law requires.

In sum, the basic registration requirement as applied to long guns satisfies intermediate scrutiny and therefore does not violate the Second Amendment.

2. The Registration–Process Requirements: Appearing In Person, Bringing the Firearm, Photographing, and Fingerprinting

The constitutionality of the basic registration requirement as applied to long guns now established, the Court moves on to examine the associated registration requirements that Plaintiffs have challenged as applied to all firearms. The Court begins with the requirements related to the registration process itself. To register a weapon, the registrant must appear in person and in possession of the firearm to be registered, and he must submit to being photographed and fingerprinted. See D.C.Code § 7–2502.04. Plaintiffs claim that these four requirements are not substantially related to the District's interests in police protection and public safety. Once again, the Court will begin by determining whether these requirements burden the Second Amendment right, will then subject them to intermediate scrutiny, and will wrap up by addressing Plaintiffs' counterarguments.

a. Burden of the Registration Process

The District, highlighting Heller II's observation that the registration schemes for voting or driving a car "cannot reasonably be considered onerous," Heller II, 670 F.3d at 1255, notes that at least some of the provisions at issue here are also present in voter-registration or driver's license schemes and that they thus impose only a de minimis burden on the Second Amendment right. In opposition, Plaintiffs emphasize the time and financial burden of traveling to the MPD office during business hours and fulfilling the various registration requirements. See Pl. Mot. at 25, 42–45; id., Exh. 16 (Declaration of Dick Anthony Heller), ¶¶ 5–10; id., Exh. 17 (Declaration of William Carter), ¶¶ 5–6, 8–10, 12, 14, 17; id., Exh. 19 (Declaration of Absalom Jordan), ¶¶ 4, 6, 8, 10; id., Exh. 20 (Declaration of William Scott), ¶¶ 5–7, 9. Either way, the issue has already been resolved by Heller II, which stated that the requirements in question "affect the Second Amendment right because they are not de minimis." Heller II, 670 F.3d at 1255. The Court, therefore, must apply intermediate scrutiny to determine the constitutionality of these four regulations.


b. Evidence Regarding the Registration Process

[11] The requirements at issue allow the city government to verify the identity of each person who seeks to register a firearm, to run a background check on that person, and to tie that person's identity to the weapon's registration certificate. The District has presented substantial evidence that all this is necessary to ensure that the underlying registration scheme is effective in tracking who is eligible to own a firearm and who owns which weapons. That insight is backed not only by "simple common sense," Lorillard Tobacco, 533 U.S. at 555, 121 S.Ct. 2404 (internal quotation marks omitted), but also by an impressive array of expert testimony.


*18 To begin, all the District's experts are in consensus that requiring people to appear in person with the weapon to be registered and to submit to fingerprinting helps to avoid fraud and ensures the identity of each prospective registrant. Ensuring the integrity and accuracy of the registry, of course, is necessary for gun registration to achieve the District's substantial interests in protecting police and promoting public safety. Lanier affirms that in her "professional opinion, the District's requirement of an initial in-person registration and background check ... is the best means to verify an applicant's eligibility." Lanier Decl., ¶ 19. She explains, "Identity theft is rampant, and gun dealers are not necessarily well trained in identifying false documents. The use of fingerprints provides MPD with a means of biometric identification, which ensures that the applicant is who he says he is." Id., ¶20. Jones echoes this assessment:


Requiring an individual to present him or herself to register a firearm allows District authorities to make a more thorough evaluation of that person, including an on-the-spot evaluation of

behavior that might indicate the applicant is not being truthful.... An additional advantage to in-person registration is the indisputable identification of the aspiring registrant as the actual owner of the firearm in question, thus limiting the ability of one person to impersonate another to defeat the legal registration program. Simply stated, programs that do not require in-person registration and ID verification are potentially less effective at preventing the diversion of firearms from legitimate to illegal purposes.

Jones Decl., ¶¶ 21–22. Vince agrees: "One of the most effective ways to ensure that criminals do not circumvent the firearm-registration process is to require in-person appearance and ID verification as part of registration." Vince Decl., ¶ 19. Vince explains that in-person registration "provides an opportunity to verify the intentions and accuracy of information for [the] person obtaining a permit.... Without such a system, the District might just as well have kiosks dispense registration permits." Id., ¶¶ 20–21.

Webster, too, backs the District's registration process. He recounts a United States Government Accounting Office study that found that gun stores and pawn shops in states that do not requiring fingerprinting for firearms purchases were vulnerable to purchasers who used fake identification cards. See Webster Decl., ¶ 10. He adds that "the casual scrutiny given to firearm sales applications suggest[s] that the system could also be vulnerable to other deceptive practices.... For example, prospective purchasers could more easily put inaccurate information on their application forms ... in order to avoid a denial of the application." Id., ¶11. Although no expert specifically addresses the requirement that registrants bring the gun to be registered with them, it is a permissible, common-sense inference from this testimony that if in-person appearance is necessary to verify the identity of the registrant, then physically bringing the gun is similarly necessary to verify the character of the registered weapon. See Def. Mot. at 25 n.21.

