IN THE

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA

➤➤◄◄

DICK ANTHONY HELLER; ABSALOM F. JORDAN, JR.; WILLIAM CARTER,

*Plaintiffs-Appellants,*

*v.*

DISTRICT OF COLUMBIA; CATHY L. LANIER, CA-09-454;
VINCENT C. GRAY, MAYOR, DISTRICT OF COLUMBIA,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Columbia

## BRIEF ON BEHALF OF *AMICUS CURIAE* NATIONAL RIFLE ASSOCIATION, INC. IN SUPPORT OF APPELLANTS

John Parker Sweeney
James W. Porter, III
BRADLEY ARANT BOULT CUMMINGS LLP
*Attorneys for Amicus Curiae*
   *National Rifle Association, Inc.*
1615 L Street NW, Suite 1350
Washington, DC 20036
202-393-7150
202-347-1684
jsweeney@babc.com

## CORPORATE DISCLOSURE STATEMENT

The National Rifle Association does not have any parent company. It has no stock, and therefore, no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

INTERESTS OF AMICUS ........................................................................1

INTRODUCTION ................................................................................2

ARGUMENT ......................................................................................3

I.  THIS COURT SHOULD APPLY AT LEAST STRICT SCRUTINY TO  THE CHALLENGED LAWS. ..................................................................3

II.  THE EXPERT TESTIMONY RELIED UPON BY THE DISTRICT COURT WAS BOTH UNRELIABLE AND IRRELEVANT TO THE ISSUE IN THIS CASE........................................................................9

   A.  This Court Must Ensure that the Evidence Relied Upon by  the District Is Reliable and Relevant. .............................................................9

   B.  This Court Should Not Rely on the Opinions of Dr. Webster  Because They Are Based on Incorrect or Irrelevant Data.........................................11

      1)  There Is No Data to Support Webster's Opinions Regarding  Deterring . Straw Purchasers ...........................................................12

      2)  Webster's Opinions Based on His Illegal Gun Diversion  Studies Are Not Reliable. ...........................................................13

   C.  This Court Should Not Rely upon the Unsupported Declarations of Mark Jones, Cathy Lanier, and Joseph Vince ...........................................18

      1.  Mark Jones ..............................................................19

      2.  Cathy Lanier............................................................22

      3.  Joseph Vince ...........................................................22

   III.  THE "DOUBLY DEFERENTIAL" STANDARD EMPLOYED BY THE DISTRICT COURT IS INAPPROPRIATE IN THE CONTEXT OF A CONSTITUTIONAL CHALLENGE TO A REGULATION OF A FUNDAMENTAL RIGHT. .................................................................25

CONCLUSION ...................................................................................29

# TABLE OF AUTHORITIES

**Cases**

*Barnes v. Dist. of Columbia*, Civ. No. 06-315 RCL, 2013 WL 541148, at *17
(D.D.C. Feb. 14, 2013) ...........................................................................24

*Burt v. Titlow*, 134 S. Ct. 10, 13 (2013)................................................................27

*Carter v. United States*, 252 F.2d 608, 617 (D.C. Cir. 1957),................................19

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594-95 (1993)....................18

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ....................................... 3, 5, 7

*Groobert v. President & Directors of Georgetown Coll.*, 219 F. Supp.2d 1, 3
(D.D.C. 2002) ........................................................................................24

*Heller v. District of Columbia*, 670 F.3d 1244, 1257 (D.C. Cir. 2011)................4, 9

*Hylton v. United States*, 3 U.S. 171 (1796)............................................................28

*Kachalsky v. County of Westchester*, 701 F.3d 81(2nd Cir. 2012)...........................7

*Marbury v. Madison*, 5 U.S. 137 (1803)................................................................28

*McDonald v. City of Chicago*, 130 S. Ct. 3020, 3044 (2010) ........................... 9, 28

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ...................................................8

*Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014) ...............................8

*Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013) ................................ 25, 27

*Turner Broadcasting Systems*, 512 U.S. 622 (1994) ..............................................26

*Turner Broad. Sys. v. FCC*, 520 U.S. 180, 195 (1997)..................................... 25, 26

*United States v. Carter*, 669 F.3d 411 (4th Cir. 2012) ..............................................6

*United States v. Chester*, 628 F.3d 673, 677 (4th Cir. 2010) ...............................5, 6

*United States v. Marzzarella*, 614 F.3d 85, 89 n.4 (3rd. Cir. 2010) .........................4

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011)...................................6

*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013)...............................................7

## Statutes

60 D.C. Reg. 55 (Dec. 27, 2013) ................................................................................8

D.C. Code § 7-2502.03(e)............................................................................................8

D.C. Code § 7-2502.04(a)-(c) .....................................................................................8

D.C. Code § 7-2502.07a(a) ..........................................................................................8

Fed. R. Evid. 702 .................................................................................................. 18, 20

## Other Authorities

Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132 .............28
Bureau of Alcohol Tobacco, Firearms, and Explosives, Department of Justice,
    ATF District of Columbia at 2, *available at*
    *https://www.atf.gov/files/statistics/download/trace-data/2011/2011-trace-data-*
    *district-of-columbia.pdf* ....................................................................................10

Subguns, For Sale H Sear
MP5http://www.subguns.com/classifieds/index.cgi?db=nfafirearms&website=&language=&session_key=&search_and_display_db_button=on&results_format=long&db_id=24728&query=retrieval (last visited September 2, 2014) (stating a firm price of $40,000 for a legal machine gun)....................................................23

Webster et al., *Preventing the Diversion of Guns to Criminal Through Effective Firearm Sales Laws*, in Reducing Gun Violence in America 109 (2013). ... 16, 17

Webster et al., *Effects of State-Level Firearm Seller Accountability Policies on Firearm Trafficking,* 84 J. Urban Health 525 (2009). ................................... 15, 16

Webster et al., *Relationship Between Licensing, Registration, and Other Gun Sales Laws and the Source State of Crime Guns*, 7 J. Injury Prevention 184 (2001),...15

Wintemute et al., *Risk Factors Among Handgun Retailers for Frequent and Disproportionate Sales of Guns Used in Violent and Firearm Related Crimes*, 11 Injury Prevention 357 (2005)...............................................................................12

*Amicus Curiae* National Rifle Association, Inc. (the "NRA" or "*Amicus*") was founded in 1871 by Col. William C. Church and Gen. George Wingate to promote rifle marksmanship skills in the United States. Over the past 150 years, its membership has grown to include over four million members nationwide.[2] The NRA has remained true to its founding principles still working tirelessly today to advocate for safe firearm shooting, quality marksmanship, thorough training, and sound education.

