No. 14-7071

## In the
## United States Court of Appeals
## for the District of Columbia Circuit

DICK ANTHONY HELLER, ET AL.,
*Appellants*,

v.

DISTRICT OF COLUMBIA, ET AL.,
*Appellees.*

## On Appeal from the
## United States District Court for
## the District of Columbia

**Brief *Amicus Curiae* of Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, U.S. Justice Foundation, The Lincoln Institute for Research and Education, The Abraham Lincoln Foundation for Public Policy Research, Institute on the Constitution, Conservative Legal Defense and Education Fund, Policy Analysis Center, Downsize DC Foundation, and DownsizeDC.org in Support of Appellants and Reversal**

MICHAEL CONNELLY
  U.S. JUSTICE FOUNDATION
  932 D Street, Suite 2
  Ramona, California 92065
  Counsel for *Amicus Curiae*
  U.S. Justice Foundation


*Attorney of Record
September 9, 2014

WILLIAM J. OLSON*
HERBERT W. TITUS
ROBERT J. OLSON
JEREMIAH L. MORGAN
JOHN S. MILES
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, Virginia 22180-5615
  (703) 356-5070
  Counsel for *Amici Curiae*

# CERTIFICATE AS TO
# PARTIES, RULINGS, AND RELATED CASES

## Parties and *Amici*

Except for the following, all parties, intervenors, and *amici curiae* appearing before the district court below and this Court are listed in the Brief for Appellants: *amici* Brady Center to Prevent Gun Violence, National Rifle Association, Inc., CRPA Foundation, Pink Pistols, Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, U.S. Justice Foundation, The Lincoln Institute for Research and Education, The Abraham Lincoln Foundation for Public Policy Research, Institute on the Constitution, Conservative Legal Defense and Education Fund, Policy Analysis Center, Downsize DC Foundation, and DownsizeDC.org.

## Ruling under Review

References to the ruling at issue appear in the Brief for Appellants.

## Related Cases

This case was previously appealed to this Court as <u>Heller</u> v. <u>District of Columbia</u>, Case No. 10-7036. Other than that, to the best of counsel's knowledge, this case has not been previously before this Court or any court other than the district court below. Counsel are unaware of any related cases currently pending in this Court or any other court.

## **Statutes and Regulations**

All applicable constitutional provisions and statutes and regulations are set forth in the Addendum to the Brief for Appellants.

## CORPORATE DISCLOSURE STATEMENT

The *amici curiae* herein, Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, U.S. Justice Foundation, The Lincoln Institute for Research and Education, The Abraham Lincoln Foundation for Public Policy Research, Institute on the Constitution, Conservative Legal Defense and Education Fund, Policy Analysis Center, Downsize DC Foundation, and DownsizeDC.org, through their undersigned counsel, submit this Corporate Disclosure Statement pursuant to Rules 26.1(b) and 29(c) of the Federal Rules of Appellate Procedure, and Rule 26.1(c) of the Rules of the United States Court of Appeals for the District of Columbia Circuit.

These *amici curiae*, except for Institute on the Constitution, are non-stock, nonprofit corporations, none of which has any parent company, and no person or entity owns them or any part of them. The Institute on the Constitution is not a publicly traded corporation, nor does it have a parent company which is a publicly traded corporation. These *amici curiae* are represented herein by William J. Olson, who is counsel of record, Herbert W. Titus, Robert J. Olson, Jeremiah L. Morgan, and John S. Miles of William J. Olson, P.C., 370 Maple Avenue West, Suite 4, Vienna, Virginia 22180-5615.

_____/s/ William J. Olson_____
William J. Olson

# TABLE OF CONTENTS

<u>Page</u>

Certificate as to Parties, Rulings, and Related Cases

Corporate Disclosure Statement

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

Glossary of Abbreviations. . . . . . . . . . . . . . . . . . . . . . . . . . viii

Interest of *Amici Curiae*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT

I.   THE PRIOR PANEL OPINION HAS RESULTED IN PRECISELY THE SORT
     OF JUDGE-EMPOWERING DECISION AGAINST WHICH <u>HELLER I</u>
     WARNED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

     A.   The District Court Judge Was Free to Pick and Choose from
          Unreliable Evidence to Achieve the Desired Result. . . . . . . . . 9

     B.   The District Court's Analysis Rises and Falls on the Court's
          Subjective Characterization of the Alleged Interests at Stake. . . . 12

     C.   The District Court Had Its Thumb on the Scale of Justice,
          Apparently Reaching a Decision before Even Having
          Considered Plaintiffs' Evidence.. . . . . . . . . . . . . . . . . . . . 13

II.  THE D.C. FIREARMS REGISTRATION ACT IS UNCONSTITUTIONAL ON
     ITS FACE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

A.      The District Court Decision Is Based Upon a False Factual Premise that the Registration Requirement Applies Equally to All D.C. Residents.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

B.      The D.C. Firearms Registration Law Rests upon an Unconstitutional Foundation.. . . . . . . . . . . . . . . . . . . . . . . . 19

C.      The D.C. Firearms Registration Act Unconstitutionally Discriminates against One Class of American Citizens in Favor of Another.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

III.    THE SECOND AMENDMENT DOES NOT CONTAIN AN "URBAN AREA" EXCEPTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

IV.    THE D.C. LAW LIMITING HANDGUN PURCHASES TO TWELVE ANNUALLY VIOLATES THE SECOND AMENDMENT. . . . . . . . . . . . . . 30

CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

# TABLE OF AUTHORITIES

Page

**CONSTITUTION**
*Amendment II. . . . . . . . . . . . . . . . .   2-6, 9-10, 14, 20-21, 23-26, 29, 31-32

**STATUTES**
D.C. Code Section 6-2301. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
D.C. Code Section 7-2502.01(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . 18
D.C. Code Section 7-2502.01(b)(1). . . . . . . . . . . . . . . . . . . . . . . 16, 17
D.C. Code Section 7-2502.01(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . 17
D.C. Code Section 7-2502.03. . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 30

