## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

DICK ANTHONY HELLER, et al.,   )
                                  )
       Plaintiffs-Appellants,   )
                                  )
v.                                  )       Case No. 14-7071
                                  )
DISTRICT OF COLUMBIA, et al.,   )
                                  )
       Defendants-Appellees.   )
                                  )

## AMICI CURIAE CRPA FOUNDATION, PINK PISTOLS, SECOND AMENDMENT SISTERS, AND WOMEN AGAINST GUN CONTROL'S CERTIFICATE OF SERVICE AND SUBMISSION OF PAPER COPIES

I hereby certify that on September 9, 2014, an electronic PDF of the BRIEF OF AMICI CURIAE CRPA FOUNDATION, PINK PISTOLS, SECOND AMENDMENT SISTERS, AND WOMEN AGAINST GUN CONTROL IN SUPPORT OF APPELLANTS FOR REVERSAL was uploaded to the Court's CM/ECF system, which automatically generated and sent by electronic mail a Notice of Docket Activity to all registered attorneys participating in the above-titled case. Such notice constitutes service on those parties.

I further certify that, pursuant to ECF-6 of the Court's Administrative Order regarding Electronic Case Filing, the original and eight paper copies of the brief were submitted to the Court and two copies were mailed to each party separately

represented.

A conformed copy of the Brief of Amici Curiae CRPA Foundation, Pink Pistols, Second Amendment Sisters, and Women Against Gun Control in Support of Appellants for Reversal, filed and served on all parties on September 9, 2014, is attached hereto as Exhibit A.

Respectfully submitted, this 12th day of September, 2014.

PISCIOTTI, MALSCH & BUCKLEY, P.C.

/s/ Jeffrey Malsch
Jeffrey Malsch
445 Hamilton Ave., Suite 1102
White Plains, NY 10601
Telephone: (914) 287-71
Fax: (914) 287-7715
Email: jmalsch@pmblegalfirm.com

Counsel for Amicus Curiae

## CERTIFICATE OF SERVICE

I hereby certify that, on September 12, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia using the appellate CM/ECF system. A copy of the foregoing was electronically served upon all counsel of record through that system.

/s/ Jeffrey Malsch
Jeffrey Malsch
jmalsch@pmblegalfirm.com
Counsel for Amicus Curiae

**EXHIBIT A**

No. 14-7071

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

DICK ANTHONY HELLER, et al.,
*Plaintiffs-Appellants*,

v.

DISTRICT OF COLUMBIA, et al.,
*Defendants-Appellees*.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
(CIVIL CASE NO. 08-1289 (JEB))

**BRIEF OF AMICI CURIAE CRPA FOUNDATION, PINK PISTOLS,
SECOND AMENDMENT SISTERS, AND WOMEN AGAINST GUN
CONTROL IN SUPPORT OF APPELLANTS FOR REVERSAL**

Anthony Pisciotti
Jeffrey Malsch
PISCIOTTI, MALSCH & BUCKLEY, P.C.
445 Hamilton Ave., Suite 1102
White Plains, NY 10601
Telephone: (914) 287-7711
Fax: (914) 287-7715
Email: jmalsch@pmblegalfirm.com

C. D. Michel*
Clinton B. Monfort
Anna M. Barvir
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Fax: (562) 216-4445
*Application for Admission Pending*

Counsel for Amicus Curiae

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

I.    PARTIES AND AMICI

Except for amici, the National Rifle Association, Inc., Gun Owners of America, Gun Owners Foundation, Gun Owners of California, U.S. Justice Foundation, Lincoln Institute, Abraham Lincoln Foundation, Institute on the Constitution, Conservative Legal Defense and Education Fund, Policy Analysis Center, Downsize DC Fund, and DownsideDC.org, and other amici curiae who have not yet entered an appearance in this appeal, all parties, intervenors, and amici appearing before the district court and in this court are listed in the Brief for Appellants.

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Amici Curiae, the CRPA Foundation, Pink Pistols, Second Amendment Sisters, Inc., and Women Against Gun Control, Inc., hereby submit the following corporate disclosure statements:

Amicus Curiae CRPA Foundation is a nonprofit organization. It has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

Amicus Curiae Pink Pistols is an unincorporated association without shareholders or parent companies.

i

Amicus Curiae Second Amendment Sisters, Inc., is a 501(c)(4) non-profit corporation. It has no parent corporation, nor does any publicly held corporation hold 10% or more of its stock.

Amicus Curiae Women Against Gun Control, Inc., is a domestic non-profit corporation. It has no parent corporation, nor does any publicly held corporation own 10% or more of its stock.

## II.    RULINGS UNDER REVIEW

References to the rulings at issue appear in the Brief for Appellants.

## III.    RELATED CASES

This case was previously appealed to this court as *Heller v. District of Columbia*, Case No. 10-7036. Other than that, this case has not previously been before this court or any other court other than the court below. Counsel are unaware of any related cases currently pending in this court or any other court.

Date: September 9, 2014                    s/ Jeffrey Malsch                    
                                           Jeffrey Malsch
                                           *Counsel for Amici Curiae*

## <u>CERTIFICATE OF COUNSEL REGARDING NEED FOR SEPARATE AMICI CURIAE BRIEF</u>

Pursuant to Rule 29 of the Federal Rules of Appellate Procedure and Rule 28 of the District of Columbia Appellate Rules, Amici Curiae the CRPA Foundation, Pink Pistols, Second Amendment Sisters, Inc., and Women Against Gun Control, Inc., respectfully submit this Brief of Amici Curiae, with the consent of all parties, in support of Appellants and urge reversal of the decision below.

Amici are aware that the National Rifle Association filed an amicus brief in support of Appellants on September 5, 2014. Pursuant to Circuit Rule 29(d), the undersigned counsel for Amici Curiae certifies that a separate brief is necessary. Neither the Appellants' opening brief nor any other amicus brief of which Amici are aware fully address the issues raised in this brief—i.e., the district court's treatment of the Second Amendment as a "second-class right" in conflict with *District of Columbia v. Heller*, 554 U.S. 570 (2008), the extreme and novel nature of the District's gun-control scheme, the impropriety of the lower court's finding that the Second Amendment protects only the possession of just "one or two" firearms, and the laws' disparate impact on women and sexual minorities.

In light of Amici's unique experience and perspectives, discussed more fully herein, they are particularly well-suited to discuss the important issues implicated by the district court's decision. Further, Amici Pink Pistols, Second Amendment

iii

Sisters, Inc., and Women Against Gun Control, Inc., represent groups of people, i.e., women and LGBT people, whose voices are all too often left out of the chorus in support of the Second Amendment. Through this brief, the particular concerns of these groups will brought into the light.

For these reasons, Amici respectfully request leave to file a separate amicus curiae brief.

Date: September 9, 2014                                s/ Jeffrey Malsch_____
                                                       Jeffrey Malsch
                                                       *Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page(s)**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES . . . . . .  i

    I.     PARTIES AND AMICI  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

    II.    RULINGS UNDER REVIEW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

    III.   RELATED CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

CERTIFICATE OF COUNSEL REGARDING NEED FOR SEPARATE AMICI CURIAE BRIEF  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

GLOSSARY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  xiii

STATEMENT OF INTERESTS OF AMICI CURIAE AND AUTHORITY TO FILE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTES AND REGULATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.     THE DISTRICT COURT'S ANALYSIS IMPROPERLY TREATS THE SECOND AMENDMENT AS A SECOND-CLASS RIGHT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.    THE DISTRICT COURT'S IMPROPER TREATMENT OF THE SECOND AMENDMENT COMPELLED IT TO UPHOLD THE MOST EXTREME FIREARM-REGISTRATION SCHEME IN THE NATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III.   THE DISTRICT'S OPINION IMPROPERLY "RATIONS" THE SECOND AMENDMENT RIGHT TO ARMS  . . . . . . . . . . . . . . . . 19

# TABLE OF CONTENTS (CONT.)

**Page(s)**

IV.   THE DISTRICT'S FIREARM-REGISTRATION SCHEME HAS
      A DISPARATE, HARMFUL IMPACT ON MINORITY GROUPS,
      INCLUDING WOMEN AND THE LGBT COMMUNITY . . . . . . . . . . . . 21

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

# <u>TABLE OF AUTHORITIES</u>

**PAGE(S)**

## <u>FEDERAL CASES</u>

*District of Columbia v. Heller*, 554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . 4

*Heller v. District of Columbia* (*Heller II*),
     670 F.3d 1244 (2011)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*\*Heller v. District of Columbia* (*Heller III*),
     No. 08-1289, 2014 WL 1978073
     (D.D.C. May 15, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 9, 10, 14, 19

*\*McCullen v. Coakley*,
     __ U.S. __, 134 S.Ct. 2518 (2014)  . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10, 17

*\*McDonald v. City of Chicago*,
     __ U.S.__, 130 S. Ct. 3020 (2010)  . . . . . . . . . . . . . . . . . . . . 5, 6, 11, 20, 21

*Town of Castle Rock, Colo. v. Gonzales*,
     545 U.S. 748 (2005)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## <u>STATUTES & REGULATIONS</u>

18 Pa. Cons. Stat. § 6111.4  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 14

18 U.S.C. § 249(a)(2)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

60 D.C. Reg. 17215 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Cal. Penal Code §17000  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

\* Authorities upon which we chiefly rely are marked with asterisks.

## TABLE OF AUTHORITIES (CONT.)

**PAGE(S)**

## STATUTES (CONT.)

Cal. Penal Code § 31615 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15

Cal. Penal Code § 31625 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15

Cal. Penal Code § 26850 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,10

Cal. Penal Code § 27560 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 14

Code Md. Regs. 29.03.01.12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 14

D.C. Mun. Regs. tit. 24, § 2331.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

D.C. Code § 7-2502.03 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15, 16

D.C. Code § 7-2502.04 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

D.C. Code § 7-2502.08(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

Fla. Stat. Ann. § 790.335 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 14

Ga. Code Ann. § 16-11-129 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 14

Haw. Rev. Stat. Ann. § 134-2(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15

Haw. Rev. Stat. Ann. § 134-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 14

Idaho Const., art. 1, § 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 14

Md. Code Ann., Crim. Law § 4-303 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 14

Md. Code Ann., Pub. Safety § 5-101(r) . . . . . . . . . . . . . . . . . . . . . . . . . 3, 14

## <u>TABLE OF AUTHORITIES (CONT.)</u>

**PAGE(S)**

## <u>STATUTES (CONT.)</u>

N.Y. Penal Law § 400.00 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3, 15

N.Y. Penal Law § 400.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 14

R.I. Gen. Laws § 11-47-41  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 14

S.D. Codified Laws § 23-7-8.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3, 14

Vt. Stat. Ann. tit. 20, § 8(b)(3)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 14

## <u>OTHER AUTHORITIES</u>

American Foundation for the Blind,
  *Low Vision and Legal Blindness Terms and Descriptions, Low Vision vs.*
  *Legal Blindness*, VisionAware, http://www.visionaware.org/infor/your-eye-
  condition/eye-health/low-vision/low-vision-terms-and-descriptions/1235
  (last visited Sept. 9, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Anna Inge Larish,
  *Why Annie Can't Get Her Gun: A Feminist Perspective on the*
  *Second Amendment*, 1996 U. Ill. L. Rev. 467,(1996) . . . . . . . . . . . . . . . . . 22

Carolyn Rebecca Block,
  *How Can Practitioners Help an Abused Woman Lower*
  *Her Risk of Death?*, 250 Nat'l Inst. Just. J. 6 (2003)  . . . . . . . . . . . . . . . . 24

David B. Kopel,
  *Trust the People: The Case Against Gun Control*,
  Cato Rep. No. 109 (July 11, 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## <u>TABLE OF AUTHORITIES (CONT.)</u>

**PAGE(S)**

### <u>OTHER AUTHORITIES</u>

David K. Johnson,
*The Lavendar Scare: The Cold War Persecution of*
*Gays and Lesbians in the Federal Government* (2004) . . . . . . . . . . . . . . . 27

Edgar A. Suter,
*Guns in the Medical Literature—A Failure of Peer Review*,
83 J. Med. Ass'n Ga. 133, (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Federal Bureau of Investigation,
*2012 Hate Crime Statistics, Incidents and Offenses* (Fall 2013),
*available at* http://www.fbi.gov/about-us/cjis/ucr/hate-crime/2012
/topic-pages/ incidents-and-offenses/incidentsandoffenses_final.pdf . . . . 25

Federal Bureau of Investigation,
Uniform Crime Report, Hate Crime Statistics
*available at* www.fbi.gov/about-us/cjis/ucr/ucr-publications#Hate . . . . . . 25

Gary Kleck,
*Point Blank: Guns and Violence in America* (1991) . . . . . . . . . . . . . . . . . 23

Gary Kleck,
*Policy Lessons from Recent Gun Control Research*,
49 Law & Contemp. Probs. 35 (Winter 1986) . . . . . . . . . . . . . . . . . . . . . . 23

Gary Kleck & Marc Gertz,
*Armed Resistance to Crime*,
86 J. of Crim. L. & Criminology 150, 180 (1995) . . . . . . . . . . . . . . . . . . . 23

Gregory M. Herek & Kevin T. Berrill,
*Hate Crimes: Confronting Violence Against*
*Lesbians and Gay Men* (Diane S. Foster ed., 1992) . . . . . . . . . . . . . . . . . 26

