NOT YET SCHEDULED FOR ORAL ARGUMENT

—————————————

No. 14-7071

—————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————————————

DICK ANTHONY HELLER, *et al.*,

APPELLANTS,

V.

DISTRICT OF COLUMBIA, *et al.*,

APPELLEES.

—————————————

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

—————————————

**BRIEF FOR APPELLEES THE DISTRICT OF COLUMBIA
AND MAYOR VINCENT C. GRAY**

—————————————

EUGENE A. ADAMS
Interim Attorney General
for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

HOLLY M. JOHNSON
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 727-6287
loren.alikhan@dc.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. *Parties and amici*.—All parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the brief for appellants except for *amici curiae* for appellants the National Rifle Association, Inc., Gun Owners of America, Gun Owners Foundation, Gun Owners of California, U.S. Justice Foundation, Lincoln Institute, Abraham Lincoln Foundation, Institute on the Constitution, Conservative Legal Defense and Education Fund, Policy Analysis Center, Downsize DC Fund, DownsizeDC.org, CRPA Foundation, Pink Pistols, Second Amendment Sisters, Inc., and Women Against Gun Control, Inc.; and *amici curiae* for appellees the International Municipal Lawyers Association, Major City Chiefs of Police Association, United States Conference of Mayors, and Brady Center to Prevent Gun Violence.

B. *Ruling under review*.—The reference to the ruling at issue appears in the brief for appellants.

C. *Related cases*.—All related cases are listed in the brief for appellants.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF THE ISSUES ..........................................................1

STATEMENT OF THE CASE.............................................................1

    1.    The District's Firearm Laws Before *Heller*. ........................................1

    2.    The Supreme Court's *Heller* Decision. .................................2

    3.    The 2008 Firearms Registration Act. ....................................3

    4.    Heller And Other Plaintiffs Bring Another Suit, The District Wins Summary Judgment, And This Court Affirms In Part.........................5

    5.    The 2012 Firearms Amendment Act And Its Implementation. .............7

    6.    Plaintiffs File A Third Amended Complaint, The Parties Engage In Voluminous Discovery, The District Identifies Four Expert Witnesses, And The District Court Denies Plaintiffs' Motions *In Limine*.................................................................12

    7.    The District Court Grants Summary Judgment To The District On The Remaining Registration Requirements Under Challenge............17

STANDARD OF REVIEW ...................................................21

SUMMARY OF ARGUMENT.............................................23

ARGUMENT ...................................................................26

    I.    The District's Registration Requirements Comport With The Second Amendment.............................................................26

        A.    The district court properly considered the District's burden and applied the level of deference owed to its legislative judgments. ....................................................................26

        B.    The registration requirements withstand constitutional scrutiny. ....................................................................31

1. Registration of long guns. ...............................................31

    a. The need for registration generally. ......................32

    b. Registration of long guns specifically. .................35

2. Background check; in-person appearance, photographing, and fingerprinting; bringing the firearm to MPD; re-registration; and fee requirements. ...................................................44

3. Education requirements. ................................................50

4. Limit on registering one pistol per month. .....................52

II. The District Court Did Not Err In Relying On The District's Experts At Summary Judgment. ..........................................54

  A. The district court's *in limine* rulings were within its discretion. ...................................................................54

  B. The district court properly considered the testimony of the District's experts on summary judgment. .................................57

CONCLUSION ...................................................................................59

# TABLE OF AUTHORITIES*

*Cases*

*Barry v. City of New York*, 712 F.2d 1554 (2d Cir. 1983) ................................. 46, 47

*Bd. of Trustees of SUNY v. Fox*, 492 U.S. 469 (1989) ............................................22

*Clark v. Jeter*, 486 U.S. 456 (1988) ................................................. 21, 32

*Cox v. New Hampshire*, 312 U.S. 569 (1941) ..........................................50

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).............. 17, 54, 55, 56

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ("*Heller I*") ................. 2, 3, 54

*Fla. Bar v. Went For It, Inc.*, 515 U.S. 618 (1995) ...................................52

*Ginsberg v. New York*, 390 U.S. 629 (1968) ..........................................27

*Hamilton v. Accu-Tek*, 62 F. Supp. 2d 802 (E.D.N.Y. 1999),..................................56

*\*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*") ...6, 7, 18, 19, 20, 21, 22, 23, 24, 26, 31, 32, 34, 36, 37, 41, 42, 43, 49, 52

*Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549 (D.C. Cir. 1993).......................23

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012) ...........................31

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) ....................................54

*Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013) .................................................50

*Lampkins v. United States*, 401 A.2d 966 (D.C. 1979) ...........................................58

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) ...................................... 20, 49

---

\*        Authorities upon which we chiefly rely are marked with asterisks.

iv

*NAACP v. AcuSport, Inc.*, 271 F. Supp. 2d 435 (E.D.N.Y. 2003)............................55

*New York Times Co. v. Eisner*, 256 U.S. 345, 349 (1921) ........................52

*Noble State Bank v. Haskell*, 219 U.S. 104 (1911) .................................27

*Paris Adult Theatre I v. Slaton*, 413 U.S. 49 (1973) ...............................27

*People v. Arcadia Machine & Tool, Inc.*, 2003 WL 21184117
    (Cal. Super. Ct. Apr. 10, 2003)..............................................55

*Queen v. Schultz*, 747 F.3d 879 (D.C. Cir. 2014) ....................................37

*\*Schrader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013) ............................ 19, 21, 31, 42

*Steele v. D.C. Tiger Market*, 854 A.2d 175 (D.C. 2004)........................................58

*\*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994)
    (*"Turner I"*) .................................................... 27, 28, 29, 31, 42, 47, 53

*\*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997)
    (*"Turner II"*) .......................................... 27, 28, 29, 30, 38, 48

*Turner Broad. Sys., Inc. v. FCC*, 910 F. Supp. 734 (D.D.C. 1995).................. 29, 30

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*,
    608 F.3d 871 (D.C. Cir. 2010)................................................54

*United States v. Day*, 524 F.3d 1361 (D.C. Cir. 2008)............................................23

*United States v. Gatling*, 96 F.3d 1551 (D.C. Cir. 1996) ........................54

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)......................................21

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011)...................................22

*United States v. Miller*, 307 U.S. 174 (1939)...................................... 2, 43

*United States v. Spriggs*, 996 F.3d 320 (D.C. Cir. 1993) ........................57

v

*United States v. Walker*, 657 F.3d 160 (3d Cir. 2011) ...................................... 57, 58

*\*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ..................... 22, 28, 42, 45, 49

*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013) ............................................22

### *Statutes and Regulations*

18 U.S.C. § 922(g) .................................................................................................49

18 U.S.C. § 924(a)(2) .............................................................................................49

28 U.S.C. § 1291 .......................................................................................................1

28 U.S.C. § 1331 .......................................................................................................1

28 U.S.C. § 1343 .......................................................................................................1

D.C. Code § 2-534(a)(2) ........................................................................................11

D.C. Code § 6-1811(a) (1978 Supp.) ......................................................................1

D.C. Code § 6-1813(a) (1978 Supp.) ......................................................................2

D.C. Code § 7-2501.01 ............................................................................................1

D.C. Code § 7-2501.01(9) ......................................................................................36

D.C. Code § 7-2502.01(a) .......................................................................... 6, 7, 13, 36

D.C. Code § 7-2502.02(a)(4) (2001 ed.) .................................................................2

D.C. Code § 7-2502.02(a)(4)(C) .............................................................................4

D.C. Code § 7-2502.02(a)(6) ................................................................................5, 6

D.C. Code § 7-2502.03(a)(10) ................................................. 4, 6, 7, 8, 13, 51

D.C. Code § 7-2502.03(a)(11) ................................................. 4, 6, 8, 13, 31

D.C. Code § 7-2502.03(a)(13) ................................................. 4, 6, 8, 13, 51

D.C. Code § 7-2502.03(b)..................................................... 6, 7, 13

D.C. Code § 7-2502.03(d)..................................................... 4, 6, 8

D.C. Code § 7-2502.03(e)............................................ 4, 5, 6, 13, 53

D.C. Code § 7-2502.04 ........................................................ 4, 7, 13

D.C. Code § 7-2502.04(c)............................................................47

D.C. Code § 7-2502.05 ..................................................................5

D.C. Code § 7-2502.05(b)..................................................... 13, 49

D.C. Code § 7-2502.07a ............................................... 5, 7, 8, 13

D.C. Code § 7-2502.08(1)(A)........................................................5

D.C. Code § 7-2502.08(c)..............................................................5

D.C. Code § 7-2506.01(b)..........................................................5, 6

D.C. Code § 7-2507.02 (2001 ed.)...............................................2

D.C. Code § 7-2507.06 ..............................................................13

## Rules

Federal Rule of Civil Procedure 30(b)(6) ..................................17

Federal Rule of Evidence 702........................................ 17, 54, 55, 56

## Other

56 D.C. Reg. 3438 (May 1, 2009)...............................................4

58 D.C. Reg. 50 (Dec. 16, 2011).................................................8

Centers for Disease Control and Prevention, National Center for Injury
    Prevention and Control, Web-based Injury Statistics Query and Reporting
    System ...................................................................................................33

Robert Churchill, *Gun Regulation, the Police Power and the Right to Keep
    Arms in Early America*, 25 Law & Hist. Rev. 139 (2007)...................................43

Saul Cornell, *et al.*, *A Well Regulated Right: The Early American Origins of
    Gun Control*, 73 Fordham L. Rev. 487 (2004).....................................................43

Glock USA, *Firearms Safety and Gun Training* ......................................................51

Glock USA, *Glock S.A.F.E. Training*.......................................................................51

National Rifle Association, *NRA Gun Safety Rules*..................................................51

National Rifle Association, *Education and Training Programs*...............................51

Sturm, Ruger & Co., Inc., *Firearms Safety for Responsible Citizens* .....................51

U.S. Sentencing Comm'n, *Quick Facts: Felon in Possession of a Firearm*...........49

# GLOSSARY

| | |
|---|---|
| 1975 Act | Firearms Control Regulations Act of 1975, D.C. Law 1-85 |
| 2008 Act | Firearms Registration Amendment Act of 2008, D.C. Law 17-372 |
| 2012 Act | Firearms Amendment Act of 2012, D.C. Law 19-170 |
| ATF | U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives |
| MPD | D.C. Metropolitan Police Department |
| NCIC | National Criminal Information Center |
| NICS | National Instant Criminal Background Check System |
| WALES | Washington Area Law Enforcement System |
| WISQARS | Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System |

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction under 28 U.S.C. § 1291. On May 19, 2014, plaintiffs timely filed an appeal from the district court's May 15, 2014 final order granting summary judgment to the District. JA988.

