NOT YET SCHEDULED FOR ORAL ARGUMENT

_____

No. 14-7071

_____

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

DICK ANTHONY HELLER, et al.,

*Plaintiffs-Appellants,*

v.

DISTRICT OF COLUMBIA, et al.,

*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the District of Columbia
Hon. James E. Boasberg, District Judge

_____

**BRIEF OF THE MAJOR CITY CHIEFS OF POLICE
ASSOCATION, THE UNITED STATES CONFERENCE OF
MAYORS, AND INTERNATIONAL MUNICIPAL LAWYERS
ASSOCIATION
AS AMICI CURIAE IN SUPPORT OF DEFENDANTS-
APPELLEES AND AFFIRMANCE**

_____

Howard R. Rubin
Daniel Lipton
KATTEN MUCHIN ROSENMAN LLP
2900 K Street, N.W.—Suite 200
Washington, D.C. 20007-5118
(202) 625-3534

Lawrence Rosenthal
CHAPMAN UNIVERSITY
FOWLER SCHOOL OF LAW
One University Drive
Orange, C.A. 92866
(714) 628-2650

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

### Parties and Amici

All parties, intervenors and *amici* appearing before this Court are listed in the Brief for Appellees.

### Ruling under Review

The reference to the ruling at issue appears in the Brief for Appellants.

### Related Cases

All related cases are listed in the Brief for Appellants.

### Pertinent Statutes and Regulations

All pertinent constitutional provisions, statutes and regulations are set forth in the Addendum to the Brief for Appellants.

## CORPORATE DISCLOSURE STATEMENT

## Fed. R. App. P. 26.1, Circuit Rule 26.1

The Major City Chiefs of Police Association is a professional organization of police executives representing the largest cities in the United States and Canada. The United States Conference of Mayors is a nonprofit organization of U.S. cities with populations of 30,000 or more that promotes the development of effective national urban and suburban policy. The International Municipal Lawyers Association is a non-profit professional organization that serves as an advocate for local government attorneys. Each of these amici certifies that it has no parent corporation and that no publicly held corporation holds more than 10 percent of its stock.

/s/ Howard R. Rubin
Howard R. Rubin
Daniel Lipton
KATTEN MUCHIN ROSENMAN LLP
2900 K Street, N.W.—Suite 200
Washington, D.C. 20007-5118
(202) 625-3534

Lawrence Rosenthal
CHAPMAN UNIVERSITY
FOWLER SCHOOL OF LAW
One University Drive
Orange, C.A. 92866
(714) 628-2650

# D.C. CIR. R. 29(d) STATEMENT

Amici Major City Chiefs of Police Association, The United States Conference of Mayors, and International Municipal Lawyers Association, ("Government Official amici") are filing a separate brief from amici Brady Center to Prevent Gun Violence and Legal Community against Violence. Government Official amici are organizations representing public officials involved in law enforcement and have interests distinct from those of private amici because they represent public officials whose responsibilities include protecting the public against violent firearms crime. Government Official amici will be able to offer unique insights regarding firearm regulations from the perspective of other law enforcement agencies and municipalities across the United States.

/s/ Howard R. Rubin

Howard R. Rubin
Daniel Lipton
KATTEN MUCHIN ROSENMAN LLP
2900 K Street, N.W.—Suite 200
Washington, D.C. 20007-5118
(202) 625-3534

Lawrence Rosenthal
CHAPMAN UNIVERSITY
FOWLER SCHOOL OF LAW
One University Drive
Orange, C.A. 92866
(714) 628-2650

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES .......................................................................................... ii

CORPORATE DISCLOSURE STATEMENT ............................... iii

D.C. CIR. R. 29(d) STATEMENT ................................................. iv

TABLE OF CONTENTS ................................................................. v

TABLE OF AUTHORITIES ........................................................ vii

STATEMENT OF INTEREST OF AMICI CURIAE ...................... 1

SUMMARY OF ARGUMENT ........................................................ 2

ARGUMENT .................................................................................. 3

    I.   THE SECOND AMENDMENT PERMITS FIREARMS REGULATIONS THAT IMPOSE NO UNDUE BURDEN ON THE RIGHT TO KEEP AND BEAR ARMS ................ 4

        A.  The Supreme Court's Decision in *Heller* Acknowledged Broad Authority To Regulate Firearms. ....................... 5

        B.  History Demonstrates the Existence of Broad Authority To Enact Novel Firearms Regulations. ........ 9

        C.  The Second Amendment's Text Acknowledges Broad Regulatory Power. ..................................................... 20

        D.  The Second Amendment Forbids Only Regulations That Impose an Undue Burden on the Right to Keep and Bear Arms ........................................................... 23

    II.  THE CHALLEGED FIREARMS REGISTRATION REGULATIONS ARE CONSTITUTIONAL. .................... 27

        A.  The Regulations at Issue Are Properly Subject to Intermediate Scrutiny. .............................................. 27

B. The Challenged Regulations Satisfy Intermediate Scrutiny. ................................................... 31

CONCLUSION.................................................................... 38

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES*

C<small>ASES</small>

*Aymette v. State,*
 2 Tenn. 154 (1840) .................................................................. 17

*Clark v. Jeter,*
 486 U.S. 456 (1988) ................................................................ 28

*Clingman v. Beaver,*
 544 U.S. 581 (2005) ................................................................ 24

*Crawford v. Marion County Elections Board,*
 553 U.S. 181 (2008) ................................................................ 24

*\*District of Columbia v. Heller,*
 554 U.S. 570 (2008) .............................. 3-10, 12, 20-22, 25-26, 37

*Drake v. Filko,*
 724 F.3d 426 (3d Cir. 2013) ..................................................... 29

*Gonzales v. Carhart,*
 550 U.S. 124 (2007) ............................................................25, 30

*\*Heller v. District of Columbia,*
 670 F.3d 1244 (D.C. Cir. 2011).....................................8, 9, 26, 27

*Kachalsky v. County of Westchester,*
 701 F.3d 81 (2d Cir. 2012)........................................................ 29

*McDonald v. City of Chicago,*
 561 U.S. 742 (2010) ............................................................13, 30

*Minnesota v. Dickerson,*
 508 U.S. 366 (1993) ................................................................ 20

---

\* Authorities upon which we chiefly rely are marked with asterisks.

