No. 14-7071

IN THE

# United States Court of Appeals for the District of Columbia Circuit

———————————

DICK ANTHONY HELLER, ABSALOM JORDAN,
WILLIAM CARTER, WILLIAM SCOTT, and ASAR MUSTAFA,

Plaintiffs-Appellants,

v.

THE DISTRICT OF COLUMBIA, and
VINCENT C. GRAY, MAYOR, District of Columbia,

Defendants-Appellees.

———————————

On Appeal from the
United States District Court for the District of Columbia
Civil Action No. 08-1289 (JEB)

———————————

## BRIEF OF DC APPLESEED CENTER FOR LAW & JUSTICE, LEAGUE OF WOMEN VOTERS OF THE DISTRICT OF COLUMBIA, AND DC FOR DEMOCRACY AS *AMICI CURIAE* IN SUPPORT OF APPELLEES

———————————

HOGAN LOVELLS US LLP
Jonathan L. Diesenhaus*
Khang V. Tran
Karla J. Aghedo
David J. Robbins
555 Thirteenth Street, NW
Washington, DC 20004
jonathan.diesenhaus@hoganlovells.com
(202) 637-5600

DC APPLESEED CENTER
FOR LAW & JUSTICE
Walter A. Smith, Jr.
Kevin Hilgers
1111 14th Street NW
Suite 510
Washington, DC 20005
(202) 289-8007

\* Counsel of Record

Counsel for *Amici Curiae*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Rules 26.1 and 29 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 28, the undersigned counsel for *amici* DC Appleseed Center for Law & Justice ("DC Appleseed"), League of Women Voters of the District of Columbia ("LWVDC"), and DC for Democracy ("DCFD") certifies the following:

**A.** **Parties and *Amici*.** Except for the following, all parties, intervenors, and *amici* appearing before the District Court and in this Court are listed in the Briefs for Appellants and/or Appellees. The instant brief is filed jointly by DC Appleseed, LWVDC, and DCFD as *amici* in support of Appellees. The Statement of Interest for these *amici* is located at pages 1-3, *infra*.

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the undersigned counsel certifies that all *amici* joining this brief are nonprofit organizations that do not issue stock and that have no parent company. No person or entity owns 10% or more of any of these *amici*.

**B.** **Rulings Under Review.** The references to the rulings at issue appear in the Brief for Appellants.

**C.** **Related Cases.** This case was previously before this Court as *Heller, et al. v. District of Columbia, et al.*, Case No. 10-7036. The undersigned counsel is aware of no other pending related cases.

**D.** *Amici* **Certification.** Pursuant to Rule 29 of the Federal Rules of Appellate Procedure, the undersigned counsel certifies that all parties have consented to the filing of this brief. Undersigned counsel likewise certifies that no party's counsel authored this brief in whole or in part; that no party or party's counsel contributed money intended to fund the brief's preparation or submission; and that no person other than *amici* and their members and counsel contributed money intended to fund the brief's preparation or submission.

/s/ Jonathan L. Diesenhaus

**CERTIFICATE IN SUPPORT OF SEPARATE BRIEF**

Pursuant to Circuit Rule 29(d), *amici* state that a separate brief is necessary for its presentation to this Court because no other amicus brief of which it is aware will address the issue raised in this brief: namely, the extent to which widely available evidence confirms the District of Columbia Council's reasonable determination that its firearm registration requirements are narrowly tailored to reduce the harm, cost and burden that gun violence in an urban environment like the District imposes on its residents, their tax dollars and their health care resources.

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CERTIFICATE IN SUPPORT OF SEPARATE BRIEF ........................................ iii

TABLE OF AUTHORITIES ...................................................................................v

GLOSSARY.............................................................................................................xi

STATEMENT OF INTEREST OF *AMICI CURIAE* .................................................1

SUMMARY OF ARGUMENT .................................................................................3

ARGUMENT ............................................................................................................4

    I.   THE DETERMINATIONS OF THE D.C. COUNCIL ARE ENTITLED TO DEFERENCE. ................................................................4

    II.  SUBSTANTIAL EVIDENCE SUPPORTS THE FINDING THAT THE CHALLENGED REGULATIONS CAN REASONABLY BE EXPECTED TO PROMOTE AN IMPORTANT GOVERNMENTAL INTEREST. ...................................6

        A.  The Problem of Gun Violence. .......................................................7

        B.  Other States Have Implemented Legislation Analogous to the D.C. Regulations to Address Gun Violence. ...........................13

        C.  Empirical Evidence Supports the Measures Implemented by the Council. ...................................................................................19

CONCLUSION .......................................................................................................26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*District of Columbia v. Heller*,
   554 U.S. 570 (2008)........................................................................2, 7

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011)..........................................................4

*Heller v. District of Columbia*,
   Civil Action No. 08-1289 (JEB), 2014 WL 1978073 (D.D.C. May 15,
   2014) ................................................................................................5

*Schrader v. Holder*,
   704 F.3d 980 (D.C. Cir. 2013)............................................................6

*Turner Broad. Sys., Inc. v. FCC*,
   512 U.S. 622 (1994)........................................................................4, 5

*Turner Broad. Sys., Inc. v. FCC*,
   520 U.S. 180 (1997)...........................................................................4

OTHER STATUTES

Cal. Penal Code § 16370....................................................................13, 18

Cal. Penal Code § 16670....................................................................13, 18

Cal. Penal Code § 17000....................................................................13, 19

Cal. Penal Code § 26835....................................................................15, 19

Cal. Penal Code §§ 26840-26859 .....................................................13, 18

Cal. Penal Code § 27535....................................................................15, 19

Cal. Penal Code § 27545....................................................................14, 18

Cal. Penal Code § 27560....................................................................13, 19

There are no authorities upon which we chiefly rely.

