# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

DICK ANTHONY HELLER, ET AL.,

*Plaintiffs-Appellants*,

*v.*

DISTRICT OF COLUMBIA, ET AL.,

*Defendants-Appellees*.

**On Appeal From the United States District Court
for the District of Columbia, Hon. James E. Boasberg**

**BRIEF FOR AMICI CURIAE BRADY CENTER TO PREVENT GUN VIOLENCE, ARIZONANS FOR GUN SAFETY, CEASEFIRE OREGON, COLORADO CEASEFIRE CAPITOL FUND, DELAWARE COALITION AGAINST GUN VIOLENCE, INC., EDUCATIONAL FUND TO STOP GUN VIOLENCE, GUN VIOLENCE PREVENTION CENTER OF UTAH, ILLINOIS COUNCIL AGAINST HANDGUN VIOLENCE, LAW CENTER TO PREVENT GUN VIOLENCE, MAINE CITIZENS AGAINST HANDGUN VIOLENCE, MARYLANDERS TO PREVENT GUN VIOLENCE, NEW MEXICANS FOR GUN SAFETY, NEW YORKERS AGAINST GUN VIOLENCE, OHIO COALITION AGAINST GUN VIOLENCE, PROTECT MINNESOTA, STATES UNITED TO PREVENT GUN VIOLENCE, VIOLENCE POLICY CENTER, WISCONSIN ANTI-VIOLENCE EFFORT, AND WOMEN AGAINST GUN VIOLENCE IN SUPPORT OF APPELLEES AND AFFIRMANCE**

JONATHAN E. LOWY
BRADY CENTER TO PREVENT GUN
  VIOLENCE
LEGAL ACTION PROJECT
840 First Street, N.E., Suite 400
Washington, D.C. 20002
(202) 370-8101

December 12, 2014

PAUL R.Q. WOLFSON
LAURA MORANCHEK HUSSAIN
FRANCESCO VALENTINI
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 663-6000
paul.wolfson@wilmerhale.com

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## Parties and Amici

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the briefs for Appellants and Appellees, except for (1) the following amici joining in this brief: Arizonans for Gun Safety; Ceasefire Oregon; Colorado Ceasefire Capitol Fund; Delaware Coalition Against Gun Violence, Inc.; Educational Fund to Stop Gun Violence; Gun Violence Prevention Center of Utah; Illinois Council Against Handgun Violence; Law Center to Prevent Gun Violence; Maine Citizens Against Handgun Violence; Marylanders to Prevent Gun Violence; New Mexicans for Gun Safety; New Yorkers Against Gun Violence; Ohio Coalition Against Gun Violence; Protect Minnesota; States United to Prevent Gun Violence; Violence Policy Center; Wisconsin Anti-Violence Effort; and Women Against Gun Violence; and (2) the following amici which joined a separate brief: D.C. Appleseed Center for Law & Justice, League of Women Voters of the District of Columbia; and D.C. for Democracy.

## Rulings Under Review

References to the rulings at issue appear in the briefs for Appellants and Appellees.

**Related Cases**

This case was previously before this Court as *Heller v. District of Columbia*, No. 10-7036.  To the best of counsel's knowledge, that appeal was the only instance in which this case was previously before this Court or any court other than the district court below.  Counsel are unaware of any related cases currently pending in this Court or any other court.

**Statutes and Regulations**

All applicable constitutional provisions, statutes, and regulations are set forth in the Addendum to the briefs for Appellants.

/s/ Paul R.Q. Wolfson
_____
PAUL R.Q. WOLFSON
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000
paul.wolfson@wilmerhale.com

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, the Brady Center To Prevent Gun Violence ("Brady Center") states that it is a § 501(c)(3) nonprofit corporation dedicated to reducing gun violence through education, research, and legal advocacy.  The Brady Center has no parent corporation, and no publicly held corporation holds ten percent or more of its stock.

Each of the following amici also states that it has no parent corporation and that no publicly held corporation holds ten percent or more of its stock:  Arizonans for Gun Safety; Ceasefire Oregon; Colorado Ceasefire Capitol Fund; Delaware Coalition Against Gun Violence, Inc.; Educational Fund to Stop Gun Violence; Gun Violence Prevention Center of Utah; Illinois Council Against Handgun Violence; Law Center to Prevent Gun Violence; Maine Citizens Against Handgun Violence; Marylanders to Prevent Gun Violence; New Mexicans for Gun Safety; New Yorkers Against Gun Violence; Ohio Coalition Against Gun Violence; Protect Minnesota; States United to Prevent Gun Violence; Violence Policy Center; Wisconsin Anti-Violence Effort; and Women Against Gun Violence.

Amici are represented herein by Paul R.Q. Wolfson, who is counsel of record, Laura Moranchek Hussain, and Francesco Valentini of Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Avenue N.W., Washington, D.C.

20006.  The Brady Center is also represented by Jonathan E. Lowy, Brady Center

To Prevent Gun Violence, Legal Action Project, 840 First Street, N.E., Suite 400,

Washington, D.C.  20002.

/s/ Paul R.Q. Wolfson
————————————————
PAUL R.Q. WOLFSON
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000
paul.wolfson@wilmerhale.com

## D.C. CIRCUIT RULE 29(d) STATEMENT

The amici joining in this brief are filing a separate brief from the brief for amici International Municipal Lawyers Association, Major City Chiefs of Police Association, and United States Conference of Mayors ("IMLA brief"), and the brief for amici D.C. Appleseed Center for Law & Justice, League of Women Voters of the District of Columbia, and D.C. for Democracy ("D.C. Appleseed brief"). Counsel for the amici joining in this brief understand that the IMLA brief principally addresses firearm regulations from the perspective of law enforcement agencies and municipalities across the United States, and that the D.C. Appleseed brief principally provides a local perspective on the issues before the Court. The amici joining this brief have a distinct perspective—that of organizations dedicated to reducing gun violence in the interest of public safety across the country. Accordingly, a separate brief is necessary to permit the organizations joining in this brief to address, inter alia, the impact of gun violence on public safety and society at large.

/s/ Paul R.Q. Wolfson
_____

PAUL R.Q. WOLFSON
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 663-6000
paul.wolfson@wilmerhale.com

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............................................................................. C-1

CORPORATE DISCLOSURE STATEMENT ................................... C-3

D.C. CIRCUIT RULE 29(d) STATEMENT ...................................... C-5

TABLE OF AUTHORITIES ......................................................... iii

INTEREST OF AMICI CURIAE ............................................................ 1

SUMMARY OF ARGUMENT ............................................................... 3

ARGUMENT ........................................................................................... 5

I.   REASONABLE FIREARMS REGULATIONS THAT DO NOT SUBSTANTIALLY BURDEN THE RIGHT OF SELF-DEFENSE DO NOT VIOLATE THE SECOND AMENDMENT ............................................................................. 5

   A.   The Exercise Of Second Amendment Rights Raises Public Safety Concerns Not Implicated By Other Constitutional Rights ............................................................. 5

   B.   The District's Firearm Regulations Do Not Impose Significant Burdens On Plaintiffs' Second Amendment Rights ................................................................................. 12

II.  LEGISLATURES HAVE LATITUDE TO REGULATE THE USE AND POSSESSION OF FIREARMS AS LONG AS SUCH REGULATIONS REASONABLY ADVANCE AN IMPORTANT GOVERNMENT INTEREST ............................. 14

III. THE DISTRICT COURT CORRECTLY FOUND THAT THE DISTRICT'S LEGISLATIVE JUDGMENT WAS REASONABLE AND SUPPORTED BY AMPLE EVIDENCE ................. 19

A.    The District's Law Enforcement Officials—And Law Enforcement Officials In General—Are Uniquely Qualified To Opine On The Impact Of Firearms Laws On Public Safety .......................................................................21

B.    The District's Firearm Regulations Are Substantially Related To Its Interests In Promoting Public Safety ..........................24

CONCLUSION ....................................................................................31

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

APPENDIX

# TABLE OF AUTHORITIES*

## CASES

Page(s)

