NOT YET SCHEDULED FOR ORAL ARGUMENT

**No. 14-7071**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

**DICK ANTHONY HELLER, ABSALOM JORDAN,
WILLIAM CARTER, WILLIAM SCOTT, and ASAR MUSTAFA**

*Appellants*

v.

**THE DISTRICT OF COLUMBIA and
MURIEL BOWSER, Mayor, District of Columbia**,

*Appellees*

**REPLY BRIEF FOR APPELLANTS**

Appeal from the U.S. District Court
for the District of Columbia
District Ct. Civil No. 08-1289 (JEB)

Stephen P. Halbrook                    Dan M. Peterson
3925 Chain Bridge Road, Suite 403      Dan M. Peterson, PLLC
Fairfax, VA  22030                     3925 Chain Bridge Road, Suite 403
(703) 352-7276                         Fairfax, VA  22030
protell@aol.com                        (703) 352-7276
                                       dan@danpetersonlaw.com

*Counsel for Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY ................................................................................. ix

SUMMARY OF ARGUMENT ............................................................. 1

ARGUMENT ............................................................................... 4

I.  THE REGISTRATION REQUIREMENTS VIOLATE
THE SECOND AMENDMENT ........................................................... 4

A. The District Court Improperly Shifted the District's
Burden to Plaintiffs and Doubly Deferred to the District's
Legislative Judgments .................................................................. 4

B. The Long Gun Registration Requirements Fail
Constitutional Scrutiny ................................................................. 7

1. It is a myth that registration "allows officers
to determine in advance whether individuals
involved in a call may have firearms." ............................................. 8

2. Registration of long guns is not narrowly
tailored to reduce crime and protect police officers ........................... 10

C. The District's Extraordinary Registration Requirements
Fail to Address the Governmental Objectives in a
Narrowly-Tailored Manner ............................................................ 15

1. Failure to consider nationwide norms ......................................... 15

2. Fingerprints, photograph, and in-person appearance ..................... 18

3. Requiring a gun to be carried to MPD ........................................ 19

4. Deregistration and reregistration ....................................................20

5. Fees for persons in poverty ............................................................21

6. Requirements of taking class and passing test ...............................22

7. The prohibition on registration of more than
one pistol in 30 days ..........................................................................23

II. THE DISTRICT COURT ERRED IN ADMITTING
AND RELYING UPON PURPORTED EXPERT OPINION
THAT WAS NOT BASED ON FACTS OR DATA ..............................................24

CONCLUSION ....................................................................................31

CERTIFICATE OF COMPLIANCE ......................................................32

CERTIFICATE OF SERVICE ...............................................................33

# TABLE OF AUTHORITIES*

**CASES**                                                    **Page**

*Barnes v. District of Columbia*, 924 F. Supp.2d 74
(D. D.C. 2013)..............................................................................27

*Bieder v. United States*, 662 A.2d 185 (D.C. 1995) ...............................12

*Burkhart v. Washington Metropolitan Area Transit
Authority*, 112 F.3d 1207 (D.C. Cir. 1997)............................................30

*Church of the Lukumi Babalu Aye, Inc. v. City of
Hialeah*, 508 U.S. 520 (1993)...............................................................15

*City of Cincinnati v. Discovery Network, Inc.*,
507 U.S. 410 (1993)..............................................................................24

*Daubert v. Merrell Dow Pharmaceuticals*,
509 U.S. 579 (1993)........................................................................26, 27

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .......................8, 24

*Edwards v. District of Columbia*, 755 F.3d 996
(D.C. Cir. 2014) ...........................................................................22, 23

*FEC v. National Rifle Ass'n of America*, 254 F.3d 173
(D.C. Cir. 2001) ......................................................................................5

*Groobert v. President & Directors of Georgetown Coll.*,
219 F. Supp.2d 1 (D. D.C. 2002)..........................................................27

*Heller v. District of Columbia,* 670 F.3d 1244
(D.C. Cir. 2011) ("*Heller II*") ......................... 1, 2, 5, 8, 9, 12, 21, 22, 24

*Authorities chiefly relied upon are marked with asterisks.

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ................................26, 27, 28

*Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013) ................................................21

*Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012) ......................................................16

*McIntosh v. Washington*, 395 A.2d 744 (D.C. 1978) ..............................................27

*Maryland & D.C. Rifle & Pistol Ass'n. v. Washington*,
442 F.2d 123 (D.C. Cir. 1971) ...............................................................................27

*\*McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010) ..................................1, 7, 14

*Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014) ...............................6

*Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995) ...................................................5

*Schrader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013) ................................................6

*Silvester v. Harris*, No. 1:11–CV–2137, 2014 WL
4209563, \*1 (E.D. Ca. Aug. 25, 2014) ...................................................................24

*\*Turner Broadcasting System, Inc. v. FCC*,
512 U.S. 622 (1994) ("*Turner I*") ...................................................................1, 5, 23

*\*Turner Broadcasting System, Inc. v. FCC*,
520 U.S. 180 (1997) ("*Turner II*") .........................................................................5, 6

*Tyler v. Hillsdale County Sheriff's Dept.*,
2014 WL 7181334, \*19 (6th Cir. 2014) ................................................................15

*United States ex rel. Miller v. Bill Harbert Intl.
Constr., Inc.*, 608 F.3d 871 (D.C. Cir. 2010)........................................................28

*United States v. National Treasury Employees
Union*, 513 U.S. 454 (1995) ..........................................................5

*United States v. Spriggs*, 996 F.2d 320 (D.C. Cir. 1993) ........................29

*United States v. Walker*, 657 F.3d 160 (3d Cir. 2011)............................29

