# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 20, 2015      Decided September 18, 2015

No. 14-7071

DICK ANTHONY HELLER, ET AL.,
APPELLANTS

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-01289)

———

*Stephen P. Halbrook* argued the cause for appellants. With him on the briefs was *Dan M. Peterson*.

*C.D. Michel*, *Anthony Pisciotti*, and *Jeffrey Malsch* were on the brief for *amici curiae* CRPA Foundation, Pink Pistols, Second Amendment Sisters, and Women Against Gun Control in support of appellants.

*William J. Olson*, *Herbert W. Titus*, *Jeremiah L. Morgan*, and *John S. Miles* were on the brief for *amici curiae* Gun Owners of America, Inc., et al. in support of appellants.

2

*John Parker Sweeney* and *James W. Porter III* were on the brief for *amicus curiae* National Rifle Association, Inc. in support of appellants.

*Loren L. AliKhan*, Deputy Solicitor General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With her on the brief were *Eugene A. Adams*, Interim Attorney General at the time the brief was filed, *Todd S. Kim*, Solicitor General, and *Holly M. Johnson*, Assistant Attorney General.

*Douglas F. Gansler*, Attorney General at the time the brief was filed, Office of the Attorney General for the State of Maryland, and *Joshua N. Auerbach*, Assistant Attorney General, *Tom Miller*, Attorney General, Office of the Attorney General for the State of Iowa, *Martha Coakley*, Attorney General at the time the brief was filed, Office of the Attorney General for the Commonwealth of Massachusetts, *Eric T. Schneiderman*, Attorney General, Office of the Attorney General for the State of New York, *Kamala Harris*, Attorney General, Office of the Attorney General for the State of California, *George Jepsen*, Attorney General, Office of the Attorney General for the State of Connecticut, *Russell A. Suzuki*, Attorney General at the time the brief was filed, Office of the Attorney General for the State of Hawaii, and *Lisa Madigan*, Attorney General, Office of the Attorney General for the State of Illinois were on the brief as *amici curiae* States of Maryland, et al. in support of appellees.

*Walter A. Smith*, *Jr.*, *Jonathan L. Diesenhaus*, appointed by the court, and *Karla J. Aghedo* were on the brief as *amici curiae* DC Appleseed Center for Law & Justice, et al. in support of appellees.

3

*Howard R. Rubin* and *Daniel Lipton* were on the brief as *amici curiae* The Major City Chiefs of Police Association, The United States Conference of Mayors, and International Municipal Lawyers Association in support of appellees.

*Paul R.Q. Wolfson*, *Francesco Valentini*, and *Jonathan E. Lowy* were on the brief for *amici curiae* Brady Center to Prevent Gun Violence, et al. in support of appellees.

Before: HENDERSON and MILLETT, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

Opinion concurring in part and dissenting in part filed by Circuit Judge HENDERSON.

GINSBURG, *Senior Circuit Judge*:  At issue in this suit is the constitutionality of certain gun laws enacted by the District of Columbia.  The district court determined as a matter of law that the District's efforts "to combat gun violence and promote public safety" by means of its registration laws were "constitutionally permissible."  *Heller v. District of Columbia*, 45 F. Supp. 3d 35, 38 (D.D.C. 2014). Before this court, Dick Anthony Heller and his co-appellants challenge both the district court's admission of, and its reliance upon, certain expert reports proffered by the District and the final order denying Heller's and granting the District's motion for summary judgment.

We hold the district court's admission of the challenged expert reports was not an abuse of discretion.  We affirm in part and reverse in part the district court's judgment in favor of the District.

4

## I. Background

In *District of Columbia v. Heller* (*Heller I*) the Supreme Court held the District of Columbia's "prohibition of handguns held and used for self-defense in the home" was unconstitutional.  554 U.S. 570, 636 (2008).  Immediately thereafter, the D.C. City Council revised the District's gun laws by enacting the Firearms Registration Amendment Act of 2008 (FRA).  D.C. Law 17-372.

The FRA created a "new scheme for regulating firearms." *Heller v. District of Columbia*, 670 F.3d 1244, 1248 (D.C. Cir. 2011) (*Heller II*).  With limited exceptions, the FRA required the registration of all firearms in the District.  D.C. Code § 7-2502.01.  The law also imposed various conditions upon the registration of a firearm and limited the persons eligible to register a firearm by excluding, for example, individuals who within the prior five years had been convicted of certain drug or violent crimes or had a severe mental health problem, and individuals under the age of 18. *Id.* § 7-2502.03-.07.  In addition, the FRA required the gun owner to renew the registration of his firearm(s) every three years, *id.* § 7-2502.07a, and prohibited registration — and hence possession — of certain firearms, such as short-barreled rifles and assault weapons.  *Id.* § 7-2502.02.

In July 2008 Heller filed suit challenging the District's new registration scheme as inconsistent with the Second Amendment to the Constitution of the United States.  The district court granted summary judgment to the District and Heller appealed.

On that appeal, we upheld the constitutionality of the District's "basic registration requirement," insofar as that requirement pertained to handguns.  *Heller II*, 670 F.3d at

5

1254-55.  We also upheld the portion of the FRA prohibiting registration, and therefore possession, of assault weapons and magazines with a capacity in excess of 10 rounds.  *Id.* at 1247-48, 1264.

We reserved judgment as to the constitutionality of the District's basic registration requirement for long guns, the conditions under which a registration certificate would be issued, and the duration for which such a certificate would be valid.  *Id.* at 1255, 1258-60.  We held that both the basic registration requirement for long guns, if not de minimis, and the conditions for registration were subject to intermediate scrutiny, and that the record as it then stood was not sufficient for us to evaluate whether those laws were narrowly tailored to serve an important governmental interest.  *Id.* at 1258.  We therefore remanded the case to the district court for further evidentiary proceedings.  *Id.* at 1260.

Subsequently, the D.C. Council enacted the Firearms Amendment Act of 2012, D.C. Law 19-170, which repealed certain of the conditions for registration, such as the requirement that a pistol be submitted for ballistic identification as part of the registration process, and reduced the burden upon registrants imposed by other provisions. Heller then filed an amended complaint to take account of these legislative changes.

During discovery, Heller and the District offered the opinion testimony of, respectively, one and four expert witnesses.  *Heller v. District of Columbia*, 45 F. Supp. 3d at 40 (*Heller III*).  Largely upon the basis of their testimony, the district court entered summary judgment for the District.

On this appeal, Heller argues the district court erred by admitting the opinion testimony of three of the District's four

6

expert witnesses. In addition, Heller argues the district court erred in upholding as constitutional: (1) the basic registration requirement as it pertains to long guns, D.C. Code § 7-2502.01(a); (2) the requirement that one appear in person to register a firearm and be fingerprinted and photographed, *id.* § 7-2502.04; (3) the requirement that the registrant bring with him the firearm to be registered, which requirement the Metropolitan Police Department (MPD) may or may not invoke as to a particular individual, *id.* § 7-2502.04(c); (4) the expiration of the registration after three years, *id.* § 7-2502.07a; (5) the imposition of certain fees for registration, *id.* § 7-2502.05(b); (6) the requirements that a registrant complete a firearms safety and training course or provide evidence of another form of training and that the registrant pass a test to demonstrate his knowledge of the District's firearms laws, *id.* §§ 7-2502.03(a)(13), 7-2502.03(a)(10); and (7) the prohibition on registration of more than one pistol per person in any 30-day period, *id.* § 7-2502.03(e).

## II. Analysis

We first address the district court's admission of the challenged expert reports and related testimony. We then turn to Heller's constitutional challenges.

### A. The expert reports and testimony

Heller moved to strike three of the four expert reports offered by the District during discovery, *viz.*, those of Cathy Lanier, the Chief of the MPD, and of Mark Jones and Joseph Vince, Jr., both former agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), but not that of Daniel Webster, Director of the Johns Hopkins Center for Gun Policy. Heller argued the expert reports "fall short of the disclosure requirements under FED. R. CIV. P. 26(a) and that

7

their proposed testimony [was] too unreliable to be admitted under FED. R. EVID. 702." The district court denied Heller's motion.

