DECIDED ON SEPTEMBER 18, 2015

No. 14-7071

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

DICK ANTHONY HELLER, ABSALOM JORDAN,
WILLIAM CARTER, WILLIAM SCOTT, and ASAR MUSTAFA,

*Appellants*

v.

THE DISTRICT OF COLUMBIA and
MURIEL BOWSER, Mayor, District of Columbia,

*Appellees*

_____

APPELLANTS' OPPOSITION TO APPELLEES' PETITION
FOR REHEARING AND FOR REHEARING EN BANC

_____

Appeal from the U.S. District Court
for the District of Columbia
District Ct. Civil No. 08-1289 (JEB)

| | |
|---|---|
| Stephen P. Halbrook | Dan M. Peterson |
| 3925 Chain Bridge Road, Suite 403 | Dan M. Peterson, PLLC |
| Fairfax, VA  22030 | 3925 Chain Bridge Road, Suite 403 |
| (703) 352-7276 | Fairfax, VA  22030 |
| protell@aol.com | (703) 352-7276 |
| | dan@danpetersonlaw.com |

*Counsel for Appellants*

This Court previously remanded this case to require the District to "establish a tight 'fit' between the registration requirements and an important or substantial governmental interest, a fit 'that employs . . . a means narrowly tailored to achieve the desired objective.'" *Heller v. District of Columbia*, 670 F.3d 1244, 1258 (D.C. Cir. 2011) (citation omitted). Thus, "the District needs to present some meaningful evidence, not mere assertions, to justify its predictive judgments." *Id.* at 1259.

In its post-remand decision, this Court upheld several provisions but also held that four provisions fail the above test and violate Second Amendment rights: 1) the prohibition on registering more than one pistol in a 30-day period; 2) the requirement of passing a test on District firearm laws; 3) the requirement to bring the firearm to the Metropolitan Police Department ("MPD"); and 4) the provision voiding one's registration every three years and requiring re-registration.

A petition for rehearing *en banc* must show that the panel decision conflicts with a decision of the U.S. Supreme Court or this Court and that consideration by the full court is necessary for decisional uniformity, or that the proceeding involves a question of exceptional importance, such as a conflict with other circuits. Fed. R. App. P. 35(b)(1). The Petition does neither.

The Petition begins with several irrelevant arguments. It states: "In the District, gun crimes in June and July 2015 went up nearly 30% from the same time last year, and by September 2015, the number of homicides surpassed the total for

2014." Petition for Reh. & Reh. *En Banc* ("Pet.") 2. The four provisions held invalid were all *in effect* during this time period, and did nothing to prevent these increases.

The District asserts that the perpetrator of the recent mass shooting at Umpqua Community College in Roseburg, Oregon, bought his firearms "in compliance with federal law" and that "Oregon does not have its own firearms-registration scheme that could have provided an important backstop against the actions of the shooter." Pet. 1-2. The District fails to identify any provision of its registration requirements, particularly those at issue here, which would have prevented those murders. All six empirical studies on the subject show that firearm registration has no effect in reducing crime. *See* Declaration of Gary Kleck, Ph.D., JA 699-704, 708-09 (summarizing studies).

The District reaches further afield by declaring that "28 mass shootings" took place in the U.S. in the 30 days since this Court's decision. Pet. 1 (citing a Wiki posting). Contrary to that claim, criminologist James Alan Fox writes:

> According to a careful analysis of data on mass shootings (using the widely accepted definition of at least four killed), the Congressional Research Service found that there are, on average, just over 20 incidents annually. More important, the increase in cases, if there was one at all, is negligible. Indeed, the only genuine increase is in hype and hysteria.[1]

---

[1] James Alan Fox, "Umpqua shooting – a tragedy, not a trend," http://www.usatoday.com/story/opinion/2015/10/02/umpqua-community-college-shooting-oregon-mass-shooting-fbi-statistics-column/73199052/. See William J.

2

The District asserts that this case involves questions of "exceptional importance," but cites no decision by any court of appeals that conflicts with the panel decision. Pet. 2. That is because, with the exception of the one handgun a month limitation, not a single state nationwide has provisions like those at issue. The District's extraordinarily restrictive laws continue a pattern that led the Supreme Court to observe: "Few laws in the history of our Nation have come close to the severe restriction of the District's handgun ban." *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008).[2] Hawaii, the only state that requires registration of all firearms, has none of the four provisions invalidated here.[3]

The District is an outlier in prohibiting the registration of more than one pistol in a 30-day period. Yet we are told that the ruling invalidating this provision "is exceptionally important by itself" because nothing is left "to slow the pace at which a resident may accumulate guns" to the point of having an "arsenal." Pet. 2-3. While the lack of such restriction is the norm nationwide, the District fails to

---

Krouse *et al.*, *Mass Murder with Firearms: Incidents & Victims, 1999-2013* 12 (Congressional Research Service 2015), http://fas.org/sgp/crs/misc/R44126.pdf.