The District's experts are in further agreement that a local background check, conducted using the prospective registrant's name and fingerprints, helps to keep guns out of the hands of unauthorized persons. As mentioned previously, MPD runs a background check on prospective registrants that queries several sources including the FBI database, the Washington Area Law Enforcement System, and the National Criminal Information Center. Shelton Decl., ¶¶ 11–12. This check is more comprehensive than the one already required of gun dealers under federal law. See Def. Reply, Exh. O (Declaration of Sergeant Colin Hall), ¶¶ 5–9; see also 18 U.S.C. § 922(t). Lanier endorses the District's broader approach to background checks, citing a 2008 study that "found that states that use local-level agencies—such as local police or sheriff's departments—to perform background checks for firearms have lower rates of homicide and suicide than states that simply rely on a federal background check." Lanier Decl., ¶ 19 (citing

Steven A. Sumner, et al., Firearm Death Rates and Association with Level of Firearm Purchase Background Check, 35 Am. J. Prev. Med. 1–6 (2008)). She explains the importance of fingerprinting to this process:

*19 [T]he criminal background check performed by MPD, which is based on fingerprints, is more effective than that performed by a gun dealer, which is merely based on a social security number.... The use of fingerprints provides MPD with a means of biometric identification, which ensures that the applicant is who he says he is and that MPD is performing a background check on the correct person.

Id., ¶20. Webster concurs, quoting the conclusion of the GAO study mentioned above: "[T]he instant background check" required by federal law "does not positively identify purchasers of firearms ... [and it] cannot ensure that the prospective purchaser is not a felon." Webster Decl., ¶ 10.

Finally, the requirement that a potential registrant be photographed allows D.C. law enforcement to quickly verify an individual's identity when presented with his firearm-registration certificate. Much like a driver's license, each firearm-registration certificate includes the photograph of the registrant taken at the time of registration. See 24 D.C. Mun. Regs. § 2314.4 (2013). Lanier explains the importance of including a photograph in the registration certificate:

[A] registration certificate with photo identification ... is critical to protecting the safety of police officers and the public.... A certificate with a photo helps to quickly and safely communicate a registrant's legal status to a law enforcement officer. Without this, in many instances it would be far more difficult for officers to readily distinguish between a registered owner legally transporting a firearm, and someone transporting an illegal firearm. This photo identification, in turn, helps to keep both the officer and the registrant safe.

Lanier Decl., ¶ 27; see also 2012 Report at 9. In other words, the photograph allows law enforcement to verify visually that the person in possession of a registration certificate is indeed its rightful holder.

The evidence shows, in sum, that the requirements that potential firearm registrants appear in person and in possession of the weapon to be registered and that they submit to fingerprinting and photographing help to effectuate the District's firearm-registration scheme by preventing fraud, enabling more comprehensive background checks, and allowing police to more easily verify the true owner of a registration certificate. This evidence is sufficiently substantial to justify the D.C. Council's predictions that the regulations in question will further the District's important interests in police protection and public safety.

The Court finds, moreover, that the requirements are narrowly tailored to achieve those interests. The fingerprinting and photographing requirements align directly with the District's need to verify the identity of gun registrants and perform background checks. Although it would be conceivably possible for the District to permit residents to register their guns remotely, the city is not required to use the least restrictive means to further its goals here, see Heller II, 670 F.3d at 1244, and in-person registration is obviously necessary for the District to ensure that the fingerprints and photographs that it processes are accurate. Asking registrants to bring their firearms with them, moreover, is the only surefire way to ensure the character of the weapon to be registered. The registration-process requirements, therefore, are not "substantially broader than necessary" to achieve the District's interests. Ward, 491 U.S. at 799, 109 S.Ct. 2746. They satisfy intermediate scrutiny.

c. Plaintiffs' Counterarguments

*20 Once again, Plaintiffs launch several broadsides against the District's proffered justifications. But once again, they miss the mark.

[12] First, Plaintiffs contend that because MPD has not yet had a problem with individuals using fake identification cards to purchase or register firearms, see Plaintiffs' Excerpted Deposition of Lieutenant Jon Shelton at 4; Pl. Mot., Exh. 13 (Plaintiff's Excerpted Deposition of Daniel Webster) at 6–7, there is no need to combat fraud in the registration process. "A fundamental principle of legislation," however, is that the legislature "is under no obligation to wait until the entire harm occurs but may act to prevent it." Turner II, 520 U.S. at 212, 117 S.Ct. 1174; see also Crawford v. Marion County Election Bd., 553 U.S. 181, 194, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (Indiana permitted to enact voter-ID law to combat voter fraud even though "[t]he record contain[ed] no evidence of any such fraud actually occurring in Indiana at any time in its history"); Barry v. City of New York, 712 F.2d 1554, 1559–61 (2d Cir.1983) (New York City permitted to enact a regulation requiring public officials to disclose personal financial information "despite its 'virtually corruption-free history' "). The fact that MPD has not detected

identity fraud in firearm registration so far does not mean that the District is barred from taking preemptive action to thwart it.

Next, Plaintiffs reassert their argument that the regulations will fail to keep weapons out of the hands of wrongdoers because "criminals already circumvent the process[ ] by purchasing guns on the street and bypassing registration altogether. Only the law-abiding register their guns." Pl. Mot. at 29; see also Kleck Decl., ¶¶ 16–17, 26. This argument fails here for the same reason it did when directed, as discussed earlier in this Opinion, at the basic registration requirement for long guns. The premise itself makes little sense—since it would invalidate any and all gun regulations—and it fails to recognize the other important benefits of the gun registry. Intermediate scrutiny, moreover, requires only that the challenged regulation "promote[ ] a substantial government interest that would be achieved less effectively absent the regulation." Turner I, 512 U.S. at 662, 114 S.Ct. 2445 (emphasis added) (internal quotation marks and citation omitted); see also Schrader, 704 F.3d at 990 (narrowly tailored in intermediate-scrutiny context means that " 'the fit between the challenged regulation and the asserted objective [need only] be reasonable, not perfect.' "). Although the various registration requirements at issue will not prevent all criminals from obtaining firearms, it surely will prevent some from doing so. That is enough.