The NRA is familiar with lawsuits around the country that involve interests protected by the Second Amendment at both the state and federal level. The NRA's expertise allows it to provide the Court with an up-to-date distillation of the relevant law governing the standard of review in cases involving the Second Amendment. Moreover, because of the breadth of its knowledge of prior and contemporaneous litigation, the NRA is in a unique position to provide the Court with an analysis of the social science evidence provided by Defendant-Appellees' experts.

---

[1] *Amicus* makes the following disclosure pursuant to Fed. R. App. P. 29(c)(5): No party's counsel authored this brief in whole or in part. No party, party's counsel, nor any other person contributed any money to fund preparing or submitting this brief, other than *Amicus*, the NRA.

[2] All Parties have consented to the filing of this Brief.

The NRA's *Amicus* brief will assist the Court in determining the proper level of constitutional scrutiny to apply and the appropriate weight to give to the expert evidence offered by Defendant-Appellees, which is a critical, and possibly determinative, issue in this case.

## INTRODUCTION

At issue in this case are portions of the 2008 amendments to the D.C. Code that created new burdens on the exercise of Plaintiff-Appellants' constitutional right to keep and bear arms. The District of Columbia ("District") requires, *inter alia*, that residents register their firearms by bringing them in person to the police station; submit to being fingerprinted; submit to being photographed; provide five-years-worth of data on their residences and places of employment; and are required take and pass a competency test. Moreover, law-abiding, responsible citizens are prohibited from registering, and thus acquiring, any more than one pistol in a thirty-day period.[3] These restrictions impose a significant burden on the exercise of Plaintiff-Appellants' core Second Amendment right to keep and possess a firearm in their homes for self-defense and should be judged under the most exacting of standards.

---

[3] This does not apply to newly-arrived residents, who may register all of their handguns at one time, but are restrained from purchasing or otherwise acquiring more than one handgun per month thereafter.

In an effort to justify these restrictions, the District has put forth declarations of a social scientist and law enforcement officers. This "evidence," however, is not based on sufficiently reliable data or relevant experience so as to be useful to resolve the issues in this case. Compounding this problem, the District Court applied a "doubly deferential" standard of review that has no basis in Second Amendment jurisprudence or even in constitutional review generally.

For these reasons, the NRA respectfully requests that this Court fully and thoroughly scrutinize the evidence presented by the District in order to protect the fundamental rights of all citizens of the District of Columbia. The NRA is confident that such scrutiny will reveal that the challenged laws are not supported by substantial evidence, and violate the Second Amendment.

## ARGUMENT

## I. THIS COURT SHOULD APPLY AT LEAST STRICT SCRUTINY TO THE CHALLENGED LAWS.

Since the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), Courts of Appeals, including this Court, have struggled with implementing the newly recognized fundamental right of personal firearm ownership. Because the Supreme Court did not articulate an express standard that should be applied to analyze laws that impact Second Amendment rights, *id.* at 634, appellate courts have turned to First Amendment jurisprudence for guidance

as to the appropriate standard of review. *E.g.*, *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010)("[W]e agree with those who advocate looking to the First Amendment as a guide in developing a standard of review for the Second Amendment."); *see also Heller v. District of Columbia*, 670 F.3d 1244, 1257 (D.C. Cir. 2011)("*Heller II*"); *United States v. Marzzarella*, 614 F.3d 85, 89 n.4 (3rd. Cir. 2010).

As a preliminary matter, we believe Judge Kavanaugh's Dissent in *Heller II* sets forth the proper analysis that should be undertaken. As Judge Kavanaugh explained, "regulations and exceptions should be judged on their 'historical justification.'" *Heller II*, 670 F.3d at 1291 (Kavanaugh, J., dissenting). At issue in this case is the registration of all long guns by all citizens. There is no historical justification for such a law. In fact, only one state – Hawaii – currently requires the registration of all firearms. As Judge Kavanaugh succinctly explained, "[b]ecause the vast majority of states have not traditionally required and even now do not require registration of lawfully possessed guns, D.C.'s registration law – which is the strictest in the Nation and mandates registration of all guns – does not satisfy the history-and-tradition-based test set forth in *Heller* and *McDonald*." *Id*. at 1293. Similarly, the novel registration requirements for handguns remanded by this Court

for further justification by the District also fail the history and tradition-based test, and must be subjected to the most-rigorous scrutiny.[4]

If this Court continues to employ First Amendment analogues, it should follow the lead of other Circuit Courts in determining what level of scrutiny to apply. Over time, there has developed a fairly straightforward consensus among the Courts of Appeals as to what level of scrutiny (intermediate or strict) is to be applied to laws alleged to violate the Second Amendment. Most courts have determined that laws that impact felons and misdemeanants, and carrying firearms outside the home, are to be analyzed under intermediate scrutiny. Laws that regulate the possession of a firearm commonly kept in the home for lawful purposes by law-abiding, responsible citizens, however, are to be subjected to strict scrutiny. This standard is articulated most clearly in a line of cases decided by the Fourth Circuit.