**CASES**
*District of Columbia v. Heller, 554 U.S. 570 (2008)
. . . . . . . . . . . . . . . . . . . . . .   1, 3, 5-8, 10, 13, 15, 19-24, 27, 29, 31-32
Heller v. District of Columbia, 698 F.Supp.2d 179 (D.D.C. 2010). . . . . . . .   5
Heller v. District of Columbia, 670 F.3d 1244 (D.C. Cir. 2011)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5-8, 12, 26
Jacobellis v. Ohio, 378 U.S. 184 (1964). . . . . . . . . . . . . . . . . . . . . . 31
Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803). . . . . . . . . . . . . . 15, 23
*McDonald v. City of Chicago, 561 U.S. 742 (2010). . . . . . . . . . .   1, 3, 27-29

**MISCELLANEOUS**
D. Burnett, Tough Targets: When Criminals Face Armed Resistance
    from Citizens, Cato Institute (2012). . . . . . . . . . . . . . . . . . . . . . . 26
C. Elsworth, "Most people own a weapon, families will keep around 27.
    Granny had 13," The Telegraph (Apr. 18, 2007). . . . . . . . . . . . . . . . 30
E. Miller, "Emily got her gun!" The Washington Times, Feb. 8, 2012. . . . . .   4
E. Miller, "Emily got her gun!" The Washington Times, 20-part series
    from Oct. 5, 2011 to Feb. 8, 2012. . . . . . . . . . . . . . . . . . . . . . . .   4
R. J. Rummel, Death by Government, Transaction Publishers (1997). . . . . . 20
A. Scalia & B. Garner, Reading Law (West 2012). . . . . . . . . . . . . . . . . 15
Sources of Our Liberties 295 (R. Perry & J. Cooper, eds., American
    Bar Foundation: Rev. ed. 1978). . . . . . . . . . . . . . . . . . . . . . . . . 23

* Authorities upon which we chiefly rely are marked with asterisks.

H. Titus, "Second Amendment:  Rule by Law or By Judges," 8
    Liberty Univ. L. Rev. 577 (2014). . . . . . . . . . . . . . . . . . . . . .  14, 27

## GLOSSARY OF ABBREVIATIONS

FRA. . . . . . . . . . . . . . . . . . . . . . . . . . D.C. Firearms Registration Act

### INTEREST OF *AMICI CURIAE*

The *amici curiae*, except Institute on the Constitution, are nonprofit organizations, exempt from federal taxation under sections 501(c)(3) or 501(c)(4) of the Internal Revenue Code, and each is dedicated, *inter alia*, to the correct construction, interpretation, and application of the law, with particular emphasis on constitutional guarantees related to firearm ownership and use. Institute on the Constitution is an educational organization.[1] Each of the following *amici* has filed *amicus curiae* briefs in other federal litigation involving similar issues, and some were *amici* in <u>District of Columbia</u> v. <u>Heller</u>, 554 U.S. 570,[2] <u>McDonald</u> v. <u>City of Chicago</u>, 561 U.S. 742,[3] and <u>Heller</u> v. <u>District of Columbia</u>, 670 F.3d 1244 (D.C. Cir. 2011)[4]: Gun Owners of America, Inc.; Gun Owners Foundation; Gun Owners of California; U.S. Justice Foundation; The Lincoln Institute for Research and Education; The Abraham Lincoln Foundation for

---

[1] All parties have consented to the filing of this brief *amicus curiae*. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members or their counsel contributed money that was intended to fund preparing or submitting this brief.

[2] http://www.lawandfreedom.com/site/constitutional/DCvHeller Amicus.pdf.

[3] http://www.lawandfreedom.com/site/firearms/McDonald_Amicus.pdf.

[4] http://www.lawandfreedom.com/site/firearms/HellerII_Amicus.pdf.

Public Policy Research; Institute on the Constitution; Conservative Legal Defense and Education Fund; Policy Analysis Center; Downsize DC Foundation; and DownsizeDC.org.[5]

## SUMMARY OF ARGUMENT

Since the U.S. Supreme Court decided <u>District of Columbia</u> v. <u>Heller</u>, lower federal courts have resisted application of the original textual and historical Second Amendment principles to challenges to numerous laws having an impact upon the individual right to keep and bear arms. This appeal is no different.

Prompted by the instructions of an earlier panel decision, the district court below purported to subject the new D.C. firearms registration law to "intermediate scrutiny," contrary to the Supreme Court's instructions in <u>Heller</u>. Even then, the district court misapplied the test, picking and choosing from among sociological studies, and mischaracterizing the competing interests to establish some foundation for its decision that the constitutional rights of D.C. gun owners must give way to the overriding interests of public and police safety.

---

[5] A list of other firearms-related *amicus curiae* briefs filed by these *amici* appears in Brief *Amicus Curiae* of Gun Owners of America, Inc., *et al.* in <u>Shew</u> v. <u>Malloy</u>, U.S. Court of Appeals for the Second Circuit, No. 14-319 (May 23, 2014), pp. 1-3. http://www.lawandfreedom.com/site/firearms/Shew%20GOA%20amicus%20brief%20as%20filed.pdf

Had the district court complied with <u>Heller</u>, it would have found the D.C. registration law in violation of the Second Amendment because the onerous and intrusive registration requirements undermines the primary purposes of the right to keep and bear arms — to resist tyranny and to defend self, family and property. Further, by discriminating among private citizenry and conferring special privileges upon government officials and the wealthy and politically powerful, the D.C. law protects only friends of the government, undermining a right that belongs to all of "the people."

Finally, the district court flaunts the principle established in <u>McDonald</u> v. <u>Chicago</u> that the right to keep and bear arms is the same whether a person lives in a high crime urban area or in a relatively safe suburban or rural environs. And, upholding the D.C. Code limitation to one handgun per month, the district court infringes upon the principle of individual choice established in <u>Heller</u>.