### <u>TABLE OF AUTHORITIES (CONT.)</u>

<b>PAGE(S)</b>

### <u>OTHER AUTHORITIES</u>

Holly Heatley,
  *"Commies and Queers" Narratives That Supported the Lavender Scare*
  (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Kenneth F. Dyer,
  *Challenging the Men: The Social Biology of*
  *Female Sporting Achievement* (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Marilyn Frye,
  *Oppression*, in *The Politics of Reality:*
  *Essays in Feminist Theory* (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

Michelle A. Marzullo & Alyn J. Libman,
  Human Rights Campaign Foundation, *Research Overview:*
  *Hate Crimes and Violence Against Lesbian, Gay, Bisexual and*
  *Transgender People* (Ché Juan Gonzales Ruddell-Tabisola ed., 2009) . . . 25

National Coalition of Anti-Violence Programs,
  *Anti-Lesbian, Gay, Bisexual and Transgender Violence*
  *in 1998* (April 6, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

National Coalition of Anti-Violence Programs,
  *Lesbian, Gay, Bisexual, Transgender, Queer and HIV-Affected Hate*
  *Violence in 2012, available at*
  http://www.avp.org/storage/documents/ncavp_ 2012_hvreport_final.pdf . 27

Neil Chakraborti & Jon Garland,
  *Hate Crime: Impact, Causes and Responses* (2009) . . . . . . . . . . . . . . . . . . 26

## <u>TABLE OF AUTHORITIES (CONT.)</u>

**PAGE(S)**

### <u>OTHER AUTHORITIES (CONT.)</u>

Philip J. Cook,
     *The Effect of Gun Availability on Violent Crime Patterns*,
     455 Annals Am. Acad. Pol. & Soc. Sci. (May 1981) . . . . . . . . . . . . . . . . . 23

Bureau of the Census, U.S. Dept. Of Commerce,
     *Statistical Abstract of the United States* 108 (107th ed. 1987) . . . . . . . . . . 22

*Women and Violence:*
     *Hearings on Legislation to Reduce the Growing Problem of Violent Crime*
     *Against Women Before the Senate Comm. on the Judiciary*, Part I, 101st
     Cong., 2d Sess. 12 (1990), *available at* http://niwaplibrary.wcl.american.
     edu/reference/additional-materials/vawa-legislative-history/violence-against-
     women-act-hearings-and-reports/vawa-related-hearings-1990/Senate-Hearin
     g--June-20-1990.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## <u>GLOSSARY</u>

| Term | Abbreviation |
|------|--------------|
| Don't Ask, Don't Tell | DADT |
| Lesbian, Gay, Bisexual, and Transgender | LGBT |
| Metropolitan Police Department | MPD |

## STATEMENT OF INTERESTS OF AMICI CURIAE AND AUTHORITY TO FILE

Pursuant to Rule 29(c)(4) of the Federal Rules of Appellate Procedure, Amici Curiae the CRPA Foundation, Pink Pistols, Second Amendment Sisters, Inc., and Women Against Gun Control, Inc., respectfully submit this amici curiae brief, with the consent of all parties, in support of Appellants. Amici further attest, pursuant to Federal Rule 29(c)(5), that no counsel for a party authored this brief in whole or in part, and that no person other than amici, their members, or their counsel made a monetary contribution to its preparation or submission.

The CRPA Foundation is a non-profit organization with headquarters in Fullerton, California. The organization seeks, among other goals, to raise awareness about unconstitutional laws, defend the rights protected by the Second Amendment, and educate the general public about firearms. The CRPA Foundation seeks to support its members, law enforcement, and other public interest organizations that advocate for the Second Amendment rights of the law-abiding Americans.

The remaining amici organizations represent segments of the American population that are disproportionately the targets of criminal violence and that therefore vigorously support the Second Amendment right to keep and bear arms.

Pink Pistols is an unincorporated shooting society with chapters throughout

the United States. It honors gender and sexual diversity and advocates the responsible and lawful use of firearms for self-defense, an issue of significant concern to sexual minorities because they are particularly subject to bias-motivated violence. Its position is that, "[w]ithout self-defense, there are no gay rights."

Second Amendment Sisters, Inc., a women's advocacy group founded in 1999, is a nationwide, non-profit organization with headquarters in Lakeway, TX. The organization is "dedicated to preserving the basic human right of self-defense, as recognized by the Second Amendment." It admits both women and men, and it advocates for education and responsible gun practices, as well as enforcement of laws against violent criminals. *Id.*

Women Against Gun Control, Inc., has been a leading national advocacy group for women's Second Amendment rights for more than two decades. Its motto is "The Second Amendment *is* the Equal Rights Amendment."Among other things, Women Against Gun Control works to raise public awareness of the growing number of women who actively support the Second Amendment right to keep and bear arms, and it "encourages and helps promote firearms instruction and gun safety training."

Amici herein offer their unique experience, knowledge, and perspective to aid the Court in the proper resolution of this case. They have at their service

2

preeminent Second Amendment scholars, as well as reputable firearms and self-defense experts and lawyers with decades of experience in firearms litigation. As such, amici respectfully submit that they are uniquely situated to bring an important perspective to the resolution of the issues raised in this appeal.

## STATUTES AND REGULATIONS

Except for the following, all applicable statutes and regulations, are contained in the Brief for Appellants.

Idaho Const., art. 1 § 11; Cal. Penal Code § 17000; Cal. Penal Code § 26850; Cal. Penal Code § 26853;  Cal. Penal Code § 26856; Cal. Penal Code § 26859; Cal. Penal Code § 27560; Cal. Penal Code § 31615; Cal. Penal Code § 31625; D.C. Code §7-1009; D.C. Code § 22-3571.01; Fla. Stat. Ann. § 790.335; Ga. Code Ann. § 16-11-129(a); Haw. Rev. Stat. § 134-2; Haw. Rev. Stat. § 134-3; Md. Code Ann., Crim. Law § 4-303; Md. Code Ann., Pub. Safety § 5-101(r); N.Y. Penal Law § 400.00(2), (7), (10); N.Y. Penal Law § 400.02; 18 Pa. Cons. Stat. § 6111.4; R.I. Gen. Laws § 11-47-41; S.D. Codified Laws § 23-7-8.6; Vt. Stat. Ann. Tit. 20, § 8; Code Md. Regs. 29.03.01.12.

The full text of these statutes can be found in Amici's addendum bound together with this brief.

## SUMMARY OF ARGUMENT

On the heels of the United States Supreme Court's watershed decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), confirming the individual right to keep and bear arms, the District of Columbia ("the District") adopted a spate of amendments to the D.C. Code, creating new burdens on the newly reinvigorated right. Among them was a comprehensive firearms-registration scheme, requiring all residents wishing to acquire and possess any firearm for self-defense to appear in person before the Metropolitan Police Department ("MPD"), guns in hand, to notify the government and seek its approval.

Under the new regime, registrants must successfully complete a course of training, pass a competency test, submit to photographing, submit to fingerprinting, and pay a non-refundable fee for each firearm. What's more, only one handgun may be registered in any 30-day period, and all registrations must be renewed every three years through a similarly onerous process. The District's registration requirements, and the substantial burdens they impose, are unlike any others in the nation. They are extreme outliers.

The district court, improperly viewing the rights protected by the Second Amendment as inferior to other fundamental rights, applied a toothless form of intermediate scrutiny unacceptable in any other rights context. Indeed, the District

4

was hardly held to its burden to establish, with actual evidence, that the challenged laws are narrowly drawn to materially advance the District's goals.

The court's unkind treatment of the Second Amendment resulted in the validation of the District's uniquely burdensome firearms-registration laws with little fanfare. And it prompted the court to hold, surprisingly, that the Second Amendment protects little more than a right to "one or two firearms"—a sort of rights-rationing that finds no support in precedent or logic. Ultimately, upholding the challenged laws disproportionately harms minority groups, including women and sexual minorities, who face a higher than average threat of violence and, accordingly, have a higher than average need for self-defense.

For these reasons, Amici respectfully request that this Court reverse the decision below.

## ARGUMENT

## I.  THE DISTRICT COURT'S ANALYSIS IMPROPERLY TREATS THE SECOND AMENDMENT AS A SECOND-CLASS RIGHT

[W]hat [Respondents] must mean is that the Second Amendment should be singled out for special—and specially unfavorable— treatment. *We reject the suggestion*.

*McDonald v. City of Chicago*, __ U.S.__, 130 S. Ct. 3020, 3043 (2010) (emphasis added.)

Despite the Supreme Court's explicit instruction on this point, the district

5

court employed a unique mode of analysis that improperly treats the Second
Amendment as a lesser right, "subject to an entirely different body of rules than the
other Bill of Rights guarantees . . . ." *Id.* at 3044. The court went to great lengths to
defer to the District, in ways that are hard to imagine and would not be tolerated in
other rights contexts.

As a starting point, the court set a uniquely low bar for the District to clear
under intermediate scrutiny to justify its exceedingly novel and burdensome
requirements to possess a firearm. In the court's view, the laws should be upheld if
the legislature might reasonably infer that the laws could serve the government's
interests, and if such inferences are in line with the unsubstantiated and highly
disputed declaration testimony offered by the District in response to this litigation.
*Heller v. District of Columbia* (*Heller III*), No. 08-1289, 2014 WL 1978073, at *7-
10 (D.D.C. May 15, 2014).

From there, the court made clear that it would resolve any conceivable
discrepancy on these issues in favor of the District. First, the court expressed its
intention to defer to the legislature's policy judgments. *Id.* at *8. The court then
announced it would be "doubly deferential" in this case because the laws restrict
the right to keep and bear arms, as opposed to any other constitutional right. *Id.* at
*8, *10. Finally, the court effectively deferred to the government's defense

6

strategy, permitting it to justify its infringement with a wealth of evidence that was never considered by the legislature. *Id.* at *12-28.

Because this Court has implied that strict scrutiny will only apply to complete bans on the right to arms, *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1257, 1261-62 (D.C. Cir. 2011),[1] the district court's diluted version of intermediate scrutiny would effectively rubber stamp all other restrictions on Second Amendment rights, no matter how rare or ineffective the policies. If politicians in anti-gun jurisdictions believe a law could have a conceivable impact at some point in the future, the law will inevitably be upheld if the legislature offers enough post-hoc opinion testimony to back up its beliefs.

Of course, those pushing restrictions on fundamental rights almost always believe their legislative curtailments are in the best interests of the populace. But the very purpose of enshrining fundamental liberties in the Constitution is to prevent government officials from infringing them, regardless whether they believe (reasonably or not) that the law would further the state's goals. If all that is required to justify the infringement of rights is a reasonable belief and declarations

---

[1] Because the District's registration scheme comprehensively regulates the ability to possess a firearm for the core lawful purpose of self-defense and does so in the home, where Second Amendment guarantees are at their zenith, Amici respectfully note that the challenged provisions call for an analysis stricter than intermediate scrutiny. *See* Am. Br. of NRA 3-9.

from a few like-minded individuals, *no* right would be secure—especially with the deferential scales tipped twice in the government's favor. If there is any distinction to be drawn between the court's mode of analysis and rational basis review, it is difficult to spot.

Amici respectfully ask the court to examine the nature of the District's onerous registration requirements through the lens of other constitutional freedoms. Consider, for example, a requirement that all individuals appear in person and pass a written test on voting laws in order to vote in an election. While these restrictions would likely be stricken, at minimum they would trigger more exacting review than the analysis employed by the district court. Because the right to arms is "no less fundamental" than others, such restrictions on the exercise of the Second Amendment must trigger equally exacting review.

Recent authority from the United States Supreme Court in the First Amendment context further reveals the impropriety of the district court's approach, particularly with respect to the burden (or lack of burden) it placed on the government to establish that its restrictions are narrowly drawn. In *McCullen v. Coakley*, the Court explained that by "demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrificing speech for efficiency.' " __ U.S. __, 134 S.Ct. 2518, 2534 (2014)

8

(quoting *Riley v. Nat'l Fed. of Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)). To satisfy the requirement of narrow tailoring, the government must establish that the regulation does not impose "a substantial portion of the burden" on individuals in a manner that does not serve to advance the stated goals. *Id*. at 2535. The court cannot simply defer to legislative judgments that the regulation is narrowly tailored.

Using this analysis, the *McCullen* Court unanimously struck down a "buffer zone" that prohibited speech on public sidewalks near abortion clinics. The Court held that the state could serve its public-safety interests with more narrowly tailored enforcement mechanisms. Of particular note here, the Court expressly rejected the state's assertion that it had tried other approaches and found them unworkable. Instead, the Court demanded *actual proof*. *Id*. at 2540-41.

In this case, the district court came nowhere close to holding the government to its burden. For most of the provisions, the court simply concluded they were narrowly tailored if it felt the means would further the government's objectives, rather than requiring the District to prove that its restrictions are not overly broad or that its objectives would be achieved less effectively absent the restrictions. *Heller III*, 2014 WL 1978073, at *19, *22, *24, *26. It never required the government to prove, as it must, "that alternative measures" with less of a burden

9

on constitutional rights "would *fail* to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 134 S. Ct. at 2524 (emphasis added).

In this case, narrow tailoring would require proof that providing existing photo identification and a picture of the firearm are not sufficient means of verifying the identity of the registrant and his or her firearm. It would also require the government to establish that subjecting residents to written tests to exercise a fundamental right are less effective, and do not burden individuals substantially more, than having them demonstrate that they can safely handle the firearm at the time of purchase, as currently required by California law. Cal. Penal Code §§ 26850(a)-(b), 26853, 26856, 26859.