## STATEMENT OF THE ISSUES

1. Whether certain provisions of the District of Columbia Code concerning the registration requirement for long guns specifically, and the registration process for firearms generally, are consistent with the Second Amendment.

2. Whether the district court properly considered the testimony of the District of Columbia's experts as part of the summary judgment record.

## STATEMENT OF THE CASE

### 1. The District's Firearm Laws Before *Heller*.

Shortly after the commencement of Home Rule, the Council for the District of Columbia adopted the Firearms Control Regulations Act of 1975, D.C. Law 1-85, codified as amended at D.C. Code § 7-2501.01 *et seq.* (the "1975 Act"), to regulate the acquisition, possession, and transfer of firearms. Notably, the 1975 Act provided that "no person or organization shall, within the District, possess or have under his or its control any firearm, unless such person or organization is the holder of a valid registration certificate for such firearm." D.C. Code § 6-1811(a) (1978 Supp.). The

1975 Act also set forth restrictions on the registration of firearms by certain individuals, including minors, those convicted of violent, drug-related, or "intrafamily" offenses, the "insan[e]," and "chronic alcoholic[s]." D.C. Code § 6-1813(a)(1)-(6) (1978 Supp.).

In addition, until 2008, District law prohibited all private individuals from registering a handgun and included "safe storage" provisions that required residents to keep their lawfully owned firearms, such as registered long guns, "unloaded and disassembled or bound by a trigger lock or similar device" unless they were located in a place of business or being used for lawful recreational activities. D.C. Code §§ 7-2502.02(a)(4), 7-2507.02 (2001 ed.).

2. **The Supreme Court's *Heller* Decision.**

In *District of Columbia v. Heller*, 554 U.S. 570 (2008) ("*Heller I*"), the Supreme Court invalidated the District's ban on the registration of handguns and the "safe storage" provisions. *Id.* at 635. After an extended historical discussion, the Court held that the Second Amendment protects a right to possess a useable firearm for the purpose of self-defense within the home, *id.*, but confirmed that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes," *id*. at 625 (citing *United States v. Miller*, 307 U.S. 174 (1939)). In addition, the Court made clear that its opinion should not be read to cast doubt upon the constitutionality of longstanding regulations, such as "prohibitions on

the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. The Court noted that these "presumptively lawful regulatory measures" were only examples; this "list does not purport to be exhaustive." *Id.* at 627 n.26.

### 3.    The 2008 Firearms Registration Act.

In response to the Supreme Court's decision in *Heller I*, the Council acted swiftly to amend the District's gun laws, adopting a number of emergency and temporary measures to bring the District into compliance while it considered permanent legislation. JA122-23. On September 18 and October 1, 2008, the Council's Committee on Public Safety and the Judiciary held public hearings during which it heard the testimony of 21 witnesses—both for and against gun regulation—and received written statements from others "in order to receive as much public comment as possible in crafting [the] bill." JA124, 132-35. Based on the testimony, the Committee made specific findings regarding, *inter alia*, the District's need for a "strong firearms[] registration law," a ban on assault weapons and high-capacity ammunition magazines, and a one-gun-per-month registration limitation. JA123-24, 128-29, 130, 131 ("2008 Report").

The Committee's efforts culminated in the Firearms Registration Amendment Act of 2008, D.C. Law 17-372 (the "2008 Act"), which was passed by the Council,

and signed by then-Mayor Adrian Fenty on January 28, 2009. 56 D.C. Reg. 3438 (May 1, 2009). After a period of passive Congressional review, the 2008 Act became law on March 31, 2009. 56 D.C. Reg. 3438 (May 1, 2009).

The 2008 Act retained the District's general registration scheme, but amended the law to explicitly permit the registration of a pistol by "[a]ny person . . . for use in self-defense within that person's home." D.C. Code § 7-2502.02(a)(4)(C). The 2008 Act also set forth certain qualification and information requirements for firearm registration, including that an applicant must: (i) "demonstrate satisfactorily a knowledge of the laws of the District of Columbia pertaining to firearms and, in particular, the safe and responsible use, handling, and storage of the same," D.C. Code § 7-2502.03(a)(10); (ii) have "vision better than or equal to that required to obtain a valid driver's license under the laws of the District of Columbia," D.C. Code § 7-2502.03(a)(11); (iii) complete a firearms training or safety course taught by a certified instructor, with a minimum of one hour of firing training at a firing range and at least four hours of classroom instruction, D.C. Code § 7-2502.03(a)(13)(A); and (iv) submit his or her pistol for a ballistics identification procedure, provide fingerprints and a photograph, and appear in person to obtain the registration certificate, D.C. Code §§ 7-2502.03(d), 7-2502.04. In addition, the 2008 Act provided that "the Chief [of Police] shall register no more than one pistol per registrant during any 30-day period," except that the Chief may permit "a person first becoming a District resident to

register more than one pistol if those pistols were lawfully owned in another jurisdiction for a period of 6 months prior to the date of the application." D.C. Code § 7-2502.03(e).

Each firearm registration "shall be accompanied by a nonrefundable fee" to "reimburse the District of the cost of services" provided in connection with registration. D.C. Code § 7-2502.05. Registration certificates are valid for three years, and may be renewed. D.C. Code § 7-2502.07a. Holders of registration certificates must notify the Metropolitan Police Department ("MPD") in writing immediately upon the loss, theft, or destruction of the certificate or the firearm, D.C. Code § 7-2502.08(1)(A), and must keep the certificate in his or her possession when in possession of the firearm and display the certificate upon demand by a law enforcement officer, D.C. Code § 7-2502.08(c).

In addition, the 2008 Act prohibited the registration of certain types of firearms, including "assault weapon[s]," and also banned the possession, sale, or transfer of large-capacity magazines capable of holding more than 10 rounds of ammunition. D.C. Code §§ 7-2502.02(a)(6), 7-2506.01(b).

**4.    Heller And Other Plaintiffs Bring Another Suit, The District Wins Summary Judgment, And This Court Affirms In Part.**

On July 28, 2008—approximately two weeks after the District enacted its first emergency legislation in response to the Supreme Court's decision in *Heller I*— Plaintiffs Dick Heller and Absalom F. Jordan, Jr., residents of the District, commenced

5

this lawsuit.  R.D.1.  On March 25, 2009, subsequent to the enactment of the 2008 Act, Plaintiffs filed a second amended complaint that added two additional District residents, William Carter and Mark Snyder, as plaintiffs and challenged almost every substantive provision of the District's gun laws as "unduly burdensome" and "onerous."  R.D.15 ¶¶ 4-5, 68-69.  The parties filed cross-motions for summary judgment and, on March 26, 2010, the district court granted summary judgment to the District.  R.D.31 (order); R.D.32 (memorandum opinion).

Plaintiffs appealed to this Court, which on October 4, 2011 issued an opinion affirming in part and remanding in part.  *Heller v. District of Columbia*, 670 F.3d 1244, 1248 (D.C. Cir. 2011) ("*Heller II*").  Specifically, this Court upheld as constitutional the District's ban on "assault weapon[s]," D.C. Code § 7-2502(a)(6), and on magazines holding more than ten rounds of ammunition, D.C. Code § 7-2506.01(b).  *Heller II*, 670 F.3d at 1262-64.  The Court also upheld the District's basic registration requirements as applied to handguns, including the requirement that an applicant disclose certain information about himself and the firearm, as set forth in D.C. Code §§ 7-2502.01(a) and 7-2502.03(b).  *Heller II*, 670 F.3d at 1253-55.

With respect to the registration requirements set forth in D.C. Code §§ 7-2502.03(a)(10) (demonstration of knowledge), 7-2502.03(a)(11) (vision test), 7-2502.03(a)(13)(A) (4 hours of classroom instruction and 1 hour of firing range training), 7-2502.03(d) (ballistics identification), 7-2502.03(e) (one-pistol-per-month),

7-2502.04 (requirement to appear in person and be photographed and fingerprinted), 7-2502.07a (re-registration after three years), and 7-2502.07a(d) (background check every six years), and all the registration requirements (including the basic registration requirements in §§ 7-2502.01(a) and 7-2502.03(b)) as applied to long guns, the Court vacated the district court's judgment and remanded for further development of the factual record. 670 F.3d at 1264. The Court found that these requirements were "novel," as opposed to longstanding, and determined that intermediate scrutiny, rather than strict scrutiny, should be applied to determine whether they are constitutionally acceptable. *Id.* at 1255-58. That is, the Court held that these registration requirements are constitutional under the Second Amendment if the District could show that they are "substantially related to an important governmental objective." *Id.* at 1258.

The Court noted that, based on the record before it, the District had advanced "two important governmental interests it may have in the registration requirements, *viz.*, to protect police officers and to aid in crime control." *Id.* The Court concluded, however, that remand was necessary to allow the District to demonstrate "a close fit between those requirements and its governmental interests." *Id*.

**5.     The 2012 Firearms Amendment Act And Its Implementation.**

After the D.C. Circuit's decision in *Heller II*, the Council revisited the District's firearm registration laws by enacting the Firearms Amendment Act of 2012, D.C. Law 19-170 (the "2012 Act"), which made various changes to the registration regime

"primarily to effect clarity and reduce the burden on a firearms registrant." JA181. As relevant here, the 2012 Act repealed the requirements that an applicant submit each pistol to be registered "for ballistics identification procedure" under former D.C. Code § 7-2502.03(d) and undergo a background check every six years under former § 7-2502.07a. JA171-72. Additionally, the 2012 Act revised the vision requirement to require only that a firearms registrant "[i]s not blind," § 7-2502.03(a)(11); eliminated the 5-hour training requirement with the range and classroom components, and instead directed the Chief of MPD to provide free safety training to firearms applicants, § 7-2502.03(a)(13)(A); clarified that the requirement to demonstrate knowledge of the District's firearms laws is a one-time requirement, § 7-2502.03(a)(10); and extended the timeframe to create a system for re-registration of firearms until January 1, 2014. JA181-82.

On January 30, 2012, the Committee held a public hearing to receive testimony on the 2012 Act, as well as on "the gun laws of the District" in general. 58 D.C. Reg. 50 (Dec. 16, 2011). At the hearing, the Committee received oral testimony from 14 witnesses, including plaintiffs Dick Heller and Absalom Jordan; MPD Chief Cathy Lanier; and Daniel W. Webster, the Co-Director of the Johns Hopkins Center for Gun Policy and Research. JA179-81. The Committee also received written statements concerning the District's firearm registration laws from these and other individuals,

which were filed in the record. JA188-309 (selected written testimony and comments).