*National Rifle Association of America, Inc. v. BATFE,*
   700 F.3d 185 (5th Cir. 2012) ................................... 29

*Nunn v. State,*
   1 Kelly 243 (1846) ....................................................... 17

*Planned Parenthood of Southeast Pennsylvania v.*
   *Casey,* 505 U.S. 833 (1992) ................................. 25, 28

*Schrader v. Holder,*
   704 F.3d 980 (D.C. Cir. 2013) ............................... 29

*Sosna v. Iowa,*
   419 U.S. 393 (1972) ................................................. 25

*State v. Chandler,*
   5 La. Ann. 489 (1850) ............................................. 17

*State v. Reid,*
   1 Ala. 612 (1840) ...................................................... 17

*State v. Smith,*
   11 La. Ann. 633 (1856) ........................................... 17

*Tennessee v. Garner,*
   471 U.S. 1 (1985) ............................................... 18, 19

*Turner Broadcasting System, Inc. v. FCC,*
   512 U.S. 622 (1994) ................................................. 29

*United States v. Marzzarella,*
   614 F.3d 85 (3d Cir. 2010) ..................................... 29

*Washington State Grange v. Washington State*
   *Republican Party,*
   552 U.S. 442 (2008) ................................................. 24

## STATUTES

Act of March 2, 1867, ch. 170, 14 Stat. 485 (1866) ........................ 13

Brady Handgun Violence Protection Act,
Pub. L. No. 103-159, 107 Stat. 1536 (1993) ............................. 15

D.C. Code § 7-2502.01 ................................................... 34

D.C. Code § 7-2502.04 ................................................... 35

D.C. Code § 7-2502.08 ................................................34, 35

Firearms Act of 1938,
Pub. L. No. 75-765, 52 Stat. 1250 (1938) ................................ 15

Gun Control Act of 1968,
Pub. L. No. 90-618, 82 Stat. 1213 (1968) ................................ 15

National Firearms Act of 1934,
Pub. L. No. 73-474, 48 Stat. 1236 (1934) ................................ 14

Violent Crime and Law Enforcement Act of 1994,
Pub. L. No. 103-322, 108 Stat. 1796 (1994) ............................. 16

## OTHER AUTHORITIES

BATF, Dep't of Treas., *Commerce in Firearms in the United States* (Feb. 2000) .......................................... 31

BATF, Dep't of Treas., *Crime Gun Trace Reports (2000): National Report* (July 2002) ........................ 32

Joseph Blocher, *Firearm Localism*, 123 YALE L.J. 82 (2013) .................................................................. 14

Anthony A. Braga et al., *The Illegal Supply of Firearms*, 29 CRIME & JUST. 319 (2002) ................................32, 35

Anthony A. Braga et al., *Interpreting the Empirical Evidence on Illegal Gun Market Dynamics*, 89 J. URB. HEALTH 779 (2012) ........................................... 33

Bur. of Just. Stat., *Federal Firearms Offenders: 1992-98* (June 2000) ........................................................ 32

Patrick J. Charles, *The Constitutional Significance of a "Well-Regulated Militia" Asserted and Proven with Commentary on the Future of Second Amendment Jurisprudence*, 3 NORTHEASTERN U.L.J. 1 (2011) ..................... 11

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139 (2007) .......................................... 11, 12

Clayton E. Cramer, *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* (1999) ................................ 12

Cong. Globe, 39th Cong., 2d Sess. (1867) ..................................... 13

Saul Cornell & Nathan DeDino, *A Well-Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2005) .......................... 11, 12

Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (2006) ................................................ 12

Tom Diaz, *Making a Killing: The Business of Guns in America* (1999) ...................................... 18

Alexander Deconde, *Gun Violence in America: The Struggle for Control* (2001) .......................... 14, 15, 16

Carole Emberton, *The Limits of Incorporation: Violence, Gun Rights, and Gun Regulation in the Reconstruction South*, 17 Stan. L. & Pol'y Rev. 615 (2006) ...................................................... 13

Mark Frasetto, *Firearms and Weapons Legislation Up to the Early Twentieth Century*, *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2200991 ...................................................... 10

Robert Leider, *Our Non-Originalist Right To Bear Arms*, 89 IND. L.J. 1587 (2014)......................................12, 13, 16

C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J.L. & PUB. POL'Y 695 (2009).......................... 14

Jonathan Meltzer, Note, *Open Carry for All:* Heller, *and Our Nineteenth-Century Second Amendment*, 123 YALE L.J. 1486 (2014) ......................................... 16

Michael S. Obermeier, Comment, *Scoping Out the Limits of "Arms" under the Second Amendment*, 60 U. KA. L. REV. 681 (2012) ......................................... 18

Glenn L. Pierce et al., *Characteristics and Dynamics of Illegal Firearms Markets: Implications for a Supply-Side Enforcement Strategy*, 21 JUST. Q. 391 (2004).................. 32

Joseph E. Sheley & James D. Wright, *In the Line of Fire: Youths, Guns, and Violence in Urban America* (1995) .................................................................... 32

Robert J. Spitzer, *The Politics of Gun Control* (5th ed. 2012) ..................................................................... 16

Mark V. Tushnet, *Out of Range: Why the Constitution Can't End the Battle over Guns* (2007) ..................................... 30

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443 (2009).................................................... 16

Daniel W. Webster, et al., *Effects of State-Level Firearm Seller Accountability Policies on Firearm Trafficking*, 86 J. URB. HEALTH 525 (2009).............................. 36

Daniel W. Webster et al., *Preventing the Diversion of Guns to Criminals through Effective Firearm Sales Laws*, *in Reducing Gun Violence in America: Informing Policy with Evidence and Analysis* (Daniel W. Webster & Jon S. Vernick eds., 2013) .................... 32

Adam Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* (2011) ........................................11, 12, 15

Franklin E. Zimring, *Firearms and Federal Law: The Gun Control Act of 1968*, 4 J. LEG. STUD. 133 (1975) .............. 15

## STATEMENT OF INTEREST OF AMICI CURIAE

The Major City Chiefs of Police Association is a professional association of police executives. Membership is comprised of Chiefs and Sheriffs of the sixty-six largest law enforcement agencies in the United States, nine largest in Canada and two largest in the United Kingdom. The United States Conference of Mayors is the official non-partisan organization of all United States cities with populations of 30,000 or more. The International Municipal Lawyers Association is a nonprofit, professional organization of over 3,500 local government entities, including cities, counties, and special district entities, as represented by their chief legal officers, state municipal leagues, and individual attorneys.