Cal. Penal Code §§ 27850-28070 ........................................................14, 18

Cal. Penal Code §§ 30510-30530 ........................................................13, 19

Cal. Penal Code §§ 30600-30675 ........................................................13, 19

Cal. Penal Code §§ 30900-30965 ........................................................13, 19

Cal. Penal Code §§ 31610-31700 ........................................................13, 18

Colo. Rev. Stat. § 18-12-112 ..................................................................14

Conn. Gen. Stat. § 29-33 ..................................................................13, 14

Conn. Gen. Stat. §§ 29-36f – 29-36i ......................................................13

Conn. Gen. Stat. § 29-36*l* .......................................................................14

Conn. Gen. Stat. § 29-37a ..................................................................13, 14

Conn. Gen. Stat. § 53-202d ......................................................................13

Conn. Gen. Stat. § 53-202g ......................................................................14

Del. Code tit. 11, § 1448B .......................................................................14

Del. Code tit. 11, § 1461 ..........................................................................14

Del. Code tit. 24, § 904A .........................................................................14

Haw. Rev. Stat. Ann. § 134-2 ..............................................................13, 14

Haw. Rev. Stat. Ann. § 134-3 ...................................................................13

Haw. Rev. Stat. Ann. § 134-4 ...................................................................13

Haw. Rev. Stat. Ann. § 134-13 .............................................................13, 14

430 Ill. Comp. Stat. 65/1 – 65/15a ......................................................13, 14

720 Ill. Comp. Stat. 5/24-3........................................................................14

720 Ill. Comp. Stat. 5/24-4.1.....................................................................14

Iowa Code § 724.15 – 724.20. .............................................................13, 14

Mass. Gen. Laws ch.140, § 121 ...................................................................13, 14

Mass. Gen. Laws ch.140, § 129B .................................................................13, 14

Mass. Gen. Laws ch.140, § 129C .................................................................13, 14

Mass. Gen. Laws ch.140, § 131 ...................................................................13, 14

Mass. Gen. Laws ch.140, § 131A .................................................................13, 14

Mass. Gen. Laws ch.140, § 131E .................................................................13, 14

Mass. Gen. Laws ch.140, § 131P .................................................................13, 14

Md. Code Ann., Crim. Law § 4-303 ..................................................................13

Md. Code Ann., Pub. Safety § 5-101 .................................................................14

Md. Code Ann., Pub. Safety § 5-117.1 ..............................................................13

Md. Code Ann., Pub. Safety § 5-124 .................................................................14

Md. Code Ann., Pub. Safety § 5-128 .................................................................15

Md. Code Ann., Pub. Safety § 5-129 .................................................................15

Md. Code Ann., Pub. Safety § 5-143 .................................................................13

Md. Code Ann., Pub. Safety § 5-144 .................................................................15

Md. Code Ann., Pub. Safety § 5-146 .................................................................14

Mich. Comp. Laws § 28.422 .........................................................................13, 14

Mich. Comp. Laws § 28.422a .......................................................................13, 14

Mich. Comp. Laws § 28.430 ............................................................................14

N.C. Gen. Stat. § 14-402 – 14-404 ..............................................................13, 14

Neb. Rev. Stat. Ann. § 69-2404 ..................................................................13, 14

Neb. Rev. Stat. Ann. § 69-2407 ..................................................................13, 14

Neb. Rev. Stat. Ann. § 69-2409 ..................................................................13, 14

N.J. Stat. Ann. § 2C:39-5 ...................................................................13

N.J. Stat. Ann. § 2C:39-6 ...................................................................14

N.J. Stat. Ann. § 2C:58-2 ...................................................................15

N.J. Stat. Ann. § 2C:58-3 .....................................................13, 14, 15

N.J. Stat. Ann. § 2C:58-3.4 ................................................................15

N.J. Stat. Ann. § 2C:58-12 .................................................................13

N.J. Stat. Ann. § 2C:58-19 .................................................................14

N.Y. Gen. Bus. Law § 898 ..................................................................14

N.Y. Penal Law § 400.00 – 400.02 ....................................................13

N.Y. Penal Law § 400.10 ....................................................................14

Ohio Rev. Code Ann. § 2923.20 .........................................................14

Or. Rev. Stat. §§ 166.432 – 166.441 ..................................................14

18 Pa. Cons. Stat. § 6111 ...................................................................14

R.I. Gen. Laws § 11-47-35 – 14-37-35.1 ...........................................13

R.I. Gen. Laws § 11-47-35 – 14-37-35.2 ...........................................14

R.I. Gen. Laws § 11-47-48.1 ..............................................................14

## LEGISLATIVE

2014 Wash. Legis. Serv. Init. Meas. 594 (I.M. 594) (West) ...............14

## OTHER AUTHORITIES

Bruce A. Lawrence, *et al.*, *Medical and Work Loss Cost Estimation Methods for the WISQARS Cost of Injury Module* (Dec. 19, 2011), *available at* http://www.cdc.gov/injury/wisqars/pdf/WISQARS_Cost_Methods-a.pdf ........11

Centers for Disease Control and Prevention, Web-based Injury Statistics
Query and Reporting System, Cost of Injury Reports, *available at*
http://www.cdc.gov/injury/wisqars/ ...............................................8, 9, 10, 11, 12

Centers for Disease Control and Prevention, Web-based Injury Statistics
Query and Reporting System, Fatal Injury Reports, *available at*
http://www.cdc.gov/injury/wisqars/ ...................................................................17

D.W. Webster, J.S. Vernick & L.M. Hepburn, *Relationship Between
Licensing, Registration, and Other Gun Sales Laws and the Source State
of Crime Guns*, 7 Inj. Prevention 184 (2001) ....................................................20

Daniel W. Webster, *et al.*, *Preventing the Diversion of Guns to Criminals
Through Effective Firearm Sales Laws*, in *Reducing Gun Violence in
America* (Daniel W. Webster & Jon S. Vernick eds., 2013) .................20, 23, 24

Daniel W. Webster, Jon S. Vernick & Maria T. Bulzacchelli, *Effects of
State-Level Firearm Seller Accountability Policies on Firearm
Trafficking*, 86 J. Urb. Health 525 (2009) ..........................................................21

Daniel W. Webster & Jon S. Vernick, *Spurring Responsible Firearms Sales
Practices Through Litigation* , in *Reducing Gun Violence in America*
(Daniel W. Webster & Jon S. Vernick eds., 2013)...............................................22

Douglas S. Weil & Rebecca C. Knox, *Effects of Limiting Handgun
Purchases on Interstate Transfer of Firearms*, 275 JAMA 1759 (1996).....24, 25

Embry M. Howell & Peter Abraham, *The Hospital Costs of Firearm
Assaults* 5 (Sept. 2013), *available at* http://www.urban.org/
UploadedPDF/412894-The-Hospital-Costs-of-Firearm-Assaults.pdf. ........10, 11

Garen J. Wintemute, *Firearm Retailers' Willingness to Participate in an
Illegal Gun Purchase*, 87 J. Urb. Health 865 (2010)..........................................22