*Brandenburg v. Ohio*,
    395 U.S. 444 (1969)................................................................10, 11

*Chaplinsky v. New Hampshire*,
    315 U.S. 568 (1942)......................................................................11

*Citizens United v. FEC*,
    558 U.S. 310 (2010)....................................................................3, 11

*City of Los Angeles v. Alameda Books, Inc.*,
    535 U.S. 425 (2002)......................................................................16

*City of Renton v. Playtime Theatres, Inc.*,
    475 U.S. 41 (1986)........................................................................10

*Clark v. Community for Creative Non-Violence*,
    468 U.S. 288 (1984)......................................................................10

*Columbia Broadcasting Systems, Inc. v. Democratic National Committee*,
    412 U.S. 94 (1973)........................................................................18

\* *District of Columbia v. Heller*,
    554 U.S. 570 (2008)..............................................................3, 12, 17

*Giboney v. Empire Storage & Ice Co.*,
    336 U.S. 490 (1949)......................................................................11

*Gonzales v. Carhart*,
    550 U.S. 124 (2007)......................................................................26

*Heffron v. International Society for Krishna Consciousness, Inc.*,
    452 U.S. 640 (1981)......................................................................10

\* *Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011)...................... 3, 9, 12, 13, 14, 15, 17

---

\*       Authorities upon which we chiefly rely are marked with asterisks.

*Justice v. Town of Cicero*,
    577 F.3d 768 (7th Cir. 2009) ........................................................................12

*Lorillard Tobacco Co. v. Reilly*,
    533 U.S. 525 (2001)..................................................................................24

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010)............................................................................17, 31

*NAACP v. Button*,
    371 U.S. 415 (1963)..................................................................................11

*National Ass'n of Manufacturers v. Taylor*,
    582 F.3d 1 (D.C. Cir. 2009) ........................................................................24

*National Socialist Party of America v. Skokie*,
    432 U.S. 43 (1977)......................................................................................9

*New State Ice Co. v. Liebmann*,
    285 U.S. 262 (1932)..................................................................................17

*Rosario v. Rockefeller*,
    410 U.S. 752 (1973)..................................................................................12

* *Schrader v. Holder*,
    704 F.3d 980 (D.C. Cir. 2013)........................................15, 18, 19, 24, 28

*Snyder v. Phelps*,
    562 U.S. 443 (2011)....................................................................................9

*Texas v. Johnson*,
    491 U.S. 397 (1989)....................................................................................9

* *Turner Broadcasting Systems, Inc. v. FCC*,
    520 U.S. 180 (1997)............................................................................18, 27

*United States v. Hayes*,
    555 U.S. 415 (2009)....................................................................................7

*United States v. Spriggs*,
    996 F.2d 320 (D.C. Cir. 1993)....................................................................24

*United States v. Stevens*,
    559 U.S. 460 (2010)......................................................................11

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)......................................................................10

## STATUTES, RULES, AND REGULATIONS

D.C. Code
    § 7-2502.03(e)...............................................................................14
    § 50-1101......................................................................................13
    § 50-1401.01.................................................................................13

D.C. Law
    17-372 (2008) ...............................................................................20
    19-170 (2012) ...............................................................................20

D.C. Cir. Rule 29 ................................................................................2

Fed. R. Evid. Rule 702........................................................................24

Fed. R. App. P. 29 ...............................................................................2

56 D.C. Reg. 3438 (May 1, 2009)......................................................20

59 D.C. Reg. 5691 (May 25, 2012) ....................................................20

D.C. Mun. Regs. tit. 18,
    §§ 100-111 ...................................................................................13
    §§ 600-601 ...................................................................................13

## OTHER AUTHORITIES

Bilton, N., *The Rise of 3-D Guns*, N.Y. Times, Aug. 13, 2014 ...............19

Brady Center Against Gun Violence, *The Truth About Kids & Guns*
    (2014)............................................................................................8

Bureau of Justice Statistics, *Criminal Victimization, 2013* (Sept.
    2014), http://www.bjs.gov/content/pub/pdf/cv13.pdf. ....................5

Campbell, J.C. et al., *Assessing Risk Factors for Intimate Partner Homicide*, 250 Nat'l Inst. J. 14 (2003) ........................................................7

Centers for Disease Control and Prevention, WISQARS Injury Mortality Reports, 1999-2012, http://webappa.cdc.gov/sasweb/ncipc/mortrate10_us.html ...................................................5, 7, 8, 10

Centers for Disease Control and Prevention, WISQARS Nonfatal Injury Reports, 2001-2013, http://webappa.cdc.gov/sasweb/ncipc/nfirates2001.html .......................................................5, 7, 10

Cook, P.J. & Ludwig, J., *Gun Violence: The Real Costs* (2000)..............................6

Cook, P.J. & Ludwig, J., *The Social Costs of Gun Ownership*, J. Pub. Econ. 379 (2005) ........................................................7

District of Columbia Department of Motor Vehicles, *Vehicle Inspection*, http://dmv.dc.gov/service/vehicle-inspection ............................13

FBI Uniform Crime Reports, *Murder by State, Types of Weapons* (2013), http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/table-22/table_22_aggravated_assault_by_state_types_of_weapons_2013.xls...............................................................................20

FBI Uniform Crime Reports, *Robbery by State, Types of Weapons* (2013), http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/table-21/table_21_robbery_by_state_types_of_weapons_2013.xls ...........................20

FBI Uniform Crime Reports, tbl. 27, http://www.fbi.gov/about-us/cjis/ucr/leoka/2012/tables/table_27_leos_fk_type_of_weapon_2003-2012.xls ........................................................6

FBI Uniform Crime Reports, tbl. 70, http://www.fbi.gov/about-us/cjis/ucr/leoka/2012/tables/table_70_leos_asltd_type_of_weapon_and_percent_injured_2003-2012.xls ..............................................6

Kellermann, A.L. et al., *Suicide in the Home in Relation to Gun Ownership*, 327 New Eng. J. Med. 467 (1992)..............................9

Miller, M. et al., *The Epidemiology of Case Fatality Rates for Suicide in the Northeast*, 43 Annals Emergency Med. 723 (2004)..............................9

Miller, M. et al., *Household Firearm Ownership and Suicide Rates in the United States*, 13 Epidemiology 517 (2002) ............................9

Morin, R., Pew Research Center, *The Demographics and Politics of Gun-Owning Households* (July 15, 2008), *available at* http://www.pewresearch.org/fact-tank/2014/07/15/the-demographics-and-politics-of-gun-owning-households/..............................12

Office of the State's Attorney, *Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School and 36 Yogananda Street, Newtown, Connecticut on December 14, 2012* (2013).....................................8

Richardson, E.G. & Hemenway, D., *Homicide, Suicide, and Unintentional Firearm Fatality: Comparing the United States with Other High-income Countries, 2003*, 70 Trauma 238 (2011)..............................................................................8

Schuster, M.A. et al., *Firearm Storage Patterns in US Homes with Children*, 90 Am. J. Pub. Health 588 (2000)....................................7

Siegel, M. et al., *The Relationship Between Gun Ownership and Firearm Homicide Rates in the United States, 1981–2010*, 103 Am. J. Pub. Health 2098 (2013) ..............................6

Tushnet, M.V., *Out of Range: Why the Constitution Can't End the Battle Over Guns* (2007)................................................16

U.S. Census Bureau, *State Population – Rank, Percent Change, and Population Density: 1980 to 2010*, http://www.census.gov/compendia/statab/2012/tables/12s0014.pdf...................................26

Vossekuil, B. et al., *The Final Report and Findings of the Safe School Initiative: Implications for the Prevention of School Attacks in the United States*, at 27 (2002), *available at* http://www.secretservice.gov/ntac/ssi_final_report.pdf. ...................................8

Wiebe, D.J., *Homicide and Suicide Risks Associated With Firearms in the Home: A National Case-Control Study*, 41 Annals Emergency Med. 771 (2003) .........................................................................9

Zimring, F.E. & Hawkins, G., *Crime is Not the Problem: Lethal Violence in America*, in *Crime, Inequality and the State* (Vogel, M.E. ed., 2007) ..............................................................................6

The World Bank, Population Density, http://data.worldbank.org/ indicator/EN.POP.DNST ...............................................................26

## INTEREST OF AMICI CURIAE

The Brady Center To Prevent Gun Violence ("Brady Center") is a nonprofit organization dedicated to reducing gun violence through education, research, and legal advocacy. Through its Legal Action Project, the Brady Center has filed numerous briefs amicus curiae in cases involving the constitutionality of firearms regulations, including in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), *District of Columbia v. Heller*, 554 U.S. 570 (2008), *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011), *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc), and *Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007).