## CONSTITUTIONS, STATUTES, AND ORDINANCES

### Federal

U.S. CONST., AMEND I .................................................... 13, 23

U.S. CONST., AMEND II................... 1, 4, 6, 7, 8, 10, 14, 20, 21, 23, 24, 30

U.S. CONST., AMEND IV ........................................................ 30

18 U.S.C. § 921(a)(21)(C) ...................................................... 16

18 U.S.C. § 922(a)(1) .......................................................... 16

18 U.S.C. § 922(a)(3) .......................................................... 16

18 U.S.C. § 922(b)(3) .......................................................... 16

18 U.S.C. § 922(g)............................................................. 17

18 U.S.C. § 922(t) ............................................................ 16

18 U.S.C. § 922(t)(1)(C) ....................................................... 18

18 U.S.C. § 924(a)(1)(D) ....................................................... 16

18 U.S.C. § 924(a)(2) .......................................................... 17

26 U.S.C. § 5841 .............................................................. 12

26 U.S.C. § § 5845(a)(1)-(4) ..................................................................... 12

Militia Act, ch. XXXIII, § 10, 1 Stat. 271 (1792) .................................... 14

14 Stat. 487 (1867) .................................................................................... 14

§ 103(f), NICS Improvement Amendments Act,
P.L. 110-180, 121 Stat. 2559 (2008)......................................................... 21

## State

430 Ill. Comp. Stat. § 65/2 .......................................................................17

Cal. Penal Code § 30900............................................................................11

Cal. Penal Code § 30905............................................................................11

Conn. Gen. Stat. Ann. § 53-202(g) ...........................................................11

Conn. Gen. Stat. Ann. § 53-202(d) ...........................................................11

Haw. Rev. Stat. Ann. § 134-3 ....................................................................11

Mass. Gen. Laws ch. 140, § 129C .............................................................17

Md. Code Ann., Crim. Law § 4-403(c)(1)(ii)....................................11, 20

N.Y. Penal Law § 400.00(10)(b) ...............................................................20

An Act more effectually to punish adherence
to the King (1781), *Laws of the Legislature of
the State of New York, In Force Against the Loyalists* (1786) ...........13, 14

N.J. Stat. Ann. § 2C:39-5(f)......................................................................11

## District of Columbia

D.C. Code § 7-2501.01 *et seq.* ...................................................................6

D.C. Code § 7-2502.03(a)(10) ...................................................................22

D.C. Code § 7-2502.03(a)(13) ...................................................................22

D.C. Code, § 7-2502.03(e) .......................................................................23

D.C. Code § 7-2502.04(c) .........................................................................19

D.C. Code § 7-2505.01 .............................................................................16

D.C. Code § 7-2505.02 .............................................................................16

D.C. Code § 22-4502.01 ...........................................................................19

D.C. Code § 22-4504(a) ............................................................................19

D.C. Code § 22-4504 (a-1) ........................................................................19

Firearms Control Regulations Act of 1975 ...............................................27

## RULES AND REGULATIONS

27 C.F.R. § 478.124 ..................................................................................18

D.C. Police Regulations, art. 50 to 55 (1969) ..........................................26

Fed. R. Evid. 702 .........................................................................25, 26, 27, 30

Fed. R. Evid. 704(a) ..................................................................................30

## OTHER AUTHORITIES

"4 at Police Center in Washington Die as
Gunfire Erupts," *New York Times*, Nov. 23, 1994....................................20

2008 Committee Report ........................................................................ 2, 10

2012 Committee Report ................................................................ 2, 10, 22

Cong. Globe, 39th Cong., 2d Sess. 1848-49 (1867) ................................................. 14

Robert Churchill, *Gun Regulation, the Police Power & the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 161 & n.54 (2007) ......................................................... 13

"Elizabethton Preacher: My right to bear arms was violated," TriCities.com (Dec. 24, 2012) ................................................................ 12

"Man takes loaded gun into police station," *Washington Post*, Jan. 7, 2015, B4 ......................................................... 20

"Muriel Bowser: You have a mayor who hates guns," *Washington Post* (Jan. 9, 2015) ......................................................... 15

# GLOSSARY

| Term | Abbreviation |
|------|-------------|
| Brief for Appellees the District of Columbia | DC Br. |
| Federal Firearms License | FFL |
| Interstate Identification Index | III |
| Joint Appendix | JA |
| Metropolitan Police Department | MPD |
| National Instant Criminal Background Check System | NICS |
| Sealed Appendix | SA |

# SUMMARY OF ARGUMENT

The district court improperly shifted the District's burden to plaintiffs and doubly deferred to the District's legislative judgments. That violated this Court's directive that the District must "establish a tight 'fit,'" employing "narrowly-tailored" means, between the registration requirements and the governmental interests at issue. *Heller v. District of Columbia,* 670 F.3d 1244, 1258 (D.C. Cir. 2011).

Under intermediate scrutiny, the government must demonstrate "that the regulation will in fact alleviate the[] harms in a direct and material way." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 664 (1994). The District cannot meet this requirement, and so resorts to calling it a "stray phrase" in a plurality opinion that is "not a 'holding' at all." But the Supreme Court and this Court have repeatedly upheld that standard.

The lower court's double-deference theory impermissibly treats the Second Amendment "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees . . . ." *McDonald v. City of Chicago*, 130 S.Ct. 3020, 3044 (2010).

Requiring registration of long guns is not narrowly tailored. The District relates that its "age-adjusted rate of firearms deaths" is "considerably higher than

the national rate," including in Maryland and Virginia, which do not require registration. Yet its assertion that "states with registration schemes like the District's" have lower "age-adjusted firearm mortality rates" than other states, flies in the face of its own statistics. Moreover, only one state nationwide, Hawaii, requires registration of long guns as a class.

The 2008 and 2012 Committee Reports, relied on by the District in this litigation, called registration "critical" because it "allows officers to determine in advance whether individuals involved in a call may have firearms." The District now admits: "MPD officers that are responding to a call for service are not informed in advance if there is a registered firearm at the location."

Conceding that "long guns are rarely used in crime," the District counters that MPD seizes "illegal" – *i.e.*, unregistered – long guns. But this Court rejected the circular rationale that the registration law can be justified because it "permits officers to charge individuals with a crime . . . ." *Heller*, 670 F.3d at 1258 n.*.

In sum, the District is an extreme outlier in requiring long-gun registration, which has no precedent in the Founding period.