On appeal, Heller renews both arguments. We review the district court's admission of expert testimony for abuse of discretion, whether that admission is challenged under the rules of evidence or under the rules of procedure. *United States v. Day*, 524 F.3d 1361, 1367 (D.C. Cir. 2008). We conclude that the district court did not abuse its discretion in admitting the challenged testimony.

## 1.  Federal Rule of Civil Procedure 26

Federal Rule of Civil Procedure 26(a)(2)(B) provides that an expert witness must submit a written report containing, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them," as well as "the facts or data considered by the witness in forming them." A party who fails to comply with Rule 26(a)(2)(B) generally may not use that witness "to supply evidence on a motion … unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1).

The purpose of the rule is to avoid "unfair surprise to the opposing party." *Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 167 (D.C. Cir. 2007) (citation and internal quotation marks omitted). Admitting a report with an omission that does not cause "unfair surprise" we deem harmless. *Id.*

As the district court noted, each of the challenged expert reports contained an explicit statement as to the basis for that witness's opinion, to wit, that his or her report was based "on my experience, my review of numerous studies and books, the

8

District of Columbia's firearms laws and regulations, and discovery materials from this case made available to me." In addition each report recounts in detail the expert's relevant experience. The district court stated:

> Plaintiffs have had an opportunity to depose these experts and examine more fully the bases for their opinions .... Where Defendants have provided adequate notice of the opinions they expect these experts to offer and Plaintiffs have had and continue to have opportunities to challenge these conclusions, the goals of Rule 26(a) are satisfied, and there is no basis for striking the reports and preventing these experts from testifying.

*Heller v. District of Columbia*, 952 F. Supp. 2d 133, 139 (D.D.C. 2013).

The district court did not abuse its discretion in so holding. The experts' reports adequately established the bases for the opinions they expressed in the reports and in their declarations. Heller had the opportunity to probe the bases for the witnesses' opinions when he deposed them.

## 2. Federal Rule of Evidence 702

Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of

9

fact to understand the evidence or to determine a fact in issue;

(b)    the testimony is based on sufficient facts or data;

(c)    the testimony is the product of reliable principles and methods; and

(d)    the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

In *Daubert v. Merrell Dow Pharmaceuticals*, the Supreme Court held Rule 702 requires courts to ensure that expert testimony is "not only relevant, but reliable." 509 U.S. 579, 589 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (noting that "*Daubert*'s general principles apply" not just to scientific testimony but to all "the expert matters described in Rule 702"). Therefore, courts are obligated to "determine whether [expert] testimony has a reliable basis in the knowledge and experience of [the relevant] discipline." *Kumho Tire*, 526 U.S. at 149 (second alteration in original) (citation and internal quotation marks omitted). Nonetheless, the Supreme Court has said "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152.

In this case the district court reasoned:

[I]t appears here that the opinion evidence is connected to the existing facts – the registration requirements and the state of gun violence in the

10

> District – by a methodology precisely contemplated by *Daubert* and Rule 702: each expert's professional judgment obtained through long experience in the field. Each of the reports specifically identifies this experience as being the basis for the opinions proffered, and each provides some justification – in the form of information gained from the expert's relevant experience – for those opinions.

*Heller v. District of Columbia*, 952 F. Supp. 2d at 142.

As the district court rightly suggested, each of the challenged experts has decades of relevant experience. Still, the Advisory Committee notes to Rule 702 provide that a witness who is "relying solely or primarily on experience … must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." In this case the experts' explanation of the connection between their experience and their conclusions was sometimes fatally sparse. Likewise, the district court failed meaningfully to evaluate the factual bases for the experts' opinions, noting only that they were supported by "some justification — in the form of information gained from the expert's relevant experience."

As this court has noted, however, the "admission of [expert] testimony does not constitute an abuse of discretion merely because the factual bases for an expert's opinion are weak." *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 567 (D.C. Cir. 1993). Nor is this a case in which the experts' reports consisted of "subjective belief or unsupported speculation," which the rules of evidence preclude. *Id.* at 570 (citation and internal quotation marks omitted).

11

In addition to invoking his or her generalized "experience," each expert claimed to have relied upon specific news stories, academic studies, or other research in forming an opinion. Moreover, each of the three experts was in a position to state whether the cited materials comported with his or her personal experience.

In light of the challenged experts' substantial relevant experience and the sources they cited in support of their conclusions — the above-noted stories, studies, and research — we hold the district court did not abuse its discretion in admitting the challenged expert reports and the subsequent expert declarations. Rather, as the district court noted, Heller's "concerns about the conclusions [to which] these experts' experience led them … go to the weight of the testimony," not its admissibility. *Heller v. District of Columbia*, 952 F. Supp. 2d at 142.

## B. The constitutional challenges

We review the district court's summary judgment determination de novo, considering the evidence in the light most favorable to the non-moving party, *i.e.*, Heller. *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013).

In *Heller II*, we adopted a two-step approach to determining the constitutionality of the District's gun registration laws: "We ask first whether a particular provision impinges upon a right protected by the Second Amendment; if it does, then we go on to determine whether the provision passes muster under the appropriate level of constitutional scrutiny." 670 F.3d at 1252. We determined that level was intermediate scrutiny. *Id.* at 1252-53.

12

For a challenged provision to survive intermediate scrutiny, the District has to show, first, that it "promotes a substantial governmental interest that would be achieved less effectively absent the regulation," and second, that "the means chosen are not substantially broader than necessary to achieve that interest." *Id.* at 1258 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 782-83 (1989)). To meet the first requirement, the District must demonstrate that the harms to be prevented by the regulation "are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662-64 (1994) (*Turner I*). We do not, however, review de novo the District's evidence of the harm to be prevented and the likely efficacy of the regulation in preventing that harm. *See id.* at 666. Rather, it is our remit to determine only whether the District "has drawn reasonable inferences based on substantial evidence." *Id.* If it has done so, and if the means chosen are not overbroad, then "summary judgment … is appropriate regardless of whether the evidence is in conflict." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 185, 195-96, 211 (1997) (*Turner II*); *see also Heller II*, 670 F.3d at 1263 (upholding the District's ban on assault weapons on the basis that "the evidence demonstrates a ban on assault weapons is likely to promote the Government's interest in crime control").

### 1. Impingement

In *Heller II* we held the basic registration requirement as applied to handguns did not impinge upon the Second Amendment and was therefore constitutional. 670 F.3d at 1254-55 ("[T]he basic requirement to register a handgun is longstanding in American law …. Therefore, we presume the District's basic registration requirement including the submission of certain information does not impinge upon the

13

right protected by the Second Amendment.  Further, we find
no basis in either the historical record or the record of this
case to rebut that presumption.") (citations omitted); *see also
Heller I*, 554 U.S. at 626-27 & n.26 ("longstanding" firearm
regulations are "presumptively lawful").  We left open the
question whether requiring the registration of long guns
impinges upon the Second Amendment.  670 F.3d at 1255
n.**; *see also* D.C. Code § 7-2502.01(a).  We now hold it
does not.

Requiring the registration of handguns is legally different
from requiring the registration of long guns only in that "basic
registration of handguns is deeply enough rooted in our
history to support the presumption that [it] is constitutional,"
*Heller II*, 670 F.3d at 1253; the registration requirement for
long guns lacks that historical pedigree.  *Id.* at 1255.

Even absent the presumption that attends the pedigree,
however, the basic registration requirement as applied to hand
guns falls into the category of requirements that are "self-
evidently de minimis, for they are similar to other common
registration or licensing schemes, such as those for voting or
for driving a car, that cannot reasonably be considered
onerous."  *Id.* at 1254-55.  On Heller's previous appeal, we
were unable to determine whether requiring the registration of
long guns is similarly a de minimis burden because the record
was "devoid of information concerning the application of
registration requirements to long guns."  *Id.* at 1255 n.**.  We
therefore allowed Heller, during the discovery proceedings on
remand, the opportunity to introduce evidence that might
differentiate the registration requirement for long guns from
other registration requirements that undoubtedly entail a de
minimis burden upon a constitutional right.   As the district
court subsequently determined, however, Heller offered no
evidence distinguishing the basic registration requirement as

14

applied to long guns. *See Heller III*, 45 F. Supp. 3d at 51. Indeed, he did not even argue the point.[1]

Because the burden of the basic registration requirement as applied to long guns is de minimis, it does not implicate the second amendment right. *Heller II*, 670 F.3d at 1255; *see also Justice v. Town of Cicero*, 577 F.3d 768, 773-75 (7th Cir. 2009) (holding local ordinance "requiring the registration of all firearms" is consistent with the Supreme Court's ruling in *Heller I*). It is therefore constitutional.