[2] "[C]ourts, including the *Heller* Court, were willing to consider the rarity of state enactments in determining whether they are constitutionally permissible." *Kerr v. Hickenlooper*, 744 F.3d 1156, 1178 (10th Cir. 2014).

[3] "Hawaii and the District are the only states [*sic*] that require all firearms to be registered." D.C. Council, Com. on Public Safety & the Judiciary, Report on Bill 17-843, "Firearms Registration Amendment Act of 2008" 3 (2008). JA 124. See Haw. Rev. Stat. § 134-2 (permit to acquire firearms), § 134-3 (registration of firearms).

identify any "arsenals" that have been used to harm the public.

The District claims that the panel decision is "inconsistent with both Circuit and Supreme Court precedent requiring deference to the legislature," Pet. 3, but no such conclusion is warranted by the two cases cited.

*Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013), simply noted about firearm regulations that the legislature is better equipped to make "public policy judgments," but that such judgments must be "within constitutional limits."  That is a truism about legislation on all subjects, and is derived from the statement of that rule in *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 666 (1994), that the deference accorded to legislative predictive judgments does not "foreclose our independent judgment of the facts bearing on an issue of constitutional law." Moreover, under intermediate scrutiny, the government must "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* at 664.

The District's bare-bones mention of *Schrader* and *Turner* does not come close to meeting the criterion for *en banc* rehearing in Fed. R. App. P. 35(b)(1)(A). The District does not claim that the panel stated any rule or principle incorrectly, but is simply dissatisfied that four of its provisions were found wanting.

Automatic deference to the legislature is urged because "Firearm policy is a complex and dynamic issue implicating vast amounts of data . . . ." Pet. 6, quoting

4

Dissenting Op. 3. *Heller* rejected this "judge-empowering 'interest-balancing inquiry'" as inappropriate for an enumerated constitutional right. *Heller,* 554 U.S. at 634. *McDonald v. City of Chicago*, 561 U.S. 742, 790-91 (2010), denied "that incorporation will require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise." It rejected a plea "to treat the right recognized in *Heller* as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees . . . ." *Id*. at 780. The District's entreaties for "deference" and "judicial humility" (Pet. 3, 5-6, 13, 15) are misplaced when encroachments are made on a fundamental constitutional right.

The District states: "Because these four provisions are central features of the District's firearms-registration scheme, the case should be reheard." Pet. 6. While that is not a valid reason under Rule 35 for rehearing, these provisions are hardly "central features" of the registration scheme. Prohibiting registration of more than one pistol per month and cancelling registrations every three years *inhibit* firearm registration. The mandate to bring the firearm to MPD could endanger public safety. These provisions were first enacted post-*Heller* in 2008, although the District had registration schemes in place since 1968. Nor has the District shown that the test requirement enhances public safety.

The four provisions have no effect on crime because they only restrict law-

abiding citizens who register firearms. Nearly all crimes committed with firearms involve unregistered firearms.[4]

The registration system as a whole admittedly does not prevent violent crimes or assist in solving them. The District conceded: "It is not clear (to the District) how firearms' registration records could be used to 'prevent' a crime." JA 442. Lt. Jon Shelton, branch commander over the Firearms Registration Section for some 20 years (JA 498), was unaware of any instances where registration records were used to solve a crime other than possessory offenses. JA 442. The four invalidated provisions cannot prevent or solve violent crimes if the registration system of which they are a part does not do so.

**1. The Prohibition on Registration of More than One Pistol in 30 Days**

The panel invalidated the prohibition on registering more than one pistol in a 30-day period, D.C. Code § 7-2502.03(e). The District has yet to explain why anyone would bring multiple handguns into the District and then register them before illegally trafficking them. In an understatement, Chief Lanier agreed that it "is not a likely scenario" that, absent the restriction, "someone would purchase

---

[4] From 2007 through early 2013, MPD recovered more than 12,000 unregistered firearms. Only 36 registered firearms owned by private individuals and associated with crime scenes were recovered in roughly the same period. Of 17 registrants charged with crimes, only two were convicted of a crime of violence apparently involving a firearm, and only seven others were convicted or put on probation for any offense. See Brief for Appellants 6 (citing MPD data).

multiple guns . . . , register them all with the [police], and then turn around and sell those guns illegally . . . ." JA 938.