Third, Plaintiffs claim that the gun-dealer background checks mandated by federal law cover the same ground as the District's background checks and so render them redundant. Plaintiffs attempt to support this argument by noting that federal law prohibits firearm sales in a state if such sales would violate federal or that state's (including D.C.'s) law. See 18 U.S.C. §§ 921(a)(2) & 922(t)(2). But, as brief reflection makes clear, the first premise does not follow from the second. Although federal law prohibits firearm sales that violate D.C. law, that does not mean that the criminal-background checks mandated by federal law are as comprehensive as those required under the District's registration scheme. Indeed, the only expert testimony in the record on this subject suggests the contrary. See Hall Decl., ¶¶ 5–9. Not all gun sales, moreover— e.g., private transfers or gun-show sales—require a federal background check at all. Along the same lines, Plaintiffs challenge the study cited by Lanier for the proposition that local-level background checks reduce suicide and homicide rates. But even if, as Plaintiffs claim, this study is flawed, common sense alone is enough for the District to justify its desire to perform more comprehensive background checks than those required by federal law—obviously, more substantial background investigations should be more effective at screening out ineligible registrants.

*21 Finally, Plaintiffs note that "[e]ven if the District wishes to conduct its own background checks, that does not require the permanent registration of the gun buyer, nor does it require recordation of the firearm." Pl. Mot. at 27. This argument ignores the District's independent reasons for establishing a firearm registry, discussed earlier. See Part III.C.1.b, supra. Incorporating background checks into the registration regime enhances the effectiveness of the city's registry—the registry does not exist to enable background checks.

To recap, the Court finds that the regulations associated with the registration process itself—that registrants appear in person, carrying the weapon to be registered, submit to fingerprinting, and have their photograph taken—are substantially related to the District's interests in police protection and public safety and narrowly tailored to achieving those interests. The requirements therefore satisfy intermediate scrutiny.

### 3. The Firearms–Safety, Training, and Knowledge Requirements

[13] Next up is the requirement that registrants complete a firearms-training and safety class and pass a test demonstrating knowledge of the District's firearms laws in order to register a weapon. See D.C.Code § 7–2502.03(a)(10) & (13). The training and safety class is provided free of charge by MPD, see § 7–2502.03(a)(13)(A), and may be taken online or at MPD itself. See Def. Mot., Exh. C (Defendants' Responses to Plaintiffs' First Request for Production of Documents), Resp. 2. It takes from 30 minutes to one hour to complete. See Jones Decl., ¶ 26; MPD Firearms Safety Training Course, available at https://dcfst.mpdconline.com/ (last visited May 15, 2014). Once a registrant has taken the class and passed the test, he need not do so again in order to register additional weapons. See D.C.Code § 7–2502.03(a)(10) & (13)(A). By now, the analytic routine should be familiar: the Court starts by assessing the burden of the requirements, next applies intermediate scrutiny, and finally addresses Plaintiffs' counterarguments.

### a. Burden of These Requirements

The District contends that these requirements are "minimally burdensome" and so should not be considered to impinge on Plaintiffs' Second Amendment rights. Def. Mot. at 28–29. The Court finds otherwise. First, Heller II plainly held that the required test demonstrating knowledge of the District's firearms laws was not merely a de minimis burden on the Second Amendment right. See Heller II, 670 F.3d at 1255. Second, that court found that a five-hour training and safety class—which was subsequently replaced with the current one-hour class—also qualified as a burden on the right to bear arms. See id. While it is possible, in theory, that the new, shorter training and safety class does not pose the same Second Amendment burden as the lengthier one

addressed in Heller II, it would be a stretch to side with the District on this point. A mandatory hour-long class is at least as much of a burden as fingerprinting or photographing, both of which the D.C. Circuit found to constitute burdens on the Second Amendment right. See id. The Court therefore finds that both the test and the revised class burden Plaintiffs' Second Amendment rights and will accordingly subject both to intermediate scrutiny.

b. Evidence Regarding These Requirements

The District has presented substantial evidence that the test and class requirements will further its interests in protecting police and public safety by reducing the risk of firearm accidents and ensuring accountability for gun owners. Multiple expert witnesses testified to this effect. First, Lanier:

*22 Anyone who possesses and registers a firearm should be aware of the laws and requirements for responsible gun ownership, as well as key safety principles.... Training with respect to safe handling and storage of a firearm is a requirement in most every law enforcement profession that requires the carrying of a firearm. Safe handling is one of the very first components of training, to reduce accidental discharges.... Moreover, in order to make registrants more clearly accountable under the law, it is important to be able to demonstrate that they were taught and aware of the requirements.

Lanier Decl., ¶¶ 23–24. Next, Jones:

In my opinion, requiring potential firearms owners to take a safety course addressing the safe handling, use, and storage of their firearms is a fundamental requirement encouraging responsible gun ownership. Understanding the risks inherent to firearms ownership is common sense and may assist in reducing unintentional discharges and injuries.... I believe that instructing District registrants in the widely accepted methods of safe storage, particularly in homes with children, is vitally important to both limiting access to the firearms only to authorized users and reducing theft, accidents, and other unintended consequences of bringing a firearm into the home.

Jones Decl., ¶¶ 25, 27. Finally, Vince:

Requiring citizens who want to register their firearms to take a course to learn about the safe use, handling, and storage of those firearms is just common sense. Every person who owns a gun should be required to take such a course. Because every firearm has the potential to seriously injure or kill, those who want to use such weapons should be trained in how to do so safely, to reduce the risk of accidental discharges.... Requiring gun owners to know how to safely handle and store their weapons clearly reduces the risk of potentially fatal accidents. I do not know of one firearm expert or law enforcement trainer who has not strongly recommended attending and successfully passing a safety course prior to owning or using a firearm.