In *United States v. Chester*, 628 F.3d 673, 677 (4th Cir. 2010), the defendant, a misdemeanant, unsuccessfully moved to dismiss his indictment on the grounds that the Supreme Court had identified only the mentally ill and felons as classes of persons that could be denied the right to possess firearms. The Fourth

---

[4]    The Supreme Court in *Heller* expressly recognized that the handgun was entitled to particular protection from governmental overreach, as it is "overwhelmingly chosen by American society for that lawful purpose," *i.e.*, "the inherent right of self-defense . . . central to the Second Amendment right." *Heller*, *supra*, 554 U.S. at 628.

Circuit in *Chester* declined to apply strict scrutiny to the prohibition on ownership of firearms by misdemeanants, explaining:

> Although Chester asserts his right to possess a firearm in his home for the purpose of self-defense, we believe his claim is not within the core right identified in *Heller* – the right of a *law-abiding*, responsible citizen to possess and carry a weapon for self-defense – by virtue of Chester's criminal history as a domestic violence misdemeanant. Accordingly, we conclude that intermediate scrutiny is more appropriate than strict scrutiny for Chester and similarly situated persons.

*Id*. at 682-83 (emphasis in original). Plaintiff-Appellants possess the characteristics found lacking in defendant Chester: they are law-abiding, responsible citizens. Thus, they do not fall into any less-protected category, and any infringement upon their ability to possess and use firearms in their homes is subject to strict scrutiny.

More recently, the Fourth Circuit has opined that a burden upon the possession of firearms in the home is subject to strict scrutiny: "As we observe that any law regulating the content of speech is subject to strict scrutiny, . . . we assume that *any* law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny." *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011)(emphasis added); *see also United States v. Carter*, 669 F.3d 411, 416 (4th Cir. 2012)("[W]e have noted that the application of strict scrutiny is important to protect the core right of self-defense identified in *Heller*....").

The court in *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013), drew precisely such a distinction between the possession of firearms in the home and carrying of firearms in public. In *Woollard*, the Fourth Circuit considered a Second Amendment challenge to Maryland's requirement that a citizen have a "good and substantial reason" before he or she could receive a concealed weapon permit. The court held that intermediate scrutiny applies to bearing arms outside the home and rejected the argument that strict scrutiny applied because that would "place the right to arm oneself in public on equal footing with the right to arm oneself at home, necessitating that we apply strict scrutiny . . . ." *Id*. at 878.

This jurisprudence is not unique to the Fourth Circuit. The Second Circuit also has noted that laws that impact the possession of firearms in the home are subject to the highest level of scrutiny. In *Kachalsky v. County of Westchester*, 701 F.3d 81(2nd Cir. 2012), the court refused to apply strict scrutiny to a challenge to the requirement that an applicant for a carry permit demonstrate "proper cause." *Id.* at 83. The court applied only intermediate scrutiny because "New York's licensing scheme affects the ability to carry handguns only **in public,** while the District of Columbia ban [in *Heller*] applied **in the home** 'where the need for defense of self, family, and property is most acute.'" *Id*. at 94 (quoting *Heller*, 554 U.S. at 628)(emphases in original).

Clearly, the line that has emerged in the Courts of Appeals as to when strict scrutiny is to be applied is whether the challenged laws reach into the homes of law-abiding, responsible citizens and burden the exercise of their Second Amendment rights.[5] The laws at issue in the instant case unquestionably do so, and must be subjected to strict scrutiny.

All of the registration requirements, procedures, and processes challenged in this case are hurdles that law-abiding citizens must clear before exercising their constitutional right to keep and bear arms in their homes. Citizens are required to take time off of work and appear personally before the police with their firearms to be fingerprinted and photographed, D.C. Code § 7-2502.04(a)-(c), and complete a competency test, D.C. Code § 7-2502.03(a)(13). They also must wait thirty days between registrations of pistols. D.C. Code § 7-2502.03(e). Moreover, they must re-register their firearms, D.C. Code § 7-2502.07a(a), which requires them to appear in person, be fingerprinted, and pay even more fees. 24 Metropolitan Police Dep't, Notice of Final Rulemaking, 60 D.C. Reg. 55 (Dec. 27, 2013). These requirements erect more than an incidental burden on the exercise of the right

---

[5] Some Courts of Appeals have rejected a sharp distinction between laws that burden the right to keep arms in the home and the right to bear them outside the home. In particular, the Seventh and Ninth Circuits categorically struck down laws that denied law-abiding citizens the right to carry a firearm outside the home. *See Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012); *Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014).

protected by the Second Amendment. They are substantial and onerous requirements that have the effect of discouraging the exercise of a fundamental right by law-abiding citizens. No other fundamental right would be subjected to these burdens without the government satisfying the strictest of tests for constitutional scrutiny. This Court should ensure that the Second Amendment is not treated as a second-class right and analyze the challenged laws under strict scrutiny. *See McDonald v. City of Chicago*, 130 S. Ct. 3020, 3044 (2010)(refusing to consider Second Amendment rights as "second class" rights for purposes of incorporation).

## II. THE EXPERT TESTIMONY RELIED UPON BY THE DISTRICT COURT WAS BOTH UNRELIABLE AND IRRELEVANT TO THE ISSUE IN THIS CASE.

### A. This Court Must Ensure that the Evidence Relied Upon by the District Is Reliable and Relevant.

In its decision remanding this case in *Heller II*, this Court recognized that "[a]lthough we do accord substantial deference to the predictive judgments of the legislature, the District is not thereby insulated from meaningful judicial review." *Heller II*, 670 F.3d at 1259 (internal quotations and citations omitted). This is an essential part of the system of ensuring that constitutional rights are not infringed. In conducting a "meaningful judicial review," a court must necessarily ensure that the evidence that is marshaled to support the law is both relevant and reliable. It is true that a legislature may consider any evidence, even junk science, in making its

policy determinations. When those determinations are later challenged in court, however, the evidence that is used to support such policies before the tribunal must meet the standards set forth in the Federal Rules of Evidence. To permit the District to present "evidence" that is nothing more than the say-so of experts, or is based on irrelevant or unidentified "experience," would subvert the concept of "meaningful judicial review." Indeed, any policy choice, no matter how much it infringed upon any constitutionally protected right, could be justified by having law enforcement officers or other officials testify that "based on their experience" the laws would be effective. So too could any law be justified based on junk science that is not properly conducted, vetted, or analyzed.