## STATEMENT

In 2008, the U.S. Supreme Court struck down the District of Columbia's ("District") almost complete ban on handguns in the home. <u>District of Columbia</u> v. <u>Heller</u>, 554 U.S. 570 (2008) ("<u>Heller I</u>"). Five of these *amici* filed a brief *amicus curiae* in that case, urging the case be decided based on an analysis of the

text and historical context of the Second Amendment.[6]  Such an approach was adopted by the Supreme Court, having rejected the interest-balancing approach argued by the District.[7]

After its loss in <u>Heller I</u>, the D.C. City Council deliberately crafted new registration and licensing regulations which technically permit possession of handguns in the home, but are so onerous as to effectively make the process so difficult and expensive that few can obtain even one firearm and, even then, only at great risk of missteps punishable by stiff legal penalties.[8]

---

[6]  http://www.lawandfreedom.com/site/constitutional/DCvHeller Amicus.pdf.

[7]  *See* the following briefs in <u>Heller I</u>:  D.C. Petitioner's Brief, pp. 40-49, and Brief *Amicus Curiae* of Gun Owners of America, *et al.*, Section III, pp. 28-31.

[8]  *See* E. Miller, "Emily got her gun!" *The Washington Times*, (Feb. 8, 2012), http://www.washingtontimes.com/blog/guns/2012/feb/8/miller-emily-got-her-gun/ and *see generally* Emily Miller's 20-part series from Oct. 5, 2011 to Feb. 8, 2012 chronicling the "**months of aggravation, hundreds of dollars in fees, countless hours jumping over hurdles**" before she was "finally exercising my second amendment right to keep arms (bearing arms is still illegal in the nation's capital)."  "Emily got her gun!" (emphasis added).  In stark contrast to the reality of compliance with the District's gun laws, the district court characterizes this regulatory Everest as "mere[] registration requirements … [s]eeking to accommodate that constitutional right while also protecting the community from gun violence."  <u>Heller</u> v. <u>District of Columbia</u>, 2014 U.S. Dist. LEXIS 66569, *2 (D.D.C. 2014) (hereinafter "<u>Heller III</u>").

Heller and others again brought suit challenging these new regulations, arguing that the legal test employed should be "strict scrutiny" rather than the more deferential "intermediate scrutiny. The district court judge disagreed, choosing the "intermediate scrutiny" test which has the effect of maximizing judicial discretion, enabling him to uphold the new regulations in their entirety. Heller v. District of Columbia, 698 F.Supp.2d 179, 184, 186 (D.D.C. 2010). Heller appealed to this Court. Heller v. District of Columbia, 670 F.3d 1244 ("Heller II") at 1256 (D.C. Cir. 2011).

Again, several of these *amici* filed a brief *amicus curiae* in Heller II,[9] arguing that, as laid out by the Supreme Court in Heller I, the appropriate analysis to be employed in Second Amendment cases is textual and contextual, and involves no judicial interest balancing. The brief filed by these *amici* can be summarized as follows: once a court determines that a person is part of "the People," the weapon is a protected "arm," and the restricted activity involves "keep[ing]" or "bear[ing]," the Second Amendment provides its own standard of review — "shall not be infringed." *See* Brief *Amicus Curiae* of Gun Owners of America, Inc., *et al.*, in Heller II at 30.

---

[9] http://lawandfreedom.com/site/firearms/HellerII_Amicus.pdf.

However, disregarding both the text of the Second Amendment and the Supreme Court's teaching in Heller I, a majority of the Heller II panel decided to adopt the "two step" approach devised by the federal judiciary, which has exhibited little sympathy to gun rights. Heller II at 1252. This approach allowed the Heller II panel, like so many other federal courts around the country, to side-step the unambiguous text of the Second Amendment, substituting "intermediate scrutiny." *Id*. at 1257. This, in turn, empowered the panel majority to decide whether Plaintiffs' Second Amendment claim was trumped by asserted government interests in public safety and welfare. *Id*. at 1253, 1261.

Although Heller I observed that there were certain "presumptively lawful" gun laws, such as ones that were "longstanding," (Heller I at 626-27), the Court never stated that such laws were "conclusively lawful." Indeed, the Court made clear that "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id*. at 635. Indeed, the prior panel, however, decided that a simple determination that a regulation was "longstanding" completely absolved it of any duty of meaningful judicial review. The prior panel stated that because "the basic requirement to register a handgun is longstanding … [t]herefore we

presume the District's basic registration requirement … does not impinge upon the right protected by the Second Amendment." <u>Heller II</u> at 1254. With this remarkable statement, the prior panel revealed its decision was based only on presumption, not on the Constitution.

Writing in dissent, Judge Kavanaugh faithfully applied <u>Heller I</u>, calling it "enormously significant jurisprudentially…." <u>Heller II</u> at 1270. Judge Kavanaugh correctly noted that <u>Heller I</u> rejected the notion that "judges [may] re-calibrate the scope of the Second Amendment right based on judicial assessment of" the individual versus governmental interests. *Id*. at 1271. Judge Kavanaugh explained that "*Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on **text, history, and tradition**, not by a balancing test such as strict or intermediate scrutiny." *Id.* (emphasis added).

In response, the prior panel majority took the position that "intermediate scrutiny" is not the "interest-balancing test" proposed and applied by Justice Breyer. <u>Heller II</u> at 1264. In <u>Heller I</u>, Justice Breyer favored intermediate scrutiny, specifically stating that **"strict scrutiny" was too high** of a burden, and that **"rational-basis" was too low** of a burden, and therefore a middle ground was appropriate. <u>Heller I</u> at 689-90. Although Justice Breyer never

explicitly called his proposed test "intermediate scrutiny," it could not be viewed to be anything else. Justice Breyer described his proposed test as "whether the challenged statute '**burdens a protected interest** in a way or **to an extent** that is out of proportion to the statute's **salutary effects** upon other **important governmental interests**.'" *Id*.