Instead, in most instances the district court merely concluded that this law was the "only" way to achieve the legislative goal or that the means "fit" with the stated objective, without requiring actual proof. *Heller III*, 2014 WL 1978073, at *19, *22. At other times, the court seemed to place the burden on Appellants to explain why the chosen means were not narrowly drawn. *Id.* at *26. But as *McCullen* makes clear, it is the government's burden to show—with actual proof—that the restrictions are appropriately drawn. 34 S. Ct at 2540-41.

In sum, the district court's failure to apply meaningful scrutiny to the

10

District's unique restrictions on the core right to keep and bear arms for self-defense contravenes the Supreme Court's admonition that the Second Amendment is not "a second-class right." *McDonald*, 130 S. Ct. at 3044. At bottom, the court's analysis cannot be reconciled with the principle that the Second Amendment protects a *fundamental* constitutional right. Laws that restrict the core of a fundamental, enumerated constitutional right demand more than the unduly deferential analysis employed by the district court in this case. They cannot be upheld under a watered-down form of scrutiny that would be unacceptable were any other fundamental right—enumerated or not—at issue.

Ultimately, the court's view of the Second Amendment as an inferior right poisoned its analysis, causing it to effectively rubber stamp the challenged provisions, disregard their overreaching nature, and overlook the very real impacts the laws have on Second Amendment rights.

## II. THE DISTRICT COURT'S IMPROPER TREATMENT OF THE SECOND AMENDMENT COMPELLED IT TO UPHOLD THE MOST EXTREME FIREARM-REGISTRATION SCHEME IN THE NATION

Against the backdrop of its improper view of the Second Amendment as a lesser right, the district court upheld the most extreme firearm-registration scheme in the country, one that mandates the registration of all types of handguns and long guns and requires that, inter alia, registrants appear before the Chief of Police to

register in person, D.C. Code § 7-2502.04(c), provide a full-face photograph taken by the Chief, *id.* § 7-2502.04(b), submit to fingerprinting, *id.* § 7-2502.04(a), sign the application under oath, *id.* § 7-2502.05(a), and pay a non-refundable fee, *id.* § 7-2502.05(b).[2] Registrants may also be required to appear before the MPD with the firearm they seek to register. *Id.* § 7-2502.04(c). And they must successfully complete a one-hour safety course and a test regarding D.C. firearm laws. *Id.* § 7-2502.03(a)(10), (13). Except for new residents, no person may register more than one handgun in any 30-day period. *Id.* § 7-2502.03(e). Further, all registration certificates must be renewed *every three years*, or they will expire. *Id.* § 7-2502.07a(a).[3] Possession of a firearm without a valid registration (i.e., not expired) is punishable by one year's imprisonment and a $2,500 fine for a first offense, and by five years imprisonment and a $12,500 fine for a second offense. *Id.* § 7-2507.06(a); 22-3571.01(b)(5)-(6). By the terms of D.C. Code section 7-2502.03(a)(2), a conviction for possession of a firearm without a valid registration disqualifies one from future registration (and so too from exercising one's Second

---

[2]  The fee is currently $35 to take and process a registrant's fingerprints and $13 per firearm to be registered. D.C. Mun. Regs. tit. 24, § 2331.1(c)-(d).

[3]  To renew a registration, one must appear in person and pay the required fees. Metropolitan Police Dep't, Notice of Final Rulemaking, 60 D.C. Reg. 17215 (Dec. 27, 2013). They likely must also submit to fingerprinting again. *Id.*

Amendment right to arms) forever.

Registration imposes various duties on all registrants, including:

* Providing written notification to the Chief "immediately upon discovery" of the loss, theft, or destruction of one's registration certificate or registered firearm, *id.* § 7-2502.08(a)(1);

* Providing written notification to the Chief within 30 days if registrant changes his or her name or address, *id.* § 7-2502.08(a)(2);

* Providing written notification to the Chief within 2 business days if one sells, transfers, or otherwise disposes of a registered firearm, *id.* § 7-2502.08(a)(3);

* Returning any registration certificate for any firearm no longer in the registrant's possession, *id.* § 7-2502.08(b); and

* Keeping one's registration certificate for each firearm in one's possession, and providing it upon demand by any member of the MPD or other law enforcement agency, *id.* § 7-2502.08(c).

A first violation of these requirements will incur a $100 fine. D.C. Code § 7-2502.08(e)(1). A second results in a $500 fine and the loss of one's Second Amendment right to possess a firearm within the District for *five years*. *Id.* § 7-2502.08(e)(2). And a third results in a $1,000 fine and the *permanent* loss of one's

13

Second Amendment rights. *Id.* § 7-2502.08(e)(3).

Staying true to its reputation of having "some of the most restrictive gun laws in the nation," *Heller III*, 2014 WL 1978073, at *1, the District has passed (and the court below upheld) a firearm-registration scheme more oppressive than any in the country. Indeed, some *forty-nine states* have no laws mandating the registration of all firearms. Only Hawaii shares this requirement with the District. Haw. Rev. Stat. Ann. § 134-3. Just one state, New York, requires registration of all handguns. N.Y. Penal Law §§ 400.00(7), 400.02. While two other states require registration of newly acquired firearms. Cal. Penal Code §§ 17000, 27560; Md. Code Ann., Crim. Law § 4-303, Md. Code Ann., Pub. Safety § 5-101(r); Code Md. Regs. 29.03.01.12 (pre-ban "assault pistols" and handguns must be registered). A total of *seven states*, on the other hand, *explicitly prohibit* registration altogether. Fla. Stat. Ann. § 790.335(2), (3); Ga. Code Ann. § 16-11-129(a); Idaho Const., art. 1, § 11; 18 Pa. Cons. Stat. § 6111.4; R.I. Gen. Laws § 11-47-41; S.D. Codified Laws § 23-7-8.6; Vt. Stat. Ann. tit. 20, § 8(b)(3)(B).

No other state requires fingerprinting and photographing each and every time a firearm is acquired. While two states require proof of safety training to obtain a credential for the purchase of firearms, Haw. Rev. Stat. Ann. § 134-2(g); Cal. Penal Code §§ 31615, 31625, none requires such proof for the registration of

14

each and every gun.

No state requires that those seeking to engage in core Second Amendment conduct physically bring each firearm they own, no matter the type, to the police department (or any administrative agency) for inspection, creating the risk that a firearm owner might be attacked for his guns, detained or arrested (or worse). *The District does*. D.C. Code § 7-2502.04(c).

No state requires that each and every firearm an individual owns be re-registered every three years. *The District does*. *Id.* § 7-2502.07a(a).[4]

No state requires firearm owners to pass a test to evaluate their understanding of relevant laws before taking possession of their lawfully owned firearms. *The District does. Id.* § 7-2502.03(a)(10).

No state bars the visually impaired from registering their otherwise lawfully owned firearms, thereby prohibiting them from engaging in the core right to bear arms for self-defense altogether. *The District does*. *Id.* § 7-2502.03(a)(11)

---

[4]  Only New York comes close, requiring that holders of a Pistol Permit, which authorizes licensees to possess handguns, renew their permits every five years. New York's permit covers the licensed *individual.* All registered handguns he or she lawfully owns are attached to that permit, and the licensee may update his or her permit to add or remove registered handguns as necessary. The handgun registrations themselves do not expire. N.Y. Penal Law § 400.00(2), (10)(b).

(prohibiting registration by the "blind," as defined by § 7-1009(1)).[5]

And no state revokes the Second Amendment rights of its citizens for even the most minor of regulatory infractions. *Yet again, the District does*. *Id.* § 7-2502.08(e)(2)-(3).[6]

All of this is to reiterate just how novel and extreme the District's firearm registration scheme really is. Again, "the District is an outlier with the most extreme restrictions on Second Amendment rights nationwide. Neither the United States nor any state requires the registration of all firearms, with the single exception of Hawaii, which does not cancel registrations every three years and require re-registration." Br. for Appellants 12. Even when analyzing a law under

---

[5] The District's definition of legal blindness mirrors the definition developed by the U.S. government to determine eligibility for vocational training, rehabilitation, schooling, disability benefits, low vision devices, and tax exemption programs. American Foundation for the Blind, *Low Vision and Legal Blindness Terms and Descriptions*, *Low Vision vs. Legal Blindness*, VisionAware, http://www.visionaware.org/info/your-eye-condition/eye-health/low-vision/low-vision-terms-and-descriptions/1235 (last visited Sept. 9, 2014). It is *not* a functional low vision definition. *Id.* It does *not* indicate what a person can and cannot see. *Id.* And it is a definition used generally to bestow benefits, *not to strip fundamental rights from the disabled.*

[6] Recall, even just twice leaving your registration certificate on the counter at home when you transport your lawfully owned and registered firearm can result in the loss of your Second Amendment right to possess any firearm for any purpose for a period of *five years*. *See* D.C. Code § 7-2502.08(c),(e)(2). One more mistake will result in the loss of your fundamental rights *forever*. *Id.* § 7-2502.08(e)(3). This is not the law in any other jurisdiction Amici are aware of.

16

intermediate scrutiny, the paucity of similar restrictions is telling. For it suggests that the government "has too readily foregone options that could serve its interests just as well," options that other jurisdictions have adopted and found successful. *McCullen*, 134 S. Ct. at 2537. And it raises the specter that the challenged laws "burden substantially more [conduct] than necessary to achieve" the state's interests. *Id.*

The court below, in structuring its opinion so as to consider the burden and benefit of each licensing requirement in isolation, blinded itself (and its readers) to the truly unique and oppressive nature of the District's licensing scheme *as a whole*. Much like viewing just a single prong of a birdcage, ignoring the matrix of other wires, prevents one from appreciating why the bird doesn't simply fly around the wire prong to freedom,[7] each of the District's licensing requirements might

---

[7]  This concept, dubbed "the birdcage analogy," was popularized by Marilyn Frye in her 1983 collection of essays, *The Politics of Reality: Essays in Feminist Theory*. Frye famously wrote:

> Cages. Consider a birdcage. If you look very closely at just one wire in the cage, you cannot see the other wires. If your conception of what is before you is determined by this myopic focus, you could look at that one wire, up and down the length of it, and be unable to see why a bird would not just fly around the wire any time it wanted to go somewhere. *There is no physical property of any one wire, **nothing that the closest scrutiny could discover**, that will reveal how a bird could be inhibited or harmed by it except in the most accidental way.* It is only when you step back, stop looking at the

17

seem, like a single birdcage prong, innocuous enough. But viewed together, they create a hopelessly oppressive scheme determined to make it as difficult as possible for even good people to comply with—likely in hopes that few will have the wherewithal to follow the process through to completion.

Consider the significant time and financial burdens Appellants faced when registering their own firearms. Br. for Appellants 8-11. In light of the long hours each Appellant spent registering his firearms (and out of work), only a percentage of those wishing to own a firearm in the District for self-defense will actually overcome the many roadblocks the city has created. Should registrants successfully complete the process, the overly burdensome duties imposed on them serve the District's more nefarious, yet unstated, goal—to disarm as many otherwise law-abiding citizens as possible—by attaching the loss of one's fundamental Second Amendment rights, a most grievous penalty, to even minor regulatory infractions.

The district court couched much of its opinion in the familiar terms of intermediate-scrutiny jurisprudence, holding each of the registration requirements

---

wires one by one, microscopically, and take a macroscopic view of
the whole cage, that you see why the bird does not go anywhere; and
then you will see it in a moment.

Marilyn Frye, *Oppression*, in *The Politics of Reality: Essays in Feminist Theory* 4-5 (1983) (emphasis added).

18

to be "narrowly tailored" and not "substantially broader than necessary" to achieve the District's stated interests. *Heller III*, 2014 WL 1978073, at *14, *19, *21-22, *24, *26-28. But, as described above and in Appellants' briefing, the challenged laws are anything but. To the contrary, they are the most extreme in the land.

## III.  THE DISTRICT COURT'S OPINION IMPROPERLY "RATIONS" THE EXERCISE OF THE SECOND AMENDMENT RIGHT TO ARMS

The district court's hostility toward the Second Amendment was again brought into view when the court surprisingly (and repeatedly) claimed that the right to arms protects only "one or two firearms," derisively suggesting that those who seek to acquire multiple firearms seek "*to amass a personal armory*." *Id.* at *24 (emphasis added). The court then upheld the one-handgun-per-month rule, reasoning that "[w]hile the District must respect the right of each resident to possess *a* handgun in his home for self-defense, it is also well within its constitutional powers to constrain the rate at which its residents accumulate deadly weapons." *Id.* (emphasis added). It also found that any "special burdens" imposed by re-registration on owners of multiple firearms were "outside the Second Amendment's ken." *Id.* at *28. The court's reasoning is, at minimum, misguided.

There is neither legal authority for nor logic behind the district court's arbitrary limitation on the Second Amendment (as revealed by the dearth of citations provided in support). Indeed, the "one or two firearm" interpretation of

19

the right's scope is made entirely from whole cloth woven on the magical loom of the district court's imagination.

The court seemingly relies on *McDonald*'s command that the Constitution protects "a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home," and the court's unfounded reasoning that Appellants need only one or two guns for self-defense purposes. *Id.* (quoting *McDonald*, 130 S. Ct. at 3044). Even assuming a single firearm is sufficient in all self-defense emergencies, there is nothing inherently unlawful about collecting firearms or owning firearms for other lawful purposes, including target shooting, competition, or hunting. *McDonald* certainly did not limit the Second Amendment's scope to self-defense within the home. It simply recognized that the right is most *notable* in that context. *McDonald*, 130 S. Ct. at 3044.