On February 29, 2012, the Committee issued a 29-page report setting forth various legislative findings concerning the 2012 Act and the District's firearm registration requirements. JA159-87 ("2012 Report"). The Committee's report discussed the District's need for a firearms registration system generally, JA163-66, and also made specific findings, based on the legislative record, concerning, *inter alia*, the requirements that an applicant: (i) appear in-person and be fingerprinted and photographed (JA166-68); (ii) re-register a firearm after three years (JA168-69); (iii) complete a firearms training or safety course (JA169-70); (iv) register no more than one pistol in a 30-day period (JA172-74); (v) demonstrate knowledge of the District's firearms laws (JA174-75); and (vi) not be legally blind (JA175).

The Committee's report also addressed the District's need to register long guns. JA177-78. Specifically, the Committee found that there was "ample evidence to support the need to require registration of long guns," including that (1) during 2006-10, over 4000 murders in the United States occurred through rifles and shotguns, JA177; (2) in the District in 2010, 17 percent of illegal weapons recovered were long guns, JA177; and (3) various witnesses had testified to the lethality of long guns, their use in crime in the District, and their effectiveness in targeting motorcades, of which there are many in the District, JA177-78. The Committee also determined that:

> The justifications that exist for registration of firearms in general—including the unique nature of the District as the nation's capital, providing law enforcement with the information necessary to ensure that gun owners do not fall into the prohibited person categories, and differentiating lawful gun owners from illegal gun owners—apply equally with regard to long arms.

JA178.

The 2012 Act was unanimously adopted by the Council and subsequently signed by Mayor Vincent C. Gray on May 15, 2012. JA85. After the expiration of the prescribed period for Congressional review, the law became effective on September 26, 2012. JA85.

Under District law, MPD is responsible for processing and issuing firearms registrations, and for verifying that applicants are eligible to register firearms. JA312-13. In response to the 2012 Act, MPD effectively created an entirely new registration system, including developing a computer database to allow it to track and process applications. JA312-13. MPD personnel worked for months to develop the database, fine-tuning it to incorporate existing records and accommodate current and possible future needs. JA313. MPD ran many tests on the registration database before it went "live," and continues with testing to ensure that the database is complete, accurate, and reliable. JA313.

To implement the fingerprinting requirement, MPD uses the LiveScan system, a device that scans a person's fingerprints and sends them electronically to the FBI. JA313. Using this system, MPD typically receives a return from the FBI on a

criminal background check on a set of fingerprints in about 15 minutes. JA313. It previously took MPD up to 4 months using an ink-and-paper system. JA313.

As part of the background check for registering a firearm, MPD conducts a check of applicants against a number of databases, including the Washington Area Law Enforcement System ("WALES") and the National Criminal Information Center ("NCIC"). JA313. WALES contains criminal background information, including outstanding warrants and protective or restraining orders, from local law-enforcement agencies, while NCIC contains similar information on a national basis. JA313. MPD also checks information it receives periodically from the Superior Court of the District of Columbia, such as information on mental-health commitments and domestic-violence convictions. JA313.

MPD has determined that personally identifiable information provided by applicants on firearms-registration forms is exempt from disclosure to the public as a "clearly unwarranted invasion of personal privacy." JA314; *see also* D.C. Code § 2-534(a)(2). MPD's firearms-registration database can be accessed only by authorized personnel within the Firearms Registration Section; it cannot be accessed through MPD's intranet or the Internet. JA313.

To satisfy the 2012 Act's mandate, MPD offers applicants an online Firearms Safety Training Course.[1] The course, which may be completed by an applicant online anywhere, including at MPD, takes between 30 minutes and one hour to complete. *See id.*; JA352.

In enacting the registration fee requirements, the Committee noted its concern that "the total cost to register a firearm not be unduly burdensome." JA130. Mindful of this, MPD charges $35 to take and process an applicant's fingerprints, and $13 per firearm for the registration itself. JA312.

Between July 2008 and August 2013, MPD disseminated 5675 firearms-registration applications to the public, with 3748 total firearms registered. JA312. There have been 2453 handguns registered and 66 handgun-registration applications have been denied. JA312. There have been 1295 long guns (*i.e.*, rifles or shotguns) registered, and 17 long gun applications denied. JA312.[2]

6. **Plaintiffs File A Third Amended Complaint, The Parties Engage In Voluminous Discovery, The District Identifies Four Expert Witnesses, And The District Court Denies Plaintiffs' Motions *In Limine*.**

On July 31, 2012, in light of the enactment of the 2012 Act, plaintiffs filed a third amended complaint, which added two District residents, Asar Mustafa and

---

[1]     *Available at* https://dcfst.mpdconline.com/.

[2]     These numbers do not include those guns "grandfathered" since the 1975 Act. JA312.

William Scott, as plaintiffs.[3]   JA5.   As relevant here, plaintiffs challenged the

following provisions of the District's firearms registration law, facially and as applied,

on the grounds that they "substantially and unduly burden, impede, and infringe" upon

the right protected by the Second Amendment:

- the basic registration requirement, D.C. Code §§ 7-2502.01(a) and 7-2507.06;

- the requirement that an applicant demonstrate knowledge of use, handling, and storage of firearms, § 7-2502.03(a)(10);

- the requirement that an applicant not be blind, § 7-2502.03(a)(11);

- the requirement that an applicant complete a firearms training or safety course, or provide evidence of another form of training, § 7-2502.03(a)(13);

- the requirement that an applicant disclose certain information about himself and his firearm, § 7-2502.03(b);

- the limitation on registering no more than one firearm in a 30-day period, § 7-2502.03(e);

- the submission of fingerprints and photographs, and the personal appearance of the applicant, § 7-2502.04;

- the requirement that an applicant pay a registration fee, § 7-2502.05(b); and

- the requirement of re-registration every three years, § 7-2502.07a.

JA20.

---

[3]      Subsequent to the filing of the third amended complaint, plaintiffs voluntarily dismissed Mark Snyder from the suit.  *See* R.D.56 (motion to dismiss); Minute Order (Apr. 1, 2013) (granting motion).

The parties engaged in significant discovery on the third amended complaint, with the District producing more than 9700 documents. The District also identified four expert witnesses to offer testimony in support of the challenged registration requirements:

*First*, the District identified Cathy Lanier, MPD's Chief of Police, with over 20 years of law-enforcement experience in the District. Lanier is responsible for overseeing MPD's efforts to prevent gun violence, and arrest and prosecute violent criminal offenders. JA388-89.[4] She offered testimony explaining the need for the District's requirements that firearms owners appear in-person and be fingerprinted and photographed as part of registration process; demonstrate knowledge of the District's firearm laws and complete a safety training course; and report the loss, theft, sale, transfer, or disposition of their firearms. JA392-95. Lanier also testified about the benefits of the District's one-gun-per-month registration provision and the need for the District to register long guns in addition to handguns. JA396-97. In Lanier's professional opinion, these firearms-registration laws "significantly aid MPD's efforts to prevent violent crime, ensure the security of the Nation's Capital, and protect the safety of law enforcement officers and members of the public." JA391.

---

[4]     Citations are to the experts' declarations, rather than their expert reports, because that is what the district court cited in its opinion. Plaintiffs agree that the experts' declarations are "nearly identical" to their reports. Br.58.

*Second*, the District identified Mark D. Jones, a former agent for 20 years with the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), who was assigned to the District of Columbia for more than seven years and has participated in more than 100 federal, state, and/or local law enforcement arrests involving unlawful firearms possession, illegal firearms trafficking, misuse of firearms, and firearm-related violence. JA343-46. Jones testified about the importance of requiring firearms registrants to appear in-person; re-register every three years; demonstrate knowledge of the District's firearm laws; complete a training or safety course; and notify law enforcement of the loss, theft, destruction, sale, or transfer of their firearms. JA350-53. Jones believes, based on his experience, that the District's firearms-registration laws "serve the goals of enhancing public safety and reducing firearm-related crime." JA346.

*Third*, the District identified Joseph J. Vince, Jr., a former ATF agent with nearly 30 years of experience investigating the illegal trafficking of firearms and diverting firearms for illegal purposes. JA399-400. Vince is also the head of the Criminal Justice Program at Mount St. Mary's University and the President of Crime Guns Solutions, LLC, a private consulting firm dedicated to assisting and training law enforcement in reducing firearm-related violent crime. JA399-400. Vince provided testimony supporting the District's requirements to register long guns; limit the number of handguns registered in a given period; require firearms registrants to appear

in person; re-register every three years; demonstrate knowledge of the District's firearm laws and complete a training or safety course; and notify law enforcement of the loss, theft, destruction, sale, or transfer of their firearms. JA403-06. In general, Vince believes that "[t]he District's firearms laws and regulations are a reasonable, practicable, and enforceable manner of reducing firearms-related violence and protecting the safety of the District's residents, visitors, and law enforcement professionals." JA402.

*Fourth*, the District identified Dr. Daniel W. Webster, ScD, MPH, who is the Co-Director of the Johns Hopkins Center for Gun Policy and has directed numerous empirical studies related to gun violence and its prevention. JA414-15. Webster testified about the public health and safety benefits of laws requiring firearms owners to appear before law enforcement and be fingerprinted; promptly report theft, loss, or transfer of registered firearms to law enforcement; renew firearms registration every three years; and complete a safety training course and be knowledgeable about the firearms laws. JA415-24. Webster believes that the District's laws enhance public safety. He explained that empirical research and data provide "compelling evidence" that gun registration laws like those in place in the District "are effective at preventing the diversion of firearms to criminals and other prohibited persons, as well as the trafficking of guns across state lines." JA424.

Plaintiffs took the opportunity to depose each of the District's four witnesses and also deposed Lieutenant Jon Shelton, the branch commander in charge of MPD's firearms registration section (in his individual capacity rather than as a Fed. R. Civ. P. 30(b)(6) deponent). Plaintiffs did not identify any affirmative expert witnesses on their behalf, but rather provided a declaration from a rebuttal expert, Dr. Gary Kleck, in opposition to summary judgment. JA657-748.

On May 9, 2013, plaintiffs filed motions to strike the expert reports of Lanier, Jones, and Vince. R.D.57 (Jones); R.D.58 (Vince); R.D.59 (Lanier). On July 8, 2013, the district court (Boasberg, J.) denied the motions. JA69-80. The court explained that the expert witnesses satisfied the strictures of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), because the experts' methodology—in which "the expert 'observed the relevant evidence' and 'applied their specialized knowledge' to the case at hand"—"has been approved by courts in a variety of cases involving experts whose experience forms the basis of their opinions." JA77. The court further concluded that plaintiffs' objections to the weight of the testimony could be raised at summary judgment or at trial. JA79.