Amici are organizations representing officials whose responsibilities include protecting the public against violent firearms crime. Amici's mission includes the filing of amicus

briefs, and they have authorized the filing of a brief as amici in this appeal.[1]

## SUMMARY OF ARGUMENT

The Second Amendment recognizes both an individual right to keep and bear arms and governmental power to regulate the exercise of that right. Only regulations that impose an undue burden on the exercise of the right should be invalidated. Under that test, registration requirements of the type at issue in this appeal, which impose only a modest burden on the right to keep and bear arms, are properly evaluated under intermediate scrutiny, which affords due deference to legislative judgment. Under intermediate scrutiny, the regulations at issue here, by making it more difficult and risky for criminals to acquire untraceable firearms, fall well within the scope of permissible firearms regulation and should be sustained.

---

[1] Pursuant to Fed. R. App. 29 and D.C. Cir. Rule 29, on September 26, 2014 Government Official amici field a notice of intent to participate in this appeal and represented to this Court that all parties had consented to the filing of this brief. No party's counsel authored this brief in whole or in part. No person other than the amici, their members, and counsel, contributed money to fund the brief's preparation or submission.

# ARGUMENT

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court concluded that the "right of the People" referred to an individual right, *id.* at 579-81, while "Arms" included "all instruments that constitute bearable arms," *id.* at 581, excluding "dangerous and unusual weapons," *id.* at 627. The right to "keep" arms, the Court concluded, "was simply a common way of referring to possessing arms," *id.* at 583, and the right to "bear" arms meant to "carry[] for a particular purpose— confrontation," *id.* at 584. The Court then held that the right to keep and bear arms was infringed by the District of Columbia's former prohibition on the registration and possession of handguns, *id.* at 628-31, and its former requirement that firearms be kept locked or otherwise stored in an inoperable condition*, id.* at 630.

*Heller* was no death knell for firearms regulation. The opinion itself, the history of firearms regulation, and even the text

of the Second Amendment recognize broad regulatory power, including the power to enact innovative firearms laws. Registration requirements of the type at issue in this appeal impose only a modest burden on the right to keep and bear arms, and for that reason are properly evaluated under intermediate scrutiny. Applying that test, the regulations the District enacted in the wake of the Supreme Court's decision fall comfortably within the scope of permissible firearms regulation.

I.  THE SECOND AMENDMENT PERMITS FIREARMS REGULATIONS THAT IMPOSE NO UNDUE BURDEN ON THE RIGHT TO KEEP AND BEAR ARMS.

Since its framing, the Second Amendment has coexisted with firearms regulation. Regulation has often been innovative and prophylactic in character. Such regulations endeavor to minimize the possibility that firearms will be misused, while maintaining the availability of firearms for the core, constitutionally protected purpose of lawful armed defense. An examination of the Supreme Court's carefully limited holding in *Heller*, the history of firearms regulation, and even the text of the Second Amendment itself, confirm the existence of broad regulatory authority. Only

regulations that impose an undue burden on the right to keep and bear arms run afoul of the Second Amendment.

> A. The Supreme Court's Decision in *Heller* Acknowledged Broad Authority To Regulate Firearms.

In its decision in *Heller*, the Supreme Court went to lengths to make clear that a wide variety of prophylactic regulations on the possession and use of firearms are consistent with the Second Amendment.

In *Heller*, the Court wrote: "Like most rights, the right secured by the Second Amendment is not unlimited." 554 U.S. at 626. "For example," the Court observed, "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or [its] state analogues." *Id.* (citations omitted). Moreover,

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-27 (footnote omitted). The Court added that it "identif[ied] these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 627 n.26. Notably, the regulations blessed in *Heller* were prophylactic in character, designed to reduce the risks posed by firearms, rather than operating only after firearms have been misused.

Even the Court's rationale for invalidating the District of Columbia's former ordinance implicitly acknowledged the propriety of regulations that impose no undue burden on armed and lawful self-defense. In assessing the challenged provisions of the District's former ordinance, the Court observed that "the inherent right of self-defense has been central to the Second Amendment right." *Heller*, 554 U.S. at 628. It described self-defense as "the *central component* of the right itself," *id.* at 599; the Amendment's "core lawful purpose," *id*. at 630; and that "it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *id.* at 635.

The Court then concluded that the District's "handgun ban amounts to a prohibition on an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose," adding that it "extends, moreover, to the home, where the need for defense of self, family, and property is most acute." 554 U.S. at 628. The Court wrote that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District of Columbia's handgun ban. And some of those few have been struck down." *Id.* at 629. Inasmuch as "the American people have considered the handgun to be the quintessential self-defense weapon," it follows, the Court wrote, that "a complete prohibition on their use is invalid." *Id.* at 629. As for the trigger-lock requirement, because it required that "firearms in the home be . . . kept inoperable at all times," this prohibition "makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional." *Id.* at 630.

The Court accordingly invalidated the ordinance not on the ground that the Second Amendment forbids any limitation on the right to keep and bear arms, but because the ordinance imposed a

particularly severe burden on the right of armed and lawful defense. Indeed, the Court stressed the burden imposed by the ordinance, noting that framing-era firearm safety laws "d[id] not remotely burden the right of self-defense as much as an absolute ban on handguns." *Id.* at 632. Thus, *Heller* does not demand invalidation of all limitations on the ability to possess or carry firearms; rather, it requires that courts examine the extent to which a challenged regulation burdens the core Second Amendment interest in lawful armed defense.

Consistent with the Supreme Court's decision in *Heller*, this Court noted in the prior appeal that the Second Amendment requires an inquiry into the extent that a challenged regulation burdens core Second Amendment interests, observing that "a regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment must have a strong justification, whereas a regulation that imposes a less substantial burden should be proportionately easier to justify." *Heller v. District of Columbia*, 670 F.3d 1244, 1257 (D.C. Cir. 2011) ("*Heller II*") (citations omitted). Thus, the threshold inquiry

in this case properly focuses on the extent of the burden on the right to keep and bear arms imposed by the registration regulations at issue in this case.