G.J. Wintemute, P.J. Cook & M.A. Wright, *Risk Factors Among Handgun
Retailers for Frequent and Disproportionate Sales of Guns Used in
Violent and Firearm Related Crimes,* 11 Inj. Prevention 357 (2005)................23

Law Center to Prevent Gun Violence, *2013 State Scorecard: Why Gun Laws
Matter* (2013), *available at* http://smartgunlaws.org/wp-content/uploads/
2013/12/SCGLM-Final10-spreads-points.pdf........................................15, 16, 17

Law Center to Prevent Gun Violence, *The California Model: Twenty Years of Putting Safety First* (2013), *available at* http://smartgunlaws.org/wp-content/uploads/2013/07/20YearsofSuccess_ForWebFINAL5.pdf.............18, 19

Legal Community Against Violence, *Gun Laws Matter: A Comparison of State Firearms Laws and Statistics* (2010), *available at* http://smartgunlaws.org/wpcontent/uploads/2010/07/Gun_Laws_Matter_Brochure.pdf.....................................................16

Mayors Against Illegal Guns, *Trace the Guns: The Link Between Gun Laws and Interstate Gun Trafficking* (Sept. 2010) ...............................................17, 18

Metropolitan Police Department, *Annual Report 2008* (Apr. 2009), *available at* http://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/ar_2008_web.pdf ...........................................................................7

Metropolitan Police Department, *Annual Report 2012*, *available at* http://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/2012_AR_1.pdf ................................................................................8

Metropolitan Police Department, *Statistical Report 2001-2005* (Dec. 2006), *available at* http://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/ar_2001_2005.pdf.........................................................9

Mona A. Wright, Garen J. Wintemute & Daniel W. Webster, *Factors Affecting a Recently Purchased Handgun's Risk for Use in Crime under Circumstances that Suggest Gun Trafficking*, 87 J. Urb. Health 352 (2010) .................................................................................................7, 23, 25

Phillip J. Cook & Anthony A. Braga, *Comprehensive Firearms Tracing: Strategic and Investigative Uses of New Data on Firearms Markets*, 43 Ariz. L. Rev. 277 (2001)....................................................................24

# GLOSSARY

Act                 Firearms Control Regulations Act of 1975

ATF                 U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives

DCFD                DC for Democracy

MPD                 Metropolitan Police Department

LWVDC               League of Women Voters of the District of Columbia

WISQARS             Centers for Disease Control and Prevention, Web-based Injury
                    Statistics Query and Reporting System

———————

No. 14-7071

———————

DICK ANTHONY HELLER, ABSALOM JORDAN,
WILLIAM CARTER, WILLIAM SCOTT, and ASAR MUSTAFA,
Plaintiffs-Appellants,

v.

THE DISTRICT OF COLUMBIA, and
VINCENT C. GRAY, MAYOR, District of Columbia,
Defendants-Appellees.

———————

On Appeal from the
United States District Court for the District of Columbia
Civil Action No. 08-1289 (JEB)

———————

**BRIEF OF DC APPLESEED CENTER FOR LAW & JUSTICE,
LEAGUE OF WOMEN VOTERS OF THE DISTRICT OF
COLUMBIA, AND DC FOR DEMOCRACY AS
*AMICI CURIAE* IN SUPPORT OF APPELLEES**

———————

## STATEMENT OF INTEREST OF *AMICI CURIAE*

DC Appleseed Center for Law & Justice, the League of Women Voters of

the District of Columbia, and DC for Democracy respectfully submit this brief as

*amici curiae*.

DC Appleseed is a nonprofit organization dedicated to solving pressing

public policy problems facing the District of Columbia and its metropolitan area.

To advance this mission, DC Appleseed works with volunteer attorneys, business leaders, and community experts to identify, research, and analyze community problems, make specific recommendations for reform, and advocate effective solutions. DC Appleseed has been involved for several years in supporting the District's efforts to implement regulations that balance the public's strong interest in gun safety with the right of self-defense. This involvement included the filing of an amicus brief with the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008). DC Appleseed's interest in this case is to assist the Court by identifying clear evidence demonstrating the harms, costs, and burdens that urban gun violence imposes on a city's residents, their tax dollars, and their health care resources, as well as the nexus between the gun regulations presented in this case and the reduction of those harms, costs, and burdens.

LWVDC is a nonpartisan organization that encourages informed and active participation in government, works to increase understanding of public policy issues, and influences public policy through education and advocacy. LWVDC is a state-level chapter of the League of Women Voters of the United States. LWVDC supports the prerogative of local elected officials in the District to make the hard choices balancing the needs of public safety against the right of self-defense.

DCFD is the District's largest unaligned progressive group of activists, community leaders, and everyday voters working for positive change in our local government and full citizenship rights through statehood for the people of Washington, D.C.

## SUMMARY OF ARGUMENT

Residents of the District of Columbia have struggled for decades to address the scourge of gun violence in the city. Since enacting the Firearms Control Regulations Act of 1975 (the "Act"), the District has made steady progress toward that goal. When the Council amended the Act in 2008 and 2012, it conducted hearings and amassed substantial written testimony concerning the challenged regulations. It also relied on the opinions of experts who, informed by the experience of the Metropolitan Police Department ("MPD") and empirical evidence, concluded that the District's regulatory regime was necessary and effective to address the challenges of urban gun violence in our city.

On remand, the District Court found the evidence, the opinions of these experts, and the views of the District's elected representatives to be compelling and entitled to deference. The District Court upheld the registration requirements.

This Court should as well. First, the collective judgment of the Council, as the voice of the District's citizens, is that its solutions tightly fit the harms caused by gun violence in the District. That assessment, and that voice, is entitled to

deference. Second, the firearms regulations challenged here were enacted to address the issues of police and public safety, both of which are undoubtedly substantial government interests. Based on the testimony and empirical evidence received by the Council and found in other supporting data, the Council reasonably concluded that the firearms regulations it passed would further these important government interests. The District Court's judgment should be affirmed.

## ARGUMENT

### I. THE DETERMINATIONS OF THE D.C. COUNCIL ARE ENTITLED TO DEFERENCE.

Contrary to Appellants' arguments, this Court's decision in *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011), did not invent a new form of intermediate scrutiny for firearms regulations that would disregard a local government's assessment of the evidence it found to establish "a tight 'fit'" between the challenged provision and a substantial government interest. *Id.* at 1258. Intermediate scrutiny neither requires nor permits the District Court to reweigh the evidence before the Council or conduct a *de novo* review of whether the Council's assessment was correct. *See Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 211 (1997) ("*Turner II*"); *see also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994) ("*Turner I*"). Instead, the Court must determine "whether the legislative conclusion was reasonable and supported by substantial evidence in the record." *Turner II*, 520 U.S. at 211. In performing this task, the Court "must

accord substantial deference to the predictive judgments of [the legislature]" because "[s]ound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable." *Turner I*, 512 U.S. at 665.