The following nonprofit organizations also join in this brief: Arizonans for Gun Safety; Ceasefire Oregon; Colorado Ceasefire Capitol Fund; Delaware Coalition Against Gun Violence, Inc.; Educational Fund to Stop Gun Violence; Gun Violence Prevention Center of Utah; Illinois Council Against Handgun Violence; Law Center to Prevent Gun Violence; Maine Citizens Against Handgun Violence; Marylanders to Prevent Gun Violence; New Mexicans for Gun Safety; New Yorkers Against Gun Violence; Ohio Coalition Against Gun Violence; Protect Minnesota; States United to Prevent Gun Violence; Violence Policy Center; Wisconsin Anti-Violence Effort; and Women Against Gun Violence.

All amici focus on the problem of gun violence and its impact on the victims of gun violence and society at large, as set forth in more detail in the Appendix.

They therefore have a strong interest in ensuring that the Second Amendment does not stand as an obstacle to effective governmental action to prevent gun violence.

All parties have consented in writing to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29 and D.C. Circuit Rule 29, on September 3, 2014, the Brady Center filed a notice of intent to participate in this case as amicus curiae and represented to this Court that all parties had consented to the filing of this brief. On December 11, all amici joining in this brief filed an amended notice of intent to participate in this case as amici curiae and join in the Brady Center's amicus brief.

No counsel for a party authored this brief in whole or in part, and no person other than amici, their members, or their counsel made a monetary contribution to its preparation or submission.

## SUMMARY OF ARGUMENT

In applying intermediate scrutiny to the District's firearm regulations, *Heller v. District of Columbia*, 670 F.3d 1244, 1257 (D.C. Cir. 2011) ("*Heller II*"), this Court should take into account the unique risks to public safety associated with firearms. Firearms increase the risk of injury and death to those who possess guns, their families, neighbors, and the public at large. This threat sets the Second Amendment apart from the rights secured by other amendments to the Constitution, such as the rights to speak, assemble, practice religion, and vote. So does the fact that, whereas the right to speak "is a precondition to enlightened self-government and a necessary means to protect it," *Citizens United v. FEC*, 558 U.S. 310, 339 (2010), the Second Amendment right as recognized in *District of Columbia v. Heller*, 554 U.S. 570 (2008), protects a quintessentially private right: the right to self-defense in the home. Deferential review of firearms regulations is therefore warranted, especially where, as here, those regulations impose no significant burden on Second Amendment rights.

Most of Appellants' arguments are rooted in a misunderstanding of the judicial inquiry under intermediate scrutiny. Intermediate scrutiny requires only "some meaningful evidence" that firearm regulations "can reasonably be expected to promote" public safety. *Heller II*, 670 F.3d at 1259. It does not require double-blind studies or statistical analyses. Such a requirement would be irreconcilable

with the considerable latitude that the Supreme Court has accorded to legislatures in making predictive judgments about complex social problems. It would also endanger a wide array of reasonable firearm regulations and impede the development of new solutions in fighting crime and promoting public safety.

Against this backdrop, the record compiled in the district court establishes that the District's firearm regulations satisfy intermediate scrutiny. As that record demonstrates, local registration can add accuracy and reliability to the background checks run under the National Instant Background Check System ("NICS"), and can address gaps in coverage of federal laws. Registration can advance public safety when applied to long guns, not just handguns. Long guns are attractive to would-be assassins and have been used in several horrific mass shootings. Finally, the District's qualified limitations on registering multiple pistols only tangentially implicate the Second Amendment. The Second Amendment protects the right to self-defense in the home, not an interest in rapidly stockpiling an arsenal. In any event, expert testimony confirms that the District's 30-day rule is an effective tool in investigating and dismantling gun trafficking. That more than suffices under intermediate scrutiny.

# ARGUMENT

## I. REASONABLE FIREARMS REGULATIONS THAT DO NOT SUBSTANTIALLY BURDEN THE RIGHT OF SELF-DEFENSE DO NOT VIOLATE THE SECOND AMENDMENT

### A. The Exercise Of Second Amendment Rights Raises Public Safety Concerns Not Implicated By Other Constitutional Rights

The right to keep and bear arms protected by the Second Amendment is unique among the rights safeguarded in the Constitution. Whereas the exercise of the right to free speech, to worship, or to vote generally does not create a risk of physical harm or death, the possession of firearms, even for the legitimate purpose of self-defense, can. A handgun or rifle kept in the home for self-defense can be stolen by criminals, turned against a partner in a domestic dispute, fired accidentally by a child, used to end the life of a depressed individual, or aimed at innocent people.

Each year, guns are used to kill more than 30,000 people and to injure 80,000 more nationwide.[1] Last year, Americans reported more than 290,000 incidents of nonfatal crimes involving firearms.[2] Law enforcement officers

---

[1] Centers for Disease Control and Prevention ("CDC"), WISQARS Nonfatal Injury Reports, 2001-2013, http://webappa.cdc.gov/sasweb/ncipc/nfirates2001.html ("CDC Nonfatal") (query for "All Intents" and "Firearm" and "2013"); CDC, WISQARS Injury Mortality Reports, 1999-2012, http://webappa.cdc.gov/sasweb/ncipc/mortrate10_us.html ("CDC Fatal") (query for "All Intents" and "Firearm" and "2012").

[2] Bureau of Justice Statistics, *Criminal Victimization, 2013*, at 3 tbl. 2 (Sept. 2014), http://www.bjs.gov/content/pub/pdf/cv13.pdf.

suffered more than 20,000 firearm assaults and 493 fatalities between 2003 and

2012.[3] All told, the costs of gun violence to American society—including medical

costs, lost earnings, pain, disability, and the costs of lost life—approach $100

billion annually.[4]

       1.    Firearms pose substantial risks to public safety.  Researchers have

pointed to significant correlations between rates of firearms ownership and rates of

criminal violence.  The homicide rate in the United States, where firearms are more

readily available than in other Western democracies, is several times greater than

in those countries, even though the overall crime rate is comparable.[5]  Within the

United States, moreover, the level of firearms ownership in a state is a significant

predictor of its firearm homicide rate, even after adjusting for socioeconomic

factors such as age, gender, income, unemployment, and crime rate.[6]  As one pair

of researchers explains, "an increase in gun prevalence causes an *intensification* of

---

[3]    FBI Uniform Crime Reports, tbl. 70 ("Law Enforcement Officers Assaulted, Type of Weapon and Percent Injured, 2003-2012"), http://www.fbi.gov/about-us/ cjis/ucr/leoka/2012/tables/table_70_leos_asltd_type_of_weapon_and_percent_ injured_2003-2012.xls; *id.* at tbl. 27 ("Law Enforcement Officers Feloniously Killed, Type of Weapon, 2003-2012"), http://www.fbi.gov/about-us/cjis/ucr/leoka/2012/tables/table_27_leos_fk_type_of_weapon_2003-2012.xls.

[4]    *See* Cook, P.J. & Ludwig, J., *Gun Violence: The Real Costs* 117 (2000).

[5]    Zimring, F.E. & Hawkins, G., *Crime is Not the Problem: Lethal Violence in America*, in *Crime, Inequality and the State* 125, 126-127 & fig. 6.1 (Vogel, M.E. ed., 2007).