The District's extraordinary registration requirements are not narrowly tailored. Nationwide norms are set forth in the National Instant Criminal Background Check System, which is supplemented by District law requiring that a

firearm may be acquired only from a licensed dealer. Persons who fall into a prohibited class have a strong incentive, backed by felony penalties, no longer to possess firearms.

When purchasing a firearm from a dealer, a person must provide, in person, positive government-issued identification with a photograph. Fingerprints are unnecessary with the IDs that are now required. The District's requirements of fingerprints, a photograph, and in-person appearance needlessly duplicate or add to what has already occurred.

Requiring presentation of a firearm at MPD headquarters subjects the registrant to possible arrest for carrying a firearm and creates the danger of a misunderstanding that could lead to use of deadly force against the registrant. The record below is devoid of any reason for this requirement.

Voiding one's registration every three years and requiring reregistration of all firearms is a trap for the unwary not found in a single state nationwide. The District could conduct a new background check on any registrant it wishes at any time without this requirement.

The fees for registration and reregistration fall heavily on persons living in poverty. No evidence is in the record that the class and the test required for registration in fact protect police officers or reduce crime.

The prohibition on registration of more than one pistol in thirty days is based on the unfounded assumption, discredited by the District's police chief, that a criminal who would illegally "traffic" firearms would register them first. The Second Amendment protects the right to keep "arms" in the plural, and no legal basis has been suggested for rationing this constitutional right.

Finally, the court below erred in relying on the testimony of persons who did not qualify as experts in the relevant field, and whose opinions were unsupported by fact. Merely because they have law-enforcement credentials, three persons inappropriately were allowed to give testimony, relied upon by the trial court, concerning the efficacy and impact of broad legislative policies, and even to testify that such policies are narrowly tailored and do not violate the Second Amendment.

## ARGUMENT

### I.  THE REGISTRATION REQUIREMENTS VIOLATE THE SECOND AMENDMENT.

#### A. The district court improperly shifted the District's burden to Plaintiffs and doubly deferred to the District's legislative judgments.

The district court erred in shifting the burden to plaintiffs and doubly deferring to the District, in disregard of this Court's instruction that "the District must establish a tight 'fit' between the registration requirements and an important or

substantial governmental interest, a fit 'that employs . . . a means narrowly tailored to achieve the desired objective.'" *Heller v. District of Columbia,* 670 F.3d 1244, 1258 (D.C. Cir. 2011) ("*Heller II*") (citation omitted). On remand, the District was ordered to present "meaningful evidence, not mere assertions, to justify its predictive judgments." *Id.* at 1259.

Under intermediate scrutiny, the government must "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 664 (1994) (plurality opinion) ("*Turner I*"). The District characterizes that directive as a "stray phrase" in the plurality opinion which is thus "not a 'holding' at all." Brief for Appellees ("DC Br.") 28. Yet those precise words have commanded majorities in numerous decisions. *E.g.*, *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995); *United States v. National Treasury Employees Union*, 513 U.S. 454, 475 (1995). This Circuit has consistently relied on that *verbatim* statement.[1]

It is for the judiciary to determine "whether the legislative conclusion was reasonable and supported by substantial evidence in the record." *Turner Broad.*

---

[1] *E.g.*, *FEC v. National Rifle Ass'n of America*, 254 F.3d 173, 191 (D.C. Cir. 2001) (FEC failed to demonstrate that NRA activities were not enmeshed in its core political purpose).

*Sys., Inc. v. FCC*, 520 U.S. 180, 211 (1997) ("*Turner II*"). Contrary to the District, DC Br. 27-28, deference is not due to the legislature regarding "the fit between the asserted interests and the means chosen to advance them," *Turner II* at 213, about which the government must prove that "the means chosen are not substantially broader than necessary" and that there was no "adequate alternative" to the restriction. *Id.* at 218; *see Peruta v. County of San Diego*, 742 F.3d 1144, 1177 (9th Cir. 2014) (deference inappropriate regarding Second Amendment restriction).

The District makes two arguments in favor of the district court's double-deference rule applicable only to laws restricting Second Amendment rights. First, "legislative judgments receive more deference than administrative agencies . . . ." DC Br. 30, citing *Turner II*, 520 U.S. at 195. Of course that is the case, as administrative judgments must be consistent with laws made by the legislature. It does not imply that courts should defer more to legislative judgments restricting constitutional rights that some view unfavorably.

Second, the District contends that firearm laws are subject to the principle that "the legislature is far better equipped than the judiciary to make sensitive public policy judgments (within constitutional limits) . . . ." *See* DC Br. 31, quoting *Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013) (citation omitted). But that applies to laws on any subject, including those that impact freedom of

speech.    Doubly deferring to laws that restrict Second Amendment rights impermissibly "treat[s] the right recognized in [*District of Columbia v. Heller,* 554 U.S. 570 (2008)] as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees . . . ."  *McDonald v. City of Chicago*, 130 S.Ct. 3020, 3044 (2010).

### B. The long-gun registration requirements fail constitutional scrutiny.

The District compares the *lower* rates of firearm deaths in Virginia and Maryland, which do not require firearm registration, with the *higher* rates in the District, as if that comparison somehow supports long-gun registration:

> The District's age-adjusted rate of firearms deaths (intentional and unintentional) for 2010 was 14.62 per 100,000, considerably higher than the national rate (10.07) and the rate in neighboring jurisdictions (9.26 for Maryland, and 10.69 for Virginia). JA958.

DC Br. 33.[2]

That discrepancy shows that the District's registration laws have proven futile in preventing homicides.  That is especially true for long guns, which are almost never used to commit homicides.  *See* Appellants' Br. at 7-8. The District's

---

[2] "[T]he District suffers from the nation's highest rate of firearm robberies and second highest rate of firearm assaults."  Brief for Amici Curiae Brady Center to Prevent Gun Violence 20.

high rate of firearms-related deaths compared to its neighbors is no justification for infringing on Second Amendment rights.  *Heller*, 554 U.S. at 636.

### 1. It is a myth that registration "allows officers to determine in advance whether individuals involved in a call may have firearms."