---

[1] In his reply brief in this court, Heller argued for the first time that the registration requirement impinges upon the Second Amendment right to bear arms because a person can "go to prison and receive a lifetime ban on possession of firearms for failure to register or reregister." *See* D.C. Code §§ 7-2502.03, 7-2507.06, 7-2502.08 (providing generally violation of the registration requirements may result in fines, imprisonment, and ineligibility to register weapons in the future). This assertion, however, is too little, too late. It comes too late because we do not ordinarily notice an argument that first appears in a reply brief. *See Gunpowder Riverkeeper v. FERC*, No. 14-1062, 2015 WL 4450952, at *5 (D.C. Cir. July 21, 2015) ("[A]rguments not clearly raised in a party's opening brief are generally considered to be forfeit"). In any event, it is too little because in *Heller II* we instanced other licensing schemes we think impose a de minimis burden notwithstanding that failure to comply with those schemes may result in criminal penalties; so it is with the basic registration requirement for long guns. *See Heller II*, 670 F.3d at 1254-55 (describing licensing schemes "such as [that] for … driving a car" as "self-evidently de minimis"); D.C. Code § 50-1403.01(e) (providing that an individual found guilty of "operating a motor vehicle in the District" while that person's license is "revoked or suspended" may be fined or imprisoned for up to one year).

15

The additional registration requirements, however, cannot be said to be de minimis. In *Heller II*, we held the additional requirements, as they then stood, "affect[ed] the Second Amendment right because they [we]re not de minimis" — that is, they "ma[d]e it considerably more difficult for a person lawfully to acquire and keep a firearm … for the purpose of self-defense in the home." *Id.* at 1255. The subsequent repeal of some of those requirements and the amendment of others somewhat reduced the burden imposed upon District residents' exercise of their Second Amendment rights. The District does not go so far as to argue, however, that the amended requirements are de minimis. Those requirements are therefore subject to intermediate scrutiny.

## 2. Intermediate scrutiny

We previously identified two substantial governmental interests served by the registration requirements enacted by the District: (1) protecting police officers by enabling them to determine, in advance, whether guns may be present at a location to which they are called and (2) aiding in crime control. *Heller II*, 670 F.3d at 1258. On remand, the District recharacterized the second interest as a broader interest in "promoting public safety." *Heller III*, 45 F. Supp. 3d at 49. On appeal, the District identifies more particularly its interest in "protecting police officers" and reiterates its interest in "promoting public safety" generally.

Heller does not dispute that these are substantial governmental interests. Rather, he challenges the closeness of the fit between the asserted interests and the various registration requirements. We agree with Heller that the District has not offered substantial evidence from which one could draw a reasonable conclusion that the challenged requirements will protect police officers; but we think the

16

District has pointed to substantial evidence that some of the requirements — but not others — will promote public safety.

### a. Police protection

Heller argues the registration requirements do not advance the District's interest in protecting the police because MPD officers very rarely check the registration records in responding to a call, conducting an investigation, or executing a search warrant. The District responds that although the "MPD does not routinely check registration records prior to responding to a call for service … such a check is a tool available for use in appropriate circumstances." It is undisputed that such checks have taken place, albeit rarely.

Therefore, the question remains whether that "tool" promotes the District's asserted interest in police protection. Discovery subsequent to our decision in *Heller II* indicates it does not.

According to the deposition testimony of an MPD officer, District police "are trained to treat situations where there might be a crime in progress or domestic dispute or some other situation possibly involving violence as always having a potential to have a dangerous weapon present." Further, one of the District's expert witnesses stated that if the registration system indicated no weapon was present at an address, then officers "would continue to exercise caution." The best the District's expert could offer was that positive confirmation of a gun might raise officers' "caution level … that much higher."

The testimony of the District's own witnesses, therefore, indicates that the records established via the registration requirements, when queried at all, have little to no effect upon

17

the conduct or safety of police officers. In light of this additional evidence, we agree with the statement of our colleague in *Heller II* that the asserted interest in police protection "leaves far too many false negatives to satisfy … intermediate scrutiny." 670 F.3d at 1295 (Kavanaugh, J., dissenting).

### b. Public safety

Drawing directly upon the Report of the Judiciary Committee of the D.C. Council with respect to the Firearms Amendment Act of 2012, the District claims the various registration requirements advance its interest in public safety by "distinguishing criminals from law-abiding citizens, enabling police to arrest criminals immediately, facilitating enforcement against prohibited persons obtaining or continuing to possess firearms, reducing gun trafficking, and increasing the difficulty for criminals to acquire guns." We next address whether the District has, with regard to each challenged registration provision, offered substantial evidence from which it could reasonably have concluded the provision will mitigate various threats to public safety "in a direct and material way," *Turner I*, 512 U.S. at 664, whether in one of the ways anticipated by the D.C. Council or otherwise.

### i. In-person appearance, fingerprinting, and photographing, D.C. Code § 7-2502.04

The District has presented substantial evidence from which it could conclude that fingerprinting and photographing each person registering a gun promotes public safety by facilitating identification of a gun's owner, both at the time of registration and upon any subsequent police check of the gun's registration. The requirement that registrants appear in

18

person is necessary in order for a photograph and fingerprints to be taken.

First, the fingerprinting requirement: The Report of the Committee on the Judiciary stated that "[t]he initial fingerprinting requirement is fundamental for the [MPD] to fulfill its public safety obligations in registering firearms — being able to screen the registrant to ensure that he or she is not disqualified from possessing a firearm." In support of this assertion, the District points to the testimony of Chief Lanier, who said "[u]sing biometrics [*i.e.*, fingerprints] to positively identify an individual is far more effective than relying simply on a name and social security number." Chief Lanier reiterates this conclusion in her expert declaration, and it is echoed in Webster's expert declaration.

In addition, the District points to evidence suggesting background checks using fingerprints are more reliable than background checks conducted without fingerprints, which are more susceptible to fraud. Specifically, the District points to an investigation conducted by the U.S. Government Accountability Office, in which five "agents acting in an undercover capacity used … counterfeit driver's licenses in attempts to purchase firearms from gun stores and pawnshops that were licensed by the federal government to sell firearms." GAO-01-427, FIREARMS PURCHASED FROM FEDERAL FIREARM LICENSEES USING BOGUS IDENTIFICATION 2 (2001). Those attempts were, without exception, successful. *Id.* at 2-3. The report concluded that federal background checks conducted by the firearm dealers "cannot ensure that the prospective purchaser is not a felon or other prohibited person

19

whose receipt and possession of a firearm would be unlawful." *Id.* at 2.[2]

Heller argues the District has not experienced a problem with fraud in the registration of firearms. He also implies the problem is unlikely to arise, given the increased difficulty of manufacturing fraudulent identification documents today, as compared to 2001, when the GAO concluded its investigation. Even if this is true, however, a prophylactic disclosure measure such as the one at issue here survives intermediate scrutiny if the deterrent value of the measure will materially further an important governmental interest. *See Barry v. City of New York*, 712 F.2d 1554, 1559-61 (2d Cir. 1983) (upholding under intermediate scrutiny a law requiring financial disclosures by certain publicly employed individuals in the face of a right-to-privacy challenge on the basis that it could "help deter corruption," despite a "virtually corruption-free history" (citation and internal quotation marks omitted)). The GAO study indicates the fingerprinting requirement would, indeed, help to deter and detect fraud and thereby prevent disqualified individuals from registering firearms.