It is no explanation to assert that the restriction "is directed at the *supply* side, rather than the demand side, of illegal handgun trafficking" by making it harder for "the rare dirty gun dealer" to allow someone to buy several handguns for resale. Pet. 7, quoting Dissenting Op. 15. Because it is illegal for a licensed firearm dealer to sell a handgun directly to anyone who resides outside the dealer's state, 18 U.S.C. § 922(b)(3), all handgun sales to District residents must be made through a licensed dealer in the District. Moreover, any transfer of a handgun within the District must go through a licensed dealer. D.C. Code §§ 7-2505.01, 7-2505.02(a).

There is only one licensed dealer for sales to District residents, Charles Sykes, whose premises are located at MPD headquarters. JA 529-31. To posit that Mr. Sykes would peddle unregistered handguns is a fantasy, especially since (1) he stocks no inventory (JA 378), and (2) he cannot transfer a handgun until *after* the purchaser presents the approved registration form. D.C. Code § 7-2505.02(c).

The District next seeks to justify the restriction by an argument never suggested in its Council committee reports, but by a retired ATF agent[5] – that "the most effective method of limiting misuse of firearms . . . is to limit the number of

---

[5] "In this case the experts' explanation of the connection between their experience and their conclusions was sometimes fatally sparse." Maj. Op. 10.

firearms present in a home." Pet. 7, citing JA 349. No significant misuse of *registered* firearms exists. JA 443, 541, 572-73; see n.4, *supra.* Limiting the misuse of firearms requires disarming criminals and incarcerating violent recidivists.⁶

The panel decided that the District's argument "does not justify restricting an individual's undoubted constitutional right to keep arms (plural) in [the] home, whether for self-defense or hunting or just collecting, because, taken to its logical conclusion, that reasoning would justify a total ban on firearms kept in the home." Maj. Op. 27-28. The District responds with an argument similar to one rejected by *Heller*⁷ – that the restriction does not "meaningfully affect anyone's ability to defend himself." Pet. 8. The District could just as well argue that it may limit possession to just one gun.

As for the Second Amendment's reference to the right to have "arms," not just one, the District avers that the "Amendment also uses the word 'people,' plural, so the 's' on 'Arms' is grammatically necessary." Pet. 8 n.5, quoting

---

⁶ As Chief Lanier testified in her deposition: "Q: Do most people who regularly engage in criminal activities in the District register their guns? A: No." JA 573.

⁷ "It is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed." *Heller,* 554 U.S. at 629. "The District contends that since it only bans one type of firearm, . . . its prohibition does not implicate the Second Amendment . . . . We think that argument frivolous. It could be similarly contended that all firearms may be banned so long as sabers were permitted." *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007) (aff'd by *Heller*).

8

Dissenting Op. 17. But "the Second Amendment right is exercised individually," *Heller,* 554 U.S. at 581, and "the right of the people" elsewhere also refers to freedoms of each individual. U.S. Const., Amends. I ("the right of the people peaceably to assemble") & IV ("The right of the people to be secure . . . against unreasonable searches and seizures"). Nothing about the term "the people" limits the number of "arms" a person may legitimately acquire to one in a 30-day period.

No precedent is cited for this gun rationing argument, which would never fly in the field of First Amendment rights.[8] A person may wish to acquire more than one pistol within 30 days for any number of legitimate reasons besides self-defense, such as hunting, investment, inheritance, collecting, or otherwise. See *Heller*, 554 U.S. at 583 & n.7. The District cites cases on a very different subject, the concealed carrying of guns in public. Pet. 9, citing *Woollard v. Gallagher*, 712 F.3d 865, 879-80 (4th Cir. 2013) (discussing a law that "reduces the number of handguns carried in public"). But the District itself acknowledges the difference in the issues between keeping at home and carrying in public by requiring a "good reason" for the latter. Pet. 9 n.6.

Despite the general lack of laws nationwide like the District's, the District fears that without its provision everyone may "possess his own Rambo-style

---

[8] *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417-18 (1993) (rejecting argument that "every decrease in the number of such dispensing devices [newsracks with commercial handbills] necessarily effects an increase in safety").

9

armory." Pet. 8, quoting Dissenting Op. 17. That is a far cry from the attempt by Plaintiff Absalom Jordan to register two pistols at the same time. JA 20, 848. The District's position is undercut by its admission that the prohibition "does not apply to individuals moving into the District who wish to register all of their firearms at once." Pet. 6-7, citing D.C. Code § 7-2502.03(e).