Vince Decl., ¶ 23.

In sum, these three expert opinions comprise substantial evidence that the District's mandatory course on firearms safety and test on firearms regulation will help to prevent firearm accidents and ensure accountability under the law. It is also common sense to believe that mandatory training in firearm safety and testing in firearm regulations will encourage compliance and reduce accidents—accidental gun deaths, of course, are not even counted in homicide figures.

The Court finds, moreover, that these requirements are narrowly tailored to the District's interests here. The D.C. Council obviously attempted to lighten the burden of the safety course, reducing it from five hours to only one, and requirements such as these are not unfamiliar. It is standard practice, for example, to require motorists to demonstrate their knowledge of roadway laws and safety in order to obtain a driver's license. Asking gun owners to take a short class and pass a minor test—once—in order to wield deadly weapons fits the District's interests in public safety and police protection. The firearms-safety, training, and knowledge requirements therefore satisfy intermediate scrutiny.

c. Plaintiffs' Counterargument

Plaintiffs' only counterargument is to insist that "[n]o evidence exists that training or the test protects police officers or controls crime.... [T]he District's experts cite no studies showing that mandatory training or testing in gun safety reduce unintentional discharges." Pl. Mot. at 36–37. As already established in this Opinion, however, the District need not prove with empirical evidence that its firearm regulations will have their intended effect, see Part III.2.b, supra—it "may rely on any evidence that is 'reasonably believed to be relevant,' " Alameda Books, 535 U.S. at 438, 122 S.Ct. 1728 (quoting Renton, 475 U.S. at 51–52, 106 S.Ct. 925), including "anecdotes ... history, consensus, and simple common sense." Lorillard Tobacco, 533 U.S. at

555, 121 S.Ct. 2404 (internal quotation marks omitted). The expert testimony here—as well as the commonsense notion that training gun owners in firearms safety and regulation will likely reduce accidents and increase accountability—is enough for the provisions at issue to survive intermediate scrutiny.


### 4. The One–Pistol–Per–Month Limit

*23 [14] The next provision Plaintiffs have challenged limits District residents to registering one pistol every 30 days. See D.C.Code § 7–2502.03(e). The rule includes an exception for new District residents, who may register multiple pistols in a single month "if those pistols were lawfully owned in another jurisdiction for a period of 6 months prior to the date of the application." Id. The Court proceeds as it did before: burden, intermediate scrutiny, Plaintiffs' counterarguments.


#### a. Burden of This Limit

Defendants argue that the one-pistol-per-month limit does not substantially burden the Second Amendment right, but since the Heller II court has already found otherwise, see 670 F.3d at 1255, the Court must accept that finding and subject the restriction to intermediate scrutiny.


#### b. Evidence Regarding This Limit

As it did for the three previously discussed challenges, the District has again put forward substantial evidence linking the one-pistol-per-month limit to a reduction in illegal gun trafficking. The D.C. Council's Committee on the Judiciary relied on a number of empirical studies linking multiple gun purchases to gun trafficking, including:


• A study showing that "handguns involved in bulk purchases were 33 % more likely to be used in crime than handguns purchased individually," 2012 Report at 15 (citing Mona Wright et al., Factors Affecting a Recently Purchased Handgun's Risk for Use in Crime Under Circumstances that Suggest Gun Trafficking, 87 J. Urban Health: Bull. Of The New York Acad. Of Med. 352, 356 (2010));


• A study showing that in Maryland "multiple-gun sales were up to 64% likely to be used in crime," id. (citing Christopher S. Koper, Crime Gun Risk Factors: Buyer, Seller, Firearm, and

Transaction Characteristics Associated with Gun Trafficking and Criminal Gun Use, Report to the National Institute of Justice 6, 83 (2007), available at https://www.ncjrs.gov/pdffiles1/nij/grants/221074.pdf (last visited May 15, 2014));

• A study showing that Virginia's one-pistol-per-month limit "reduced by 66% the odds that a crime gun was purchased in Virginia rather than elsewhere in the Southeast." Id. (citing Douglas Weil & Rebecca Knox, Effects Limiting Handgun Purchases on Interstate Transfer of Firearms, 275 J. Am. Med. Ass'n 1759, 1760 (1996)).

On remand, the District has further supplemented this already-impressive array of evidence with the testimony of several of its expert witnesses, who all support the one-pistol-per-month limit as a way to combat gun trafficking. Jones reflects: "In my experience, laws that limit the quantity of firearms that can be purchased or registered during a given time period make it more difficult for firearms traffickers to acquire and resell guns from that municipality or state." Jones Decl., ¶ 18. If gun registrations are capped, Jones explains, "[i]llegal gun sellers must then travel farther to obtain their goods, limiting their ability to employ local straw purchasers and generally reducing or removing the illegal seller's capacity to profit from his or her gun sales." Id. Jones says that his experience as an ATF agent in the District confirmed these observations. See id., ¶¶ 19–20. Vince, too, backs the limitation on multiple handgun sales: "In my opinion, one of the most effective methods of disrupting illegal interstate trafficking of firearms are state and local laws that limit the quantity of firearms that can be purchased or registered during a given time period." Vince Decl., ¶ 17. He endorses the District's version of the limitation: "I believe that the District's current law, which limits an individual to registering no more than one pistol during a 30–day period, is an effective means of limiting the illegal trafficking of guns into (or out of) the District." Id., ¶18; see also Lanier Decl., ¶ 30 ("In my opinion, the District's prohibition on registering more than one newly acquired handgun per month provides important benefits in terms of deterring and controlling the trafficking of firearms into or out of the District."). The limit, in short, prevents gun trafficking by limiting the flow of new handguns into the community.