In this case, however, that is precisely the state of the record with respect to the evidence submitted by the District. The opinions of the social scientist upon which the District, and the District Court, chiefly relied, Dr. Daniel Webster, are based on an inaccurate analysis. In fact, the majority of his opinions, described in more detail below, are based on an incorrect assumption that the firearms trace data upon which he relies are capable of producing results that inform policy decisions. *See* Bureau of Alcohol Tobacco, Firearms, and Explosives, Department of Justice, ATF District of Columbia at 2, *available at https://www.atf.gov/files/statistics/download/trace-data/2011/2011-trace-data-district-of-columbia.pdf* ("Firearms selected for tracing are not chosen for purposes

of determining which types, makes or models of firearms are used for illicit purposes. The firearms selected do not constitute a random sample and should not be considered representative of the larger universe of all firearms used by criminals, or any subset of that universe."). The other "experts" relied upon by the District present their opinions based on nothing more than their unidentified, unarticulated, and unknown "experience." This evidence is not reliable and this Court should refuse to consider it.

**B.    This Court Should Not Rely on the Opinions of Dr. Webster Because They Are Based on Incorrect or Irrelevant Data.**

The District Court relied heavily on the declaration of Dr. Daniel Webster. A careful review of Webster's declaration and the support that undergirds that declaration, however, reveals that Webster's opinions are largely unsupported, are based on research that is not relevant to the issues in this case, or are based on misinterpretations of the implications of academic studies.

The District Court relied upon two of Webster's conclusions to support its determination that the mandatory registration of long guns is constitutional. First, the Court cited to Webster's conclusion that registration of long guns would be a deterrent to straw purchases and "could mitigate the potential negative consequences of negligent sales practices by gun dealers with more careful practices." Decl. of Daniel Webster, ECF No. 73-10 at ¶ 12 ("Webster Decl."); *see also* Slip Op. at 27. The Court also extensively relied upon Dr. Webster's study of

the effects of Missouri's repeal of its permit-to-purchase system. Slip Op. at 28-29.

As demonstrated below, neither of Webster's opinions can withstand scrutiny.

### 1) There Is No Data to Support Webster's Opinions Regarding Deterring Straw Purchasers

Webster cites a Government Accountability Office study stating that licensed firearm dealers did not question the validity of fake IDs offered by undercover agents posing as prospective gun buyers to support his opinions regarding straw purchasers. *See* Slip Op. at 27, 39. Webster implies that there is a significant problem of "negligent sales practice by gun dealers." Webster Decl. at ¶ 12. To support his claim that there is a significant problem of "negligent sales practice by gun dealers," Webster notes that "a relatively small portion of gun dealers sell the majority of guns recovered by police from criminals." Webster Decl. at ¶ 13. What Webster does not mention is that a relatively small portion of gun dealers also sell a large majority of all guns, regardless of whether they were traced guns.

In the study that Webster cites, Wintemute et al., *Risk Factors Among Handgun Retailers for Frequent and Disproportionate Sales of Guns Used in Violent and Firearm Related Crimes*, 11 Injury Prevention 357 (2005), the authors did indeed report that 11.7% of California firearms retailers accounted for 85.5% of traced handguns. That study, however also reported that these same dealers also

accounted for 81.5% of all handgun sales. *Id.* at 360; *see also* Decl. of Gary Kleck ("Kleck Decl."), ECF No. 75-12 at ¶ 18.

By leaving out this crucial piece of information, Webster has intentionally skewed the data reported by Wintemute et al. to buttress his position when it does not. In short, the top-selling dealers accounted for only slightly more traced handguns than one would expect based solely on their share of the handguns sold. Dealers who sell more guns to eligible buyers can obviously expect more guns being traced back to them simply because a larger number of these legally sold guns will later be stolen from those lawful buyers, otherwise later acquired by criminals, or otherwise taken into law enforcement custody. Webster's opinions related to "negligent business practices," cited by the District Court, Slip Op. at 27, are not based on sufficient data and should not be relied upon by this Court.

### 2) Webster's Opinions Based on His Illegal Gun Diversion Studies Are Not Reliable.

Webster's analysis of Missouri's permit-to-purchase licensing law is based on a fundamental misunderstanding of ATF trace data. Webster asserts that the time from when a gun was first sold at retail to when it is recovered by police is an "indicator of illegal gun diversion." Webster Decl. at ¶ 14. As a National Research Council panel concluded, however, "trace data cannot show whether a firearm has been illegally diverted from legitimate firearms commerce." Wellford et al, Firearms and Violence: A Critical Review 40 (2004). In fact, "trace analysis alone

cannot reveal the extent and nature of illegal firearms trafficking. . . In general, trace data are not informative about populations of interest, such as offenders, potential offenders, victims, and the general population." *Id*. Clearly, then, Webster's opinions are based on a flawed understanding of the data that he analyzed. *See* Kleck Decl. at ¶ 21 ("Webster had no basis for drawing conclusions about 'crime guns' because traced gun samples can tell us nothing about crime guns in general . . . .")