Even though the Heller II panel attempted to distinguish its "intermediate scrutiny" test as one devoid of the interest balancing condemned in Heller I (*see* Heller II at 1264-65), its test is remarkably comparable to Justice Breyer's. At the heart of both tests is how important the individual's interest is, whether there is a "substantial governmental interest," and whether the right to keep and bear arms must give way to a burdensome regulation so long as that burden is not "broader than necessary" to achieve the purported regulatory goal of public safety. *See* Heller II at 1258. No matter how one slices it, the Heller II panel's test calls for judicial interest balancing. Only by flatly denying the same test was being used — employing judicial legerdemain rivaling the performances of Houdini — could the prior panel escape the clear teachings of Heller I.

Contrary to the prior panel's attempt to draw a distinction, intermediate scrutiny is precisely the "judge-empowering," interest-balancing test put forth by

Justice Breyer, but rejected by the Heller I majority. Intermediate scrutiny gives a court the ability to consider whatever evidence it wishes, to characterize the interests at stake, and to assign weight subjectively or even arbitrarily in reaching its decision. One need only examine the district court opinion below to see this is the approach that was ordered by the Heller II panel and followed by the district court.

## ARGUMENT

### I. THE PRIOR PANEL OPINION HAS RESULTED IN PRECISELY THE SORT OF JUDGE-EMPOWERING DECISION AGAINST WHICH HELLER I WARNED.

#### A. The District Court Judge Was Free to Pick and Choose from Unreliable Evidence to Achieve the Desired Result.

Having received its marching orders from this Court, the district court below reviewed a mountain of "professional opinions," "personal experience," and "empirical evidence" put on by the parties. Heller III at *44-46. The lower court then issued a 20,000 word opinion — adding to the 12,500 word opinion of the prior panel. Neither opinion, however, addressed the text or historical context of the Second Amendment. Obviously, the Founding Fathers never sought the advice of social science "experts" when determining the wording of the constitutional right to keep and bear arms against tyrants. Nor should this

Court find it necessary to gather opinions of social scientists to understand the right's modern meaning. Rather, as <u>Heller I</u> affirmed, the Second Amendment codifies a "pre-existing right." <u>Heller I</u> at 592. As such, it is not subject to the vicissitudes of sociological studies or judicial opinions.

Virtually all of the District's evidence was accepted at face value and given maximum weight by the district court[10] — and, indeed, lauded as "common sense"[11] — while disregarding almost all of Plaintiffs' evidence.[12] All criticisms

---

[10] <u>Heller III</u> at *50 ("powerful evidence in favor of gun registration"); *63 ("substantial evidence that all this is necessary"); *64 ("backed not only by 'simple common sense,' … but also by an impressive array of expert testimony"); *82-83 ("the District has further supplemented this already-impressive array of evidence with the testimony of several of its expert witnesses….").

[11] *Id.* at *64, *66, *74, *79, *80.

[12] *Id.* at *50 ("none of their arguments is persuasive"); *70 ("Plaintiffs launch several broadsides [which] miss the mark"); *86 ("Plaintiffs stand at the ready with two arguments … [n]either is convincing.").

of the District's evidence were written off as insignificant or immaterial,[13] while

every criticism of Plaintiffs' evidence was deemed to be valid.[14]

When the District provided empirical evidence, the district court was quick

to point that out. *See, e.g.*, <u>Heller III</u> at *46. When the District provided no

empirical evidence, the district court deemed that omission immaterial, stating

that "the District need not prove with empirical evidence…." *Id.* at *80; *see*

*also id.* at *97. When the District failed to offer any evidence at all in support of

a provision, the district court was happy to fill in the blanks by calling the

provision a "common-sense inference…." *Id.* at *66. Even when Plaintiffs did

manage to show an irrefutable flaw in the District's case, the district court

dismissed the argument as "better presented to the D.C. Council than to the

federal judiciary." *Id.* at *60. In summary, the district court applied a

profoundly deferential test of constitutionality: when faced with "conflicting

evidence … the judiciary must defer to the [District]." *Id.* at *61.

---

[13] *Id.* at *53-55, *57 ("Although Plaintiffs have raised some important points, these are not enough…."); *73-74 ("even if, as Plaintiffs claim, this study is flawed, common sense alone is enough for the District to justify its desire…."); *87 ("Although the research cited by the District may not be perfect, it is clearly sufficient….").

[14] *Id.* at *57-58 ("The District notes … that there are reasons to be skeptical of Plaintiffs' numbers….").

**B.    The District Court's Analysis Rises and Falls on the Court's Subjective Characterization of the Alleged Interests at Stake.**

Disregarding Heller I, the district court undertook an examination of the District's regulations in order to weigh their perceived usefulness against the Court's perceived lack of usefulness of gun rights.  The district court characterized the process described as "months of aggravation, hundreds of dollars in fees, countless hours jumping over hurdles" that was faced by journalist Emily Miller simply to obtain a firearm as "'self-evidently de minimis.'"[15] Heller III at *42, *64, *76, *91.  The district court then weighed this vague and inconstistent description of the burden on citizens against the District's interests, which it determined to be quite "substantial" indeed. *Id.* at *36.

Assuredly, the district court's decision was driven by how it characterized the competing interests.  On the one hand, the district court reveals its preferences in describing the Second Amendment right as being based on nothing

---

[15]    The prior panel claimed that intermediate scrutiny was appropriate for registration requirements because "registration requirements **'do[] not severely limit the possession of firearms**.'"  Heller II at 1257 (emphasis added).  Ironically, the district court on remand then used intermediate scrutiny to uphold the registration requirement because "[l]imiting District residents to one pistol each month … will **reduce the overall number of firearms** in circulation.…" Heller III at *84-85 (emphasis added).

more than a desire to "assembl[e] a personal arsenal." *Id.* at *100. Who could possibly be in favor of that? The District's interests, on the other hand, are made to sound benevolent and princely — "'[p]rotect[ing] police officers' and 'promoting public safety'" by "screen[ing] out dangerous and irresponsible people." *Id.* at *37-38. Who could possibly be opposed to that? When sanitized in such a manner, how could gun rights ever triumph against the state's interests? Indeed, if the Supreme Court employed this same type of analysis in <u>Heller I</u>, it would have resulted in the District's handgun ban being upheld rather than struck down. *See* <u>Heller I</u> at 681-83, 687-705 (Breyer, J., dissenting).