The district court's attempt to ration the exercise of the Second Amendment to the "one or two firearms" it deems to be "enough" offends notions of fundamental liberties. Imagine a holding that the First Amendment protects the ownership of just one or two books, or only to one or two copies of the same book, and does not protect those who, as the court below would put it, seek to "amass a personal [library]." *Heller*, 2014 WL 1978073, at *24.

## IV.  THE DISTRICT'S FIREARM-REGISTRATION SCHEME HAS A DISPARATE, HARMFUL IMPACT ON MINORITY GROUPS, INCLUDING WOMEN AND THE LGBT COMMUNITY

Amici are a coalition of groups that represent individuals more likely than average to fall prey to violence, including women and members of the Lesbian, Gay, Bisexual, and Transgender (LGBT) community. In *McDonald*, the Supreme Court expressly recognized the need in 1868 for recently emancipated black citizens in the South to bear arms for self-defense against those who would harm them based on twisted notions of race. 130 S. Ct. at 3038-41, 3049. Today, a century and half later, it is still very apparent that some groups face a particular threat of violence and so have an acute need for armed defense. As such, government attempts to diminish firearm ownership throughout society at large disparately harm those groups.

Women, for instance, experience a heightened threat of violence because of their supposed vulnerability as "easy prey" for male predators, whether in the form of domestic violence at the hands of husbands or boyfriends or street violence by common muggers or rapists. It has been estimated that three out of four women will be victimized by at least one violent crime in their lifetimes. *Women and Violence: Hearings on Legislation to Reduce the Growing Problem of Violent Crime Against Women Before the Senate Comm. on the Judiciary*, Part I, 101st

21

Cong., 2d Sess. 12 (1990), *available at* http://niwaplibrary.wcl.american.edu/

reference/additional-materials/vawa-legislative-history/violence-against-women-ac

t-hearings-and-reports/vawa-related-hearings-1990/Senate-Hearing--June-20-1990.

pdf.

Generally speaking, disparity in size and strength between women and men

provides male attackers with a great advantage. As Inge Anna Larish explained:

> On average women are weaker than men of comparable height.
> Muscles form a lower proportion of female body weight than of male
> body weight (36% and 43%, respectively. Kenneth F. Dyer,
> *Challenging the Men: The Social Biology of Female Sporting
> Achievement* 71-72 (1982). Women can develop arm muscles only
> 75% to 85% the strength of men's muscles.
>
> . . . .
>
> Women are on average smaller than men. The average height of men
> in the United States ranges from 5'7.4" to 5'9.7" and from 163 to 178
> pounds; the average height for women ranges from 5'2.2" to 5'4.3"
> and from 134 to 150 pounds. Bureau of the Census, U.S. Dep't of
> Commerce, *Statistical Abstract of the United States* 108 (107th ed.
> 1987).

Anna Inge Larish, *Why Annie Can't Get Her Gun: A Feminist Perspective on the

Second Amendment*, 1996 U. Ill. L. Rev. 467, 494 n.213 (1996). Larish thus

concluded that firearm possession by women "not only equalize[s] the differences

between men [and women], but also eliminates the disparity in physical power

between the sexes." *Id.* at 494.

While firearms have regularly been found to be " 'the surest and safest method of protection for those who are most vulnerable to "vicious male predators," ' " *id.* at 498,[8] "the available information on civilian restriction of gun ownership indicates that one of the groups most harmed by restrictions on private gun ownership will be women," *id.* at 494.[9] Any measure "that effectively reduce[s] gun availability among the noncriminal majority also would reduce DGUs (Defensive Gun Uses) that otherwise would have saved lives, prevented injuries, thwarted rape attempts, driven off burglaries, and helped victims retain their property." Gary Kleck & Marc Gertz, *Armed Resistance to Crime*, 86 J. of Crim. L. & Criminology 150, 180 (1995). Such is equally true, if not more so, as regards impeding access to firearms by the law-abiding majority of women.

The inordinate amount of time it takes to acquire a firearm in the District has a dangerous and disparate impact on women, especially those in need of immediate protection from male abusers, e.g., those having left or preparing to leave a

---

[8]  Quoting Edgar A. Suter, *Guns in the Medical Literature—A Failure of Peer Review*, 83 J. Med. Ass'n Ga. 133, 140 (1994).

[9]  Citing Philip J. Cook, *The Effect of Gun Availability on Violent Crime Patterns*, 455 Annals Am. Acad. Pol. & Soc. Sci. 63-79 (May 1981); Gary Kleck, *Policy Lessons from Recent Gun Control Research*, 49 Law & Contemp. Probs. 35, 37 (Winter 1986); David B. Kopel, *Trust the People: The Case Against Gun Control*, Cato Rep. No. 109 (July 11, 1988); *cf.* Gary Kleck, *Point Blank: Guns and Violence in America* 331, 377 (1991)).

situation of domestic violence.[10] The days or weeks it will necessarily take to acquire a firearm for self-defense could mean the difference between life and death. A woman seeking to protect and empower herself from an aggressive stalker, a violent husband, or jilted lover may choose to purchase a firearm for self-defense, but find herself at the mercy of the government. Under the District's laws, her right to engage in armed self-defense will have to wait—even if she cannot.

Before a woman can possess a firearm for self-defense, she must take time off work, travel to and from MPD headquarters, complete a registration application, undergo a background check, have her fingerprints taken, be photographed, undergo safety training, receive a training certificate, and certify her firearm. Even after all that, her application could still be denied. While a woman might be willing to wait during this period, her victimizer will not.

Similarly, sexual minorities—whether gay, lesbian, bisexual, or transgender—are especially subject to violence based on discriminatory animus. Even inside their homes, LGBT people risk murder, aggravated assault, and other particularly violent, bias-motivated crimes. The FBI reports that approximately

---

[10]  Statistics reveal that women are at a significantly increased risk of murder by their abusive male partners when preparing to end the relationship and exit the violent environment. Carolyn Rebecca Block, *How Can Practitioners Help an Abused Woman Lower Her Risk of Death?*, 250 Nat'l Inst. Just. J. 6 (2003).

one-fifth of all hate crimes are motivated by such bias, which makes this category

of hate crime second only to crimes based on racial animus.[11] Between 1995 and

2005, law enforcement agencies reported *more than 13,000 incidents* of hate

violence linked to sexual-orientation bias. *See* Federal Bureau of Investigation,

Uniform Crime Report, Hate Crime Statistics, *available at* http://www.fbi.gov/

about-us/cjis/ucr/ucr-publications#Hate (last visited Sept. 9, 2014). And this was

*before* the enactment of the Matthew Shephard/James Byrd, Jr. Hate Crimes

Prevention Act of 2009, which expanded federal hate crimes law to include

violence perpetrated because of the of the victim's actual or perceived sexual

orientation or gender identity. *See* 18 U.S.C. § 249(a)(2).

Further, hate crimes against sexual minorities are often considered the most

violent of bias-motivated crimes. A 2001 study found that over half of anti-LGBT

"homicides show evidence of 'rage/hate-fueled extraordinary violence . . . such as

---

[11]  *See* Federal Bureau of Investigation, *2012 Hate Crime Statistics, Incidents and Offenses* (Fall 2013), *available at* http://www.fbi.gov/about-us/cjis/ucr/hate-crime/2012/topic-pages/incidents-and-offenses/incidentsandoffenses_final .pdf. The numbers, however, may be skewed because of under-reporting by LGBT victims who fear, among other things, secondary victimization by law enforcement or public disclosure of their sexual orientation ("outing"). Michelle A. Marzullo & Alyn J. Libman, Human Rights Campaign Foundation, *Research Overview: Hate Crimes and Violence Against Lesbian, Gay, Bisexual and Transgender People*, 2 (Ché Juan Gonzales Ruddell-Tabisola ed., 2009). Investigative bias and poor police training may also contribute to under-reporting of anti-LGBT hate crimes. *Id.* at 10-11.

dismemberment, bodily and genital mutilation, use of multiple weapons, repeated blows from a blunt object, or numerous stab wounds'. This graphic violence reveals a frightening kind of 'overkill' typical of manifestations of violence homophobia." Neil Chakraborti & Jon Garland, *Hate Crime: Impact, Causes and Responses* 63-64 (2009); *see also* Gregory M. Herek & Kevin T. Berrill, *Hate Crimes: Confronting Violence Against Lesbians and Gay Men* 25 (Diane S. Foster ed., 1992) ("A striking feature . . . is their gruesome, often vicious nature.").

LGBT people regularly must rely on themselves for protection against the violence perpetrated against them. For police rarely have the resources or ability to respond *before* a violent crime occurs—and they have no duty to, *see Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 760-61 (2005). Indeed, they are granted wide discretion in determining when to use their authority to intervene. *Id.* And LGBT people have often been disfavored in the exercise of that discretion, exposing them to a heightened need to engage in the core Second Amendment right to keep and bear arms for self-defense.[12]

---

[12]  What's more, law enforcement has long been notorious for "re-victimizing" LGBT crime victims who report their attacks. *See* National Coalition of Anti-Violence Programs, *Anti-Lesbian, Gay, Bisexual and Transgender Violence in 1998*, at 24 (April 6, 1999) ("[O]ne in five victims of an anti-gay bias incident in 1998 who attempted to report it to police were treated to more of the same. Almost one in 14 became victims of actual (and in some cases, further) physical abuse."); National Coalition of Anti-Violence Programs, *Lesbian, Gay,*

26

Nonetheless, the District's licensing scheme presents a particular problem for LGBT people who have, historically, held a reasonable suspicion of the government gathering and tracking their personal information. Due to the widespread criminalization of their private, intimate conduct, the one-time treatment of their identity as a psychological disorder, and a lack of anti-discrimination protections, LGBT people have long feared the government might target them and strip them of their jobs, benefits, or freedom. For instance, the "Lavender Scare" of the 1950s[13] and nearly 20 years of Don't Ask, Don't Tell (DADT) resulted in the unjust discharge of *thousands* of LGBT individuals from military and government service. Just the fear of being "found out" under these

_____

*Bisexual, Transgender, Queer and HIV-Affected Hate Violence in 2012*, at 19-20 (2013) (finding that police made up 23.9% of unknown offenders of bias-motivated violence), *available at* http://www.avp.org/storage/documents/ncavp_2012_hvreport_final.pdf. Many LGBT people are thus reasonably fearful that their interactions with police when reporting a hate crime may turn physically or verbally abusive. Transgender people, in particular, experience a heightened threat, given that there is a common belief among law enforcement that transgender persons predominantly engage in sex work or other unlawful conduct.

[13] A term popularized by David K. Johnson his 2004 study, *The Lavender Scare: The Cold War Persecution of Gays and Lesbians in the Federal Government*, the "Lavender Scare" refers to the Cold-War era purge of gays and lesbians from the ranks of the federal government, led by Senator Joseph McCarthy and Roy Cohn. Holly Heatley,*"Commies and Queers": Narratives That Supported the Lavender Scare* 1-3 (2007). This anti-gay witch-hunt lasted well into the 1970s, outlasting the infamous Red Scare hunt for alleged Communists. *Id.* at iv.

27

oppressive government policies ruined the professional and personal lives of scores of LGBT Americans.

And so many gays and lesbians harbor a suspicion of the government meddling in their private affairs—one that easily spills over into other areas of their lives. Submission to registration of firearms for this group of marginalized citizens, calling the government to scrutinize their every move, thus stands as a significant barrier to LGBT individuals' free exercise of the right to arms for self-defense (which, sadly, they must disproportionately engage in).

Every law that impedes access to firearms in the name of public safety and crime prevention impacts the law-abiding majority of citizens who would seek to possess those firearms for the core, lawful purpose of self-defense. This is manifestly the effect (and, apparently, also the design) of the District's extreme firearm-licensing regime. And minority groups, including women and LGBT people, are disproportionately harmed in light of their heightened likelihood to require armed self-defense. That harm is magnified in light of the practical realities of the challenged laws and these groups' experiences. The district court's hostility toward the Second Amendment thus had the (hopefully) unintended consequence of inviting a particular harm on these groups of people. It should not be allowed to stand.

# CONCLUSION

For the foregoing reasons, amici curiae respectfully request that this Court reverse the decision of the district court.

Dated: September 9, 2014         Respectfully submitted,

          /s/ Jeffrey Malsch
         Jeffrey Malsch
         PISCIOTTI, MALSCH & BUCKLEY, P.C.
         445 Hamilton Ave., Suite 1102
         White Plains, NY 10601
         Telephone: (914) 287-7711
         Fax: (914) 287-7715
         Email: jmalsch@pmblegalfirm.com

         C. D. Michel
         Clinton B. Monfort
         Anna M. Barvir
         MICHEL & ASSOCIATES, P.C.
         180 East Ocean Blvd., Suite 200
         Long Beach, CA 90802
         Telephone: (562) 216-4444
         Fax: (562) 216-4445

         *Counsel for Amici Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(c) of the Federal Rules of Appellate Procedure, I hereby certify that the foregoing brief contains 6,511 words and is thus in compliance with the type-volume limitation for amicus curiae briefs set forth in Rules 29 and 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

The foregoing brief was prepared in 14-Point Times Roman proportional font and thus complies with the typeface requirement of Rule 32(a)(5).