**7.    The District Court Grants Summary Judgment To The District On The Remaining Registration Requirements Under Challenge.**

The parties filed cross-motions for summary judgment and on May 15, 2014, the district court granted summary judgment to the District and denied plaintiffs' motion for summary judgment. JA941. The court applied the two-step inquiry that

this Court outlined in *Heller II*, whereby "the Court [first] asks whether the challenged law 'impinges on a right protected by the Second Amendment.'" JA950 (quoting *Heller II*, 670 F.3d at 1252). "If the court determines that a challenged law does not burden the right to bear arms—either because it is longstanding and the plaintiff has failed to rebut the presumption of Second Amendment compatibility or because it simply does not burden the right—then there is no constitutional violation. The court may uphold the law without going further." JA950. If the court finds that "the challenged law does burden the Second Amendment right," then it will proceed to the second step and determine what level of scrutiny should apply. JA951 (quoting *Heller II*, 670 F.3d at 1252). In *Heller II*, this Court held that intermediate scrutiny applies to the registration requirements at issue here because "none of [them] prevents an individual from possessing a firearm in his home or elsewhere." JA951 (quoting *Heller II*, 670 F.3d at 1258). Under intermediate scrutiny, "the District must show that the challenged regulation is 'substantially related to an important governmental objective.'" JA951 (quoting *Heller II*, 670 F.3d at 1258).

Noting that the parties disagreed "on what exactly the District must do to survive this inquiry—in other words, what it must show to establish that the challenged gun regulations are 'substantially related' to its important interests," JA952, the court extensively analyzed the subtleties of intermediate-scrutiny review. *See* JA952-57. The court considered two issues in depth: "First, whether the District

18

need only show that the D.C. Council 'could reasonably believe that the laws' would serve its important interests or if it must establish that the laws 'will have th[o]se effects.' And second, whether the District may meet its burden by citing to sources other than empirical data or if it is limited exclusively to statistical evidence." JA952 (citations omitted). The court concluded that "the District has the better of the argument on both issues." JA952.

On the level of certainty necessary, the district court found that "the Supreme Court has stated explicitly that the government satisfies intermediate scrutiny if its predictions about the effect of a challenged law are rational and based on substantial evidence—it need not establish with certitude that the law will actually achieve its desired end." JA952. And "the D.C. Circuit has instructed that courts should be especially deferential to legislative predictions when it comes to gun policy" because, "'the legislature is far better equipped than the judiciary to make sensitive public policy judgments (within constitutional limits)'" in this area. JA953 (quoting *Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013)). Thus, to satisfy intermediate scrutiny, the District's "predictions about the effect of the gun regulations are entitled to significant deference, and the District need only show that they reflect 'reasonable inferences based on substantial evidence.'" JA954 (quoting *Heller II*, 670 F.3d at 1259).

On the type of data necessary, the Supreme Court had also resolved the matter: "[W]e have permitted litigants to justify . . . restrictions [under intermediate scrutiny] by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and simple common sense." JA955 (quoting *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (alterations in district court's opinion)). The court found that this Court's remand order in *Heller II* "did not limit the District exclusively to statistics, but instructed only that 'the District needs to present some meaningful evidence, not mere assertions, to justify its predictive judgments.'" JA955 (quoting *Heller II*, 670 F.3d at 1259). Consistent with *Heller II*, the district court rejected plaintiffs' invitation to give little or no weight to the District's law-enforcement expert witnesses, explaining that this Court "routinely permits law-enforcement officers to testify as expert witnesses based on their professional experiences, without the kind of formal statistical training that [p]laintiffs insist is indispensable to any legitimate policy judgment," and that the testimony of these witnesses could provide "meaningful evidence" in the intermediate-scrutiny analysis. JA956.

On the merits, the court determined that the District had identified two substantial government interests—protecting police officers and promoting public safety. JA957-58. The district court then evaluated the challenged registration requirements at length and found that they were substantially related to those interests.

JA958-67 (long gun registration); JA967-73 (registration requirements of appearing in person, bringing the firearm, photographing, and fingerprinting); JA973-76 (requirements of firearms-safety training and knowledge test); JA976-79 (limit on registering one pistol per month); JA979-84 (requirements for renewing registration); JA984-85 (administrative and enforcement provisions). The court also concluded that plaintiffs lacked standing to challenge the vision requirement because none of them is blind, JA985-86, and that certain of plaintiffs' other challenges had already been rejected by this Court in *Heller II*, JA984-85.

This appeal followed. JA988-89.

## STANDARD OF REVIEW

Legal questions are reviewed *de novo*, and in *Heller II*, this Court established that the challenged registration requirements are subject to intermediate scrutiny because "none of the District's registration requirements prevents an individual from possessing a firearm in his home or elsewhere, whether for self-defense or hunting, or any other lawful purpose." 670 F.3d at 1258. Under intermediate scrutiny, a challenged provision is constitutional if it is "substantially related to an important governmental objective." *Id.* (quoting *Clark v. Jeter*, 486 U.S. 456, 461 (1988)). "[T]he fit between the challenged regulation and the asserted objective [need only] be reasonable, not perfect." *Schrader*, 704 F.3d at 990 (quoting *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010)). In assessing this "fit," a court must

afford "substantial deference to the predictive judgments" of the legislature because it is better able to make policy judgments.

In its previous opinion, this Court remanded the matter for the District to show that its firearms-registration provisions are "not necessarily the least restrictive means, but . . . a means narrowly tailored to achieve the desired objective." *Heller II*, 670 F.3d at 1258 (quoting *Bd. of Trustees of SUNY v. Fox*, 492 U.S. 469, 480 (1989)). "Narrow tailoring" in this context is not the same as narrow tailoring for strict-scrutiny purposes. Rather, as in the First Amendment context cited, *see Fox*, 492 U.S. at 480, it is more lenient. "[N]arrow tailoring" does not mandate that the District's firearms requirements "'be the least intrusive means of achieving the relevant government objective[s], or that there be no burden whatsoever on' [plaintiffs'] Second Amendment right." *Woollard v. Gallagher*, 712 F.3d 865, 878-79 (4th Cir. 2013) (quoting *United States v. Masciandaro*, 638 F.3d 458, 474 (4th Cir. 2011)); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 799-800 (1989) (reaffirming that "the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation" (internal quotation marks and alterations omitted)). Rather, the District need only present "some meaningful evidence" that its firearms-registration requirements "can reasonably be expected to promote" an important government interest. *Heller II*, 670 F.3d at 1259.

"'[A] district court has broad discretion regarding the admission or exclusion of expert testimony, and reversal of a decision on these matters is appropriate only when that discretion has been abused.'" *United States v. Day*, 524 F.3d 1361, 1367 (D.C. Cir. 2008) (quoting *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 567 (D.C. Cir. 1993)).

## SUMMARY OF ARGUMENT

In *Heller II*, this Court concluded that intermediate scrutiny applies to "novel" gun registration requirements, and it remanded the case for the district court to consider, on a more developed record, whether the District's requirement that long guns be registered and its requirements for how all guns are registered satisfy the Second Amendment. 670 F.3d at 1260. On remand, the District provided considerable evidence, including the testimony of four experts—one academic and three experienced law-enforcement professionals—to establish that the challenged registration requirements were narrowly tailored to achieve the substantial government interests of protecting police officers and promoting public safety. The district court, in a painstakingly thorough opinion, found that the District had met its burden for each of the registration requirements and that plaintiffs' counterarguments were unavailing. JA957-85.

On appeal, plaintiffs levy two general challenges to the district court's intermediate-scrutiny analysis—they argue that the District must prove with certainty

that its law will satisfy its objectives, and that for this prong of the analysis the legislative findings should be accorded no deference. This is inconsistent with binding precedent, which holds just as the district court did: "the District need not meet [p]laintiffs' demanding standard by proving definitively that the challenged gun regulations will actually further its important interests." JA954. Instead, the District's "predictions about the effect of the gun regulations are entitled to significant deference, and the District need only show that they reflect 'reasonable inferences based on substantial evidence.'" JA954 (quoting *Heller II*, 670 F.3d at 1259). Especially when public safety is at issue, plaintiffs' crabbed view of the deference courts owe to legislative judgments is impractical and should be rejected.

Plaintiffs also attack the district court's analysis on several of the challenged registration requirements, including the requirement that long guns be registered; the registration requirements that the applicant undergo a background check, appear in person and be photographed and fingerprinted, bring the firearm to MPD upon request, re-register the firearm every three years, and pay a modest fee to register the weapon; the requirement that the applicant compete basic firearms training and pass a knowledge test; and the limitation that a resident may only register one firearm in a 30-day period.

Plaintiffs' scattershot challenges to these requirements follow the same general themes: (1) the district court should not have relied on the District's evidence about

the need for and effectiveness of its registration requirements, and especially should not have relied on the District's law-enforcement experts, despite their decades of on-the-ground experience; (2) the "novelty" of a regulation militates against a finding that it satisfies intermediate scrutiny; and (3) the existence of another possible means of achieving the government's interest, no matter how impractical or theoretical, demonstrates that the method the Council actually chose after careful consideration is not narrowly tailored.

None of plaintiffs' arguments has merit, and this Court should uphold the registration requirements for the very same reasons the district court articulated in its sound analysis. The District's experts provided substantial evidence—both empirical and practical—that the registration requirements will advance the government's interests in protecting police officers and promoting public safety. Next, the "novelty" of a registration requirement is the reason why it is subject to intermediate scrutiny; it does not then factor in again when determining whether the requirement satisfies intermediate scrutiny. Finally, given the deference accorded to legislative judgments, the registration requirements need not be the least-restrictive means for accomplishing the government's aim—the fit must be reasonable; it need not be perfect.

The registration requirements at issue were carefully crafted by the Council in light of *Heller I* and *II* to permit gun ownership in the District while safeguarding against the harms that gun violence and trafficking have in the city. On remand from

*Heller II*, the District marshalled a strong record explaining the practical, commonsense reasons why these regulations will alleviate some of the harms associated with guns. The district court found that the registration requirements satisfy intermediate scrutiny, and this Court should affirm.

## ARGUMENT

## I. The District's Registration Requirements Comport With The Second Amendment.

### A. The district court properly considered the District's burden and applied the level of deference owed to its legislative judgments.

The district court held that "the District need not meet [p]laintiffs' demanding standard by proving definitively that the challenged gun regulations will actually further its important interests." JA954. Instead, the court determined that the District's "predictions about the effect of the gun regulations are entitled to significant deference, and the District need only show that they reflect 'reasonable inferences based on substantial evidence.'" JA954 (quoting *Heller II*, 670 F.3d at 1259). This approach was proper—demanded not only by the practical realities of legislating in the profoundly important area of public safety, but also by binding precedent.