> B.  History Demonstrates the Existence of Broad Authority To Enact Novel Firearms Regulations.

Plaintiffs stress that this case involves "novel registration requirements," Brief for Appellants 13, and, in the prior appeal, this Court agreed that the regulations at issue were properly characterized as novel. *See Heller II*, 670 F.3d at 1255-56. Still, nothing in the Supreme Court's decision in *Heller* or this Court's opinion in *Heller II* condemns a regulation merely because it is novel. To the contrary, in the prior appeal, this Court forcefully rejected the view that "a regulation must be longstanding or rooted in text, history, and tradition in order to be constitutional." *Id.* at 1266 (internal quotations omitted). Indeed, history confirms the existence of broad governmental power to enact novel regulations to meet changing circumstances and felt exigencies.

In *Heller*, in order to ascertain the meaning of the Second Amendment, the Supreme Court examined commentary and practice from "after its ratification through the end of the 19th

century." 554 U.S. at 605. It did so to undertake "the examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification," adding that "[t]hat sort of inquiry is a critical tool of constitutional interpretation." *Id.* Thus, an inquiry into historical practice is critical to ascertaining the scope of Second Amendment rights.

In the framing era and beyond, the Second Amendment was never understood to permit only regulations prevalent at the Second Amendment's ratification. To the contrary, history demonstrates that the Second Amendment permits new regulations to address new regulatory challenges. Such innovative regulation has often been prophylactic in character; designed to minimize the possibility that firearms will be misused, while maintaining the availability of firearms for the core, constitutionally protected purpose of facilitating lawful armed defense.[2] Thus, history confirms that not all limitations on the

---

[2] For a compilation of firearms laws enacted prior to the twentieth century, *see* Mark Frasetto, *Firearms and Weapons Legislation Up*

ability to possess or carry firearms, even when embodied in novel regulations, should be regarded as impermissible infringements on the right to keep and bear arms.

The prevalence of prophylactic regulation that limits the ability to possess or carry firearms dates to the framing era. At that time, entire classes of individuals such as slaves, freed blacks, and people of mixed race, were frequently prohibited from owning or carrying guns, some states extended the bar to Catholics or whites unwilling to swear allegiance to the Revolution, and laws requiring the safe storage of firearms or gunpowder or barring loaded firearms indoors were common as well.[3] Indeed, in the framing era, it was widely held that only those loyal to the new government possessed a right to bear arms, with others facing sanctions including disarmament. *See* Patrick

---

*to the Early Twentieth Century*, *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2200991.

[3] *See*, *e.g.*, ADAM WINKLER, GUNFIGHT: THE BATTLE OVER THE RIGHT TO BEAR ARMS IN AMERICA 113-17 (2011); Saul Cornell & Nathan DeDino, *A Well-Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 506-12 (2005); Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 159-65 (2007).

J. Charles, *The Constitutional Significance of a "Well-Regulated Militia" Asserted and Proven with Commentary on the Future of Second Amendment Jurisprudence*, 3 NORTHEASTERN U.L.J. 1, 59-61, 97-98 (2011). Militia laws also frequently required individuals to appear at periodic musters with their firearms and have them registered and inspected.[4]

In the 1820s and 1830s, laws prohibiting the carrying of concealed firearms emerged in the wake of a surge in violent crime.[5] "[T]he majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Heller*, 554 U.S. at 626.

Subsequently, the same Congress that framed the Fourteenth Amendment—which the Supreme Court held in

---

[4] *See*, *e.g.*, SAUL CORNELL, A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA 3, 27 (2006); WINKLER, *supra* note 3, at 11-14; Churchill, *supra* note 3, at 161.

[5] *See*, *e.g.*, CORNELL, *supra* note 4, at 138-44; CLAYTON E. CRAMER, CONCEALED WEAPON LAWS OF THE EARLY REPUBLIC: DUELING, SOUTHERN VIOLENCE, AND MORAL REFORM 2-3, 139-41 (1999); WINKLER, *supra* note 3, at 166-69; Robert Leider, *Our Non-Originalist Right To Bear Arms*, 89 IND. L.J. 1587, 1599-601 (2014).

*McDonald v. City of Chicago*, 561 U.S. 742 (2010), incorporated the Second Amendment, making it applicable to state and local laws—also enacted legislation abolishing the militia in most southern states and prohibiting any effort to arm militias in those states. *See* Act of March 2, 1867, ch. 170, § 6, 14 Stat. 485, 487 (1867). The measure's sponsors dismissed Second Amendment objections, arguing that the prohibition was justified by the prevalence of armed groups in the south in the wake of the Civil War "dangerous to the public peace and to the security of Union citizens in those states." CONG. GLOBE, 39th Cong., 2d Sess. 1849 (1867) (Sen. Lane); *accord id.* at 1848-49 (Sen. Wilson). This legislation was one of a series of gun-control measures undertaken at the time in an effort to suppress what was seen as unacceptable levels of violence, principally in the occupied former Confederate states.[6] Also in the nineteenth century, in response to rampant violence in frontier towns, some towns limited or even banned the carrying of firearms, an approach taken in many cities as well.

---

[6] *See*, *e.g.*, Carole Emberton, *The Limits of Incorporation: Violence, Gun Rights, and Gun Regulation in the Reconstruction South*, 17 STAN. L. & POL'Y REV. 615, 621-23 (2006); Leider, *supra* note 5, at 1619-23.

*See, e.g.*, Joseph Blocher, *Firearm Localism*, 123 YALE L.J. 82, 114-18 (2013). Indeed, history reflects a tradition of more stringent regulation of the possession and use of firearms in larger cities as a consequence of the greater law-enforcement challenges that cities face. *See id.* at 108-20.

Regulatory innovation continued apace in the twentieth century. Early in the century, a number of state and local governments enacted new restrictions on the sale and carrying of firearms.[7] For example, prohibitions on the possession of firearms by convicted felons emerged early in the twentieth century in the wake of a crime wave following the First World War.[8] At the federal level, the National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 (1934), required manufacturers to obtain a federal license and register machineguns, short-barrel rifles,

---

[7] *See, e.g.*, ALEXANDER DECONDE, GUN VIOLENCE IN AMERICA: THE STRUGGLE FOR CONTROL 105-11 (2001).