Against this backdrop, the District of Columbia offered, and the District Court accepted, the substantial government interests of promoting public safety and protecting police officers. *Heller v. District of Columbia*, Civil Action No. 08-1289 (JEB), 2014 WL 1978073, at *10 (D.D.C. May 15, 2014). As discussed in greater detail below, these interests are substantial government interests because they are substantial community interests—impacting in particular the health and well-being of those who reside in an urban environment like the District. The Council appropriately passed the regulations challenged here to advance the ongoing efforts of the community it represents to combat gun violence and accidental shootings in its streets and neighborhoods. Ignoring clear evidence that regulatory regimes like those long in place in the District (and some states) have effectively slowed gun violence, Appellants would have the Court assess the need for *continued* regulation against crime statistics and other evidence reflecting circumstances in the District *during* a period of regulation. The question before the Council was predictive—whether the trend revealed in that substantial

evidence would be advanced by continued regulation. The Council weighed the evidence in light of the District's long history of gun regulation and the well-informed opinions of its experts. Deference is due to the Council's assessment in these circumstances, particularly in the field of gun violence, where "the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013) (quoting *Kachalsky v. County of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012)).

II.     **SUBSTANTIAL EVIDENCE SUPPORTS THE FINDING THAT THE CHALLENGED REGULATIONS CAN REASONABLY BE EXPECTED TO PROMOTE AN IMPORTANT GOVERNMENTAL INTEREST.**

When the Council amended its gun laws to impose various registration and related requirements, it acted to limit and control the ownership and purchase of firearms in the District to combat the deadly problem of gun violence. A substantial body of widely available evidence demonstrates that gun violence imposes tragic personal and economic costs on communities across the United States, reflected in loss of life, injuries, and the associated health care and economic costs. Requirements like those the Council adopted have been empirically shown to reduce gun violence and those associated costs.

## A.    The Problem of Gun Violence.

Firearms play a role in numerous deaths and violent crimes each year, and are the weapons most commonly used in homicides within the District.  In 2008, when the Council enacted the Firearms Registration Amendment Act in response to the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), an estimated 315,000 violent crimes committed in the United States involved a gun, including 10,886 homicides.  *See* Mona A. Wright, Garen J. Wintemute & Daniel W. Webster, *Factors Affecting a Recently Purchased Handgun's Risk for Use in Crime under Circumstances that Suggest Gun Trafficking*, 87 J. Urb. Health 352, 352-53 (2010).  That same year, the District of Columbia reported 186 homicides, 76 percent of which were committed with a firearm.  *See* Metropolitan Police Department, *Annual Report 2008*, at 19-20 (Apr. 2009), *available at* http://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/ attachments/ar_2008_web.pdf (the "2008 MPD Annual Report").  According to statistics reported in the 2008 MPD Annual Report, in the five years preceding 2008, nearly four out of five homicides had been committed with a firearm.  *Id.* at 20.  Tragically, the District's homicide victims under the age of eighteen had increased by more than 50 percent from the previous year.  *Id.*

By 2012, when the D.C. Council amended the firearms legislation, the number of homicides committed in the District had dropped to 88, a dramatic

reduction of more than 50 percent from 2008. *See* Metropolitan Police Department, *Annual Report 2012*, at 24, *available at* http://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/2012_AR_1.pdf (last visited Dec. 9, 2014) (the "2012 MPD Annual Report"). Juvenile homicides also dropped by 50 percent from the previous year. *Id*. at 25. Yet, largely unchanged was the weapon of choice: MPD reported that "[f]irearms remain the primary type of weapon used to commit homicides in the District of Columbia," with 67 percent of all homicides committed using a firearm in 2012. *Id*. at 24. Once again, the majority of homicides had been committed with a firearm over the previous five years. *Id*. at 25.

The staggering health care costs of gun violence also were apparent when the Council crafted the challenged legislation.

- In 2010,[1] the average medical cost of a firearm death in the District was $19,861, for a total of approximately $1,966,000 in medical costs related

---

[1] WISQARS allows a user to generate injury reports based on various characteristics, including state and type of weapon; as of November 19, 2014, the data used for these user-generated reports is from 2010. Prior to November 19, 2014, WISQARS provided information on the medical cost of firearms-related deaths and injuries based on data from 2005. In 2005, the average medical cost of a firearm death in the District was $5,753, for a total of approximately $886,000 in medical costs related to firearm deaths; the national average medical cost of a gun-related death was $3,676 for an estimated total of $112,837,000 in medical costs nationwide; 38,844 non-fatal hospitalizations resulted from a firearm gunshot in the United States, with a national average medical cost of $14,716 per hospitalization and an estimated $571,632,000 in total medical costs; and non-fatal

to firearm deaths.[2]  *See* Centers for Disease Control and Prevention ("CDC"), Web-based Injury Statistics Query and Reporting System ("WISQARS"), Cost of Injury Reports, *available at* http://www.cdc.gov/injury/wisqars/ (last visited Dec. 10, 2014).

- The national average medical cost of a gun-related death was $5,891 for an estimated total of more than $186 million in medical costs nationwide in 2010.  *Id.*

- 38,565 non-fatal hospitalizations resulted from a firearm injury in the United States in 2010, with a national average medical cost of $22,115 per hospitalization and estimated aggregate medical costs exceeding $852.8 million.[3]  *Id.*

---

gunshot injuries generated 30,179 emergency room visits where the patient was treated and released without hospitalization for a national average medical cost of $931 per emergency room visit and an estimated $28,106,000 in total medical costs.  Based on CDC data from 2005, the aggregate medical cost of firearm-related deaths, hospitalizations, and emergency room visits in the United States was $712,575,000.  Counsel for *amici* accessed the 2005 data through WISQARS on November 11, 2014.

[2] WISQARS reported 154 firearms-related deaths in 2005, whereas MPD reported 157 firearms-related homicides for the same year.  Metropolitan Police Department, *Statistical Report 2001-2005,* at 26 (Dec. 2006), *available at* http://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/ar_2001_2005.pdf.

[3] WISQARS does not provide an option to generate a report about non-fatal hospitalizations from firearm gunshots in the District specifically.