[6]    Siegel, M. et al., *The Relationship Between Gun Ownership and Firearm Homicide Rates in the United States, 1981–2010*, 103 Am. J. Pub. Health 2098, 2099 (2013).

criminal violence—a shift toward greater lethality, and hence greater harm to the community."[7]

The presence of firearms also increases the homicide risk for women suffering from domestic abuse, making "[f]irearms and domestic strife … a potentially deadly combination nationwide." *United States v. Hayes*, 555 U.S. 415, 427 (2009). In 2012, 1,825 women were murdered with guns and 5,090 women were treated in emergency rooms for assault-related gunshot wounds.[8] Abused women living in homes with firearms are six times more likely to be killed than other abused women.[9]

Guns in the home—often improperly stored[10]—are also frequently involved in unintentional shootings. In 2012, there were 548 unintentional gun deaths and 17,362 unintentional gun injuries in the United States.[11] The unintentional firearm-

---

[7] Cook, P.J. & Ludwig, J., *The Social Costs of Gun Ownership*, 90 J. Pub. Econ. 379, 387 (2005).

[8] CDC Fatal (query for "Homicide" and "Firearm" and "Females" and "2012"); CDC Nonfatal (query for "Assault – All" and "Firearm" and "Females" and "2012").

[9] Campbell, J.C. et al., *Assessing Risk Factors for Intimate Partner Homicide*, 250 Nat'l Inst. Just. J. 14, 15, 16 (2003).

[10] According to one study, more than forty percent of gun-owning households with children store their guns unlocked. Schuster, M.A. et al., *Firearm Storage Patterns in US Homes with Children*, 90 Am. J. Pub. Health 588, 590 (2000).

[11] CDC Fatal (query for "Unintentional" and "Firearm" and "2012"); CDC Nonfatal (query for "Unintentional" and "Firearm" and "2012").

related death rate for children is several times higher in the United States than in 22 other populous high-income countries combined.[12]

Guns in the home also provide a source of firearms used in school shootings.[13]  A 2002 study by the U.S. Secret Service and U.S. Department of Education found that 68 percent of the attackers in school shooting incidents had acquired the guns from their own home or that of a relative.[14]  The December 2012 Sandy Hook massacre is illustrative:  All of the firearms Adam Lanza used to kill twenty first-grade students, six school employees, his mother, and himself had been acquired by Lanza's mother and were stored in the home in which Lanza and his mother resided.[15]

Finally, guns increase the risk of death from suicide.  In 2012 alone, 20,666 people committed suicide using firearms,[16] far more than by any other

---

[12]    Richardson, E.G. & Hemenway, D., *Homicide, Suicide, and Unintentional Firearm Fatality:  Comparing the United States with Other High-income Countries, 2003*, 70 J. Trauma 238, 241 tbl. 3 (2011).

[13]    Brady Center Against Gun Violence, *The Truth About Kids & Guns*, at 17 (2014) (citing studies).

[14]    Vossekuil, B. et al., *The Final Report and Findings of the Safe School Initiative: Implications for the Prevention of School Attacks in the United States*, at 27 (2002), *available at* http://www.secretservice.gov/ntac/ssi_final_report.pdf.

[15]    Office of the State's Attorney, *Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School and 36 Yogananda Street, Newtown, Connecticut on December 14, 2012*, at 2 (2013).

[16]    CDC Fatal (query for "Suicide" and "Firearm" and "2012").

method.[17]  People who attempt suicide with firearms are also more likely to succeed in killing themselves, with one study estimating a fatality rate of over 90 percent for suicide attempts involving firearms.[18]  The risk of suicide is three to five times higher in homes with firearms.[19]

2.    The unique risks posed by unregulated gun ownership counsel against a wholesale importation of First Amendment doctrine, especially its more vigorous forms of scrutiny.  This Court has already held that "intermediate scrutiny"—not strict scrutiny—"is the more appropriate standard for review of gun registration laws" at issue in this case.  *Heller II*, 670 F.3d at 1257.  In applying that framework, this Court should take account of the fact that the public safety risks posed by unregulated gun ownership find no counterpart in the First Amendment context.  Acquiring a private library or even advocating the most offensive viewpoints[20] usually does not pose a threat to public safety.  But acquiring a

---

[17]    Miller, M. et al., *Household Firearm Ownership and Suicide Rates in the United States*, 13 Epidemiology 517, 522 (2002).

[18]    Miller, M. et al., *The Epidemiology of Case Fatality Rates for Suicide in the Northeast*, 43 Annals Emergency Med. 723, 723-724 (2004).

[19]    Kellermann, A.L. et al., *Suicide in the Home in Relation to Gun Ownership*, 327 New Eng. J. Med. 467, 467 (1992); Wiebe, D.J., *Homicide and Suicide Risks Associated With Firearms in the Home: A National Case-Control Study*, 41 Annals Emergency Med. 771, 771 (2003).

[20]    *See Texas v. Johnson*, 491 U.S. 397 (1989) (flag burning); *Snyder v. Phelps*, 562 U.S. 443 (2011) (funeral protests by Westboro Baptist Church); *National Socialist Party of America v. Skokie*, 432 U.S. 43 (1977) (per curiam) (Nazi parades).

private arsenal—with all the risk of diversion, misuse, and accidental discharge that inheres in that activity, *see supra* pp. 5-9—raises serious public safety concerns.  The fact that approximately one million Americans have been wounded or killed by gunfire in the last decade alone[21] sets the right to keep and bear arms apart from First Amendment rights.

Even in the First Amendment context, in those circumstances where speech does create a risk to public safety, the Supreme Court has upheld regulations designed to mitigate those risks.  The Court has thus upheld regulations on speech to further the government's interests in "'protecting its citizens from unwelcome noise,'"[22] "avoiding congestion and maintaining [] orderly movement,"[23] maintaining public parks "in an attractive and intact condition,"[24] preventing "secondary effects" of particular kinds of speech, and "'preserv[ing] the quality of urban life.'"[25]  And the Court has long held that incitement,[26] speech integral to

---

[21]   CDC Nonfatal (query for "All Intents" and "Firearm" and "2003-2012" shows 715,502 nonfatal injuries); CDC Fatal (query for "All Intents" and "Firearm" and "2003-2012" shows 313,045 deaths).

[22]   *Ward v. Rock Against Racism*, 491 U.S. 781, 796 (1989).

[23]   *Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 652 (1981).

[24]   *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 296 (1984).

[25]   *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 50 (1986).

[26]   *Brandenburg v. Ohio*, 395 U.S. 444, 447-449 (1969) (per curiam).

criminal conduct,[27] and "fighting words"[28] lie categorically outside the First Amendment. *See United States v. Stevens*, 559 U.S. 460, 468-472 (2010). If the prospect that speech could "[i]ncite or produc[e] imminent lawless action" is sufficient to place that speech entirely outside the scope of the First Amendment, *Brandenburg*, 395 U.S. at 447, then the immense loss of life that routinely results from gun violence surely justifies a deferential form of intermediate scrutiny of laws designed to prevent that loss of life from occurring.

3.     The different functions of the rights created by the First and Second Amendments also counsel against wholesale importation of free speech doctrine into the context of firearms regulations. Speech is "an essential mechanism of democracy, for it is the means to hold officials accountable to the people." *Citizens United*, 558 U.S. at 339. Its exercise is "a precondition to enlightened self-government and a necessary means to protect it." *Id.* Yet, freedom of expression is also "delicate and vulnerable," in that "[t]he threat of sanctions may deter [its] exercise almost as potently as the actual application of sanctions." *NAACP v. Button*, 371 U.S. 415, 433 (1963). For these reasons, the Supreme Court has long recognized that "First Amendment freedoms need breathing space to survive." *Id.*

---

[27]     *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949).

[28]     *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-572 (1942).