In the previous appeal of this case, the District contended, quoting the 2008 Committee Report, that registration (including long gun registration) is "critical" because it "allows officers to determine in advance whether individuals involved in a call may have firearms."  Case No. 10-7036, Doc. 1264075 at 8, 57.  The panel majority and dissent took that statement at face value: that officers routinely access the registration system when involved in a call to determine if a registered firearm may be at the scene.  *Heller II*, 670 F.3d at 1258 (quoting JA 124 (2008 Report)); *id.* at 1294-95 (Kavanaugh, J. dissenting).

During discovery on remand, it turned out that the registration system is almost *never* used for that purpose.[3]  The District admitted what it had never acknowledged in the first appeal: "MPD officers that are responding to a call for service are not informed in advance if there is a registered firearm at the location."  JA 555.

_____

[3] *See* JA 472 (Pl. Stmt. of Material Facts Nos. 48-51, with citations to record); JA 915 (Def. Resp. to Pl. Stmt. of Material Facts Nos. 48-51).

The District now retreats to arguing that it "has never asserted that this was the foremost reason for requiring registration," and that it is just "one of the many benefits of registration."  DC Br. 32-34.

The District points to other listed factors that the Report cited as "critical," DC Br. 34, such as that registration "gives law enforcement essential information about firearm ownership," . . . permits officers to charge individuals with a crime if an individual is in possession of an unregistered firearm, and permits officers to seize unregistered weapons." JA 124. "These rationales are circular," this Court found, as they established neither an important interest nor a substantial relation between registration and an important interest.  *Heller II*, 670 F.3d at 1258 n.*.

The District cites the testimony of Lt. Shelton, former commander of the firearms registration section, that police agencies had contacted his office to check registration records, DC Br. 34, citing JA 515, but that occurred in *fewer than a dozen instances in his twenty years in that position*.  JA 443, 498, 515.  And he did not testify (nor is there any other evidence) that this checking of the records roughly once every two years ever bore any fruit.

The District concludes: "The fact that MPD currently does not check the firearms-registration database prior to *every* call for service does not mean that the District's desire to check before some calls is a 'false' reason for enacting the law."

DC Br. 35. The fact is that the asserted reason never had any basis in MPD policy and practice. The 2008 Committee Report copied it from a lobbyist's testimony speculating on possible reasons for registration. JA 139-40. The 2012 Committee Report repeated the claim. JA 164. The Committee was evidently more concerned with inventing justifications for registration than with communicating with MPD about how it actually operates.

The District offers three other uses of registration: background checks, gun safety, and inhibition of trafficking. DC Br. 35, citing JA 957. None of these requires registration. Background checks, using NICS or otherwise, and gun-safety education do not require registration of specific firearms or of firearm owners. *See* Appellants' Br. 39-42. No one would register a gun and then try to traffic it, as Chief Lanier admitted. JA 938, 940.

### 2. Registration of long guns is not narrowly tailored to reduce crime and protect police officers.

The District suggests that making it a crime to possess a long gun does not impinge on any Second Amendment right, DC Br. 36, despite the fact that one can go to prison and receive a lifetime ban on possession of firearms for failure to register or to reregister. The District further suggests that the requirement

withstands intermediate scrutiny, DC Br. 37, despite its failure to incorporate any semblance of narrow tailoring.

The District asserts that Webster shows that "states with registration schemes like the District's" had low "age-adjusted firearm mortality rates per 100,000 population" in 2006-10. DC Br. 38. Yet no state has a registration scheme like the District's. Hawaii is the *only* state nationwide that requires registration of all long guns, and its registration system is not as onerous as the District's.[4] The District presented no evidence of any nexus between Hawaii's registration scheme and crime rates. Moreover, the District undercuts Webster's theory by conceding that its own "age-adjusted rate of firearms deaths" are "considerably higher than the national rate." DC Br. 33.[5]

The District concedes that "long guns are rarely used in crime," but states that "[o]ne out of every six illegal firearms recovered by MPD in 2010 was a long gun," DC Br. 39, 41. But "illegal" just means "unregistered." This Court already

---

[4] *See* Haw. Rev. Stat. Ann. § 134-3. Some states require registration of certain firearms that the District bans outright. *E.g*., Cal. Penal Code §§ 30900 ("assault weapons"), 30905 (".50 BMG rifles"); Conn. Gen. Stat. Ann. §§ 53-202(g) (machine guns), 53-202d ("assault weapons"); Md. Code Ann., Crim. Law § 4-403(c)(1)(ii) (machine guns); N.J. Stat. Ann. § 2C:39-5(f) ("assault weapons").

[5] The *Amici* D.C. Appleseed Br. at 13 claims that "the District's gun regulations are analogous to tried and effective practices in the states . . . ." It cites various state laws which are *not* analogous to the District's far more onerous laws and makes unsupported claims – based on an uncertain "scorecard" of two advocacy groups – that such laws reduce crime. *Id*. at 13-19.

rejected the circular rationale that registration "permits officers to charge individuals with a crime. . . ." *Heller II*, 670 F.3d at 1258 n.*.

While only law-abiding persons register guns, otherwise law-abiding citizens who are unaware of the District's unusual laws do not. The District appears to take pride in arresting and prosecuting hapless tourists with gun permits from their own states. *See*, *e.g.*, *Bieder v. United States*, 662 A.2d 185, 187 (D.C. 1995) (New York permittee with wife and 7-year old daughter sought to check gun with police and was arrested); "Elizabethton Preacher: My right to bear arms was violated," TriCities.com (Dec. 24, 2012) (Tennessee minister with carry permit jailed for three days during holiday visit with family to District).[6] To suggest that such prosecutions concern guns "likely intended for trafficking or other crimes," DC Br. 39, is groundless.

The District claims that a federal law requiring registration of "certain types of long guns" reduces their use in crime. DC Br. 40. No such federal law exists regarding what are normally referred to as "long guns," *i.e.*, rifles and shotguns. Instead, a federal law requires registration of rifles and shotguns with *short* barrels and *short* overall lengths. 26 U.S.C. § § 5841, 5845(a)(1)-(4). No evidence was presented that the law had any causal relation to any reduction in crime.