Regarding the requirement of a photograph: The Committee on the Judiciary emphasized "the importance of a registrant being able to present a registration certificate with a photograph, so police can quickly identify whether and to

---

[2] The states in which the GAO conducted its study had adopted the National Instant Criminal Background Check System (NICS), see 18 U.S.C. § 922(t), under which, then as now, the following information is required of each individual who undergoes a NICS check: (1) name, (2) sex, (3) race, (4) date of birth, and (5) state of residence. 28 C.F.R. § 25.7. A dealer may, in addition, report the purchaser's Social Security or other identifying number and physical description. *Id.*

20

whom the firearm has been legally registered." The Committee pointed to the testimony of Chief Lanier, who asserted that "a certificate with a photo helps to quickly and safely communicate" the fact of registration to police officers, which, "in turn, helps to keep both the officer and the registrant safe." Heller, while maintaining that photographing a registrant will not deter fraud, does not contest that photographic confirmation of a registrant's identity would be beneficial to public safety when the police encounter an armed registrant. *See* D.C. Code § 7-2502.08(c) ("Each registrant shall have in the registrant's possession, whenever in possession of a firearm, the registration certificate, or exact photocopy thereof, for such firearm, and exhibit the same upon the demand of a member of the [MPD], or other law enforcement officer").

For the foregoing reasons, we believe the District has adduced substantial evidence from which it reasonably could conclude that fingerprinting and photographing registrants will directly and materially advance public safety by preventing at least some ineligible individuals from obtaining weapons and, more important, by facilitating identification of the owner of a registered firearm during any subsequent encounter with the police. Those requirements are therefore not unconstitutional. The additional requirement that registrants appear in person to be photographed and fingerprinted is but a corollary necessary to implement those requirements. *See Heller II*, 670 F.3d at 1249 n.* (noting that administrative provisions "incidental to the underlying regime" are "lawful insofar as the underlying regime is lawful").

21

### ii.    Bringing the firearm, D.C. Code § 7-2502.04(c)

The District argues that the "requirement that the firearm be made available for inspection allows MPD to verify that the application information is correct and that the firearm has not been altered or switched with another firearm." The District, however, has offered no evidence — let alone substantial evidence — from which it can be inferred that verification will promote public safety. The district court acknowledged as much when it noted that not one of the District's four experts "specifically addresse[d] the requirement that registrants bring the gun to be registered with them." *Heller III*, 45 F. Supp. 3d at 59. The district court nonetheless deemed it a "common-sense inference" that "if in-person appearance is necessary to verify the identity of the registrant, then physically bringing the gun is similarly necessary to verify the character of the registered weapon." *Id.* Yet common sense suggests a person would not go to the trouble of obtaining a registration certificate for a weapon other than a weapon in his possession. On the contrary, common sense suggests that bringing firearms to the MPD would more likely be a threat to public safety; as Heller maintains, there is a "risk that the gun may be stolen en route or that the [would-be registrant] may be arrested or even shot by a police officer seeing a 'man with a gun' (or a gun case)."

### iii.    Re-registration, D.C. Code § 7-2502.07a

The District has offered three justifications for the requirement that a gun owner re-register his firearm every three years. None is supported by substantial evidence from which the District could reasonably have concluded that requiring re-registration would advance an important governmental interest.

22

First, the District's experts argued that re-registration "will improve public safety by making sure that, in the time since [the gun owner] first registered, [he has] not fallen into a category of persons prohibited from owning a firearm." *Heller III*, 45 F. Supp. 3d at 67-68. As Heller rightly points out, however, "District officials and experts conceded [that] background checks could be conducted at any time without causing the registrations to expire." The re-registration requirement cannot survive intermediate scrutiny on the (dubious) basis that it will make this task easier. *Cf. McCullen v. Coakley*, 134 S. Ct. 2518, 2540 (2014) ("To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier").

Second, the District argues triennial re-registration will help to maintain the accuracy of the registration database. This seems self-evidently true, but it is far from an adequate reason for burdening every gun owner when there is already a requirement that gun owners report relevant changes in their information, such as a new address. D.C. Code § 7-2502.08 (requiring such reporting). To the extent that a gun owner's death or disposal of a registered gun is a fact of which the District should be aware, the District's registration requirements as applied to any new owner within the District should satisfy that interest.

Third, the District argues that it has "an interest in its residents verifying the whereabouts of their firearms" in order "to determine when firearms have been lost or stolen." District law, however, separately requires a gun owner to report the loss or theft of a weapon "immediately upon

23

discovery" of the loss or theft, and imposes a monetary penalty for failure to do so. *Id.* § 7-2502.08(a)(1). In contrast, the re-registration provision imposes no penalty for failure to re-register except the revocation of one's registration certificate, but a person whose weapon has been lost or stolen no longer has need of a certificate. Although the District fails to make the argument express in its brief, the report of its Committee on the Judiciary, on which the brief relies in general, asserted that the re-registration provision may complement the loss-reporting provision because it "likely causes the owner to look for his or her gun if it hasn't been used" for a while, but that is mere speculation. The re-registration process requires only that a gun owner affirm that he still has the registered weapon; it does not require the gun owner physically to examine the weapon. *See id.* § 7-2502.07a. Therefore, there is no reason to believe that an owner who does not suspect his gun has been lost or stolen is likely to look for the registered weapon prior to re-registering it.

### iv.     Fees, D.C. Code § 7-2502.05

Heller argues "[t]he District may not condition exercise of a fundamental constitutional right on the creation of a burdensome registration regime and then justify imposing 'administrative costs' to pay for it." He does not argue the registration fees of $13 per firearm and $35 for fingerprinting, D.C. Mun. Regs. tit. 24, § 2320.3(c)(3), are unreasonably high.

As we already said in *Heller II*, "administrative … provisions incidental to the underlying regime" — which include reasonable fees associated with registration — are lawful insofar as the underlying regime is lawful. 670 F.3d at 1249 n.*; *see also Cox v. New Hampshire*, 312 U.S. 569, 577

24

(1941) (holding, in response to a First Amendment challenge to a parade licensing statute, that a government may impose a fee "to meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed"); *Kwong v. Bloomberg*, 723 F.3d 160, 165–69 (2d Cir. 2013) (holding constitutional a $340 fee for a license to possess a handgun in one's home).  As such, reasonable fees associated with the constitutional requirements of registration and fingerprinting are also constitutional.

> **v.     Education requirements, D.C. Code §§ 7-2502.03(a)(10), 7-2502.03(a)(13)**

The District has presented substantial evidence from which it could conclude that training in the safe use of firearms promotes public safety by reducing accidents involving firearms, but has presented no evidence from which it could conclude that passing a test of knowledge about local gun laws does so.   The safety training, therefore, is constitutional; the test of legal knowledge is not.

Regarding the one-hour firearms safety course, available online or at the MPD, FIREARMS SAFETY TRAINING COURSE, https://dcfst.mpdconline.com/ (last visited Aug. 21, 2015), the District's experts each testified to their belief in the value of training to prevent accidents.   Heller responds that "the District's experts cite no studies showing that mandatory training or testing in gun safety reduce unintentional discharges."  The District, however, need not present such evidence.  Rather, the Supreme Court has "permitted litigants to justify … restrictions … based … on history, consensus, and simple common sense" when the three are conjoined.  *Cf. Lorillard Tobacco Co.*, 533 U.S. 525, 555 (2001) (internal quotation marks omitted).   In this case, the District has offered anecdotal evidence showing the adoption of training

25

requirements "in most every law enforcement profession that requires the carrying of a firearm" and a professional consensus in favor of safety training.[3]   Though its experts have characterized the training requirement as a matter of "common sense," this is not a case in which the District has asked the court to rule upon the basis of "common sense" alone.

None of the District's experts, however, offers any reason to believe that knowledge of the District's gun laws will promote public safety.   Indeed, the closest the District's experts came to addressing the subject was the statement by Chief Lanier that "in order to make registrants more clearly accountable under the law, it is important to be able to demonstrate that they were taught and aware of the requirements."   This assertion, however, does not tie knowledge of the law to the District's interest in public safety.

Furthermore, even if acquiring knowledge of the law were demonstrably helpful, the imposition of a requirement that registrants prove their knowledge of the law on "a test prescribed by the Chief" is an additional burden, *see* D.C. Code § 7-2502.03(10), the utility of which is supported by no evidence   whatsoever,   not   even   anecdotal   evidence. Moreover, only a few of the 15 questions in the test actually

---

[3] J.A. 394 (Lanier declaration) ("California, Connecticut, Hawaii, Massachusetts, and Michigan all have laws requiring some sort of training or safety certification as part of the registration process, and other jurisdictions are considering instituting similar requirements"); J.A. 407 (Vince declaration) (stating that he "do[es] not know of one firearm expert or law enforcement trainer who has not strongly recommended attending and successfully passing a safety course prior to owning or using a firearm").