### 2. The Knowledge-of-the-Law Test

The panel invalidated the requirement that the applicant pass a test on knowledge of D.C. firearm laws, D.C. Code § 7-2502.03(a)(10), but upheld the requirement of a firearms training and safety class. § 7-2502.03(a)(13). While no state requires a knowledge-of-the-law test merely to possess a firearm, the District argues that no alternative exists for ensuring that firearm owners know its gun laws. Pet. 10.

Persons are presumed to know the law on countless subjects and strong incentives exist to ensure that they do so – the threat of fines, imprisonment, and loss of rights being prominent. Information on the District's laws is readily available on MPD's website.[9] The District produced no evidence that its test enhances public safety or even knowledge of the law.[10]

---

[9] E.g., *Firearms Registration—General Requirements and Study Guide*, http://mpdc.dc.gov/service/firearm-registration-district-columbia.

[10] One multiple choice question is: "3. Firearms may be lawfully discharged on public space in the District of Columbia: (A) Into the air on New Year's Eve. (B)

*Edwards v. District of Columbia*, 755 F.3d 996, 1002 (D.C. Cir. 2014), invalidated the District's exam for tour guides in part because "the record is 'utterly devoid' of evidence that the burdens of studying for and passing the 100-question exam 'do anything at all to advance a legitimate government objective.'" "The District rehearses a plethora of harms it claims to forestall with the exam requirement," but "the record contains no evidence" of a real problem. *Id*. at 1003. The same is true here.

### 3. Bringing the Firearm to MPD

No law of the United States or of any state has an equivalent of the District's provision that a person may be required to bring a firearm to MPD in order lawfully to possess it. D.C. Code § 7-2502.04(c). Not one word was uttered to give any reason for the requirement in a committee report or by an MPD witness. The District asserts that "[t]he Council determined" that bringing the firearm to MPD allows police "to verify that the information on the registration application was correct and that the firearm had not been altered." Pet. 11, citing Br. 47-48. The Council said no such thing – Appellees' Brief invented those reasons.

There is no record evidence that incorrect applications or altered firearms are a problem, or that the District was concerned about "innocent mistakes." Dissenting Op. 10. No reason exists to falsify information, which would leave the

---

At registered turkey hunts on Thanksgiving. (C) After obtaining a special written permit from the Chief of Police. . . ." Dissenting Op. 7 n.1; JA 832.

registrant unprotected.

We now hear two new reasons – to "ensur[e] that the firearm is in safe operating condition and can be legally owned in the District." Pet. 12, citing Dissenting Op. 9. Nothing in the record suggests that the police test-fire the guns or conduct any safety checks. Nothing in the record indicates that police examine firearms to see if they can be legally owned. That determination is made on the application to register, which indicates the caliber, make, model, and other information. D.C. Code § 7-2502.03(b)(9). See, e.g., JA 850-54 (applications approved for a pistol and denied for a prohibited rifle model).

The District ignores the risk that a person taking a gun to MPD could be arrested for the felony of carrying a firearm, D.C. Code § 22-4504(a), (a-1), or doing so within 1,000 feet of its numerous "gun free zones." *Id*. § 22-4502.01. As for the risk of being "shot by a police officer seeing a 'man with a gun,'" Maj. Op. 21, the District replies that Appellants "could not cite even one instance" where that took place. Pet. 12. Thankfully not, but they did cite instances in which grave situations occurred from persons going armed into police stations.[11]

Finally, it is argued that "any remaining risk of theft or misunderstanding is an *inherent* feature of owning a firearm . . . ." *Id.*, quoting Dissenting Op. 10. To

---

[11] *See* "Man takes loaded gun into police station," *Washington Post*, Jan. 7, 2015, B4; "4 at Police Center in Washington Die as Gunfire Erupts," *New York Times*, Nov. 23, 1994, http://www.nytimes.com/1994/11/23/us/4-at-police-center-in-washington-die-as-gunfire-erupts.html.

12

the contrary, these risks arise only because registrants must take firearms to MPD.

4. **Voiding Registrations Every Three Years and Re-Registration**

The District has required registration since 1968, D.C. Police Regs., art. 51 (1968), but did not require re-registration, D.C. Code § 7-2502.07a, until after the Supreme Court decided *Heller* in 2008. No law of the United States or any State requires re-registration.[12] Voiding registrations every three years is a trap for the unwary, including the poor, the elderly, and those who travel for extended periods. Possession of an unregistered firearm is punishable by imprisonment for one year and a $1,000 fine. D.C. Code § 7-2507.06. Further consequences are being listed in the Gun Offender Registry (§ 7-2508.01(2)), and being prohibited from possession of a firearm (§ 7-2502.03(a)(2)). The District scoffs at the risks, because "re-registering a firearm is considerably less burdensome then renewing a library card." Pet. 14. No one is thrown into jail for not renewing a library card.