*24 The Court notes, furthermore, that Jones's testimony suggests an additional justification for the restriction unrelated to gun trafficking: It is a way to limit misuse of firearms by limiting access to multiple firearms. See Jones Decl., ¶ 17. In backing the limitation on this basis, Jones explains that his experience and his research have convinced him that "the single greatest risk factor for being murdered with a firearm, committing suicide with a firearm, or being injured by unintentional discharge of a firearm, is the easy availability of a firearm." Id. Limiting District residents to one pistol each month, in other words, will reduce the overall number of firearms in

circulation within city bounds and thereby decrease the risk that District residents will be killed or injured, or will kill themselves, with a firearm. That decrease is obviously related to the District's substantial interest in promoting public safety. Although the Second Amendment "protects a personal right to keep and bear arms," including handguns, "for lawful purposes, most notably for self-defense within the home," McDonald, 130 S.Ct. at 3044, the Amendment has not been read to protect the right to amass a personal armory with a single stop at the gun shop. While the District must respect the right of each resident to possess a handgun in his home for self-defense, it is also well within its constitutional powers to constrain the rate at which its residents accumulate deadly weapons. All in all, this combination of empirical research and expert testimony constitutes substantial evidence supporting the D.C. Council's judgment that a one-pistol-per-month registration limit will reduce illegal gun trafficking and promote public safety.

The limit, moreover, is narrowly tailored to those interests. The District has applied the rule only to pistols, rather than to all guns, and it permits new residents who own several pistols to grandfather all of them in at once. The District might have adopted a less restrictive limit on multiple-gun purchases—one pistol per week, for example—but intermediate scrutiny does not require it to use the least restrictive means possible, see Heller II, 670 F.3d at 1258, and even under the current limitation, District residents can still accumulate up to 12 new pistols each year. That is more than enough. The limitation is therefore not substantially broader than necessary to achieve the District's interests in this case and it survives intermediate scrutiny.

c. Plaintiffs' Counterarguments

Plaintiffs stand at the ready with two arguments against the District's evidence on this point—one empirical and the other more abstract. Neither is convincing.

First, Plaintiffs question the reliability of the studies cited by the District, noting that there is no evidence that the District's own one-pistol-per-month limit has had any beneficial effects since it was enacted in 2009 and that several of the studies to which the District cites addressed either individual states without firearm registries or multiple states without regard to whether they had firearm registries or not. Yet this objection does little to discredit the D.C. Council's judgment on the matter. Although the research cited by the District may not be perfect, it is clearly sufficient to support a reasonable inference that limitations on multiple gun registrations, such as the one at issue here, will help to reduce illegal gun trafficking.

Second, Plaintiffs question the theory behind the limitation, since, as Lanier concedes in her deposition, it does not seem likely that an aspiring gun trafficker would purchase multiple pistols in the District and then seek to register them before passing them along to his customers. See Pl. Reply, Exh. 24 (Plaintiffs' Excerpted Deposition of Cathy Lanier, Part II) at 5–7. Yet this critique, ironically, is practically an argument for the restriction in question: Precisely because gun traffickers are unlikely to attempt to register their wares, the one-pistol-per-month limitation allows D.C. law enforcement to identify and prosecute would-be criminals who have unregistered pistols in their possession. Plaintiffs, moreover, once again overstate the degree of "fit" required in this case. As explained earlier, intermediate scrutiny demands only that the challenged regulation fit its objectives reasonably, not perfectly. See Schrader, 704 F.3d at 990. The provision must "promote[ ] a substantial government interest that would be achieved less effectively absent the regulation." Turner I, 512 U.S. at 662, 114 S.Ct. 2445 (emphasis added) (internal quotation marks and citation omitted). By making it harder to purchase multiple handguns in a short period of time, the limitation likely deters at least some potential traffickers in the District who would have continued to ply their trade in the absence of the regulation. This is all the law requires for the limitation to survive intermediate scrutiny.

5. The Renewal Requirement

*25 [15] Plaintiffs next challenge the provision mandating that firearm-registration certificates automatically expire three years after the date they are issued, unless the registrant renews them. See D.C.Code § 7–2502.07a(a). Registrants are eligible to renew their certificates so long as they continue to meet the District's initial registration requirements, see § 7–2502.03(a), and follow any procedures the MPD Chief establishes by rule. See § 7–2502.07a(b).

At least some of the renewal process apparently depends on when the registration certificate was issued. For firearms registered before January 1, 2011, the Chief of MPD is assigned the task of "establish[ing], by rule, a method for conducting the renewal of registration certificates." § 7–2502.07a(g). The Chief recently did just that, requiring that such registrants appear in person at the MPD's Firearm Registration Section, be fingerprinted, and submit an attestation confirming that they continue to possess the firearms in question, updating their current residential addresses, and affirming that they are still compliant with the District's various registration requirements. See 24 D.C. Mun. Regs. § 2326.2. Registrants must submit their renewals in accordance with a schedule that stretches over the course of the next two years, with each gun owner assigned a particular three-month renewal period based on his date of birth. See § 2326.3.

For firearms registered after January 1, 2011, the renewal process is specified in part by statute. Renewal notices are to be mailed to each registrant by MPD at least 90 days prior to the expiration of his registration certificate. See D.C.Code § 7–2502.07a(e)(1). Registrants must submit their renewals at least 60 days prior to the expiration of the registration certificate at issue. See § 7–2502.07(e)(2). For each renewal, the registrant must submit a statement attesting to his continued possession of the registered firearm, his address, and his continued compliance with the various registration requirements. See § 7–2502.07a(c)(1). That statement must be submitted on a form provided by the Chief of MPD "that can be submitted online via the Metropolitan Police website, by mail, or in person." § 7–2502.07a(c)(2). It appears that the Chief may establish additional rules to govern renewal for post-January 1, 2011, registrations, see § 7–2502.07a(b), but none has yet been issued.