The District Court acknowledged all of this. Slip Op. at 32-33. The Court stated, however, that this pervasive problem does "not affect the studies he cites examining the relationship between gun registration and the use of guns in crime." Slip Op. at 32-33 (citing Webster Decl. ¶¶ 22-25). This statement is not accurate. In fact, Webster states in paragraphs 23 and 24 of his declaration that he "used crime gun trace data" to analyze the effects of registration on the use of guns in crime. In paragraph 25, he states that the data he used for "crime gun exports were obtained from the 2009 state-level crime gun trace data posted on the ATF's website." Thus, the portions of Webster's declaration cited by the District Court as "not affect[ed]" are indeed fatally affected.

Webster, throughout his declaration, clings to his erroneous interpretation of gun trace data. He also attributes a mistaken significance to the share of traced guns that originated in a state different from the one where the gun was recovered

by police. Webster Decl. at ¶ 23. Webster asserts that if, in states with permit-to-purchase laws and handgun registration, a higher percentage of a city's traced guns come from out-of-state, it must be because those laws were responsible by discouraging criminals from getting in-state guns. Webster, however, does not provide the factual links that would logically connect his observations about out-of-state guns with the effects of these kinds of gun control.

The study he cites, Webster et al., *Relationship Between Licensing, Registration, and Other Gun Sales Laws and the Source State of Crime Guns*, 7 J. Injury Prevention 184 (2001), "did not rule out a far more likely alternative explanation of these patterns. It is politically harder to get stricter gun laws passed in states where a large share of the electorate are gun owners, so the presence of the two gun laws on which Webster focuses merely serves as an indirect indicator of low gun ownership." Kleck Decl. at ¶ 39. If anything, these state gun control laws appear to discourage the exercise of firearm ownership by responsible, law-abiding citizens.

To bolster his position, Webster cited to an additional study, Webster et al., *Effects of State-Level Firearm Seller Accountability Policies on Firearm Trafficking,* 84 J. Urban Health 525 (2009). This study, however, lends no additional support because not only did it repeat the errors of the 2001 study, it also chose an arbitrary definition of a "trafficked gun" that has no relationship to

actual firearms trafficking. Webster interpreted any traced gun with a "time-to-crime" of under a year, recovered from a possessor who was not the legal purchaser of record, as a "trafficked gun." *Id.* at 527; *see also* Kleck Decl. at ¶ 42.

Given the National Research Council's statement that "trace data cannot show whether a firearm has been illegally diverted from legitimate firearms commerce," Webster's results are devoid of significance. Webster has taken a methodology that has been demonstrated to be unreliable and based his opinions on it. Thus, his opinions based on this study are not based on reliable, or even relevant, data, and this Court should not rely upon them.

Finally, Webster relies upon his 2013 study, *Preventing the Diversion of Guns to Criminal Through Effective Firearm Sales Laws*, in Reducing Gun Violence in America 109 (2013). This study is similarly flawed "by a misunderstanding of the meaning of gun trace data and of how guns are moved across state lines." Kleck Decl. at ¶ 43. Webster asserts that a main reason that guns are sold at retail in one state but are used to commit crimes in a different state is that gun traffickers purchase guns in the origin state, then sell them to criminals in the destination state.

A more plausible explanation "is simply that many Americans change residence across state lines each year, and move their possessions, including guns, with them. If they are burglarized or their guns are otherwise stolen, these guns are

then, by definition, in the hands of criminals, and many of them will later be used in crimes, recovered by police, and traced." Kleck Decl. at ¶ 43. Webster's own data confirm this interpretation. Webster found that the strongest correlate of a state's rate of "crime gun export" was its gun ownership rate. *Id.* at 116. Even more telling is the fact that "states bordering other states where gun laws are relatively strict was unrelated to the rate of exporting crime guns after controlling for gun sales laws and other factors." *Id.*

Webster is also highly selective in his report of the findings of his 2013 study. Five of the ten gun control laws he and his colleagues studied showed no significant association with rates of crime gun "export." As Webster stated, "[a]lthough billed as a deterrent to interstate gun trafficking, one-gun-per-month restrictions were unrelated to trafficking and neither were strong dealer regulations, penalties for failure to conduct background checks, or penalties for straw purchasing." *Id.* at 117.

The flaws in Webster's research, and in his opinions based on this research, are not merely points of debate such that the Court should conclude that there is substantial, albeit disputed, evidence to support the challenged regulations. Rather, Webster has misinterpreted cherry-picked data to support the baseless opinions that he espoused in his declaration. Indeed, some of the measures enacted by D.C. that Webster supports, such as the one-gun-per-month policy are, by his own research,

not related to any reduction in criminal use of firearms. *Id.* Given the pervasive flaws in Webster's research and methodology, and the absence of any reliable data to support his opinions, this Court should not rely on Webster's declaration.

### C. This Court Should Not Rely upon the Unsupported Declarations of Mark Jones, Cathy Lanier, and Joseph Vince.

The Federal Rules of Evidence require that an expert's opinion be admitted and considered only if "(b) the testimony is based on sufficient facts or data," (c) the testimony is the product of reliable principles and methods, and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d). These requirements are conjunctive, and each and every one must be met. Critically, an expert's experience may be sufficient for him or her to be able to be qualified of an expert, but such experience is not sufficient, standing alone, to render his or her opinions admissible. *See* Fed. R. Evid. 702 (stating that a "witness who is qualified as an expert by knowledge skill, experience, training, or education may testify in the form of an opinion or otherwise if" the four requirements of the Rule are met).

The Supreme Court has been direct and unequivocal in its requirement that a court must analyze the facts that underlie an expert's opinions and not analyze merely the ultimate conclusion. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594-95 (1993)(stating that the focus of an inquiry under Rule 702 "must be solely on principles and methodology, not on the conclusions that they generate").