**C.    The District Court Had Its Thumb on the Scale of Justice, Apparently Reaching a Decision before Even Having Considered Plaintiffs' Evidence.**

Each and every time the district court considered a provision of the District's gun laws, it considered only the District's evidence before determining that the provision "satisfies intermediate scrutiny." <u>Heller III</u> at *50, *70, *80, *86, *96. Only after having decided against Plaintiffs did the district court even bother to consider Plaintiffs' evidence, and when it did refer to it, the court swept it aside. In fact, the district court even admits that "[b]y now, the analytic routine should be familiar: the Court starts by assessing the burden of the

requirements, next applies intermediate scrutiny, and finally addresses Plaintiffs' counterarguments." *Id.* at \*75. This raises the question as to why Plaintiffs were asked to put on evidence, since the district court looked at it only after having already decided that a particular regulation "survives intermediate scrutiny." *See, e.g.*, *id.* at \*50. If the conclusion had already been reached, then there was no reason to review Plaintiffs' evidence at all.

The decision of the prior panel gives the impression that it was remanded only to fill in the blanks to give the prior panel a more complete record in order to better support its desired result. True to task, the district court faithfully used intermediate scrutiny, thereby subordinating the views of "the People" in the Constitution to the personal policy preferences of a federal judge.

As applied by the district court, intermediate scrutiny is no test at all. Instead it is mere camouflage for avoidance of the constitutional text.[16] Reliance on expert opinion, instead of the text and historic context of the Second Amendment, is incapable of producing a rule fixed as to time and, therefore, departs from the rule of law in favor of the rule by judges and academic specialists whose opinions vary over time. This is the fundamental flaw of an

---

[16] *See, e.g.*, H. Titus, "Second Amendment: Rule by Law or By Judges," 8 LIBERTY UNIV. L. REV. 577, 587-96 (2014).

evolving or "Living Constitution"[17] — the very antithesis of our written

Constitution. *See* <u>Marbury</u> v. <u>Madison</u>, 5 U.S. (1 Cranch) 137, 176 (1803)

("[T]he people have an original right to establish[] for their future government …

principles [that] are designed to be permanent.").

The Supreme Court in <u>Heller I</u> made it clear that the analysis ordered by

the prior panel and engaged in by the district court is wholly irrelevant to

resolving this Second Amendment challenge. The <u>Heller I</u> Court noted that

> [w]e know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach. The very enumeration of the right takes out of the hands of government — even the Third Branch of Government — the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad. [<u>Heller I</u> at 634-35.]

---

[17] *See* A. Scalia & B. Garner, <u>Reading Law</u> (West 2012), pp. 403-410.

## II. THE D.C. FIREARMS REGISTRATION ACT IS UNCONSTITUTIONAL ON ITS FACE.

### A. The District Court Decision Is Based Upon a False Factual Premise that the Registration Requirement Applies Equally to All D.C. Residents.

The district court has reported in its opinion that the D.C. Firearms Registration Act ("FRA") "requires that **all** gun owners in the District **individually** register **each** of their firearms with the city government," thereby triggering "a host of obligations, limitations, and prohibitions [associated with] that basic registration mandate." *See* <u>Heller III</u> at *5 (emphasis added). This statement is patently untrue. FRA's firearms registration requirement, with its associated obligations and limitations, prohibitions and penalties, does not apply to all gun owners. Rather, it is riddled with exceptions.

FRA specifically states that the registration requirement does not apply to:

> [a]ny law enforcement **officer** or **agent** of the **District** or the **United States**, or any law enforcement officer or agent of the government of **any state** or **subdivision** thereof, or any member of the **armed forces** of the United States, the **National Guard** or **organized reserves**, when such officer, agent, or member is authorized to possess such a firearm or device while on duty in the performance of official authorized functions. [D.C. Code Section 7-2502.01(b)(1) (emphasis added).]

This special exception is not limited to those firearms officially issued to such officer, agent, or member. Rather it applies broadly to all firearms owned or possessed by any such officer, agent, or member for any purpose whatsoever, including for his private use or protection.

To be sure, one might assume that this exception would not apply to firearms kept for private use or protection, because it does not expressly provide for such use or protection. But that reading is precluded by a comparison to the more limited exception conferred upon a licensed firearms dealer for the firearms "[a]cquired … in the normal conduct of business," which expressly does **not** apply to any firearm that is "kept" by the dealer for his "private use or protection." *See* D.C. Code Section 7-2502.01(b)(2). In such case, the licensed dealer must comply with the more onerous registration requirements imposed by D.C. Code Section 7-2502.03 upon the ordinary District resident. There is no comparable provision in D.C. Code Section 7-2502.01(b)(1).

In addition to this broad mandatory statutory exception, there are several discretionary exceptions built into the law that fall within the power of the D.C. Metropolitan Chief of Police who is apparently authorized to issue "registration certificates" to the following:

- an **organization** and its **president or CEO** which employs at least one commissioned special police officer or employee licensed to carry a firearm during the employee's duty hours;

- a **police officer** who has **retired** from the Metropolitan Police Department; and

- the **Fire Marshall,** and any member of the **Fire and Arson Investigation Unit of the Fire Prevention Bureau** of the Fire Department of the District of Columbia, as designated by the Fire Chief. [*See* D.C. Code Section 7-2502.01(a)(1)(A) and (B), 2 and 3 (emphasis added).]

It is evident that both groups of special exceptions extend to many thousands of civil servants and military personnel working in federal, state, and district government. What is not well-known is that the special exception for entities that employ "special police officers or employees" also extends to an untold number of politically powerful private sector businessmen.[18] These corporate executives can avoid the onerous registration requirements so long as they stay in the good graces of the D.C. Chief of Police, just as government workers have their exemption based on the good graces of the agency for which they work.