Dated: September 9, 2014            <u>s/ Jeffrey Malsch            </u>
                                   Jeffrey Malsch
                                   *Counsel for Amici Curiae*

# ADDENDUM

# <u>TABLE OF CONTENTS</u>

Idaho Const., art. 1 § 11.................................................................... Addend 1

Cal. Penal Code § 17000................................................................... Addend 1

Cal. Penal Code § 26850................................................................... Addend 2

Cal. Penal Code § 26853................................................................... Addend 3

Cal. Penal Code § 26856................................................................... Addend 5

Cal. Penal Code § 26859................................................................... Addend 6

Cal. Penal Code § 27560................................................................... Addend 6

Cal. Penal Code § 31615................................................................... Addend 9

Cal. Penal Code § 31625................................................................... Addend 9

D.C. Code §7-1009....................................................................... Addend 10

D.C. Code § 22-3571.01................................................................. Addend 11

Fla. Stat. Ann. § 790.335............................................................... Addend 12

Ga. Code Ann. § 16-11-129(a)........................................................ Addend 18

Haw. Rev. Stat. § 134-2 ................................................................ Addend 19

Haw. Rev. Stat. § 134-3 ................................................................ Addend 23

Md. Code Ann., Crim. Law § 4-303 ............................................... Addend 25

Md. Code Ann., Pub. Safety § 5-101(r).......................................... Addend 26

N.Y. Penal Law § 400.00(2)........................................................... Addend 29

N.Y. Penal Law § 400.00(7)....................................................................... Addend 30

N.Y. Penal Law § 400.00(10)..................................................................... Addend 31

N.Y. Penal Law § 400.02 ........................................................................... Addend 32

18 Pa. Cons. Stat. § 6111.4 ....................................................................... Addend 33

R.I. Gen. Laws § 11-47-41 ........................................................................ Addend 33

S.D. Codified Laws § 23-7-8.6 .................................................................. Addend 33

Vt. Stat. Ann. Tit. 20, § 8 .......................................................................... Addend 33

Code Md. Regs. 29.03.01.12....................................................................... Addend 36

# ADDENDUM

## Idaho Const., art. 1 § 11

The people have the right to keep and bear arms, which right shall not be abridged; but this provision shall not prevent the passage of laws to govern the carrying of weapons concealed on the person nor prevent passage of legislation providing minimum sentences for crimes committed while in possession of a firearm, nor prevent the passage of legislation providing penalties for the possession of firearms by a convicted felon, nor prevent the passage of any legislation punishing the use of a firearm. No law shall impose licensure, registration or special taxation on the ownership or possession of firearms or ammunition. Nor shall any law permit the confiscation of firearms, except those actually used in the commission of a felony.

## Cal. Penal Code § 17000

(a) As used in this part, until January 1, 2014, any reference to the term "personal firearm importer" shall be deemed to mean "personal handgun importer" and, on and after January 1, 2014, any reference to the term "personal handgun importer" shall be deemed to mean "personal firearm importer." A "personal handgun importer," until January 1, 2014, and commencing January 1, 2014, a "personal firearm importer" means an individual who meets all of the following criteria:

(1) The individual is not a person licensed pursuant to Article 1 (commencing with Section 26700) and Article 2 (commencing with Section 26800) of Chapter 2 of Division 6 of Title 4.

(2) The individual is not a licensed manufacturer of firearms pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code.

(3) The individual is not a licensed importer of firearms pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto.

(4) The individual is the owner of a firearm.

(5) The individual acquired that firearm outside of California.

(6) The individual moved into this state on or after January 1, 1998, in the case of a handgun, or in the case of a firearm that is not a handgun, on or after January 1, 2014, as a resident of this state.

(7) The individual intends to possess that handgun within this state on or after January 1, 1998, or in the case of a firearm that is not a handgun, he or she intends to possess that firearm within this state on or after January 1, 2014.

Addend 1

(8) The firearm was not delivered to the individual by a person licensed pursuant to Article 1 (commencing with Section 26700) and Article 2 (commencing with Section 26800) of Chapter 2 of Division 6 of Title 4, who delivered that firearm following the procedures set forth in Section 27540 and Article 1 (commencing with Section 26700) and Article 2 (commencing with Section 26800) of Chapter 2 of Division 6 of Title 4.

(9) The individual, while a resident of this state, had not previously reported ownership of that firearm to the Department of Justice in a manner prescribed by the department that included information concerning the individual and a description of the firearm.

(10) The firearm is not a firearm that is prohibited by any provision listed in Section 16590.

(11) The firearm is not an assault weapon.

(12) The firearm is not a machinegun.

(13) The person is 18 years of age or older.

(14) The firearm is not a .50 BMG rifle.

(15) The firearm is not a destructive device.

(b) For purposes of paragraph (6) of subdivision (a):

(1) Except as provided in paragraph (2), residency shall be determined in the same manner as is the case for establishing residency pursuant to Section 12505 of the Vehicle Code.

(2) In the case of a member of the Armed Forces of the United States, residency shall be deemed to be established when the individual was discharged from active service in this state.

## Cal. Penal Code § 26850

(a) Except as authorized by the department, no firearms dealer may deliver a handgun unless the recipient performs a safe handling demonstration with that handgun.

(b) The safe handling demonstration shall commence with the handgun unloaded and locked with the firearm safety device with which it is required to be delivered, if applicable. While maintaining muzzle awareness, that is, the firearm is pointed in a safe direction, preferably down at the ground, and trigger discipline, that is, the trigger finger is outside of the trigger guard and along side of the handgun frame, at all times, the handgun recipient shall correctly and safely perform the following:

Addend 2

(1) If the handgun is a semiautomatic pistol, the steps listed in Section 26853.
(2) If the handgun is a double-action revolver, the steps listed in Section 26856.
(3) If the handgun is a single-action revolver, the steps listed in Section 26859.

(c) The recipient shall receive instruction regarding how to render that handgun safe in the event of a jam.

(d) The firearms dealer shall sign and date an affidavit stating that the requirements of subdivisions (a) and (b) have been met. The firearms dealer shall additionally obtain the signature of the handgun purchaser on the same affidavit. The firearms dealer shall retain the original affidavit as proof of compliance with this requirement.

(e) The recipient shall perform the safe handling demonstration for a department-certified instructor.

(f) No demonstration shall be required if the dealer is returning the handgun to the owner of the handgun.

(g) Department-certified instructors who may administer the safe handling demonstration shall meet the requirements set forth in subdivision (b) of Section 31635.

(h) The persons who are exempt from the requirements of subdivision (a) of Section 31615, pursuant to Section 31700, are also exempt from performing the safe handling demonstration.

## Cal. Penal Code § 26853

To comply with Section 26850, a safe handling demonstration for a semiautomatic pistol shall include all of the following steps:

(a) Remove the magazine.

(b) Lock the slide back. If the model of firearm does not allow the slide to be

locked back, pull the slide back, visually and physically check the chamber to ensure that it is clear.

(c) Visually and physically inspect the chamber, to ensure that the handgun is unloaded.

(d) Remove the firearm safety device, if applicable. If the firearm safety device prevents any of the previous steps, remove the firearm safety device during the appropriate step.

(e) Load one bright orange, red, or other readily identifiable dummy round into the magazine. If no readily identifiable dummy round is available, an empty cartridge casing with an empty primer pocket may be used.

(f) Insert the magazine into the magazine well of the firearm.

(g) Manipulate the slide release or pull back and release the slide.

(h) Remove the magazine.

(i) Visually inspect the chamber to reveal that a round can be chambered with the magazine removed.

(j) Lock the slide back to eject the bright orange, red, or other readily identifiable dummy round. If the handgun is of a model that does not allow the slide to be locked back, pull the slide back and physically check the chamber to ensure that the chamber is clear. If no readily identifiable dummy round is available, an empty cartridge casing with an empty primer pocket may be used.

(k) Apply the safety, if applicable.

(l) Apply the firearm safety device, if applicable. This requirement shall not apply to an Olympic competition pistol if no firearm safety device, other than a cable lock that the department has determined would damage the barrel of the pistol, has been approved for the pistol, and the pistol is either listed in subdivision (b) of Section 32105 or is subject to subdivision (c) of Section 32105.

**Cal. Penal Code § 26856**

To comply with Section 26850, a safe handling demonstration for a single-action revolver shall include all of the following steps:

(a) Open the loading gate.

(b) Visually and physically inspect each chamber, to ensure that the revolver is unloaded.

(c) Remove the firearm safety device required to be sold with the handgun. If the firearm safety device prevents any of the previous steps, remove the firearm safety device during the appropriate step.

(d) Load one bright orange, red, or other readily identifiable dummy round into a chamber of the cylinder, close the loading gate and rotate the cylinder so that the round is in the next-to-fire position. If no readily identifiable dummy round is available, an empty cartridge casing with an empty primer pocket may be used.

(e) Open the loading gate and unload the revolver.

(f) Visually and physically inspect each chamber to ensure that the revolver is unloaded.

(g) Apply the firearm safety device, if applicable. This requirement shall not apply to an Olympic competition pistol if no firearm safety device, other than a cable lock that the department has determined would damage the barrel of the pistol, has been approved for the pistol, and the pistol is either listed in subdivision (b) of Section 32105 or is subject to subdivision (c) of Section 32105.


**Cal. Penal Code § 26859**

To comply with Section 26850, a safe handling demonstration for a single-action revolver shall include all of the following steps:

(a) Open the loading gate.

(b) Visually and physically inspect each chamber, to ensure that the revolver is

unloaded.

(c) Remove the firearm safety device required to be sold with the handgun. If the firearm safety device prevents any of the previous steps, remove the firearm safety device during the appropriate step.

(d) Load one bright orange, red, or other readily identifiable dummy round into a chamber of the cylinder, close the loading gate and rotate the cylinder so that the round is in the next-to-fire position. If no readily identifiable dummy round is available, an empty cartridge casing with an empty primer pocket may be used.

(e) Open the loading gate and unload the revolver.

(f) Visually and physically inspect each chamber to ensure that the revolver is unloaded.

(g) Apply the firearm safety device, if applicable. This requirement shall not apply to an Olympic competition pistol if no firearm safety device, other than a cable lock that the department has determined would damage the barrel of the pistol, has been approved for the pistol, and the pistol is either listed in subdivision (b) of Section 32105 or is subject to subdivision (c) of Section 32105.

**Cal. Penal Code § 27560**

(a) Within 60 days of bringing a handgun, and commencing January 1, 2014, any firearm, into this state, a personal firearm importer shall do one of the following:

> (1) Forward by prepaid mail or deliver in person to the Department of Justice, a report prescribed by the department including information concerning that individual and a description of the firearm in question.

> (2) Sell or transfer the firearm in accordance with the provisions of Section 27545 or in accordance with the provisions of an exemption from Section 27545.

> (3) Sell or transfer the firearm to a dealer licensed pursuant to Article 1 (commencing with Section 26700) and Article 2 (commencing with Section 26800) of Chapter 2.

(4) Sell or transfer the firearm to a sheriff or police department.

(b) If all of the following requirements are satisfied, the personal firearm importer shall have complied with the provisions of this section:

> (1) The personal firearm importer sells or transfers the firearm pursuant to Section 27545.

> (2) The sale or transfer cannot be completed by the dealer to the purchaser or transferee.

> (3) The firearm can be returned to the personal firearm importer.

(c)

> (1) The provisions of this section are cumulative and shall not be construed as restricting the application of any other law.

> (2) However, an act or omission punishable in different ways by this article and different provisions of the Penal Code shall not be punished under more than one provision.

(d) The department shall conduct a public education and notification program regarding this section to ensure a high degree of publicity of the provisions of this section.

(e) As part of the public education and notification program described in this section, the department shall do all of the following:

> (1) Work in conjunction with the Department of Motor Vehicles to ensure that any person who is subject to this section is advised of the provisions of this section, and provided with blank copies of the report described in paragraph (1) of subdivision (a), at the time when that person applies for a California driver's license or registers a motor vehicle in accordance with the Vehicle Code.

> (2) Make the reports referred to in paragraph (1) of subdivision (a) available to dealers licensed pursuant to Article 1 (commencing with Section 26700)

Addend 7

and Article 2 (commencing with Section 26800) of Chapter 2.

(3) Make the reports referred to in paragraph (1) of subdivision (a) available to law enforcement agencies.

(4) Make persons subject to the provisions of this section aware of all of the following:

> (A) The report referred to in paragraph (1) of subdivision (a) may be completed at either a law enforcement agency or the licensed premises of a dealer licensed pursuant to Article 1 (commencing with Section 26700) and Article 2 (commencing with Section 26800) of Chapter 2.

> (B) It is advisable to do so for the sake of accuracy and completeness of the report.

> (C) Before transporting a firearm to a law enforcement agency to comply with subdivision (a), the person should give notice to the law enforcement agency that the person is doing so.

> (D) In any event, the handgun should be transported unloaded and in a locked container and a firearm that is not a handgun should be transported unloaded.

(f) Any costs incurred by the department to implement this section shall be absorbed by the department within its existing budget and the fees in the Dealers' Record of Sale Special Account allocated for implementation of subdivisions (d) and (e) of this section pursuant to Section 28235.

## Cal. Penal Code § 31615

(a) A person shall not do either of the following:

> (1) Purchase or receive any handgun, except an antique firearm, without a valid handgun safety certificate.

> (2) Sell, deliver, loan, or transfer any handgun, except an antique firearm, to any person who does not have a valid handgun safety certificate.

(b) Any person who violates subdivision (a) is guilty of a misdemeanor.

(c) The provisions of this section are cumulative, and shall not be construed as restricting the application of any other law. However, an act or omission punishable in different ways by different provisions of this code shall not be punished under more than one provision.

(d) This section shall remain in effect only until January 1, 2015, and as of that date is repealed, unless a later enacted statute, that is enacted before January 1, 2015, deletes or extends that date.

## Cal. Penal Code § 31625

(a) A certified instructor shall not issue a handgun safety certificate to any person who has not complied with this article. Proof of compliance shall be forwarded to the department by certified instructors as frequently as the department may determine.