Plaintiffs contend that the District must prove with certitude that its registration requirements will serve the governmental interests of protecting police officers and promoting public safety. Br.20-22. But, as the district court found, that is not the test. "Sound policymaking often requires legislators to forecast future events and to

26

anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994) ("*Turner I*"). Courts have never "demand[ed] of legislatures 'scientifically certain criteria of legislation.'" *Ginsberg v. New York*, 390 U.S. 629, 642-43 (1968) (quoting *Noble State Bank v. Haskell*, 219 U.S. 104, 110 (1911)); *see also Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 61 (1973) ("From the beginning of civilized societies, legislators and judges have acted on various unprovable assumptions."); *id.* at 62 ("The fact that a [legislative] directive reflects unprovable assumptions about what is good for people . . . is not a sufficient reason to find that statute unconstitutional."); *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 196 (1997) ("*Turner II*") ("[C]omplete factual support in the record for the [agency's] judgment or prediction is not possible or required . . . ." (internal quotation marks omitted)).

And when a court reviews a legislative judgment—even one that burdens a constitutional right—"[t]he question is not whether [the legislature], as an objective matter, was correct . . . . Rather, the question is whether the legislative conclusion was reasonable and supported by substantial evidence in the record." *Turner II*, 520 U.S. at 211. The district court thus held the District to the correct burden of proof.

Plaintiffs quote a stray phrase from the plurality portion of the opinion in *Turner I* and misrepresent it as a "holding" that when the government legislates to

remedy a particular harm, it must "demonstrate . . . that the regulation will in fact alleviate the[] harms in a direct and material way."  Br.20 (quoting *Turner I*, 512 U.S. at 664).  Of course, that portion of the opinion did not command a majority of the Court, and so it is not a "holding" at all.  But the larger problem is that plaintiffs read this language in isolation from the rest of the *Turner I* opinion, in which the same plurality explained that legislators may "forecast future events" and "anticipate the[ir] likely impact . . . based on deductions and inferences for which complete empirical support may be unavailable," 512 U.S. at 665, and that "the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation."  512 U.S. at 662 (quoting *Ward*, 491 U.S. at 799) (internal quotation marks and alteration omitted).

Plaintiffs also misread *Turner II* as limiting the deference owed to the legislature.  Br.22.  In plaintiffs' view, the *Turner II* Court accorded deference to legislative predictive judgments only as to whether there is a harm to be remedied, and not whether the enacted law would alleviate those harms in a material way.  *Id.*  But *Turner II* deferred to the legislature on both: "deference [to the legislature] must be accorded to its findings as to the harm to be avoided *and to the remedial measures adopted for that end*, lest we infringe on traditional legislative authority to make predictive judgments when enacting nationwide regulatory policy."  *Turner II*, 520 U.S. at 196 (emphasis added); *see also id.* at 219 ("The record reflects a deliberate

congressional choice to adopt the present levels of protection, to which this Court must defer."); *id.* at 213 ("afford[ing] the Government latitude in designing a regulatory solution").

The *Turner* cases provide a clear roadmap for this case. In those cases, Congress perceived that cable companies were threatening the viability of local broadcast networks and made a predictive judgment that the problem could be solved by requiring cable networks to carry some local broadcast channels. In *Turner I*, the Court recognized important government interests in maintaining local broadcast channels, but a plurality found the record insufficient to determine whether the broadcast networks were really in jeopardy and whether the must-carry provisions would remedy the perceived harm without overburdening speech. 512 U.S. at 667-68. The Court remanded for additional record development.[5]

On remand, the parties generated "tens of thousands of pages" of additional evidence, comprising, *inter alia*, information acquired by Congress during hearings about the challenged legislation, additional expert declarations and testimony, documents from the industry, and other "studies and anecdotal evidence." *Turner II*, 520 U.S. at 187 (citing *Turner Broad. Sys., Inc. v. FCC*, 910 F. Supp. 734, 742-55

---

[5] Justice Stevens believed that the record was sufficient to find the must-carry provisions constitutional, but he joined in remanding the case because otherwise "no disposition of th[e] appeal would command the support of a majority of the Court." 512 U.S. at 673-74.

(D.D.C. 1995)).  Based on this evidence, the Court had "no difficulty in finding a substantial basis to support Congress' conclusion that a real threat justified enactment of the must-carry provisions," *id.* at 196, and that "the burden imposed by must-carry is congruent to the benefits it affords," *id.* at 215.

Just as the Supreme Court did in *Turner II*, this Court should affirm here.  After *Heller II* was remanded for the record to be developed, the parties engaged in full discovery and the District generated extensive evidence in support of the challenged legislation.  Applying appropriate deference to the Council's judgments, the record demonstrates that the registration requirements satisfy intermediate scrutiny.

Plaintiffs next argue that the district court accorded more deference to the District's legislative judgments than precedent allows.  Br.23-24.  Seizing on a single remark by the district court—that "[t]he standard for substantiality [of evidence] is doubly deferential [because] the Court is reviewing a legislative judgment on firearms policy," JA956—plaintiffs contend that the district court was establishing a "novel rule" of heightened deference.  Br.23.  But the district court was merely stating two basic and well-established principles of law: first, that legislative judgments receive more deference than administrative agencies, which comes from *Turner II*.  520 U.S. at 195 ("[S]ubstantiality [of a statute] is to be measured . . . by a standard more deferential than we accord to judgments of an administrative agency."); *id*. at 196 ("We owe Congress' findings an additional measure of deference out of respect for its

authority to exercise the legislative power.").  Next, that "[i]n the context of firearm regulation, the legislature is far better equipped than the judiciary to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks"—a principle established in *Turner I* and applied to firearm laws in *Schrader*, 704 F.3d at 990 (quoting *Kachalsky v. County of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012), in turn quoting *Turner I*, 512 U.S. at 665).  Far from fashioning a "novel" standard, the district court was applying well-settled law.

> **B.  The registration requirements withstand constitutional scrutiny.**

The district court reviewed the challenged provisions against the substantial record, which included the testimony of four experts put on by the District, and it upheld each of the registration requirements under intermediate scrutiny.  On appeal, plaintiffs abandon their challenges to certain requirements, such as the sight requirement, D.C. Code § 7-2502.03(a)(11).  But they persist with their challenges to the registration of long guns and a multitude of specific registration requirements.  All of the challenged requirements withstand intermediate security and should be upheld.

> 1.  Registration of long guns.

This Court in *Heller II* upheld the District's registration requirement as applied to handguns.  670 F.3d at 1254-55.  With the additional evidence introduced on

remand specific to long guns, the Court should recognize that the registration requirement comports with the Second Amendment as applied to all firearms.

<h3>a.    The need for registration generally.</h3>

As noted above, this Court in *Heller II* explained that for the requirements at issue to "pass muster under intermediate scrutiny[,] the District must show they are 'substantially related to an important governmental objective.'"  670 F.3d at 1258 (quoting *Clark*, 486 U.S. at 461).  In *Heller II*, the Court found that the District had advanced "two important governmental interests it may have in the registration requirements, *viz.*, to protect police officers and to aid in crime control." *Id.*; *see also* JA91 (Council of the District of Columbia, Committee on the Judiciary and Criminal Law, Report on Bill 1-164, the "Firearms Control Act of 1975," Apr. 21, 1976).  On remand, the District expanded the category of "crime control" to also include public safety.  JA957 ("'Crime control' and 'public safety' are not synonymous terms as they relate to guns, since the latter also incorporates suicides and firearm accidents.").

Plaintiffs do not seriously dispute that these are important government interests. JA958 ("Plaintiffs do not appear to dispute that public safety is a substantial government interest that the registration requirements are at least intended to address, and, indeed, the [c]ourt finds that this is a powerful justification for the District's gun-registration regime.").  Nor can they.  The District has a real and pressing need to address gun violence.  *See* JA161 (the 2012 Report) (noting that between 2008 to

2011, the percentage of homicides in the District involving guns ranged from 71% to 76%). Annually, the District has more than twice as many firearm homicides as motor-vehicle deaths. *See* Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System ("WISQARS") (in 2010, the District had 84 firearms homicides, compared to 38 motor-vehicle deaths).[6] The District's age-adjusted rate of firearms deaths (intentional and unintentional) for 2010 was 14.62 per 100,000, considerably higher than the national rate (10.07) and the rate in neighboring jurisdictions (9.26 for Maryland, and 10.69 for Virginia). JA958 (citing WISQARS). The statistics are even worse for young African-American males: the firearm death rate for black men aged 15 to 24 in the District in 2010 was *more than double* that of the United States as a whole, and more than the rate for Maryland and Virginia *combined*. JA958 (in 2010, the rates were 152.43 per 100,000 in the District, compared to 73.80 in the United States, 69.70 in Maryland, and 53.71 in Virginia).

Plaintiffs do quibble with one aspect of the substantial government interest in protecting police officers, contending that the District's "foremost reason" advanced for registration "turns out to be false." Br.26. One of the many benefits of registration is that the information obtained "allows officers to determine in advance whether

---

[6] *Available at* http://www.cdc.gov/ncipc/wisqars.

individuals involved in a call may have firearms." *Heller II*, 670 F.3d at 1258 (quoting JA124 (2008 Report)). But the District has never asserted that this was the foremost reason for requiring registration. Indeed, the very source plaintiffs cite, the 2008 Report, lists many reasons why a registration law "is part of a sound gun policy." JA124.

> Registration is critical because it: gives law enforcement essential information about firearm ownership, allows officers to determine in advance whether individuals involved in a call may have firearms, facilitates the return of lost or stolen firearms to their rightful owners, assists law enforcement in determining whether registered owners are eligible to possess firearms or have fallen into a prohibited class, permits officers to charge individuals with a crime if an individual is in possession of an unregistered firearm, and permits officers to seize unregistered weapons.

JA124-25. Accordingly, this was not the "foremost" reason, but one among many.

Nor is it "false." The District acknowledged below that MPD does not routinely check registration records prior to responding to a call for service, but rather that such a check is a tool available for use in appropriate circumstances. R.D.80, at 11. The evidence established that "these checks do occur," which prompted the district court to "find[] that this justification provides some, albeit limited, support for the District's registration policy." JA957 (citing JA515). Indeed, plaintiffs themselves cite (Br.27) the testimony of Lieutenant Shelton, former commander of the firearms registration section, that police agencies had contacted his office to check registration records before executing a search warrant, albeit infrequently. JA515.

The fact that MPD currently does not check the firearms-registration database prior to *every* call for service does not mean that the District's desire to check before some calls is a "false" reason for enacting the law. Just because the District has not routinely relied on this tool in the past does not mean that it will not use it in the future. And, more clearly, the executive branch's current practice does not detract from the fact that *the Council* could legitimately think providing MPD this tool helps justify a registration requirement.