[8] *See, e.g.*, C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J.L. & PUB. POL'Y 695, 698-728 (2009).

silencers, and other weapons regarded as dangerous.[9]   The Firearms Act of 1938, Pub. L. No. 75-765, 52 Stat. 1250 (1938), required a license to ship firearms in interstate commerce and prohibited transfers to specified classes of individuals including certain convicted felons, fugitives from justice, and persons under indictment.[10]

The Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 (1968), later prohibited the interstate shipment of firearms except to a licensed dealer or collector, required all dealers to obtain federal licenses, and prohibited the sale of firearms to, and their possession by, additional classes of disqualified individuals, including convicted felons, those suffering from serious mental illness, substance abusers and minors.[11]   In 1993, Congress required a background check to purchase handguns in the Brady Handgun Violence Protection Act, Pub. L. No. 103-159, 107 Stat.

---

[9] DECONDE, *supra* note 7, at 141-44; WINKLER, *supra* note 3, at 201-04; Franklin E. Zimring, *Firearms and Federal Law: The Gun Control Act of 1968*, 4 J. LEG. STUD. 133, 138-39 (1975).

[10] *See*, *e.g.*, DECONDE, *supra* note 7, at 146-47; Zimring, *supra* note 9, at 139-41.

[11] *See*, *e.g.*, WINKLER, *supra* note 3, at 251-52; Zimring, *supra* note 9, at 148-57.

1536 (1993) and the following year, in the Violent Crime and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994), it banned the possession of specified assault weapons for the ensuing decade.[12]

History thus demonstrates an abundance of novel regulations that were prophylactic in character, rather than regulations that merely imposed sanctions on those who used firearms to commit other crimes.  For example, the emergence of prohibitions on carrying concealed weapons, a number of commentators have observed, rested on the view that law-abiding persons carried weapons openly, while concealed carry was thought suspicious or threatening.[13]  In this fashion, regulations were directed not only at the actual misuse of firearms, but also at

---

[12] *See*, *e.g.*, DECONDE, *supra* note 7, at 249-56; ROBERT J. SPITZER, THE POLITICS OF GUN CONTROL 141-53 (5th ed. 2012).

[13] *See*, *e.g.*, Leider, *supra* note 5, at 1602-05; Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1522-23 (2009); Jonathan Meltzer, Note, *Open Carry for All: Heller and Our Nineteenth-Century Second Amendment*, 123 YALE L.J. 1486, 1518-20 (2014).

preventing the possession or use of firearms under circumstances that were thought to pose unacceptable risks to public safety.

Moreover, this history contains no hint of a demand for rigorous empirical proof of the efficacy of innovative regulations before they can be enforced. For example, laws imposing limited burdens on the right to keep and bear arms, directed at what legislatures could reasonably believe to be the possession or use of firearms under circumstances that pose undue threats to public safety, such as laws prohibiting the possession of firearms by convicted felons and prohibitions on carrying concealed weapons, were frequently upheld without need of rigorous proof of their efficacy.[14]

It is not hard to understand the need for and acceptance of innovative regulations. In the framing era, the most advanced type of bearable firearm was the flintlock smoothbore musket, which was difficult to load, could produce at most three shots per

---

[14] For judicial decisions upholding laws prohibiting carrying concealed weapons without demanding empirical proof of efficacy, see, for example, *State v. Reid*, 1 Ala. 612, 616 (1840); *Nunn v. State*, 1 Kelly 243, 249 (1846); *State v. Smith*, 11 La. Ann. 633, 633 (1856); *State v. Chandler*, 5 La. Ann. 489, 489 (1850); *Aymette v. State*, 2 Tenn. 154, 158 (1840).

minute, and was inaccurate, except at close range. *See*, *e.g.*, Michael S. Obermeier, Comment, *Scoping Out the Limits of "Arms" under the Second Amendment*, 60 U. KA. L. REV. 681, 684-87 (2012). Today, firearms in common civilian use have evolved to include weapons capable of firing at a far greater range, rate, and level of accuracy than a musket could ever achieve, and carry a far greater risk of discharging accidentally. *See*, *e.g.*, TOM DIAZ, MAKING A KILLING: THE BUSINESS OF GUNS IN AMERICA 98-105 (1999). What was regarded as sufficient regulation in the framing era could therefore become insufficient in light of the greater dangers posed by newer firearms.

Constitutional law has long understood, even in the specific context of firearms, how changed circumstances can produce changes in the law. *Tennessee v. Garner*, 471 U.S. 1 (1985), is instructive. In that case, the Court repudiated the framing-era rule that deadly force could be used to stop a fleeing felon under the Fourth Amendment's prohibition on unreasonable search and seizure, concluding: "Because of sweeping change in the legal and technological context, reliance on the common-law rule in this case

would be a mistaken literalism that ignores the purposes of a historical inquiry." *Id.* at 13. The Court explained:

> [T]he common-law rule developed at a time when weapons were rudimentary. Deadly force could be inflicted almost solely in a hand-to-hand struggle during which, necessarily, the safety of the arresting officer was at risk. Handguns were not carried by police officers until the latter half of the last century. Only then did it become possible to use deadly force from a distance as a means of apprehension. As a practical matter, the use of deadly force under the standard articulation of the common-law rule has an altogether different meaning—and harsher consequences—now than in past centuries.

*Id.* at 14-15 (citations omitted). Accordingly, "though the common-law pedigree of Tennessee's rule is pure on its face, changes in the legal and technological context mean the rule is distorted almost beyond recognition when literally applied." *Id.* at 15.

Justice Scalia has made a similar point; considering the permissibility of a stop-and-frisk in the absence of probable cause to arrest under the Fourth Amendment, he opined that although a frisk under such circumstances was likely regarded as unlawful in the framing era, it may have become constitutionally reasonable once "concealed weapons capable of harming the interrogator quickly and from beyond arm's reach have become common— which might alter the judgment of what is 'reasonable' under the

original standard." *Minnesota v. Dickerson*, 508 U.S. 366, 382 (1993) (Scalia, J., concurring).