- 33,348 non-fatal gunshot injuries generated emergency room visits where the patient was treated and released without hospitalization, with a national average medical cost of $2,570 per emergency room visit and an estimated $85.7 million in total medical costs in 2010.[4] *Id.*

- The aggregate medical cost of firearm-related deaths, hospitalizations, and emergency room visits in the United States was over $1.12 billion based on CDC data from 2010. *Id.*

Taxpayers bear most of the medical costs associated with gun violence. In 2010, some 52 percent of hospital costs for firearm assault injuries were paid by publicly-funded insurance (primarily Medicaid), with another 28 percent of hospital costs generated by the uninsured. *See* Embry M. Howell & Peter Abraham, *The Hospital Costs of Firearm Assaults* 5 (Sept. 2013), *available at* http://www.urban.org/UploadedPDF/412894-The-Hospital-Costs-of-Firearm-Assaults.pdf. Additionally, the average cost of inpatient hospitalization for gun-related injuries to a patient with public insurance (about $27,000 per hospitalization) was approximately 12 percent more than for a patient with private insurance (about $24,000 per hospitalization), which in turn was almost 25 percent more than for patients with no insurance (about $19,000 per hospitalization). *Id.* at 8. Similarly, emergency room visits cost more for publicly-insured patients than

---

[4] WISQARS does not provide an option to generate a report about non-fatal emergency room visits from firearm gunshots in the District specifically.

for privately-insured patients with firearm assault injuries, while emergency room costs generated by the uninsured outpaced those of both publicly- and privately-insured patients. *Id.* at 7. Overall, hospitals nationwide reported that the average cost of an inpatient admission resulting from firearm assault injuries was almost $14,000 more than the average inpatient admission in 2010. *Id*. at 8.

Gun violence presented even greater work loss costs, undermining economic opportunities and stability. The CDC defines work loss as "the value of goods and services not produced because of injury-related illness and disability" or "the value of goods and services never produced because of injury-related premature death," including lost wages, fringe benefits, and the ability to perform normal household responsibilities. Bruce A. Lawrence, *et al.*, *Medical and Work Loss Cost Estimation Methods for the WISQARS Cost of Injury Module* 20 (Dec. 19, 2011), *available at* http://www.cdc.gov/injury/wisqars/pdf/WISQARS_Cost_Methods-a.pdf.

- In 2010,[5] the average work loss cost resulting from a firearm death in the District was $1,712,805, for a total of nearly $170 million in work loss costs for the District alone. *See* WISQARS Cost of Injury Reports.

---

[5] In 2005, the average work loss cost resulting from a firearm death in the District was $2,513,543, for a total of nearly $387.1 million in work loss costs for the District. Nationwide, fatal injuries from firearms resulted in an average work loss cost of $1,202,071, for a total of almost $36.9 billion in work loss costs; non-fatal firearm injuries resulting in hospitalizations had an average work loss cost of

- Nationally, fatal injuries from firearms resulted in an average work loss cost of $1,296,238, for a total of over $41 billion in work loss costs for 2010. *Id.*

- Non-fatal firearm injuries resulting in hospitalizations had an average work loss cost of $85,417 with total work lost costs of just under $3.3 billion nationwide in 2010.[6] *Id.*

- Emergency room visits related to non-fatal firearm injuries produced an average work loss cost of $4,080 with over $136 million in total work loss costs for the United States in 2010.[7] *Id.*

This represents over $44.4 billion missing from the U.S. economy as a result of firearms-related injuries and deaths. *Id.*

---

$79,615 with total work lost costs of just under $3.1 billion; and emergency room visits related to non-fatal firearm injuries produced an average work loss cost of $2,775 with $83.7 million in total work loss costs. In sum, firearms-related injuries and deaths cost the U.S. economy over $40 billion in 2005, not including the medical costs outlined above. Counsel for *amici* accessed the 2005 data through WISQARS on November 11, 2014.

[6] WISQARS does not provide an option to generate a report about non-fatal hospitalizations from firearm gunshots in the District specifically.

[7] WISQARS does not provide an option to generate a report about non-fatal emergency room visits from firearm gunshots in the District specifically.

## B. Other States Have Implemented Legislation Analogous to the D.C. Regulations to Address Gun Violence.

By and large, the District's gun regulations are analogous to tried and effective practices in the states, including ones with large urban communities like the District.

- Six states require registration of firearms in at least some circumstances.[8]

- Thirteen states, including all of the states that require some form of registration, require permits for gun owners or purchasers.[9]

- In six of those states, permit requirements extend to *all* types of firearms.[10]

---

[8] For example, Hawaii requires registration of all firearms. *See* Haw. Rev. Stat. Ann. §§ 134-3(a), (b), 134-4. New York requires registration of all handguns in connection with the licensing process, as well as pre-ban assault weapons. *See* N.Y. Penal Law §§ 400.00 – 400.02. California requires new residents to report their firearms or sell them through a licensed dealer or to a sheriff or police department, and also requires registration for pre-ban assault weapons and fifty caliber rifles. *See* Cal. Penal Code §§ 17000, 27560, 30510-30530, 30600-30675, 30900-30965; *see also* Md. Code Ann., Pub. Safety § 5-143; Md. Code Ann., Crim. Law § 4-303; Conn. Gen. Stat. § 53-202d(a); N.J. Stat. Ann. §§ 2C:39-5(f), 58-12.

[9] *See* Cal. Penal Code §§ 16370, 16670, 26840-26859, 31610-31700; Conn. Gen. Stat. §§ 29-33, 29-36f – 29-36i, 29-37a; Haw. Rev. Stat. Ann. §§ 134-2, 134-13; Iowa Code §§ 724.15 – 724.20; 430 Ill. Comp. Stat. 65/1 – 65/15a; Md. Code Ann. Pub. Safety § 5-117.1; Mass. Gen. Laws ch. 140, §§ 121, 129B, 129C, 131, 131A, 131E, 131P; Mich. Comp. Laws §§ 28.422, 28.422a(1)(c) (no permit is required when purchasing from a licensed dealer after a background check); Neb. Rev. Stat. Ann. §§ 69-2404, 69-2407, 69-2409 (no permit is required when purchasing from a licensed dealer after a background check); N.J. Stat. Ann. § 2C:58-3; N.Y. Penal Law §§ 400.00 – 400.02; N.C. Gen. Stat. §§ 14-402 – 14-404; R.I. Gen. Laws §§ 11-47-35 – 11-47-35.1.