The Second Amendment right recognized in *Heller*, in contrast, protects a quintessentially *private* interest: "the right of law-abiding citizens to use arms in defense of hearth and home." 554 U.S. at 635. Regulating gun ownership does nothing to undermine the democratic process or the marketplace of ideas. Nor is there reason to believe that reasonable regulation might "chill" citizens' exercise of their Second Amendment rights. There is no evidence that reasonable regulation of gun rights has in any way impeded gun ownership in the United States, where currently an estimated one-third of households contain a handgun, rifle, or pistol.[29]

### B. The District's Firearm Regulations Do Not Impose Significant Burdens On Plaintiffs' Second Amendment Rights

A deferential form of intermediate scrutiny is particularly appropriate in this case because the District's firearm regulations do not impose significant burdens on Plaintiffs' ability to "acquire and keep a firearm … for the purpose of self-defense in the home." *Heller II*, 670 F.3d at 1255. In *Heller II*, this Court held that "basic registration requirements are self-evidently de minimis, for they are similar to other common registration or licensing schemes, such as those for voting or for driving a car, that cannot reasonably be considered onerous." *Id.* at 1254-1255 (citing *Rosario v. Rockefeller*, 410 U.S. 752, 754-758 (1973) (upholding voting registration)); *see also Justice v. Town of Cicero*, 577 F.3d 768, 773-774

---

[29]    Morin, R., Pew Research Center, *The Demographics and Politics of Gun-Owning Households* (July 15, 2008), *available at* http://www.pewresearch.org/fact-tank/2014/07/15/the-demographics-and-politics-of-gun-owning-households/.

(7th Cir. 2009) ("requiring the registration of all firearms … appears to be consistent with the ruling in *Heller*").

*Heller II* thus sets the yardstick to decide whether a firearm registration requirement can be "reasonably considered onerous"—and thus subject to scrutiny—by reference to the de minimis burdens of "common registration … schemes, such as those for voting or for driving a car."  670 F.3d at 1254-1255. The District's in-person appearance, photographing, re-registration and knowledge-testing requirements for firearm registration are similar in kind to the Department of Motor Vehicles' ("DMV") procedures for obtaining a driver's license.[30]  Similarly, maintaining a vehicle registration generally requires emissions inspection by District personnel[31]—similar to the requirement of presenting a firearm to the Metropolitan Police Department ("MPD") at the time of registration.  And although fingerprinting is not required to obtain a driver's license or register a vehicle, that step adds at most minimal inconvenience—but no real burden—to someone who is already at the MPD to register a firearm.

The District's one-pistol-per-30-days rule also imposes no substantial burden on Second Amendment rights.  *Heller* recognized a right of law-abiding

---

[30]     *See* D.C. Code § 50-1401.01; D.C. Mun. Regs. tit. 18, §§ 100-111.  The five-hour training and instruction requirement in force when *Heller II* was decided has since been replaced with a much less burdensome one-hour class.  JA973-974.

[31]     D.C. Code § 50-1101; D.C. Mun. Regs. tit. 18, §§ 600-601; District of Columbia Department of Motor Vehicles, *Vehicle Inspection*, http://dmv.dc.gov/service/vehicle-inspection.

citizens to "acquire and keep *a* firearm … *for the purpose of self-defense* in the home." *Heller II*, 670 F.3d at 1255-1256 (emphasis added). *Heller* did not create a right to rapidly "assembl[e] a personal arsenal," JA984—which is not needed for self-defense and could only serve to endanger the public and law enforcement.[32] Thus, while the 30-day rule may frustrate the plans of those intent on rapidly stockpiling an arsenal, it does not impinge on the right to self-defense actually recognized in *Heller*.[33]

## II. LEGISLATURES HAVE LATITUDE TO REGULATE THE USE AND POSSESSION OF FIREARMS AS LONG AS SUCH REGULATIONS REASONABLY ADVANCE AN IMPORTANT GOVERNMENT INTEREST

Contrary to the suggestion of Plaintiffs (at 12, 20-22) and their amici, intermediate scrutiny does not require the District to produce empirical proof of a law's effectiveness for it to withstand constitutional challenge. Such a requirement would prevent the enactment of innovative legislation merely because it might touch on constitutional rights. Neither this Court nor the Supreme Court has ever found intermediate scrutiny to impose such a legislative straightjacket. Instead, as this Court held in *Heller II*, the District need only present "some meaningful

---

[32] In any event, the District does not limit the number of pistols that an individual may register, and new D.C. residents may grandfather in pistols they already own at the time they move to the District. D.C. Code § 7-2502.03(e).

[33] Plaintiffs also challenge (at 14, 51) the administrative fees applicable to registrants. But this Court has already rejected that challenge in *Heller II*. 670 F.3d at 1249 n.* (fee "lawful insofar as the underlying regime is lawful and hence enforceable."); *see also* JA984-985.

evidence" that its firearms registration requirements "can reasonably be expected to promote" an important government interest. 670 F.3d at 1259. As discussed in Part III below, the District has fulfilled its burden, for it has come forward with evidence supporting the Council's reasonable judgment that its firearms registration laws will advance its compelling interest in public safety.

Although the legislature's judgment in this case is in fact backed by substantial evidence, this Court should not adopt Plaintiffs' constrained view of the evidence required to support a law under intermediate scrutiny. The District of Columbia explains (at 26-30) why Plaintiffs' argument (Appellants' Br. 12) that intermediate scrutiny requires that the legislature's judgment be backed conclusively by "studies or data" is inconsistent with decisions of the Supreme Court and this Court. This Court's recent decision in *Schrader v. Holder*, 704 F.3d 980 (D.C. Cir.), *cert. denied*, 134 S. Ct. 512 (2013)—which rejected a facial challenge to a law that barred common-law misdemeanants from owning arms—is particularly instructive. *Id.* at 990. Applying intermediate scrutiny, the Court relied on common-sense logic and the holdings of other courts, reasoning that "individuals with prior criminal convictions for felonies or other domestic violence misdemeanors … pose a heightened risk of future armed violence." *Id.* This Court did not demand empirical evidence backed by "studies or data" (Appellants' Br.

12) that common-law misdemeanants *are in fact* more likely than the population at large to abuse firearms, as Plaintiffs would require.

Plaintiffs' proposed empirical data requirement would put at risk a wide array of reasonable gun regulations. Given the complex and diverse factors that influence the incidence of gun violence, gun-related accidents, and suicide, it is often exceptionally difficult, if not impossible, to design and execute studies that isolate the impact of particular gun regulations on public safety.[34] So-called hard data would be even harder to come by in the case of regulations that seek to increase public safety by mandating new safety technologies or that reflect innovative approaches to crime-solving. The requirement that serial numbers be imprinted on weapons has undoubtedly led to public safety gains by giving law enforcement an enhanced tool to solve crimes, yet it would have been impossible to conclusively show these public safety gains by hard data prior to the roll-out of the first imprinted gun. *See City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 439-440 (2002) (plurality op.) ("A municipality considering an innovative solution may not have data that could demonstrate the efficacy of its proposal because the solution would, by definition, not have been implemented previously.").

---

[34]    *See* Tushnet, M.V., *Out of Range: Why the Constitution Can't End the Battle Over Guns* 77-85 (2007) (discussing the difficulties of assembling empirical evidence of the efficacy of gun regulations).

Nor does the mere fact that a given firearms law may not be commonplace, or is a so-called "outlier," doom it under intermediate scrutiny. *See* Appellants' Br. 34-36; Pink Pistols Br. 16-17. In so arguing, Plaintiffs effectively seek to impose a "history-and-tradition" test, *Heller II*, 670 F.3d at 1291 (Kavanaugh, J., dissenting), that this Court correctly rejected in *Heller II*. *Id.* at 1266 (rejecting the dissent's view that "a regulation must be longstanding or 'rooted in text, history, and tradition' in order to be constitutional"). The Supreme Court also rejected the notion that gun laws must be uniform to be constitutional, recognizing "that conditions and problems differ from locality to locality and that citizens in different jurisdictions have divergent views on the issue of gun control." *McDonald v. City of Chicago*, 561 U.S. 742, 783 (2010) (plurality op.); *see also Heller*, 554 U.S. at 605 (legislatures retain "a variety of tools for combatting" the "problem of handgun violence"). The District of Columbia, an entirely urban jurisdiction that is the seat of the federal government as well as home to thousands of diplomats, is clearly set apart from other jurisdictions. And as Justice Brandeis famously articulated, one of the great values of our federal system of government is "that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting).