---

[6] Available at http://www.tricities.com/news/article_8bbac09d-e89f-5d12-b5c8-3acf724695bc.html.

Unable to deny that only law-abiding citizens register guns and criminals do not, the District rejoins that "all citizens are law-abiding until they break the law, and that a government does not know in advance who will do so."  DC Br. 42 n.10. The chance that a person who passes the NICS check and obtains a long gun will use it in a crime is remote, and in any event registration would prove no barrier to commit an unlawful act by a determined person.[7]

Long-gun registration, the District argues, has a historical antecedent in isolated colonial laws authorizing door-to-door gun censuses.  DC Br. 43, citing Robert Churchill, *Gun Regulation, the Police Power & the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 161 & n.54 (2007).  Yet the purpose of those laws was to ensure that people had guns, not to confiscate guns and arrest the owners.  *Id.* at 141-42.  "[T]he colonial and state governments of what would become the first fourteen states neglected to exercise any police power over the ownership of guns by members of the body politic."  *Id.* at 161.

Some states during the Revolution allowed gun possession only to those swearing loyalty (DC Br. 43) because a war was being fought.  The patriots also repressed the free expression of the disloyal.  New York's "An Act more effectually to punish adherence to the King" (1781) made it a felony to state in

---

[7] For 2009 through 2011, three murders in total were committed with long guns in the District, less than 1% of the 383 total murders.  *See* Appellants' Br. 7-8.

speech or print that the King had any authority over that State. *Laws of the Legislature of the State of New York, In Force Against the Loyalists* (1786), 110-11. Such laws would violate what became the First and Second Amendments.[8]

The District asserts that early militia laws allowed government "to keep track of who had firearms . . . ." DC Br. 43, citing the federal Militia Act, ch. XXXIII, § 10, 1 Stat. 271, 273-74 (1792). The Act provided that "every citizen so enrolled" in the militia shall "provide himself with a good musket or firelock," *id.* at 271, and that militiamen, "during the time of their being under arms," were subject to having their arms inspected. *Id.* at 273. Nothing in the law required the militiaman to report any other firearm.

In sum, the District has failed to meet its burden to justify long-gun registration.

---

[8] That at the founding "slaves, freed blacks, and people of mixed race, were frequently prohibited from owning or carrying guns," is hardly an argument for the restrictions set forth in the Brief of the Major City Chiefs of Police Association 11. Nor is it relevant that Congress passed a law that "disbanded" Southern state militias, *see id.* at 13; 14 Stat. 487 (1867). Senator Wilson proposed the bill because the militias had "disarm[ed] portions of the people," but he struck out of the bill the requirement that the militias be "disarmed" based on the objection that it would disarm the people. Cong. Globe, 39th Cong., 2d Sess. 1848-49 (1867). *See McDonald*, 130 S.Ct. at 3044.

## C. The District's Extraordinary Registration Requirements Fail to Address the Governmental Objectives in a Narrowly-Tailored Manner.

### 1. Failure to consider nationwide norms.

The District's requirements are more stringent than any jurisdiction nationwide. By rejecting national norms, the District shows its disregard of less restrictive alternatives, refuting its claim that its policies are narrowly tailored. See DC Br. 44-45. Indeed, Defendant Bowser recently announced the intent to use the "most restrictive" means to suppress firearms ownership:

> "You have a mayor who hates guns," she said. "If it was up to me, we wouldn't have any handguns in the District of Columbia. I swear to protect the Constitution and what the courts say, but I will do it in the most restrictive way as possible."

"Muriel Bowser: You have a mayor who hates guns," *Washington Post* (Jan. 9, 2015).[9]

"Central to narrow tailoring is the fit between the government's objective and its means. A regulation flunks narrow tailoring by being 'overbroad' if '[the proffered] interests could be achieved by narrower ordinances that burde[n] [the right] to a far lesser degree.'" *Tyler v. Hillsdale County Sheriff's Dept.*, 2014 WL 7181334, *19 (6th Cir. 2014), quoting (and adding bracketed items) *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993).

---

[9]Available at http://www.washingtonpost.com/blogs/mike-debonis/wp/2015/01/09/muriel-bowser-you-have-a-mayor-who-hates-guns/.

The foundation of the national norm is conducting background checks for transfers of firearms from Federal Firearms Licensees (FFLs), who are engaged in the business of dealing in firearms and who are thus generally the source for firearm acquisitions. *See* 18 U.S.C. §§ 921(a)(21)(C), 922(a)(1), (t). In addition to checks through the National Instant Criminal Background Check System (NICS), the District is free to consult any other record system when such a transfer is made, without requiring registration.

There is no way for a District resident lawfully to obtain a firearm other than through an FFL with a background check. No firearm may be transferred in the District other than through a licensed dealer. D.C. Code §§ § 7-2505.01, 7-2505.02. Under federal law, it is a felony to transport into or receive in one's State of residence (including D.C.) a firearm obtained outside that State, including at a gun show or from a private person outside the District. 18 U.S.C. §§ 922(a)(3), 924(a)(1)(D). Thus, a D.C. resident may receive a handgun only from an FFL in the District. *See Lane v. Holder*, 703 F.3d 668, 669 (4th Cir. 2012). Purchase of a rifle or shotgun also requires a D.C. resident to go through an FFL. *Id.*; 18 U.S.C. § 922(b)(3). While a person who moves to the District with a firearm would not be subject to a background check at that time, such person would have had a NICS check when originally receiving a firearm from an FFL.

The District's real argument is that persons who have passed background checks need to continue to have background checks for a lifetime. DC Br. 45-46. No other jurisdiction nationwide mistrusts lawful gun owners in that manner. The threat of ten years' imprisonment for falling into a prohibited class suffices to induce the small number of persons affected to dispossess themselves of any firearm. 18 U.S.C. §§ 922(g), 924(a)(2).

The District replies that "those laws alone are not a strong enough deterrent." DC Br. 49. Yet those who are undeterred by such laws with such severe punishment for violation are surely not deterred by District laws punishing non-registration. It adds nothing to the deterrence stemming from prosecution for the felon-in-possession offense to pile on a non-registration crime. The latter crime is designed to fall on the shoulders of persons who have committed no offense other than possession of an unregistered firearm.