26

prescribed by the Chief plausibly reflect a concern with public safety.[4]

Because the District has offered no evidence from which the court can infer it reasonably concluded that knowledge of its gun laws, as shown by passing its test, will promote public safety, on this record the requirement must be held constitutionally invalid.

### vi.     One-pistol-per-month rule, D.C. Code. § 7-2502.03(e)

The District has not presented substantial evidence to support the conclusion that its prohibition on the registration of "more than one pistol per registrant during any 30-day period," D.C. Code § 7-2502.03(e), "promotes a substantial governmental interest that would be achieved less effectively absent the regulation." *Heller II*, 670 F.3d at 1258 (quoting *Rock Against Racism*, 491 U.S. at 782-83). It is therefore unconstitutional.

The District argues that the limitation could reduce gun trafficking and that it would further promote public safety by limiting the number of guns in circulation, as the District "could reasonably conclude that more guns lead to more gun theft, more gun accidents, more gun suicides, and more gun crimes."

---

[4] *Compare* J.A. 834 ("When handling a firearm, you should always: (A) Treat it as if it is loaded; (B) Point it in a safe direction; (C) Both A and B") *with* J.A. 834 ("To purchase ammunition in the District of Columbia you must have the following in your possession: (A) A U.S. Passport; (B) A valid firearm registration certificate; (C) A valid driver's license").

27

As for the District's first argument, what little expert testimony it presented indeed indicates that limiting gun purchases in turn might limit trafficking in weapons. The experts' conclusion that limiting gun registrations would likewise reduce trafficking is, however, unsupported by the evidence. For example, Chief Lanier stated "[s]tudies have shown that laws restricting the registration or purchase of multiple firearms in a given period are effective in disrupting illegal interstate trafficking of firearms." Yet the only study she and the District's other witnesses cited has nothing to do with "laws restricting registration," as its title attests. See Douglas S. Weil & Rebecca C. Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275 J. AM. MED. ASS'N 1759 (1996). One of the experts also testified from his own observation that when Virginia limited firearm purchases to one every 30 days, fewer guns bought in Virginia were used in crimes committed in the District; traffickers, he observed, instead sourced more guns through straw purchasers in Maryland. But even if this is true, the suggestion that a gun trafficker would bring fewer guns into the District because he could not register more than one per month there lacks the support of experience and of common sense. Indeed, as Heller notes, even Chief Lanier acknowledged that the efficacy of purchasing limitations in preventing trafficking may have little bearing upon the efficacy of registration limitations in doing so.

As for the District's second argument, one of its experts testified that, in his opinion, "the most effective method of limiting misuse of firearms, including homicide, suicide, and accidental injuries, is to limit the number of firearms present in a home." Accepting that as true, however, it does not justify restricting an individual's undoubted constitutional right to keep arms (plural) in his or her home, whether for self-defense or hunting or just collecting, because, taken to its

28

logical conclusion, that reasoning would justify a total ban on firearms kept in the home. *See Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007), *aff'd sub nom. Heller I* (rejecting the District's argument that a ban on one type of gun was constitutional because the "prohibition … [did] not threaten total disarmament" and noting that, if such argument were adopted "[i]t could similarly be contended that all firearms may be banned so long as sabers were permitted").

### III. Conclusion

For the reasons set forth above, the district court's final order is AFFIRMED with respect to: the basic registration requirement as applied to long guns, D.C. Code § 7-2502.01(a); the requirement that a registrant be fingerprinted and photographed and make a personal appearance to register a firearm, D.C. Code § 7-2502.04; the requirement that an individual pay certain fees associated with the registration of a firearm, D.C. Code § 7-2502.05; and the requirement that registrants complete a firearms safety and training course, D.C. Code § 7-2502.03(a)(13). The district court's order is REVERSED with respect to the requirement that a person bring with him the firearm to be registered, D.C. Code § 7-2502.04(c); the requirement that a gun owner re-register his firearm every three years, D.C. Code § 7-2502.07a; the requirement that conditions registration of a firearm upon passing a test of knowledge of the District's firearms laws, D.C. Code § 7-2502.03(a)(10); and the prohibition on registration of "more than one pistol per registrant during any 30-day period," D.C. Code § 7-2502.03(e).

*So ordered.*

KAREN LECRAFT HENDERSON, *Circuit Judge*, concurring in part and dissenting in part: Regulating firearms in order to combat gun violence is a grave and complex task. The Supreme Court has made that legislative endeavor considerably more difficult by "tak[ing] certain policy choices off the table," *Dist. of Columbia v. Heller*, 554 U.S. 570, 636 (2008), and divining a new—and incomplete, *see id.* at 635—definition of what the Second Amendment protects. *Heller* has "hand[ed] our democratic destiny to the courts" by inviting litigants to draw them into this political thicket. J. Harvie Wilkinson III, *Of Guns, Abortions, and the Unraveling Rule of Law*, 95 VA. L. REV. 253, 257 (2009). Happily, the "dominoes" have not fallen as quickly as expected, *Heller*, 554 U.S. at 680 (Stevens, J., dissenting), as most of our sister circuits have afforded a healthy level of deference to the law-makers. But today I fear the majority has initiated a retreat—at least in part—from the practice of restraint.

My colleagues uphold six District of Columbia firearms laws but strike down four of them. Because I would uphold them all, I concur in part and dissent in part. In my view, the firearms laws that my colleagues invalidate (hereinafter, the remaining laws) satisfy intermediate scrutiny and, accordingly, I would affirm the well-reasoned decision of the district court. *See* 45 F. Supp. 3d 35 (D.D.C. 2014).

## I. GENERAL PRINCIPLES

Since the Supreme Court's decision in *Heller*, this Court analyzes Second Amendment challenges under a two-step framework. First, we ask whether the law "impinges upon" Second Amendment rights, *i.e.*, whether it has "more than a de minimis effect" on the right to keep and bear arms. *Heller v. Dist. of Columbia (Heller II)*, 670 F.3d 1244, 1252–53 (D.C. Cir. 2011). Second, if it does, we evaluate it under "the appropriate level of constitutional scrutiny." *Id.* at 1252. In

2

an earlier iteration of this case, we concluded that the challenged laws were "not de minimis" because they were "novel" and "ma[d]e it considerably more difficult for a person lawfully to acquire and keep a firearm . . . [for] self-defense in the home." *Id.* at 1255 (citing *Heller*, 554 U.S. at 630). We also determined that *intermediate* scrutiny, not strict scrutiny, is the proper yardstick because the laws "do not severely limit the possession of firearms." *Id.* at 1257 (alteration and quotation marks omitted).

Intermediate scrutiny has its genesis in the Supreme Court's equal protection and free speech jurisprudence. *See, e.g.*, *Craig v. Boren*, 429 U.S. 190, 197 (1976); *United States v. O'Brien*, 391 U.S. 367, 377 (1968). It is a middle-ground approach that "offer[s] proper protection in the many instances in which a statute adversely affects constitutionally protected interests but warrants neither near-automatic condemnation (as 'strict scrutiny' implies) nor near-automatic approval (as is implicit in 'rational basis' review)." *United States v. Alvarez*, 132 S. Ct. 2537, 2552 (2012) (Breyer, J., concurring in judgment). It essentially imposes a balancing test: the law is constitutional if "the governmental interest outweighs the burden [on constitutional rights] and cannot be achieved by means that do not infringe . . . rights as significantly." *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 n.7 (1983). "[T]he fit between the challenged regulation and the asserted objective need only be reasonable, not perfect," *Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013) (alterations and quotation marks omitted), and the challenged law "need not be the least restrictive or least intrusive means of" achieving the government's interest, *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989).

3

The application of intermediate scrutiny "varies to some extent from context to context, and case to case." *Bartnicki v. Vopper*, 200 F.3d 109, 124 (3d Cir. 1999), *aff'd*, 532 U.S. 514 (2001). In this case and context, I believe the following principles should shape our analysis.