The District claims that re-registration only requires submitting a form online, by mail, or in person. Pet. 13, citing D.C. Code § 7-2502.07a(c). Yet it is requiring many to appear in person at MPD and submit fingerprints and photographs to re-register, even though they already did so when they originally registered. D.C. Mun. Regs. tit. 24, § 2326.2.

---

[12] Hawaii, the only state that requires the registration of all firearms, has no such provision. Haw. Rev. Stat. § 134-3. Nor does the National Firearms Act, which mandates registration of machineguns. 26 U.S.C. § 5841.

13

Throughout this litigation, the District justified re-registration as a way to continue doing background checks. But it can conduct checks any time it pleases without cancelling registrations. Maj. Op. 22. The District claims that it would waste resources to do background checks on persons who left the District, Pet. 13, but produced no such evidence in the record.

The re-registration requirement duplicates information in the original registration and in any notice of changed address or other information filed pursuant to D.C. Code § 7-2502.08(a). The District now claims that the address change provision "was not working," Pet. 14, but presents no evidence of that. It speculates that re-registration "encourag[es] registrants to verify the whereabouts of their firearms," Pet. 14, again with no support in the record.

The District's failure to implement its re-registration requirement for six years after its enactment in 2008 exhibits its insignificance. The Firearms Registration Amendment Act of 2008, D.C. Law 17-372, added the requirement that "Registration certificates shall expire 3 years after the date of issuance unless renewed," that the Chief shall establish a method for "renewal of registrations for all firearms registered prior to March 31, 2009," and that such renewals "shall be completed within 3 years of March 31, 2009." D.C. Code § 7-2502.07a(a), (g) (2008). But when the three years had nearly passed, the District had done nothing to implement such a system. Chief Lanier questioned the benefit of re-registration:

14

> [G]iven limited government resources, establishing and maintaining the systems and processes to regularly track this information may cost more than the potential benefit. . . . This effort needs either to be properly funded, or we need to reconsider whether the city can afford this requirement.

Testimony of Cathy L. Lanier on the Firearms Amendment Act of 2011, Committee on the Judiciary (Jan. 30, 2012). J.A. 192-93. Re-registration was not implemented until 2014, six years after it was originally enacted.

*McCullen v. Coakley*, 134 S. Ct. 2518, 2537 (2014), voided a law that was "truly exceptional" in that no other state had such a law, indicating that the state "has too readily forgone options that could serve its interests just as well, without substantially burdening the kind of speech" at issue. *Id*. The state never "seriously undertook to address the problem with less intrusive tools" or "considered different methods that other jurisdictions have found effective." *Id*. at 2539. Police testimony that the law would "make our job so much easier" was no substitute for narrow tailoring. *Id*. at 2540. Here, too, narrow tailoring is lacking, and automatic deference to what the Council might "think" promotes public safety is inappropriate. Pet. 15. The panel correctly decided that cancelling registrations and requiring re-registration every three years violates the Second Amendment.

## CONCLUSION

This Court should deny Appellees' Petition for Rehearing and Petition for Rehearing En Banc.

Respectfully Submitted,

Dick Anthony Heller
Absalom F. Jordan, Jr.
William Carter
William Scott
Asar Mustafa

By counsel

/s/Stephen P. Halbrook
Stephen P. Halbrook
D.C. Bar No. 379799
3925 Chain Bridge Road, Suite 403
Fairfax, VA 22030
(703) 352-7276
(703) 359-0938 (fax)
protell@aol.com

/s/ Dan M. Peterson
Dan M. Peterson
D.C. Bar No. 418360
Dan M. Peterson PLLC
3925 Chain Bridge Road, Suite 403
Fairfax, VA 22030
(703) 352-7276
(703) 359-0938 (fax)
dan@danpetersonlaw.com

Counsel for Plaintiffs-Appellants

**CERTIFICATE OF SERVICE**

I certify that on November 6, 2015, electronic copies of Appellants' Opposition to Appellees' Petition for Rehearing and for Rehearing En Banc were served on all parties registered through the CM/ECF system.

/s/ Stephen P. Halbrook
STEPHEN P. HALBROOK