Presumably, the difference in treatment between pre- and post-January 1, 2011, registrants will only persist for this first round of registration renewals. In other words, the Court assumes, based on the language of the statute, that after the pre-January 1, 2011, registrants have renewed their registrations in accordance with the procedures specified by MPD, they will in the future be subject to the same expiration and renewal rules as post-January 1, 2011, registrants. To continue to treat pre- and post-January 1, 2011, registrants differently, after all, would make no sense based on the record before the Court, and the Court sees no reason to attribute any such purpose to the D.C. Council or to MPD.

Plaintiffs challenge both the fact that registration certificates expire—and thus must be renewed—and the renewal procedures themselves. To determine the constitutionality of the renewal requirement, then, the Court must answer two separate questions. First, is the "basic" fact of registration expiration and renewal permissible, in isolation from whatever renewal process has been specified by law? And second, are the specific renewal procedures selected by the District themselves consistent with the Second Amendment? As the Heller II court has already held that requiring registration renewal every three years imposes more than a de minimis burden on Plaintiffs' Second Amendment rights, see Heller II, 670 F.3d at 1255, the Court will address these issues under intermediate scrutiny.

a. Evidence Regarding Certificate Expiration and Renewal

(i) Basic Fact of Expiration and Renewal

*26 On the first question, the Court finds that the District has presented substantial evidence that the basic fact of registration expiration and renewal furthers the government's substantial

interests in this case by ensuring that the registry remains accurate and encouraging gun owners to account for their firearms. Several expert witnesses testify that requiring District gun owners to renew their registrations every three years will improve public safety by making sure that, in the time since they first registered, they have not fallen into a category of persons prohibited from owning a firearm—for example, if they had been convicted of a disqualifying crime. See Jones Decl., ¶ 23–24; Vince Decl., ¶ 22; Webster Decl., ¶ 30; 2012 Report at 10–11. Relatedly, the D.C. Council's Committee on the Judiciary observed that registration expiration and renewal would help "keep[ ] the registration records up to date." 2012 Report at 10. While the previous version of the registry law had not mandated renewal and instead simply "require[d] registrants to notify MPD of any change in registration status," in the meantime "[t]housands of registrants ha[d] moved, died, disposed of their guns (perhaps lost them) and ha[d] not notified MPD. [Accordingly,] MPD has told the Committee that many registrants cannot be located." Id.

Renewal, according to the evidence, will not only improve the accuracy of the District's registry, but it will also help keep track of residents' firearms. The Committee noted that requiring gun owners to renew their registrations "likely causes the owner to look for his or her gun if it hasn't been used, and this assures that the gun has not been lost or stolen." Id. at 11. Renewals also require registrants to "affirm[ ] continued possession of the firearm, which could prohibit an individual from later asserting that he or she did not know that the firearm was lost or stolen." Id. Indeed, Webster compares this system "to the widely-accepted Federal requirement that licensed gun dealers be audited periodically to make sure that they can account for their firearms." Webster Decl., ¶ 30. All in all, this evidence suffices to justify the District's judgment that the renewal requirement will help maintain an accurate gun registry and prompt residents to account for the weapons in their possession—both important benefits for ensuring public safety and protecting District police.

Expiration and renewal, moreover, are narrowly tailored to the District's interests in this case. Asking gun owners to renew their registrations—just like motorists must renew their driver's licenses—is hardly an oppressive burden, and the Court can imagine no easier way for the city to both maintain the accuracy of its gun registry and ensure that gun owners regularly account for their weapons other than by requiring registrants to periodically update and affirm their information. At the same time, this policy helps the District to perform continuous background checks on gun owners in the city. Indeed, it is telling that Plaintiffs themselves suggest no more narrowly tailored alternative that could achieve all three goals at once. Although there may be cleaner ways for the District to pursue each of these benefits separately, the fit here need only be reasonable, not perfect. See Schrader, 704 F.3d at 990. The basic fact of registration expiration and renewal satisfies that requirement.

(ii) Renewal Procedures

On the second question, the Court similarly finds that there is substantial evidence supporting the actual renewal process that has been specified by the District and by MPD. MPD's announced process for pre-January 1, 2011, registrants, who must renew their certificates in person and submit to fingerprinting, finds support in the evidence justifying in-person registration and fingerprinting. See Part III.C.2.b, supra. Just as the District may require in-person appearance and fingerprinting at the time of registration in order to combat fraud and perform background checks, it is a reasonable inference that those means are also appropriate at the time of renewal for the same reasons. The renewal process specified by statute for post-January 1, 2011, registrants appears even less burdensome, since it provides that such renewals may be submitted not only in person, but also online or via mail. See D.C.Code § 7–2502.07a(c)(2). If MPD ultimately enacts more onerous policies for those renewals, Plaintiffs may file another Second Amendment challenge. As the record stands, however, the Court finds that the renewal procedures that have been put in place so far are justified by the evidence.