This Court has been even more explicit in the need for a court to analyze the facts that support an expert's opinion. In *Carter v. United States*, 252 F.2d 608, 617 (D.C. Cir. 1957), this Court stated "[t]he chief value of an expert's testimony in this field, as in all other fields, rests upon the material from which his opinions is fashioned and the reasoning by which he progresses from his material to his conclusion . . . it does not lie in his mere expression of conclusion."[6]

As the Federal Rules of Evidence and the decisions of the Supreme Court and this Court make clear, the facts and data that underlie an expert's opinion must be scrutinized to determine if such opinions should be relied upon by a court. In the present case, however, the District Court did review the adequacy of the facts submitted by Mark Jones, Cathy Lanier, and Joseph Vince, and the Defendants-Appellees have not provided any such facts. Thus, this Court should refuse to consider their unsupported opinions, and recognize that the district court erred when it relied on them.

### 1. Mark Jones.

The District Court found that Mark Jones was qualified to present his opinions as an expert because he had the requisite "experience," despite having

---

[6] While *Carter* was decided long before the Supreme Court's decision in *Daubert*, its rationale still holds true. *Carter* involved the question of whether an expert's label of a particular mental disorder was sufficient to provide enough information to the trier of fact to make an informed decision. 252 F.2d at 617. It did not involve any analysis under the "general acceptance" test employed by this Court before *Daubert* and so its reasoning is unaffected by *Daubert's* holding.

never conducted any empirical studies. Slip Op. at 20. While it is true that Fed. R. Evid. 702 permits a witness to qualify as an expert based on experience, this is not the end of the inquiry as to whether the expert's opinion is admissible. Indeed, the opinion must also be based on sufficient facts and data. Fed. R. Evid. 702(b). By failing to consider the lack of any data to support Jones's opinions, the District Court failed to act as a "gatekeeper."

For example, the District Court cited paragraphs 10-16 of Jones's declaration to support the argument that the registration scheme screens out dangerous or irresponsible firearm purchasers, ensures that firearm purchasers are familiar with D.C. law, and inhibits trafficking of firearms. Slip Op. at 23. In those seven paragraphs, however, Jones relates only a single piece of data to support his opinions: a newspaper article reporting the murder of two firefighters who were killed with long guns that were purchased by a straw purchaser. Moreover, he never even claims to have any actual relationship to this event; he simply cites a newspaper article as the source of his information. *See* Declaration of Mark Jones ("Jones Decl."), ECF No. 73-5 at ¶ 14 & n.1. In every other instance, Jones simply states "in my experience" or "based on my experience," without providing any information on what that experience is or how it informs the opinions he is providing to the court. Without this information, the Defendants, who have the

burden to establish that expert evidence is admissible, have not provided any, much less sufficient, data to support their expert's opinion.

The District Court also relied upon Jones's unsupported opinions in determining that the one-gun-per-month restriction was constitutional. Slip Op. at 49 (citing Jones Decl. at ¶¶ 17-20). Even though Jones presented no data other than his unverifiable "experience" that the ATF recovered more firearms from Maryland than Virginia in D.C., the court relied upon solely his declaration to "confirm[]" the hypothetical benefit of such a law. Slip Op. at 49 (citing Jones Decl. at ¶¶ 19-20). In paragraph 19 of his declaration, Jones states "when I worked in the District of Columbia for the ATF's Firearms Trafficking Group, Virginia prohibited the purchase of more than one gun per month. During my time in the District, we investigated many more recovered crime guns from Maryland, which did not have a similar scheme." Jones Decl. at ¶ 19. By failing to include relevant data, the District Court was not able to determine whether this statement was true, given that Virginia enacted its one-gun-per-month law in 1993 and Maryland enacted the same law in 1996. Thus, it is impossible even to determine whether Jones's declaration is true, much less supported by sufficient data.

In addition to being unconfirmable, it is impossible to know if Jones's experience can be extrapolated without conducting any sort of actual analysis. The overrepresentation of Maryland guns could easily be explained by the different

crime patterns between the states. Simply put, without proper statistical analysis, his experience could merely be an outlier.

## 2. Cathy Lanier.

The District Court relied upon Chief Cathy Lanier's declaration for largely the same points for which it relied upon Jones's declaration. *See, e.g.,* Slip Op. at 22-23, 26, 29, 31, 38-39, 46 (citing both Lanier and Jones declarations). Chief Lanier's declaration, however, is infected by the same problem as Jones's: her opinions are based entirely on unspecified, unreported "experience." *See* Declaration of Cathy Lanier ("Lanier Decl."), ECF No. 83 (referring only to vague, general experience except for two citations to scholarly articles: in paragraph 19, fn. 1 and paragraph 29, fn. 2). Rather than an objective expert report based on verifiable facts and evidence, Lanier's declaration is nothing more than unsupported conjecture about what the possible effects of the challenged laws could be. This is insufficient to qualify her opinion as substantial, relevant or reliable, or in any other way helpful to the court in making its determinations.

## 3. Joseph Vince.

The declaration of Joseph Vince continues the pattern of providing unverifiable "opinions" without any reference to actual evidence other than Vince's "experience" or "common sense." *See, e.g.,* Declaration of Joseph Vince ("Vince Decl."), ECF No. 73-9 at ¶¶ 9, 11, 12, 17, 19, 23, 24. The District Court

relied upon Vince's unsupported opinions in much the same manner as it did for Jones and Lanier, with one notable addition.