---

[18] The rationale for extending the special exemption to the president or CEO of certain large businesses and nonprofit organizations is not obvious, especially since all these organizations already have armed police, and the organization has a special exemption as well. Moreover, a business with only two employees (a president and an armed employee) would appear to qualify.

Section 6-2301 of the D.C. Code states that FRA is based upon a finding "that **in order to promote the health, safety and welfare** of the people of the District of Columbia it is **necessary** to: [r]equire the registration of **all** firearms that are **owned** by **private citizens**." (Emphasis added.) However, by enacting and implementing FRA, the D.C. Council deliberately adopted the policy that the health, safety, and welfare of the D.C. community is threatened only by guns in the hands of some "private citizens," but not by guns in the hands of the government or the District's politically connected and wealthy business community.

As recognized by the U.S. Supreme Court in <u>Heller I</u> at 580-81, and as demonstrated and explained below, the District's exemptions are foreclosed by the Second Amendment, which protects the rights of all Americans, not a privileged few.

**B.     The D.C. Firearms Registration Law Rests upon an Unconstitutional Foundation.**

Three times in the opening paragraphs of its opinion, the district court stressed that it was the overriding duty of D.C. government officials to deal with "gun violence" — to "protect[] the community from gun violence," and to "combat gun violence," as if somehow guns themselves were the danger to

public safety, and not the persons who misuse those guns. <u>Heller III</u> at *2-3. By attributing blame for violence caused by human hands to the guns, the district court managed to ignore the fact that history has demonstrated that guns in the hands of government officials are highly susceptible to misuse.[19] Likewise, guns in the hands of wealthy and powerful business and nonprofit organization presidents and CEOs who are approved by the D.C. Chief of Police are capable of abuse. Moreover, the district court's sanctioning of such arbitrary exemptions ignores the text and historic purpose of the Second Amendment — including ensuring private ownership of firearms to protect "the people" from the threat of tyrannical misuse of firearms by government officials and their favored classes.

Fortunately, in <u>Heller I</u>, the Supreme Court did not miss the Second Amendment's historic purpose. As clearly stated in the Second Amendment's prefatory clause, the right to keep and bear arms was expressly designed to "secur[e] a free State," maintain the "security of a free State," that is, a "free polity." *Id.*, 554 U.S. 570, 597 (2008). Among the reasons for the right to keep and bear arms recounted by the Court was to ensure that "the able-bodied men of [the] nation are trained in arms and organized, [so that] they are better able to

---

[19] *See, e.g.,* R. J. Rummel, <u>Death by Government</u>, Transaction Publishers (1997).

resist tyranny." *Id.* at 598. A necessary corollary to one's right to keep and bear arms was, and remains, ready personal access to such arms as would be necessary to resist tyrants. Therefore, the Second Amendment was set as a jurisdictional barrier against any effort by civil authorities to "tak[e] away the people's arms." *Id.*

But the Second Amendment does more than prohibit confiscation of the people's arms. Rather, it prohibits any measure that rests upon the assumption that the government has "plenary" authority to say who belongs to the people's militia. *See id.* at 600. As the district court acknowledges, FRA requires D.C. citizens not just to register each of their long guns as well as handguns with the city government, but ties to that registration "a host of obligations, limitations, and prohibitions to that basic registration mandate," along with severe penalties for the violation of any of these myriad requirements. Heller III at *5.

Among the "host" of qualifying requirements is a complete background check, including:

- appearing personally for photograph and fingerprinting;
- providing one's place of employment and history of residency going back five years;
- taking and passing a firearms regulation test administered by the police;

- completion of a firearms training and safety course administered by the District; and
- paying a fee to reimburse the District for its costs of the registration. <u>Heller III</u> at *6-7.

Additionally, having registered his firearm, the owner is obliged to:

- keep the registration certificate with him whenever he is in possession of the weapon and produce the registration certificate to any law enforcement official on demand;
- notify police of any change of address or change of name;
- obtain permission of the police to transfer the firearm; and
- continually renew the registration certificates which expire every three years. <u>Heller III</u> at *8.

Any violation of these requirements is enforced with harsh penalties, including fines, revocations, prohibitions, and prison time. *Id.*

Such bureaucratic smothering of the ownership of constitutionally protected firearms infringes the right to keep and bear arms, securing that right as if it belonged to only "a select militia of the sort the Stuart kings found useful," but not as it was designed to secure — "the people's militia that was the concern of the founding generation." <u>Heller I</u> at 600. Under FRA, it is the D.C. Government which enrolls, selects, trains, and oversees the people's access to, and continuing use of, constitutionally secured firearms. Such a system of control undermines the constitutionally guaranteed "citizen militia" composed of self-trained and disciplined volunteers ready at arms "to oppose an oppressive

military force if the constitutional order broke down." *See id*. at 599. Indeed,

FRA secures the opposite, a dependent and compromised people whose right to

keep and bear arms is subject to the discretionary power to ensure that the polity

conforms to the wishes of the D.C. Council, and the Metropolitan Chief of

Police, acting as Lords and benefactors of the people, rather than as servants in a

constitutional republic as established by a written constitution. *See* Marbury, at

176-77.

C.    **The D.C. Firearms Registration Act Unconstitutionally Discriminates against One Class of American Citizens in Favor of Another.**

While the history of the Second Amendment may be traced to the 1689

English Bill of Rights, as the Heller I Court explained (*id*. at 598), there are two

instructive distinctions between the right as stated in the British document and the

one that appeared 102 years later in the 1791 federal Bill of Rights. First,

Paragraph 7 of the 1689 document secured the "right" only to British "subjects"

who were "protestants." *See* Bill of Rights, reprinted in Sources of Our

Liberties, p. 246 (R. Perry & J. Cooper, eds., rev. ed., ABA Foundation:1978)

("Sources"). Second, the "right" secured was discretionary, stating only that

these selected subjects "may have arms for their defence suitable to their

conditions, and as allowed by law." *Id.* In contrast, the Second Amendment of the Bill of Rights to the U.S. Constitution extends its protection of the right to keep and bear arms to all of the "people" — not a selected subclass. Heller I establishes that "'the people' … unambiguously refers to all members of the political community." *Id.* at 580. Second, the Amendment "codified a *preexisting* right" — not one subject to change as suited to the conditions and as allowed by law. *See* Heller I at 592. Thus, the Amendment commands that this preexisting right is not to be "infringed," that is, not limited in any way to fit current or future conditions.