(b) A certified instructor shall not issue a handgun safety certificate to any person who is under 18 years of age.

(c) A violation of this section shall be grounds for the department to revoke the instructor's certification to issue handgun safety certificates.

(d) This section shall remain in effect only until January 1, 2015, and as of that date is repealed, unless a later enacted statute, that is enacted before January 1, 2015, deletes or extends that date.

## D.C. Code §7-1009

For the purposes of this chapter:

(1) The term "blind person" means, and the term "blind" refers to, a person who is totally blind, has impaired vision of not more than 20/200 visual acuity in the better eye and for whom vision cannot be improved to better than 20/200, or who has loss of vision due wholly or in part to impairment of field vision or to other factors which affect the usefulness of vision to a like degree.

Addend 9

(2) The term "deaf person" means a person who is totally deaf or a person with hearing impairment that severely interferes with his or her ability to hear environmental noises.

(3) The term "guide dog" means a dog that is specially trained to assist a blind or deaf person and one which a blind or deaf person relies on for assistance.

(4) The term "persons with physical or mental disabilities" refers to an individual who has a medically determinable physical or mental impairment that substantially limits the ability of one to assist one's self, to perform manual tasks, to engage in an occupation, to live independently, to walk, to see, or to hear.

(5) The term "service animal" means an animal, permitted in the District under § 8-1808(h)(1), including a guide dog, that is specially trained to assist a person who meets the definition of persons with physical or mental disabilities, and is one which a person with physical or mental disabilities relies on for disability-related assistance. The term also includes an animal in training by an organization that provides service animals to persons with physical or mental disabilities. The term does not encompass an animal whose sole purpose is to serve as a crime deterrent or that serves solely as a companion.

(6) The term "service animal in training" means an animal that is:

> (A) At least 6 months of age;

> (B) Undergoing special training to assist persons with physical or mental disabilities;

> (C) Accompanied by an experienced service animal trainer; and

> (D) Designated as a service animal in training by wearing a harness, backpack, or vest that identifies it as a service animal in training.

**D.C. Code § 22-3571.01**

(a) Notwithstanding any other provision of the law, and except as provided in § 22-3571.02, a defendant who has been found guilty of an offense under the District of Columbia Official Code punishable by imprisonment may be sentenced to pay a

fine as provided in this section.

(b) An individual who has been found guilty of such an offense may be fined not more than the greatest of:

    (1) $100 if the offense is punishable by imprisonment for 10 days or less;

    (2) $250 if the offense is punishable by imprisonment for 30 days, or one month, or less but more than 10 days;

    (3) $500 if the offense is punishable by imprisonment for 90 days, or 3 months, or less but more than 30 days;

    (4) $1,000 if the offense is punishable by imprisonment for 180 days, or 6 months, or less but more than 90 days;

    (5) $2,500 if the offense is punishable by imprisonment for one year or less but more than 180 days;

    (6) $12,500 if the offense is punishable by imprisonment for 5 years or less but more than one year;

    (7) $25,000 if the offense is punishable by imprisonment for 10 years or less but more than 5 years;

    (8) $37,500 if the offense is punishable by imprisonment for 15 years or less but more than 10 years;

    (9) $50,000 if the offense is punishable by imprisonment for 20 years or less but more than 15 years;

    (10) $75,000 if the offense is punishable by imprisonment for 30 years or less but more than 20 years;

    (11) $125,000 if the offense is punishable by imprisonment for more than 30 years; or

    (12) $250,000 if the offense resulted in death.

(c) An organization that has been found guilty of an offense punishable by imprisonment for 6 months or more may be fined not more than the greatest of:

> (1) Twice the maximum amount specified in the law setting forth the penalty for the offense;

> (2) Twice the applicable amount under subsection (b) of this section; or

> (3) Twice the applicable amount under § 22-3571.02(a).

**Fla. Stat. Ann. § 790.335**

(1) Legislative findings and intent.--

> (a) The Legislature finds and declares that:

>> 1. The right of individuals to keep and bear arms is guaranteed under both the Second Amendment to the United States Constitution and s. 8, Art. I of the State Constitution.

>> 2. A list, record, or registry of legally owned firearms or law-abiding firearm owners is not a law enforcement tool and can become an instrument for profiling, harassing, or abusing law-abiding citizens based on their choice to own a firearm and exercise their Second Amendment right to keep and bear arms as guaranteed under the United States Constitution. Further, such a list, record, or registry has the potential to fall into the wrong hands and become a shopping list for thieves.

>> 3. A list, record, or registry of legally owned firearms or law-abiding firearm owners is not a tool for fighting terrorism, but rather is an instrument that can be used as a means to profile innocent citizens and to harass and abuse American citizens based solely on their choice to own firearms and exercise their Second Amendment right to keep and bear arms as guaranteed under the United States Constitution.

>> 4. Law-abiding firearm owners whose names have been illegally recorded in a list, record, or registry are entitled to redress.

Addend 12

(b) The Legislature intends through the provisions of this section to:

    1. Protect the right of individuals to keep and bear arms as guaranteed under both the Second Amendment to the United States Constitution and s. 8, Art. I of the State Constitution.

    2. Protect the privacy rights of law-abiding firearm owners.

(2) Prohibitions.--No state governmental agency or local government, special district, or other political subdivision or official, agent, or employee of such state or other governmental entity or any other person, public or private, shall knowingly and willfully keep or cause to be kept any list, record, or registry of privately owned firearms or any list, record, or registry of the owners of those firearms.

(3) Exceptions.--The provisions of this section shall not apply to:

    (a) Records of firearms that have been used in committing any crime.

    (b) Records relating to any person who has been convicted of a crime.

    (c) Records of firearms that have been reported stolen that are retained for a period not in excess of 10 days after such firearms are recovered. Official documentation recording the theft of a recovered weapon may be maintained no longer than the balance of the year entered, plus 2 years.

    (d) Firearm records that must be retained by firearm dealers under federal law, including copies of such records transmitted to law enforcement agencies. However, no state governmental agency or local government, special district, or other political subdivision or official, agent, or employee of such state or other governmental entity or any other person, private or public, shall accumulate, compile, computerize, or otherwise collect or convert such written records into any form of list, registry, or database for any purpose.

    (e)

        1. Records kept pursuant to the recordkeeping provisions of s.

Addend 13

790.065; however, nothing in this section shall be construed to authorize the public release or inspection of records that are made confidential and exempt from the provisions of s. 119.07(1) by s. 790.065(4)(a).

2. Nothing in this paragraph shall be construed to allow the maintaining of records containing the names of purchasers or transferees who receive unique approval numbers or the maintaining of records of firearm transactions.

(f) Firearm records, including paper pawn transaction forms and contracts on firearm transactions, required by chapters 538 and 539.

1. Electronic firearm records held pursuant to chapter 538 may only be kept by a secondhand dealer for 30 days after the date of the purchase of the firearm by the secondhand dealer.

2. Electronic firearm records held pursuant to chapter 539 may only be kept by a pawnbroker for 30 days after the expiration of the loan that is secured by a firearm or 30 days after the date of purchase of a firearm, whichever is applicable.

3. Except as required by federal law, any firearm records kept pursuant to chapter 538 or chapter 539 shall not, at any time, be electronically transferred to any public or private entity, agency, business, or enterprise, nor shall any such records be copied or transferred for purposes of accumulation of such records into lists, registries, or databases.

4. Notwithstanding subparagraph 3., secondhand dealers and pawnbrokers may electronically submit firearm transaction records to the appropriate law enforcement agencies as required by chapters 538 and 539; however, the law enforcement agencies may not electronically submit such records to any other person or entity and must destroy such records within 60 days after receipt of such records.

5. Notwithstanding subparagraph 3., secondhand dealers and pawnbrokers may electronically submit limited firearms records

Addend 14

consisting solely of the manufacturer, model, serial number, and caliber of pawned or purchased firearms to a third-party private provider that is exclusively incorporated, exclusively owned, and exclusively operated in the United States and that restricts access to such information to only appropriate law enforcement agencies for legitimate law enforcement purposes. Such records must be destroyed within 30 days by the third-party provider. As a condition of receipt of such records, the third-party provider must agree in writing to comply with the requirements of this section. Any pawnbroker or secondhand dealer who contracts with a third-party provider other than as provided in this act or electronically transmits any records of firearms transactions to any third-party provider other than the records specifically allowed by this paragraph commits a felony of the second degree, punishable as provided in s. 775.082 or s. 775.083.

(g) Records kept by the Department of Law Enforcement of NCIC transactions to the extent required by federal law and a log of dates of requests for criminal history record checks, unique approval and nonapproval numbers, license identification numbers, and transaction numbers corresponding to such dates.

(h) Records of an insurer that, as a condition to providing insurance against theft or loss of a firearm, identify such firearm. Such records may not be sold, commingled with records relating to other firearms, or transferred to any other person or entity. The insurer may not keep a record of such firearm more than 60 days after the policy of insurance expires or after notification by the insured that the insured is no longer the owner of such firearm.

(i) Lists of customers of a firearm dealer retained by such dealer, provided that such lists do not disclose the particular firearms purchased. Such lists, or any parts thereof, may not be sold, commingled with records relating to other firearms, or transferred to any other person or entity.

(j) Sales receipts retained by the seller of firearms or by a person providing credit for such purchase, provided that such receipts shall not serve as or be used for the creation of a database for registration of firearms.

(k) Personal records of firearms maintained by the owner of such firearms.

Addend 15

(l) Records maintained by a business that stores or acts as the selling agent of firearms on behalf of the lawful owner of the firearms.

(m) Membership lists of organizations comprised of firearm owners.

(n) Records maintained by an employer or contracting entity of the firearms owned by its officers, employees, or agents, if such firearms are used in the course of business performed on behalf of the employer.

(o) Records maintained pursuant to s. 790.06 by the Department of Agriculture and Consumer Services of a person who was a licensee within the prior 2 years.

(p) Records of firearms involved in criminal investigations, criminal prosecutions, criminal appeals, and postconviction motions, civil proceedings relating to the surrender or seizure of firearms including protective injunctions, Baker Act commitments, and sheriff's levies pursuant to court judgments, and voluntary surrender by the owner or custodian of the firearm.

(q) Paper documents relating to firearms involved in criminal cases, criminal investigations, and criminal prosecutions, civil proceedings relating to the surrender or seizure of firearms including protective injunctions, Baker Act commitments, and sheriff's levies pursuant to court judgments, and voluntary surrender by the owner or custodian of the firearm.

(r) Noncriminal records relating to the receipt, storage or return of firearms, including, but not limited to, records relating to firearms impounded for storage or safekeeping, receipts proving that a firearm was returned to the rightful owner and supporting records of identification and proof of ownership, or records relating to firearms impounded pursuant to levies or court orders, provided, however, that such records shall not be compiled, sorted, or otherwise arranged into any lists, indexes, or registries of firearms or firearms owners.

(4) Penalties.--

(a) Any person who, or entity that, violates a provision of this section

commits a felony of the third degree, punishable as provided in s. 775.082 or s. 775.083.

(b) Except as required by the provisions of s. 16, Art. I of the State Constitution or the Sixth Amendment to the United States Constitution, no public funds shall be used to defend the unlawful conduct of any person charged with a violation of this section, unless the charges against such person are dismissed or such person is determined to be not guilty at trial. Notwithstanding this paragraph, public funds may be expended to provide the services of the office of public defender or court-appointed conflict counsel as provided by law.

(c) The governmental entity, or the designee of such governmental entity, in whose service or employ a list, record, or registry was compiled in violation of this section may be assessed a fine of not more than $5 million, if the court determines that the evidence shows that the list, record, or registry was compiled or maintained with the knowledge or complicity of the management of the governmental entity. The Attorney General may bring a civil cause of action to enforce the fines assessed under this paragraph.

(d) The state attorney in the appropriate jurisdiction shall investigate complaints of criminal violations of this section and, where evidence indicates a violation may have occurred, shall prosecute violators.

(5) Electronic records.--Secondhand dealers and pawnbrokers who electronically submit firearms transaction records to the appropriate law enforcement agencies as required by chapters 538 and 539 shall submit the name of the manufacturer and caliber information of each firearm in Florida Crime Information Center coding, and shall include the model and serial number of each firearm.

(6) Construction.--This section shall be construed to effectuate its remedial and deterrent purposes. This section may not be construed to grant any substantive, procedural privacy right or civil claim to any criminal defendant, and a violation of this section may not be grounds for the suppression of evidence in any criminal case.

## Ga. Code Ann. § 16-11-129(a)

(a) Application for weapons carry license or renewal license; term. The judge of the probate court of each county may, on application under oath and on payment of a fee of $30.00, issue a weapons carry license or renewal license valid for a period of five years to any person whose domicile is in that county or who is on active duty with the United States armed forces and who is not a domiciliary of this state but who either resides in that county or on a military reservation located in whole or in part in that county at the time of such application. Such license or renewal license shall authorize that person to carry any weapon in any county of this state notwithstanding any change in that person's county of residence or state of domicile. Applicants shall submit the application for a weapons carry license or renewal license to the judge of the probate court on forms prescribed and furnished free of charge to persons wishing to apply for the license or renewal license. An applicant who is not a United States citizen shall provide sufficient personal identifying data, including without limitation his or her place of birth and United States issued alien or admission number, as the Georgia Bureau of Investigation may prescribe by rule or regulation. An applicant who is in nonimmigrant status shall provide proof of his or her qualifications for an exception to the federal firearm prohibition pursuant to 18 U.S.C. Section 922(y). Forms shall be designed to elicit information from the applicant pertinent to his or her eligibility under this Code section, including citizenship, but shall not require data which is nonpertinent or irrelevant, such as serial numbers or other identification capable of being used as a de facto registration of firearms owned by the applicant. The Department of Public Safety shall furnish application forms and license forms required by this Code section. The forms shall be furnished to each judge of each probate court within this state at no cost.