What is more, even if the registration requirement is not a perfect fit for the District's government interest in protecting police officers, it indisputably (and undisputedly) advances the District's governmental interest in promoting public safety. As the district court explained, registration promotes public safety "by allowing the city government to screen out dangerous or irresponsible people who try to obtain a firearm, to ensure that gun owners are familiar with gun safety and D.C. firearm regulations, and to inhibit the illegal trafficking of firearms." JA957. Plaintiffs do not argue otherwise.

> b.     Registration of long guns specifically.

Essentially conceding the District's substantial interests in protecting police officers and promoting public safety, plaintiffs argue that the District failed to establish on summary judgment that the registration requirement for long guns furthered these interests. Br.29-35. This fails for two independent reasons.

*First*, this Court can affirm the basic requirement that long guns be registered because it "does not impinge upon a right protected by the Second Amendment." *Heller II*, 670 F.3d at 1254. In *Heller II*, this Court held that "basic registration requirements are self-evidently de minimis, for they are similar to other common registration or licensing schemes, such as those for voting or for driving a car, that cannot reasonably be considered onerous," and upheld the registration requirement for handguns on this basis. *Id.* at 1254-55. The Court, in *dicta*, went on to suggest that "[t]he requirement of basic registration as applied to long guns may also be de minimis," but given that "the record [wa]s devoid of information concerning the application of registration requirements to long guns," it remanded the issue to the district court to take additional evidence and address the question in the first instance. *Id.* at 1255 n.**

On remand, plaintiffs "offered no evidence to suggest that the basic registration requirement—the mere fact of having to register one's gun, in isolation from the means prescribed by the District for doing so—is any more burdensome as applied to long guns than it is as applied to handguns." JA960. Nor could they, because the base registration requirement is the same for handguns and long guns. D.C. Code §§ 7-2501.01(9), 7-2502.01(a). The record on remand demonstrated that the need for and benefits of registration laws accrue equally for handguns and long guns alike. The Council certainly thought so, and its legislative judgment is entitled to deference.

JA178 (2012 Report) ("The justifications that exist for registration of firearms in general . . . apply equally with regard to long arms.").  The District's experts agreed. For example, Lanier testified that, in her professional opinion, "the objectives of the District's firearm registration laws are just as applicable to long guns as they are to handguns."  JA396; *see also* JA347 (Jones); JA404 (Vince).  The requirement that long guns be registered is de minimis and should be upheld.[7]

*Second*, assuming that the requirement that long guns be registered burdens a Second Amendment right, it withstands intermediate scrutiny.  As an initial matter, a registration requirement for long guns serves the same interests as a registration requirement for handguns, which this Court upheld in *Heller II*.  Registration requirements advance the District's interests in keeping guns away from felons and mentally ill individuals, they allow law enforcement to monitor whether a gun owner has become ineligible to possess a firearm, and they assist the District in tracking lost or stolen weapons.  JA960 (quoting JA392 (Lanier), JA402 (Vince)).  Webster presented empirical evidence about the benefits of gun registration, citing a study he conducted demonstrating that the repeal of Missouri's permit-to-carry law led to a significant increase in gun trafficking.  JA961 (citing JA417-18 (Webster)).  Plaintiffs

---

[7]  While the district court did not rule on this ground, instead proceeding to determine whether the registration requirement for long guns withstood intermediate scrutiny, this Court can affirm on any ground supported by the record.  *See Queen v. Schultz*, 747 F.3d 879, 884 (D.C. Cir. 2014).

dispute the merits of this study (Br.32-33), but as the district court explained, while plaintiffs "score[] some blows against Webster's research," they do not "entirely vitiate Webster's endorsement of the D.C. gun-registration scheme." JA964. That is because the Missouri study plaintiffs criticize is only a small part of Webster's extensive empirical research on the relationship between gun registration and reducing gun use in crime. JA419-21 (Webster describing his studies showing that states with registration schemes like the District's "have some of the lowest age-adjusted firearm mortality rates per 100,000 population in the nation for the period 2006-10" and that "cross-state diversion of guns to criminals would be *reduced* by [registration] systems, especially those requiring in-person applications to local law enforcement").[8] At minimum, such research provides a reasonable basis for requiring gun registration.

---

[8]      Plaintiffs argue (Br.26) that the District's "own witnesses admitted that no studies show that firearm registration prevents illegal possession of firearms or reduce[s] use of firearms in crime." Plaintiffs conveniently omit from their string citation any reference to Dr. Webster, who not only is aware of the studies, but in fact authored many of them. JA415 (Webster "published 68 articles in scientific, peer-reviewed journals" and contributed to several books, the vast majority of which concerned gun violence and its prevention). And while the NRA in its amicus brief (11-18) attacks the studies that Webster relied on in his declaration to the district court, Webster provided more empirical evidence in his oral and written testimony at the Council hearings on the 2008 and 2012 Acts. JA134 (2008); JA180, JA194-196, JA266-78, JA279-91 (2012). The Council relied on this testimony in enacting its gun laws, and for judicial review, "[t]he question is not whether [the Council], as an objective matter, was correct . . . . Rather, the question is whether [the Council's] conclusion was reasonable and supported by substantial evidence in the record." *Turner II*, 520 U.S. at 211.

The record demonstrates that long guns in particular give rise to legitimate public safety and security concerns in the District. *See* JA177 (2012 Report) (finding that "[t]here is ample evidence to support the need to require registration of long guns based on the perceived dangers that they can pose to this city—the nation's capital"). One out of every six illegal firearms recovered by MPD in 2010 was a long gun. JA177 (citing testimony of Daniel W. Webster). Plaintiffs argue that these weapons are only "illegal" because they are "unregistered," Br.31, but, if plaintiffs are correct in their repeated assertion that "only law-abiding citizens register guns," Br.32, a long gun registry allows District law enforcement to "identify unregistered ones likely intended for trafficking or other crimes," JA963.

Moreover, long guns undisputedly are more lethal than handguns. JA455 (plaintiffs' expert discussing how long guns are "more lethal" than handguns because shotguns "fire large numbers of pellets, each one of which creates its own wound cavity in the victim's body, and so that's more likely to intersect vital organs that could result in death" and "[i]n the case of rifles . . . they'll create a larger wound cavity [and] also generally travel at a higher velocity than handgun rounds"); *see also* JA178 (2012 Report) (noting that "the most violent incident in this city in over a decade" (the South Capitol Street shooting) involved long guns); JA396-97 (Lanier discussing the same incident). Such lethality is all the more dangerous in an urban environment such as the District. JA396 (Lanier testifying that "[i]n the city, when

you miss your target with a long gun, it is very likely to hit an unintended target");
JA403 (Vince noting that "firearms homicide rates are highest among young men in
urban areas and have been increasing in this population").

Additionally, long guns pose a special threat to the District given its status as
the Nation's capital. Long guns' "accuracy at long range poses a special threat to
government officials, diplomats, and motorcades." JA178 (2012 Council Report)
(quoting JA201 (2012 Council Hearing Testimony of Daniel R. Vice)); *see also* JA396
(Lanier testifying that "[h]istorically, high-powered rifles have been the preferred tool
of political assassins, as they typically are more accurate over a longer range"); JA348
(Jones explaining the "distinct type of threat [long guns pose] within the confines of
the Nation's capital," including "increas[ing] the risk of a 'standoff' assassination
attempt against political and government leaders").

As the Council noted, requiring the registration of long guns "enables a
modicum of necessary oversight by [MPD]." JA177. That oversight has proved
helpful at the federal level, where laws requiring the registration of certain types of
long guns has proven "highly successful" in reducing the use of such long guns in
crime. JA403 (Vince).

The district court found this evidence "powerful," but it did not stop there.
JA962-63. It went on to consider plaintiffs' counterarguments at length and reject

them.[9]  JA963-67.  They are many of the same arguments plaintiffs raise here, and they should be rejected for the same reasons.

For example, plaintiffs contend (Br.30) that long guns are rarely used in crime, but the district court questioned plaintiffs' statistics and found in any event that the District was allowed to take "preemptive action" to prevent potential harms before they occurred.  JA966.  Plaintiffs also complain (Br.32-33) that Webster did not always distinguish between long guns and handguns in his analysis, but the district court explained that "it was not unreasonable for the District to extrapolate from [handgun research] in determining its long-gun policy, especially given the opinion of multiple experts that long guns and handguns pose similar dangers and should be regulated similarly."  JA966.

Plaintiffs next argue that long gun registration requirements are "novel" and not "narrowly tailored" and thus cannot withstand intermediate scrutiny.  Br.36.  But their "novelty" is precisely the reason *why* they might be subject to intermediate scrutiny.  If they were longstanding, they would be "presumptively lawful"—"that is, they are presumed not to burden conduct within the scope of the Second Amendment."  *Heller*

---

[9]  In their *amici* brief, Gun Owners for America, *et al.*, curiously argue that the district court declined to consider plaintiffs' evidence until after it had reached a conclusion on whether the District satisfied intermediate scrutiny.  Br.13-14.  Not so.  Plaintiffs declined to put on any affirmative experts, only one rebuttal witness.  It was thus perfectly appropriate for the district court to consider the District's affirmative evidence and then assess whether plaintiffs had successfully rebutted it.

II, 670 F.3d at 1253. Novelty is what subjects the requirement to intermediate-scrutiny review; it is not a factor in whether the regulation satisfies that review. Neither the Supreme Court nor this Court has read the Second Amendment impractically to prohibit new regulatory approaches.

Plaintiffs are also incorrect to assert (Br.29, 36-38) that the registration requirements are not narrowly tailored. For narrow tailoring in the context of intermediate scrutiny, "the fit between the challenged regulation and the asserted objective [must be] reasonable, not perfect." *Schrader*, 704 F.3d at 990; *see Ward*, 491 U.S. at 799-800. As the district court explained:

> Not all gun owners will register their weapons and the registry will not stop all gun violence, but there is more than enough evidence to support the District's conclusion that its goals of promoting public safety and protecting police would be "achieved less effectively" absent the basic registration requirement. That is all the law requires.

JA963 (citing *Turner I*, 512 U.S. at 662).[10]

Finally, a holding that the District may not require registration of particular types of firearm would be contrary to the history underlying the Second Amendment's

---

[10]   Plaintiffs repeatedly state the "truism" that "only the law-abiding citizens register their guns," while "criminals do not." Br.32; *see also* Br.26, 43. But it is equally true that all citizens are law-abiding until they break the law, and that a government does not know in advance who will do so. One of the benefits of gun registration generally and a re-registration requirement specifically is that they make it possible for the District to ensure that those who wish to possess a weapon are in fact eligible to do so, and to verify at regular intervals that those registered to possess a gun have not subsequently become ineligible to do so.

adoption. While this Court in *Heller II* previously concluded that basic registration requirements for long guns "are novel, not historic," 670 F.3d at 1255, it nonetheless bears note that regulatory measures akin to, and more intrusive than, a basic registration requirement were accepted at the time of the Framing. Both government measures to survey gun ownership and government requirements of approval for gun possession have historic roots. Colonial legislation authorized door-to-door gun censuses. Robert Churchill, *Gun Regulation, the Police Power and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 161 & n.54 (2007). During the Revolution, several states allowed gun possession only by those swearing loyalty. Saul Cornell, *et al.*, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506-08 (2004).