Thus, as firearms present new challenges to public safety, the law has adapted to these changed circumstances. The Second Amendment should not be thought to condemn a regulation merely because it is novel.

C.    The Second Amendment's Text Acknowledges Broad Regulatory Power.

Not only history and precedent, but even the Second Amendment's text supports the existence of broad governmental power to enact innovative firearm regulations.

The Amendment's preamble contemplates "[a] well regulated Militia." The term "Militia," the Supreme Court concluded in *Heller*, refers not to "the organized militia," but rather "all able bodied men." 554 U.S. at 596. The Court added that the "militia" was originally understood as comprised of "the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty." *Id.* at 627. Thus, the class that is to be "well regulated" consists of all who are able-bodied and capable of military service, regardless of whether

they are actually enrolled in an organized militia. Accordingly, *Heller* treats the militia and those entitled to exercise the right to keep and bear arms as, for all practical purposes, synonyms.

As for the phrase "well regulated," *Heller* stated that the original meaning of the phrase was "the imposition of proper discipline and training." 554 U.S. at 597. These terms, of course, are expansive; they contemplate not merely training, but also rules and "discipline," which, as we explain above, could embrace everything from a forfeiture of the right to keep and bear arms as a consequence of misconduct to a variety of prophylactic measures that endeavor to reduce the likelihood that firearms will be misused.

As we also explain above, history demonstrates the propriety of both innovative and prophylactic regulation. Those thought to pose unreasonable risks have long been regarded as falling within the ambit of regulatory power, regardless of whether they were serving in an organized militia. The Second Amendment's preamble helps to explain this broad regulatory power; after all, a militia, that is, all persons capable of exercising the right to keep

and bear arms, could hardly be "well regulated" if it contained individuals reasonably believed to present undue threats to public safety.

The Supreme Court's decision in *Heller* acknowledges that the preamble can be used to shed light on the operative clause; it explains that "[l]ogic demands that there be a link between the stated purpose and the command," and that this "requirement of logical connection may cause a prefatory clause to resolve an ambiguity in an operative clause," thereby serving the preamble's "clarifying function." 554 U.S. at 577-78. Although the Court found no ambiguity in the original meaning of the phrase "the right of the people to keep and bear arms," *id.* at 579-92, the Court pointedly did not state that the term "infringed" in the operative clause was unambiguous. To the contrary, the Court's discussion of permissible firearms regulations suggests a good deal of play in what constitutes an infringement of the right to "keep and bear arms."

The Second Amendment thus reflects a textual commitment to regulation found nowhere else in the Bill of Rights. To be sure,

the preamble does not contemplate limitless regulation. For one thing, boundless regulatory authority would convert the right into a nullity, which is not a plausible reconciliation of the operative clause and the preamble. For another, the concept of a "well regulated" militia implies that regulations have sufficient justification. Thus, the Second Amendment's text contemplates a jurisprudence that accommodates both a right and regulatory power.

> D. The Second Amendment Forbids Only Regulations That Impose an Undue Burden on the Right to Keep and Bear Arms.

The problem of accommodating a core individual right and legitimate regulatory interests is not unique to Second Amendment jurisprudence. It arises frequently in other areas of constitutional law, and has been addressed through a methodology that evaluates the extent of the burden placed on the core right by a challenged regulation as well as the justification for that burden.

For example, the First Amendment protects the right to vote and participate in the political process, but there are any number of legitimate governmental interests that support regulation of the

electoral process. The Court mediates between right and regulation by subjecting regulations imposing what are regarded as severe burdens on First Amendment electoral rights to strict scrutiny, while regulations imposing more modest burdens are subjected to a less searching brand of intermediate scrutiny. *See, e.g.*, *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 451-52 (2008); *Crawford v. Marion County Elections Board,* 553 U.S. 181, 189-91 (2008) (opinion of Stevens, J.); *id.* at 204-05 (Scalia, J., concurring in the judgment); *Clingman v. Beaver*, 544 U.S. 581, 592-97 (2005).

Similarly, while the Constitution secures both a right to travel and a right of access to the courts, the Court upheld a durational residency requirement to obtain a divorce because it imposed no absolute bar to travel or access to the courts, while advancing legitimate governmental interests in assuring that an individual has an adequate attachment to the forum state before it endeavors to adjudicate an action for divorce. *See Sosna v. Iowa*, 419 U.S. 393, 405-09 (1972).

Perhaps most familiar is the approach that the Court has taken with respect to abortion, where the Court has been careful to protect both right and regulatory authority. In *Planned Parenthood of Southeast Pennsylvania v. Casey*, 505 U.S. 833 (1992), the joint opinion of Justices O'Connor, Kennedy, and Souter concluded that *Roe*'s framework gave insufficient weight to the concededly legitimate governmental interest in protecting potential life by requiring that "any regulation touching upon the abortion decision must survive strict scrutiny, to be sustained only if drawn in narrow terms to further a compelling state interest." *Id.* at 871. Instead, "[o]nly where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause." *Id.* at 874; *accord, e.g., Gonzales v. Carhart*, 550 U.S. 124, 146 (2007).

Amici curiae Gun Owners observe that in *Heller*, the Supreme Court rejected Justice Breyer's advocacy of "none of the traditionally expressed levels (strict-scrutiny, intermediate scrutiny, rational basis), but rather a judge-empowering 'interest-

balancing inquiry,'" explaining, "[w]e know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach." 554 U.S. at 634. *See* Brief Amicus Curiae of Gun Owners of America, Inc., et al. 15. An undue burden test, however, is not a novel freestanding interest-balancing inquiry. To the contrary, it has ample precedential support. Indeed, as we explain in Part I.A above, *Heller* itself focused on the extent to which the challenged restrictions burdened the interest in lawful armed defense. And in *Heller II*, this Court similarly focused on the magnitude of the burden imposed by the challenged regulations, and rejected the view that its approach was tantamount to the interest-balancing test that the Supreme Court had earlier rejected. *See* 670 F.3d at 1264-66.

When the government has a legitimate interest in regulating the manner in which a right is exercised, the appropriate inquiry is directed at whether a challenged regulation unduly burdens the exercise of the right.