- All thirteen of the states that require registration and/or permits, plus five additional states, require background checks at the point of transfer or in order to obtain a permit.[11]

- Six states have safety training or exam requirements for permits.[12]

- Ten states require reporting of lost or stolen firearms.[13]

---

[10] These states are California (effective January 1, 2015), Connecticut, Hawaii, Illinois, Massachusetts, and New Jersey. New Jersey's permit requirement appears to apply to guns in public, not in the home or place of business. *See* N.J. Stat. § 2C:39-6(e).

[11] Some states require background checks for purchases or permits for all types of firearms. *See* Cal. Penal Code §§ 27545, 27850-28070; Colo. Rev. Stat. § 18-12-112; Conn. Gen. Stat. §§ 29-33(c), 29-36*l*(f), 29-37a(e)-(j); Del. Code tit. 11, § 1448B; Del. Code tit. 24, § 904A; N.Y. Gen. Bus. Law § 898; R.I. Gen. Laws §§ 11-47-35 – 11-47-35.2; Haw. Rev. Stat. Ann. §§ 134-2, 134-13; 430 Ill. Comp. Stat. 65/1 – 65/15a, 720 Ill. Comp. Stat. 5/24-3(k); Mass. Gen. Laws ch. 140, §§ 121, 129B, 129C, 131, 131A, 131E, 131P; N.J. Stat. Ann. § 2C:58-3; Or. Rev. Stat. §§ 166.432 – 166.441 (law only requires background checks before sales at gun shows and does not extend to other private unlicensed sales); 2014 Wash. Legis. Serv. Init. Meas. 594 (I.M. 594) (West). Other states require background checks for purchases or permits for handguns only. *See* Md. Code Ann., Pub. Safety §§ 5-101(t), 5-124; 18 Pa. Cons. Stat. § 6111(b), (c), (f)(2); Iowa Code §§ 724.15 – 724.20; Mich. Comp. Laws §§ 28.422, 28.422a; Neb. Rev. Stat. Ann. §§ 69-2404, 69-2407, 69-2409; N.C. Gen. Stat. §§ 14-402 – 14-404.

[12] These states are California, Connecticut, Hawaii, Maryland, Massachusetts, and Rhode Island. *See supra* note 9.

[13] These states are Connecticut, Delaware, Illinois, Maryland (handguns and assault weapons only), Massachusetts, Michigan (thefts only), New Jersey, New York, Ohio, and Rhode Island. *See* Conn. Gen. Stat. § 53-202g; Del. Code tit. 11, § 1461; 720 Ill. Comp. Stat. 5/24-4.1; Md. Code Ann., Pub. Safety § 5-146; Mass. Gen. Laws ch. 140, § 129C; Mich. Comp. Laws § 28.430; N.J. Stat. Ann. § 2C:58-19; N.Y. Penal Law § 400.10; Ohio Rev. Code Ann. § 2923.20(A)(5); R.I. Gen. Laws § 11-47-48.1.

- Three states limit handgun purchases to one per month.[14]

Thus, the Council is not alone in concluding that requirements like the ones at issue in this case are a reasonable means of tackling the problem of gun violence.

Strong gun regulations correlate with lower rates of gun death, a fact that corroborates the sound legislative judgment of the Council. With the goal of improving public safety, the Council, observing the impressive trends in states with sensible gun laws, reasonably concluded that such laws are substantially related to that aim. That the District has also introduced some additional policy tools to buttress those core gun policies that work in the states does not render the law an impermissible response to the task of combatting the scourge of gun violence in our community.

A 2013 joint report by the Law Center to Prevent Gun Violence and the Brady Campaign shows a clear association between strong gun laws and low gun death rates. Law Center to Prevent Gun Violence, *2013 State Scorecard: Why Gun Laws Matter* 3 (2013), *available at* http://smartgunlaws.org/wp-content/uploads/2013/12/SCGLM-Final10-spreads-points.pdf (the "2013 State Scorecard"). The report ranks and assigns letter grades to all the states based on the strength or

---

[14] These states are California, Maryland, and New Jersey. *See* Cal. Penal Code §§ 26835, 27535 (restriction does not apply to private party firearms transactions, though such transactions must be processed through a licensed dealer); Md. Code Ann., Pub. Safety §§ 5-128(a), (b), 5-129, 5-144; N.J. Stat. Ann. §§ 2C:58-2(a)(7), 2C:58-3(i), 2C:58-3.4.

weakness of their gun laws[15] and compares those results against age-adjusted gun death rates. Seven states appeared on *both* the lists of the top ten states with the strongest gun laws and the top ten states with the lowest gun death rates. *Id.* at 4.[16] Five of the states with at least some firearms registration requirements in 2010[17] were among the top ten states with the lowest gun death rates in 2010. *See id.* at 4, 8 (uses 2010 gun death rates). Three of the states which required permits for the purchase or ownership of *all* types of firearms in 2010[18] were among the top ten states with the lowest gun death rates in 2010. *See id.* (uses 2010 gun death rates).

---

[15] Scores are based on whether the state has enacted partially or in full thirty specific gun policies. The methodology and detailed scores for the states are included in the report.

[16] Those states are California, Connecticut, New Jersey, New York, Massachusetts, Hawaii, and Rhode Island. The gun death rate data in the report is from 2010. *See* 2013 State Scorecard, *supra*, at 8 (chart). Regardless, comparing the 2010 gun death rate data from this report to the gun law scores from 2010 available in a report by the same organization yields the same result. The same seven states appear on both the lists of the top ten states with the lowest gun death rates (2010 data from 2013 report), *see id.* at 4, and the top ten states with the strongest gun laws (2010 scores from 2010 report), *see* Legal Community Against Violence, *Gun Laws Matter: A Comparison of State Firearms Laws and Statistics* 3 (2010), *available at* http://smartgunlaws.org/wp-content/uploads/2010/07/Gun_Laws_ Matter_Brochure.pdf. Again, those states are California, Connecticut, New Jersey, New York, Massachusetts, Hawaii, and Rhode Island.

[17] In 2010, these states were Hawaii, California, Connecticut, New Jersey, and New York. *See supra* note 8.

[18] In 2010, these states were Hawaii, Massachusetts, and New Jersey. Connecticut, which previously required permits to purchase for handguns only, extended the requirement to long guns effective April 1, 2014. California, which previously required permits to purchase handguns only, has extended the requirement to all firearms, to become effective January 1, 2015. *See supra* notes 9-10.