Moreover, as this Court has recognized, deference to reasonable legislative judgments is particularly appropriate where public safety and firearms are concerned, *Schrader*, 704 F.3d at 990, given the myriad and complex factors that affect social problems such as crime. This approach is consistent with the Supreme Court's practice of affording legislatures ample room to address complex problems of public policy. *See Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 196 (1997) ("*Turner II*") ("This principle [of deference] has *special significance* in cases, like this one, involving congressional judgments concerning regulatory schemes of inherent complexity and assessments about the likely interaction of industries[.]" (emphasis added)); *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 103 (1973) ("[W]hen we face a complex problem with many hard questions and few easy answers we do well to pay careful attention to how the other branches of Government have addressed the same problem."). Determining the interaction between gun regulations and public safety is surely at least as complex as the task of regulating the broadcasting industry that was at issue in *Turner II* and *Columbia Broadcasting*.

Evaluating the impact of gun policies on public safety necessarily involves predictive judgments in areas of considerable uncertainty. Consider, for example, newly emerging "3-D" printer technology. This technology may enable felons, children, or other unqualified individuals to manufacture homemade weapons,

permit the creation of plastic weapons that cannot be seen in a metal detector, or render weapons untraceable when used in crime.[35]  The legislature is uniquely well suited to make a policy judgment as to whether such technologies should be regulated or banned *before* they develop into a serious public safety problem.

Plaintiffs and their amici criticize the district court's formulation of this concept as "double deference," *see, e.g.*, Appellants' Br. 23-24; NRA Br. 25-28, but, in fact, the district court faithfully applied this Court's and the Supreme Court's precedents.  As this Court made clear in *Schrader* (and consistent with *Turner II*), "in the context of firearm regulation, the legislature is far better equipped than the judiciary to make sensitive policy judgments (within constitutional limits)."  704 F.3d at 990.[36]  In its thorough review of the record, the district court did nothing more than apply this standard.

## III.  THE DISTRICT COURT CORRECTLY FOUND THAT THE DISTRICT'S LEGISLATIVE JUDGMENT WAS REASONABLE AND SUPPORTED BY AMPLE EVIDENCE

The evidence in the record establishes that the District's firearms regulations are an appropriate response to the threat posed by gun violence.  As the district court correctly observed, the District has a long and unfortunate history of gun

---

[35]     *See* Bilton, N., *The Rise of 3-D Guns*, N.Y. Times, Aug. 13, 2014.

[36]     Plaintiffs attempt (at 24) to distinguish *Schrader* because it did not involve "law-abiding citizens."  But *Schrader* assumed that common-law misdemeanants "fall within the scope of" the protections of the Second Amendment.  704 F.3d at 986.

violence.  JA942.  Even today, despite significant improvements in recent years, the District suffers from the nation's highest rate of firearm robberies and second-highest rate of firearm assaults.[37]  Nor is gun violence merely a function of street crime.  The recent Washington Navy Yard massacre—where twelve people were shot to death by a Navy contractor who had lawful access to the Yard's premises— serves as a reminder that gun violence in the District (as elsewhere) is a complex social problem that defies easy categorizations.

The District enacted the current firearms regulations in response to the Supreme Court's decision in *Heller*.  *See* D.C. Law 17-372 (2008); 56 D.C. Reg. 3438 (May 1, 2009); D.C. Law 19-170 (2012); 59 D.C. Reg. 5691 (May 25, 2012). That legislative process was extensive, and took account of the fact that *Heller* recognized a right to self-defense within the home.  *See* JA159 (Council of the District of Columbia Committee on the Judiciary, *Report on Bill 19-614, Firearms Amendment Act of 2012* ("2012 Report")).  As a result, the District today bans assault weapons and large-capacity magazines (measures this Court upheld in *Heller II*), while imposing registration requirements for handguns and long guns.

---

[37]     FBI Uniform Crime Reports, *Robbery by State, Types of Weapons* (2013), http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/table-21/table_21_robbery_by_state_types_of_weapons_2013.xls (0.239% (1,545/646,449) per capita rate); FBI Uniform Crime Reports, *Murder by State, Types of Weapons* (2013), http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/table-22/table_22_aggravated_assault _by_state_types_of_weapons_2013.xls (0.133% (858/646,449) per capita rate).

This measured framework safeguards both the District's residents and their constitutional rights.

Plaintiffs nonetheless seek to set aside the District's registration system by challenging the expert testimony offered by the District in the trial court and these measures' efficacy. If accepted, Plaintiffs' theories would severely limit the ability of elected officials to enact reasonable regulations intended to protect public safety.

## A. The District's Law Enforcement Officials—And Law Enforcement Officials In General—Are Uniquely Qualified To Opine On The Impact Of Firearms Laws On Public Safety

The district court correctly rejected Plaintiffs' attempt to discard the expert testimony of the District's law enforcement witnesses. In defending the constitutionality of its registration system, the District relied, among other evidence, on the expert testimony of three law enforcement experts with more than 70 years of combined experience: (1) Cathy L. Lanier, who has served as the MPD's Chief of Police since 2007, JA388; (2) Mark Jones, a Senior Law Enforcement Advisor at the University of Chicago's Crime Lab who previously served as an ATF agent and as a Regional Firearms Advisor to several Central American countries, JA343-344; and (3) Joseph Vince, a former Chief of ATF's Firearms Enforcement Division and Crime Gun Analysis Branch who now heads

the Criminal Justice Program at Mount St. Mary's University in Maryland, JA399-400.[38]

These officials' cumulative experience includes decades devoted to fighting gun violence in the District itself. Chief Lanier has spent her "entire law enforcement career" in the MPD. JA388. Former ATF agent Jones was assigned to the District of Columbia for more than seven years; for part of this period, he served as a supervisor of the ATF group investigating firearms trafficking in the Washington, D.C. Field Division. JA344. Both Chief Lanier and former ATF agent Vince, moreover, were among the witnesses who provided testimony in the legislative hearings that led to the enactment of the District's current firearms regulations. JA188-193, 222-229.

In the district court, the District's law enforcement experts testified to issues central to their professional experience. For example, Chief Lanier explained that the District's firearm registration system would help keep firearms out of the hands of individuals with a history of mental illness. JA392. That concern is particularly serious in a city where the mentally ill have repeatedly made attempts on the life of the President. *Id.* (citing 2011 incident involving shots fired at the White House and John Hinckley's 1981 attempt to assassinate President Reagan); *see also*

---

[38] The District also offered testimony from Daniel Webster, a leading academic expert on gun-related violence and the Director of the Johns Hopkins Center for Gun Policy and Research. JA194-196.

JA391 ("[T]he District offers no shortage of high-profile human targets, including the President, members of Congress, … Supreme Court justices," as well as "approximately 3,000 foreign dignitaries").  Similarly, as a firearm expert, Jones was qualified to testify that long guns pose "a distinct type of threat within the confines of the Nation's capital" because their long range of fire "greatly increase[s] the risk of a 'stand off' assassination attempt against political and government leaders."  JA348; *see also* JA404 ("History has shown that high-powered rifles are the preferred tool of political assassins" (Vince Decl.)).  Having served as an advisor on gun trafficking, Jones was also well-placed to explain that in-person registration "prevent[s] the diversion of firearms from legitimate to illegal purposes."  JA351.  So was Vince, who has represented the United States internationally on issues of firearms trafficking.  JA400; JA405-406 (explaining that in-person registration is a "final line of defense … for insuring responsible citizens' rights to possess and use a firearm while denying prohibited persons an inherently dangerous product").