And finally, even if future background checks are justified, the registration of each specific firearm has no nexus to any background check on the individual.[10]

---

[10] The two states that require a firearms ID card for possession of a firearm have the ability to conduct perpetual background checks, but registration of any specific firearm is not required. *See* 430 Ill. Comp. Stat. § 65/2; Mass. Gen. Laws ch. 140, § 129C.

## 2. Fingerprints, photograph, and in-person appearance.

Nor has the District demonstrated that fingerprints are required for background checks. It concedes that it can "run a LiveScan check on the NICS and other databases like NCIC and WALES us[ing] personal identifying information like name, birthdate, and social security number to process the background check." DC Br. 45. It has not shown that such information "can be easily forged,"[11] *id.*, nor has it suggested why a criminal would bother to register a firearm using someone else's identity, or how doing so would possibly benefit that individual.

The in-person identification of the gun buyer with a valid ID containing a photograph already took place when the person purchased the firearm from an FFL. 18 U.S.C. § 922(t)(1)(C); 27 C.F.R. § 478.124.

While the District's experts "opined" that its requirements avoid fraud, DC Br. 45, they produced no actual evidence of such. The District suggests that its requirements alleviate the concern that "prohibited individuals could circumvent the federal background check process," DC Br. 46, without so much as suggesting

---

[11] Identity documents of the kind required to purchase a firearm from a dealer are now difficult to forge, and criminals very rarely obtain their firearms by using false documents. *See* Appellants' Br. 44.

*why* a prohibited person would have any incentive to register a firearm under a false name, as it would provide no legal protection.

### 3. Requiring a gun to be carried to MPD.

The District provided no evidence in support of its requirement that a registrant bring the firearm to MPD headquarters.   D.C. Code § 7-2502.04(c).   It speculates that this "allows MPD to verify that the application information is correct and that the firearm has not been altered or switched with another firearm." DC Br. 47-48.   Neither one of the committee reports gave any reason for the requirement, nor did any MPD witness mention it.   The registrant has every incentive to ensure that the information is correct, for otherwise the specific firearm will not be registered.   The reason about a firearm being "altered or switched" makes no sense.

The District ignores the dangers created by requiring persons to carry firearms on the streets to take them to MPD headquarters.   The registrant could be arrested for carrying a firearm, which is punishable by imprisonment for five years. D.C. Code § 22-4504(a), (a-1).   The punishment is doubled for carrying a gun within 1,000 feet of a long list of "gun free zones."   *Id*. § 22-4502.01.

The person could be reported as a "man with a gun" that could induce use of deadly force by police.   Officers who observe a civilian bringing firearms and gun

cases into the MPD building and who are unaware that it is a registrant may be apprehensive, in light of threats and murders against officers.[12]  The potential for a misunderstanding leading to great harm is a heavy burden without any benefit that might contribute to protection of police officers or controlling crime.

### 4.  Deregistration and reregistration.

The District asserts that cancelling registrations every three years and requiring reregistration is necessary to conduct perpetual background checks.  DC Br. 48.  Knowing that it could conduct background checks anytime without that, the District astonishingly suggests that just conducting the background checks without this additional bureaucratic burden would be "less efficient."  DC Br. 48-49.

Cancelling registrations and requiring reregistration cannot be narrowly tailored, when not a single state nationwide imposes that burden.[13]  It exposes the citizen to "gotchas" that can lead to imprisonment and loss of Second Amendment rights for inadvertent failure or inability to reregister.  This applies not only to

---

[12] *See* "Man takes loaded gun into police station," *Washington Post*, Jan. 7, 2015, B4; "4 at Police Center in Washington Die as Gunfire Erupts," *New York Times*, Nov. 23, 1994, http://murderpedia.org/male.L/l/lawson-bennie.htm.

[13]  Maryland requires renewal of registrations of machine guns, which the District bans.  Md. Code Ann., Crim. Law § 4-403(c)(1)(ii).  Beginning in 2013, New York requires renewal of handgun licenses.  N.Y. Penal Law § 400.00(10)(b).  No other state has any law that is remotely comparable.

persons in the Armed Forces or government jobs who are assigned to service elsewhere for long periods, but also to the elderly, the ill, and the poverty-stricken, who are most likely to be unable to comply with reregistration.

### 5. Fees for persons in poverty.

The District's fees to register a firearm amount to a tax on core exercise of Second Amendment rights in the home. This Court upheld fees for the basic registration of handguns, *Heller II*, 670 F.3d at 1255 n.\*, but it did not uphold long-gun registration or the novel registration requirements, and thus did not foreclose a challenge to the fees imposed to implement those provisions. *See* DC Br. 49.

Three of the plaintiffs are unemployed or retired persons living below or near the poverty line, and to whom the fees are a substantial financial burden. JA 366 (Mustafa), 838 (Jordan), 843 (Scott). Imposition of fees on them to exercise a core constitutional right should be rejected.

Once again, the District ignores the nationwide norm – the NICS system charges no fee for conducting a background check.[14] Instead, the District relies on the high fees for a handgun license upheld in *Kwong v. Bloomberg*, 723 F.3d 160, 168-69 (2d Cir. 2013). DC Br. 50. However, in that case plaintiffs "put forth *no*

---

[14] § 103(f), NICS Improvement Amendments Act, P.L. 110-180, 121 Stat. 2559 (2008).

*evidence* to support their position that the fee is prohibitively expensive." *Id*. at

167 (emphasis in original). The court thought it a "better approach to require

plaintiffs to put forth *at least some* evidence to suggest that a fee operates as a

'substantial burden.'" *Id*. at 168 n.15. Plaintiffs here did so. JA 366, 838-39, 843-

44.

### 6. Requirements of taking class and passing test.

Registration requires the applicant to pass a test prescribed by the Chief on

D.C. gun law requirements and also requires a firearms training and safety class

provided by the Chief. D.C. Code § 7-2502.03(a)(10), (13). While knowledge of

the law and training and safety are desirable, the District produced no evidence that

its test and its class "can reasonably be expected to promote" the objectives of

protecting police officers and reducing crime. *Heller II*, 670 F.3d at 1259.