*First*, the nature of firearms regulation requires ample deference to the legislature. We have previously held that, in the Second Amendment context, "we afford 'substantial deference to the predictive judgments of [the legislature].' " *Schrader*, 704 F.3d at 990 (quoting *Turner Broad. Sys., Inc. v. FCC (Turner I)*, 512 U.S. 622, 665 (1994)). This is because "the legislature is far better equipped than the judiciary to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Id.* (quotation marks omitted). Firearm policy is a "complex and dynamic" issue implicating "vast amounts of data" that the legislature is "far better equipped" to gather and analyze. *Turner I*, 512 U.S. at 665–66. Such "information can be difficult to obtain and the impact of certain conduct difficult to assess," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010), due to the different challenges facing different jurisdictions and the multiple factors that contribute to gun violence. Indeed, the data that does exist is either incomplete or influenced by partisanship:

> Few topics in the realm of U.S. justice and politics elicit a more polarizing response than that of gun control. . . . At the center of the debate is the fundamental question of whether firearms, specifically those owned and wielded by private citizens, do more harm than good in deterring violent crime. Despite intense scrutiny from so many fields, however, scholars have reached few solid

4

conclusions to date. The answers to even basic questions (who is victimized, how many are victimized, and at what cost are they victimized) are fiercely disputed, resulting in a nebulous yet hotly contested understanding of the interplay between guns and crime. . . . Data exists to support both sides; the difficulty lies in separating partisanship and underlying attitudes from empirical observation and objective analysis. In truth, the isolation of such objectivity may be a logical impossibility.

II AMERICAN POLITICAL CULTURE: AN ENCYCLOPEDIA 505–06 (Michael Shally-Jensen ed. 2015). Intermediate scrutiny is a flexible framework that allows for different perspectives and a range of approaches to firearms regulation. *See Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 632 (1995) (intermediate scrutiny does not require "the single best disposition" to problem); *Time Warner Entm't Co., L.P. v. United States*, 211 F.3d 1313, 1322 (D.C. Cir. 2000) ("In applying intermediate scrutiny, we inquire 'not whether Congress, as an objective matter, was *correct* . . . .' " (quoting *Turner Broad. Sys., Inc. v. FCC (Turner II)*, 520 U.S. 180, 211 (1997) (emphasis added))).

Indeed, judicial humility is especially important in the context of firearms regulation. Although our Second Amendment precedent draws on First Amendment and voting-rights cases, *see, e.g.*, *Heller II*, 670 F.3d at 1257, the right to bear arms is meaningfully different from the rights to speak and vote. *See Bonidy v. USPS*, 790 F.3d 1121, 1126 (10th Cir. 2015) ("The risk inherent in firearms and other weapons distinguishes the Second Amendment right from other fundamental rights that . . . can be exercised without creating a direct risk to others."). At the same time, however, the Second Amendment is not a "second-class right,"

5

*McDonald v. City of Chi.*, 561 U.S. 742, 780 (2010) (plurality), but the reality of gun violence means our constitutional analysis should incorporate deference to the legislature, *see Humanitarian Law Project*, 561 U.S. at 34–36. One of our sister circuits said it well:

> This is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights. . . . If ever there was an occasion for restraint, this would seem to be it.

*United States v. Masciandaro*, 638 F.3d 458, 475–76 (4th Cir. 2011).

**Second**, the District of Columbia is *sui generis*. The plaintiffs are quick to point out that the District's firearms laws are the toughest in the country and that a few have no parallel in other jurisdictions. But their point is unhelpful if the District is *different* from other jurisdictions. And it is. Most notably, the District is the seat of our national government. The record amply documents the unique security risks presented by a city full of high-level government officials, diplomats, monuments, parades, protests and demonstrations and, perhaps most pertinent, countless government buildings where citizens are almost universally prohibited from possessing firearms. *See, e.g.*, 18 U.S.C. § 930(a), (g)(1) (unlawful to "knowingly possess[] or cause[] to be present a firearm or other dangerous weapon in . . . a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties," other than a Federal court facility); *id.* § 930(e)(1) (unlawful to "possess[] or cause[] to be present a firearm or other

6

dangerous weapon in a Federal court facility"); 40 U.S.C. § 5104(e)(1)(A) (unlawful to "carry on or have readily accessible to any individual on the Grounds or in any of the Capitol Buildings a firearm"); *see also* 18 U.S.C. § 922(q)(2)(A) (making schools gun-free zones); Lanier Test. 2–5. Indeed, walking around this town, one gets the impression that it is one big government building. *Cf. Heller*, 554 U.S. at 626 ("the right secured by the Second Amendment is not unlimited" and can give way to regulations of "the carrying of firearms in sensitive places" like "government buildings"). Although the Constitution does not stop at the Beltway, our analysis should account for the unique challenges that confront the District as it struggles to regulate firearms in our Nation's capital. *See City of L.A. v. Alameda Books, Inc.*, 535 U.S. 425, 439–40 (2002) ("A municipality considering an innovative solution may not have data that could demonstrate the efficacy of its proposal because the solution would, by definition, not have been implemented previously.").

## II.  THE REMAINING LAWS

My colleagues strike down the District's laws requiring registrants to pass a knowledge test, D.C. CODE § 7-2502.03(a)(10); present their firearms for inspection, *id.* § 7-2502.04(c); renew their registration every three years, *id.* § 7-2502.07a(a); and register no more than one pistol per month, *id.* § 7-2502.03(e). I address these laws *seriatim* and explain why, in my view, each one satisfies intermediate scrutiny.

### A.  Knowledge Test

Before an individual can register a gun, he must demonstrate his knowledge of the District's firearms laws by passing a test. *Id.* § 7-2502.03(a)(10). The test is not particularly onerous: it consists of two pages with thirteen

7

multiple-choice questions and two True/False questions.[1]  The examinee must answer eleven questions correctly (a score of 70%).  He need pass the test only once, *id.*, and he can retake it as many times as he wants.  *See* 24 DCMR § 2311.7–.8.  The test is intended to ensure gun owners have a "basic level of knowledge" about the District's firearms laws.  Comm. Report 17.  Those laws, in turn, promote the public safety.  *Id.*

The plaintiffs contend, and my colleagues agree, that the District presented "no evidence" its knowledge test furthers its alleged interests.  Appellants' Br. 53–54; Maj. Op. 24.  But the notion that test-taking promotes knowledge is obvious— ask any teacher, student or professional licensing board in the country.  *See Delaware v. Prouse*, 440 U.S. 648, 658 (1979) ("States have a vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles . . . [and] are sufficiently familiar with the rules of the road . . . ."); *Levitt v. Comm. for Pub. Educ. & Religious Liberty*, 413 U.S. 472, 480 (1973) ("a regular program of traditional internal testing designed to measure pupil achievement" plays an "obviously integral role . . . in the total teaching process"); *Schware v. Bd. of Bar Exam.*, 353 U.S. 232, 239 (1957) ("A State can require high standards of qualification, such as . . . proficiency in its law, before it admits an applicant to the bar . . . .").  Several of the District's experts testified to that effect.

---

[1]  The questions are not difficult.  Consider, for example, Question 3:

> Firearms may be lawfully discharged on public space in the District of Columbia:
> (A)   Into the air on New Year's Eve.
> (B)   At registered turkey hunts on Thanksgiving.
> (C)   After obtaining a special written permit from the Chief of Police authorizing the weapon to be discharged on public space.

8

*See* Lanier Decl. ¶¶ 23–24; Jones Decl. ¶ 23; Webster Decl. ¶ 35; Lanier Test. 2; Jones Report 10. Under intermediate scrutiny, the District does not need to cite empirical studies for the common-sense notion that mandatory testing promotes knowledge of, and obedience to, its laws. *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) ("[W]e have permitted litigants . . . even[] in a case applying strict scrutiny, to justify restrictions based *solely* on history, consensus, and 'simple common sense.' " (quoting *Went For It*, 515 U.S. at 628 (emphasis added)); *Nat'l Cable & Telecomms. Ass'n v. FCC*, 555 F.3d 996, 1002 (D.C. Cir. 2009) (we do not require "exhaustive evidence documenting the necessity of [a given law]" and we have "relied on [the legislature's] reasonable, commonsense determination that [the law is] required"). *See generally Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000) ("The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised.").