*27 The specified renewal procedures, moreover, are sufficiently narrowly tailored to survive intermediate scrutiny. Requiring in-person renewal for pre-January 1, 2011, registrants might well be broader than necessary to achieve the District's goals, since the D.C. Council has provided that post-January 1, 2011, registrants will also be able to renew their registrations online or by mail. See § 7–2502.07(c)(2). Given that this requirement is apparently only a onetime deal, however, and that it will only apply to a fraction of District gun owners, the Court finds that it is "not substantially broader than necessary" to achieve the city's interests in this case. Ward, 491 U.S. at 799, 109 S.Ct. 2746 (emphasis added); see also Heller II, 670 F.3d at 1258 (intermediate scrutiny does not require government to use "the least restrictive means") (internal quotation marks omitted). The outcome might be different if the District were to require in-person renewals for all gun owners in perpetuity, but on these facts, the government has not colored too far outside the lines. As for the post-January 1, 2011, registrants, the online and mail renewal options are minimally burdensome and fit well to the District's interests in receiving updated registry information and ensuring that gun owners account for their weapons. They therefore satisfy intermediate scrutiny.

b. Plaintiffs' Counterarguments

Plaintiffs raise several objections to the District's arguments on this point. None of their three points, however, alters the outcome.

First, Plaintiffs complain that the District's experts "cite no studies showing that periodic registration renewal ... reduce[s] crime or protect[s] police officers." Pl. Mot. at 34. But Plaintiffs lost on this point far earlier—as the Court has already explained, the District need not provide empirical studies conclusively proving the effectiveness of the challenged provisions. It need only put forward evidence "reasonably believed to be relevant to the problem" at hand, Renton, 475 U.S. at 51–52, 106 S.Ct. 925, in order to show that "in formulating its judgments, [the D.C. Council] has drawn reasonable inferences based on substantial evidence." Turner I, 512 U.S. at 666, 114 S.Ct. 2445. The District has met that burden here.

Next, Plaintiffs claim that it is unnecessary to require gun owners to renew their registrations in order to ensure that they have not committed a disqualifying criminal offense subsequent to their initial background checks—the District could simply conduct those checks remotely. See Plaintiffs' Excerpted Deposition of Cathy Lanier at 27–28. Indeed, to some extent, it appears that this is already the District's current practice. See Plaintiffs' Excerpted Deposition of Lieutenant Jon Shelton at 8–11. While the District could conduct background checks remotely, however, Plaintiffs forget that this is not the sole purpose of the renewal requirement. As already noted, the renewal process also serves to maintain the accuracy of the information in the District's gun registry and to ensure that gun owners periodically account for their weapons. Even without the need to perform a background check, then, the renewal requirement is narrowly tailored to the District's important interests.

Finally, Plaintiffs charge that the renewal requirement imposes an especially severe and unjustifiable burden on individuals who own several firearms, since they may need to appear multiple times at MPD to renew their registrations and pay multiple renewal fees. The process for renewing pre-January 1, 2011, registrations, however, appears to allow gun owners to renew multiple weapons in a single trip, see Firearms Registration Renewal Application, Metropolitan Police Department, available at http://goo.gl/LUKYqT (last visited May 15, 2014) (permitting renewal of three different firearm-registration certificates via a single form); Firearms Registration Renewal Application—Additional Registered Firearms, Metropolitan Police Department, available at http:// goo.gl/DP0jdL (last visited May 15, 2014) (permitting renewal of twelve additional firearm registration-certificates via a single form), and the renewal fees are assessed on a per-registrant basis, not per firearm. See Firearms Registration Renewal: Complete Renewal Procedures, Metropolitan Police Department, available at http://mpdc.dc.gov/node/750552 (last visited May 15, 2014) ("Regardless of the number of firearms you have registered, you will pay a total of $48, which includes a registration fee of $13 and a fingerprinting/FBI background check fee of $35."). There is thus no special burden on

multiple-gun owners who are renewing pre-January 1, 2011, certificates. The process for renewing post-January 1, 2011, has not yet been announced in full, but as the record stands, there is no reason to believe that it will impose a more onerous burden on multiple-gun owners than the system just described.

*28 In any event, as alluded to earlier, see Part III.C.4, supra, the Second Amendment has so far been read to protect only "a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." McDonald, 130 S.Ct. at 3044. While one or two firearms may be necessary for such purposes, a large collection of weapons is not. The Constitution, in short, guarantees the right "to keep and bear arms," not the right "to keep and bear an armory." As an individual seeks to acquire more guns, he moves farther and farther away from the right to bear arms and closer toward the constitutionally unprotected goal of assembling a personal arsenal. Any special burden the renewal requirement places on owners of multiple firearms, then, is outside the Second Amendment's ken.

Because the record evidence demonstrates that the expiration of firearm-registration certificates and the accompanying renewal requirement are substantially related to the District's interests in protecting police and promoting public safety as well as narrowly tailored to those interests, the provisions survive intermediate scrutiny.

6. The Administrative and Enforcement Provisions

Plaintiffs also challenge several provisions related to the administration and enforcement of the District's gun-registry scheme. These include the requirement that gun owners keep their registration certificates with them when they are in possession of their registered firearms and be able to exhibit the certificate upon the demand of law enforcement, see D.C.Code § 7–2502.08(c); the requirement that gun owners notify MPD in writing if their registered weapons are ever lost, stolen, or destroyed, if they sell or transfer their weapons, or if they change their name or address, see § 7–2502.08(a); the fees associated with the registration process, see § 7–2502.05(b); Shelton Decl., ¶ 8; and the penalties for violations of the registration scheme. See § 7–2507.06.

Although both parties devote several pages of their pleadings to this matter, the constitutionality of these provisions has already been established by the D.C. Circuit. In Heller II, the panel majority noted that "plaintiffs ... challenge several administrative and enforcement provisions incidental to the underlying regime," including the ones just listed, but that these provisions were

"lawful insofar as the underlying regime is lawful and hence enforceable." Heller II, 670 F.3d at 1249 n. *. That holding by the Court of Appeals is binding on this Court, and Plaintiffs have provided no reason to question it. Because the Court has found the underlying registration regime lawful, these provisions are also bulletproof.