The District Court quoted Vince's opinion that the National Firearms Act of 1934, which required registration of numerous types of firearms including machine guns, was an example of the positive effects of registration, because very few of those firearms are used in crime. Slip Op. at 28. Vince provides no studies indicating that there is any causal relationship between the 1934 Act and the infrequency with which such firearms are used in crime. Weapons regulated by the National Firearms Act are much less common than other firearms. Indeed, since 1986, sales of new machine guns have been essentially prohibited. *See* the Firearm Owner Protection Act of 1986 (amending 18 U.S.C. § 922(o) to state "it shall be unlawful for any person to transfer or possess a machinegun" except as applied to the "lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date" of the Act). As a result, these firearms are extremely expensive.[7] The vast expense alone is a likely reason for them not being used in crime. Vince does not address this point. In fact, he offers no support for his personal belief as to why firearms regulated by the National Firearms Act are

---

[7]    *See, e.g.*, Subguns, For Sale H Sear MP5 http://www.subguns.com/classifieds/index.cgi?db=nfafirearms&website=&languag e=&session_key=&search_and_display_db_button=on&results_format=long&db_i d=24728&query=retrieval (last visited September 2, 2014) (stating a firm price of $40,000 for a legal machine gun).

infrequently used in crime. This is not an instance in which there exists no reliable data upon which a credible opinion could be based. *Cf. Groobert v. President & Directors of Georgetown Coll.*, 219 F. Supp.2d 1, 3 (D.D.C. 2002)(permitting expert testimony based on personal experience because no other data existed); *Barnes v. Dist. of Columbia*, Civ. No. 06-315 RCL, 2013 WL 541148, at *17 (D.D.C. Feb. 14, 2013)(same). Rather, Vince has chosen to eschew relevant, reliable data and base his opinions on nothing more than his unidentified experience. This is not permissible.

In sum, the opinions of Mark Jones, Chief Lanier, and Joseph Vince are nothing more than their "say-so" preceded by the talismanic, at least in the view of the District Court, words "in my experience," or "in my expert opinion."[8] While it may be true that an individual can qualify as an expert based on experience, the

---

[8]     The impropriety of relying on nothing more than the unsupported say-so of law enforcement officers can be seen in the irreconcilable positions taken by Maryland State Police with respect to the issue of banning "assault weapons." When such legislation was first considered in 2004, the Maryland State Police issued a formal policy position of opposing the ban. The Maryland State Police is a state agency, and, at the time, the Governor of Maryland was a Republican. In 2013, however, as part of a Democrat administration, Maryland State Police supported an assault weapons ban. In fact, the language used by the Maryland State Police is nearly identical, except for the change in its position. *Compare* Maryland State Police, Position on Proposed Legislation: 2004 Senate Bill 288, Addendum at 1 ("[T]he Department of State Police urges the Committee to give Senate Bill 288 an unfavorable report.") *with* Maryland State Police, Position on Proposed Legislation: 2013 Senate Bill 281, Addendum at 2 ("[T]he Department of State Police urges the Committee to give a favorable report on Senate Bill 281, Firearms Safety Act of 2013.").This is a concrete example of why the unsupported say-so of law enforcement executives should not be accepted without scrutiny.

opinions that an expert offers must be grounded in fact. Simply saying "this is so, because I have experience" cannot be a sufficient foundation upon which constitutional rights may be infringed.

## III. THE "DOUBLY DEFERENTIAL" STANDARD EMPLOYED BY THE DISTRICT COURT IS INAPPROPRIATE IN THE CONTEXT OF A CONSTITUTIONAL CHALLENGE TO A REGULATION OF A FUNDAMENTAL RIGHT.

The District Court applied a "doubly deferential" standard of review to determine whether the District had met its burden to supply substantial evidence. Slip Op. at 21. To support the selection of this novel analytical approach, the District Court relied upon *Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013) and *Turner Broad. Sys. v. FCC*, 520 U.S. 180, 195 (1997). Neither of these cases supports a "doubly deferential" standard.

The seminal language regarding the role of a court conducting heightened review of a challenged law was provided by the Supreme Court in *Turner Broadcasting*. The Court applied intermediate scrutiny to analyze whether a federal law that required broadcasters to carry certain channels violated the First Amendment. The Court noted that it was not the role of a federal court to replace the considered judgment of the legislature with its own. The Court was clear that its ruling did not mean that predictive judgments of the legislature are insulated from review; rather, a court must "assure that, in formulating its judgments, [the

legislature] has drawn reasonable inferences based on substantial evidence." *Turner Broadcasting Systems v. FCC,* 512 U.S. 622, 666 (1994).

Assessing the substantiality of the evidence to support challenged laws must include scrutiny not only of whether the evidence existed, but also of whether the evidence is sufficiently reliable and sound so as to support the predictive judgment of a legislature, *i.e.* whether the legislative body has "drawn reasonable inferences." This necessitates a thorough review of all of the evidence, including whether expert evidence is reliable and based on sufficient data so as to be admissible under Federal Rule of Evidence 702 and whether it lends sufficient support to the positions being taken by the District. What *Turner Broadcasting* does not permit is the rubber-stamping of insufficient, biased, or unsupported "evidence" under a "doubly deferential standard." Such a standard is an abdication of the judiciary's responsibility to ensure that laws are "based on substantial evidence."

*Turner Broadcasting* stated the general principle that the considered judgments of Congress were to be afforded deference because, as an institution, Congress is in a better position than a court to amass and weigh competing data. 520 U.S. at 195. *Turner Broadcasting* did not state that there was any standard of "double deference," as that phrase does not appear in the Court's opinion. Similarly, in *Schrader*, this Court quoted a statement from the Second Circuit's

opinion in *Kachalsky*, *supra*, that "in the context of firearm regulation, the legislature is far better equipped than the judiciary to make sensitive policy judgments." *Schrader*, 704 F.3d 980. This statement was not an endorsement of a "doubly deferential" standard as the District Court thought. Rather it was a restatement of the principle articulated by the Supreme Court in *Turner Broadcasting*. The passage from *Kachalsky* quoted in *Schrader*, was, in turn, quoting *Turner Broadcasting*. *See id*. In short, there is nothing in the law relied upon by the District Court to justify a "doubly deferential" standard of review.

In fact, the only area of law in which such a standard has been employed does not involve the evaluation of the constitutionality of legislative acts at all; it involves a federal court's review of a state prisoner's claim that he or she was denied effective assistance of counsel. *See Burt v. Titlow*, 134 S. Ct. 10, 13 (2013)("When a state prisoner asks a federal court to set aside a sentence due to ineffective assistance of counsel during plea bargaining, our cases require that the federal court use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt."). The instant case bears no resemblance to the factual situation of a state prisoner asking a federal court for relief because he was denied effective assistance of counsel. A federal court's power to grant such relief is heavily constrained by statute and requires such deference. *See* Antiterrorism and Effective Death Penalty Act of 1996, Pub. L.