In Heller I, the Supreme Court rejected the notion that the Second Amendment referred only to a government-organized militia because it consisted of only a "subset" of the "people" — "male, able-bodied, and within a certain age group." *Id.* at 580-81. Thus, the Court reasoned, to read the Second Amendment to protect only the collective right of an organized militia would extend the right to only part of the "people," and would conflict directly with the Second Amendment text." By exempting politically favored classes of government workers and large corporate and nonprofit entities from its registration requirements, FRA violates this fixed principle.

## III. THE SECOND AMENDMENT DOES NOT CONTAIN AN "URBAN AREA" EXCEPTION.

The district court recognized that its fundamental responsibility in this case was to determine whether the District's firearms laws being challenged by the Plaintiffs "infringe[] their Second Amendment rights." Heller III at *3. Nevertheless, the court began its opinion not by addressing the text or context of the Second Amendment, or even a discussion of Second Amendment case law, but rather with a plaintive plea about the prevalence of crime in the District of Columbia:

> The District of Columbia knows gun violence. Notorious for a time as the "murder capital" of the United States, it recorded over 400 homicides annually in the early 1990s -- more than one for every 1500 residents. [*Id.* at *1.]

The district court then found that the District's "substantial government interest" in restricting firearms ownership[20] was "particularly compelling in the District of

---

[20] The district court cites "empirical data" about crimes committed with firearms and then leaps to the assumption that violence in the District is caused by the presence of firearms. *Id.* at *38-39. While such data may reflect correlation between violence and firearms, they do nothing to establish causation. The court does not even consider that the District has been under a virtually complete gun ban for decades. Under such circumstances, is it not more reasonable to assume that the District's problem of gun violence is tied to the fact that in the District, guns in private hands are possessed almost exclusively by criminals? Would it not make more sense to conclude that firearms violence is

Columbia, a '**densely populated urban area**' that 'share[s] the problem of gun violence with other **dense, urban jurisdictions**.'" *Id*. at \*38 (emphasis added). Additionally, the court below felt free to dismiss lessons learned from the abolition of Canada's long-gun registry because "our northern neighbor comprises several sparsely populated, rural provinces while D.C. is a **dense, entirely urban** jurisdiction." *Id*. at \*60 (emphasis added).

Focusing on the urban nature of the District of Columbia to justify the District's harsh anti-gun laws, the district court cited this Court's earlier Heller II opinion which concluded:

> the evidence demonstrates a ban on assault weapons is likely to promote the Government's interest in crime control in the **densely populated urban area** that is the District of Columbia. *See* Comm. on Pub. Safety, Report on Bill 17-593, at 4 (Nov. 25, 2008) ("The District shares the problem of gun violence with other **dense, urban** jurisdictions"). [Heller II at 1263 (emphasis added).]

In seeking to justify gun laws as being consistent with the Second Amendment, the district court, and indeed, this Court before it, rely on an unspoken assumption that federal constitutional rights may vary by locality, and the

---

high because the District's gun laws have rendered law-abiding residents of the District vulnerable to armed criminals? *See, e.g.*, D. Burnett, Tough Targets: When Criminals Face Armed Resistance from Citizens, Cato Institute (2012).

necessary corollary that citizens residing in one part of America may have fewer federal constitutional protections than citizens residing in another part.[21] This proposition has already been foreclosed by the U.S. Supreme Court.[22]

Heller I specifically rejected an urban areas exception argument made by D.C. that: "The dangers [handguns] cause are particularly acute in the District. As Councilmember Clarke noted, 'The District of Columbia is a unique place.... [O]ur area is **totally urban**. There is no purpose in this city for ... handguns other than to shoot somebody else with.'" Heller I, Brief of Petitioners, p. 49 (emphasis added).

Again in McDonald, the municipal respondents offered the same "urban area" arguments offered by the District of Columbia. Like the district court below, Justice Breyer in dissent found those arguments persuasive:

> Those who live in **urban areas**, police officers, women, and children, all may be particularly at risk.... The nature of gun violence also varies as between rural communities and cities. **Urban centers** face significantly greater levels of firearm crime and homicide, while rural communities have proportionately greater problems with nonhomicide gun deaths, such as suicides and accidents. And idiosyncratic **local factors**

---

[21] *See* H. Titus at 595.

[22] Justice Breyer made this same argument in Heller I. *See id.* at 695-98.

can lead to two cities finding themselves in dramatically different circumstances: For example, in 2008, the murder rate was 40 times higher in **New Orleans** than it was in **Lincoln, Nebraska**. [McDonald, 130 S.Ct. at 3127-29 (J. Breyer, dissenting) (emphasis added).]

However, the majority in McDonald[23] refused to balkanize civil liberties,

rejecting such distinctions as incompatible with our constitutional scheme:

We likewise **reject municipal respondents' argument** that we should depart from our established incorporation methodology on the ground that making the Second Amendment binding on the States and their subdivisions is inconsistent with principles of federalism and will stifle experimentation. Municipal respondents point out — quite correctly — that **conditions and problems differ from locality to locality** and that citizens in different jurisdictions have divergent views on the issue of gun control. Unless we turn back the clock or adopt a **special incorporation test** applicable only to the Second Amendment, municipal respondents' argument **must be rejected**. Under our precedents, if a Bill of Rights guarantee is fundamental from an American perspective, then, unless *stare decisis* counsels otherwise, **that guarantee is fully binding on the States** and thus *limits* (but by no means eliminates) their ability to devise solutions to social problems that suit local needs and values…. The relationship between the Bill of Rights' guarantees and the States must be governed by a **single, neutral principle**. [McDonald at 3045-46, 3048 (emphasis added).]