## Haw. Rev. Stat. § 134-2

(a) No person shall acquire the ownership of a firearm, whether usable or unusable, serviceable or unserviceable, modern or antique, registered under prior law or by a prior owner or unregistered, either by purchase, gift, inheritance, bequest, or in any other manner, whether procured in the State or imported by mail, express, freight, or otherwise, until the person has first procured from the chief of police of the county of the person's place of business or, if there is no place of business, the person's residence or, if there is neither place of business nor residence, the person's place of sojourn, a permit to acquire the ownership of a firearm as

prescribed in this section. When title to any firearm is acquired by inheritance or bequest, the foregoing permit shall be obtained before taking possession of a firearm; provided that upon presentation of a copy of the death certificate of the owner making the bequest, any heir or legatee may transfer the inherited or bequested firearm directly to a dealer licensed under section 134-31 or licensed by the United States Department of Justice without complying with the requirements of this section.

(b) The permit application form shall include the applicant's name, address, sex, height, weight, date of birth, place of birth, country of citizenship, social security number, alien or admission number, and information regarding the applicant's mental health history and shall require the fingerprinting and photographing of the applicant by the police department of the county of registration; provided that where fingerprints and photograph are already on file with the department, these may be waived.

(c) An applicant for a permit shall sign a waiver at the time of application, allowing the chief of police of the county issuing the permit access to any records that have a bearing on the mental health of the applicant. The permit application form and the waiver form shall be prescribed by the attorney general and shall be uniform throughout the State.

(d) The chief of police of the respective counties may issue permits to acquire firearms to citizens of the United States of the age of twenty-one years or more, or duly accredited official representatives of foreign nations, or duly commissioned law enforcement officers of the State who are aliens; provided that any law enforcement officer who is the owner of a firearm and who is an alien shall transfer ownership of the firearm within forty-eight hours after termination of employment from a law enforcement agency. The chief of police of each county may issue permits to aliens of the age of eighteen years or more for use of rifles and shotguns for a period not exceeding sixty days, upon a showing that the alien has first procured a hunting license under chapter 183D, part II. The chief of police of each county may issue permits to aliens of the age of twenty-one years or more for use of firearms for a period not exceeding six months, upon a showing that the alien is in training for a specific organized sport-shooting contest to be held within the permit period. The attorney general shall adopt rules, pursuant to chapter 91, as to what constitutes sufficient evidence that an alien is in training for a sport-shooting contest. Notwithstanding any provision of the law to the contrary and upon joint

Addend 19

application, the chief of police may issue permits to acquire firearms jointly to spouses who otherwise qualify to obtain permits under this section.

(e) The permit application form shall be signed by the applicant and by the issuing authority. One copy of the permit shall be retained by the issuing authority as a permanent official record. Except for sales to dealers licensed under section 134-31, or dealers licensed by the United States Department of Justice, or law enforcement officers, or where a license is granted under section 134-9, or where any firearm is registered pursuant to section 134-3(a), no permit shall be issued to an applicant earlier than fourteen calendar days after the date of the application; provided that a permit shall be issued or the application denied before the twentieth day from the date of application. Permits issued to acquire any pistol or revolver shall be void unless used within ten days after the date of issue. Permits to acquire a pistol or revolver shall require a separate application and permit for each transaction. Permits issued to acquire any rifle or shotgun shall entitle the permittee to make subsequent purchases of rifles or shotguns for a period of one year from the date of issue without a separate application and permit for each acquisition, subject to the disqualifications under section 134-7 and subject to revocation under section 134-13; provided that if a permittee is arrested for committing a felony or any crime of violence or for the illegal sale of any drug, the permit shall be impounded and shall be surrendered to the issuing authority. The issuing authority shall perform an inquiry on an applicant who is a citizen of the United States by using the National Instant Criminal Background Check System before any determination to issue a permit or to deny an application is made. If the applicant is not a citizen of the United States and may be eligible to acquire a firearm under this chapter, the issuing authority shall perform an inquiry on the applicant, by using the National Instant Criminal Background Check System, to include a check of the Immigration and Customs Enforcement databases, before any determination to issue a permit or to deny an application is made.

(f) In all cases where a pistol or revolver is acquired from another person within the State, the permit shall be signed in ink by the person to whom title to the pistol or revolver is transferred and shall be delivered to the person who is transferring title to the firearm, who shall verify that the person to whom the firearm is to be transferred is the person named in the permit and enter on the permit in the space provided the following information: name of the person to whom the title to the firearm was transferred; names of the manufacturer and importer; model; type of action; caliber or gauge; and serial number as applicable. The person who is

Addend 20

transferring title to the firearm shall sign the permit in ink and cause the permit to be delivered or sent by registered mail to the issuing authority within forty-eight hours after transferring the firearm.

In all cases where receipt of a firearm is had by mail, express, freight, or otherwise from sources without the State, the person to whom the permit has been issued shall make the prescribed entries on the permit, sign the permit in ink, and cause the permit to be delivered or sent by registered mail to the issuing authority within forty-eight hours after taking possession of the firearm.

In all cases where a rifle or shotgun is acquired from another person within the State, the person who is transferring title to the rifle or shotgun shall submit, within forty-eight hours after transferring the firearm, to the authority which issued the permit to acquire, the following information, in writing: name of the person who transferred the firearm, name of the person to whom the title to the firearm was transferred; names of the manufacturer and importer; model; type of action; caliber or gauge; and serial number as applicable.

(g) Effective July 1, 1995, no person shall be issued a permit under this section for the acquisition of a pistol or revolver unless the person, at any time prior to the issuance of the permit, has completed:

>   (1) An approved hunter education course as authorized under section 183D-28;

>   (2) A firearms safety or training course or class available to the general public offered by a law enforcement agency of the State or of any county;

>   (3) A firearms safety or training course offered to law enforcement officers, security guards, investigators, deputy sheriffs, or any division or subdivision of law enforcement or security enforcement by a state or county law enforcement agency; or

>   (4) A firearms training or safety course or class conducted by a state certified or National Rifle Association certified firearms instructor or a certified military firearms instructor that provides, at a minimum, a total of at least two hours of firing training at a firing range and a total of at least four hours of classroom instruction, which may include a video, that focuses

on:

> (A) The safe use, handling, and storage of firearms and firearm safety in the home; and

(B) Education on the firearm laws of the State.

An affidavit signed by the certified firearms instructor who conducted or taught the course, providing the name, address, and phone number of the instructor and attesting to the successful completion of the course by the applicant shall constitute evidence of certified successful completion under this paragraph.

(h) No person shall sell, give, lend, or deliver into the possession of another any firearm except in accordance with this chapter.

(i) No fee shall be charged for permits, or applications for permits, under this section, except for a single fee chargeable by and payable to the issuing county, for individuals applying for their first permit, in an amount equal to the fee actually charged by the Federal Bureau of Investigation to the issuing police department for a fingerprint check in connection with that application or permit. In the case of a joint application, the fee provided for in this section may be charged to each person to whom no previous permit has been issued.

## Haw. Rev. Stat. § 134-3

(a) Every person arriving in the State who brings or by any other manner causes to be brought into the State a firearm of any description, whether usable or unusable, serviceable or unserviceable, modern or antique, shall register the firearm within five days after arrival of the person or of the firearm, whichever arrives later, with the chief of police of the county of the person's place of business or, if there is no place of business, the person's residence or, if there is neither a place of business nor residence, the person's place of sojourn. A nonresident alien may bring firearms not otherwise prohibited by law into the State for a continuous period not to exceed ninety days; provided that the person meets the registration requirement of this section and the person possesses:

> (1) A valid Hawaii hunting license procured under chapter 183D, part II, or a

commercial or private shooting preserve permit issued pursuant to section 183D-34;

(2) A written document indicating the person has been invited to the State to shoot on private land; or

(3) Written notification from a firing range or target shooting business indicating that the person will actually engage in target shooting.

The nonresident alien shall be limited to a nontransferable registration of not more than ten firearms for the purpose of the above activities.

Every person registering a firearm under this subsection shall be fingerprinted and photographed by the police department of the county of registration; provided that this requirement shall be waived where fingerprints and photographs are already on file with the police department. The police department shall perform an inquiry on the person by using the National Instant Criminal Background Check System before any determination to register a firearm is made.

(b) Every person who acquires a firearm pursuant to section 134-2 shall register the firearm in the manner prescribed by this section within five days of acquisition. The registration shall be on forms prescribed by the attorney general, which shall be uniform throughout the State, and shall include the following information: name of the manufacturer and importer; model; type of action; caliber or gauge; serial number; and source from which receipt was obtained, including the name and address of the prior registrant. If the firearm has no serial number, the permit number shall be entered in the space provided for the serial number, and the permit number shall be engraved upon the receiver portion of the firearm prior to registration. All registration data that would identify the individual registering the firearm by name or address shall be confidential and shall not be disclosed to anyone, except as may be required for processing the registration or as may be required by a law enforcement agency for the lawful performance of its duties or as may be required by order of a court.

(c) Dealers licensed under section 134-31 or dealers licensed by the United States Department of Justice shall register firearms pursuant to this section on registration forms prescribed by the attorney general and shall not be required to have the

firearms physically inspected by the chief of police at the time of registration.

(d) Registration shall not be required for:

> (1) Any device that is designed to fire loose black powder or that is a firearm manufactured before 1899;

> (2) Any device not designed to fire or made incapable of being readily restored to a firing condition; or

> (3) All unserviceable firearms and destructive devices registered with the Bureau of Alcohol, Tobacco, and Firearms of the United States Department of Justice pursuant to Title 27, Code of Federal Regulations.

(e) No fee shall be charged for the registration of a firearm under this section, except for a fee chargeable by and payable to the registering county for persons registering a firearm under subsection (a), in an amount equal to the fee actually charged by the Federal Bureau of Investigation to the registering police department for a fingerprint check in connection with the registration. In the case of a joint registration, the fee provided for in this section may be charged to each person.

## Md. Code Ann., Crim. Law § 4-303

In general

(a) Except as provided in subsection (b) of this section, a person may not:

> (1) transport an assault weapon into the State; or

> (2) possess, sell, offer to sell, transfer, purchase, or receive an assault weapon.

Exception

(b)

> (1) A person who lawfully possessed an assault pistol before June 1, 1994, and who registered the assault pistol with the Secretary of State Police

Addend 24

before August 1, 1994, may:

> (i) continue to possess and transport the assault pistol; or

> (ii) while carrying a court order requiring the surrender of the assault pistol, transport the assault pistol directly to the law enforcement unit, barracks, or station if the person has notified the law enforcement unit, barracks, or station that the person is transporting the assault pistol in accordance with a court order and the assault pistol is unloaded.

(2) A licensed firearms dealer may continue to possess, sell, offer for sale, or transfer an assault long gun or a copycat weapon that the licensed firearms dealer lawfully possessed on or before October 1, 2013.

(3) A person who lawfully possessed, has a purchase order for, or completed an application to purchase an assault long gun or a copycat weapon before October 1, 2013, may:

> (i) possess and transport the assault long gun or copycat weapon; or

> (ii) while carrying a court order requiring the surrender of the assault long gun or copycat weapon, transport the assault long gun or copycat weapon directly to the law enforcement unit, barracks, or station if the person has notified the law enforcement unit, barracks, or station that the person is transporting the assault long gun or copycat weapon in accordance with a court order and the assault long gun or copycat weapon is unloaded.

(4) A person may transport an assault weapon to or from:

> (i) an ISO 17025 accredited, National Institute of Justice-approved ballistics testing laboratory; or

> (ii) a facility or entity that manufactures or provides research and development testing, analysis, or engineering for personal protective equipment or vehicle protection systems.