Furthermore, Framing-era laws organizing state militias "could be quite intrusive, allowing government not only to keep track of who had firearms, but requiring them to report for a muster or face stiff penalties." *Id.* at 505, 509-10. For instance, Virginia militiaman at musters held every two months had to produce guns and ammunition "whenever called for by [their] commanding officers." *Miller*, 307 U.S. at 182. The first Congress enacted a federal militia law that required officers to "inspect" militia arms and report at least annually on "the actual situation of the arms, accoutrements, and ammunition of the several corps." Act of May 8, 1792, ch. XXXIII, § 10, 1 Stat. 271, 273-74. The Framers thus understood that the pre-existing

right the Amendment codified was not offended by government measures to determine how the people were armed. Registration achieves largely the same end as these measures, but is far less intrusive.

2. Background check; in-person appearance, photographing, and fingerprinting; bringing the firearm to MPD; re-registration; and fee requirements.

Plaintiffs challenge five aspects of the registration system for all firearms, not just long guns. Each is a practical, commonsense regulation that withstands intermediate scrutiny.

*First*, plaintiffs appear to concede that background checks to purchase firearms pass constitutional muster, but argue (Br.39-42) that the District should conduct its checks through the National Instant Criminal Background Check System ("NICS") rather than on its own as part of the registration process. The district court rejected this argument because the background checks required as part of the District's registration system are more comprehensive. JA972. Plaintiffs do not dispute this, arguing instead that the District would be free to conduct NICS background checks "and consult any relevant databases[s]" without requiring registration. Br.41. But plaintiffs fail to explain how, in the absence of a registration system, the District would learn that an individual has acquired a firearm—whether through a licensed dealer, private transfer, or gun show—or how it would discover that an individual has relocated to the District with a firearm. Moreover, the fingerprints collected through

44

the registration process are what allow the District to run a LiveScan check on the applicant's background. *See supra* page 10. NICS and other databases like NCIC and WALES use personal identifying information like name, birthdate, and social security number to process the background check. That information can be easily forged in a way that fingerprints cannot. JA393 (Lanier testifying that fingerprint-based background checks "ensure that the applicant is who he says he is and that MPD is performing a background check on the correct person").

In any event, the Second Amendment does not require a government to conduct a background check in a particular way, or to use a particular source. *Cf. Ward*, 491 U.S. at 799. By requiring District residents to register their firearms, the District ensures that it can conduct a thorough background check whenever a gun is purchased by a District resident or otherwise transferred to him, or when a gun owner relocates to the District with a firearm.

*Second*, plaintiffs object to the requirements of an in-person appearance, fingerprinting, and photographing. Br.42-45. All four of the District's experts opined that these requirements avoid fraud and ensure the true identity of the person trying to register the gun. JA350-51 (Jones); JA392-93 (Lanier); 405-06 (Vince); JA415-21 (Webster); JA968-71 (district court discussing evidence at length). Plaintiffs argue that the requirements are not narrowly tailored because the federal requirements for identification and background check already do much of the same work and because

there was no evidence that the federal alternative was not sufficient to prevent fraud. In their view, until MPD has a pronounced problem of people using fake identification to purchase firearms, there is no need for the District to maintain its in-person, photographing, and fingerprinting requirements.

This argument fails because courts have routinely upheld even purely prophylactic government action under intermediate scrutiny. For example, *Barry v. City of New York*, 712 F.2d 1554 (2d Cir. 1983), concerned a challenge to a New York City regulation requiring disclosure of personal financial information by public officials. Because cognizable privacy interests were involved, the Second Circuit applied intermediate scrutiny. *See id.* at 1559. Although the plaintiffs successfully showed that the department in question had a "virtually corruption-free history," the Court sustained the regulation, finding it sufficient that the city had a general concern about corruption and that financial disclosure would alleviate it. *Id.* at 1561. Similarly, even if plaintiffs here were correct that, currently, "[c]riminals virtually never acquire guns by using a fake ID," Br.44, the District's in-person registration, photographing, and fingerprinting requirements would still survive intermediate scrutiny based upon a reasonable prediction that prohibited individuals could circumvent the federal background check process, and that in-person registration, photographing, and fingerprinting will alleviate that concern.

*Third*, plaintiffs challenge the requirement that an individual "*may* be required to bring with him the firearm for which a registration certificate is sought." D.C. Code § 7-2502.04(c) (emphasis added). Plaintiffs think it significant that other states do not have such a requirement, Br.46-47, but the fact that other states have taken a different approach is not instructive. Simply because other places take *less* restrictive measures to protect public safety does not mean that the District's laws violate the Second Amendment. *See Turner I*, 512 U.S. at 662 ("To satisfy [intermediate scrutiny], a regulation need not be the least []restrictive means of advancing the Government's interest."). Again, the novelty of a law is what subjects it to intermediate-scrutiny review in the first place—it is not a reason to find that the law fails to satisfy the test. And, indeed, this provision is not a strict requirement; rather, MPD *may*, but does not *always*, require the weapon to be brought to MPD. In any event, as the district court found, "it is a permissible, common-sense inference from th[e expert] testimony that if in-person appearance is necessary to verify the identity of the registrant, then physically bringing the gun is similarly necessary to verify the character of the registered weapon." JA969. Plaintiffs argue that the information an applicant provides on the registration application about the make, model, serial number, and identifying marks on the firearm should be sufficient, but a requirement that the firearm be made available for inspection allows MPD to verify that the

application information is correct and that the firearm has not been altered or switched with another firearm.

*Fourth*, plaintiffs complain (Br.47-50) that the registration certificates expire after three years and take issue with the re-registration requirements. Plaintiffs again argue that the District is an outlier among governments to require re-registration but, again, this does not mean that the District's laws violate the Second Amendment—the Constitution permits a range of policy choices, and courts must defer to the legislature's judgment. *Turner II*, 520 U.S. at 196. The District also has a population that is significantly more transient than other states. It cannot be seriously suggested the District does not have an interest in its residents verifying the whereabouts of their firearms and their eligibility to own them at regular intervals.

The district court credited the renewal requirement with "further[ing] the government's substantial interests . . . by ensuring that the registry remains accurate and encouraging gun owners to account for their firearms." JA980-81. Re-registration "will improve public safety by making sure that, in the time since they first registered, they have not fallen into a category of persons prohibited from owning a firearm—for example, if they had been convicted of a disqualifying crime." JA981. Plaintiffs question this, arguing that the District can conduct background checks on their own at regular intervals, without requiring re-registration. Br.48. That process, however, is considerably less efficient, as the Council recognized. JA168-69 (2012

Council Report).  During the previous registration regime, where re-registration was not required, "[t]housands of registrants ha[d] moved, died, disposed of their guns (perhaps lost them) and ha[d] not notified MPD."  JA981 (quoting JA168); *see also Ward*, 491 U.S. at 799.  The Council could take this history into account.  *See Lorillard Tobacco Co.*, 533 U.S. at 555.

Plaintiffs also assert that federal laws prohibiting gun ownership by felons and other ineligible persons, such as 18 U.S.C. §§ 922(g) and 924(a)(2), provide "strong incentives" for ineligible individuals to get rid of guns in their possession, but the sheer number of convictions under those statutes establishes that those laws alone are not a strong enough deterrent.  *See* U.S. Sentencing Comm'n, *Quick Facts: Felon in Possession of a Firearm*[11] ("In fiscal year 2012, 5,768 offenders were convicted of violating 18 U.S.C. § 922(g).").

*Fifth*, plaintiffs object that the District charges modest fees to register a firearm. Br.51; *see also* D.C. Code § 7-2502.05(b).  This argument is squarely foreclosed by this Court's opinion in *Heller II*, where plaintiffs challenged "several administrative and enforcement provisions incidental to the underlying [registration] regime," including "fees for registration . . . and fingerprinting."  670 F.3d at 1255 n.*.  This Court concluded that "[t]hese provisions are lawful insofar as the underlying regime is

---

[11]    *Available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Quick_Facts_Felon_in_Possession_of_a_Firearm.pdf.

lawful and hence enforceable." *Id.* That holding is law of the case and law of the Circuit and controls here, as the district court concluded. JA984 (constitutionality of the fee provision, among other administrative and enforcement provisions, "has already been established by the D.C. Circuit").

In any event, the modest fees withstand constitutional review. It costs just $48 to register a firearm, with $35 of that a one-time fee for MPD to take and process an applicant's fingerprints. JA312. That amount is less than it costs to get a driver's license, 18 DCMR § 103.8 (2011), and less than the cheapest speeding ticket, 18 DCMR § 2600.1. In *Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013), the Second Circuit upheld against a Second Amendment challenge New York City's $340 fee for a three-year residential handgun license. 723 F.3d at 168-69. The Second Circuit confirmed—contrary to the instant plaintiffs' arguments—that it is perfectly permissible for the government to impose licensing fees for the exercise of constitutional rights, so long as the fees "are designed to defray (and do not exceed) the administrative costs of regulating the protected activity." *Id.* at 165 (citing, *inter alia*, *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941)). The District's considerably more modest fee here withstands challenge for the same reason.

### 3. Education requirements.

The District put on evidence from its three law-enforcement experts that the District's requirements that an individual demonstrate knowledge of the District's

firearm laws (D.C. Code § 7-2502.03(a)(10)) and complete a firearms safety and training course (§ 7-2502.03(a)(13)) further the District's interest in public safety and reduce accidental firearm discharges. *See* JA406-07 (Vince); JA352 (Jones); JA393-94 (Lanier). Plaintiffs do not seriously contest these opinions, but contend that these requirements cannot withstand constitutional scrutiny because there is no evidence that the training or test actually protects police officers or promotes public safety. Br.53. But plaintiffs cannot explain why, if this is true, law enforcement agencies train their officers on the safe handling and use of firearms, or why such training is mandatory in the armed forces and recommended by groups such as the National Rifle Association and by firearms manufacturers themselves. *See, e.g.*, JA352; National Rifle Association, *NRA Gun Safety Rules* and *Education and Training Programs*[12]; Sturm, Ruger & Co., Inc., *Firearms Safety for Responsible Citizens* at 16[13]; Glock USA, *Firearms Safety and Gun Training*[14] (online course); Glock USA, *Glock S.A.F.E. Training*[15] ("a class designed for new shooters, teaching the fundamentals of responsible gun ownership and safety"). "The expert testimony here—as well as the commonsense notion that training gun owners in firearms safety and regulation will

---

[12]   *Available at* http://training.nra.org/nra-gun-safety-rules.aspx.