## II.  THE CHALLEGED FIREARMS REGISTRATION REGULATIONS ARE CONSTITUTIONAL.

The regulations at issue here impose only a modest burden on the right to keep and bear arms.  For that reason, they are properly subject to intermediate scrutiny, and under that test, the limited burden they impose is amply justified.

### A.  The Regulations at Issue Are Properly Subject to Intermediate Scrutiny.

In the prior appeal, after observing that "a regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment must have a strong justification, whereas a regulation that imposes a less substantial burden should be proportionately easier to justify," *Heller II*, 670 F.3d at 1257, this Court concluded that because "none of the District's registration requirements prevents an individual from possessing a firearm in his home or elsewhere," they impose a limited burden on the right to keep and bear arms and accordingly need only "pass muster under intermediate scrutiny," which requires that they be "'substantially related to an important

governmental objective.'" *Id.* at 1258 (quoting *Clark v. Jeter*, 486 U.S. 456, 461 (1988)).

Plaintiffs-Appellants do not quarrel with this test or otherwise challenge the law of the case as established in the prior appeal, but they nevertheless complain that it may take some hours and perhaps something in excess of $100 to register firearms. *See* Brief for Appellants 8-11. Yet, as abortion jurisprudence demonstrates, it is settled that under the undue burden test, "[t]he fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it." *Planned Parenthood*, 505 U.S. at 874 (opinion of O'Connor, Kennedy & Souter, JJ.). Neither Plaintiffs-Appellants nor their amici explain why this rule should be regarded as inapplicable to the Second Amendment.

Plaintiffs-Appellants also complain that deference to legislative policy judgments has no place in Second Amendment jurisprudence. *See* Brief for Appellants 23-25. This contention,

however, overlooks the essential character of intermediate scrutiny.

As this Court has explained, "[u]nder intermediate scrutiny, 'the fit between the challenged regulation and the asserted objective [need only] be reasonable, not perfect,'" and "[i]n assessing this 'fit,' we afford 'substantial deference to the predictive judgments of Congress.'" *Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013) (brackets in original) (quoting *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010); and *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 665 (1994)). That is because "[i]n the context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks.'" *Id.* (quoting *Kachalsky v. County of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012)); *accord, e.g.*, *Drake v. Filko*, 724 F.3d 426, 436-37 (3d Cir. 2013); *National Rifle Association of America, Inc. v. BATFE*, 700 F.3d 185, 210 n.21 (5th Cir. 2012). Indeed, as we explain in Part I.B above, there is a long history of firearms

regulation that place no undue burden on the right to keep and bear arms unaccompanied by judicial demands for rigorous proof of the efficacy of those regulations.

A critical virtue of intermediate scrutiny is that it minimizes the extent to which the judiciary must engage in difficult predictive or empirical judgments about the efficacy of challenged regulation. *Cf. McDonald*, 561 U.S. at 790-91 (plurality opinion) (warning against "requir[ing] judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise"). Indeed, there are a myriad of methodological difficulties in demonstrating the effect of any one regulation in isolation on crime rates, and then assessing whether a particular regulation is effective in reducing crime. *See* MARK V. TUSHNET, OUT OF RANGE: WHY THE CONSTITUTION CAN'T END THE BATTLE OVER GUNS 77-85 (2007). The character of the less demanding scrutiny appropriate when a challenged regulation imposes a limited burden on a right minimizes these difficulties by affording a degree of deference to legislative judgment. *Cf. Gonzales*, 550 U.S. at 158, 163

(upholding a statutory prohibition on partial birth abortions and affording legislatures "wide discretion to pass legislation in areas where there is medical and scientific uncertainty").

>    B.    The Challenged Regulations Satisfy Intermediate Scrutiny.

We leave it to the District's brief to offer a detailed response to the criticisms of the challenged regulations offered by Plaintiffs-Appellants and their amici.  It is important to note, however, that even if Plaintiffs-Appellants and their amici are correct that only law-abiding individuals are likely to register their firearms, the experience of Government Official amici and the cities they represent with firearms crime provides ample reason to believe that a rigorous system of registration advances important governmental interests.

Under federal law, when a firearm is recovered by the authorities during a criminal investigation, a law enforcement agency may ask that the National Tracing Center trace the firearm by first requesting that the manufacturer identify the transferee that initially received the firearm from the manufacturer, and then contacting subsequent transferees until

the Center identifies the first transferee at retail made by a licensed dealer. *See* BATF, DEP'T OF TREAS., COMMERCE IN FIREARMS IN THE UNITED STATES 19-20 (Feb. 2000).

Significantly, studies show that traced firearms are rarely recovered during criminal investigations from those who bought the firearms at retail from a licensed dealer.[15] The same pattern is reflected in surveys of offenders, which consistently find that the vast majority of firearms in the hands of offenders were not purchased from a licensed dealer.[16]

---

[15] *See, e.g.*, BATF, DEP'T OF TREAS., CRIME GUN TRACE REPORTS (2000): NATIONAL REPORT 29 (July 2002) (analyzing crime gun trace requests during calendar year 2000 in cities with populations greater than 250,000 participating in a crime-gun interdiction initiative and concluding that in 88 percent of the trace requests for which both the purchaser and possessor at the time of recovery could be ascertained, the possessor and purchaser were not the same person); Glenn L. Pierce et al., *Characteristics and Dynamics of Illegal Firearms Markets: Implications for a Supply-Side Enforcement Strategy*, 21 JUST. Q. 391, 400 (2004) (study of 1999 traces finding that only 11.2 percent of guns were recovered from the original buyer).

[16] *See, e.g.*, BUR. OF JUST. STAT., FEDERAL FIREARMS OFFENDERS: 1992-98, at 10 (June 2000); JOSEPH E. SHELEY & JAMES D. WRIGHT, IN THE LINE OF FIRE: YOUTHS, GUNS, AND VIOLENCE IN URBAN AMERICA 47 tbl.3.6 (1995); Anthony A. Braga et al., *The Illegal Supply of Firearms*, *in* CRIME AND JUSTICE: A REVIEW OF RESEARCH 319, 332-33 & tbl.2 (Michael Tonry ed., 2002); Daniel W. Webster et al., *Preventing the Diversion of Guns to Criminals*

The existing federal regulatory scheme largely explains offenders' preferences for acquiring firearms on the secondary market and not from licensed dealers. As one analysis concluded:

> It is easy to understand why offenders would prefer private sellers over licensed firearms dealers. Under federal law and laws in most states, firearms purchasers require no background check or record keeping. The lack of record keeping requirements helps to shield an offender from law enforcement scrutiny if the gun were used in a crime and recovered by the police. Indeed, in the offenders in the [Survey of Inmates of State Correctional Facilities] who were not prohibited from possessing a handgun prior to the crime leading to their incarceration, two-thirds had obtained their handguns in a transaction with private sellers.