Conversely, many of the states with the highest gun death rates had weak gun laws. *See id.* at 3. In short, strong gun regulations work in lowering gun death rates.

By this metric, the District's gun regulations have worked. Since the 2010 data cited by Appellants, *see* Appellants' Br. at 25, the age-adjusted firearm death rate in the District decreased significantly (to 9.15 per 100,000) and actually fell below the national rate (10.45 per 100,000). *See* CDC, WISQARS Fatal Injury Reports, *available at* http://www.cdc.gov/injury/wisqars/ (2012 data, which is the most recent available). Appellants' emphasis on the District's death rate as compared to that in the *states* is misplaced. Whereas the District is a densely populated urban center, the states consist of a mix of urban, suburban, and rural areas. Accordingly, *states* can be compared to *other states* to determine associations between gun laws and gun death rates.

At the same time, data from the District and the states demonstrate that the strength of gun laws also correlates with other useful metrics. For example, in 2009, the District had a crime gun export rate lower than that of any state. Relying on crime gun trace data gathered by the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), a study by Mayors Against Illegal Guns compared states that have and have not enacted ten types of gun laws and found that each of the ten laws is strongly associated with lower crime gun export rates. Mayors Against Illegal Guns, *Trace the Guns: The Link Between Gun Laws and Interstate*

*Gun Trafficking* 6, 10, 29 (Sept. 2010). The study found a "strong association between a state's gun laws and that state's propensity to export crime guns." *Id.* at 3.

Experience in California demonstrates that reasonable gun regulations can have a significant positive effect on public safety, providing further support for the Council's judgment in enacting the laws challenged here. In California, the development of strong gun laws corresponded with a significant decrease in gun violence: "In the early 1990s, California's gun laws were weak and full of gaps, and the toll of gun violence across the state rose to unprecedented levels – at one point 15% higher than the national average." Law Center to Prevent Gun Violence, *The California Model: Twenty Years of Putting Safety First* 2 (2013), *available at* http://smartgunlaws.org/wp-content/uploads/2013/07/20Yearsof Success_ForWebFINAL5.pdf. Over the last two decades, California has developed stronger gun laws than any other state in the nation. *Id.* at 3. These include but are not limited to: requiring background checks on all prospective gun purchasers[19]; requiring handgun purchasers (and all firearms purchasers starting January 1, 2015) to obtain a safety certificate after passing a written test and performing a safe handling demonstration[20]; limiting handgun sales in many

---

[19] *See* Cal. Penal Code §§ 27545, 27850-28070.

[20] *See* Cal. Penal Code §§ 16370, 16670, 26840-26859, 31610-31700.

transactions to one per person per month[21]; requiring registration of pre-ban assault weapons and 50 caliber rifles[22]; and requiring handgun owners (all firearms owners as of January 1, 2014) who become new residents to report or sell their firearms through a licensed dealer or to a sheriff or police department.[23]

In the last two decades,

> [T]he number of people injured or killed by guns in California has decreased dramatically. In 1993, 5,500 Californians were killed by gunfire; by 2010 . . . that number had dropped to 2,935. In just two decades, the state's [age-adjusted] gun death rate has been cut by 56% [17.48 per 100,000 in 1993; 7.70 per 100,000 in 2010], a reduction that translates to thousands of lives saved every single year.

Law Center to Prevent Gun Violence, *supra*, at 4 & nn. 3-4. While California had the thirty-fifth lowest gun death rate of any state two decades ago, California had the ninth lowest gun death rate in 2010. *Id.* at 4. By following the lead of states with strong gun regulations, D.C. joins them in reducing the incidence of gun deaths.

### C. Empirical Evidence Supports the Measures Implemented by the Council.

Crime statistics and numerous studies support the measures adopted by the Council to address gun violence in our city.

---

[21] *See* Cal. Penal Code §§ 26835(g), 27535.

[22] *See* Cal. Penal Code §§ 30510-30530, 30600-30675, 30900-30965.

[23] *See* Cal. Penal Code §§ 17000, 27560.

1. <u>Gun Licensing and Registration Requirements</u>. As a general proposition, empirical evidence suggests that gun licensing and registration requirements reduce the presence of crime guns within a city. A 2001 study by Daniel W. Webster, who testified before the Council for both the 2008 and 2012 legislation, used tracing data for crime guns recovered in 25 cities in the United States and found that cities in states requiring both licensing and registration of firearms had a significantly lower proportion of their crime guns coming from within the state. D.W. Webster, J.S. Vernick & L.M. Hepburn, *Relationship Between Licensing, Registration, and Other Gun Sales Laws and the Source State of Crime Guns*, 7 Inj. Prevention 184, 185, 187 (2001). Cities in states imposing both permit-to-purchase licensing and registration requirements had an average of only 33.7 percent of their crime guns originating from within the state, compared to 72.7 percent for cities in states requiring either permit-to-purchase licensing or registration (but not both) and 84.2 percent for cities in states with neither permit-to-purchase licensing nor registration laws. *Id*. The study also found that the closer a city was to a state with weak gun laws, the more likely the city was to have crime guns originating from out-of-state dealers. *Id*. at 188.

Gun licensing also has been shown to reduce gun trafficking. In 2009, 30 percent of crime guns traced by ATF were recovered outside the state where they were originally sold. Daniel W. Webster, *et al.*, *Preventing the Diversion of Guns*

*to Criminals Through Effective Firearm Sales Laws* 114, in *Reducing Gun Violence in America* (Daniel W. Webster & Jon S. Vernick eds., 2013). That same year, a study of 54 cities in the United States considered whether three regulatory components affected gun trafficking within those cities: 1) regulations and the enforcement of regulations governing gun retailers; 2) regulations requiring potential buyers to undergo a background check before buying a gun from a private individual; and 3) permit-to-purchase licensing that gave law enforcement discretion to deny purchase applications if the applicant might pose a risk. Daniel W. Webster, Jon S. Vernick & Maria T. Bulzacchelli, *Effects of State-Level Firearm Seller Accountability Policies on Firearm Trafficking*, 86 J. Urb. Health 525, 527 (2009). The study found that strong gun dealer regulation and oversight, regulation of private handgun sales, and discretionary permit-to-purchase licensing resulted in statistically significantly lower levels of intrastate gun trafficking. *Id*. at 531. Specifically, intrastate gun trafficking was two to four times higher for cities in states without gun sales regulations. *Id*. The study estimated that gun trafficking was 64 percent lower in cities with strong gun dealer regulations and enforcement, 68 percent lower in cities with discretionary permit-to-purchase licensing, and 48 percent lower in cities with laws regulating the private sale of handguns. *Id*. at 532.