Despite those experts' "impressive credentials," JA 946-948, Plaintiffs would have this Court disregard their testimony because it is not based on "statistical analysis" and "research design."  Appellants' Br. 63.  But both the Supreme Court and this Court have rejected attempts to limit the government to empirical studies in justifying its laws under intermediate scrutiny.  *See, e.g.*,

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001); *National Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 15 (D.C. Cir. 2009) (rejecting argument that even strict scrutiny requires "studies, statistics, or empirical evidence"). Nor does Plaintiffs' theory find support in the Federal Rules of Evidence, which plainly permit expert testimony based on the professional "experience," including the professional experience of law enforcement officers. Fed. R. Evid. 702; *see also* Fed. R. Evid. 702 advisory committee's note (2000) ("Nothing in this amendment is intended to suggest that experience alone … may not provide a sufficient foundation for expert testimony."); *United States v. Spriggs*, 996 F.2d 320, 325 (D.C. Cir. 1993) (upholding admission of detective's expert opinion on drug trafficking because he had "extensive experience in dealing with heavy drug users and … ha[d] observed their patterns of behavior").

**B.    The District's Firearm Regulations Are Substantially Related To Its Interests In Promoting Public Safety**

The record compiled in the district court confirms that each of the firearm regulations at issue is substantially related to the District's interests in promoting public safety and protecting police officers.

*1.    Long-Gun Registration*

The record establishes "a substantial relationship" between the registration of long guns and public safety. *Schrader*, 704 F.3d at 990. Registration schemes advance public safety in at least three respects. First, as Chief Lanier, Jones, and

Vince each testified, they help keep weapons out of the hands of criminals and others who pose an unacceptable safety risk, such as the mentally ill. JA392 (Lanier); JA346-347 (Jones); JA402 (Vince). Second, they make it possible for law enforcement to know when a gun owner subsequently becomes ineligible to possess a firearm—for example, because of an intervening conviction. JA351 (Jones); JA395 (Lanier); JA402 (Vince). Finally, the information obtained during the registration process assists law enforcement in investigating and dismantling gun trafficking by facilitating the tracing of guns used in crime. JA347 (Jones), JA395-396 (Lanier), JA402 (Vince).

Empirical research confirms the wisdom of gun registration schemes. Dr. Webster, one of the District's expert witnesses, testified about a study he conducted to analyze the impact of Missouri's repeal of its firearm registration law in 2007. JA417-420. He found that Missouri's repeal led to a marked increase in both illegal gun trafficking, JA417-418, and homicide rates, JA418-419, in the state. Dr. Webster also reported that gun trace data show that states that require firearm registration have fewer locally sold firearms used in crime. JA420. And he testified that "[d]iscretionary [permit-to-purchase] licensing was independently associated with lower levels of diversion of guns sold by in-state dealers." *Id.* Plaintiffs try to cast doubt (at 32-33) on Dr. Webster's methodological choices, but such disagreements are not a valid basis to constrain the District's "wide discretion

to pass legislation in areas where there is … scientific uncertainty." *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007).

Registration is just as important for long guns as it is for other firearms. Plaintiffs' own expert concedes that long guns are "more lethal" than handguns and should be regulated in the same way. JA455. Moreover, as already noted, long guns pose an exceptionally serious threat in the District, where would-be assassins might view these long-range firearms as ideal for "stand-off" attacks. *See supra* pp. 23-24.[39] This unique risk distinguishes the District of Columbia from the Canadian example invoked by Plaintiffs. Appellants' Br. 34-35. So does the fact that the District's population density exceeds 9,000 people per square mile[40] whereas Canada's does not reach 11.[41]

---

[39]     Plaintiffs brush aside (at 34) some high-profile crimes perpetrated in the District using long guns on the ground they involved residents of other states. But the fact that the District cannot legislate extraterritorially surely does not mean that the District is not permitted to alleviate the threat of gun violence by requiring *its* residents to register their firearms.

[40]     *See* U.S. Census Bureau, *State Population – Rank, Percent Change, and Population Density: 1980 to 2010*, http://www.census.gov/compendia/ statab/2012/tables/12s0014.pdf (2010 data).

[41]     The World Bank, Population Density, http://data.worldbank.org/ indicator/EN.POP.DNST (showing Canada's density of 4 people per square kilometer, or approximately 10.4 people per square mile).

2. *Requirements For In-Person Appearance, Photographing, Fingerprinting, Bringing The Firearm To The MPD, And Re-Registration*

Each aspect of the registration process challenged by Plaintiffs—in-person appearance, photographing and fingerprinting, presenting the firearm to the MPD, and re-registration—substantially advances the District's legitimate objective of keeping registered guns out of the hands of individuals who are ineligible to own them. The District's system works in three steps: (1) it verifies the identity of the would-be firearm owner; (2) it runs a background check to ensure that the registrant is eligible to own the firearm; and (3) it ties the firearm to the registrant. As the District's law enforcement experts explained, in-person appearance, photographing, and fingerprinting all serve the same objective: preventing fraud by would-be registrants and maintaining the integrity of the registry. JA350-351 (Jones); JA392-393 (Lanier); JA405-406 (Vince); *see also* JA415 (Webster); JA242-243 (GAO, Firearms Purchased from Federal Firearms Licensees Using Bogus Identification, at 2-3 (Mar. 2001)). Against this backdrop, Plaintiffs' quibbling about the extent of fraud among would-be registrants of firearms falls short: the D.C. Council "is under no obligation to wait until the entire harm," i.e., widespread fraud, "occurs"; it "may act to prevent it." *Turner II*, 520 U.S. at 212.

There is also no merit to Plaintiffs' contention that the background checks gun dealers run through the NICS at the time of purchase render the District's

registration system redundant. Federal law does not require background checks for transfers by unlicensed sellers—a significant loophole in the federal system. *See* JA972; JA124 (2012 Report at 3). NICS background checks are also more easily circumvented by would-be criminals with fake identifications, because NICS does not rely on fingerprinting. *See* JA125; JA242-243. Even absent outright fraud, NICS checks can be less reliable, because they do not necessarily reflect all local-level information about the applicant's criminal and mental health history. JA392-393. Finally, federal law does not require gun owners to notify police when their firearms have been lost or stolen. This is no trivial matter. As former ATF agent Jones testified, "a requirement to report the loss/theft/transfer of registered firearms is an important step in reducing firearms trafficking because it eliminates the most common excuses (loss and theft) offered by erstwhile gun owners whose weapons have been recovered by the police." JA353.

Nor is there merit to Plaintiffs' claim (at 43) that the District's system is not narrowly tailored because criminals are unlikely to register their firearms. Under intermediate scrutiny, "'the fit between the challenged regulation and the asserted objective [need only] be reasonable, not perfect.'" *Schrader*, 704 F.3d at 990. The District's registration requirement will surely prevent *some* wrongdoers from obtaining guns. In any event, the registration system *does* make it riskier for *all*

criminals to own a gun, for it adds a readily chargeable offense for those who are caught with an unregistered firearm.

### 3. One-Pistol-Per-Month Rule

Because the Second Amendment does not create a right to amass a private arsenal overnight, the District's one-pistol-per-month rule does not implicate Plaintiffs' constitutional rights. *See supra* p. 14. In any event, ample evidence shows that the District's rule is reasonable.

Limiting bulk registration of pistols promotes public safety in at least two respects. *First*, multiple firearms purchases are linked to illegal gun trafficking. The legislative record before the D.C. Council noted two studies confirming that firearms purchased in bulk transactions are more likely to be used in crime. JA173 (2012 Report at 15). It also cited an assessment of Virginia's comparable one-handgun-per-month limit, which "reduced by 66% the odds that a crime gun was purchased in Virginia rather than elsewhere in the Southeast." JA 976-977 (citing Weil, D. & Knox, R., *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275 J. Am. Med. Ass'n 1759, 1760 (1996)). Consistent with this empirical evidence, each of the District's law enforcement experts testified

below that limitations on bulk transactions of pistols are an effective tool to disrupt gun trafficking. JA350 (Jones), JA395-396 (Lanier), JA404-405 (Vince).[42]

Plaintiffs try to brush all this evidence aside because, they claim, an "aspiring gun trafficker" is unlikely to register his firearms with the MPD in the first place. Appellants' Br. 54-55. But "this critique … is practically an argument *for* the restriction in question," as the district court observed: Precisely *because* the District's 30-day rule prevents traffickers from registering their pistols in bulk, it assures that, when these traffickers are caught with their unregistered pistols, they can be prosecuted. JA979. The registration requirement and 30-day rule thus work in tandem to ensure that illegal gun traffickers can be effectively prosecuted.