Firearm training takes place in the military and law enforcement, and is

promoted by the National Rifle Association. DC Br. 50-51. But that is not

evidence that the Chief's test and class achieve the stated objectives, any more than

the District's exam for tour guides did so. *Edwards v. District of Columbia*, 755

F.3d 996, 1002 (D.C. Cir. 2014).

The District states that it need not offer empirical evidence that "guarantees"

that the test and class "will absolutely ameliorate" the problem. DC Br. 52. But

"the record contains *no evidence*" in that regard. *Edwards* at 1003 (emphasis added). Accordingly, the requirement cannot be based on substantial evidence from which reasonable inferences were drawn by the Council. *See Turner I*, 512 U.S. at 666.

### 7. The prohibition on registration of more than one pistol in 30 days.

The prohibition on registering more than one pistol within 30 days, D.C. Code, § 7-2502.03(e), allegedly "prevent[s] gun traffickers from purchasing guns in bulk sales to in turn sell those guns to prohibited purchasers." JA 172 (2012 Report); DC Br. 53. This ignores two realities: (1) persons who register firearms do not traffic them, and (2) persons who traffic firearms do not register them.

Chief Lanier conceded the unlikelihood that "someone would purchase multiple guns . . . , register them all with [the police], and then turn around and sell those guns illegally . . . ." JA 938. Not a single instance of a trafficker registering pistols and then selling them illegally was identified.

The District makes a *post hoc* litigation argument that while the Second Amendment protects the right to keep and bear "arms" in the plural, "12 pistols a year is well more than [a resident] could use in any self defense situation," and the number of registered guns may be limited. DC Br. 53-54. No precedent is cited for this gun rationing argument, which would never fly in the field of First

Amendment rights.[15] In the exercise of the Second Amendment right to keep arms, a person may wish to acquire more than one pistol within 30 days for any number of legitimate reasons besides self-defense, such as hunting, investment, inheritance, collecting, or otherwise. *See Heller,* 554 U.S. at 583 & n.7.[16]

## II.  THE DISTRICT COURT ERRED IN ADMITTING AND RELYING UPON PURPORTED EXPERT OPINION THAT WAS NOT BASED ON FACTS OR DATA.

This Court remanded to give the District a second chance at producing "meaningful evidence" that its registration laws protect police officers and control crime. *Heller II*, 670 F.3d at 1258-59.  These are empirical questions, and properly conducted criminological and social science studies, based on sufficient evidence and using appropriate methodologies, can shed light on whether registration advances the asserted interests.

The six empirical studies on registration of which Dr. Kleck is aware are unanimous in finding that registration has no effect in reducing crime.  *See* Declaration of Gary Kleck, Ph.D., JA 699-704, 708-09 (summarizing studies).

---

[15] *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417-18 (1993) (rejecting argument that "every decrease in the number of such dispensing devices [newsracks with commercial handbills] necessarily effects an increase in safety").

[16] Acquisition of multiple firearms has been held to be protected by the Second Amendment.  *See Silvester v. Harris*, No. 1:11–CV–2137, 2014 WL 4209563, *1 (E.D. Ca. Aug. 25, 2014) (10-day waiting period violative of Second Amendment as applicable to persons who already possess a firearm and have passed applicable background check).

Gun registration has no detectable effect on rates of total homicide, gun homicide, long gun homicide, total robbery, gun robbery, total aggravated assault, gun aggravated assault, rape, total suicides, gun suicides, or fatal gun accidents. JA 702.

The District submitted supposed "expert" declarations that ignore the existing registration studies and instead rely on unsupported opinion, in clear violation of the rules regarding expert testimony. Under Fed. R. Evid. 702, expert opinion testimony may be admitted only if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

The District asserts that each of the declarations of Jones, Lanier, and Vince is "rife with facts and data." DC Br. 56. The only way to determine whether this is true is to actually read those declarations. They consist of nothing more than pages and pages of unsupported opinion, with a small admixture of anecdote and a tiny handful of citations to studies that have nothing to do with registration. The 15-page Declaration of Mark Jones cites an undocumented personal conversation, a newspaper report of a murder in New York with a weapon that is illegal to possess in the District, and two studies, neither of which has to do with

registration.  JA 342.  That alleged "evidence" is buried in masses of unsupported statements of opinion.

Lanier's declaration consists largely of statements about the need to protect the public, diplomats, officials, and other persons within the District, together with anecdotes about high profile shootings, with no nexus drawn to how registration would allegedly prevent such crimes.  JA 386.

Vince's declaration is virtually 100% fact free, referring only to an unverifiable "case I'm familiar with"—the rest is mere *ipse dixit*, uncontaminated by any fact.  JA 398, 405.

This testimony is not based on "sufficient facts and data" under Rule 702, no "reliable principles and methods" have been identified for these witnesses, and therefore these witnesses have not "applied the principles and methods reliably to the facts."  These declarations fail to satisfy all three parts of Rule 702.

The trial court must perform a "gatekeeping" function under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  *Kumho Tire* made it clear that the court's gatekeeping function applies to "all expert testimony," not only scientific testimony.  *Id.* at 147, 148-49.  "The objective of that requirement is to ensure the reliability and relevancy of expert testimony."  *Id*. at 152.

The District seeks to justify its lack of "academic or empirical studies" by claiming that "it would be impossible to conduct a case study on the effectiveness of firearm restrictions before they are enacted (or even soon thereafter)." DC Br. 56. But D.C. Police Regulations, art. 50 to 55 (1969), required the registration of all pistols, rifles, and shotguns. *Maryland & D.C. Rifle & Pistol Ass'n. v. Washington*, 442 F.2d 123 (D.C. Cir. 1971). Restrictions were ratcheted up in the Firearms Control Regulations Act of 1975. *McIntosh v. Washington*, 395 A.2d 744, 746 (D.C. 1978). More than 45 years is enough time to study the effects of registration in the District, and (as noted) it has been studied elsewhere, with findings that refute the District's contentions.