The plaintiffs do not identify any alternative means by which the District can achieve its goals. Their implied alternative—no test at all—is plainly lacking. Given the uniqueness and complexity of the District's firearms laws, it has an especially pressing need to educate its citizens about their contents. Under intermediate scrutiny, the District can "add[] a prophylaxis to the law," even if it "focuses upon behavior already arguably proscribed by other laws." *Time Warner*, 211 F.3d at 1320; *see also United States v. Mahin*, 668 F.3d 119, 127 (4th Cir. 2012) ("The Second Amendment does not disable Congress and the states from erecting *preventative* measures . . . ." (emphasis added)). Granted, in criminal cases, courts usually presume that individuals know the law. *See McFadden v. United States*, 135 S. Ct. 2298, 2304 (2015) ("[I]gnorance of the law is typically no defense

9

to criminal prosecution . . . .").  But this presumption is a legal *fiction*, not an accurate description of the world.  *See McBoyle v. United States*, 283 U.S. 25, 27 (1931); *see also* JOHN SELDEN, TABLE-TALK 174 (Constable & Co. 1827) ("Ignorance of the law excuses no man; *not that all men know the law*, but because 'tis an excuse every man will plead, and no man can tell how to confute him." (emphasis added)).  All too often, individuals do *not* know the law and legislatures do well to ensure they are informed before they can own and use a dangerous weapon.

In sum, I believe the District's knowledge test satisfies intermediate scrutiny.  It ensures a gun owner has a basic understanding of the District's firearms laws—laws that unquestionably promote the public safety.

## B.  Presenting the Firearm

The Metropolitan Police Department (MPD) can require a potential registrant to present his firearm for inspection. D.C. CODE § 7-2502.04(c).  The law has an obvious, straightforward purpose: verification.  *See* Appellees' Br. 47– 48; Defs.' Summ. J. Reply Br. 25 n.21.  The MPD wants to conduct a physical inspection to "verify that the application information is correct and that the firearm has not been altered."  Appellees' Br. 47–48; *see* 24 DCMR § 2313.8(c) ("The Director may require an applicant to return with the firearm if . . . the information relating to the weapon on the application [appears] incorrect, misleading, or incomplete."). It also wants to ensure the firearm is in safe operating condition and does not belong to a prohibited class of weapons.  *See* 24 DCMR § 2313.8(b) ("The Director may require an applicant to return with the firearm if . . . the firearm may be unregisterable, defective, or in a dangerous condition or state of disrepair.").

10

The plaintiffs contend, and my colleagues agree, that physically inspecting a firearm is unnecessary because no one would both register a firearm and lie about its physical characteristics—they would simply decline to register it in the first place. *See* Maj. Op. 21. But the present-the-firearm requirement is not targeted at falsehoods only; the District is also worried about innocent mistakes. *See* 24 DCMR § 2313.8(c) ("The Director may require an applicant to return with the firearm if . . . the application [appears] *incorrect . . .* or *incomplete*." (emphases added)). And many registrants will not be aware that their firearm is unsafe to operate or ineligible to be registered, *see id.* § 2313.8(b), until they present it and allow the MPD to take a closer look.

The plaintiffs further contend that the District's interest in verification is outweighed by the burdens that presenting the firearm imposes on registrants. According to the plaintiffs, a person who presents his firearm to the MPD could be arrested, have his gun stolen or be mistaken for an assailant. These risks, in my mind, are quite overblown. For starters, it is not a crime to transport a firearm to the MPD for the purpose of registering it. *See* D.C. CODE §§ 22-4504.01; 22-4504.02(a); 18 U.S.C. § 926a. Moreover, registrants are instructed to leave their firearm at home unless asked to present it, 24 DCMR § 2313.7, and must transport the firearm "in accordance with [section] 22-4504.02," D.C. CODE § 7-2502.04(c)—*i.e.*, unloaded, stored in a locked container, separate from any ammunition and inaccessible to the driver and any passenger, *see id.* § 22-4504.02(b)–(c). These provisions minimize the risk of an accident. And any remaining risk of theft or misunderstanding is an *inherent* feature of owning a firearm—not a unique problem created by the District's laws.

11

Accordingly, I believe the present-the-firearm requirement satisfies intermediate scrutiny. It imposes a slight burden on registrants and allows the District to verify that the firearm is described correctly, has not been altered, is safe to operate and is eligible for registration.

## C. Re-Registration

The District's registration certificates expire every three years. *Id.* § 7-2502.07a(a). Thus, a gun owner who wants to maintain his registration must periodically renew it. *Id.* Renewal is "simple" by design. Comm. Report 10. The registrant fills out a two-page form online, by mail or in person. D.C. CODE § 7-2502.07a(c). The form includes a questionnaire to determine whether the registrant remains qualified to possess a firearm and requests his current address and an attestation that he continues to possesses the firearm. *See* Firearms Registration Renewal Application, METRO. POLICE DEP'T, *available at* http://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/Firearms%20Registration%20Renewal%20Form%2012.18.13.pdf (last visited September 17, 2015).[2] The District reminds a registrant to renew his certificate ninety days in advance, D.C. CODE § 7-2502.07a(e)(1), and gives him a ninety-day grace period after

---

[2]    To renew the certificate for a firearm registered before January 1, 2011, a registrant must also appear in person and be fingerprinted. *See* 24 DCMR § 2326.2. This process is a one-time requirement and does not apply to subsequent renewals. *See* Firearms Registration Renewal: Complete Renewal Procedures, METRO. POLICE DEP'T, *available at* http://mpdc.dc.gov/page/firearms-registration-renewal-complete-renewal-procedures (last visited September 17, 2015) ("Subsequent registration renewals will be done online or by mail."). It is constitutional for the same reasons that the re-registration, fingerprinting and in-person appearance requirements are constitutional.

12

the renewal period expires, *see* 24 DCMR § 2326.4.  Re-registration serves several purposes.  It promotes public safety by allowing the District to monitor whether a gun owner has fallen into a class of people who cannot legally possess a firearm (*e.g.*, felons, the mentally ill, subjects of protective orders).  *See* Comm. Report 4, 11–12; Jones Decl. ¶ 23; Lanier Decl. ¶ 21; Vince Decl. ¶ 22; Webster Decl. ¶ 30.  And it keeps the District's firearms registry up to date.  *See* Comm. Report 4, 10.  The MPD needs updated information, including the registrant's most recent address, so that it knows where to retrieve the firearm if the owner becomes disqualified to possess it.  *See* Lanier Decl. ¶ 21; Webster Decl. ¶ 30; *see also* Appellees' Br. 48 ("The District . . . has a population that is significantly more transient than other states.").  Moreover, re-registration helps combat the loss and illegal transfer of firearms by requiring a registrant to account for his weapons on a regular basis and by providing MPD with "up-to-date information about the firearm's last legal whereabouts." Comm. Report 11; *see also id.* at 8, 10; Webster Decl. ¶ 30.

The plaintiffs argue that the District could achieve each of these goals with less burdensome alternatives.  As for ensuring that a registrant does not fall into a disqualified class, the plaintiffs note that the District is free to run background checks whenever it pleases.  Yet background checks are less efficient and effective than a universal re-registration requirement, the latter ensuring that *everyone* remains eligible to own a firearm.  *See* Jones Decl. ¶ 24 (re-registration provides "mandatory accountability to . . . public safety officials"); *id.* at ¶ 23 (re-registration "compels a systemic review of all legally registered firearms and registrants").  "Of course, administrative convenience and economic cost-saving are not, by themselves, conclusive justifications for burdening a constitutional right under intermediate scrutiny.  However, such considerations are

13

*relevant* to [the Second Amendment analysis]." *Bonidy*, 790 F.3d at 1127 (emphasis added).  At bottom, the District needs to show that re-registration does not burden "substantially more [rights] than is necessary," not that it is the "least intrusive means" of keeping tabs on gun owners.  *McCullen v. Coakley*, 134 S. Ct. 2518, 2535 (2014) (quoting *Ward*, 491 U.S. at 798–99).  Assuming they could reveal all the reasons someone might become disqualified to possess a firearm (a dubious proposition, *see generally* D.C. CODE § 7-2502.03(a)), I fail to see how dragnet background checks are "substantially" less burdensome than filling out a two-page form every three years.  *McCullen*, 134 S. Ct. at 2535. Moreover, background checks plainly do not further the District's interests in updating its firearms registry and promoting accountability of gun owners.