### D. Plaintiffs' Standing to Challenge Vision Requirement

[16] The final provision of the D.C. gun registry at issue in this case is the requirement that a registrant "not [be] blind." D.C.Code § 7–2502.03(a)(11). Because none of the Plaintiffs is blind, however, they lack standing to challenge this rule. The Court, consequently, need not address Plaintiffs' argument about why even the blind should be allowed to own firearms.

To sue in federal court, a plaintiff must have "standing." Standing requires that a plaintiff "allege[ ] such a personal stake in the outcome of the controversy as to warrant the invocation of federal-court jurisdiction." Summers v. Earth Island Inst., 555 U.S. 488, 493, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009) (internal quotation marks omitted). Standing comprises three elements: (1) that the plaintiff suffered a concrete and particularized injury that is actual or imminent, not conjectural or hypothetical; (2) that there is a causal relationship between the plaintiff's injury and the defendant's conduct; and (3) that it is likely that a victory in court will redress the plaintiff's injury. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). "[A] plaintiff must demonstrate" all three elements of standing "for each claim he seeks to press." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006).

*29 It is undisputed that none of the Plaintiffs in this case is "blind" as defined by D.C. law. See Def. Mot., Exh. E (Plaintiffs' Responses to Defendants' First Requests for Admissions), Resp. 3. They have thus suffered no "concrete and particularized" injury as a result of the District's prohibition on blind gun registrants. Lujan, 504 U.S. at 560, 112 S.Ct. 2130; see also Pennell v. City of San Jose, 485 U.S. 1, 8, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988) ("A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement."). As a result, they lack standing to challenge the vision requirement.

Fighting every possible skirmish, Plaintiffs contend that "because of age and other factors," they "may well face blindness, and need to plan accordingly for the uncertainties that condition may entail." Pl. Mot. at 49. That may well be true, but it is both too "speculative" to support their

claim, Whitmore v. Arkansas, 495 U.S. 149, 157, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990), and the kind of " 'generalized grievance' shared in substantially equal measure by all or a large class of citizens" that "normally does not warrant exercise of [federal court] jurisdiction." Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

In a last-ditch effort to save this piece of their case, Plaintiffs grasp hold of a single phrase from the Heller II decision, where the court observed:

[S]ome of the plaintiffs' arguments—in particular with respect to the provisions requiring registrants to demonstrate knowledge about firearms, meet a vision standard, and take a training course—are so cursory we might, in other circumstances, consider them forfeit. As we will in any event be remanding other registration requirements to the district court, however, we see no reason to foreclose these particular plaintiffs from fleshing out their arguments as well as supplementing the record, if they can.

Heller II, 670 F.3d at 1256 n. * (emphasis added) (citations omitted). Plaintiffs contend that the court's stray reference to "these particular plaintiffs" affirms their standing to challenge the vision requirement. But they read too much into too little. Even if the Court were to accept that the D.C. Circuit intended these three words to bear so much weight, it is clear from context that the Court of Appeals was referring to the question of whether it should dismiss the vision-requirement claim as forfeit or remand it so that Plaintiffs could develop it further. The court passed no judgment on the question of whether Plaintiffs had standing to press their vision claim—it simply allowed that "these particular plaintiffs" could try to explain that claim on remand.

In now considering the question, the Court finds no standing to exist.

IV. Conclusion

For the foregoing reasons, the Court will issue a contemporaneous Order that will grant in full the District's Motion to Dismiss and deny Plaintiffs'. The Court will dismiss with prejudice all of Plaintiffs' challenges to the District's firearm laws, except for their challenge to the vision requirement for gun registration, which, having been decided on jurisdictional grounds, will be dismissed without prejudice.

--- F.Supp.2d ----, 2014 WL 1978073 (D.D.C.)

END OF DOCUMENT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DICK ANTHONY HELLER, *et al.* | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-1289 (JEB) |
| | ) | |
| THE DISTRICT OF COLUMBIA, *et al.* | ) | |
| | ) | |
| Defendants | ) | |

**NOTICE OF APPEAL**

Notice is hereby given that Dick Anthony Heller, Absalom F. Jordan, Jr., William Carter, William

Scott, and Asar Mustafa, Plaintiffs in the above named case, hereby appeal to the United States Court of

Appeals for the District of Columbia Circuit from the final order of May 15, 2014, granting defendants'

motion for summary judgment, denying plaintiffs' cross-motion for summary judgment, and entering

judgment in favor of defendants.

Respectfully submitted,

Dick Anthony Heller
Absalom F. Jordan, Jr.
William Carter
William Scott
Asar Mustafa

By counsel

/s/Stephen P. Halbrook
Stephen P. Halbrook
D.C. Bar No. 379799
Suite 403
3925 Chain Bridge Road
Fairfax, VA 22030
(703) 352-7276
(703) 359-0938 (fax)
protell@aol.com

-1-

JA 988

/s/ Dan M. Peterson
DAN M. PETERSON
D.C. Bar No. 418360
Dan M. Peterson, PLLC
3925 Chain Bridge Road, Suite 403
Fairfax, VA  22030
(703) 352-7276
(703) 359-0938 (fax)
dan@danpetersonlaw.com

Counsel for Plaintiffs


      CLERK: Please mail copies of the above Notice of Appeal to the following at the address indicated:

Andrew J. Saindon
Office of the Attorney General, DC
441 Fourth Street, NW
Sixth Floor South
Washington, DC 20001

-2-