104-132 (codified as amended in scattered sections of 28 U.S.C.). A federal court's power to strike down unconstitutional legislation, however, has been an inherent and bedrock part of our system of government since its inception. *See Hylton v. United States*, 3 U.S. 171 (1796)(upholding the constitutionality of a federal tax); *see also Marbury v. Madison*, 5 U.S. 137 (1803).

By subjecting Plaintiff-Appellants' Second Amendment rights to a "doubly deferential" standard, the District Court also ran afoul of the Supreme Court's admonitions that Second Amendment rights are not to be treated as "second class" rights. *See McDonald v. City of Chicago*, 130 S. Ct. 3020, 3044 (2010)(refusing to consider Second Amendment rights as "second class" rights for purposes of incorporation). The rights secured by the Second Amendment are no less important, and no less deserving of protection, than the rights secured by any other Amendment.

The District Court erred in subjecting Plaintiff-Appellants' Second Amendment claims to a lower standard of constitutional scrutiny than would be applied to a challenge brought under any other provision of the Constitution requiring heightened judicial review. This Court should remedy that error and analyze the challenged laws in an appropriate manner, giving due deference to policy choices made by the legislature, but requiring that the evidence supporting those choices be substantial, relevant, reliable, and admissible.

## CONCLUSION

Because the registration scheme at issue in this case is not longstanding or widespread, this Court should determine it to be unconstitutional. If the Court applies a balancing test, the general consensus among the Courts of Appeals is that laws that burden the ability of law-abiding, responsible citizens to acquire a firearm to keep in their home must be subjected to strict scrutiny. This Court should not rely on unsupported and unjustified opinions that do not meet the standards for reliability. Finally, this Court should not continue the District Court's error of applying a "doubly deferential" standard that has no basis in constitutional jurisprudence.

/s/ John Parker Sweeney
John Parker Sweeney, Esq.
James W. Porter, III
*Attorneys for Amicus Curiae*
*National Rifle Association*
Bradley Arant Boult Cummings, LLP
1516 L Street, NW, Suite 1350
Washington, DC 20036
(202) 393-7150
jsweeney@babc.com

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 28(e)(2)(a) because this brief contains less than 7,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(viii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

Dated: September 5, 2014

/s/ John Parker Sweeney
John Parker Sweeney, Esq.
*Attorney for Amicus Curiae*
*National Rifle Association*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of September, 2014, this brief of *amicus curiae* National Rifle Association was served, via electronic delivery to all parties' counsel via the Court's appellate CM/ECF system which will forward copies to Counsel of Record.

*/s/ John Parker Sweeney*
Of Counsel

# ADDENDUM



**State of Maryland**
**Department of State Police**
*Government Affairs Section*
*Annapolis Office (410) 974-5068*

## POSITION ON PROPOSED LEGISLATION

DATE:              February 10, 2004

BILL NUMBER:    **Senate Bill 288**          **POSITION: Oppose**

BILL TITLE:      **Maryland Assault Weapons Ban of 2004**

REVIEW AND ANALYSIS:

This legislation seeks to make it a misdemeanor to transport an assault weapon into the State or to possess, sell, offer to sell, transfer, purchase, or receive an assault weapon.

During 2002, 528 homicides were reported in the State of Maryland. Of the homicides committed, 354 involved the use of a firearm. During 2001, 463 homicides were committed and 336 of these involved the use of a firearm.

Homicides involving a firearm have decreased over a period from 1990 to 2002. In 2002, of the 354 homicides involving firearms 330 were handguns, 8 were shotguns, 9 were rifles, and 7 were classified as unknown weapons which include weapons such as crossbows. None of these homicides involved the use of assault type weapons.

From 1994 to 2002, with the exception of the sniper shootings, very few homicides involved assault type weapons. Handguns continue to be the preferable weapon used to commit homicides in the State. Very few crimes involved the use of shotguns or rifles, and in comparison to the number of homicides and handguns used in these crimes, the number of crimes involving shotguns, rifles or assault weapons is negligible.

For these reasons, the Department of State Police urges the Committee to give Senate Bill 288 an unfavorable report.



**State of Maryland**
**Department of State Police**
Government Affairs Section
Annapolis Office (410) 260-6100

## POSITION ON PROPOSED LEGISLATION

**DATE:**            **February 6, 2013**

**BILL NUMBER:**    **Senate Bill 281**    **Position: Support**

**BILL TITLE:**    **Firearms Safety Act 2013**

### REVIEW AND ANALYSIS:

This bill seeks to create a ban of military style assault weapons, and copycat weapons as defined in the legislation. In addition, this bill will reduce the allowable magazine capacity from 20 rounds to 10 rounds. This bill creates a handgun qualification license requirement for those wishing to purchase a handgun.

Maryland State Police, working with our law enforcement partners and the members of the Maryland General Assembly, wish to develop new laws which impact crime and provide for additional protections from firearm violence by those who would unlawfully possess a firearm.

Senate Bill 281 allows citizens to lawfully purchase, own and possess handguns. The bill improves the screening of prospective gun owners to
ensure that weapons don't fall into the hands of dangerous individuals. This bill will strengthen the restrictions on those individuals who are prohibited from possessing a regulated firearm to include the prohibition of those individuals from possessing ammunition as well. This bill will not require anyone to relinquish their lawfully owned firearms. Firearms legally purchased before October 1st, 2013 can remain with their owners.

For these reasons the Department of State Police urges the Committee to give a favorable report on Senate Bill 281, Firearms Safety Act of 2013.

DEF001141