---

[23] Not only did McDonald reject the power of states to undermine the right to keep and bear arms, but it was also a specific rejection of the draconian gun control laws in a dense, urban area known as the city of Chicago.

In accepting the District's legal position, the district court has treated Justice Breyer's dissent in <u>McDonald</u> as if it were the majority opinion. The district court rejected the requirement of a "single, neutral principle," and instead allowed one set of watered-down constitutional liberties to exist in "dense, urban jurisdictions" and another set in rural areas, in direct conflict with the principle of national uniformity clearly articulated in the Supreme Court's opinion in <u>McDonald</u>.[24]

Indeed, in crafting the Second Amendment, the Founders wrote a rule that was as equally applicable to citizens of large, densely populated cities of that day (*e.g.*, New York City with 33,131 people, Philadelphia with 28,522 people) as it was to residents of rural, and even frontier, areas. It should be no different today. If federal constitutional rights are to be the same for all Americans,[25] federal courts must reject special pleading by big city mayors and their police chiefs who want to deprive their citizens of their rights as citizens under the U.S. Constitution.

---

[24] The district court never considered how the principle it was endorsing would operate. Could a state law restricting firearms be operational only within urban areas, but not in suburban or rural areas? And who would decide where to draw the boundaries?

[25] *See* <u>Heller I</u> at 581.

## IV. THE D.C. LAW LIMITING HANDGUN PURCHASES TO TWELVE ANNUALLY VIOLATES THE SECOND AMENDMENT.

D.C. Code Section 7-2502.03(e) prohibits an otherwise qualified person from purchasing more than one handgun per 30-day period. The district court concluded that "12 new pistols each year … is more than enough.…" Heller III, at *86. After all, the court asserted, "the [Second] Amendment has not been read to protect the right to amass a personal armory."[26] Id., at *85. Apparently, the court believes that the constitutional right to own or possess a handgun, recognized in Heller I, is limited by a number fixed by the government and approved by a judge. And what would that number be? According to the district court below it would be the number that would transform a home into a "personal armory." What number would that be, the court did not say. The

---

[26] By one estimate, the average Montana household owns 27 firearms. C. Elsworth, "Most people own a weapon, families will keep around 27. Granny had 13," The Telegraph (Apr. 18, 2007). http://www.telegraph.co.uk/news/worldnews/1548988/Most-people-own-a-weapon-families-will-keep-around-27.-Granny-had-13.html. While ownership of 27 firearms might shock a judge in the District, it would not have that effect in a Montana court, and thus we can be grateful that constitutionally protected rights are not determined by how a judge "feels" about their exercise.

trial judge implies that he could know whether the number is "more than enough."[27]

According to Heller I, however, Second Amendment protection of the right to keep and bear arms[28] does not turn on the number of arms. Rather, the Court determined that Second Amendment protection turned on the purpose of the arms — "to resist tyranny" (*id.* at 598), and "for defense of self, family, and property," including the home (*id.* at 628). And like all of the other rights secured by the Bill of Rights, the right to keep and bear arms is to be "exercised individually" (*id.* at 579-581) — by the person who is entitled to keep and bear them, not supervised by some government official or body — even a federal judge. Indeed, it would be unthinkable for a judge to deny a person's motion for a jury trial in a criminal case on the ground that the person had used up his quota of jury trial rights for the year. As for the number of arms, it is the same — the Second Amendment reserves the number of constitutionally protected firearms to

---

[27] Apparently, the trial court below would know how many arms would constitute a constitutionally unprotected armory in the same way that Justice Potter Stewart claimed that he knew constitutionally unprotected pornography: "I know it when I see it." *See* Jacobellis v. Ohio, 378 U.S. 184, 197 (1964).

[28] Significantly, the word the Founders chose, "arms," is plural and indefinite as to number, not singular and definite.

the "people," to be "exercised individually," not corporatively, and certainly not by the good graces of the D.C. Council and a federal trial judge.  *See* <u>Heller I</u> at 579-80.

## **CONCLUSION**

For the reasons stated herein, the decision of the district court should be reversed, and the challenged portions of the D.C. Code should be struck down as violating the Second Amendment of the U.S. Constitution.

Respectfully submitted,

/s/ William J. Olson

<table>
<tr><td>

MICHAEL CONNELLY<br>
  U.S. JUSTICE FOUNDATION<br>
  932 D Street, Suite 2<br>
  Ramona, California 92065<br>
  Counsel for *Amicus Curiae*<br>
    U.S. Justice Foundation<br>
<br>
*Attorney of record<br>
September 9, 2014

</td><td>

WILLIAM J. OLSON*<br>
HERBERT W. TITUS<br>
ROBERT J. OLSON<br>
JOHN S. MILES<br>
JEREMIAH L. MORGAN<br>
  WILLIAM J. OLSON, P.C.<br>
  370 Maple Avenue West, Suite 4<br>
  Vienna, Virginia  22180-5615<br>
  (703) 356-5070<br>
Counsel for *Amici Curiae*

</td></tr>
</table>

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

IT IS HEREBY CERTIFIED:

1.      That the foregoing Brief *Amicus Curiae* of Gun Owners of America, Inc., *et al.*, in Support of Appellants complies with the type-volume limitation of Rule 32(a)(7)(B), Federal Rules of Appellate Procedure, because this brief contains 6,931 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 14.0.0.756 in 14-point CG Times.


/s/ William J. Olson
_____
William J. Olson
Attorney for *Amici Curiae*

Dated:  September 9, 2014

# CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of Gun Owners of America, Inc., *et al.*, in Support of Appellants and Reversal, was made, this 9th day of September 2014, by the Court's Case Management/Electronic Case Files system upon the attorneys for the parties.

/s/ William J. Olson
_____
William J. Olson
Attorney for *Amici Curiae*