**Md. Code Ann., Pub. Safety § 5-101(r)**

Addend 25

(r) "Regulated firearm" means:

    (1) a handgun; or

    (2) a firearm that is any of the following specific assault weapons or their copies, regardless of which company produced and manufactured that assault weapon:

        (i) American Arms Spectre da Semiautomatic carbine;

        (ii) AK-47 in all forms;

        (iii) Algimec AGM-1 type semi-auto;

        (iv) AR 100 type semi-auto;

        (v) AR 180 type semi-auto;

        (vi) Argentine L.S.R. semi-auto;

        (vii) Australian Automatic Arms SAR type semi-auto;

        (viii) Auto-Ordnance Thompson M1 and 1927 semi-automatics;

        (ix) Barrett light .50 cal. semi-auto;

        (x) Beretta AR70 type semi-auto;

        (xi) Bushmaster semi-auto rifle;

        (xii) Calico models M-100 and M-900;

        (xiii) CIS SR 88 type semi-auto;

        (xiv) Claridge HI TEC C-9 carbines;

        (xv) Colt AR-15, CAR-15, and all imitations except Colt AR-15 Sporter H-BAR rifle;

(xvi) Daewoo MAX 1 and MAX 2, aka AR 100, 110C, K-1, and K-2;

(xvii) Dragunov Chinese made semi-auto;

(xviii) Famas semi-auto (.223 caliber);

(xix) Feather AT-9 semi-auto;

(xx) FN LAR and FN FAL assault rifle;

(xxi) FNC semi-auto type carbine;

(xxii) F.I.E./Franchi LAW 12 and SPAS 12 assault shotgun;

(xxiii) Steyr-AUG-SA semi-auto;

(xxiv) Galil models AR and ARM semi-auto;

(xxv) Heckler and Koch HK-91 A3, HK-93 A2, HK-94 A2 and A3;

(xxvi) Holmes model 88 shotgun;

(xxvii) Avtomat Kalashnikov semiautomatic rifle in any format;

(xxviii) Manchester Arms "Commando" MK-45, MK-9;

(xxix) Mandell TAC-1 semi-auto carbine;

(xxx) Mossberg model 500 Bullpup assault shotgun;

(xxxi) Sterling Mark 6;

(xxxii) P.A.W.S. carbine;

(xxxiii) Ruger mini-14 folding stock model (.223 caliber);

(xxxiv) SIG 550/551 assault rifle (.223 caliber);

(xxxv) SKS with detachable magazine;

(xxxvi) AP-74 Commando type semi-auto;

(xxxvii) Springfield Armory BM-59, SAR-48, G3, SAR-3, M-21 sniper rifle, M1A, excluding the M1 Garand;

(xxxviii) Street sweeper assault type shotgun;

(xxxix) Striker 12 assault shotgun in all formats;

(xl) Unique F11 semi-auto type;

(xli) Daewoo USAS 12 semi-auto shotgun;

(xlii) UZI 9mm carbine or rifle;

(xliii) Valmet M-76 and M-78 semi-auto;

(xliv) Weaver Arms "Nighthawk" semi-auto carbine; or

(xlv) Wilkinson Arms 9mm semi-auto "Terry".

**N.Y. Penal Law § 400.09(2)**

2. Types of licenses. A license for gunsmith or dealer in firearms shall be issued to engage in such business. A license for a pistol or revolver, other than an assault weapon or a disguised gun, shall be issued to (a) have and possess in his dwelling by a householder; (b) have and possess in his place of business by a merchant or storekeeper; (c) have and carry concealed while so employed by a messenger employed by a banking institution or express company; (d) have and carry concealed by a justice of the supreme court in the first or second judicial departments, or by a judge of the New York city civil court or the New York city criminal court; (e) have and carry concealed while so employed by a regular employee of an institution of the state, or of any county, city, town or village, under control of a commissioner of correction of the city or any warden, superintendent or head keeper of any state prison, penitentiary, workhouse, county jail or other institution for the detention of persons convicted or accused of crime

or held as witnesses in criminal cases, provided that application is made therefor by such commissioner, warden, superintendent or head keeper; (f) have and carry concealed, without regard to employment or place of possession, by any person when proper cause exists for the issuance thereof; and (g) have, possess, collect and carry antique pistols which are defined as follows: (i) any single shot, muzzle loading pistol with a matchlock, flintlock, percussion cap, or similar type of ignition system manufactured in or before l898, which is not designed for using rimfire or conventional centerfire fixed ammunition; and (ii) any replica of any pistol described in clause (i) hereof if such replica--

(1) is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition, or

(2) uses rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade.

## N.Y. Penal Law § 400.09(7)

7. License: form. Any license issued pursuant to this section shall, except in the city of New York, be approved as to form by the superintendent of state police. A license to carry or possess a pistol or revolver shall have attached the licensee's photograph, and a coupon which shall be removed and retained by any person disposing of a firearm to the licensee. Such license shall specify the weapon covered by calibre, make, model, manufacturer's name and serial number, or if none, by any other distinguishing number or identification mark, and shall indicate whether issued to carry on the person or possess on the premises, and if on the premises shall also specify the place where the licensee shall possess the same. If such license is issued to an alien, or to a person not a citizen of and usually a resident in the state, the licensing officer shall state in the license the particular reason for the issuance and the names of the persons certifying to the good character of the applicant. Any license as gunsmith or dealer in firearms shall mention and describe the premises for which it is issued and shall be valid only for such premises.

## N.Y. Penal Law § 400.09(10)

Addend 29

10. License: expiration, certification and renewal. (a) Any license for gunsmith or dealer in firearms and, in the city of New York, any license to carry or possess a pistol or revolver, issued at any time pursuant to this section or prior to the first day of July, nineteen hundred sixty-three and not limited to expire on an earlier date fixed in the license, shall expire not more than three years after the date of issuance. In the counties of Nassau, Suffolk and Westchester, any license to carry or possess a pistol or revolver, issued at any time pursuant to this section or prior to the first day of July, nineteen hundred sixty-three and not limited to expire on an earlier date fixed in the license, shall expire not more than five years after the date of issuance; however, in the county of Westchester, any such license shall be certified prior to the first day of April, two thousand, in accordance with a schedule to be contained in regulations promulgated by the commissioner of the division of criminal justice services, and every such license shall be recertified every five years thereafter. For purposes of this section certification shall mean that the licensee shall provide to the licensing officer the following information only: current name, date of birth, current address, and the make, model, caliber and serial number of all firearms currently possessed. Such certification information shall be filed by the licensing officer in the same manner as an amendment. Elsewhere than in the city of New York and the counties of Nassau, Suffolk and Westchester, any license to carry or possess a pistol or revolver, issued at any time pursuant to this section or prior to the first day of July, nineteen hundred sixty-three and not previously revoked or cancelled, shall be in force and effect until revoked as herein provided. Any license not previously cancelled or revoked shall remain in full force and effect for thirty days beyond the stated expiration date on such license. Any application to renew a license that has not previously expired, been revoked or cancelled shall thereby extend the term of the license until disposition of the application by the licensing officer. In the case of a license for gunsmith or dealer in firearms, in counties having a population of less than two hundred thousand inhabitants, photographs and fingerprints shall be submitted on original applications and upon renewal thereafter only at six year intervals. Upon satisfactory proof that a currently valid original license has been despoiled, lost or otherwise removed from the possession of the licensee and upon application containing an additional photograph of the licensee, the licensing officer shall issue a duplicate license.

(b) All licensees shall be recertified to the division of state police every five years thereafter. Any license issued before the effective date of the chapter of the laws of two thousand thirteen which added this paragraph shall be recertified by the

licensee on or before January thirty-first, two thousand eighteen, and not less than one year prior to such date, the state police shall send a notice to all license holders who have not recertified by such time. Such recertification shall be in a form as approved by the superintendent of state police, which shall request the license holder's name, date of birth, gender, race, residential address, social security number, firearms possessed by such license holder, email address at the option of the license holder and an affirmation that such license holder is not prohibited from possessing firearms. The form may be in an electronic form if so designated by the superintendent of state police. Failure to recertify shall act as a revocation of such license. If the New York state police discover as a result of the recertification process that a licensee failed to provide a change of address, the New York state police shall not require the licensing officer to revoke such license.

## N.Y. Penal Law § 400.02

There shall be a statewide license and record database which shall be created and maintained by the division of state police the cost of which shall not be borne by any municipality. Records assembled or collected for purposes of inclusion in such database shall not be subject to disclosure pursuant to article six of the public officers law. Records containing granted license applications shall be periodically checked by the division of criminal justice services against criminal conviction, mental health, and all other records as are necessary to determine their continued accuracy as well as whether an individual is no longer a valid license holder. The division of criminal justice services shall also check pending applications made pursuant to this article against such records to determine whether a license may be granted. All state agencies shall cooperate with the division of criminal justice services, as otherwise authorized by law, in making their records available for such checks. The division of criminal justice services, upon determining that an individual is ineligible to possess a license, or is no longer a valid license holder, shall notify the applicable licensing official of such determination and such licensing official shall not issue a license or revoke such license and any weapons owned or possessed by such individual shall be removed consistent with the provisions of subdivision eleven of section 400.00 of this article. Local and state law enforcement shall have access to such database, as otherwise authorized by law, in the performance of their duties. Records assembled or collected for purposes of inclusion in the database established by this section shall be released pursuant to a court order.

**18 Pa. Cons. Stat. § 6111.4**

Notwithstanding any section of this chapter to the contrary, nothing in this chapter shall be construed to allow any government or law enforcement agency or any agent thereof to create, maintain or operate any registry of firearm ownership within this Commonwealth. For the purposes of this section only, the term "firearm" shall include any weapon that is designed to or may readily be converted to expel any projectile by the action of an explosive or the frame or receiver of any such weapon.

**R.I. Gen. Laws § 11-47-41**

No government agency of this state or its political subdivisions shall keep or cause to be kept any list or register of privately owned firearms or any list or register of the owners of those firearms; provided, that the provisions of this section shall not apply to firearms which have been used in committing any crime of violence, nor to any person who has been convicted of a crime of violence.

**S.D. Codified Laws § 23-7-8.6**

No state agency, political subdivision, official, agent, or employee of any state agency or political subdivision may knowingly keep or cause to be kept any list, record, or registry of privately owned firearms or any list, record, or registry of the owners of those firearms, or any list, record, or registry of holders of permits to carry a concealed pistol.

**Vt. Stat. Ann. Tit. 20, § 8**

(a) The governor shall have general direction and control of the emergency management agency and shall be responsible for the carrying out of the provisions of this chapter.

(b) In performing the duties under this chapter, the governor is further authorized and empowered:

> (1) Orders, rules and regulations. To make, amend and rescind the necessary orders, rules and regulations to carry out the provisions of this chapter with due consideration of the plans of the federal government.

Addend 32

(2) Plans.

    (A) To prepare a comprehensive plan and program for the emergency management of this state, such plan and program to be integrated into and coordinated with the emergency management plans of the federal government, the Canadian government, and other states to the fullest possible extent; and

    (B) To coordinate the preparation of plans and programs for emergency management with public safety districts, local emergency planning committees, regional planning commissions, and by the municipalities of this state, such plans to be integrated into and coordinated with the emergency management plans and program of this state to the fullest possible extent.

(3) Inventories, training, mobilization. In accordance with such plan and program for the emergency management of the state:

    (A) to ascertain the requirements of the state or the municipalities for food or clothing or other necessities of life in any all-hazards event and to plan for and procure supplies, medicines, materials, and equipment for the purposes set forth in this chapter;

    (B) to make surveys of the industries, resources and facilities within the state as are necessary to carry out the purposes of this chapter, provided that no inventory or record of privately owned firearms shall be made under authority of this or any other provision of this chapter; and

    (C) to institute training programs and public information programs, and to take all other preparatory steps, including the partial or full mobilization of emergency management organizations in advance of actual disaster, to ensure the furnishing of adequately trained and equipped forces of emergency management personnel in time of need.

(4) Cooperation with the president and others. To cooperate with the president and the heads of the armed forces, and the homeland security agency of the United States, and with the officers and agencies of other

states in matters pertaining to the emergency management of the state and nation, to take any measures not inconsistent with the constitution of this state, which the governor may deem proper to carry into effect any request for the president and the appropriate federal officers and agencies, for any action looking to emergency management, including the direction or control of mobilization of emergency management and homeland security forces, tests and exercises, warnings and signals for drills or emergencies, shutting off water mains, gas mains, electric power connections and the suspension of all other utility services, the conduct of civilians and the movement and cessation of movement of pedestrians and vehicular traffic during, prior, and subsequent to drills or attack, public meetings or gatherings, and the evacuation and reception of the civilian population.

(5) Services and facilities. To utilize the services and facilities of existing officers and agencies of the state and of the counties and municipalities of the state, and all the officers and agencies shall cooperate with and extend services and facilities to the governor as the governor may request.

(6) Law enforcement. To take such action and give such directions to state and local law enforcement officers and agencies as may be reasonable and necessary for the purpose of securing compliance with the provisions of this chapter and with the orders, rules, and regulations made pursuant thereto.

(7) Delegation of authority. To delegate any authority vested in the governor under this chapter to the commissioner or designee.

(8) Mutual aid agreements with other states. On behalf of this state, to enter into reciprocal aid agreements under this chapter and pursuant to compacts with other states and the federal government or province of a foreign country under such terms as the Congress of the United States may prescribe. These mutual aid arrangements shall be limited to the furnishing or exchange of food, clothing, medicine, and other supplies; engineering services; emergency housing; police services; national or state guards while under the control of the state; health; medical and related services; fire fighting, rescue, transportation and construction services and equipment; personnel necessary to provide or conduct these services; and such other supplies, equipment, facilities, personnel, and services as may be needed; the reimbursement of costs and expenses for equipment, supplies, personnel,

Addend 34

and similar items for mobile support units, fire fighting, and police units and health units; and on such terms and conditions as are deemed necessary.

(9) Mutual aid among municipalities. To sponsor, develop, and approve mutual aid plans and agreements among the towns and cities of the state, similar to the mutual aid arrangements referred to in this section.

## Code Md. Regs. 29.03.01.12

A. Sales, Rentals, and Transfers.

(1) A sale, rental, or transfer of a regulated firearm shall be reported to the Firearms Registration Section within 7 days after the completed sale.

(2) A dealer or person who sells, rents, or transfers a regulated firearm shall submit notification of the completed transaction to the Firearms Registration Section in the manner prescribed by the Secretary.

(3) The notification shall contain an identifying description of the regulated firearm, including its caliber, make, model, manufacturer's serial number, and any other special or peculiar characteristic or marking by which the firearm may be identified.

B. A dealer shall submit to the Firearms Registration Section, with the proper notification, applications held by the dealer that have been disapproved by the Secretary.

C. A dealer shall submit to the Firearms Registration Section, with the proper notification, applications held by the dealer that have expired pursuant to the 90-day limit of Regulation .19 of this chapter.

D. The Secretary shall maintain a permanent record of notifications received of completed sales, rentals, and transfers of regulated firearms in the State.