[13]   *Available at* http://www.ruger.com/pdf/blueBook.pdf.

[14]   *Available at* http://us.glock.com/confidence/university.

[15]   *Available at* https://www.glocktraining.com/GlockSAFE.aspx.

likely reduce accidents and increase accountability—is enough for the provision at issue to survive intermediate scrutiny."  JA976.

Moreover, as discussed above, the District is not required to offer empirical evidence that guarantees its firearms-registration requirements will absolutely ameliorate the adverse secondary effects of firearms possession; rather, the District is required only to provide "some meaningful evidence" demonstrating that the challenged registration requirements "can reasonably be expected to promote" an important government interest. *Heller II*, 670 F.3d at 1259.  In doing so, the District may justify its registration requirements with "history, consensus, and simple common sense." *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995).  Here, as the district court found, the Council could rely upon the opinions of the District's law enforcement experts to reasonably conclude that the training and knowledge requirements will further the District's interest in public safety and reducing accidental discharges.  JA956 ("Just as Justice Holmes once observed that 'a page of history is worth a volume of logic,' so too, sometimes, a page of professional experience is worth a volume of statistics." (quoting *New York Times Co. v. Eisner*, 256 U.S. 345, 349 (1921))).

### 4. Limit on registering one pistol per month.

Finally, plaintiffs challenge the provision limiting a resident to the registration of one pistol per month, with the exception that new residents may register multiple

pistols so long as "those pistols were lawfully owned in another jurisdiction for a period of 6 months prior to the date of the application." D.C. Code § 7-2502.03(e). The district court concluded that the limitation survived intermediate scrutiny because it could reduce gun trafficking and provides a way "to limit misuse of firearms by limiting access to multiple firearms," thereby serving the District's interest in promoting public safety. JA977-78. This was based on the Council's findings that "laws restricting the number of firearms purchased . . . helps to reduce the flow of guns both into the illegal market and across state lines," as well as testimony from the District's experts. JA172 (2012 Report); *see also* JA349-50 (Jones); JA404-05 (Vince). The court also found that the law was narrowly tailored because it still allowed residents to register 12 guns each year. JA978.

Plaintiffs claim that the limit does not prevent illegal trafficking of guns into the District. Br.54-55. But, as the district court found, the evidence presented "is clearly sufficient to support a reasonable inference that limitations on multiple gun registrations . . . will help to reduce illegal gun trafficking." JA978. The law thus "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Turner I*, 512 U.S. at 662.

Plaintiffs also take issue with the district court's determination that having fewer guns in circulation will promote public safety. Br.56. They contend that the Second Amendment protects the right to bear "arms" in the plural. But the Supreme

Court in *Heller I* was clear that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home" because it was a "pre-existing" right. 554 U.S. at 635, 652. Allowing a resident to accumulate 12 pistols a year is well more than he could use in any self-defense situation, and the Council could reasonably conclude that more guns lead to more gun theft, more gun accidents, more gun suicides, and more gun crimes.

## II. The District Court Did Not Err In Relying On The District's Experts At Summary Judgment.

### A. The district court's *in limine* rulings were within its discretion.

Plaintiffs filed motions *in limine* seeking to exclude the District's three law-enforcement witnesses—Lanier, Jones, and Vince—under Federal Rule of Evidence 702 and *Daubert*, R.D.60-62, and the district court denied these motions, JA69-80. (Plaintiffs do not challenge the district court's consideration of the testimony of the District's fourth expert, Dr. Webster.) Plaintiffs fail, however, to demonstrate that the district court abused its discretion in considering the testimony of these experts.

"[D]istrict courts have 'broad discretion in determining whether to admit or exclude expert testimony.'" *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 865 (D.C. Cir. 2010) (quoting *United States v. Gatling*, 96 F.3d 1551, 1523 (D.C. Cir. 1996); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (trial judge has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable"); Fed. R.

Evid. 702 advisory committee's note (2000) ("A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule.").

It was plainly not an abuse of discretion for the district court to admit the three witnesses. All three are qualified as experts in the field of law enforcement. Lanier is the Chief of Police for MPD with over 20 years of law-enforcement experience in the District, and she is responsible for overseeing MPD's efforts to prevent gun violence, and arrest and prosecute violent criminal offenders. JA52. Jones is a former ATF agent with more than 30 years of experience in law enforcement, including seven in the District, and he has participated in more than 100 Federal, state, and local law-enforcement arrests involving unlawful firearms possession, illegal firearms trafficking, misuse of firearms, and firearm-related violence. JA37. Vince is also a former ATF agent with nearly 30 years of experience investigating the illegal trafficking of firearms and the diversion of firearms for illegal purposes. JA59. He has provided expert testimony in a number of firearm-related lawsuits. *See, e.g.*, *NAACP v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 520 (E.D.N.Y. 2003) (court "credit[ing] as accurate" Vince's testimony "based on his 30 years of experience in law enforcement and criminal firearms interdiction efforts" that "there is a strong correlation between the presence of illegally possessed guns in a community and the number of gun homicides and non-fatal gun injuries"); *see also People v. Arcadia Machine & Tool, Inc.*, 2003 WL 21184117, at *32 (Cal. Super. Ct. Apr. 10, 2003);

*Hamilton v. Accu-Tek*, 62 F. Supp. 2d 802, 830 (E.D.N.Y. 1999), *vacated sub nom.*, *Hamilton v. Beretta U.S.A. Corp.*, 264 F.3d 21 (2d Cir. 2001).

Just as plaintiffs contend, impractically, that the Council could not regulate firearms without waiting first for empirical studies on the effect of such untried regulations, they argue that the experts' opinions should not have been admitted because they contain "unproven assertions" and "no data." Br.59. They appear to base this claim on the fact that the opinions rely on the professional experience of the particular witness rather than "studies." Br.63. But each of the expert reports and declarations is rife with facts and data, just not in the form of academic or empirical studies. Of course, this is not surprising, as it would be impossible to conduct a case study on the effectiveness of firearm restrictions before they are enacted (or even soon thereafter). Nor are such studies required. *Daubert* set forth numerous factors courts may consider in determining whether to admit expert testimony on scientific evidence:

> Unlike an ordinary witness, *see* Rule 701, an expert is permitted wide latitude to offer opinions, including those that are *not based on firsthand knowledge or observation*. *See* Rules 702 and 703. Presumably, this relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the *knowledge and experience of his discipline*.

509 U.S. at 592 (emphasis added). As the district court found in denying the *in limine* motions, "it appears here that the opinion evidence is connected to the existing facts— the registration requirements and the state of gun violence in the District—by a methodology precisely contemplated by *Daubert* and Rule 702: each expert's

professional judgment obtained through long experience in the field." JA78; *see also* JA77-78.  This was not an abuse of discretion.

**B.    The district court properly considered the testimony of the District's experts on summary judgment.**

In its opinion denying plaintiffs' motions *in limine*, the district court noted that plaintiffs' concerns about the experts could be addressed on cross-examination or raised on summary judgment.  JA78-79.  In their opposition to the District's motion for summary judgment and cross-motion for summary judgment, plaintiffs raised in a footnote the argument that the district court should accord little or no weight to Lanier, Jones, and Vince because, in their view, the testimony was based on anecdote rather than fact.  R.D.75-1, at 21 n.16.  The district court considered this argument and concluded that it would not disregard the witnesses because "[t]here is no per se rule . . . requiring the government to confine its justifications to objective evidence or empirical studies.  So long as the District provides 'meaningful evidence' that satisfies intermediate scrutiny, it will have met its burden under the law."  JA956.

Plaintiffs put forth nothing on appeal showing that, at the summary judgment stage, a court should disregard entirely the testimony of a seasoned law-enforcement professional simply because it is based on personal experience rather than empirical studies, and the law is quite to the contrary.  *See United States v. Spriggs*, 996 F.3d 320, 325 (D.C. Cir. 1993) (allowing testimony of law-enforcement officer on aspects of drug-trafficking); *United States v. Walker*, 657 F.3d 160, 176 (3d Cir. 2011) ("[L]aw

enforcement officials can rely upon their specialized knowledge or experience to offer expert testimony on various aspects of drug-trafficking.").

Nor should their testimony be disregarded at the summary judgment stage because their declarations contain opinions on whether "firearm registration protects police and reduces gun-related crime." Br.60 (quoting JA60). It is perfectly appropriate, for example, for Vince to state that based on the views formed from his extensive law-enforcement experience, the District's firearms laws and regulations are a reasonable and effective attempt to ensure public safety and deter gun-related crime, and they are not overly burdensome under the Second Amendment. JA402. "Expert opinion is not inadmissible 'merely because it amounts to an opinion upon ultimate facts.'" *Steele v. D.C. Tiger Market*, 854 A.2d 175, 181 (D.C. 2004) (quoting *Lampkins v. United States*, 401 A.2d 966, 970 (D.C. 1979) ("[A]n expert may state a conclusion on such facts provided the conclusion is one that laymen could not draw.")).

Finally, plaintiffs complain that they did not have the opportunity for cross-examination because the district court granted summary judgment. Br.64. But plaintiffs deposed each of the experts—which is how parties "cross-examine" witnesses for purposes of summary judgment in every civil action—and secured their own rebuttal expert. JA657-704. Their rebuttal expert specifically responded to each of the District's three law-enforcement expert witnesses. JA691-92 (Kleck rebutting

all three witnesses); JA692-94 (rebutting Lanier); JA695-97 (rebutting Jones); JA697-99 (rebutting Vince). Plaintiffs had ample opportunity to attempt to discredit the District's experts and put forth their best rebuttal evidence and argument. Considering all of the evidence on summary judgment, the district court concluded that the District had the better of the argument and granted summary judgment in its favor.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment of the district court.

Respectfully submitted,

EUGENE A. ADAMS
Interim Attorney General
for the District of Columbia

TODD S. KIM
Solicitor General

/s/ Loren L. AliKhan
LOREN L. ALIKHAN
Deputy Solicitor General

HOLLY M. JOHNSON
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
December 2014     (202) 727-6287

## CERTIFICATE OF SERVICE

I certify that on December 5, 2014, electronic copies of this brief were served on all parties registered through the CM/ECF system.

/s/ Loren L. AliKhan
LOREN L. ALIKHAN

## CERTIFICATE OF COMPLIANCE

I further certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 13,950 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Times New Roman 14 point.

/s/ Loren L. AliKhan
LOREN L. ALIKHAN