Webster et al., *supra* note 16, at 110. There is also evidence, based on both surveys and trace data, that newer guns are disproportionately represented among firearms used by criminals. *See*, *e.g.*, Anthony A. Braga et al., *Interpreting the Empirical Evidence on Illegal Gun Market Dynamics*, 89 J. URB. HEALTH 779, 786-88 (2012).

Thus, many cities have found that the vast majority of armed offenders are able, without undergoing background checks,

---

*through Effective Firearm Sales Laws*, *in* REDUCING GUN VIOLENCE IN AMERICA: INFORMING POLICY WITH EVIDENCE AND ANALYSIS 109, 110 (Daniel W. Webster & Jon S. Vernick eds., 2013).

to obtain guns that cannot be traced to them. A critical gap in enforcement is therefore created when firearms purchased at licensed dealers are thereafter diverted into the secondary market. The regulations at issue here endeavor to address that regulatory gap by making it more difficult to divert firearms to the secondary market. Individuals are required to register firearms whenever they acquire them, whether from a licensed dealer or otherwise, and thereafter to produce registration certificates upon demand by a law enforcement official. D.C. Code §§ 7-2502.01(a), 7-2502.08(c). Registrations must remain current, and the accompanying photograph and fingerprint requirements help to verify the identity of the registrant. *Id.* § 2502.04.

The District of Columbia's ordinance thus makes it more difficult and risky for offenders to acquire untraceable firearms. It creates a credible threat of sanctions against any individual found in possession of a firearm without a proper registration certification, and against any individual who transfers a firearm to another without registering it, or who fails to report a lost or stolen firearm. Under the ordinance, whenever a firearm is

recovered in a criminal investigation from someone other than the registered owner, the registered owner faces sanctions if he failed to report the transfer, loss, or theft of the recovered firearm. D.C. Code § 7-2502.08. The challenged regulations therefore increase the legal risks—for offenders and non-offenders alike—associated with circumventing background checks and the tracing system. And the ordinance's photograph requirements and one-pistol-per-month rule make it even more difficult for an individual to acquire and sell large numbers of untraceable weapons to potential offenders.

Elementary economics teach that regulations that increase the difficulty and risk of acquiring untraceable firearms are likely to increase their cost, and hence reduce demand. *See*, *e.g.*, Anthony A. Braga et al., *The Illegal Supply of Firearms*, 29 CRIME & JUST. 319, 340 (2002). These regulations significantly increase the risks associated with buying a firearm at a licensed dealer and then reselling it in an unregistered sale—both for the buyer and seller—such that it will become more costly to acquire firearms in the secondary market.

To be sure, these regulations might be circumvented if gunrunners purchase new firearms in other jurisdictions and then resell them unlawfully in the District, but the regulations are likely to increase costs and reduce demand for trafficked firearms by imposing penalties on local residents who purchase firearms from interjurisdictional gunrunners and cannot subsequently produce registration certificates.

The challenged regulations will not eliminate trafficking in untraceable firearms, but basic economic principles indicate that they will have an inhibitory effect in that market. Indeed, most of the criminal law proceeds on the assumption that new or additional sanctions and more comprehensive enforcement will increase the risks attending regulated transactions and therefore produce a measure of deterrence. The available empirical evidence suggests that more stringent systems of regulation that currently operate to increase the risks of supplying guns later used in crimes reduce the flow of firearms to criminals. *See generally* Daniel W. Webster, et al., *Effects of State-Level Firearm Seller Accountability Policies on Firearm Trafficking*, 86 J. URB.

HEALTH 525 (2009) (finding that more comprehensive regulation reduces incidence of gun trafficking).

The challenged regulations accordingly impose a modest and amply justified burden on the core interest in lawful armed defense central to *Heller*. Little more than basic economic principles are necessary to demonstrate that these regulations are likely to produce deterrence by increasing the cost and risks associated with circumventing background checks and acquiring untraceable firearms, while permitting the use of firearms by law-abiding persons for purposes of lawful armed defense.

The policy judgments underlying these regulations are firmly grounded in economics. In that light, coupled with the deference properly owed well-grounded policy judgments under intermediate scrutiny, these regulations should readily survive Second Amendment attack.

## CONCLUSION

For the preceding reasons, the judgment of the district court should be affirmed.

Respectfully Submitted:


/s/ Howard R. Rubin

| | |
|---|---|
| Howard R. Rubin | Lawrence Rosenthal |
| Daniel Lipton | CHAPMAN UNIVERSITY |
| KATTEN MUCHIN ROSENMAN LLP | FOWLER SCHOOL OF LAW |
| 2900 K Street, N.W.—Suite 200 | One University Drive |
| Washington, D.C. 20007-5118 | Orange, C.A. 92866 |
| (202) 625-3534 | (714) 628-2650 |

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32, I hereby certify that this brief is proportionately spaced; uses a Roman-style, serif typeface (Century Schoolbook) of 14-point; and contains **6,820 words**, exclusive of the material not counted under Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

/s/ Howard R. Rubin
Howard R. Rubin
*Counsel for Amicus*

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Brief of the Major City Chiefs of Police Association, The United States Conference of Mayors, and International Municipal Lawyers Association as Amici Curiae in Support of Defendants-Appellees and Affirmance with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the Appellate CM/ECF system on December 11, 2014.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Appellate CM/ECF system.

/s/ Howard R. Rubin
Howard R. Rubin
KATTEN MUCHIN ROSENMAN LLP
2900 K Street, N.W.—Suite 200
Washington, D.C. 20007-5118
(202) 625-3534
howard.rubin@kattenlaw.com

Dated: December 11, 2014