2.    <u>Fingerprinting and Photo Identification</u>.    Requiring in-person fingerprinting and photographing along with background checks and potential presentation of the firearm during registration provides additional safeguards for police dealing with the common problem of straw purchases.  Straw purchases occur when one person buys a firearm for another, thereby illegally circumventing a federal background check and other federal or state regulations of firearm sales. In 2006, New York City's undercover investigation of 55 gun dealers from seven states uncovered 27 dealers—almost 50 percent—who were willing to engage in illegal straw purchases (and subsequently sued by the city).  Daniel W. Webster & Jon S. Vernick, *Spurring Responsible Firearms Sales Practices Through Litigation* 126-27, in *Reducing Gun Violence in America* (Daniel W. Webster & Jon S. Vernick eds., 2013).  Similarly, in a study of 149 gun dealers contacted in 2005 by female callers using a script that clearly suggested a prospective straw purchase, 20 percent of the dealers agreed to assist with an illegal straw purchase, and others who declined the purchase offered "concrete assistance in completing a purchase they appeared to understand was against the law."  Garen J. Wintemute, *Firearm Retailers' Willingness to Participate in an Illegal Gun Purchase*, 87 J. Urb. Health 865, 872 (2010).

Other research suggests that women may be more likely to act as surrogates for straw purchasers.  For example, 18 percent of straw purchasers working with

gun trafficking operations were girlfriends or spouses of the traffickers. *See* G.J. Wintemute, P.J. Cook & M.A. Wright, *Risk Factors Among Handgun Retailers for Frequent and Disproportionate Sales of Guns Used in Violent and Firearm Related Crimes*, 11 Inj. Prevention 357, 361 (2005). Additionally, handguns purchased by females were twice as likely to be traced and used in a crime than were handguns purchased by males, though men were much more likely than women to commit a violent crime involving a gun. *See* Wright, Wintemute & Webster, *supra,* at 358.

Among guns recovered by police and traced by the ATF, about 85 percent of criminal possessors were not the retail purchaser. *See* Webster, *et al.*, *supra*, at 110. As reported by Webster, this is consistent with analysis of data from the 2004 Survey of Inmates in State Correctional Facilities which showed that the "largest proportions of offenders got their handguns from friends or family members (39.5%) or from street or black market suppliers (37.5%), sales for which there are no federal background check requirements." *Id*. One in 10 offenders reported that they had stolen the firearm used in their most recent crime. *Id*. Only 11.4 percent of gun offenders sourced their gun from a licensed gun dealer, meaning the majority of guns likely came from sources requiring no identification or background check. *Id*. These facts underscore the importance and utility of in-person registration requirements in allowing law enforcement to readily verify

whether the person in possession of a firearm is the registered owner of that firearm.

Fingerprinting further supports identification of a gun's origins and has been shown to reduce trafficking. A 2009 study found that nondiscretionary permit-to-purchase laws requiring fingerprinting at a law enforcement agency were associated with statistically significantly lower rates of crime gun exports. *Id.* at 117.

3. <u>One Gun Per Month Laws</u>. One-gun-a-month laws have been shown to reduce gun trafficking, despite successful efforts to repeal such laws in some states. Virginia became the second state to adopt a one-gun-a-month law in 1993.[24] In the 18 months after Virginia enacted its law limiting handgun purchases to no more than one purchase in a 30-day period, Virginia's role in supplying guns to the Northeast was greatly reduced. Phillip J. Cook & Anthony A. Braga, *Comprehensive Firearms Tracing: Strategic and Investigative Uses of New Data on Firearms Markets*, 43 Ariz. L. Rev. 277, 302-03 (2001). Prior to enactment of the law, ATF reported that 41 percent of one sample of guns seized in New York City in 1991 were traceable to gun dealers in Virginia, and Virginia was a primary out-of-state source of crime guns traced in Washington, D.C. and Boston. Douglas

---

[24] Virginia repealed its one-gun-a-month law in 2012.

S. Weil & Rebecca C. Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275 JAMA 1759, 1759 (1996).

A study estimating the odds of tracing a gun recovered in the Northeast to a Virginia gun dealer as opposed to a dealer in other Southeastern states showed that 35 percent of all guns originating in the Southeast purchased prior to passage of Virginia's one-gun-a-month law were traced to a Virginia gun dealer, whereas only 16 percent of all guns originating in the Southeast purchased after passage of the law were traced to a Virginia gun dealer. *Id*. at 1760. More significantly, the likelihood that a gun recovered in the Northeast would be traced to Virginia instead of another Southeastern state was reduced by 66 percent after the one-gun-a-month law took effect. *Id*.

Another study of handgun sales by licensed dealers in California in 1996 found that handguns purchased as part of several guns bought on the same day were more likely to be traced than handguns purchased as a single gun in one day. *See* Wright, Wintemute & Webster, *supra*, at 356. Likewise, handguns purchased by individuals who bought multiple similar guns were 58 percent more likely to be used in crime than handguns purchased by individuals who only purchased one handgun in 1996. *Id*. at 362. One-gun-a-month laws are designed to address these troubling trends.

In summary, the D.C. Council acted well within its discretion under the intermediate scrutiny standard in determining that the gun safety regulations it enacted were an appropriate response to the serious problem of gun violence in the District of Columbia.

## CONCLUSION

For the foregoing reasons, the Court should affirm the District Court's decision.

Respectfully submitted,

HOGAN LOVELLS US LLP

By:  /s/ Jonathan L. Diesenhaus
Jonathan L. Diesenhaus*
Khang V. Tran
Karla J. Aghedo
David J. Robbins
555 Thirteenth Street, NW
Washington, DC 20004
jonathan.diesenhaus@hoganlovells.com
(202) 637-5600

-and-

Walter A. Smith, Jr.
Kevin Hilgers
DC APPLESEED CENTER FOR LAW & JUSTICE
1111 14th Street NW
Suite 510
Washington, DC 20005
(202) 289-8007

Counsel for *Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(d) and 32(a)(7)(C), as well as Circuit Rule 32(a), because the brief contains 6,161 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1). I further certify that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because the brief has been has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

/s/ Jonathan L. Diesenhaus

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of December, 2014, the foregoing Brief was filed through the Court's ECF system, and accordingly was served electronically on all parties.

/s/ Jonathan L. Diesenhaus