*Second*, an individual's rapid accumulation of an armory escalates the risk that the guns will be stolen or misused. As former ATF agent Jones testified, "the single greatest risk factor for being murdered with a firearm, committing suicide with a firearm, or being injured by unintentional discharge of a firearm, is the easy availability of a firearm." JA349. Thus the "most effective method" for combating this public safety threat "is to limit the number of firearms present in a home." *Id.* This alone suffices under intermediate scrutiny, for the Second Amendment "protects the right to keep and bear arms … for lawful purposes, most

---

[42] The District also appropriately tailored its one-pistol-per-month limit by, for example, allowing new residents owning multiple pistols to grandfather all of them in when they move to the District. *See supra* p. 14 n.32.

notably for self-defense within the home," *McDonald*, 561 U.S. at 780; it does not create a right to stockpile unlimited numbers of firearms for *any* purpose.

## CONCLUSION

The judgment of the district court should be affirmed.

Dated: December 12, 2014

JONATHAN E. LOWY
BRADY CENTER TO PREVENT GUN
   VIOLENCE
LEGAL ACTION PROJECT
840 First Street, N.E., Suite 400
Washington, D.C. 20002
(202) 370-8101

Respectfully submitted,

/s/ Paul R.Q. Wolfson
PAUL R.Q. WOLFSON
  *Counsel of Record*
LAURA MORANCHEK HUSSAIN
FRANCESCO VALENTINI
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 663-6000
paul.wolfson@wilmerhale.com

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I hereby certify as follows:

1.　This brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 32(a)(7)(B) and 29(d) because it contains 6,957 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.　This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6) and Circuit Rule 32(b) because this brief has been prepared using the Microsoft Word 2010 and Times New Roman 14-point font.

Dated: December 12, 2014

Respectfully submitted,

/s/ Paul R.Q. Wolfson

PAUL R.Q. WOLFSON
WILMER CUTLER PICKERING
　HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000
paul.wolfson@wilmerhale.com

# CERTIFICATE OF SERVICE

I hereby certify that, on this 12th day of December 2014, I electronically filed the foregoing using the Court's CM/ECF system. I certify that the following counsel for the parties or amici are registered as ECF Filers and that they will be served electronically by the CM/ECF system:

STEPHEN P. HALBROOK
DAN M. PETERSON
RICHARD E. GARDINER
3925 Chain Bridge Road, Suite 403
Fairfax, VA 22030
*Counsel for Appellants*

JOHN P. SWEENEY
JAMES W. PORTER, III
BRADLEY ARANT BOULT
  CUMMINGS LLP
1615 L Street, N.W., Suite 1350
Washington, D.C. 20036
*Counsel for Amicus Curiae National Rifle Association, Inc.*

JEFFREY M. MALSCH
PISCIOTTI, MALSCH & BUCKLEY, PC
445 Hamilton Avenue, Suite 1102
White Plains, NY 10601
*Counsel for Amici Curiae The CRPA Foundation, Pink Pistols, Second Amendment Sisters, Inc., Women Against Gun Control, Inc.*

WILLIAM J. OLSON
JOHN S. MILES
JEREMIAH L. MORGAN
HERBERT W. TITUS
WILLIAM J. OLSON, PC

TODD SUNHWAE KIM
LOREN L. ALIKHAN
HOLLY MICHELLE JOHNSON
D.C. OFFICE OF THE SOLICITOR GENERAL
441 4th Street, N.W.
One Judiciary Square, Sixth Floor
Washington, D.C. 20001
*Counsel for Appellees*

HOWARD ROBERT RUBIN
DANIEL EDWARD LIPTON, ATTORNEY
KATTEN MUCHIN ROSENMAN LLP
2900 K Street, N.W., Suite 200
Washington, D.C. 20007
*Counsel for Amici Curiae International Municipal Lawyers Association, Major City Chiefs of Police Association, United States Conference of Mayors*

JONATHAN L. DIESENHAUS
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
*Counsel for Amici Curiae D.C. Appleseed Center for Law & Justice, League of Women Voters of the District of Columbia, and D.C. for Democracy*

370 Maple Avenue West, Suite 4
Vienna, VA 22180
*Counsel for Amici Curiae Gun
Owners of America, Inc., Gun
Owners Foundation, Gun Owners of
California, Inc., U.S. Justice
Foundation, Lincoln Institute for
Research and Education, The
Abraham Lincoln Foundation for
Public Policy Research, Institute on
the Constitution, Conservative Legal
Defense and Education Fund, Policy
Analysis Center, Downsize DC
Foundation, DownsizeDC.org*

Dated: December 12, 2014       Respectfully submitted,

/s/ Paul R.Q. Wolfson

PAUL R.Q. WOLFSON
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 663-6000
paul.wolfson@wilmerhale.com

# APPENDIX

Arizonans for Gun Safety is a community-based organization dedicated to reducing gun deaths and injuries with common sense, prevention-oriented solutions.

Ceasefire Oregon works to prevent gun violence by advocating reasonable, effective gun laws.

Colorado Ceasefire Capitol Fund works primarily to strengthen gun laws to reduce access to guns by persons who should not have them, and to uphold existing gun laws.

Delaware Coalition Against Gun Violence, Inc., formed after the tragedy of Sandy Hook, is a Section 501(c)(4) corporation whose mission is to help safeguard Delaware's citizens and communities by preventing gun violence in the state.

Educational Fund to Stop Gun Violence is an organization that seeks to reduce gun violence through research, strategic engagement, and policy advocacy.

Gun Violence Prevention Center of Utah is an organization working to end the violence and suffering resulting from the misuse of firearms.

Illinois Council Against Handgun Violence is the oldest and largest statewide organization in the United States working to prevent the devastation caused by firearms.

The Law Center to Prevent Gun Violence (formerly Legal Community Against Violence) is a national law center focused on providing comprehensive legal expertise in support of gun violence prevention and the promotion of smart gun laws that save lives.

Maine Citizens Against Handgun Violence works to prevent gun violence by advocating for personal responsibility, practical legislation, enforcement of laws, and increased manufacturer responsibility.

Marylanders to Prevent Gun Violence is a coalition that supports efforts to curb gun violence in Maryland. Among other initiatives, Marylanders to Prevent Gun Violence endeavored to present evidence and arguments urging Maryland's legislators to adopt the measures subsequently enacted as the Maryland Firearm Safety Act of 2013.

New Mexicans for Gun Safety is composed of the people of the state of New Mexico who are dedicated to promoting gun safety in our communities.

New Yorkers Against Gun Violence is an organization that works to reduce gun violence through legislative advocacy and education designed to encourage action, influence public opinion, and lead to policy change.

Ohio Coalition Against Gun Violence is an organization that works toward the goal of increasing safety in Ohio in regards to firearms.

Protect Minnesota is an organization dedicated to educating the public on gun violence prevention.

States United to Prevent Gun Violence is a national organization that works with 27 state affiliates, and a combined 150,000 grassroots supporters, to build healthy communities by reducing gun death and injury through stronger laws, community education, and grassroots action.

Violence Policy Center is an organization based in Washington, D.C., that works to stop the broad-based public health crisis that is gun violence through research, advocacy, education, and collaboration.

Wisconsin Anti-Violence Effort is a statewide grassroots organization solely dedicated to reducing gun violence, injuries, and deaths.

Women Against Gun Violence is an organization that educates the public, policymakers, and the media about the human, financial, and public health consequences of gun violence.