The argument that "experience" or "professional judgment" is a substitute for applying proper methodologies to real data is spurious in this context. DC Br. 56-57. Trial courts may allow testimony of experts with extensive experience on narrow issues where no data otherwise exists. *E.g.*, *Groobert v. President & Directors of Georgetown Coll.*, 219 F. Supp.2d 1, 11 (D. D.C. 2002); *Barnes v. District of Columbia*, 924 F. Supp.2d 74, 97 (D. D.C. 2013). But here, the effects of firearms laws on crime can be *measured* using proper analytical techniques applied to data, which would meet the reliability standards of Rule 702, *Daubert*, and *Kumho Tire*.

The District argues that the trial court has discretion as to whether to admit ostensible expert testimony. DC Br. 54 (citing *United States ex rel. Miller v. Bill Harbert Intl. Constr., Inc.*, 608 F.3d 871 (D.C. Cir. 2010). But *Bill Harbert* described how the trial court "thoroughly and thoughtfully analyzed the application of Rule 702" to establish the reliability of the expert testimony. *Id.* at 895. Here, the trial court did little more than note that "The D.C. Circuit . . . routinely permits law-enforcement officers to testify as expert witnesses based on their professional experiences," and that there is no "per se rule . . . requiring the government to confine its justifications to objective evidence or empirical studies." JA 956. It engaged in no analysis of the reliability of the actual testimony or its basis in fact. *Kumho Tire* "makes clear that the discretion it endorses – trial-court discretion in choosing the manner of testing expert reliability – is not discretion to abandon the gatekeeping function. I think it worth adding that it is not discretion to perform the function inadequately." *Id.* at 159 (Scalia, J., concurring).

The District contends that Vince, Jones, and Lanier "are qualified as experts in the field of law enforcement." DC Br. 55. But "law enforcement" is an exceedingly broad field. The District urges reliance on testimony of law enforcement professionals "based on personal experience rather than empirical

studies," DC Br. 57, but their subjective opinions about the effectiveness and constitutionality of laws are beyond their expertise.

Such testimony is inadmissible based on the very cases cited by the District. DC Br. 57-58. A police officer may testify about his observations based on "extensive experience in dealing with heavy drug users," *United States v. Spriggs*, 996 F.2d 320, 325 (D.C. Cir. 1993), but could not testify on the effectiveness of the drug laws and whether they were narrowly tailored. Similarly, *United States v. Walker*, 657 F.3d 160, 176 (3d Cir. 2011), upheld an officer's expert testimony "based upon his personal experiences interacting with drug traffickers and law enforcement personnel over a period of decades." His narrow testimony that cocaine was generally imported from New York City, and that he had never heard of synthetic cocaine being made in Pennsylvania, *id*., is in no way comparable to the generalizations about the complex relationship between laws and crime made here.

The District even offered their experts' opinions as resolving the ultimate legal and constitutional issues in this case, which is impermissible. It claims that the testimony of its four experts "establish that the challenged registration requirements were *narrowly tailored* to achieve the substantial government interests of protecting police officers and promoting public safety." DC Br. 23

(emphasis added). "It is perfectly appropriate, for example, for Vince to state that based on the views formed from his extensive law-enforcement experience, the District's firearms laws . . . are *not overly burdensome under the Second Amendment*." DC Br. 58, citing JA402 (emphasis added). Imagine deferring to a police officer's opinion that a search-and-seizure tactic is not overly burdensome under the Fourth Amendment.

Persons with expertise on "police procedures, practices, and training" who testify about "legal conclusions cannot properly assist the trier of fact . . ., and thus [such testimony] is not 'otherwise admissible'" under Fed. R. Evid. 704(a). *Burkhart v. Washington Metropolitan Area Transit Authority*, 112 F.3d 1207, 1211-12 (D.C. Cir. 1997).

There are countless law enforcement professionals nationwide. If the plaintiffs had produced six current or former law enforcement officers to offer generalities, based on no facts, but completely opposed to the those offered by the District's three "experts," would that mean that the plaintiffs should prevail? Of course not. Under Rule 702, expert testimony must be anchored in fact and sound methodology. Here, plaintiffs produced a true expert, the eminent criminologist Dr. Gary Kleck, who summarized in detail the six extant studies of the effect on

crime of registration laws.  JA 699-704, 708-09.  Those studies, and Kleck's other testimony, were never refuted—they were simply ignored.

The burden was on the District to produce "meaningful evidence" to show that its registration laws advanced its governmental objectives.  It produced only unsupported opinions, of the kind previously rejected by this Court.  Those opinions should have been excluded by the trial court as unreliable, and this Court should do the same.

## CONCLUSION

This Court should reverse the judgment of the district court and remand the case with an order to enter summary judgment in favor of Plaintiffs-Appellants, or alternatively to order that the case be tried.

Date: January 14, 2015

Respectfully Submitted,

Dick Anthony Heller, Absalom F. Jordan, Jr., William Carter, William Scott, and Asar Mustafa

By counsel

/s/Stephen P. Halbrook
Stephen P. Halbrook
D.C. Bar No. 379799
3925 Chain Bridge Road, Suite 403
Fairfax, VA 22030
(703) 352-7276
(703) 359-0938 (fax)
protell@aol.com

/s/ Dan M. Peterson
Dan M. Peterson
D.C. Bar No. 418360
Dan M. Peterson, PLLC
3925 Chain Bridge Road, Suite 403
Fairfax, VA  22030
(703) 352-7276
(703) 359-0938 (fax)
dan@danpetersonlaw.com

Counsel for Plaintiffs-Appellants

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,928 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

 /s/ Stephen P. Halbrook
STEPHEN P. HALBROOK
Counsel for Appellants

Date: January 14, 2015

**CERTIFICATE OF SERVICE**

I hereby certify that on January 14, 2015, an electronic PDF of the foregoing Reply Brief for Appellants was uploaded to the Court's CM/ECF system, which will automatically generate and send by electronic mail a Notice of Docket Activity to all registered attorneys participating in the case. Such notice constitutes service on those registered attorneys.

/s/ Stephen P. Halbrook
STEPHEN P. HALBROOK