As for the latter interests, the plaintiffs point out that a gun owner is already required to notify the District if he changes his address or loses his firearm.  *See* D.C. CODE § 7-2502.08(a).  But the District tried to rely on registrant notification for several years and the experiment failed. According to the Committee Report, "[relying on notification alone] has not been effective.  Thousands of registrants have moved, died, disposed of their guns (or perhaps lost them) and have not notified MPD. . . .  [M]any registrants cannot be located."  Comm. Report 10; *see also* Jones Decl. ¶ 24. Instead of continuing to depend on registrant-initiated notification, the District's re-registration requirement provides "mandatory accountability" by forcing a registrant to update his information under threat of cancellation.  Jones Decl. ¶ 24; *see also* Vince Decl. ¶ 22; Webster Decl. ¶ 30 (re-registration "is analogous to the widely-accepted Federal requirement that licensed gun dealers be audited periodically to make sure that they can account for their firearms").  This is a permissible alternative under intermediate scrutiny.  *See Nat'l Cable &*

14

*Telecomm'ns Ass'n*, 555 F.3d at 1002 (affirming opt-in scheme because "opt-out is only marginally less intrusive than opt-in" and agency "carefully considered the differences between the[] two" and made "reasonable, commonsense determination" (citation omitted)).  "[T]he Constitution does not require that the [District] choose ineffectual means." *Rosario v. Rockefeller*, 410 U.S. 752, 762 n.10 (1973).

My colleagues do not believe the re-registration requirement deters the loss or illegal transfer of firearms because it does not require a registrant to produce the gun; it "requires only that [he] affirm that he still has [it]."  Maj. Op. 23.  In other words, my colleagues believe registrants will not be truthful on their re-registration forms.  The plaintiffs do not make this argument in their briefs, however, so we need not— indeed, *should* not—consider it.  *See Schrader*, 704 F.3d at 991–92.  Nor is the argument persuasive.  A re-registrant must attest, under penalty of perjury, that he still possesses the firearm.  *See* Firearms Registration Renewal Application, *supra*, at 11.  In my view, the District reasonably assumes that most re-registrants will tell the truth.  *Cf. Rehberg v. Paulk*, 132 S. Ct. 1497, 1505 (2012) (threat of perjury prosecution adequately deters false testimony).

In short, I believe the District's re-registration requirement passes constitutional muster.  It imposes only minimal burdens on Second Amendment rights and simultaneously satisfies the District's interests in preventing disqualified people from owning firearms, keeping the firearms registry up-to-date and deterring the loss and illegal transfer of firearms.

### D.  One Pistol Per Thirty Days

The District prohibits a registrant from registering more than one pistol in the same thirty-day period.  D.C. CODE § 7-

15

2502.03(e); 24 DCMR § 2305.3; *see also* D.C. CODE § 7-2501.01(12) (defining "pistol" as "any firearm originally designed to be fired by use of a single hand or with a barrel less than 12 inches in length").  This limitation does not apply to an individual who relocates to the District and wants to register pistols he lawfully owned in another jurisdiction for at least six months.  D.C. CODE § 7-2502.03(e); 24 DCMR § 2305.4.[3]  The parties agree that the purpose behind the one-pistol-per-thirty-days rule is to stem the illegal trafficking of handguns.  *See* Comm. Report 10, 14–15.

The plaintiffs argue, however, that the one-pistol-per-month limitation does nothing to further this goal.  No one, they point out, would bring pistols into the District, register them and then traffic them.  The person would simply never register the pistols at all.  But the plaintiffs focus on the wrong side of the equation.   The one-pistol-per-thirty-days limitation is directed at the *supply* side, rather than the demand side, of illegal handgun trafficking.  As stated in the Committee Report:

> The law burdens gun traffickers and the straw purchasers they hire to supply them with guns, and it makes it more difficult for the rare dirty gun dealer who is willing to look the other way when a single individual walks in to his store asking to buy five or 10 or even 20 or more inexpensive handguns to be sold on the street.

Comm. Report 16 (quoting Douglas Weil, *A Law that Gun-Rights Advocates Should Be Fighting to Keep*, WASH. POST

---

[3]  And the one-pistol-per-thirty-days limitation applies to the initial registration only; an individual can simultaneously *re*-register as many pistols as he wants.  *See* 24 DCMR § 2305.3.

16

(Feb. 17, 2012), http://www.washingtonpost.com /opinions/a-law-that-gun-rights-advocates-should-be-fighting-to-keep/2012/02/16/gIQAvcASKR_story.html); *see also* Jones Decl. ¶ 18; Lanier Decl. ¶ 29; Vince Decl. ¶ 17. In other words, the one-pistol-per-thirty-days limitation deters dealers from selling more than one handgun at a time because they know multiple handguns cannot be registered and, thus, cannot be possessed or used for a lawful purpose. The Committee Report points to Virginia as an example of a jurisdiction that, after enacting a similar law, successfully reduced illegal handgun trafficking. *See* Comm. Report 15–16; *see also* Jones Decl. ¶ 19. True, notwithstanding the one-pistol-per-thirty-days limitation, a firearms trafficker could acquire handguns from *another* jurisdiction and transport them into the District. *See* Maj. Op. 27. But the law nonetheless deters the rapid acquisition of multiple firearms *within* the District. *See* Comm. Report 16 ("Since other states permit multiple gun sales—including, now, Virginia—our District law remains important. Indeed, the other states should follow, so as to erect a wide web to frustrate the traffickers.") The District need not—indeed, *cannot*—solve problems created by the relatively lax firearms laws in other jurisdictions. *Cf. Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1668 (2015) (even under strict scrutiny, "[a] State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns").[4]

---

[4]    My colleagues point out that the sources cited in the Committee Report discuss limitations on the *purchase*, not the registration, of handguns. *See* Maj. Op. 27. The plaintiffs, however, do not make this argument and I do not believe we should do so on their behalf. *See Schrader*, 704 F.3d at 991–92. Even if we did, I think any distinction between purchase and registration is immaterial. Because the District prohibits the possession of

17

Given the record evidence supporting it, the one-pistol-per-thirty-days limitation is constitutional—a conclusion that is bolstered by the fact that it imposes very little burden on Second Amendment rights. The plaintiffs contend—and my colleagues suggest, *see* Maj. Op. 27–28—that an individual has as much constitutional right to a second pistol as he does the first. They note that the Second Amendment discusses the right to keep and bear "Arm*s*," plural. *See id.* But I doubt their textual point has much force: the Second Amendment also uses the word "people," plural, so the "s" on "Arms" is grammatically necessary. And *Heller* does not support their position either. The "core" of the Second Amendment is the right to use a firearm for self-defense in the home, *Heller*, 554 U.S. at 630—a right that is vindicated with *one* handgun. The plaintiffs' position has no stopping point: it would authorize everyone to possess his own Rambo-style armory. *Cf. id.* at 627 (noting that Second Amendment does not protect right to form "*effective*" militia (emphasis added)). In any event, we need not decide whether the Second Amendment protects the right to a second firearm as much as the first firearm because, even assuming it does, the one-pistol-per-month limitation is only a small (and temporary) limit on Second Amendment rights. It imposes a thirty-day waiting period on the right to acquire a second pistol—an acceptable burden, given the availability of the first pistol, the availability of other firearms and the deadly costs of illegal handgun trafficking. *Cf. Rosario*, 410 U.S. at 760–62 (requiring party registration eight months in advance of presidential primary is constitutional means of preventing one party's voters from designating themselves as another party's voters).

---

unregistered firearms, D.C. CODE § 7-2502.01(a), a limitation on registration is the functional equivalent of a limitation on purchases.

18

In conclusion, I agree with my colleagues' decision to uphold the District's long-gun registration, registration fee, in-person appearance, photographing, fingerprinting and training requirements. Those parts of the majority opinion display proper deference to the District in its ongoing efforts to formulate a workable firearms policy for our Nation's capital. I believe my colleagues too readily abandon this approach, however, with respect to the knowledge test, present-the-firearm, re-registration and one-pistol-per-thirty-days requirements. Accordingly, I respectfully dissent in part.